# In re Blockbuster Inc. Secs. Litig.

United States District Court for the Northern District of Texas, Dallas Division

April 26, 2004, Decided ; April 26, 2004, Filed

3:03-CV-0398-M (LEAD)

**Reporter**

2004 U.S. Dist. LEXIS 7173 *; Fed. Sec. L. Rep. (CCH) P92,806

In re BLOCKBUSTER INC. SECURITIES LITIGATION

**Disposition:** Defendant's motion to dismiss granted.

**Counsel:** [*1] For Eva Crescente, On Behalf of Herself and All Others Similarly Situated, Plaintiff: Joe Kendall, Provost Umphrey Law Firm, Dallas, TX. Darren J Robbins, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA. Elizabeth J Arleo, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA. Laura M Andracchio, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA. Nadeem Faruqi, Faruqi & Faruqi, New York, NY. Tricia L McCormick, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA. William S Lerach, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA.

For City of Dearborn Heights General Government Employees Retirement System, Plaintiff: Roger F Claxton, Claxton & Hill, Dallas, TX. Andrew Barroway, Schiffrin & Barroway, Bala Cynwyd, PA. Darren J Check, Schiffrin & Barroway, Bala Cynwyd, PA. David A Rosenfeld, Cauley Geller Bowman Coates & Rudman - Melville, Melville, NY. Samuel H Rudman, Cauley Geller Bowman Coates & Rudman - Melville, Melville, NY. Stuart L Berman, Schiffrin & Barroway, Bala Cynwyd, PA.

For Institutional Investors City of Westland Police and Fire Retirement System, Plaintiff: Roger F Claxton, Claxton & Hill, Dallas, TX. Andrew Barroway, Schiffrin & Barroway, Bala Cynwyd, [*2] PA. Darren J Check, Schiffrin & Barroway, Bala Cynwyd, PA. David A Rosenfeld, Cauley Geller Bowman Coates & Rudman - Melville, Melville, NY. Samuel H Rudman, Cauley Geller Bowman Coates & Rudman - Melville, Melville, NY. Stuart L Berman, Schiffrin & Barroway, Bala Cynwyd, PA. Robert J Hill, Claxton & Hill, Dallas, TX.

For John Reynolds, On behalf of himself and all others similarly situated, Consol Plaintiff: Roger F Claxton, Claxton & Hill, Dallas, TX. Robert J Hill, Claxton & Hill, Dallas, TX.

For James D Connors, On behalf of himself and all others similarly situated, Consol Plaintiff: Theodore Carl Anderson, III, Kilgore & Kilgore, Dallas, TX.

For Blockbuster Inc, John F Antioco, Nigel Travis, Larry Zine, Defendants: Karen L Hirschman, Vinson & Elkins - Dallas, Dallas, TX. Kenneth P Held, Vinson & Elkins, Houston, TX.

For James L. House, James R Worlin, Walter P Schroeder, Movants: Thomas E Bilek, Hoeffner & Bilek, Houston, TX.

**Judges:** BARBARA M. G. LYNN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** BARBARA M. G. LYNN

# Opinion

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Amended and Consolidated Complaint, filed on September 22, 2003. The [*3] Court grants Defendants' Motion. The Court dismisses Plaintiffs' Consolidated Amended Complaint, partially with prejudice and partially without prejudice.

## I. BACKGROUND

This is a federal securities class action on behalf of those who purchased Blockbuster securities between February 12, 2002 and December 17, 2002 (the "Class Period"). On December 18, 2002, Blockbuster announced that it would fall short of its prior projections for the fiscal year and fourth quarter of 2002. After this announcement, the price of Blockbuster common stock closed at $ 13.64 per share, compared to the closing price of $ 19.40 per share on December 17, 2002.

Plaintiffs bring suit for securities fraud under Section 10(b) of the Securities Exchange Act, and Rule 10b-5, against Blockbuster and John Antioco, Larry Zine, and Nigel Travis (the "Individual Defendants"). In addition, Plaintiffs bring suit under Section 20(a) of the Securities Exchange Act against the Individual Defendants, as control persons of Blockbuster. Plaintiffs' allegations of fraud fall into six general categories.

The first category is premised on Blockbuster's alleged failure to disclose, and failure to recognize as a contingent [*4] liability, its dispute with Buena Vista Home Entertainment ("Buena Vista"). On December 31, 2002, Buena Vista, a division of Disney, filed suit against Blockbuster, alleging that Blockbuster had breached the terms of their revenue sharing agreement, and seeking more than $ 120 million in damages. Plaintiffs contend that Defendants knew about the dispute with Buena Vista no later than June 20, 2001, and that Defendants should have disclosed the dispute and treated it as a contingent liability in Blockbuster's financial statements.

The second category is premised on Defendants' alleged fraudulent scheme to hide the losses associated with destroying Blockbuster's VHS inventory. On September 10, 2001, Blockbuster announced a merchandising campaign to destroy 25% of its VHS inventory in order to make room for DVDs. Blockbuster announced that the merchandising campaign was completed in 2001. However, Plaintiffs contend that the merchandising campaign was internally referred to as the Merchandise Opportunity Program ("MOP") and that MOP actually continued into 2002. Plaintiffs further contend that the financial statements for the first half of 2002 were inaccurate, because they did not take [*5] into account the costs of the continuing VHS destruction. Although the costs associated with the destruction of VHS inventory would ordinarily have been reflected in Blockbuster's financial statements as merchandise rental costs, Plaintiffs allege that the improperly deferred costs of the merchandising campaign were reflected in the financial statements for the second half of 2002 as merchandise sales costs. Plaintiffs additionally allege that "shrink," which Blockbuster explained was the reason for the increase in merchandise sales costs, was a false explanation.

The third category is premised on Defendants' alleged misrepresentations and omissions relating to whether competition from mass merchants was hurting Blockbuster's business. According to Plaintiffs, the swing from DVD to VHS caused consumers to more frequently purchase, rather than rent, DVDs. Mass merchants sell DVDs for virtually no profit, as a way to attract consumers into their stores, thus hurting Blockbuster's sales of DVDs. Plaintiffs contend that Defendants misrepresented and failed to disclose the effect of this phenomenon on Blockbuster's business.

Fourth, Plaintiffs allege that Defendants misrepresented that [*6] the gross profit margin on DVD rentals was 70%, when it was actually lower, and that Defendants misrepresented that the gross profit margin on DVD rentals was 10 percentage points higher than the gross profit margin on VHS rentals when the gross profit margin on DVD rentals was actually only 3 or 4 percentage points higher.

Fifth, Plaintiffs allege that Defendants misrepresented that Blockbuster was not experiencing problems with its inventory and distribution technology, and that they failed to disclose the actual problems Blockbuster was experiencing with that technology.

Finally, Plaintiffs allege that, because of the Buena Vista dispute, the continuing merchandising campaign, the competition from mass merchants, declining DVD rental margins, and the problems with Blockbuster's technology, Defendants made numerous financial projections without a reasonable basis.

Defendants contend that Plaintiffs' allegations of fraud should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because (1) all of the alleged misrepresentations and omissions are protected by the Private Securities Litigation Reform Act ("PSLRA") safe harbor provision, [*7] as forward-looking statements, (2) the allegedly misrepresented and omitted information is immaterial, (3) application of the fraud-on-the-market theory of reliance is precluded for the alleged failure to disclose the Buena Vista dispute, (4) Defendants did not have a duty to disclose the Buena Vista dispute, (5) Plaintiffs have failed to plead a sufficient factual basis for the alleged misrepresentations and omissions, and (6) Plaintiffs have failed to plead scienter adequately. The Court will analyze each argument in turn.

## II. PSLRA SAFE HARBOR

The PSLRA provides a safe harbor for "any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). If a forward-looking statement is identified as forward-looking and accompanied by meaningful cautionary statements, the statement is not actionable and the defendant's state of mind is irrelevant. *In re Enron Corp. Securities, Derivative & ERISA Litigation,* 235 F. Supp. 2d 549, 575 (S.D. Tex. 2002) [*8] (citing *Harris v. Ivax Corp.,* 182 F.3d 799, 803 (11th Cir. 1999)); *see also* H.R. CONF. REP. NO. 104-369, *reprinted in* 1995 U.S.C.C.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement."). The Court finds that the following statements [1] are protected under the PSLRA safe harbor for forward-looking statements, and thus dismisses Plaintiffs' claims with prejudice to the extent they are premised on these statements:

1. "Going forward, the Company expects rental margins will be enhanced by the continued growth of DVD as a rental format." Am. Compl. P30.
2. "Our plan is to triple our retail share by 2006, increasing our revenues from approximately $ 400 million this year to 9 percent of approximately $ 20 billion or $ 1.8 billion." Am. Compl. P35; 70.

3. "For the full year [2002], gross profit is expected to increase in the mid-single digit range, driven by a combination of sales growth and margin improvement due to growth in higher margin DVD rentals. Additionally, [. [*9] . .] the Company believes that it will achieve double digit EBITDA growth, which will result in significant EPS growth." Am. Compl. P53.
4. "For the full year [2002], gross profit is expected to increase in the mid-single digit range, driven by a combination of sales growth and margin improvement due to growth in higher margin DVD rentals. Additionally, for the full year, the percentage increase in worldwide same store revenues is expected to be in the low to mid-single range. For the full year, the Company believes that it will achieve double digit EBITDA growth, which will result in growth of 2002 EPS over 2001 cash EPS of at least 20%." Am. Compl. P60.

---

[1] For ease of reference, the Court has assigned numbers to the statements excerpted from the Amended Complaint. These numbers do not correspond to the numbered paragraphs in the Amended Complaint.

5. "Given the strengthening in Q2, we expect gross profit to grow in mid-single digit for the quarter and low single digit comp store sales. This growth translates into strong EBITDA growth. We expect the [gross profit] to grow at least in the mid-single range that translates into double digit EBITDA growth. In summary, we are pleased with store operations that set the industry standard in terms (sic) execution and diligence." Am. Compl. P61.

6. "Moving forward, we are strategically positioning Blockbuster to become [*10] a complete source for movies and games with innovative marketing and merchandising initiatives designed to strengthen our rental proposition while increasing our share of the growing retail market." Am. Compl. P69.

7. "During the second quarter of 2002, we increased our focus on the sale of new movies and games to complement our rental offerings and to accommodate increased demand. As a result of this increased focus, we expanded the selection in our stores for DVD and games hardware and software. We expect the strong growth in merchandise sales to continue for the rest of the year and beyond, as we anticipate consumer demand for these products will continue to grow." Am. Compl. P75.

8. "Beginning in August, as a result of the investments we made in product and marketing to initiate new consumer programs, we experienced increased sales momentum in both our rental and retail business. That momentum continues, and we believe positions the company to exceed previous fourth quarter guidance and achieve full-year expectations and double-digit revenue growth in 2003 and beyond." Am. Compl. P78.

9. "In line with current analyst consensus expectations, the Company believes that [*11] it will achieve full-year 2002 EPS growth of approximately 30% over 2001 EPS, excluding charges, of $ 1.01." Am. Compl. P78.

10. "For the fourth quarter, we expect results to exceed current expectations, meaning you can expect analysts (sic) add the three cent shortfall in the third quarter to the full year results, leaving full-year estimates unchanged." Am. Compl. P79.

The definition of "forward-looking statement" includes statements containing a projection of revenues, income, or earnings per share; statements of the plans and objectives of management for future operations; and statements of future economic performance. 15 U.S.C. § 78u-5(i)(1). The ten statements listed above project future growth in rental margins, profits, earnings before interest, taxes, depreciation, and amortization [*12] ("EBITDA"), earnings per share ("EPS"), share of the retail market, and consumer demand--thus qualifying as forward-looking statements under the PSLRA.

A statement that qualifies as forward-looking under the PSLRA is protected by the safe harbor if it is identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" from those in the forward-looking statement. 15 U.S.C. § 78u-5(c)(1)(A)(i). The PSLRA specifically provides that, in the case of an oral forward-looking statement, the aforementioned requirement shall be deemed met if the forward-looking statement is accompanied by a cautionary statement that identifies the statement as forward-looking, states that actual results might differ materially from those projected, and incorporates by reference meaningful cautionary language in a readily available written document. 15 U.S.C. § 78u-5(c)(2). The PSLRA is silent about whether meaningful cautionary language can be incorporated by reference when the forward-looking statement is written, rather than oral. The PSLRA safe harbor is [*13] "based on aspects of . . . the judicially created 'bespeaks caution' doctrine." H.R. CONF. REP. NO. 104-369, *reprinted in* 1995 U.S.C.C.A.N. 730, 742. The Fifth Circuit has characterized the bespeaks caution doctrine as merely reflecting "the unremarkable proposition that statements must be analyzed in context." *Rubinstein v. Collins,* 20 F.3d 160, 167 (5th Cir. 1994). In light of this characterization, the Court concludes that, as long as the reference is clear and explicit so that the referenced cautionary language can fairly be viewed as part of the "context" surrounding the written forward-looking statement, the PSLRA safe harbor for written forward-looking statements can be satisfied by meaningful cautionary language that is incorporated by reference. *See Karacand v. Edwards,* 53 F. Supp. 2d 1236, 1245 (D. Utah 1999) (holding that, because the bespeaks caution doctrine does not require the cautionary language to be in the same document as the alleged misstatement or omission, the PSLRA similarly does not impose such a

requirement). This conclusion is buttressed by the illogic of allowing incorporation by reference into oral statements, when the [*14] listener may mishear or forget the location of the referenced cautionary language, but not allowing incorporation by reference into written statements, when the reader is at significantly less risk of misinterpreting or forgetting.

In order to qualify as meaningful cautionary language, the language must identify important factors that could cause actual results to differ materially from those in the forward-looking statement. 15 U.S.C. § 78u-5(c)(1)(A)(i). In *Harris v. Ivax Corp.,* the Ninth Circuit rejected the plaintiffs' argument that the cautionary language was "mere boilerplate" because it was "detailed and informative" and told "the reader in detail what kind of misfortunes could befall the company and what the effect could be." *Harris v. Ivax Corp.,* 182 F.3d 799, 807 (11th Cir. 1999). Contrary to Plaintiffs' assertion, the cautionary language need not list the specific risk factor alleged to have rendered the forward-looking statement false. *Harris,* 182 F.3d at 807 ("To be 'meaningful,' must the cautionary language explicitly mention *the* factor that ultimately belies a forward-looking statement? We think not. [*15] ") (citing the House Conference Report accompanying the PSLRA).

In order to analyze whether the forward-looking statements alleged in the Amended Complaint are within the PSLRA safe harbor, "the Court must examine piecemeal the statements made by the company as expressed in the pleadings." *In re Enron,* 235 F. Supp. 2d 549, 576 (S.D. Tex. 2002). Therefore, the Court will separately analyze each statement listed above to determine whether it satisfies the PSLRA safe harbor. Each statement is accompanied by language warning the reader that the news release, call, or report contains forward-looking statements, identifying numerous risk factors that could cause the projections to vary, and referencing additional risk factors contained in Blockbuster's annual report. For example, the following language, which accompanies Statement 1, typifies the type of language accompanying Statements 1-10.

> This news release contains forward-looking statements relating to Blockbuster's plans to re-merchandise its stores, including, without limitation, statements related to the following: Blockbuster's plans to increase the presence of DVDs and DVD players in its stores and the [*16] related elimination of slower-moving VHS units and games; Blockbuster's expectations regarding the anticipated financial impact of its re-merchandising efforts; and Blockbuster's intent to implement marketing initiatives to support its increased focus on the DVD format. These forward-looking statements are based on Blockbuster's current intent, expectations, estimates, and projections and are not guarantees of future performance. These statements involve risks, uncertainties, assumptions, and other factors that could cause actual results to vary materially from those expressed in or indicated by them. Factors include, among others: Blockbuster's ability to effectively execute its re-merchandising plans; consumer demand for DVDs and the impact of competitive product and service offerings and pricing; the impact of technological shifts on Blockbuster's business; and other factors, as set forth under the heading "Cautionary Statements" in Blockbuster's annual report on Form 10-K for the fiscal year ended December 31, 2000.

Blockbuster's annual report on Form 10-K for the fiscal year ended December 31, 2000 includes seven pages of cautionary statements, which are incorporated by [*17] reference into the paragraph quoted above. Therefore, the Court finds that the forward-looking statements are identified as such and are accompanied by meaningful cautionary language, thus satisfying the PSLRA safe harbor.

The following statements are forward-looking, but were not identified as such and were not accompanied by cautionary language. Thus, the safe harbor is not satisfied as to these statements:

11. In response to a question about the impact of DVD sales on Blockbuster: "We think the retail business will continue to grow and we think the rental business will continue to grow. . . ." Am. Compl. P54.

12. "I mean, we've got a great business, a great brand . . . we feel comfortable in our ability to grow our business in a meaningful and sustainable way over a long period of time. And if that translates, and hopefully it should, to a higher stock price, then we don't think the upside is over for Blockbuster." Am. Compl. P62.

13. "We really did not know how to compete against retail DVD in 2001. I think we have figured that out, and you will see that reflected in our results for the balance of 2002." Am. Compl. P63.

Defendants argue that, in addition [*18] to the thirteen statements identified above as forward-looking, the Court should treat this entire case as a "forward-looking statements case." Plaintiffs' suit is premised on the drop in stock price that followed Blockbuster's amended financial projections. Therefore, relying on *Harris v. Ivax Corp.* and *Lemmer v. Nu-Kote Holding, Inc.,* Defendants argue that, even if Plaintiffs could show that Defendants made fraudulent misrepresentations and omissions about, for example, the destruction of VHS inventory, those misrepresentations and omissions would be shielded because Plaintiffs complain solely about their effect on Blockbuster's financial projections, which are themselves protected forward-looking statements. In *Harris,* the Ninth Circuit held that a plaintiff could not premise a lawsuit on the absence of a material factor in the cautionary language accompanying a forward-looking statement because "the entire list of factors is treated as a forward-looking statement." *Harris,* 182 F.3d at 807. Similarly, in *Lemmer,* the court found that a plaintiff could not assert a claim for fraudulent omissions of material fact where the plaintiff contended that the [*19] duty to disclose the material fact arose from the forward-looking statements: "That is, she bases her claims on omissions of material fact which Nu-Kote was required to communicate *because* they conflicted with Nu-Kote's vague statements about current operations and predictions about future results. Accordingly, the omissions of material fact on which the Complaint is based are subject to the 'safe harbor' for forward-looking statements." *Lemmer v. Nu-Kote Holding, Inc.,* 2001 U.S. Dist. LEXIS 13978, No. 3:98-CV-0161-L, 2001 WL 1112577, at *5 (N.D. Tex. Sept. 6, 2001) (Lindsay, J.).

The Court agrees with *Harris* that Plaintiffs' claims cannot be premised on the failure to include a risk factor in the cautionary language accompanying a forward-looking statement. Similarly, the Court agrees with *Lemmer* that Plaintiffs cannot assert a claim based on the failure to disclose information if the duty to disclose is premised on the forward-looking statement. However, the Court does not read these cases to suggest that, simply because a representation or omission would affect a forward-looking statement, the representation or omission is non-actionable. If the representation or omission is fraudulent, [*20] independent of the existence of a forward-looking statement, the representation or omission is not shielded simply because a forward-looking statement exists. For example, assume a hypothetical case in which Company X made glowing financial projections and simultaneously fraudulently represented that Company X had entered into a profitable contract. Later, because it had not entered into the profitable contract, Company X was forced to significantly alter its financial projections and Company X's stock price dropped precipitously as a result. If Defendants' argument were accepted, the fraudulent misrepresentation about the profitable contract would not be actionable merely because it affected a financial projection. Therefore, simply by making financial projections, a company would insulate itself from liability for virtually all fraudulent statements and omissions because, in the securities context, material statements and omissions are invariably related, at least tangentially, to a company's current and future financial position. The Court rejects Defendants' argument that this is entirely a "forward-looking statements case." To the extent that Plaintiffs allege that Defendants [*21] made material misrepresentations and omissions that are independently actionable without reference to the protected forward-looking statements, the PSLRA safe harbor does not apply.

## III. MATERIALITY

A misrepresentation or omission of information is material if there is a substantial likelihood that a reasonable investor would consider the information to have significantly altered the total mix of information about investing in the company. *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 361 (5th Cir. 2002). "Generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 869 (5th Cir. 2003). "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable

investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than [*22] specific facts." *In re Sec. Litig. BMC Software, Inc.,* 183 F. Supp. 2d 860, 888. The Court finds Statements 11-13, *supra,* and Statements 14-15, excerpted below, to be mere vague expressions of corporate optimism, and thus dismisses with prejudice Plaintiffs' claims to the extent they are premised on these statements.

> 14. "We undertook a number of key initiatives to strengthen our core business and drive growth in profitability, including re-merchandising our stores to expand our selection of higher margin DVDs and dedicating more of our sales area to high-growth new game formats and promising new business opportunities." Am. Compl. P53.
> 15. "Our first quarter performance speaks to the strengths of our business and validates the strategy that we implemented last year focusing on high-growth game and DVD formats." Am. Compl. P60.

In addition to arguing that many of the statements identified by Plaintiffs are immaterial puffery, Defendants argue that none of the alleged misrepresentations and omissions are material because Plaintiffs have not alleged that they affected Blockbuster's stock price. However, Plaintiffs have alleged that (1) the stock price [*23] dropped when Blockbuster announced that it would fall short of its prior projections and (2) the reason that Blockbuster was unable to meet its prior projections was because of existing problems that were misrepresented or omitted prior to the announcement. Therefore, Plaintiffs have alleged that the stock price dropped as a result of disclosure of the effect of underlying facts that were misrepresented and omitted.

Defendants, relying on *ABC Arbitrage,* contend that this indirect allegation of an effect on stock price is insufficient. In *ABC Arbitrage,* the Fifth Circuit found that the plaintiffs did not plead sufficiently that the alleged misrepresentations and omissions were material because the plaintiffs did not plead that the predictions did not account for known problems and losses. *ABC Arbitrage,* 291 F.3d at 361. Without that, the Court found that no reasonable investor would view the information as significantly altering the total mix of information about investing in the company. *Id.* Then, the Court found that the mere drop in stock price following an announced anticipated failure to meet previous expectations, where misrepresented and omitted [*24] problems allegedly contributed to the failure to meet expectations, was not sufficient to "save" Plaintiffs' claims. *Id.* at 362.

In contrast to the facts in *ABC Arbitrage,* here a reasonable jury could find that a reasonable investor would have viewed the dispute with Buena Vista, the alleged scheme to destroy Blockbuster's VHS inventory, the alleged negative effect of competition from mass merchants, and the alleged misrepresentations about DVD rental margins to have significantly altered the total mix of information about investing in Blockbuster. The Court is not looking to the drop in stock price to establish materiality and "save" Plaintiffs' claims, but rather is analyzing the potential materiality of the allegedly omitted and false information and the impact such had on the restatement. Therefore, the Court rejects Defendants' argument that *ABC Arbitrage* compels the Court to hold that, even if a reasonable jury could find the information allegedly misrepresented or omitted to be material, it is immaterial simply because Plaintiffs have failed to allege that the stock price dropped upon public disclosure of the information.

That this interpretation of [*25] *ABC Arbitrage* is logical is demonstrated by the following hypothetical: Company X makes glowing financial projections for the year and knowingly misrepresents that Company X has entered into a profitable contract. Because the glowing projections are based on the false representations regarding the profitable contract, halfway through the year, Company X is forced to amend its projections, projecting a poor second half of the year. The stock price of Company X plummets. The reason that Company X restates its projections is because the revenue from the unsecured contract is not forthcoming, but Company X does not disclose that this is the reason for the restatement, and manages to keep the true reason secret. If Defendants' argument were accepted, Company X's misrepresentation about the profitable contract would be immaterial and thus non-actionable. The Court does not interpret *ABC Arbitrage* to compel this result. Therefore, the Court rejects Defendants' argument that all of Plaintiffs' claims should be dismissed for failure to allege materiality.

## IV. RELIANCE

Defendants, relying on *Nathenson v. Zonagen,* 267 F.3d 400 (5th Cir. 2001), contend that the [*26] failure to disclose the Buena Vista dispute is not actionable because Plaintiffs rely on the "fraud on the market" theory of reliance and the eventual disclosure of the Buena Vista lawsuit did not negatively affect the stock price. In *Nathenson,* the plaintiffs alleged that the defendants misrepresented that certain medical research trials had produced statistically significant results. *Id.* at 417. The plaintiffs relied on the fraud-on-the-market theory, which is based on the rebuttable presumption that potentially significant publicly disseminated information is reflected in the price of stock traded on an efficient market. Throughout the several months following the defendants' disclosure that the research trials had not produced statistically significant results, the stock price rose. *Id.* at 418. The Fifth Circuit held: "If the market price was not *actually* affected by the statement, reliance on the market price does not *of itself* become reliance on the statement." *Id.* at 419. Therefore, the Court held that the plaintiffs were unable to use the fraud-on-the-market theory to establish reliance and affirmed the district [*27] court's dismissal of the complaint with respect to the alleged misrepresentations. *Id.*

In *Nathenson,* the plaintiffs' suit was premised on affirmative misrepresentations; in the present case, Plaintiffs' suit is premised on a failure to disclose the Buena Vista dispute. "Where the gravamen of the fraud is a failure to disclose, as opposed to a fraudulent misrepresentation, a plaintiff is entitled to a rebuttable presumption of reliance." *Krogman v. Sterritt,* 202 F.R.D. 467, 478 (N.D. Tex. 2001) (Lynn, J.) (relying on *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152-53, 31 L. Ed. 2d 741, 92 S. Ct. 1456 (1972), and *Smith v. Ayres,* 845 F.2d 1360, 1363 (5th Cir. 1988)). Therefore, in the current case, in contrast to *Nathenson,* if here pled, Plaintiffs would be entitled to a rebuttable presumption of reliance rendering the fraud-on-the-market theory of reliance extraneous.

Even if Plaintiffs were to rely on the fraud-on-the-market theory of reliance rather than the rebuttable presumption of reliance, the Court finds that *Nathenson* would be distinguishable if Plaintiffs had sufficiently pled that (1) the stock price dropped on [*28] December 18, 2002 as a result of the amended earnings estimates, (2) the earnings estimates had to be revised to take into account the contingent liability related to the Buena Vista dispute, and (3) the market did not react to the public disclosure of the Buena Vista dispute on January 2, 2003, because the market had already absorbed the effects of the negative information when it reacted to the restated earnings estimates, which were predicated in part on the Buena Vista dispute.

However, Plaintiffs' Amended Complaint pleads neither a presumption of reliance nor a reason why the stock price was unaffected by the public disclosure of the Buena Vista dispute. Therefore, the Court agrees with Defendants that Plaintiffs' pleading of reliance with respect to the failure to disclose the Buena Vista dispute is insufficient. The Court therefore dismisses Plaintiffs' Amended Complaint, without prejudice, to the extent it is premised on the failure to disclose the Buena Vista dispute. In other portions of this Opinion, the Court will identify additional deficiencies in the Amended Complaint with respect to this claim.

## V. DUTY TO DISCLOSE

According to Plaintiffs, Buena Vista notified [*29] Blockbuster no later than June 20, 2001 that Buena Vista viewed Blockbuster as breaching their contract and causing Buena Vista damages of almost one hundred million dollars. Buena Vista did not file suit against Blockbuster until December 31, 2002, which was after the Class Period. However, Plaintiffs allege that Blockbuster should have disclosed its dispute with Buena Vista during the Class Period. Between June 20, 2001, when Blockbuster allegedly learned of the potential for liability to Buena Vista, and December 17, 2002, the end of the Class Period, Blockbuster filed one Form 10-K report and several Form 10-Q reports. Plaintiffs allege that Blockbuster should have disclosed in these reports its potential liability to

Buena Vista and that the financial statements included in these reports violated GAAP because they failed to account for this contingent liability.

Absent a duty to disclose, the failure to disclose information, even if that information is material, is not actionable. *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n.17, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). Plaintiffs allege that GAAP and [*30] Item 303 of Regulation S-K required disclosure of the Buena Vista dispute. Statement of Financial Accounting Standards No. 5 ("SFAS No. 5") requires a charge to income if both of the following conditions are met:

a. Information prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b. The amount of the loss can be reasonably estimated.

Additionally, if no accrual is made for a loss contingency because one or both of the above conditions are not met, SFAS No. 5 provides:

Disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. Disclosure is not required of a loss contingency involving an unasserted claim or assessment when there has been no [*31] manifestation by a potential claimant of an awareness of a possible claim or assessment unless it is considered probable that a claim will be asserted and there is a reasonable possibility that the outcome will be unfavorable.

Finally, Item 303 of Regulation S-K requires the disclosure of known trends, demands, commitments, events, and uncertainties that are reasonably likely to have a materially adverse effect on a company's liquidity, net sales, capital resources, revenues, or income from continuing operations. 17 C.F.R. § 229.303.

Plaintiffs' Amended Complaint fails to allege that, during the Class Period, it was probable or reasonably possible that the Buena Vista dispute would result in a loss, that the amount of the loss could be reasonably estimated, or that the dispute was reasonably likely to have a materially adverse effect on Blockbuster's liquidity, net sales, capital resources, revenues, or income from continuing operations. Therefore, Plaintiffs have failed to allege that Blockbuster had a duty to disclose the Buena Vista dispute during the Class Period. Although the Court is dismissing without prejudice Plaintiffs' claims to the extent [*32] they are premised on the failure to disclose the Buena Vista dispute, this is an additional defect with respect to those claims of which Plaintiffs must take account when repleading, to determine if the claim can legitimately be asserted.

## VI. PSLRA PLEADING REQUIREMENTS

In order to state a claim under section 10(b) of the 1934 Act and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. *ABC Arbitrage,* 291 F.3d at 348. The PSLRA and Federal Rule of Civil Procedure 9(b) require a plaintiff to plead fraud with particularity. The Fifth Circuit describes this requirement as follows:

[A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) &78u-4(b)(3)(A):

(1) specify . . . each statement alleged to have been misleading, *i.e.,* contended [*33] to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent.

This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA. Additionally, under 15 U.S.C. § 78u-4(b)(1), for allegations made on information and belief, the plaintiff must:

(7) state with particularity all facts on which that belief is formed, *i.e.,* set forth a factual basis for such belief.

*ABC Arbitrage,* 291 F.3d at 350.

An allegation is "made on information and belief" when it is not based on a plaintiff's personal knowledge. *Id.* at 351. Since Plaintiffs' allegations are made "based upon the investigation of their counsel" rather than on Plaintiffs' personal knowledge, Plaintiffs must set forth a factual basis for their allegations. Defendants contend that Plaintiffs' [*34] Amended Complaint fails to satisfy the pleading requirements of the PSLRA. The Court will analyze each category of alleged fraud in turn to determine whether the PSLRA pleading requirements are satisfied.

## A. Alleged fraudulent scheme relating to the destruction of VHS inventory

In Blockbuster's 2001 Form 10-K, Blockbuster announced that it had completed the implementation of the merchandising campaign as of December 31, 2001. Plaintiffs contend that, under the internal name of MOP, the merchandising campaign continued into 2002. Plaintiffs additionally contend that the financial statements for the first half of 2002 were inaccurate because they did not take into account the costs of the continuing merchandising campaign, that the improperly deferred costs were reflected in the financial statements for the second half of 2002 as merchandise sales costs, and that Blockbuster's proffered reason for the increase in merchandise sales costs, *i.e.,* "shrink," or theft, was false.

Plaintiffs have pled a sufficient factual basis for Plaintiffs' allegation that MOP continued in 2002. According to a former manager from California, MOP "began late in 2001 and was ongoing throughout [*35] 2002." Am. Compl. P32(1). According to a former Texas store manager, MOP started at the end of 2001 and continued into 2003. Am. Compl. P32(4). Another Texas store manager stated that MOP continued into the spring of 2002. Am. Compl. P101. A former Maryland store manager stated that he received e-mails throughout 2002, instructing him to destroy VHS tapes under MOP. Am. Compl. P32(5).

However, Plaintiffs have failed to plead a sufficient factual basis for the contention that MOP was the same merchandising campaign that the 2001 Form 10-K stated was completed as of December 31, 2001. The Amended Complaint states: "A former district manager in California stated that the program became known as 'the MOP [Merchandise Opportunity Program], began in late in 2001 and was ongoing throughout 2002.'" Am. Compl. P32(1). This oblique link between the campaign described in the 2001 Form 10-K and MOP is insufficient under the PSLRA.

Plaintiffs have additionally failed to plead a sufficient factual basis for their allegations that the financial statements for the first half of 2002 were inaccurate because they did not take into account the costs of the continuing merchandising campaign, that [*36] the improperly deferred costs of the merchandising campaign were reflected in the financial statements for the second half of 2002 as merchandise sales costs, and that Blockbuster's proffered reason for the increase in merchandise sales costs was false.

Plaintiffs quote a former district manager from California as stating: "[Blockbuster] was doing a program where they basically cut half of the product in every store and (sic) selling it for no price at all. In order to do that, they hid product in a different line in the P&L." Am. Compl. P32(1). Plaintiffs also quote a former store manager who managed eight stores during his tenure with Blockbuster as stating that it "doesn't make sense" that shrinkage would have increased in the fourth quarter of 2002. Am. Compl. P111. Another store manager stated that "shrinkage happened continually and that it was unlikely that Blockbuster would record a loss on shrinkage in any one quarter." Am. Compl. P111. A former Blockbuster district manager, whose district had the highest rate in the United States of shrinkage, stated that it did not make sense for shrinkage to spike in the fourth quarter of 2002 and that historically the fourth quarter [*37] was not the quarter reflecting the highest reported shrinkage. Am. Compl. P111.

Plaintiffs' pleading is insufficient because there are no facts alleged from which one could conclude that the employees quoted were privy to how or when the costs of MOP were accounted for on Blockbuster's financial statements or to the level of company-wide shrinkage in 2002. In a case where the confidential sources are not named and the other facts do not provide an adequate basis for believing that the alleged statements were false, the personal sources must be identified "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded." *ABC Arbitrage,* 291 F.3d at 353. Here, without further description of a district manager's job, it is not probable that a district manager would be privy to how the costs of MOP were reflected in Blockbuster's financial statements. It is similarly not probable that two store managers and one district manager would know the rates of company-wide shrink in the fourth quarter of 2002. Therefore, the Court dismisses without prejudice [2] Plaintiffs' claims premised [*38] on an alleged fraudulent scheme relating to the destruction of VHS inventory.

## B. Alleged fraud relating to the competition posed by mass merchants of DVDs

Plaintiffs have failed to plead adequately that Defendants failed to disclose the competition posed by mass merchants of DVDs. Rather than hiding the competition posed by mass merchants, the statements quoted by Plaintiffs in the First Amended Complaint explicitly recognize that competition. Additionally, Plaintiffs have failed to adequately plead why Defendants' statements related to this competition were misleading or fraudulent. The statements [*39] recognize the competition and highlight Blockbuster's plan for combating that competition. Blockbuster "was under no duty to cast its business in a pejorative, rather than a positive, light." *Rosenzweig,* 332 F.3d at 869. Therefore, Plaintiffs' claims of misrepresentations and omissions related to the following statements are dismissed without prejudice:

16. "We think that the retail business will continue to grow and we think the rental business will continue to grow. . . . I think one would be mistaken to think that they're mutually exclusive. But when it gets right down to it, when you look at number of transactions, retail transactions are, you know, only a fraction of what rental transactions are, and that's because the vast majority of movies that are produced by Hollywood, most people only want to watch them once. . . . Do I really need to own this movie for, you know, what today is a $ 20 price point. I don't think that dynamic changes very much, even if the price point went to $ 12." Am. Compl. P54.

---

[2] To the extent the Court dismisses Plaintiffs' claims for pleading defects, the dismissal is without prejudice. However, in so doing, the Court does not intend to suggest that Plaintiffs should re-urge the claims upon repleading. Plaintiffs shall determine whether it is possible to cure the identified pleading defects and shall only reassert those claims, if any, that can be pled in compliance with the PSLRA.

17. "It's important to note that there is no downside implications to Blockbuster increasing its share of the retail market. In the--in addition to the [*40] opportunity for incremental sales, we make the same gross margin dollars on a DVD sale as we do on a rental. So we are ambivalent as to how customers use us. Retail, rental, new, used, DVD, VHS." Am. Compl. P70 (sic).

18. In response to a question about how Blockbuster plans to compete with their competitors who are selling DVDs making "a buck or nothing": "So our view is the best way to combat that, quite frankly, is to use a rental promotional currency. So at Blockbuster the price of that DVD might be $ 17.99 or $ 18.99 or $ 19.99. Couple that with a free rental offer. We think that converts to a great value for the consumer without necessarily lowering the profit dollars on the transaction. So we feel comfortable through managing the mix, through item price management, through using promotional currency, that we can manage the margin dollars effectively and still give the consumer a great value." Am. Compl. P71.

## C. Alleged fraud relating to DVD rental margins

Plaintiffs allege that Defendants misrepresented that the gross profit margin on DVD rentals was 70% when it was actually lower, and that Defendants misrepresented that the gross profit margin on DVD rentals [*41] was 10 percentage points higher than the gross profit margin on VHS rentals, when the gross profit margin on DVD rentals was actually only 3 or 4 percentage points higher. Plaintiffs identify the following statements as alleged misrepresentations:

19. In 2001, "We undertook a number of key initiatives to strengthen our core business and drive growth in profitability, including re-merchandising our stores to expand our selection of higher margin DVDs and dedicating more of our sales area to high-growth new game formats and promising new business opportunities." Am. Compl. P53.

20. "Blockbuster now has three DVD revenue sharing agreements, which help the company to lower inventory costs, increase product depth and share risk. These agreements do not include an exclusive window, but do preserve the approximate 70% margin on DVD rentals." Am. Compl. P55.

21. "In addition, our merchandise gross margin declined due to an increase in DVD sales as a percentage of total merchandise sales, primarily due to the current competitive environment for retail DVD. These decreases were partially offset by an increase in our rental gross margin, primarily due to an increase in the percentage [*42] of rental revenues attributable to DVD rental product, which on average has a lower overall cost than other rental product." Am. Compl. P75.

22. "We are maintaining our margins on DVD rentals in the high 60s, and we are increasing our copy depth, and we are not giving up our flexibility to market and sell previously viewed DVDs, which we also feel is very important to our business." Am. Compl. P80.

Statement 20 is from a February 12, 2002 report issued by Salomon Smith Barney. Plaintiffs have failed to plead sufficient facts to impute to Defendants the "70% gross profit margin" statement in the analyst's report. "To hold a defendant liable for misleading statements published by a third party, the plaintiff must at least identify the defendant who provided the information that the third party made public to the market." *In re Capstead Mortg. Corp. Secs. Litig.,* 258 F. Supp. 2d 533, 562 (N.D. Tex. 2003) (Lindsay, J.). Additionally, the plaintiff must plead facts "demonstrating that Defendants exercised control over any of the analysts' comments." *In re Sec. Litig. BMC,* 183 F. Supp. 2d at 893. Here, since the speaker is not identified and no facts [*43] are pled to show Defendants' control over the analyst's comments, the Court dismisses without prejudice Plaintiffs' claims based on Statement 20.

Additionally, even if Statement 20 could be attributed to Defendants, Plaintiffs have failed to adequately plead that this statement was false or misleading when made. Plaintiffs allege that this statement was false when made because, in a February 12, 2003 press release, Blockbuster stated: "Rental margin declined to 66.6% in the fourth quarter of 2002 from 67.3% in the fourth quarter of 2001 as a result of the investment in incremental rental product

in support of the expected higher rental revenues, which did not materialize." Am. Compl. P87. However, this press release discusses the combined rental margin for DVD and VHS, not the rental margin for DVD alone, while the alleged 70% statement refers to DVD rental margin alone. Therefore, this press release does not support an inference that Statement 20 was false when made.

Plaintiffs additionally allege that Defendants misrepresented that there was a 10 percentage point differential between DVD and VHS rental margins, when it was later disclosed to be only a 3 to 4 percentage point differential. [*44] Am. Compl. P36, 89. However, Plaintiffs do not allege any specific facts about who made this statement, when it was made, or to whom it was made. Since Plaintiffs have completely failed to plead the "who, what, when, where, how" details about this alleged statement, the Court dismisses without prejudice Plaintiffs' claims based on this alleged misrepresentation. [3]

[*45] Finally, Plaintiffs have failed to plead any facts to support the allegation that Statements 19, 21, or 22 were false or misleading when made. In fact, Plaintiffs' Amended Complaint supports the characterization of DVDs as "higher margin," the statement that DVD rental product "on average has a lower overall cost than other rental product," and the statement that the margins on DVD rentals were "in the high 60s." Therefore, the Court dismisses without prejudice Plaintiffs' Amended Complaint to the extent it is premised on alleged misrepresentations contained in Statements 19, 21, or 22.

## D. Alleged fraud relating to problems with Blockbuster's technology

Plaintiffs claim that Blockbuster misrepresented the capability of its inventory management and product distribution systems because its national point-of-sale (POS) system and distribution system were inadequate to support Blockbuster's business, and were in fact generating increased costs. Plaintiffs identify the following alleged misrepresentations:

23. The POS system allows Blockbuster "to determine on a store-by-store basis the number of copies of each newly released movie that is to be offered by each U.S. [*46] store." Am. Compl. P46.

24. The centralized distribution system allows Blockbuster "to process and distribute a greater quantity of products while reducing costs and improving services to our stores." Am. Compl. P46.

25. In response to a question about how Blockbuster will manage the purchase of a couple hundred video game titles to be released in the second half of 2002: "As far as number of titles to manage, we're not especially troubled by that. Let's face it, we manage thousands of titles every year. So, it's really nothing new about that." Am. Compl. P71.

---

[3] In their Response, Plaintiffs attempt to cure this defect by citing the following excerpt from a February 12, 2002 article in the *Hollywood Reporter*:

According to Zine, Blockbuster has margins of 70%-plus on DVDs by buying a DVD for $ 17 on average, renting it and then selling it for $ 12 on average. VHS sell-through margins are at 70% and VHS revenue sharing margins at 60%.

Even if Plaintiffs had included this statement in their Amended Complaint, Plaintiffs would have failed to sufficiently allege that this statement was false when made. Plaintiffs contend that the *Hollywood Reporter* statement was shown to be false by the February 12, 2003 conference call discussion of the 3 to 4 percentage point differential between DVD and VHS rental margins. The *Hollywood Reporter* statement reports a 10 percentage point differential between the gross profit margins for DVD and VHS rental products that are acquired through sell-through pricing arrangements and the gross profit margins for VHS rental products that are acquired through revenue sharing arrangements. Therefore, the February 12, 2003 conference call statement discussing the differential between DVD rental margins and VHS rental margins, regardless of how the products were acquired, does not support an inference that the *Hollywood Reporter* statement was false when made.

In an attempt to plead with particularity facts showing that the above statements were false or misleading when made, Plaintiffs quote one former district manager from California as stating: "It was very frustrating as store manager to be out of DVD movies within two hours of a release and then spend the rest of the week giving out hundreds upon hundreds of coupons because of [Blockbuster's] in stock guarantee." Am. Compl. P48. This statement, of only one store manager, does not tie the out-of-stock problem to the POS or product distribution systems.

Second, Plaintiffs refer to a former district manager's statements [*47] about repricing and inventory during the "remerchandising" program: "The manager explained that to transfer a tape from a rental to a PVT takes some time since new bar codes (sic) labels have to be printed for and placed on each tape. Under MOP, [Blockbuster] used a different method because it would take 'forever' to manually generate new bar codes and update the selling price for hundreds of movies at a time. . . . When the tapes were transferred back into the stores, they were reflected in [Blockbuster's] system with the designation of 'MOP,' rather than being reflected in the computer with the original title of the movie." Am. Compl. P48. These statements about how repricing and inventory were managed during the remerchandising program do not tend to show that Blockbuster's POS and product delivery systems were inadequate to support Blockbuster's business.

Third, Plaintiffs cite Blockbuster's 2002 Form 10-K, filed on March 27, 2003, which includes the following cautionary statements: "Any Failure or Inadequacy of Our Information Technology Infrastructure Could Harm Our Business. . . . For approximately fifteen years, we have been adding applications to our existing point-of-sale, [*48] or POS, system in order to add features and functionality relevant to our business, and we have not yet determined how we will approach updates or upgrades to this system in the future. We may not be able to effectively upgrade and expand our systems, or add new systems, in a timely manner or to integrate smoothly any newly developed or purchased technologies with our existing systems. These difficulties could harm or limit our ability to improve our business." Am. Compl. P90. This statement does not support Plaintiffs' allegation that, during 2002, the POS and inventory management systems were inadequate or caused Blockbuster any problems.

Because Plaintiffs have failed to adequately plead that the statements about POS and the inventory management system were false, the Court dismisses without prejudice Plaintiffs' claims based on Statements 23-25.


## VII. INFERENCE OF SCIENTER

The PSLRA also requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If this requirement is not met here, the Court must dismiss the Amended Complaint. 15 U.S.C. § 78u-4(b)(3)(A).

 [*49] Misrepresentations and omissions are actionable if the plaintiff proves that the defendant acted with "severe recklessness." *Nathenson,* 267 F.3d at 408 ("It seems clear to us that the PSLRA has not generally altered the substantive scienter requirement for claims brought under section 10(b) and Rule 10b-5, and therefore severe recklessness, as defined in *Broad,* remains a basis for such liability."). Under *Broad v. Rockwell,* severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad v. Rockwell,* 642 F.2d 929, 961 (5th Cir. 1981). Defendants contend that Plaintiffs have failed to state with particularity facts giving rise to a strong inference that Defendants acted with "severe recklessness" of the falsity of the alleged misrepresentations and omissions.

Although allegations of motive and opportunity may meaningfully [*50] enhance the strength of an inference of scienter, allegations of motive and opportunity, without more, will not fulfill the pleading requirements of the

PSLRA. *Goldstein v. MCI WorldCom,* 340 F.3d 238, 246 (5th Cir. 2003). The Fifth Circuit has distinguished those complaints alleging opportunity and unrealized motive from those alleging actual insider trading. *See Rosenzweig,* 332 F.3d at 867 ("We note additionally that there is no allegation that defendants sold their Azurix shares, calling into question the alleged motive to artificially inflate the stock price."); *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 434 (5th Cir. 2002) ("Absent an allegation that the defendants profited from the inflated stock value of the offerings, such allegations fail."). Therefore, although "allegations of insider trading are essentially a form of motive and opportunity allegations," they may be sufficient to support an inference of scienter when they are in suspicious amounts, at suspicious times, and out of line with prior trading practices. *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.,* 365 F.3d 353, 2004 U.S. App. LEXIS 5902, 2004 WL 626721, at *8 (5th Cir. 2004) [*51] (citing *Abrams,* 292 F.3d at 435). Here, Plaintiffs have alleged motive, opportunity, and insider trading.

### 1. Motive

Plaintiffs allege that the Individual Defendants were motivated to keep the stock price high so that they could sell their holdings at a profit. *E.g.,* Am Compl. P102 ("Defendants were motivated not to disclose that Blockbuster's strategic re-merchandising program was ongoing during 2002 so that they could forestall the Company's reporting of the adverse financial consequences associated with such program until after they sold millions of dollars of Blockbuster stock at artificially inflated prices.").

### 2. Opportunity

Plaintiffs allege that Defendants, as a result of their positions within the Company, must have known about the Buena Vista dispute, the ongoing merchandising program, the competition posed by mass merchants, the gross profit margins on DVD rentals, and the technology problems. Am. Compl. P16. Throughout the Class Period, John Antioco was Blockbuster's CEO and Chairman of the Board, Nigel Travis was Blockbuster's President, and Larry Zine was Blockbuster's Chief Financial Officer.

### 3. Insider [*52] *trading*

Prior to the Class Period, none of the Individual Defendants sold any shares of common stock. Am. Compl. P50. During the Class Period, Antioco, Zine, and Travis sold, respectively, 36%, 27%, and 31% [4] of their holdings. This percentage calculation takes into account vested stock options that were not exercised. During the Class Period, Antioco, Zine, and Travis sold, respectively, 69%, 100%, and 100% of their holdings of stock, excluding options. During the Class Period, Antioco realized a profit of $ 6,725,739; Zine realized a profit of $ 955,525; and Travis realized a profit of $ 1,476,799.

Defendants argue that any suspicious motive suggested by these figures is negated because the Individual Defendants retained a large [*53] percentage of their stock options, and it was contrary to their self-interests to inflate the price in the short term at the expense of the long term price. The Court agrees that, if the Individual Defendants had actually lost more money than they gained as a result of the alleged fraud, the aggregate loss might defeat an inference of scienter. In the current case, however, what the Individual Defendants retained were primarily options, not stock. Therefore, although the lower stock price after December 2002 decreased Defendants' potential profits from an exercise of their options, Defendants did not actually lose money because they did not have to pay for the options. Therefore, the Individual Defendants' retention of their vested stock options does not

---

[4] The Court notes that the last two rows of the chart on page 553 of Defendants' Appendix seem to incorrectly tally the running totals of options exercised during the Class Period, as the Court understands the facts. In each row, a total of 96,000 options had been exercised.

foreclose an inference of fraud. Plaintiffs have stated with particularity facts supporting the allegation that the Individual Defendants engaged in trading in suspicious amounts and out of line with prior trading practices.

### 4. Individualized Pleading

As recently clarified by the Fifth Circuit in *Southland Securities Corp. v. INSpire Insurance Solutions Inc.,* the "group pleading" doctrine conflicts with the scienter [*54] requirement of the PSLRA. *Southland,* 365 F.3d 353, 2004 U.S. App. LEXIS 5902, 2004 WL 626721, at *6. Therefore, generalized pleading about motive, opportunity, and insider sales during the Class Period (even if in suspicious amounts and out of line with prior trading practices) are insufficient to adequately plead scienter. Rather, Plaintiffs must "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud." *Id.* (quoting Judge Means's district court opinion). In order to enlighten each Individual Defendant as to his particular part in the alleged fraud, Plaintiffs must provide "specific factual allegations linking the individual to the statement at issue." *Id.* "Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement." *Id.* Further, although statements issued on behalf of a corporation may be attributed to the corporation without specific factual allegations linking an individual to the statement, a "defendant [*55] corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter." *365 F.3d 353, 2004 U.S. App. LEXIS 5902, [WL]* at *7. Therefore, in analyzing whether Plaintiffs' allegations raise an inference of scienter with respect to the Individual Defendants and Blockbuster, the Court must analyze whether Plaintiffs have alleged a link between each Individual Defendant's alleged insider trading and his particular part in the alleged fraud. [5] [*57] In performing this analysis, guided by the Fifth Circuit's analysis in *Southland,* the Court will examine (1) the temporal proximity of the alleged misrepresentation or omission and the stock sale, [6] and (2) the price of the stock when it was sold by the insider. *See also Abrams,* 292 F.3d at 435 (finding that Plaintiffs' allegations of insider trading did not create an inference of scienter because sales were not alleged to be "at times calculated to maximize personal profit");

---

[5] In order to plead an inference of scienter with respect to Blockbuster, Plaintiffs could attempt to impute to Blockbuster the scienter of officers, directors, or employees of Blockbuster who are not named as Individual Defendants in this action. *See Southland,* 365 F.3d 353, 2004 U.S. App. LEXIS 5902, 2004 WL 626721, at *7 (noting that the plaintiffs had not alleged that "any individual INSpire director, officer, or employee *other than* the named individual defendants had acted with scienter in or respecting the making or issuing of any of the complained of statements" and concluding that, as a result, it was only necessary "to address the allegations claimed to adequately show such state of mind on the part of the individual defendants"). Here, Plaintiffs have alleged insider trading by numerous individuals who are not named as parties. However, Plaintiffs have failed to plead with sufficient particularity a connection between those individuals and any of the alleged misrepresentations or omissions. Therefore, the Court need only analyze whether Plaintiffs have pled an inference of scienter with respect to the statements or omissions of the Individual Defendants. Upon re-pleading, if Plaintiffs intend to impute to Blockbuster the scienter of individuals who are not named as parties, Plaintiffs shall identify the specific statements or omissions with which each individual is connected and demonstrate how the individual's stock sales create an inference of scienter with respect to those specific statements or omissions.

[6] Defendants argue that, when examining the temporal proximity of an alleged misrepresentation or omission and a stock sale, the Court should consider an alternative explanation for the timing of the sale of stock: "As with other companies, Blockbuster maintains a trading window prohibiting insider transactions prior to earnings announcements." As recognized by the Fifth Circuit in *Rubinstein,* when deciding a motion to dismiss, the Court should not consider evidence of alternative explanations for the timing of sales. *Rubinstein,* 20 F.3d at 170 n.38 ("The defendants claim in their brief and at oral argument that these sales were innocuous because they were made in response to tax considerations. While this may well turn out to be true, at this stage of the litigation we only have the Plaintiffs (sic) complaint before us. Thus, it is impossible for us to consider this 'evidence' to ascertain whether this purported insider trading occurred at suspicious times or in suspicious amounts."). Therefore, the Court will not consider the Individual Defendants' alternative explanation for the timing of sales. Further, even if the Court were to take this alternative explanation into account, the Court notes that Antioco's sale of 100,000 shares in the week preceding the filing of Blockbuster's May 14, 2002 Form 10-Q and Zine's sale of 25,000 shares the day before the filing of Blockbuster's May 14, 2002 Form 10-Q tend to raise doubts about the proffered alterative explanation.

*Nathenson,* 267 F.3d at 420 (finding that Plaintiffs' allegations of insider trading did not raise an inference of scienter because sales were "unrelated to any Company announcements"). [*56]

[*58] **a. John Antioco**

Between April 26, 2002 and April 30, 2002, Antioco sold 141,840 shares, at share prices of $ 28.6973 and $ 28.5151. On April 24, 2002, Blockbuster issued a press release announcing its financial results for the first quarter of 2002. Plaintiffs have not pled specific factual allegations linking that press release to Antioco, and therefore, Antioco's sale of stock shortly after its issuance does not raise an inference of scienter with respect to that press release. On April 24, 2002, Antioco participated in a conference call with analysts; on April 25, 2002, Antioco gave an interview to *Bloomberg Business News;* and, on April 28, 2002, *Video Store* published an article quoting Antioco. Therefore, Plaintiffs have pled temporal proximity between Antioco's stock sales and the statements or omissions contained in the aforementioned conference call, interview, and article. Further, in light of Plaintiffs' allegation that Antioco's fraudulent statements or omissions contained in the aforementioned conference call, interview, and article inflated the stock price until December 18, 2002, the Court notes the dramatic difference between the price of the stock [*59] when Antioco sold it, roughly $ 28.00 per share, and the $ 13.13 price at the close of the market on December 18, 2002. Therefore, in light of the alleged motive, opportunity, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the stock when Antioco sold it, the Court finds that Plaintiffs' allegations create an inference that Antioco, and thus Blockbuster, acted with the requisite scienter when making the alleged misrepresentations and omissions in the April 24, 2002 conference call, April 25, 2002 interview, and April 28, 2002 article.

Between May 10, 2002 and May 17, 2002, Antioco sold 275,000 shares, at share prices between $ 28.55 and $ 29.648. On May 14, 2002, Blockbuster filed its Form 10-Q for the first quarter of 2002. Since Plaintiffs allege that the Form 10-Q contained fraudulent misrepresentations and omissions that artificially *inflated* the stock price, Antioco's stock sales *prior* to May 14, 2002 do not raise an inference of scienter with respect to the Form 10-Q. Antioco did not benefit from the alleged misrepresentations and omissions by selling his stock prior to their alleged effect [*60] on the stock price. Further, Plaintiffs have not pled specific factual allegations linking the form 10-Q to Antioco, [7] and therefore, Antioco's sale of stock shortly after its filing does not raise an inference of scienter with respect to the Form 10-Q.

In summary, Plaintiffs' allegations create an inference of scienter with respect to Antioco's alleged misrepresentations and omissions in the April 24, 2002 conference call, April 25, 2002 interview, and April 28, 2002 article, and that inference of scienter is imputed to Blockbuster. However, with respect to all other misrepresentations or omissions, Plaintiffs' allegations fail to create an inference that Antioco acted with the requisite scienter.

**b. Larry Zine**

On April 26, 2002, Zine sold 33,333 shares, at a share price of [*61] $ 28.6973. On April 24, 2002, Blockbuster issued a press release announcing its financial results for the first quarter of 2002. Plaintiffs have not pled specific factual allegations linking that press release to Zine, and therefore, Zine's sale of stock shortly after its issuance does not raise an inference of scienter with respect to that press release. On April 24, 2002, Zine participated in a conference call with analysts. Therefore, Plaintiffs have pled temporal proximity between Zine's stock sales and Zine's statements or omissions contained in the aforementioned conference call. Further, because Plaintiffs allege that the fraudulent statements or omissions contained in the aforementioned conference call inflated the stock price until December 18, 2002, the Court notes the dramatic difference between the price of the stock when sold,

---

[7] The Court does not reach the issue of whether, if Plaintiffs had alleged a link between the Form 10-Q and Antioco as a result of Antioco's position as CEO and Chairman of the Board, such an allegation would be sufficient.

approximately $ 28.00 per share, and the price at the close of the market on December 18, 2002, $ 13.13 per share. Therefore, in light of the alleged motive, opportunity, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the stock when sold, the Court finds that Plaintiffs [*62] have alleged that, like Antioco, Zine (and thus Blockbuster) acted with the requisite scienter when making the alleged misrepresentations and omissions in the April 24, 2002 conference call.

On May 13, 2002, Zine sold 25,000 shares, at a share price of $ 28.7781. On May 16, 2002 and May 17, 2002, Zine sold a total of 40,000 shares, for share prices of $ 29.6459 and $ 29.3576. On May 14, 2002, Blockbuster filed its Form 10-Q for the first quarter of 2002, signed by Zine. Since Plaintiffs allege that the Form 10-Q contained fraudulent misrepresentations and omissions that artificially *inflated* the stock price, Zine's stock sales *prior* to May 14, 2002 do not raise an inference of scienter with respect to the Form 10-Q. However, Zine's sales on May 16, 2002 and May 17, 2002 are temporally proximate to the filing of the Form 10-Q, which was signed by Zine. Further, because Plaintiffs allege that the fraudulent statements or omissions contained in the Form 10-Q inflated the stock price until December 18, 2002, the Court notes the substantial difference between the price of the stock when sold, approximately $ 29.00 per share, and the price at the close of the market on December 18, 2002, $ [*63] 13.13 per share. Therefore, in light of the alleged motive, opportunity, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the stock when sold, the Court finds that Plaintiffs have alleged that Zine, and thus Blockbuster, acted with the requisite scienter when making the alleged misrepresentations and omissions in the Form 10-Q.

In summary, Plaintiffs have pled an inference of scienter with respect to Zine's alleged misrepresentations and omissions in the April 24, 2002 conference call and the May 14, 2002 Form 10-Q, and that inference of scienter is imputed to Blockbuster. However, with respect to all other misrepresentations or omissions, Plaintiffs' allegations fail to create an inference that Zine acted with the requisite scienter.

### c. Nigel Travis

On February 14, 2002, Travis sold 66,666 shares, at a share price of $ 21.5066. On February 12, 2002, Blockbuster issued a press release announcing its financial results for the 2001 calendar year, Antioco gave an interview to *Bloomberg Business News,* and Salomon Smith Barney issued a report rating Blockbuster's stock as "neutral." Plaintiffs [*64] have not pled specific factual allegations linking the press release, interview, or report to Travis, and therefore, Travis's sale of stock shortly thereafter does not raise an inference of scienter with respect to the press release, interview, or report. On July 29, 2002, Travis sold 40,000 shares, at a share price of $ 24.0439. On July 24, 2002, Blockbuster issued a press release announcing its financial results for the second quarter of 2002, and Antioco and Zine participated in a conference call. Plaintiffs have not pled specific factual allegations linking the press release or conference call to Travis, and therefore, Travis's sale of stock shortly thereafter does not raise an inference of scienter with respect to the press release or conference call. Plaintiffs' allegations fail to create an inference that Travis acted with the requisite scienter.

### VIII. SECTION 20(A) CLAIMS

Section 20(a) of the Securities Exchange Act provides in pertinent part: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled [*65] person to any person to whom such controlled person is liable. . . ." 15 U.S.C. § 78t. There can be no liability under section 20(a) without a finding that a provision of the Securities Exchange Act has been violated. Therefore, to the extent Plaintiffs' section 20(a) claim is premised on Plaintiffs' claims related to Statements 1-15, Plaintiffs' section 20(a) claim is dismissed with prejudice. To the extent Plaintiffs' section 20(a) claim is premised on Plaintiffs' claims related to other alleged misrepresentations and omissions, Plaintiffs' section 20(a) claim is dismissed without prejudice.

## IX. LEAVE TO AMEND

The Court dismisses with prejudice Plaintiffs' claims premised on Statements 1-10 because they are protected by the PSLRA safe harbor for forward-looking statements, and Plaintiffs' claims premised on Statements 11-15 because they are immaterial as a matter of law.

The remainder of Plaintiffs' claims are dismissed because they are inadequately pled. In Plaintiffs' Response to Defendants' Motion to Dismiss, Plaintiffs do not seek leave to amend Plaintiffs' Amended Complaint in the event that the Court finds Plaintiffs' pleading to be inadequate, [*66] and Defendants thus urge the Court to dismiss Plaintiffs' Amended Complaint without leave to amend. However, the Court finds that justice would be better served if Plaintiffs were afforded the opportunity to amend their complaint to comply with the PSLRA. Therefore, the Court dismisses Plaintiffs' remaining claims without prejudice and with leave to amend.

The Court warns Plaintiffs that the Court is unlikely to grant Plaintiffs further opportunity to amend. The Court suggests that Plaintiffs consider how their Second Amended Consolidated Complaint could be better drafted than their Amended Complaint. Judge Lindsay's description of the plaintiffs' complaint in *Schiller* is equally apt here: Plaintiffs' Amended Complaint "represents a labyrinth, requiring the court to piece together the elements of the claims from allegations made all over the complaint." *Schiller v. Physicians Res. Group,* 2002 U.S. Dist. LEXIS 3240, No. 2:97-CV-3158-L, 2002 WL 318441, at *5 (N.D. Tex. Feb. 26, 2002) (Lindsay, J.).

If they wish to do so, Plaintiffs shall file a Second Amended Consolidated Complaint on or before May 21, 2004. Defendants shall answer or otherwise respond by June 18, 2004. If Defendants file [*67] a Motion to Dismiss Plaintiffs' Second Amended Consolidated Complaint, Plaintiffs shall respond within 25 days after the motion is filed, and Defendants shall reply within 15 days after the response is filed. The Court is extremely unlikely to grant any motions, agreed or otherwise, to extend these deadlines.

**SO ORDERED.**

April 26, 2004.

BARBARA M. G. LYNN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

End of Document

# In re Entrust Sec. Litig.

United States District Court for the Eastern District of Texas, Marshall Division

September 30, 2002, Decided ; September 30, 2002, Filed, Entered

MASTER FILE NO. 2:00CV119, CLASS ACTION

**Reporter**

2002 U.S. Dist. LEXIS 26669 *; Fed. Sec. L. Rep. (CCH) P92,027

IN RE ENTRUST SECURITIES LITIGATION; THIS DOCUMENT RELATES TO: ALL ACTIONS.

**Disposition:** [*1] Case dismissed with prejudice. Leave to amend denied, Any other pending motions denied as moot.

**Counsel:** For ROBERT FRANKEL, ITZHAK KADOSH, CHARLES HOWE BIAGIO DI MARTINO, BARRIE MITCHELL AND MICHAEL L LEATHERS, Lead Plaintiff, plaintiffs: Marc Robert Stanley, Stanley Mandel & Iola LLP, Dallas, TX.

For ROBERT FRANKEL, ITZHAK KADOSH, CHARLES HOWE BIAGIO DI MARTINO, BARRIE MITCHELL AND MICHAEL L LEATHERS, Lead Plaintiff, plaintiffs: Edward P Dietrich, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA.

For ITZHAK KADOSH, CHARLES HOWE BIAGIO DI MARTINO, BARRIE MITCHELL AND MICHAEL L LEATHERS, Lead Plaintiff, plaintiff: Martin Darren Woodward, Stanley Mandel & Iola LLP, Dallas, TX.

For ITZHAK KADOSH, CHARLES HOWE BIAGIO DI MARTINO, BARRIE MITCHELL AND MICHAEL L LEATHERS, Lead Plaintiff, plaintiff: Mel E Lifshitz, Bernstein Liebhart & Lifshitz, New York, NY.

For ITZHAK KADOSH, CHARLES HOWE BIAGIO DI MARTINO, BARRIE MITCHELL AND MICHAEL L LEATHERS, Lead Plaintiff, plaintiff: James Robert Hail, William S Lerach, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA.

For ITZHAK KADOSH, CHARLES HOWE BIAGIO DI MARTINO, BARRIE MITCHELL AND MICHAEL L LEATHERS, Lead Plaintiff, [*2] plaintiff: Paul J Geller, Jonathan M Stein, Cauley & Geller LLP, Boca Raton, FL.

For ENTRUST TECHNOLOGIES INC, JOHN A RYAN, DAVID L THOMPSON, defendants: Stephen G Gleboff, Hughes & Luce, Dallas, TX.

For ENTRUST TECHNOLOGIES INC, defendant: Timothy T Scott, Daniel W Turbow, Helen Chae, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For ENTRUST TECHNOLOGIES INC, JOHN A RYAN, DAVID L THOMPSON, defendants: Terry T Johnson, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For NORTEL NETWORKS CORP, defendant: David J Beck, Beck Redden & Secrest LLP, Houston, TX.

For NORTEL NETWORKS CORP, defendant: Stuart J Baskin, Mary K Warren, H Miriam Farber, Konstantin Chelney, Shearman & Sterling, New York, NY.

**Judges:** T. JOHN WARD, UNITED STATES DISTRICT JUDGE.

**Opinion by:** T. JOHN WARD

# Opinion

## MEMORANDUM OPINION AND ORDER

### 1. Introduction.

In this private securities fraud case, the defendants have filed motions to dismiss the plaintiffs' Second Amended Complaint ("SAC"). The defendants urge that the SAC falls short of the standards set forth by the Private Securities Litigation Reform Act ("PSLRA"). The court agrees and dismisses this case.

### 2. Factual Background [*3] and Procedural Posture.

#### A. Facts.

The facts are stated in the light most favorable to the plaintiffs as alleged in the SAC. In 1993, Nortel created a division known as Nortel Secure Networks group to develop and market data security software. In 1996, Nortel reorganized the division as a majority-owned subsidiary known as Entrust Technologies Inc., In an August 18, 1998, initial public offering ("IPO") Entrust sold 5.4 million shares at $ 16.00 per share and Nortel sold an additional 1.7 million shares.

In connection with the IPO, the insiders agreed not to sell any more shares for a 180 day lock-up period. This agreement, together with SEC restrictions and market conditions curtailed Entrust's and Nortel's ability to sell additional shares after the IPO. Pursuant to a Registration Rights Agreement, however, Nortel possessed the ability to force Entrust to conduct a Secondary Offering any time after a year from the IPO. According to the SAC, Nortel's ability to force Entrust to conduct a Secondary Offering led the insiders to pepper the market with misleading statements to drive up the price of the stock so as to maximize the capital that Entrust would realize in connection with [*4] any Secondary Offering.

The stock price began to rise after the IPO, but the lock-up period prevented the insiders from selling more shares. The insiders persuaded the underwriters to release the lock-up, but the market reacted adversely to this news. The price per share fell by 38%, so the insiders became more determined to push the price back up to sell in connection with a Secondary Offering.

According to the SAC, on October 19, 1999, the insiders began renewed efforts to inflate artificially the price of Entrust's stock. The insiders developed a three-pronged strategy. First, they installed a new CFO who had "investor relations" experience. Second, they instituted an aggressive investor relations campaign. Third, they began to release positive but misleading or false statements.

Under the plaintiffs' theory, the campaign pushed the price of the stock up to record highs. Nortel took advantage of the rise in stock price and sold 1.5 million shares between November 15-18, 1999. Entrust conducted a Secondary Offering on February 24, 2000 and the defendants sold an additional 8.9 million shares for net proceeds of almost $ 700 million.

The plaintiffs allege in January 2000, while [*5] preparing for the Secondary Offering and negotiating in connection with a merger plan, defendants Ryan and Thompson went on a nationwide Roadshow and made certain statements that were intended to inflate artificially the price of the stock. (SAC P 18). The plaintiffs contend that Ryan and Thomson told investors that Entrust had a very large and growing installed base of customers and that corporate information technology departments were shifting their focus from Y2K issues and toward Internet security issues. As a result, Entrust would experience accelerating demand for its PKI products and customers who purchased initial or "pilot" systems from Entrust for $ 50,000-$ 100,000 would fully deploy Entrust PKI throughout

their organizations. According to the plaintiffs, Ryan and Thompson stated that full deployment contracts were generally in excess of $ 1 million.

In addition, the plaintiffs allege that Ryan and Thompson told investors that the PKI market was growing 60% a year, Entrust's market share was 35%, and Entrust was gaining market share from its competitors. According to the plaintiffs, Ryan and Thomson also communicated that Entrust was selling pilots to 90 new customers [*6] a quarter, and as Entrust's 400 customers who had already purchased pilot systems executed "follow on" contracts for "Stage II" or "Stage III" deployments, revenue and EPS growth would accelerate in 2000 and 2001. The plaintiffs allege that Ryan and Thompson told investors that 40%-45% of Entrust's pilot customers were moving to Stage II and Stage III deployments and that as a result of these positive developments in Entrust's business, Entrust would earn $ .35 in 2000 and $ .55 in 2001.

The plaintiffs allege that the defendants were concerned that if adverse information concerning Entrust's business was revealed, the stock price would drop and Entrust would not make as much money in the Secondary Offering. The complaint, in PP 59-110, alleges various statements similar to those set forth in the preceding two paragraphs that were made by the defendants and third parties concerning Entrust's business prospects and earnings forecasts. The plaintiffs further allege that the insiders had to conceal adverse company conditions because if those conditions became known, the shareholders of enCommerce would not endorse a merger agreement with Entrust. The merger ultimately closed on June 26, 2000. On [*7] July 5, 2000, Entrust warned the market that its earnings per share ("EPS") for the Second Quarter ("Q2") of 2000 would fall short of the expected $ .08 by approximately $ .06. This announcement caused the price of the stock to fall from $ 771/8 to $ 36 5/8.


## B. Procedural Posture.

Two days after the earnings warning, investors filed a number of separate class action suits in this district, complaining that Entrust's conduct in connection with a merger amounted to securities fraud. This court consolidated the suits under a master file, appointed lead plaintiffs, and issued a scheduling order.

The plaintiffs filed a Consolidated Amended Class Action Complaint ("FAC"). The defendants moved to dismiss the FAC on the grounds that it failed to comply with the Reform Act. This court granted that motion with leave to amend. The court held that the FAC failed to plead fraud with particularity, due in large measure to the puzzle-style nature of the FAC. The court also held that the FAC failed to comply with the Reform Act's requirement that the plaintiffs state all facts that supported certain of their information and belief allegations. The court concluded that the plaintiffs' failure [*8] to plead primary liability necessarily required dismissal of their controlling person theory as against Nortel, and that, aside from this failure, the plaintiffs had not adequately pleaded controlling person liability. The court declined to choose between the Second and the Ninth Circuit's scienter requirements, as the plaintiffs' pleading precluded meaningful application of either standard. The court granted plaintiffs leave to amend to correct these deficiencies but warned that the plaintiffs should assume that the amendment could represent their last opportunity to plead in this case.

After the court dismissed the FAC, the plaintiffs filed their SAC. The defendants have renewed their motions to dismiss and the matter is ripe for decision. For the following reasons, the court holds that the SAC fails to comply with the Reform Act's requirements. The court dismisses this case with prejudice.


## 3. Discussion.

To state a claim for securities fraud under section 10(b) of the Securities Exchange Act and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on [*9] which plaintiff relied (5) that proximately caused the plaintiff's injury.

*Nathenson v. Zonagen Inc.,* 267 F.3d 400, 406-07 (5th Cir. 2001). The defendants contend that the complaint must be dismissed for any number of reasons. This court will address only two: the PSLRA's specificity requirement and its requirement that a plaintiff explain why a particular statement is false and misleading.

## A. Failure to plead with specificity the false or misleading statements.

After the court dismissed the FAC, the Fifth Circuit assessed the PSLRA's pleading requirements. In *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336 (5th Cir. 2002), the court considered the PSLRA in light of the court's Rule 9(b) cases. The court held that a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and §§ 15 U.S.C. 78u-4(b)(1)& 78u-4(b)(3)(A):

(1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement [*10] was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

In addition, the court noted that under § 15 U.S.C. 78u-4(b)(1), for allegations made on information and belief, the plaintiff must:

(7) state with particularity all facts on which that belief is formed, i.e., set forth a factual basis for such belief.

Under *ABC Arbitrage,* the SAC suffers from the same deficiency as the FAC. The SAC fails to plead with sufficient specificity the false or misleading statements that give rise to liability under the securities laws. In PP 59-100, the plaintiffs attempt to plead the false and misleading statements, but like the FAC, the SAC is confusingly drafted. The "false and misleading statements" are sometimes entire block quotes from conference calls or analysts reports. Some portions of the block quotes are in bold print or italicized, but the SAC makes no attempt to attribute any significance to bold print [*11] or italics.

To illustrate this deficiency, the SAC attributes the following statement to defendant Ryan:

> ***And in this area, again, we once again experienced dramatic growth in our customer base -*** adding over 140 new customers to bring our total number of customers to over 1,100. Our product program, which many of you are familiar with, also exceeded our expectations for growth. This quarter we sold 77 new pilot systems globally -- a 133% increase over Q3 1998 and a 28% increase over last quarter. In fact, the increased number of products quarter-over-quarter of 17 is a record growth result. For the first three quarters of 1999, we have now sold 192 pilots compared with 63 for the same three quarters of last year -- an impressive 205% increase. ***We continue to be excited by the momentum this pilot program generates each quarter, and opportunities it provides for us to expand into full-scale business-to-business and business-to-consumer offerings.***

(SAC P 59).

The plaintiffs do not state whether they contend the bold or italicized portions are the claimed false or misleading statements. Is Ryan being sued for securities fraud because he was not in fact [*12] excited by the momentum generated by the pilot program? Or is he being sued because he stated falsely that Entrust did not grow its customer base to over 1,100? This paragraph does not plead with particularity the statements alleged to be false and misleading. The same can be said for the statements alleged in paragraphs 61, 65, 66, 68, 71, 73, 75, 77, 79, 81, 82, 84, 86, 88, 90, 92, 94, 96, 98, 100, 103, 105, 107, and 109. The SAC does not plead with sufficient particularity those statements, or the portions thereof, that the plaintiffs contend are false and/or misleading.

In a related vein, the plaintiffs rely heavily on statements made by third-party analysts. But the SAC does not plead with particularity the allegedly false statements made by Ryan or Thompson to the analyst which the analyst repeated. *Williams v. WMX Techs.,* 112 F.3d 175, 179-80 (5th Cir. 1997). Boilerplate allegations that an analyst made a report "based on information provided by Ryan and Thompson" are insufficient to state a securities fraud claim.

**B. Failure to allege with particularity the reason a particular statement was false when it was made.**

The SAC also does not plead with [*13] particularity why statements concerning Entrust's earnings forecasts were false or misleading when made. Even assuming that all or a portion of the quotations listed in the SAC were alleged with particularity, the plaintiffs have not alleged with sufficient specificity why a statement was false when it was made. The plaintiffs go to great lengths to explain that certain glowing statements were false or misleading because, for example, the software was difficult to implement, Entrust's market share was smaller than anticipated, customers were delaying initial orders, and customers were having trouble moving from pilot implementation to full enterprise deployment. But the SAC acknowledges that the drop in Entrust's share price resulted from Entrust's disclosure that its second quarter earnings for 2000 would fall short of expectations. The SAC also alleges that Entrust's EPS fell short because of Entrust's failure to sign four contracts that would comprise approximately 75% of its second quarter earnings. (SAC P 24). What is critical is that the SAC does not allege, however, *when* the defendants knew the four deals would not close. As a result, the SAC does not allege sufficiently [*14] that any forecast concerning Entrust's projected earnings was false or misleading *when it was made.*

To be sure, the SAC alleges certain details concerning Entrust's internal forecasting documents, but the plaintiffs do not allege that any of these forecasting documents informed the defendants that Entrust's EPS projections for the Second Quarter of 2000 would be adversely affected because the contracts were in jeopardy. The plaintiffs allege that Entrust's sales organization had regular meetings and conference calls and also that bi-weekly one-on-one conference calls were held between each regional sales manager and the Controller and/or a Vice President of Sales Operations. SAC P 47. The plaintiffs assert that defendant Ryan received updates from the Controller and the Vice President of Sales Operations about the contents of these meetings. The problem with these allegations is that the plaintiffs fail to allege that either the Controller or the Vice President of Sales Operations learned anything in any particular meeting that was inconsistent with Entrust's forecasts. And, the plaintiffs fail to allege that the Controller or the Vice President of Sales Operations told Ryan or [*15] Thompson information inconsistent with Entrust's forecasts.

Likewise, the plaintiffs allege that Entrust maintained a deal rating system to track the status of prospective sales. Like the preceding paragraph, however, there is no allegation that any contract that was included in Entrust's second quarter forecast was actually rated low in any particular deal rating scheme. There are also no allegations that the defendants knew that any of the four contracts were rated low in Entrust's deal rating scheme at the time they made any forecasts.

Throughout the SAC, the plaintiffs state in a conclusory fashion that the defendants "knew" of certain true facts or "falsely" represented certain facts. This type of pleading "fails to provide the specific facts upon which an inference

of conscious behavior may be based." *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir. 1994). The plaintiffs have pleaded no specific facts that indicate at the time the alleged revenue forecasts were made, the defendants had actual knowledge of contradictory facts. The SAC therefore does not state a claim for securities fraud and the PSLRA requires the court to dismiss this action.

**C. Claims against** [*16]  **Nortel.**

The complaint contains certain charges against Nortel. To the extent that Nortel is alleged to be liable under a controlling person theory, the court dismisses that theory because the complaint does not sufficiently plead primary liability under the Reform Act. *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1021 n.8 (5th Cir. 1996). Without primary liability, there is no case for controlling person liability. *Id.*

**4. Conclusion.**

The PSLRA requires the court to dismiss this complaint. Although the particularity requirements set forth by that statute make private securities fraud suits difficult to plead, that is a statement of Congressional policy choice. This court must abide by that choice. The court dismisses the case with prejudice. Leave to amend is denied, given that the court has already permitted one amendment on these issues and informed the plaintiffs that their latest amendment could be their last. Any other pending motions are denied as moot.

So **ORDERED** and **SIGNED** this 30th day of September, 2002.

T. JOHN WARD

UNITED STATES DISTRICT JUDGE

**End of Document**

# In re Loral Space & Communs. Ltd. Secs. Litig.

United States District Court for the Southern District of New York

February 23, 2004, Decided ; February 27, 2004, Filed

01 Civ. 4388 (JGK)

**Reporter**

2004 U.S. Dist. LEXIS 3059 *; Fed. Sec. L. Rep. (CCH) P92,696; 2004 WL 376442

IN RE LORAL SPACE & COMMUNICATIONS LTD. SECURITIES LITIGATION; This document relates to: ALL ACTIONS

**Disposition:** [*1] Defendants' motion to dismiss the claims in Amended Complaint against defendants Schwartz and Townsend was granted.

**Counsel:** For Richard Scalfan, Movant: Jeffrey S. Abraham, LEAD ATTORNEY, Law Offices of Jeffrey S. Abraham, New York, NY.

For S. Gene Cauley, Movant: S. Gene Cauley, LEAD ATTORNEY, Cauley Geller Bowman Coates & Rudman, Melville, NY.

For Philip J. Hage, Jr., Plaintiff: Aaron Lee Brody, Jules Brody, LEAD ATTORNEYS, Stull, Stull & Brody, Laurence D. Paskowitz, LEAD ATTORNEY, Abraham & Paskowitz, Joseph H. Weiss, LEAD ATTORNEY, Weiss & Yourman, New York, NY.

For Joe F. Moore, Jr., Plaintiff: Robert I. Harwood, LEAD ATTORNEY, Wechsler, Harwood, L.L.P., New York, NY.

For Merchants TNS Pension Trust, Consol Plaintiff: Steven E. Cauley, LEAD ATTORNEY, Cauley, Geller, Bowman & Coates, L.L.P., Little Rock, AR.

**Judges:** John G. Koeltl, United States District Judge.

**Opinion by:** John G. Koeltl

## Opinion

*OPINION and ORDER*

**JOHN G. KOELTL, District Judge:**

This action is based upon an amended consolidated class action complaint alleging violations of the federal securities [*2] laws arising out of allegedly false and misleading public statements made by the defendant, Loral Space & Communications Ltd. ("Loral"), a Bermuda company, regarding the performance and financial condition of Globalstar, L.P. ("Globalstar"), a telecommunications company in which Loral had heavily invested. The lead plaintiff, Joe F. Moore, Jr., sues on behalf of himself and others (the "plaintiffs") who purchased shares of Loral stock between November 4, 1999 and April 2, 2001 (the proposed "class period"). The plaintiffs assert claims against Loral; Bernard L. Schwartz ("Schwartz"), the Chief Executive Officer and Chairman of the Board of Directors of both Loral and Globalstar; and Richard L. Townsend ("Townsend"), the Chief Financial Officer and Senior Vice-President of Loral and Chief Financial Officer of Globalstar (collectively, the "defendants").

This action originated out of a series of individual lawsuits that were consolidated pursuant to Federal Rule of Civil Procedure 42(a). In an order dated March 2, 2002, the Court designated Joe F. Moore, Jr., the lead plaintiff for the proposed class in the consolidated action pursuant to the [*3] procedures specified in § 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4 *et seq.* [1] The plaintiffs thereafter filed a Consolidated Class Action Complaint (the "Complaint") asserting (1) violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against all defendants; and (2) violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t, against defendant Schwartz.

The defendants moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on various grounds. The parties appeared before the Court on May 9, 2003 for argument on the motion to dismiss. At that conference, the plaintiffs requested leave to amend the Complaint. The Court granted leave to amend the Complaint within thirty days, and [*4] denied the motion to dismiss as moot without prejudice to renewal against any amended complaint.

On June 9, 2003, the plaintiffs filed a Second Consolidated Class Action Complaint (the "Amended Complaint"). Defendants Schwartz and Townsend now move to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) as well as the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) ("PSLRA"). [2] The defendants contend that the plaintiffs have failed adequately to plead scienter, that many of the alleged misrepresentations or omissions are not actionable because they are forward-looking statements or mere corporate "puffery," that the plaintiffs cannot demonstrate reliance given the total mix of information about Globalstar in the marketplace, and that the plaintiffs have not adequately pleaded loss causation. Defendant Schwartz also moves to dismiss the § 20(a) control person liability claim on the grounds that the plaintiffs have failed to plead a primary violation of the securities laws.

[*5]  I

On a motion to dismiss, the allegations in the complaint are accepted as true. *See Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir. 1998). In deciding a motion to dismiss, all reasonable inferences are drawn in the plaintiffs' favor. *See Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir. 1995); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir. 1989). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985). Therefore, the defendants' motion to dismiss should be granted only if it appears that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *See Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 514, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002); *Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); *Grandon,* 147 F.3d at 188; *Goldman,* 754 F.2d at 1065.

In deciding the motion, the Court may consider documents that are referenced [*6] in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *see also Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991); *Vtech Holdings Ltd. v. Lucent Techs., Inc.,* 172 F. Supp. 2d 435, 437 (S.D.N.Y. 2001). "When a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it relies and which is integral to the complaint, the court may nonetheless take the document into consideration in deciding the defendant[s'] motion to dismiss, without converting the proceeding to one for

---

[1] A class has not yet been certified in this action.

[2] Loral filed a voluntary Chapter 11 bankruptcy petition on July 15, 2003. This action, to the extent it implicates Loral, is subject to the Bankruptcy Code's automatic stay. Therefore, Loral has not joined this motion to dismiss the Amended Complaint. (*See* Defs.' Mem. Supp. Mot. Dismiss 2d Consol. Class Action Compl. at 1 n.*.*)

summary judgment." *International Audiotext Network v. American Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995) (internal citation and quotation marks omitted); *see Yucyco, Ltd. v. Republic of Slovenia,* 984 F. Supp. 209, 215 (S.D.N.Y. 1997). Accordingly, the following facts alleged [*7] in the Amended Complaint are accepted as true for the purposes of this motion.

Loral is a Bermuda exempt company with its principal executive offices in New York, New York. (Am. Compl. P 13.) Loral is one of the world's leading satellite communication companies and has substantial activities in satellite manufacturing and satellite-based communication services. (*Id.*) Loral's satellite-related business includes acting, through a subsidiary, as the General Managing Partner of Globalstar, L.P. ("Globalstar"), which commenced operations in October 1999 and which owns and operates a global telecommunications network designed to serve virtually every populated area of the world. (*Id.*) As of November 9, 1999, Loral owned 43% of the equity of Globalstar. (*Id.*) As of December 31, 1999, Loral's total assets amounted to $ 5.6 billion. (Am. Compl. P 10.)

Bernard L. Schwartz was, at all relevant times, the Chief Executive Officer and Chairman of the Board of Directors of both Loral and Globalstar. (Am. Compl. P 14.) Schwartz owned 2.5% of the common stock of Loral and 1.7% of the common stock of Globalstar. (*Id.*) Richard J. Townsend was, at all relevant times, Chief Financial [*8] Officer of both Loral and Globalstar, as well as Senior Vice President of Loral. (Am. Compl. P 15.)

Globalstar was founded by Loral and Qualcomm Incorporated ("Qualcomm") with the stated goal of owning and operating a satellite constellation network that would serve every populated area of the world. (Am. Compl. P 29.) Globalstar mobile phones function as cellular phones where terrestrial cellular service is available, and, where cellular service is not available, they link up with the Globalstar network of low-earth orbit satellites. (*Id.*) Loral's business plan was to use the Globalstar system to provide a cost-effective communications solution for areas that were either underserved or not served by existing telecommunications infrastructure. (*Id.*)

In 1995, Globalstar received an FCC license to construct and launch its satellite constellation network, and it began placing satellites in orbit in 1998. (Am. Compl. P 30.) The Globalstar system of 48 satellites became operational in 1999, and full commercial service began in the first quarter of 2000. (*Id.*) The Globalstar system operates through a series of "gateways," each of which serves a large geographic area. (Am. Compl. [*9] P 31.) The gateways consist of large antennas that relay calls between the sate1lites and local public telephone networks, as well as other equipment and software that keep the system operational. (*Id.*)

The Globalstar system did not meet Loral's expectations, and Globalstar's poor performance contributed to Loral's net loss of $ 1,469,678,000 for the year 2000, which was reported in Loral's 2000 Form 10-K filed on April 2, 2001. (Am. Compl. PP 104-105.) By April 3, 2001, the price of Loral stock had sunk to $ 1.15 per share, from about $ 18 per share at the beginning of the class period, which was also before the well publicized stock market decline in 2000. (Am. Compl. PP 11, 106.)

The plaintiffs allege that during the class period, the defendants misled the investing public, including the plaintiffs, to believe that Globalstar was meeting or exceeding expectations, and that Globalstar was a viable investment and asset of Loral. (Am. Compl. P 9.) The plaintiffs allege that the defendants made allegedly false and misleading statements concerning Globalstar in public interviews, press releases, and conference calls with investment analysts from November 1999 through January 2001. [*10] (*See, e.g.,* Am. Compl. PP 36-37, 40, 42, 46, 61, 64-65, 69-70, 75, 76, 86, 89.) The plaintiffs also allege that the defendants made other allegedly false and misleading statements in Loral's Form 10-K for the year ended December 31, 1999, in Loral's Form 10-Q for the quarter ending March 31, 2000, in Loral's Form 10-Q for the quarter ended June 30, 2000, and in Loral's Form 10-Q for the quarter ending September 30, 2000. (*See, e.g.,* Am. Compl. PP 53, 56-58, 62-63, 85, 99, 103.)

The alleged misrepresentations and omissions relate to several broad categories of facts and circumstances concerning Loral and the performance of the Globalstar system. First, the plaintiffs allege that the defendants consistently overstated and misrepresented the actual and projected number of subscribers to the Globalstar

communications service, even though the defendants knew that Globalstar was falling short in its attempts to attract subscribers. (Am. Compl. PP 9, 33-36, 37a, 38-39, 43-45, 46a, 61, 64-65, 72-75, 88-89, 92, 108.) Second, the plaintiffs allege that the defendants failed to disclose in a timely fashion the difficulties Globalstar had encountered in rolling out numerous gateways, [*11] difficulties that included regulatory delays in some foreign countries and problems encountered in China, one of Loral's largest anticipated foreign markets. (Am. Compl. PP 36, 37b, 46b, 46c, 47, 67-69, 108-109.) Third, the plaintiffs allege that the defendants failed to disclose that Globalstar's success was affected by the growing market for cellular telephones. (Am. Compl. PP 10, 37c, 46b.) Fourth, the plaintiffs allege that adequate disclosures were not made with respect to the inability of the Globalstar system to support inter-gateway roaming, a problem which depressed customer demand and corporate revenues. (Am. Compl. PP 36, 37d, 44, 69, 108.) Fifth, the plaintiffs allege that in the aftermath of the bankruptcy of Iridium, another company in the space-based communications industry, the defendants misrepresented the differences between Globalstar and Iridium in order to mislead investors into thinking that Globalstar would not face a similar fate as Iridium. (Am. Compl. PP 33, 35, 41-42, 48-49.) Sixth, the plaintiffs allege that Loral made misrepresentations about its intentions to continue to support and invest in Globalstar. (Am. Compl. PP 70, 86.) Finally, the plaintiffs [*12] allege that the defendants failed to recognize an impairment of Loral's investment in Globalstar in Loral's public financial statements until April 2001, a failure that the plaintiffs allege violated Loral's own accounting procedures as well as Generally Accepted Accounting Principles ("GAAP"), and a failure that the plaintiffs allege caused Loral's public filings with the SEC to be materially false and misleading. (Am. Compl. PP 7-8, 39-40, 53, 58-60, 62-63, 77, 82-85, 96-99, 103.)

II

The defendants contend that the plaintiffs' § 10(b) and Rule 10b-5 claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because the plaintiffs have failed adequately to plead scienter pursuant to Federal Rule of Civil Procedure 9(b) and the PSLRA.

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) provides in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-

…

(b) To use or employ, in connection [*13] with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Similarly, Rule 10b-5, promulgated under § 10(b) and codified at 17 C.F.R. § 240.10b-5, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

In order to state a claim brought pursuant to § 10(b) [*14] and Rule 10b-5, a plaintiff must allege sufficiently that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that the plaintiff's reliance on defendant's action caused [the plaintiff] injury." *Rothman v. Gregor,* 220 F.3d 81, 89 (2d Cir. 2000) (alteration in original) (citing *Chill v. GE,* 101 F.3d 263, 266 (2d Cir. 1996)); *see also Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir. 2001) (citing

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir. 1996)); *Buxbaum v. Deutsche Bank,* 196 F. Supp. 2d 367, 372 (S.D.N.Y. 2002).

In the context of securities fraud statutes, scienter "means intent to deceive, manipulate, or defraud, or at least knowing misconduct." *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1467 (2d Cir. 1996) (citations omitted); *see also SEC v. Todt,* 2000 U.S. Dist. LEXIS 2087, No. 98 Civ. 3980, 2000 WL 223836, at *9 (S.D.N.Y. Feb. 25, 2000), *aff'd,* 7 Fed. Appx. 98 (2d Cir. 2001). [*15] Scienter may be inferred from proof of "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" or from proof that a defendant had "both motive and opportunity to commit fraud." *Rothman,* 220 F.3d at 90; *see also Kalnit,* 264 F.3d at 138; *Chill,* 101 F.3d at 267. An "egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of … recklessness." *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000) (quotations omitted).

Moreover, allegations of securities fraud under § 10(b) and Rule 10b-5 are subject to Federal Rule of Civil Procedure 9(b) and the PSLRA'S requirements regarding scienter. *See* 15 U.S.C. § 78u-4(b)(2); *Chill,* 101 F.3d 263, 266 (2d Cir. 1996); *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 52 (2d Cir. 1995); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127-28 (2d Cir. 1994). Under the PSLRA, "plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted [*16] with the required state of mind," namely, the intent to "deceive, manipulate, defraud, or knowing misconduct." *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 537-38 (2d Cir. 1999). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128, *quoted by Press,* 166 F.3d at 538.

The defendants argue that the plaintiffs have not pleaded scienter adequately under either of these two approaches.

A

The defendants first contend that the plaintiffs cannot raise a strong inference of fraud because the plaintiffs have failed to allege that the defendants had both motive and opportunity to commit fraud. In the Amended Complaint, the plaintiffs allege that the defendants were motivated to make material misrepresentations concerning Globalstar's financial condition because the viability of Loral depended on the success of Globalstar, and because the profitability of Globalstar was important to securing [*17] additional financing on favorable terms. (*See, e.g.,* Am. Compl. PP 10-11, 32, 87.) In their papers opposing the motion to dismiss, the plaintiffs add a separate allegation that defendant Schwartz was motivated to commit the alleged fraud in order to protect his reputation as a leading businessman. Even assuming that opportunity is not in dispute, neither of these allegations adequately demonstrates motive.

The Court of Appeals has explained that allegations of motive are sufficient if they "entail concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged." *Kalnit,* 264 F.3d at 139 (internal quotation marks omitted). The plaintiffs "must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Id.* Motives generally possessed by most corporate directors and officers do not suffice. *Id.* Therefore, the Court of Appeals has concluded that motive is not adequately pleaded where the plaintiffs allege that the defendants have a desire for the corporation to appear profitable or a desire to keep stock prices high in order to increase officer compensation. *Id.; see also* [*18] *Novak,* 216 F.3d at 307-08 (collecting cases). By contrast, the Court of Appeals has held that motive is adequately pleaded where the plaintiffs allege that the defendants sold their own shares while at the same time misrepresenting corporate performance in order to inflate stock prices. *See Kalnit,* 264 F.3d at 139; *Novak,* 216 F.3d at 307-08 (collecting cases).

The plaintiffs allege in the Amended Complaint that the defendants were motivated to hide Globalstar's deteriorating financial position because Loral's success depended on the viability of Globalstar, and because Loral hoped to secure additional financing on the most favorable terms possible. These are the types of generalized

motives that the Court of Appeals has concluded do not suffice to establish scienter, because they "could be imputed to any publicly-owned, for-profit endeavor." *Chill,* 101 F.3d at 268 (finding allegations that corporation willfully blinded itself to facts casting doubt on subsidiary's purported profitability in order to justify $ 1 billion investment in subsidiary insufficient to establish motive); *see also Rombach v. Chang,* 355 F.3d 164, 177 (2d Cir. 2004) [*19] (allegations that defendants attempted to artificially inflate and maintain price of corporation's common stock in order to complete a previously arranged corporate acquisition and to retire debt not sufficient to demonstrate motive); *San Leandro,* 75 F.3d at 814 (company's desire to maintain high bond and credit ratings is not sufficient motive from which to infer scienter).

The plaintiffs' reliance on this Court's decision in *In re Credit Suisse First Boston Corp. Sec. Litig.,* 1998 U.S. Dist. LEXIS 16560, 1998 WL 734365 (S.D.N.Y. Oct. 20, 1998), is misplaced. In that case, the Court did not hold that the plaintiffs had alleged a sufficient motive to establish scienter. *See id.* 1998 U.S. Dist. LEXIS 16560, [WL] at *10 n.3. In any event, the motive alleged in that case was more direct and concrete than that alleged here. The plaintiffs in *Credit Suisse* alleged "that" the defendants had short positions in the stock and issued sell recommendations in order to drive down the price of the stock and thus directly profit their investment." *Id.* 1998 U.S. Dist. LEXIS 16560, [WL] at *10. The plaintiffs in this case have not alleged a similarly personal and concrete benefit that the defendants realized from the alleged fraud.

The [*20] plaintiffs attempt to bolster their allegations of motive in their opposition papers. They insist that defendant Schwartz was motivated to misrepresent Globalstar's financial condition so that he could protect his professional reputation. This allegation is also insufficient. In *Shields,* the Court of Appeals rejected as inadequate the plaintiffs' allegations that the defendants were motivated to inflate the corporation's stock price in order to protect their executive positions and compensation and prestige. *Shields,* 25 F.3d at 1130. Similarly, in *Acito,* the Court of Appeals rejected as insufficient the plaintiffs' allegations that the defendants were motivated to defraud the public because an inflated stock price would increase their incentive-based compensation. *See Acito,* 47 F.3d at 54. The Court of Appeals concluded that "if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Id.; see also Rombach,* 355 F.3d at 177. The plaintiffs' allegation that defendant Schwartz was motivated to protect [*21] his reputation as a businessman is even more generalized than the motives alleged in *Shields* and *Acito.* It would be difficult to find a corporate officer who does not wish to protect his or her professional reputation. Moreover, the plaintiffs' argument that Schwartz was motivated to engage in fraud to protect his professional reputation--when there was substantial risk that any such fraud would eventually be disclosed--is, at the very least, strained. *See Shields,* 25 F.3d at 1130 ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning.")

For these reasons, even assuming that opportunity is not in dispute, the plaintiffs have failed to allege motive sufficiently to establish scienter.

B

Because the plaintiffs have failed adequately to plead motive and opportunity to commit fraud, the Amended Complaint can survive the defendants' motion to dismiss only if the facts alleged in the Amended Complaint constitute circumstantial evidence of conscious misbehavior or recklessness by the defendants. The Court of Appeals has noted that, even in the context of a motion to dismiss, "this is a highly fact-based inquiry." *Kalnit,* 264 F.3d at 142. [*22] The inquiry thus requires that the Court consider all of the allegations in the Complaint in their totality. *See In re Scholastic Corp. Secs. Litig.,* 252 F.3d 63, 74-77 (2d Cir. 2001); *In re Duane Reade Inc. Sec. Litig.,* 2003 U.S. Dist. LEXIS 21319, No. 02 Civ. 6478, 2003 WL 22801416, at *9 (S.D.N.Y. Nov. 25, 2003) (noting that court should consider allegations in complaint "in their totality" in determining whether plaintiffs have adequately pleaded conscious misbehavior or recklessness). In addition, "the strength of the circumstantial

allegations must be correspondingly greater" where motive is not apparent. *Kalnit,* 264 F.3d at 142 (internal quotation marks omitted).

The Court of Appeals has explained that "reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill,* 101 F.3d at 269 (internal quotation marks omitted); *Kalnit,* 264 F.3d at 142. For example, plaintiffs can plead scienter based on recklessness [*23] when they "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements." *Novak,* 216 F.3d at 308. In some cases, recklessness can be inferred from "an egregious refusal to see the obvious, or to investigate the doubtful …." *Chill,* 101 F.3d at 269 (internal quotation marks omitted). In any event, the facts alleged must be sufficiently strong circumstantial evidence of the alleged recklessness that the alleged facts give rise to a strong inference of fraudulent intent. *See id.* (collecting cases).

For the reasons explained below, with respect to each set of alleged material misrepresentations or omissions, the plaintiffs have not adequately alleged facts that give rise to an inference of conscious misbehavior or recklessness on the part of the defendants.

1

The plaintiffs allege that the defendants' statements concerning the actual and potential number of Globalstar subscribers are circumstantial evidence of conscious misbehavior or recklessness. The plaintiffs allege that, during the class period, the defendants made material misrepresentations concerning projected consumer demand for [*24] the Globalstar service, even though the defendants knew that those projections were unreasonable and unattainable. (*See, e.g.,* Am. Compl. PP 33-35, 38-39, 43-44, 61.) The plaintiffs allege that the defendants knew that the projections were unattainable because the defendants allegedly received weekly reports disclosing the low number of actual Globalstar subscribers. (*See, e.g.,* Am. Compl. PP 37a, 108.) The plaintiffs also allege that the defendants knew that the subscriber projections were false when made in December 1999 because "according to a former Globalstar senior business development manager," the subscriber projections were based on the premise that the majority of Globalstar's 38 planned gateways were in operation as of October 1999, when there were in fact allegedly only three gateways then in operation. (Am. Compl. P 37(b).)

For example, the plaintiffs allege that defendant Schwartz stated in an *Aerospace Daily* article published on November 4, 1999 that he expected Globalstar to have between 650,000 and 1,000,000 telephone subscribers worldwide by the end of 2000. (Am. Compl. P 33.) The plaintiffs allege that in an interview published in *Satellite News* [*25] on December 6, 1999, Schwartz indicated that Globalstar would have 35,000 to 40,000 subscribers by the end of 1999, and about 650,000 subscribers by the end of 2000. (Am. Compl. P 34.) The plaintiffs further allege that Schwartz estimated 500,000 subscribers by the end of 2000 when he was interviewed for a *Wall Street Journal* article published on February 24, 2000 as well as during an investor conference call on March 8, 2000. (Am. Compl. PP 43-44.) The plaintiffs also allege that Schwartz stated in a May 4, 2000 conference call with investment analysts that there were 75,000 phones "in the system" without clarifying that the number referred to the phones in Globalstar's distribution system, not the number of phones purchased or in use. (Am. Compl. P 61.) The plaintiffs allege that all of these statements were materially false and misleading. (Am. Compl. PP 36, 43, 46, 61.)

However, the defendants' public statements during the class period indicate that the defendants disclosed not only that subscriber demand was unpredictable, but also that Globalstar subscribers were fewer than had been previously predicted. For example, in Globalstar's Form 10-K for the Year ending December 31, 1998, which [*26] was filed substantially before Globalstar began commercial service, the defendants warned in no uncertain terms, "THE GLOBALSTAR SYSTEM IS NOT OPERATIONAL, AND UNTIL IT IS, WE CAN'T PREDICT CUSTOMER DEMAND FOR THE SERVICE." (Globalstar Form 10-K for the Year ending Dec. 31, 1998 ("Globalstar 1998 Form 10-K") attached as Ex. 2 to Affidavit of Francis J. Menton, Jr. ("Menton Aff.") sworn to July 31, 2003, at 15.)

The substance of this warning was reiterated in Loral's 1999 Form 10-K, which stated, "THE GLOBALSTAR SYSTEM HAS JUST COMMENCED OPERATIONS AND WE CANNOT PREDICT CONSUMER DEMAND FOR THE SERVICE." (Loral Form 10-K for the Year ending Dec. 31, 1999 ("Loral 1999 Form 10-K") attached as Ex. 7 to Menton Aff. at 18.) Loral's 1999 Form 10-K further stated that Loral could not assure investors "that Globalstar will attract enough subscribers either to compete effectively or to implement fully its current business plan." (*Id.* at 23-24.) Moreover, in quarterly financial statements issued after Globalstar commenced commercial service in the first quarter of 2000 the defendants disclosed that the actual number of subscribers had not met expectations. (*See, e.g.,* Loral Form 10-Q for [*27] Quarterly Period ending June 30, 2000 ("Loral June 2000 Form 10-Q") attached as Ex. 32 to Menton Aff. at 19 ("Globalstar's subscriber demand to date has been lower than anticipated ….").) On October 27, 2000, six months before the end of the class period, the defendants disclosed that Globalstar had only 21,300 subscribers. (Am. Compl. P 92.)

Even during the March 8, 2000 conference call, when defendant Schwartz decided not to revise the previous projection of 500,000 subscribers by the end of 2000, Schwartz cautioned against relying too firmly on the anticipated subscribers. Indeed, at the outset of the call, Schwartz warned that any information from the first quarter of 2000 was "not reliable." (Transcript of March 8, 2000 Conference Call attached as Ex. 12 to Menton Aff., at 3.) On the basis of several weeks of actual experience Schwarz noted that the launch of the service "is a little bit slower than we had hoped," but he was "hopeful that we'll be able to recover--later in the year now; I don't know that we will be able to do that." (*Id.* at 27.) Schwartz indicated that he was reluctant to revise the previous projections of 600,000 phones and 500,000 subscribers by the end [*28] of the year, "because I don't know what to change it to, and I won't know what to change it to until later in the year when the experience gets a little bit stronger for us to base an assessment on." (*Id.* at 27.) Schwartz cautioned with respect to the projection that "at this stage of the game, the numbers are entirely too sketchy to have a firm stand on it." (*Id.*)

These relevant warnings and disclosures, prior to and during the class period, show that the defendants acknowledged that any predictions of potential Globalstar customers would remain uncertain. These disclosures necessarily tempered the defendants' optimistic projections of future Globalstar subscribers. Therefore, the disclosure in October 2000 that the Globalstar had only 21,300 subscribers does not raise a strong inference of fraudulent intent with respect to the earlier projections, because the defendants continually cautioned that the projections were not firm or reliable and could be revised downward once further information was available as the year progressed. Without more, therefore, the projections themselves could not provide sufficient circumstantial evidence of conscious misbehavior or recklessness [*29] by the defendants. Indeed, the cautions, the necessarily hypothetical nature of the projections, the frank admission of the slow start, and the disclosure of the actual subscriber number undercut the plaintiffs' speculation that the defendants were consciously attempting to defraud investors. [3] To raise an inference of fraudulent intent, the plaintiffs must allege with particularity facts demonstrating that the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak,* 216 F.3d at 311.

[*30] The plaintiffs allege that the defendants knew that the projections were materially misleading because the defendants allegedly were privy to internal Loral reports and memoranda that directly contradicted the defendants' projections of consumer demand for the Globalstar service. The plaintiffs allege that the defendants received weekly and monthly reports updating the number of subscribers and the number of airtime minutes sold. (*See* Am.

---

[3] The plaintiffs' allegation that Schwartz stated in a May 4, 2000 conference call that there were 75,000 phones "in the system" without clarifying that the number referred to the phones in Globalstar's distribution system, not the number of phones purchased or in use, (Am. Compl. P 61), also does not raise a strong inference of fraudulent intent. During the conference call, Schwarz stated that there were "73,000 handsets currently in the pipeline," and also stated that "subscriber numbers will be reported in 2Q results." (Ex. 23 to Menton Aff. at 009.) Given that Schwartz indicated that subscriber numbers would be released at a later date, and given the other relevant warnings and disclosures noted in the text, Schwartz's statement that there were 73,000 phones "in the pipeline" or "in the system" does not suggest that this was a subscriber number nor does it give rise to an inference of fraudulent intent.

Compl. PP 37a, 74, 76-77, 108.) However, the plaintiffs have not adequately identified the reports and memoranda that ostensibly contained facts contradicting the defendants' statements. *See Novak,* 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); *San Leandro,* 75 F.3d at 812 ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."). Nor have the defendants adequately alleged when the defendants first began to have access to this weekly and monthly data. The plaintiffs [*31] allege that the defendants must have had access to such information because the defendants referred to such weekly and monthly reports in some of their public statements; however, the public statements alleged in the Amended Complaint that refer to such reports were not made until the middle of 2000. (*See* Am. Compl. 74, 76-77.) Moreover, the reports described referred to actual subscribers and airtime minutes actually sold. [4] Such statistics could not have been available until, at the earliest, the first quarter of 2000, when the system first became commercially operational. (*See* Am. Compl. P 30.) That was the time when Schwartz announced publicly that the rollout was a little bit slower than had been hoped for, that projections were not reliable, and that, although he was hopeful, he did not know whether Globalstar would be able to recover later in the year. "As long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak,* 216 F.3d at 309.

[*32] Because the plaintiffs have not alleged with sufficient particularity the nature, the content, the reliability, or the availability of the allegedly contradictory internal reports, the allegations concerning this information do not provide sufficient circumstantial evidence to raise a strong inference of the defendants' fraudulent intent. The plaintiffs' general allegation that internal company reports contradicted the defendants' projections of Globalstar's eventual subscribers is insufficient to raise an inference that the defendants were reckless in making those projections. *See Novak,* 216 F.3d at 309 ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." (internal citation omitted)).

The plaintiffs' allegations concerning the unnamed Globalstar source are also insufficient to raise a strong inference of the defendants' fraudulent intent. The plaintiffs allege that a former Globalstar senior business [*33] development manager stated that the December 1999 subscriber projections for the end of 2000 were based on the premise that a majority of Globalstar's 38 planned gateways were in operation as of October 1999, even though the defendants knew that only three gateways were actually operational at that time. (*See* Am. Compl. P 37(b).) At the pleading stage, "confidential" sources need not be named, "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak,* 216 F.3d at 314.

Even assuming that a "senior business development manager" would possess the information alleged, the allegation is not specific enough to raise a strong inference of fraudulent intent. To plead scienter, the information alleged to be contradictory must suggest that the defendants knew, or were reckless in not knowing, that the subscriber projections were false or without any reasonable basis. The plaintiffs do not allege that the Globalstar "senior business development manager" ever alleged that the projections were false or misleading or should be withdrawn. [*34] The plaintiffs also do not allege that the unnamed Globalstar manager ever stated that the projections could not be achieved by the end of 2000. While the plaintiffs conclusorily allege that the defendants knew that the delay in rolling out gateways made the subscriber projections unrealistic, they provide no factual basis for that assertion. (*See* Am. Compl. P 37(b).) When the actual subscribers fell behind initial projections, Schwartz acknowledged that

---

[4] For example, the plaintiffs themselves allege that "business development and sales employees of Globalstar compiled data about the number of Globalstar subscribers and satellite airtime minutes sold on a weekly basis," and that "these numbers were placed into one master weekly report" that was allegedly reviewed by the defendants. (Am. Compl. P 108.)

fact and coupled it with the hope, but not the promise, that Globalstar would be able to recover in the later part of the year. (*See* Ex. 12 to Menton Aff. at 27.)

Globalstar's progress in opening gateways was reported throughout the class period. The plaintiffs do not allege that the defendants ever misrepresented the number of gateways that were actually operational. Indeed, the defendants continually disclosed the number of gateways that were actually operational. In a February 2000 press release, for example, the defendants stated that only ten gateways were operational. (Am. Compl. P 39.) Loral's Form 10-Q for the quarter ending March 31, 2000, dated May 15, 2000, reported that as of March 31, 2000, eleven gateways were [*35] operational. (Loral Form 10-Q for the quarter ending March 31, 2000 ("Loral March 2000 Form 10-Q") attached as Ex. 19 to Menton Aff., at 17.) Loral's Form 10-Q for the quarter ending June 30, 2000, dated August 11, 2000, stated that seventeen gateways were operational. (Loral June 2000 Form 10-Q at 19.) Moreover, there is no contention that Loral misrepresented the rather meager actual revenues and usage of Globalstar throughout the class period. Loral's Form 10-Q for the quarter ending March 31, 2000 reported that Globalstar was in the development stage through 1999, began commercial operation in 2000, realized revenues of $ 600,000 for the quarter ended March 31, 2000, and increased its $ 42 million loss in 1999 to $ 57 million, measured by earnings before interest, taxes, depreciation, and amortization ("EBITDA"). (Loral March Form 10-Q at 20.) Loral's Form 10-Q for the quarter ended June 30, 2000, reported that Globalstar realized revenues of $ 700,000, on 1,137,000 minutes of billable service, and that Globalstar's EBITDA increased to $ 52 million in 2000. (Loral June Form 10-Q at 23.) Loral also candidly reported that "Globalstar's subscriber demand has been lower than anticipated [*36] and it must achieve revenue quickly in order to meet a financial covenant that will become effective in March 2001 …." (*Id.* at 19.) The plaintiffs' allegation does not raise a strong inference of fraudulent intent by the defendants.

This case differs from cases such as *Cosmas v. Hassett,* 886 F.2d 8 (2d Cir. 1989), where the Court of Appeals concluded that the plaintiffs had raised a strong inference of fraudulent intent where the defendants stated that sales to China would be "an important new source of revenue," even though they knew that China had imposed new import restrictions that made it "impossible" for the corporation at issue to make any sales to that country. *Id.* at 12-13. To raise a strong inference of fraudulent intent, as the plaintiffs did in *Cosmas,* the Amended Complaint must contain more specific allegations of the defendants' knowledge of facts or access to information timely contradicting the subscriber projections and the ability of Globalstar eventually to meet such projections than the plaintiffs have alleged here.

Therefore, the defendants' statements concerning the actual and projected number of Globalstar subscribers [*37] are not sufficient circumstantial evidence of conscious misbehavior or recklessness by the defendants such that the statements raise a strong inference of fraudulent intent. *See Shields,* 25 F.3d at 1129 ("Misguided optimism is not a cause of action, and does not support an inference of fraud. We have rejected the legitimacy of alleging fraud by hindsight." (internal quotation marks omitted)). [5]

[*38]  2

---

[5] At oral argument, the plaintiffs relied on a recent decision by Judge Stein in *In re Globalstar Secs. Litig.,* 2003 U.S. Dist. LEXIS 22496, No. 01 Civ. 1748, 2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003). That case involves allegations very similar to those alleged by the plaintiffs in this case, but with some differences. The complaint before Judge Stein was filed by shareholders of Globalstar rather than Loral, and the class period extended from December 6, 1999 to October 27, 2000, rather than from November 4, 1999 to April 2, 2001 as in this case. Judge Stein concluded that the plaintiffs in *Globalstar* adequately pleaded scienter under the PSLRA and Rule 9(b). The difference in class periods is of some significance because Judge Stein relied on, among other things, statements issued after the class period in his case, but during the class period in this case, to support the inference that the defendants were acting with reckless disregard for the facts because they acknowledged the facts soon after the class period was over. In this case, the statements about actual Globalstar usage made during the class period are part of the pattern of disclosures that undercut the argument that the defendants were consciously or recklessly misrepresenting the facts rather than making good faith predictions and then reporting the adverse results throughout the class period. In any event, for the reasons explained in the text, the Court finds that in this case, the plaintiffs have failed to allege sufficient circumstantial evidence of conscious misbehavior or recklessness.

The plaintiffs allege that, throughout the class period, the defendants misrepresented the pace at which the gateway rollout was proceeding, and failed to disclose that Globalstar was having problems with specific gateways, particularly those related to China.

The plaintiffs specifically allege (1) that during a March 8, 2000 conference call Schwartz failed to disclose problems with respect to Globalstar's rollout in South and East Africa (Am. Compl. PP 46b); (2) that as of March 2000, the defendants knew that the two of the three anticipated China gateways were not operational, and therefore Globalstar would fall far short of its anticipated 58,000 Chinese subscribers (Am. Compl. P 47); and (3) that Globalstar's May 25, 2000 announcement that 100,000 new Chinese subscribers would exist by 2002-2003 was fraudulent given Globalstar's knowledge of the failure of the China gateways. (Am. Compl. PP 67-69.)

In the context of the substantial and ongoing public disclosures that Loral and Globalstar made in their public SEC filings, these alleged facts do not raise an inference of conscious misbehavior or recklessness. In its 1998 Form 10-K, Globalstar disclosed the obvious facts that [*39] its operations could be delayed by, among other things, "regulatory delays," "delay in the integration of Globalstar's system into the land-based network," "changes in technical specifications," "construction delays," "launch delays or failures," and "slower-than-anticipated consumer acceptance." (Globalstar 1998 Form 10-K at 16-17.) The disclosures placed investors on notice that delays could occur in rolling out the Globalstar system's technological infrastructure, including the gateways. Similar warnings were repeated in subsequent public filings. (*See, e.g.,* Loral 1999 Form 10-K at 18 ("Globalstar service providers could fail to obtain local partners; to acquire, install or adequately maintain and operate the Globalstar gateways; or to obtain the regulatory licenses needed for service in their countries.").)

Moreover, prior to the Globalstar system coming on-line, Globalstar indicated that the nature of foreign operations entailed inherent uncertainty and risk, and it was therefore impossible to guarantee success regarding foreign markets or their subscribers. (*See* Globalstar 1998 Form 10-K at 17 ("GLOBALSTAR FACES RISKS INHERENT IN FOREIGN OPERATIONS."); Loral 1999 Form 10-K at 18 [*40] ("Globalstar service providers could fail to obtain local partners …. If Globalstar is unable to offer service in any particular region or country, it will not benefit from the potential demand in that region or country."). Given these broad disclosures in which the defendants plainly reveal the risks inherent in operations in foreign markets, the defendants' statements concerning the possible success of foreign operations do not give rise to an inference of fraudulent intent. The plaintiffs' conclusory allegations of fraud are further undercut by the fact that, as explained above, there is no allegation that Loral failed to disclose the actual number of gateways that were in fact operational, and Loral did disclose the progress of opening gateways. Indeed, the plaintiffs' own allegations make it clear that Loral accurately announced in May 2000 that it opened only one of three gateways in China and the other two were only expected to be opened toward the end of 2000. (*See* Am. Compl. P 67.)

3

The plaintiffs allege that the defendants failed to disclose the impact that the growing market for cellular telephones would have on the demand for Globalstar's services. (Am. Compl. [*41] PP 10, 37c, 46b.) In the context of the consistent disclosures by the defendants, there is no basis to infer from this alleged omission that the defendants acted with scienter. For example, prior to the class period, it was reported:

> It is expected that as land-based telecommunications service expands to regions currently not served by wireline or cellular services, demand for Globalstar service in those regions may be reduced. If such systems are constructed at a more rapid rate than that anticipated by Globalstar, the demand for Globalstar service may be reduced at rates higher than those assumed by Globalstar …. New technology could render Globalstar obsolete or less competitive by satisfying consumer demand in alternative ways ….

(Globalstar 1998 Form 10-K at 13-14.) This warning was substantially reiterated in Loral's 1999 Form 10-K. (*See* Loral 1999 Form 10-K at 23-24 ("Globalstar faces intense competition for customers from various companies,

including providers of land-based mobile phone services ....").) Given the defendants' disclosures concerning the relevant competitive market forces, including cellular telephone services, the defendants' alleged [*42] failure to disclose that Globalstar's success would be affected by the growing market for cellular telephones does not give rise to an inference of conscious misbehavior or recklessness on the part of the defendants.

4

The plaintiffs allege that the defendants failed to disclose problems arising out of the Globalstar system's inability to support calls placed by subscribers in one gateway to subscribers in another gateway, a feature known as "inter-gateway roaming." (Am. Compl. PP 36, 37d, 69.) The plaintiffs allege that during a March 8, 2000 conference call Schwartz misled investors by indicating that inter-gateway roaming problems were limited to specific gateways, and that those problems would be resolved by April 2000. (Am. Compl. P 44.)

The statements regarding inter-gateway roaming are not sufficient circumstantial evidence of conscious misbehavior or recklessness by the defendants. As noted above, the defendants consistently indicated that technological difficulties could be expected in implementing the Globalstar system. The defendants disclosed that the gateways could encounter technological hurdles; the inter-gateway roaming problem was one of those hurdles. (*See, e.* [*43] *g.,* Globalstar 1998 Form 10-K at 16-17.) There are no facts alleged that would suggest that the defendants' statements or omissions concerning inter-gateway roaming were either intentionally or recklessly false or misleading. The defendants made substantial disclosures concerning the technological difficulties that could arise in a space-based telecommunications systems, and any statements or omissions that the defendants made concerning inter-gateway roaming within the Globalstar system do not give rise to an inference of fraudulent intent.

5

The plaintiffs allege that the defendants' statements distinguishing Globalstar from Iridium, which filed for bankruptcy after failing to establish a space-based telecommunications system similar to Globalstar's, give rise to an inference of fraudulent intent. The plaintiffs allege that in interviews with *Aerospace Daily, International Herald Tribune, CNET News.com,* and *Daily Deal.com,* and in an appearance on a CNBC news show, Schwartz materially misrepresented the differences between Iridium's bankruptcy and Globalstar's future prospects. (Am. Compl. PP 33, 35, 41-42, 48-49.)

However, in the context of the defendants' [*44] other disclosures about Iridium, the statements by Schwartz do not give rise to a strong inference of fraudulent intent. For example, Loral's 1999 Form 10-K contains the following explicit disclosure concerning Iridium:

> Since telephone systems using low-earth orbit satellites are a new commercial technology, we cannot predict demand for Globalstar's service. The first company to launch service in this industry, Iridium L.L.C. filed for bankruptcy in August 1999. More recently, Iridium announced that it was terminating commercial service on March 17, 2000 and that it was commencing the process of liquidating its assets. If Globalstar fails to generate sufficient cash flow from operations through the marketing efforts of its service providers, it will be unable to fund its operating costs or service its debt.

(Loral 1999 Form 10-K at 17.) This statement discloses the existence of Iridium's failures and indicates that Globalstar could conceivably suffer the same fate. In the context of this overall and generalized warning, any representations made by Schwartz in attempting to distinguish Globalstar from Iridium do not give rise to an inference of fraudulent intent.

6

[*45] The plaintiffs allege that investors were misled by the defendants' statements that Loral would continue to support Globalstar, and that these statements are further circumstantial evidence of conscious misbehavior or

recklessness on the part of the defendants. The plaintiffs allege that the defendants made misrepresentations regarding Loral's intentions to invest in Globalstar on at least two occasions. The plaintiffs allege that in a June 2000 interview with *Reuters,* Schwartz stated that Loral "would continue to back Globalstar" and that Loral "would continue to make this investment because we think it is a very good business. That is why we are not going to get out of the business." (Am. Compl. P 70.) The plaintiffs further allege that in an August 27, 2000 interview with *The New York Times* Schwartz stated that he remained optimistic about Globalstar and that Loral would continue to be a financial supporter of Globalstar. (Am. Compl. P 86.) The plaintiffs allege that these statements were made at the same time that Loral was balking at the prospect of continuing its financial support of Globalstar. (*Id.*)

These statements do not provide sufficient circumstantial evidence [*46] of conscious misbehavior or recklessness on the part of the defendants. The plaintiffs have not alleged any facts that suggest that the statements were intentionally or recklessly false. The plaintiffs' conclusory allegation that Loral was "balking" at future financial support of Globalstar is insufficient. *See Shields,* 25 F.3d at 1129 (concluding that "pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent" is insufficient to raise a strong inference that the defendants knew or recklessly disregarded facts).

Moreover, to the extent that Loral did in fact reduce its financial support of Globalstar, the defendants' prior disclosures concerning the risk involved in the Globalstar venture indicated that Loral's future investment in Globalstar was not guaranteed and would not necessarily continue indefinitely. For example, Loral's 1999 Form 10-K stated: "We intend to use our available cash … and the net proceeds from our February 2000 offering of preferred stock to help pay for the growth and operation of our businesses. If any of our subsidiaries or affiliates finds itself faced with an imminent default, we may [*47] be faced with a choice between providing additional support to that company or accepting the loss of some or all of our equity investment." (Loral 1999 Form 10-K at 17.) Loral's 1999 Form 10-K also disclosed the boundaries of its investment in Globalstar, the fact that Globalstar was in need of additional financing, and the fact that no assurances could be made that additional funding would be available. (*See* Loral 1999 Form 10-K at 44-45.) The substance of these disclosures was reiterated in Loral's subsequent filings with the SEC. (*See, e.g.,* Loral March Form 10-Q at 23-24.)

Given the defendants' statements in public disclosures that Loral's financial investment in Globalstar was not unconditional, and given the plaintiffs' failure to allege any facts suggesting that defendant Schwartz's statements about Loral's ongoing financial support of Globalstar were intentionally or recklessly false when they were made, Schwartz's statements do not give rise to a strong inference of fraudulent intent.

7

The plaintiffs also allege that the defendants violated their own internal accounting practices as well as Generally Accepted Accounting Principles ("GAAP") by failing to take an [*48] impairment charge on its investment in Globalstar before April 2, 2001, the date on which it actually took the charge. (*See* Am. Compl. PP 7-8, 39-40, 53, 58-60, 62-63, 77, 82-85, 96-99, 103.) The plaintiffs specifically allege that Loral's delay in writing down its investment in Globalstar violated Financial Accounting Standards Board Statement Nos. 5 and 121. The plaintiffs also allege that by using a twenty-year amortization period Loral falsely indicated that Globalstar continued to be a viable business. The plaintiffs contend that these alleged violations of accounting principles give rise to a strong inference of scienter.

These allegations are similar to those that the Court of Appeals in *Shields* found insufficient to plead scienter. *See Shields,* 25 F.3d 1128-29. As in *Shields,* the plaintiffs' allegations lack "particularized facts to support the inference that the defendants acted recklessly or with fraudulent intent." *Id.* at 1129. The plaintiffs use the Amended Complaint "to couple a factual statement with a conclusory allegation of fraudulent intent," but as the Court of Appeals explained in *Shields,* to plead scienter plaintiffs [*49] must allege facts that give rise to a strong inference

that the defendants knew or recklessly disregarded information contradicting the alleged misstatements or omissions. *Id.*

The plaintiffs try to avoid this problem by alleging that the defendants had internal reports that indicated that Loral should have taken an impairment charge long before April 2, 2001. These are the same internal reports that the plaintiffs allege included information that contradicted the defendants' statements concerning the actual and projected Globalstar subscribers. However, for the reasons stated above, the plaintiffs have not adequately identified the ostensible reports or the specific information contained in them that the defendants either intentionally or recklessly disregarded when determining whether to take an impairment charge on its investment in Globalstar. There are no allegations that there were any internal reports that suggested that the failure to take an impairment charge earlier was an incorrect application of accounting principles, much less an error so grievous that it exceeded differences over accounting principles and rose to the level of fraud.

As the public filings discussed [*50] above indicate, the evolving poor performance of Globalstar during 2000 was publicly disclosed. When the impairments became so severe as to require specific accounting charges, and whether the requirements of the accounting principles were satisfied, necessarily involved issues of judgment. *See Thor Power Tool Co. v. Comm'r Internal Revenue,* 439 U.S. 522, 544, 58 L. Ed. 2d 785, 99 S. Ct. 773 (1979) ("'Generally accepted accounting principles' … tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.") The failure to comply with standard accounting practices, without more, does not constitute circumstantial evidence of misconduct or recklessness. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir. 1999) (quotations omitted); *see also Chill,* 101 F.3d at 270 ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."); *S.E.C. v. Price Waterhouse,* 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) [*51] (noting that "misapplication of accounting principles" is insufficient to state securities fraud claim). The plaintiffs have failed to allege sufficient facts to show that the failure to take an earlier impairment charge was so clearly required by accounting principles that the failure to take such a charge was fraudulent, particularly in view of the disclosures of the ongoing poor performance of Globalstar. Therefore, the plaintiffs allegations that the defendants violated various accounting practices by incorrectly calculating Globalstar's losses and by failing to recognize impairment losses in Loral's public SEC filings do not give rise to the necessary inference of fraud.

Accordingly, the plaintiffs have failed to plead scienter under either of the two approaches permitted for securities fraud claims. None of the allegations in the Amended Complaint, either individually or in combination, give rise to the strong inference of scienter required by Rule 9(b) and the PSLRA. Therefore, the defendants' motion to dismiss the § 10(b) and Rule 10b-5 claim for failure to state a claim is granted. [6]

 [*52] III

The defendants also move to dismiss the plaintiffs' claims on the grounds that the statements identified by the plaintiffs as misrepresentations or omissions are not actionable under § 10(b) or Rule 10b-5 because they are statements that are merely predictive statements reflecting the defendants' optimism about Globalstar. As the Court of Appeals recently stated, "under the bespeaks caution doctrine, 'alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'" *Rombach,* 355 F.3d at 173 (quoting *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir. 2002)). In making this determination, the Court must analyze

---

[6] Because the plaintiffs have failed adequately to plead scienter, it is not necessary to reach the defendants' arguments that the plaintiffs have failed properly to allege reliance or loss causation.

the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby [*53] mislead a reasonable investor regarding the nature of the securities offered.

*Id.* (quoting *Halperin v. eBanker USA.COM, Inc.,* 295 F.3d 352, 357). The Court of Appeals also observed that "expressions of puffery and corporate optimism do not give rise to securities violations." *Id.* at 174.

Although not all of the categories of statements in the Amended Complaint are statements predicting future events or are of an optimistic quality, three sets of statements do fall in this category, namely: (1) statements regarding the expected number of Globalstar subscribers that the defendants expected to have by a certain time (*see, e.g.,* Am. Compl. PP 33-36, 38-39, 43-44, 46a, 61); (2) statements regarding the number of expected Chinese subscribers (*see* Am. Compl. PP 47, 67-69); and (3) statements by Schwartz predicting when inter-gateway roaming problems would be fixed. (*See* Am. Compl. P 44.) For the reasons explained above, when these statements are placed in the context of all of statements made by the defendants, no reasonable investor could have been misled by them, because they are statements about predicted future events and reflected the company's optimism. As such, they [*54] are not actionable under the Exchange Act. *See San Leandro,* 75 F.3d at 811-12 (collecting cases) (holding defendants had no duty to disclose adverse sales figures notwithstanding prior statements that projected continued growth and profitability); *Lasker v. New York State Elec. & Gas Corp.,* 85 F.3d 55, 58-59 (2d Cir. 1996) (per curiam) (affirming district court's determination that company's statements regarding future earnings, sales goals, and desire for continued prosperity constituted unactionable puffery); *Shields,* 25 F.3d at 1129-30 ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."). [7]

[*55] IV

The defendants also move to dismiss the plaintiffs' claim against Schwartz, an individual defendant, brought under Section 20(a) of the Exchange Act.

Section 20(a) provides that "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. To make out a prima facie case under Section 20(a) a plaintiff "must show a primary violation [of the Exchange Act] by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *First Jersey Sec. Inc.,* 101 F.3d at 1472 (quotation marks and internal alterations omitted). For the reasons states above, the plaintiffs have failed to allege [*56] sufficient facts to demonstrate a violation of § 10(b) of the Exchange Act by Loral; therefore, the plaintiffs have not satisfied the first element of a § 20(a) claim. Consequently, the § 20(a) claim against defendant Schwartz is dismissed.

CONCLUSION

---

[7] It is unnecessary to reach the defendants' additional argument that the alleged misstatements are also protected under the "safe harbor" provision of the PSLRA for forward-looking statements, identified as such, that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c).

The Court has considered all of the remaining arguments of the parties, and they are either moot or without merit. For the reasons stated above, the defendants' motion to dismiss the claims in the Amended Complaint against defendants Schwartz and Townsend is granted.

**SO ORDERED.**

**Dated: February 23, 2004**

**John G. Koeltl**

**United States District Judge**

# In re Tetra Techs., Inc. Sec. Litig.

United States District Court for the Southern District of Texas, Houston Division

July 9, 2009, Decided; July 9, 2009, Filed

CIVIL ACTION NO. 4:08-cv-0965

**Reporter**
2009 U.S. Dist. LEXIS 126687 *; 2009 WL 6325540

IN RE: TETRA TECHNOLOGIES, INC. SECURITIES LITIGATION

**Subsequent History:** Clarified by In re Tetra Techs. Inc., Sec. Litig., 2009 U.S. Dist. LEXIS 126825 (S.D. Tex., Aug. 10, 2009)

**Prior History:** In re Tetra Techs., Inc. Sec. Litig., 2008 U.S. Dist. LEXIS 112706 (S.D. Tex., June 27, 2008)

**Counsel:** [*1] For City of Livonia Employees' Retirement System, Plaintiff: David Avi Rosenfeld, LEAD ATTORNEY, Coughlin Stocia Geller Rudman & Rubbins LLP, Melville, NY; Roger B Greenberg, LEAD ATTORNEY, Schwartz Junell et al, Houston, TX; Samuel H Rudman, LEAD ATTORNEY, Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY; Beth A Kaswan, ScottScott LLP, New York, NY; John Henry Crouch, IV, Kilgore Kilgore PLLC, Dallas, TX.

For Jon P Leim, Plaintiff: Thomas E Bilek, LEAD ATTORNEY, The Bilek Law Firm LLP, Houston, TX; Beth A Kaswan, ScottScott LLP, New York, NY.

For Fulton County Employees' Retirement System, Plaintiff: David R Scott, LEAD ATTORNEY, Scott & Scott, Colchester, CT; Amanda F Lawrence, PRO HAC VICE, Scott and Scott LLP, Colchester, CT; Beth A Kaswan, Scott+Scott LLP, New York, NY; John Henry Crouch, IV, Kilgore Kilgore PLLC, Dallas, TX; Theodore C Anderson, Kilgore & Kilgore PLLC, Dallas, TX.

For TETRA Technologies Inc., Geoffrey M. Hertel, George McCarroll, Defendants: Paul R Bessette, Royale M Pence, Greenberg Traurig LLP, Austin, TX.

For Jospeh M. Abell, III, Raymond Symens, Defendants: Paul R Bessette, Greenberg Traurig LLP, Austin, TX.

For New Jersey Carpenters Pension Fund, Movant: [*2] Stephen L Hubbard, LEAD ATTORNEY, Hubbard & Biederman LLP, Dallas, TX.

For Michigan Pension Funds, Movant: Roger B Greenberg, LEAD ATTORNEY, Schwartz Junell et al, Houston, TX.

For Ernst & Young LLP, Movant: Mark Daniel Manela, Mayer Brown et al, Houston, TX.

**Judges:** KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** KEITH P. ELLISON

# Opinion

## MEMORANDUM & ORDER

Pending before the Court are Defendants' Motion to Dismiss (Doc. No. 44) and Defendants' Motion for Sanctions. (Doc. No. 61.) Having considered the Motions, all responses and replies thereto, and the arguments of counsel at a recent motion hearing, the Court has determined that Defendants' Motion to Dismiss must be granted in part and denied in part, and Defendants' Motion for Sanctions must be denied.

## I. INTRODUCTION

This is a Securities Exchange Act class action on behalf of purchasers of TETRA Technologies, Inc. ("TETRA") common stock between November 3, 2006 and October 16, 2007 (the "Class Period"). TETRA is an oil and gas services company with three divisions: fluids; wells abandonment and decommissioning ("WA&D"); and production enhancement. The Fluids Division manufactures and markets clear brine fluids ("CBF") that are used in well drilling, completion [*3] and workover operations [1]. The WA&D Division has two operating segments: WA&D Services, which performs well abandonment and decommissioning work, and Maritech Resources, Inc. ("Maritech"), which purchases mature oil and gas wells. The properties purchased by Maritech provide business for WA&D Services. The Production Enhancement Division is not part of this litigation.

Plaintiffs are investment funds that suffered when the price of TETRA stock fell at the end of 2007. [2] Individual Defendants [3] allegedly dumped millions of dollars of stock at inflated prices during the Class Period: Geoffrey M. Hertel received $ 12 million from stock proceeds in May 2007; George McCarroll received over $ 400,000 in stock proceeds during the Class Period; and Raymond Symens received over $ 11 million in stock proceeds during the Class Period.

In May 2007, TETRA announced the "highest first quarter earnings in company history" and forecast even greater earnings in later quarters. In August 2007, Tetra announced lower than expected earnings for the Fluids Division, WA&D Services, and Maritech. TETRA's CEO Hertel held a conference call in which he explained that Maritech took a write-off related to receivables from disputed insurance proceeds, the Fluids Division recorded lower than expected earnings from onshore operations and high inventory costs, and Maritech experienced a production shortfall because two offshore platforms did not produce as early as was anticipated. TETRA's stock price dropped 25 percent. On October 16, 2007, TETRA withdrew its previously issued 2007 earnings guidance, and announced more possible insurance-related write-downs, and that Maritech would record impairments for non-productive oil and gas properties [*5] purchased in 2005. Its stock dropped 8 percent.

Plaintiffs' claim that Defendants committed fraud because they:
(1) misrepresented the expected cash flow from a package of properties purchased in 2005 ("2005 properties") by understating Maritech's decommissioning liabilities, improperly allocating acquisition costs for these properties to fields without proved reserves, and failing to either "write off" the properties under the "successful efforts" method of accounting or increase their "depreciation and depletion" expenses at the proper time;
(2) misrepresented the profitability of Maritech's oil and gas properties by wrongly stating that oil and gas reserves of the 2005 properties had increased when TETRA was about to write the properties off;

---

[1] Operations that clean, repair, and maintain a production well to increase or restore production.

[2] Fulton County was appointed lead Plaintiff in late June 2008 because it has the largest financial interest in the relief sought. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (Private Securities Litigation Reform Act, "PSLRA").

[3] The individual Defendants are: Geoffrey M. Hertel [*4] who was the President and CEO during the class period and had formerly been its Executive Vice-President Finance and Administration and COO; George M. McCarroll who was the President of Maritech, a subsidiary of TETRA, and Raymond D. Symens who was a senior VP of TETRA who oversaw the Fluids Division.

(3) improperly reduced the cost of goods sold and inflated revenues from the Fluids' Division "buyback" program by failing to report customer credits for returned CBFs as sales returns and allowances;

(4) misrepresented the financial performance TETRA's Fluids Division by overstating forecasted sales for onshore operations when demand was flat; and

(5) misrepresented the likelihood of collection of millions of dollars of insurance reimbursements [*6] for hurricane-related repairs performed by WA&D when some of the claims had already been disallowed and Defendants had already incurred costs for weather downtime that exceed those allowed under the applicable insurance policies. Defendants also failed to recognize expense for weather downtime and other reimbursable costs spent working on Maritech properties.

Because of these challenged patterns of alleged conduct, Plaintiffs contend that TETRA and individual Defendants made misleading and false statements about TETRA's expected performance and artificially inflated stock prices during the class period, thereby violating § 10(b) of the Exchange Act of 1934 and Rule 10b-5. They aver that the individual Defendants violated § 20(a) of the Exchange Act as controlling persons. Plaintiffs detail several TETRA filings that contain allegedly false and misleading statements related to the above challenged patterns of alleged conduct. Plaintiffs pray for damages, costs, and fees. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. MOTION TO DISMISS STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering [*7] a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief--including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (May 18, 2009) (quoting *Twombly*, 550 U.S. at 570). Although the Court generally considers a motion to dismiss for failure to state a claim based on the face of the complaint, the Court may also take notice of matters of public record when considering a 12(b)(6) motion. *See Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995); *Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir. 1994). Defendants [*8] have provided many SEC filings, and the Court may rely on them for what they say, although not for their truth, in deciding the Motion to Dismiss in addition to the complaint and documents incorporated therein. *Tellabs Inc. v. Makor Issues & Rights, Ltd.* (Tellabs I), 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007).

Rule 9(b) states that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). A plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)).

## III. SECURITIES VIOLATIONS

### A. Pleading Standard

To state a claim under § 10(b) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u-4(b)(1), a plaintiff must allege, in connection with the purchase or sale of securities (1) a material misstatement or omission (2) made with scienter (3) on which [*9] plaintiff relied, (4) economic loss and, (5) "loss causation" (a causal connection between the material misrepresentation and the loss). *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238-39 (5th Cir. 2009); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (quoting *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 348 (5th Cir. 2002) (internal quotations omitted)).

The PSLRA requires plaintiffs to specify each allegedly misleading statement and the reason why it is misleading; it incorporates, at a minimum, the Fed. R. Civ. P. 9(b) fraud-pleading standard. *ABC Arbitrage v. Tchuruk*, 291 F.3d at 348. "[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The Fifth Circuit has defined the PSLRA standard as requiring the plaintiffs to:

(1) specify each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;
(2) identify the speaker;

(3) [*10] state when and where the statement was made;
(4) plead with particularity the contents of the false representations;
(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.

(7) [for statements made on information and belief] state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief.

*Tchuruk*, 291 F.3d at 350, 363 n.4 (citing 15 U.S.C. § 78u-4(b)(2)); *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362-63 (5th Cir. 2004); *In re Alamosa Holdings, Inc.*, 382 F.Supp.2d 832, 842 (N.D. Tex. 2005).

The Fifth Circuit has rejected the group pleading doctrine, or the presumption that statements in group-published documents are attributable to those individuals with direct involvement with the everyday business of the company. [4] *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 531 n. 1 (5th Cir. 2008) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d at 363-65 (5th Cir. 2004)). *See also, In re Alamosa Holdings, Inc.*, 382 F.Supp.2d at 857 [*11] (dismissing allegations made against "defendants" because the allegations do not meet the pleading requirements for allegations of fraud). This rejection requires plaintiffs, in pleading both material misstatements and scienter, to distinguish among defendants and allege the role of each with respect to "each act or omission" in the alleged fraud. *Southland Sec. Corp.*, 365 F.3d at 365. Therefore, corporate statements can be tied to corporate officers if plaintiffs allege that these officers signed the documents in which the statements were made or plaintiffs adequately allege the officers' involvement in creating the documents. *Blackwell*, 440 F.3d at 287 (citing *Southland Sec. Corp.*, 365 F.3d at 364-65). A silent defendant who knows that another's statement is false may be liable as long as the complaint identifies which defendant made the statement and which remained inappropriately silent. *Blackwell*, 440 F.3d at 288. The Circuit, however, attributes to the defendant corporation all the statements in SEC filings, reports, and releases issued in its name by individual defendants pursuant to their positions of authority within the company. *Southland Securities Corp.*, 365 F.3d at 365-66.

_____

[4] The [*12] Court notes that the group pleading doctrine is still accepted outside the Fifth Circuit. For example, in the Southern District of New York, one corporate document may be considered the product of a group effort and considered the responsibility of top management for 10b-5 purposes. *See, e.g., In re Pfizer Inc. Securities Litigation*, 584 F.Supp.2d 621, 638 (S.D.N.Y. 2008).

As to documentary evidence, the plaintiffs must "specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *Tchuruk* 291 F.3d at 356 (5th Cir. 2002) (citing *In re Scholastic Corp. Litig.*, 252 F.3d 63, 72 (2d Cir.), *cert denied sub nom, Scholastic Corp. v. Truncellito*, 534 U.S. 1071, 122 S. Ct. 678, 151 L. Ed. 2d 590 (2001)). The existence of unspecified confidential corporate reports that reveal corporate information contrary to reported accounts will not defeat a motion to dismiss. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002); *Tchuruk* 291 F.3d at 355-56. That is, named reports delivered on particular dates are specific enough to support securities act claims, but unidentified "regular reports" delivered to the defendants without any detail about how frequently they [*13] were prepared or by whom, are not. *Tchuruk* 291 F.3d at 359.

## B. Materiality

Materiality is the "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988); *Tchuruk*, 291 F.3d at 359. The disclosure is not measured by the "literal truth" but by the ability of the statements to accurately inform rather than mislead prospective buyers. *Lormand*, 565 F.3d at 248. "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Id.* (collecting cases). Materiality is traditionally a question of fact, but if the alleged omissions are "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality, the court may rule them immaterial as a matter of law." *See Eizenga v. Stewart Enterprises, Inc.*, 124 F.Supp.2d 967, 975 (E.D. La. 2000) (quoting *Klein v. General Nutrition Companies, Inc.*, 186 F.3d 338, 342 (3d Cir. 1999)).

The Court addresses [*14] most of the parties specific arguments in its analysis of Plaintiffs' allegations below. It pauses however on the parties' differing contentions as to the recently issued opinion in the *Skilling* case since their arguments concern the law to be applied. Likewise, when the parties' arguments relate globally to the ACC, the Court will note them in its recitation of the law to frame the analysis below.

Defendants contend that Plaintiffs have failed to plead materiality because they cite numbers and percentages without examining the total mix of information including TETRA's cautionary disclosures. Defendants contend that, in the context of TETRA's full disclosures, the allegedly omitted information would not have significantly altered the mix of information available. Plaintiffs cite the recent decision on materiality in the *Skilling* case as analogous to the facts at hand. There, Skilling held conference calls in which he claimed, *inter alia*, that all of Enron's businesses were "uniquely strong franchises with sustainable high earnings power" when there was evidence of contrary, verifiable historical facts that some of the businesses were facing a potentially enormous loss, one business [*15] had an unsupportable cost structure and was losing money, and one company was based on unstable, speculative trading. *U.S. v. Skilling*, 554 F.3d 529, 553-54 (5th Cir. 2009). The Fifth Circuit upheld the jury's determination that those statements were material and not, as the defendant alleged, immaterial puffery. The Court explained that conclusory statements of belief may be so contrary to verifiable historical facts that they falsely misstate the speaker's true reasons and mislead the investors about the stated subject matter. *Skilling*, 554 F.3d at 553. Defendants contend that, unlike the government in *Skilling*, Plaintiffs made no allegations that any individual Defendant knew facts contrary to TETRA's public disclosures at the time they were made. Applying this standard below, the Court will conclude that, for one of the challenged patterns of alleged conduct, Plaintiffs allege that Defendants made several specific material misrepresentations or omissions in press releases, conference calls, interviews, and filings with the SEC that were purportedly contrary to verifiable historical facts.

## C. Scienter

Defendants contend that none of the confidential witnesses ("CW") provide facts [*16] that give rise to a strong inference of scienter. In addition, because Plaintiffs cite no false statement made by McCarroll or Symens, Defendants argue that, because the Fifth Circuit has rejected group pleading, Plaintiffs have failed to plead a securities violation as to Symens or McCarroll as a matter of law. Plaintiffs respond that they have demonstrated conscious misbehavior in at least four ways: (1) information provided by the confidential witnesses, (2) suspiciously timed insider stock sales, (3) statements of Defendants, and (4) the nature and extent of the GAAP violations. The Court will examine the pleading standard and the inferences that may be permissibly drawn from each of these possible sources of scienter, but will reserve the specific arguments as to particular confidential witnesses, post-class statements, presumed knowledge, stock sales and alleged GAAP or SOX violations to the analysis section of the Order.

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976). In *Tellabs I*, the Supreme Court outlined the proper approach to evaluate scienter. First, the plaintiff's allegations [*17] must, as in federal pleadings generally, be taken as true. Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice. Third, a plaintiff must plead scienter such that it raises a "strong inference" (i.e., a powerful or cogent inference) of "fraudulent intent" and is sufficiently pled "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs I*, 127 S.Ct. at 2510; [5] *Lormand*, 565 F.3d at 239. In its analysis, the court must take into account "plausible opposing inferences." *Tellabs I*, 127 S.Ct. at 2502. This strong inference, however, need not be "of the smoking-gun genre or even the most plausible of competing inferences." *Tellabs I*, 127 S.Ct. at 2510. That is, for the scienter element only, the court must alter the 12(b)(6) rule that all reasonable inferences should be drawn in the plaintiff's favor and take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (citing [*18] *Tellabs I*, 127 S.Ct. at 2510).

The facts must be [*19] evaluated collectively to determine whether a strong inference of scienter has been pled. *Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 533 (citing *Tellabs I*, at 2509-10). Each allegation of a misrepresentation or fraud must individually meet the particularity requirements of the PSLRA. *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) (citing generally *Greenberg v. Crossroads Sys.*, 364 F.3d 657 (5th Cir. 2004)). However, when considering scienter, the complaint must be considered *in toto* to discern whether its allegations create a strong inference. *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d at 552, 555 (citing *Barrie*, 397 F.3d at 260). For purposes of corporate defendants, if the plaintiff alleges only that the named individual defendants acted with scienter in issuing any of the complained of statement and no other director, officer, or employee did so, the court can simply address the allegations of the individual defendants because liability of the defendant corporation arises derivatively from the individual defendants' state of mind. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d at 367.

In the [*20] Fifth Circuit, scienter can be established with intent or severe recklessness and may be based on circumstantial evidence. *Fin. Acquisition Partners LP*, 440 F.3d at 287; *Goldstein v. MCI WorldCom*, 340 F.3d 238,

---

[5] The Fifth Circuit has taken a holistic view of the 9(b) standard. The complaint in *Shushany v. Allwaste, Inc*. was dismissed for failure to satisfy Fed. R. Civ. P. 9(b)--pre-PSLRA but the reasoning was quoted with approval by the Fifth Circuit last year. The *Shushany* court held that the plaintiffs failed to state a claim for fraud based on accounting irregularities because "the complaint did not identify who in particular was instructing the employees to make the arbitrary accounting adjustments, what particular adjustments were made, how those adjustments were improper in terms of reasonable accounting practices, how those adjustments were incorporated into [the defendant's] financial statements, and if incorporated, whether those adjustments were material in light of Allwaste's overall financial position. Although we need not identify which of these deficiencies, standing alone, might render the complaint insufficient under Rule 9(b), we hold that altogether, they do." *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc*. 537 F.3d 527, 540 (5th Cir. 2008) (quoting *Shushany v. Allwaste*, 992 F.2d 517, 522 (5th Cir.1993)).

246 (5th Cir. 2003); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, or that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware." *Nathenson*, 267 F.3d at 408. *See also Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (describing reckless indifference as an omission or misrepresentation that is "so obvious that the defendant must have been aware of it").

Motive and opportunity may support a finding of severe recklessness, but the plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible. *Nathenson*, 267 F.3d at 412 ("[M]otive and opportunity does not of itself automatically and categorically [*21] mean that the necessary strong inference of scienter is present.") The allegations that directors and officers possess motive and opportunity to keep a high stock price for their benefit or that a corporation benefits from the high price are universal goals for public companies, and cannot be used to create a strong inference of scienter. *Nathenson*, 267 F.3d at 420 (citing *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994)). Likewise, the desire to keep one's job does not satisfy the scienter requirement. *Blackwell*, 440 F.3d at 290 (citing *Melder*, at 1102).

## 1. Use of Confidential Witnesses

Defendants argue that Plaintiffs' reliance on confidential witness ("CW") statements in their Complaint is improper because Plaintiffs have not described the witnesses with sufficient particularity to support the probability that a witness in that person's position at the Company would possess the information alleged. Without their statements, Defendants aver that Plaintiffs fail to allege any other facts to support their claims or to call into question TETRA's disclosures. Defendants contend that, in general, courts must discount allegations from confidential sources. In their Reply, Defendants [*22] specifically claim that CWs 1-3 and 6-8 do not possess personal knowledge of the facts they assert. They do not specifically address CWs 4 and 5--those related to the reporting of expected insurance payments--but contend that those statements do not establish materiality. Plaintiffs respond that the CWs are in positions to have personal knowledge of the allegations attributed to them and highlight the details provided for each CW.

Confidential sources may be used, but they must be described with "sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief." *Tchuruk*, 291 F.3d at 353. [6] *See also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005) (citing *Tchuruk*). Post-*Tellabs I*,

---

[6] Confidential sources may be used, but, prior to *Tellabs I*, the Fifth Circuit adopted a Second Circuit test to determine whether they are appropriately described:

(1) if plaintiffs rely on confidential personal sources *and* other facts, their sources [*24] need not be named in the complaint so long as the other facts, *i.e.*, documentary evidence, provide an adequate basis for believing that the defendants' statements or omissions were false or misleading;

(2) if the other facts, *i.e.*, documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false, the complaint need not name the personal sources so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief;

(3) if the other facts, i.e., documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false and the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name [*25] the personal sources.

the Fifth Circuit has explained that allegations of confidential sources must be discounted, and, at the very least, must comply with the requirement stated above--that they are identified with sufficient particularity to support the probability that the person would possess the information pleaded. *Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 535 (5th Cir. 2008) [*23] (discussing *Higginbotham v. Baxter Intern., Inc*., 495 F.3d 753 (7th Cir. 2007) (holding that, pursuant to the PSLRA, allegations from confidential sources must be discounted, but not necessarily ignored, *post-Tellabs I*)). Recently, the Seventh Circuit distinguished *Higginbotham* and credited the testimony of confidential witnesses when:

> The confidential sources listed … consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify… The information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources… the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions.

*Makor Issues & Rights, Ltd. v. Tellabs Inc*. (Tellabs II), 513 F.3d 702, 712 (7th Cir. 2008) (noting that named sources would be preferable).

### 2. Presumed Knowledge

In addition, pleadings of scienter may not rely on allegations that the defendants must have known of the misstatements based on their position within the company, even if they have a "hands on" management style. *Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 535, 539-40. Likewise, allegations that the perpetrator of the fraud reported to one of the defendants are insufficient to establish scienter. [7] *Kushner v. Beverly Enters., Inc*., 317 F.3d 820, 828 (8th Cir. 2003) (holding that an allegation that someone involved in a fraudulent scheme reported to one of the named defendants was "not specific enough to support a strong inference that [the defendant] knew of or participated in the fraudulent practice while it was occurring"); *Indiana Elec. Workers'*, 537 F.3d at 542 (citing *Kushner); cf. Nathenson*, 267 F.3d at 424-25 (holding that an officer's position may create an inference of scienter when the company is a small, one product company and patent protection of the product is the source of the misstatements).

### 3. Timing of Stock Sales

Plaintiffs contend that the individual Defendants sold millions of dollars of stock within several days for the May 7, 2007 announcement of TETRA's 2007Q1 performance. (Am. Consolidated Compl. "ACC" P 154.) Defendants argue that Plaintiffs ignore all of the stock sales other than those in May 2007 to create an artificial inference of scienter. Stock sales may suggest scienter, depending on their timing and amount. When a defendant makes regular stock sales or does not sell stock immediately following an alleged material misstatement, the court will not infer scienter. *Indiana Elec. Workers'*, 537 F.3d at 543-44. Only trading at suspicious times or in suspicious amounts is probative of scienter. *Abrams v. Baker Hughes, Inc*., 292 F.3d at 434 (citing *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 987 (9th Cir. 1999)). [*27] In this context, "suspicious" means "sales that are out of line with prior trading practices or at times calculated to maximize personal profit." *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc*., 497 F.3d 546, 552 (5th Cir. 2007) (quoting *Abrams v. Baker Hughes, Inc*., 292

---

*Tchuruk*, 291 F.3d at 353.

[7] The Fifth Circuit dismissed a complaint against Bernard Ebbers of WorldCom because "the complaint [*26] here present[ed] what could best be described as allegations of mismanagement of WorldCom's accounts receivable situation, perhaps even gross mismanagement, by several individuals in charge of handling the accounts rather than severe recklessness by Ebbers and Sullivan individually…." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003).

F.3d at 435). If the defendants sell only a small percentage of their stock during the class period, the sales do not contribute to an inference of scienter. *Cent. Laborers Pension Fund*, 497 F.3d at 553 (selling 4 percent of one's stock insufficient combined with continued ownership of a large amount of stock).


#### 4. Post-class Statements

Defendants contend that Plaintiffs' post-class statements may only give rise to an inference of scienter if they are directly and cogently related, quoting *Lormand*, 565 F.3d at 254. Plaintiffs insist that several post-class statements imply that management knew of the problems with the production from reserves in the 2005 packages "from the start." *Rosenzweig v. Azurix Corp.*, 332 F.3d at 867, 868 n. 8. *Azurix* distinguished hindsight assessments from allegations that the management knew, at the time of the relevant occurrence, that the problems were already manifest. [*28] *Azurix*, 332 F.3d at 867-68 (holding that the post-class statements were insufficiently particular to satisfy the 9(b) and PSLRA pleading requirements).


#### 5. GAAP and Sarbanes-Oxley violations

Defendants contend that Hertel was not on notice of any glaring irregularities or red flags such that his SOX verifications would support a strong inference of scienter. Allegations that the defendants failed to follow GAAP or published inaccurate accounting figures, without more, are not adequate to satisfy the scienter prong--such allegations must be coupled with allegations that lead to a strong inference of fraudulent intent to mislead investors. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d at 534, 534 n. 3 (collecting cases); *Fin. Acquisition Partners LP*, 440 F.3d at 290 (citing *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990)). On the other hand, securities fraud may be proved, even where improper accounting is alleged as the basis for misrepresentation, without showing violations of GAAP. *S.E.C. v. Seghers*, 298 Fed.Appx. 319, 331 (5th Cir. 2008) (not designated for publication). Similarly, Sarbanes-Oxley ("SOX") certifications do not, without allegations [*29] that the officer knew of glaring accounting violations or other red flags, establish scienter. *Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 545 (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006) with approval). The Fifth Circuit accepted as a "plausible" interpretation of the PSLRA that a defendants' SOX certification may raise an inference of scienter "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Cent. Laborers Pension Fund*, 497 F.3d at 555.


#### D. Loss causation

Defendants contend that, because there were no corrective disclosures that contradict the Company's disclosures or describe the challenged patterns of alleged conduct that Plaintiffs allege, Plaintiffs have not adequately pled loss causation. Plaintiffs respond that the Fifth Circuit does not require a confession of fraudulent misconduct to satisfy the requirement of relatedness between the false statements and the disclosures causing the stock decline. Because the purported disclosures that establish [*30] loss causation relate to all the challenged patterns of alleged conduct at once, the Court will address Plaintiffs' allegations of loss causation here rather than in the context of the challenged patterns of alleged conduct below.

The Exchange Act requires plaintiffs to plead loss causation, or a causal connection between the material misrepresentation and the loss. *Dura Pharm., Inc. v. Brodo*, 544 U.S. 336, 342, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005); *Catogas v. Cyberonics, Inc.*, 292 Fed. Appx. 311, 314 (5th Cir. Sept. 8, 2008) (not designated for publication). The plaintiffs must allege that the market responded negatively to a corrective disclosure;

confirmatory information, information already known to the market, may not constitute a corrective disclosure. *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004). That is, the plaintiffs must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal a "facially plausible causal relationship between the alleged fraudulent statements or omissions and plaintiff's economic loss, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and [*31] plaintiff's economic loss." *Lormand*, 565 F.3d at 258 (citing *Dura* and *Twombly*) (holding that statements related to churn and involuntary disconnection problems with its sub-prime credit classes were plausibly related to the alleged misstatements regarding the benefits of programs promoting sales to sub-prime credit classes). The Fifth Circuit does not prevent a plaintiff from alleging loss causation based on the partial or indirect disclosures of the truth, or disclosures by persons other than the defendants. *Lormand*, 565 F.3d at 261-63 (relying on disclosures by corporations involved in the same business, disclosures by the parent corporation, reports of expert stock analysts, and the defendant's discussion of the failures of the business program about which the defendant made material misrepresentations). Moreover, the disclosure need not reveal that previous information was fraudulent, only that it was wrong. *Alaska Electrical Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 2009 WL 1740648, at *7-*8 (5th Cir. 2009) (distinguishing the requirements for alleging loss causation from the requirements for alleging scienter).

Specifically, as to the Fluids Division's buyback program, [*32] Defendants contend that the corrective disclosure that purportedly "corrected and removed the inflation from TETRA's stock price" actually revealed that the high Fluids Division inventory was due to the Company's decision to accelerate the purchase obligations under a high-price contract with a bromine supplier. Likewise, as to the 2007 forecasts for the Fluids' Division, Defendants contend that none of the disclosures purportedly reveals any foreseeable losses known at the time the forecasts were issued. As to Maritech's accounting for oil and gas properties, the alleged disclosures simply state that the Company recorded impairments in accordance with the successful accounting method. As to the hurricane-related claims, Defendants argue that Plaintiffs identify no statement related to Plaintiffs' allegation that TETRA delayed writing off the insurance receivables.

Plaintiffs respond that the August and October 2007 press releases were related to the challenged pattern of alleged conduct to inflate TETRA's stock price by falsely portraying the Company's prospects in these business areas even though the reasons given for the problems in fall 2007 were not necessarily truthful or complete. [*33] On August 3, 2007, TETRA announced a decrease in per share earnings for 2007Q2 and reduced the 2007 earnings guidance to $ 1.30-1.50/share (from $ 1.80-2.15 per share), but Hertel attributed the decrease to "transitory" reasons. TETRA stock fell 25 percent. (ACC P 129.) Plaintiffs contend that this release revealed a portion of the truth by disclosing flat onshore customer demand, insurance write-offs, and reduced production from the 2005 properties.

Specifically, in these releases, Hertel explained that the Fluids Division was impacted by higher inventory costs because of an existing purchase contract that the company was terminating and that earnings from the onshore fluids service business had not made up the difference because of exceptional rainfall in the Texas and southern Oklahoma markets. (ACC P 127.) Also in the August 3, 2007 press release, Hertel explained that delays in production from two offshore platforms meant that Maritech's production did not reach previously budgeted volumes. (ACC P 127.) In an earnings conference call later that day, Hertel repeated some of these statements and explained that Maritech had taken a write-off for insurance proceeds related to the 2005 [*34] hurricanes because the amount was in dispute with the insurance carrier. (ACC P 128.) On August 9, 2007, Defendants filed TETRA's 2007Q2 Form 10-Q that included the purported "admission" regarding the insurance claims that "the underwriters repeated their position that certain wells did not qualify as covered costs." (ACC P 131.)

Later, on October 16, 2007, when TETRA withdrew its 2007 earnings guidance, Hertel purportedly admitted accounting manipulations related to the insurance reimbursements when he explained "we also have a number of issues related to prior events. An example of this is where historical costs are currently represented as insurance receivables. Almost all of these types of issues have involved charges that impacted reported earnings, but which did not affect cash flow, in the then current period." (ACC P 133.) Hertel also explained that, as of October 2007,

TETRA had $ 27.8 million in unreimbursed insurance receivables. (ACC PP 134-35.) TETRA also revealed that it would record impairments "in accordance with the successful efforts accounting method," a statement that Plaintiffs contend reveals what should have happened many quarters previously: all capitalized costs [*35] for non-producing properties would have to be expensed. (ACC P 136.)

Unlike scienter, the standard for loss causation is notice pleading guided by FED. R. CIV. P. 8. *Lormand*, 565 F.3d at 266-67 (rejecting the defendants' arguments that they had a more plausible alternative inference as to the proximate cause of the plaintiffs' economic loss). Consequently, Plaintiffs allege a facially plausible causal relationship between the purported misrepresentations as to the insurance reimbursements and their losses. Prior statements indicated that Defendants believed that most of the insurance receivables would be collected, including Misrepresentations 16-21, discussed below. Plaintiffs connect their losses to TETRA's announcement of the large write off associated with allegedly previously known but undisclosed difficulties with the insurance companies. By consistently omitting the information that the insurance receivables had already been disallowed and then revealing that the company had to write-off millions of dollars of receivables related to those insurance payments, Plaintiffs have plausibly suggested that a significant portion of the stock decline in the fall of 2007 may have been caused [*36] by a revelation of part of the truth about the collectibility of the insurance receivables. The Court need not reach the question of loss causation as to the other challenged patterns of alleged conduct because it finds that Plaintiffs have not adequately alleged facts giving rise to a strong inference of scienter.

## E. Forward Looking Statements

Defendants note that forward-looking statements accompanied by cautionary language are not actionable because they are protected by the PSLRA "safe harbor" and the "bespeaks caution" doctrine. Defendants contend that the cases upon which Plaintiffs rely to render forward-looking statements actionable are distinguishable because those cases involve particular, detailed facts available to management that demonstrate that forecasts disclosed to investors were based on false information. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp*., 320 F.3d 920 (9th Cir. 2003); *Griffin v. GK Intelligent Sys., Inc*., 87 F.Supp.2d 684 (S.D. Tex. 1999); *Rubinstein v. Collins*, 20 F.3d 160 (5th Cir. 1994). *Rubinstein* involved predictions about data about a new gas well when the defendants knew that test results should have given management [*37] reason to know that the test results were inaccurate. 20 F.3d 160 (5th Cir. 1994). *America West* and *Griffin* purportedly involve statements of current fact rather than forward-looking statements. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp*., 320 F.3d 920, 937 (9th Cir. 2003) (holding that statements about the present effect of a past violation are not forward looking); *Griffin v. GK Intelligent Sys., Inc*., 87 F.Supp.2d 684, 686 (S.D. Tex. 1999) (holding that statements about an announced agreement that, in fact, did not exist, were not forward looking). In addition, Defendants contend that the cautionary language accompanying TETRA's disclosures was meaningful and substantive. Plaintiff contends that none of the assertions was wholly forward looking. In the alternative, Plaintiffs contend that Defendants knew that the predictions were false, lacked a reasonable basis and were belied by other facts, and the cautionary language was either boilerplate or failed to provide warning of applicable risks.

No person shall be liable under the securities laws for forward looking statements. 15 U.S.C. § 78u-5(c)(1)-(2). In general, under the safe harbor clause, [*38] a "forward-looking" oral or written statement is not actionable if (1) the statement is "identified as … forward-looking … and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially …."; (2) it is "immaterial"; or (3) "the plaintiff fails to [plead] that the forward-looking statement … was made with actual knowledge … that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A)-(B). *Lormand*, 565 F.3d at 243. Well-pleaded factual allegations that defendants knew their statements were false are sufficient to bar application of the safe harbor clause. *Lormand*, 565 F.3d at 244; *Tellabs II*, 513 F.3d at 705 (noting that "indifference to the danger that a statement is false" is insufficient, citing, inter alia, 15 U.S.C. § 78u-5(c)(1)(B)(ii)).

A "forward looking statement" is:

    (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

    (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to [*39] the products or services of the issuer;

    (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission….

15 U.S.C. § 78u-5(i)(1); *Congregation of Ezra Sholom v. Blockbuster, Inc*., 504 F.Supp.2d 151, 162 (N.D. Tex. 2007).

"'Meaningful cautionary language' cannot be boilerplate and must include substantive, company-specific warnings based on realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland Sec. Corp*., 365 F.3d at 372. *See, e.g. Lormand*, 565 F.3d at 244 (holding that the following is boilerplate: statements in its documents are "not guarantees of future performance … and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them."). [8] Meaningful cautionary language identifies "important factors that could cause actual results to differ materially from the forward-looking statements." *Harris v. Ivax Corp*., 182 F.3d 799, 807 (11th Cir. 1999) [*40] (quoting 15 U.S.C. § 78u-5(c)(1)). If "reasonable minds could disagree as to whether the mix of information in the allegedly actionable document is misleading, the statutory safe harbor provision cannot provide the basis for dismissal as a matter of law." *Lormand*, 565 F.3d at 248 (internal citations omitted).

Oral statements are not actionable if they are accompanied by an "oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available [identified] written document or portion thereof." 15 U.S.C. § 78u-5(c)(2). Reasoning by analogy, federal district courts in Texas have held that incorporated language from SEC filings may protect forward-looking statements in other written statements. *See, e.g., Home Solutions of Am. Investor Group v. Fradella*, No. 3:06-cv-1096-N, 2008 U.S. Dist. LEXIS 33425, 2008 WL 1744588, at *6 (N.D. Tex. Mar. 24, 2008); *In re Blockbuster Securities Litigation*, No. 3:03-cv-0398-M, 2004 U.S. Dist. LEXIS 7173, 2004 WL 884308, at *4 (N.D. Tex. Apr. 26, 2004). [*42] The "bespeaks caution" doctrine, similar to the PSLRA safe harbor provision, survived enactment of the PSLRA and protects optimistic projections accompanied by cautionary language. *In re Securities Litigation BMC Software, Inc*., 183 F.Supp.2d 860 (S.D. Tex. 2001) (holding that the doctrine can protect alleged misstatements even when the cautionary language is not contained in the same document as the alleged misstatement when the cautionary language is sufficiently related in time and substance to the purported misstatements). *See also Kurtzman v. Compaq Computer Corp*., No. Civ. A H-99-779 et al., 2002 U.S. Dist. LEXIS 26569, 2002 WL 32442832, at *23 (S.D. Tex. Mar 30, 2002) (citing *Grossman v. Novell, Inc*., 120 F.3d 1112, 1122

---

[8] The Court notes that the language identified by Defendants as "Standard 2006 Cautionary Language" is similar to this rejected language in *Lormand*. TETRA's language is: "This press release includes certain statements that are deemed to be forward-looking statements. These statements are based on certain assumptions and analyses made by the Company in light of its experience and its perception of historical trends, current conditions, expected future developments and other factors it believes are appropriate in the circumstances. Such statements are subject to a number of risks and uncertainties, many of which are beyond the control of the Company. Investors are cautioned that any such statements are not guarantees of future performances and that actual results or developments may differ materially from those projected in the forward-looking statements. Some of the factors that [*41] could affect actual results are described in the section titled 'Certain Business Risks' contained in the Company's … Form 10-K for … 2005, as well as other risks identified from time to time in its reports on Form 10-Q and Form 8-K…" (Doc. No. 45, Ex. 8, at Ex. 99.1, p. 4.) As this language explicitly incorporates risk factors identified in other SEC filings, the Court considers below whether these factors may provide meaningful cautionary language.

(10th Cir. 1997) for the proposition that cautionary language that does not appear in the same document as the forward-looking statement is less effective).


## IV. Application to TETRA's Challenged Patterns of Alleged Conduct

In the following alleged misstatements [9] Plaintiffs specifically identify the speaker, when and where the statement was made, and why the statements are allegedly misstatements. The facts that purportedly render these statements are false, provided by the confidential witnesses [*43] and by post-class statements made by the individual Defendants, are discussed below. Each set of statements is provided followed by Plaintiffs' explanation as to why they are material misstatements.

1. On November 3, 2006, Defendants issued a press release that included statements about WA&D's 2006Q4 revenues and profits and discussed the timing of insurance reimbursements as a possible source of profit, though they noted that $ 2.2 million in pretax earnings were eliminated until they were reviewed by the underwriter. (ACC P 90.)

2. The same press release discussed Maritech's pretax earnings and explained that earnings increases of 803 percent over 2005Q3 levels reflected production increases from acquired properties. TETRA predicted that the same factors that raised earnings over 2006 would bode well for production in 2007. (*Id.*)

3. The same press release describes the 152 percent increase over 2005Q3 pretax earnings from the Fluids Division as a result of the absence of hurricane downtime, price increases, and the rapid increase in domestic [*44] and international onshore markets. In this release, Defendants predict that inventory profits should decline throughout 2006 and 2007, but overall, they predict earnings growth in 2007 and note that the domestic onshore business continues to grow rapidly. (*Id.*)

Plaintiffs allege these statements were materially misleading because the reports about record earnings are not the result of legitimate business operations, but instead were the direct result of Defendants' challenged pattern of alleged conduct to manage earnings in the Fluids and WA&D Divisions (including Maritech) by manipulating TETRA's successful efforts accounting method, failing to recognize expense for weather delays, and inflating Fluids Division revenues and writing up inventory pursuant to TETRA's buyback program. Furthermore, the statement about the onshore business was purportedly misleading because demand for onshore customers was flat. In addition, Plaintiffs contend that Defendants' statements about the timing on insurance reimbursements was false because Defendants already knew that the claims had been returned as "not allowed." (ACC PP 91-94.)

4. On January 3, 2007, Defendants issued a press release announcing [*45] earnings guidelines for 2007 in which Hertel explained that some WA&D profits were deferred until an insurance payment expected in 2007 and that TETRA incurred substantial costs "'waiting on weather' on turn-key platform decommissioning contracts (this work was essentially completed in December)." (ACC P 95.)

5. Also in that press release, Hertel explained that the existing and potential market for WA&D Services in the Gulf of Mexico is larger than previously experienced and WA&D has acquired new equipment and secured a number of contracts. Defendants aver that the dramatically improved profitability guidance for WA&D reflects these among other factors. (ACC P 95.)

6. The January 3, 2007 press release also discusses Maritech's anticipated growth from bringing storm damaged production back onstream and an expected $ 52 million of well abandonment and decommissioning work in 2007.

---

[9] Because this is a Motion to Dismiss, the following are referred to throughout the Order as "misstatements" followed by the numbers assigned below.

The company predicted that significant exploitation capital expenditures for 2007 would materially impact 2008 and beyond but not substantially affect 2007 production. (ACC P 95.)

7. The same press release repeated expectations that the Fluids Division and associated markets would improve in 2007 from investments [*46] in expanding domestic and international markets and that this growth bodes well for longer-term Fluids Division profits. (ACC P 95.)

Plaintiffs contend that these statements were false and misleading for many of the same reasons discussed above: TETRA knew that its insurer had disallowed the claims so that deferred "profits" for WA&D would not be collectible. In addition, the statements about WA&D were misleading because the majority of the 2005 properties had already been exploited and would soon be abandoned. These statements were also misleading because the hurricane repair work would lead to losses rather than profits because of the lack of reimbursement from the insurance companies. As to Maritech, the statements were allegedly misleading because Maritech's properties had already been exploited and Defendants manipulated the successful efforts accounting method. Finally, the Fluids' Divisions earnings were misleading because 80 percent of Fluids Division profits were attributable to the wrongful accounting of the buy-back program including the inflation of revenues and the write-up of inventory and because the onshore market was flat. (ACC PP 96-99.)

8. On January 3, 2007, Hertel [*47] and another TETRA officer held a conference call and again stated that they could not record insurance proceeds until they have been paid and that anticipated 2007 Maritech volumetric production gains were expected from expenditures made in 2006 and 2005. (ACC P 100.)

These statements are allegedly misleading for the reasons described above.

9. On February 28, 2007, Defendants announced record 2006 earnings of $ 1.37 per share and announced a 31-57 percent increase over its 2006 earnings guidance for 2007. (ACC PP 101.)

10. Discussing the earnings report and 2007 guidance, Hertel explained that "the ability to generate incremental reserves out of older, mature properties is the primary reason that we are projecting improving profits for Maritech in 2007…." (ACC P 102.)

Plaintiffs aver that these statements were false and misleading because Defendants knew that Maritech had already exploited the most attractive 2005 properties and Defendants were facing a complete write-off of these properties. In addition, Plaintiffs contend that these statements are misleading because of the manipulation of the successful efforts accounting method through which Defendants avoided recognizing costs associated [*48] with decommissioning the wells and avoided recognizing current expense. (ACC P 103.)

11. Also on February 28, 2007, Hertel and McCarroll held an earnings conference with analysts in which Hertel explained that TETRA had completed some Maritech work for which it could not reflect profits because the insurer had not yet paid. In addition, Hertel explained that Maritech had an excellent 2006, increased its proven reserves after producing 16 Bcf equivalents, and the new reserves should allow an increase in total profits in 2007. (ACC P 104.)

Plaintiffs argue that these statements are misleading because Defendants later admitted that Maritech had exploited the most attractive properties first and the "proven" reserves had been depleted already. Plaintiff reiterates that Maritech's 2007 profitability was misleading because of manipulation of the "successful efforts" accounting methods. (ACC P 105.)

13. On February 29, 2007 [10], TETRA filed its 2006 Form 10-K that included TETRA's balance sheet and explained the accounting rules that applied to the 10-K, including that TETRA periodically evaluates its estimates including the collectibility of accounts receivable and the current cost of future [*49] abandonment and decommission obligations and basis its estimates on reasonable historical experience and future expectation. (ACC PP 106-107.)

14. The 2006 Form 10-K also describes the method by which Maritech accounts for its oil and gas properties: Maritech accounts for its interests using the successful efforts methods where costs, including those for unsuccessful development wells "are capitalized and costs related to unsuccessful exploratory wells are expensed as incurred." In addition, capitalized costs are recorded by field and depleted on a unit-of-production basis, based on the estimated remaining proved oil and gas reserves of each field. The properties "are assessed for impairments in value whenever indicators become evident and any impairment is charged to expense." The Form described decommissioning liabilities as estimates based on third-party market values to plug and abandon the wells and to generally decommission the pipelines and platforms and clear [*50] the sites. (ACC P 108.)

15. The 2006 Form 10-K specifies that TETRA reviews its decommissioning liabilities "whenever indicators suggest that either the amount or the timing of the estimated cash flows underlying the liability have changed materially." The 10-K also describes procedures for revenue recognition for turnkey contracts, valuing reserves for bad debts from oil and gas exploration and production companies, and accounting for acquisitions of the TETRA businesses. (ACC P 108.)

Plaintiffs contend that figures associated with the 10-K were misstated in violation of GAAP and the description of the accounting rules included false and misleading statements and omissions with respect to TETRA's actual accounting practices. (ACC P 108.) These challenged patterns of alleged conduct are fleshed out below in ACC P 119, summarized below.

16. The 2006 Form 10-K described accounting for insurance reimbursements and reported both $ 5.2 million of repair costs that the Company did not believe will be reimbursed, as well as a $ 9.2 million gain associated with insurance proceeds in excess of the net carrying value of the destroyed assets. TETRA notes "The Company believes that substantially [*51] all of the repair and well intervention and debris removal costs associated with the hurricane damage, other than the applicable deductibles and the amount charged to earnings discussed above, will be covered under the company's various insurance policies." (ACC P 109.)

17. The 2006 Form 10-K also explains that, in the last half of 2006, the insurance claims adjuster did not have enough information to conclude that the well intervention costs for qualifying wells would qualify as covered costs, but "the Company believes that well intervention costs being questioned by the underwriters will qualify for reimbursement under its insurance policies and are probable of collection." In addition, the Company indicated its belief that debris removal costs, in excess of the policy limit for removal of debris with the three destroyed platforms, is available under an August 2005 endorsement although TETRA acknowledged that the underwriters questioned whether this endorsement provides additional coverage. (ACC P 110.)

18. In the footnotes to the 2006 Form 10-K, the Company states its belief that "the significant majority of hurricane repair costs, including the well intervention and debris removal [*52] costs associated with the three destroyed Maritech platforms, is covered pursuant to the Company's various insurance policies." The Company reported that $ 57.9 million of hurricane related costs had already been reimbursed during 2006 and $ 12.5 million in the early parts of 2007. (ACC P 111.)

---

[10] The Complaint uses the date February 29, 2008, but the Court assumes this date is actually 2007 as it reports on 2006 year-end numbers. The 2006 Form 10-K listed its filing date as March 1, 2007. (Doc. No. 52, Ex. 1.)

19. These footnotes explain that the net book value of destroyed assets covered by the Company's insurance policies are included in accounts receivable and that these amounts were $ 12.8 million as of December 31, 2005 and $ 64.5 million as of the end of 2006, including non-storm related insurance claims. The company stated its belief that it will be reimbursed related to repair costs for the destroyed assets. (ACC P 111.)

20. The Company also anticipated $ 27.9 million included in accounts receivable related to well intervention costs related to three destroyed Maritech offshore platforms. The Company stated its belief that all of the well intervention costs were probable of collection. (ACC P 111.)

21. Likewise, the Company reiterated its belief that debris removal and other costs qualify for reimbursement under an endorsement obtained in August 2005 even though it noted that the underwriters [*53] questioned whether there is additional coverage provided under this endorsement for the cost of removal of the platforms. (ACC P 111.)

Plaintiffs contend that these statements are misleading with respect to hurricane repair expenses and insurance reimbursements. (ACC P 111.)

22. The 2006 Form 10-K explained that the cash outflow to extinguish Maritech's total decommissioning liability would occur shortly after the end of each property's productive life. It also explained that the timing of the cash outflows is estimated based on future oil and gas production and the resulting depletion of the company's oil and gas reserves. (ACC P 112.)

Plaintiffs aver that this statement is misleading because it suggests that there will be cash outflow from the 2005 properties for several years. (ACC P 112.)

23. The 2006 Form 10-K explained that determination of impairments on long-lived assets is based on the future estimated cash flows from the Company's proved, probable and possible reserves. (ACC P 113.)

Plaintiffs allege that this statement was misleading with respect to the facts underlying Maritech's oil and gas impairments.

24. The 2006 Form 10-K explained that Fluids' revenues are recognized "only [*54] when collectibility is reasonably assured." (ACC P 114.)

Plaintiffs argue that this statement is misleading with respect to revenue recognition for the Fluids' Division.

25. The 2006 Form 10-K contained statements about costs of product sales and costs of services that includes operating expenses. The Form 10-K also explains that depreciation, depletion, amortization and accretion include depreciation expense for all of the Company's facilities. (ACC P 115.)

Plaintiffs contend that these statements are false and misleading as they apply to Fluids, WA&D expenses incurred on Maritech's properties and Maritech's expense recognition.

26. The 2006 Form 10-K describes TETRA's process for accounting for asset retirement obligations and explains that these asset retirement obligations are the estimated fair value for retiring these assets and are capitalized as part of the asset accounting. The costs are then depreciated on a unit of production basis for oil and gas properties. It then reports that TETRA acquired $ 6.9 million in liabilities and incurred $ 2.8 million in retirement of obligations during 2006. (ACC P 116.)

Plaintiffs contend that this is a misleading account of asset retirement [*55] obligations as applied to Maritech properties.

27. The 2006 Form 10-K describes costs incurred in oil and gas property acquisition including $ 115 million in capitalized costs for proved properties acquired in 2005, and $ 187 million of proved developed properties being

amortized in 2005. TETRA explains that the capitalized costs of properties include the properties' proportionate share of liabilities relating to these properties. It also describes the depreciation, depreciation, and amortization for 2006 as $ 38 million and the impairments of properties as zero for 2006. The 10-K provides the definition for "proved" oil and gas reserves. The 10-K also describes the standardized measure of discounted future net cash flows including $ 752 million for discounted future net cash flows relating to proved oil and gas reserves for 2006, including $ 244 million for production and $ 196 million for development and abandonment. (ACC P 117.)

28. The Form 10-K includes the standard Sarbanes-Oxley certification, signed by Hertel.

Plaintiffs aver that the 2006 Form 10-K balance sheet is false and/or misleading because of the challenged patterns of alleged conduct described previously. For example, [*56] some of the WA&D expenses are improperly treated as insurance receivables, Fluids Division inventories are misstated because sales returns are recorded as inventory rather than sales credits to customers. They contend that, as the flip side of the improperly recorded Fluids inventories, the Fluids Division's income statement included inflated product sales because Fluids failed to report customer credits as sales returns and allowances and COGS were understated for Fluids inventory write-ups. Fluids revenues were recognized even though the Company agreed to provide credit for the buy-back program so revenues were recognized even though collection was not "reasonably assured."

In addition, as to WA&D, the cost of services was understated because WA&D failed to report expenses for weather downtime. In addition, Plaintiffs contend that the amounts for Maritech DD&A were understated because of abuses of the successful efforts method and the false assumption that the cash flows from the 2005 properties would continue for several years. They also contend that the insurance reimbursement statements were misleading because facts relating to the 2006 disallowances were not discussed.

Plaintiffs [*57] reiterate that TETRA had not adjusted the reported balances for Maritech's 2005 property "impairments" even though they knew the properties were unproductive or largely depleted, decommissioning liabilities were not adjusted up, and Defendants had not expensed the costs of unsuccessful wells as represented in the Critical Accounting Policies and Estimates. Plaintiffs also contend that acquisition cost allocations for the 2005 purchases were made to fields without proven reserves. Impairments were not assessed on the basis of true reserves because the 2005 properties did not have a productive life of more than 3 years. The Maritech properties did not consider the assets' "useful life" because the assets were already exhausted; they were not depreciated in a straight-line basis.

29. On May 7, 2007, TETRA issued a press release and represented that WA&D Services profits were up 712 percent over profits in 2006Q1. It also explained that production volumes for Maritech were lower than forecasted in the 2007 guidance but that Maritech is attempting to accelerate exploitation activities planned for later in the year to offset a near-term production shortfall. (ACC P 120.)

30. In an earnings [*58] conference that day, Hertel explained that TETRA was experiencing unprecedented growth because it was: constructing a new fluids plant to reduce COGS for completion fluids, terminating a supply agreement for some products, experiencing heartening WA&D performance. TETRA noted that a production shortfall for Maritech could be remedied by moving forward several projects. (ACC P 121.)

31. Hertel explained that WA&D revenues should increase and Maritech production was only 3 or 4 months out of sync with the levels that were indicated previously. (ACC P 122.)

Plaintiffs contend that these statements are misleading because Maritech's oil and gas properties were exhausted so there was a permanent volumetric shortfall, WA&D expenses were increasing because TETRA's insurer was not going to reimburse costs on Maritech properties and Fluids' high inventories were falsely stated and the buy-back program concealed. (ACC P 123.)

32. On May 10, 2007, Defendants filed TETRA's 2007Q1 Form 10-Q and reiterated several statements of previous forms including communications from the insurance adjusters, reiterated false and misleading accounting figures, and repeated the false and misleading statement that [*59] TETRA continued to expect cash flow from the 2005 properties over several years. (ACC PP 124-25.)

Plaintiffs contend that these statements are false for the reasons described above.

## A. Successful Efforts Accounting for Oil and Gas Properties

In 2005, just prior to Hurricanes Katrina and Rita's landfall, Maritech purchased three "packages" of economically unproductive oil and gas wells in the Gulf of Mexico, for $ 23.1 million cash up-front with decommissioning liabilities (the cost to dismantle the oil or gas wells when they were depleted or abandoned, known as asset retirement obligations or "AROs") of $ 94.6 million ("2005 properties"). [11] (ACC PP 2, 33-34.) Defendants purportedly recorded the packages on their books using the "successful efforts" accounting method, which requires the immediate expensing of the cost of non-productive or uneconomic wells. [12] (ACC P 36.) Plaintiffs allege that acquisition costs and the associated abandonment and decommissioning liabilities were allocated to unproductive wells. (*Id*.) In this manner, instead of properly accounting for the wells using the "successful efforts" accounting method, Defendants allegedly delayed the recognition of depreciation, [*60] depletion, and amortization ("DDA") expenses as they worked the wells in 2006. Instead, Defendants allegedly wrote these expenses off as impairments near the end of 2007. Plaintiffs claim that Defendants misrepresented the profitability of the WA&D Division that include Maritech. TETRA reported an "impairment" charge of $ 70 million for the abandonment of properties purchased in 2005 and Maritech reported a $ 71 million total loss in 2007. (ACC P 3.)

Defendants contend that Plaintiffs misstate GAAP and TETRA's accounting methods to allege their supposed misstatements. Defendants note that TETRA accounts for its properties by field, so that the decision to write off a field is made based on the field as a whole. Consequently, even if many of the wells in the field are unproductive, the field need not yet be written off. In addition, Defendants contend that Plaintiffs misconstrue purchase price allocation under GAAP. They aver that the acquisition cost of a package of fields is allocated based on the fields' realizable reserves or production so that fields with minimal cash flow are allocated little or none of the purchase [*62] price. In this manner, Plaintiffs' contention that Defendants failed to immediately expense costs associated with low performing fields is allegedly wrong. Likewise, Defendants explain that AROs are recorded when fields are acquired and when they are reduced, they do not result in a charge against income or impact profit (unless the actual ARO costs exceed the recorded liability). Moreover, they contend that SFAS No. 143 requires AROs to be recorded at present value so that the AROs carried on the books will often understate the expected future cost.

Defendants also contend that certain of the purported misstatements related to the successful efforts accounting challenged pattern of alleged conduct are protected by the PSLRA safe harbor. For example, as related to

---

[11] As this is a Motion to Dismiss, Plaintiffs' alleged facts are taken as true. To the extent that the following are consistent with Plaintiffs' explanation of TETRA's accounting conduct, the Court provides Defendants' explanation of the some of the accounting terms used throughout the Order: Defendants explain that when a well is purchased, the abandonment and decommissioning obligations are recorded as asset retirement obligations ("AROs"). Over time, these AROs are reduced as cash is spent on abandonment work and have no effect on profit or income. In addition, the portion of acquisition costs assigned to the producing fields is amortized over time and is expensed as "depreciation, depletion or amortization" ("DDA"). Low producing fields [*61] are allocated little or none of the purchase price of the field. Impairment costs are recorded against income when the Company determines that production at a particular field is no longer possible or profitable. (Def. Reply, at 5-6.)

[12] Defendants contend that TETRA's accounting policy was actually to account for its properties by field rather than by well so that the decision to write off a given field is based on the whole field rather than individual wells. (Def. Reply at 4.) (citing Doc. No. 445, Ex. 29, at 26-27.)

Misstatement 2, in its 2005 10-K, TETRA explains that estimating reserves is complex, and the estimates of oil and gas reserves may be significantly incorrect. Moreover, Maritech may continue to experience significant revisions to its reserve estimates because reserve estimates are:

> to some degree subjective, each of the following items may prove to differ materially from that assumed in estimating reserves: the quantities [*63] of oil and gas that are ultimately recovered; the production and operating costs incurred; the amount and timing of future development and abandonment expenditures; and future oil and gas sales prices. Furthermore, different reserve engineers may make different estimates of reserves and cash flow based on the same available data.

(Doc. No. 45, Ex. 3, at 16.) Plaintiffs contend that the statement that Maritech's earnings increased 803 percent, a statement of past fact, is false and therefore cannot be protected by the safe harbor. As to the part of Misstatement 2 in which TETRA avers that 2007 production would do similarly well in the future, Defendants' purported meaningful cautionary language does not warn that revenues and earnings may be significantly revised because the company was improperly allocating acquisition costs to non-producing fields or intentionally understating AROs in order to manage the reporting of expenses (see also Misstatement 5). While the language notes that reserve engineers' estimates may reasonably differ as to reserves, taking all inferences in favor of Plaintiffs, if, as Plaintiffs allege, Defendants knew that the fields would have to be written off well [*64] before they were, the PSLRA safe harbor provides no protection. Misstatements 14, 15, and 26 are related to how TETRA performs its accounting rather than predictions of future results. Likewise, Misstatements 5 and 13 are not protected to the extent that Plaintiffs have adequately alleged that Defendants knew that recorded AROs were too low and depreciation expenses were written off too slowly. The Fifth Circuit has clarified that, in cases where defendants knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable. *Lormand*, 565 F.3d at 244 (citing 15 U.S.C. § 78u-5(c)(1)(A)-(B)); *Tchuruk*, 291 F.3d at 359.

Even though the analysis of scienter requires courts to find a strong inference of scienter, this weighing is not appropriate when addressing whether Plaintiffs have alleged misstatements. Assuming that the successful efforts accounting method does require the cost of non-productive wells to be immediately expensed and that, as Plaintiffs allege, costs were allocated to unproductive wells and fields without reserves and then expensed en masse in 2007 in an action called an "impairment," Defendants may have materially misstated [*65] the revenues, profits and assets of WA&D in several of its disclosures by failing to expense these non-productive wells and by under-booking the AROs for these fields not in accordance with SFAS 143. (ACC P 119.) The $ 70 million impairment, purportedly related to the misstatements regarding the accounting of non-productive wells and underbooking AROs, is plausibly material because an investor would have considered that this omission altered the basic mix of information--the impairment equaled Maritech's revenues for the previous year. Plaintiffs allege the connection between the $ 70 million restatement and the allegedly improper accounting practices.

Assuming that Plaintiffs have pled a material misstatement, and leaving aside some problems with Plaintiffs' failure to plead the fraudulent scheme with particularity that are addressed below, the Court now turns to the scienter prong. As to whether Plaintiffs have adequately alleged scienter as opposed to only negligent or innocent misrepresentations, Plaintiffs provide the statements of the CWs, post-class statements, the individual Defendants' stock sales, and purported GAAP and SOX violations.

CW 5 is described as an accounting manager [*66] from April 2006 until June 2007 who reported to Maritech's CFO. (ACC P 71.) CW 5's allegations relate to the challenged patterns of alleged conduct at WA&D including the write-offs of the 2005 properties, the purported successful accounting method flaws, and the insurance reimbursements. Based on the job description provided, it is probable that CW 5 had personal knowledge of the concern expressed by staff at the CFO's weekly meetings regarding the asset retirement obligations for abandoned and decommissioned wells. CW 5 contends that he knew that ARO costs exceeded the liability on the books, but the alleged fact that Maritech's CFO knew that the ARO costs were "large" does not suggest that he knew that they

were recklessly or intentionally underbooked or how they were underbooked. Although one could infer that the CFO heard these concerns about AROs, CW 5 does not contend that the CFO shared these concerns. The CFO allegedly participated in meetings with two other high level TETRA officials, but it is not clear that, if he shared the concerns with the AROs, he repeated them to these TETRA officials. CW 5 also does not allege that any individual Defendants who made alleged misstatements [*67] knew of the alleged problems with the non-productive wells that were allocated part of the purchase price, but not expensed.

CW 4 is described as a senior joint interest billing accountant from December 2005 until September 2007 who handled billing of costs, accounts receivable, and other accounting. (ACC P 62.) She reported to Maritech's controller. (*Id*.) CW 4 alleges that Maritech did not have many properties being drilled and that the successful efforts accounting method meant that non-performing properties were written off immediately. Based on CW 4's position as a billing accountant during most of the Class Period, the Court finds it probable that she was in a position to know this information firsthand. CW 4 does not, however, allege that anyone at the company knew that other properties should have been written off. [13] In addition, she asserts her own belief that Maritech was not keeping up with FAS 143 or that its plug and abandon costs, but she does not explain how that accounting was improper and does not aver that she shared these concerns with others such that her allegations may allow a strong inference of scienter about these supposed problems.

CW 1 is described as the vice president of operations at Maritech who reported to the president of Maritech, then McCarroll. (ACC P 45.) Defendants contend that Plaintiffs do not plead that CW 1 held a position that allowed him personal knowledge of the accounting decisions and particularities involved in writing off a well. CW 1 describes a property, Sabine 12, that was allegedly not performing well, and claims that "new engineers" had determined that the reserves of other properties were overestimated, specifically East Cameron 305 and others at the Vermillion locations. Plaintiffs concede that CW 1 was only involved with accounting for Maritech and TETRA from the "fringes." (ACC P 53.)

Defendants contend that CW 1's statements about reserves are speculative because CW 1 is not a reserve engineer. *See, e.g., Wieland v. Stone Energy Corp*., No. 05-2088, 2007 U.S. Dist. LEXIS 76636, 2007 WL 2903178, at *5 (W.D. La. Aug. 17, 2007) (holding that statements from a production manager and reservoir engineers who had knowledge regarding the way proved reserves were calculated, and how and why the reports deviated from SEC requirements, were sufficient to conclude that they would possess the information [*69] they allege). CW 1 does not assert that he is familiar with the reserve process, but instead relies on reports by the new engineers. On one hand, he is described as a vice president who speaks to McCarroll. On the other hand, even if he did have personal knowledge of the information, the purported fraud is not described with particularity--CW 1 does not specifically allege that the reserves were intentionally overestimated or by how much they were overestimated. Plaintiffs also do not plead that McCarroll or other officers knew of the overestimation. Even if CW 1 had responsibilities or job descriptions suggesting that he would understand the accounting problems at a particular well or field, CW 1 explains that reserves were overstated but does not provide the alleged discrepancy between actual and underreported reserves.

Defendants aver that Hertel's post-class statements are not an admission that he previously knew that the properties written off had already been largely exhausted. They also contend that the statement that TETRA exploits the most attractive properties first, suggests only that TETRA accesses the most attractive properties first, not that these same properties were [*70] largely exhausted. Plaintiffs suggest that the post-class statements imply that Hertel knew, at least by February 28, 2007, that his statements that Maritech had actually increased its proven reserves for the 2005 packages and that the new reserves should allow Maritech to increase total profits in 2007, were false and misleading.

---

[13] The end of ACC P 69 appears [*68] to have been cut off.

In the November 5, 2007 earnings call, Hertel explained:

> Maritech produces profits by actively exploiting properties that it acquires. The last packages … of properties purchased by Maritech were pre-Rita and Katrina. The inventory of exploitable operations in these older purchases has dwindled during the last 29 months.

(ACC P 138.) Defendants explain that "develop" and "exploit" are synonyms. That is, developing a field is not the same as "exhausting" its reserves.

In an earnings call in January 14, 2008, Hertel stated that the company attempts to exploit the most attractive properties first and that "the remaining exploitable opportunities after three years are generally quite lean in the economic area." (ACC P140.) Likewise, in that press release, Hertel explained that "by 2007, most exploitation projects, generated out of 2005 acquisitions, had diminishing [*71] return potential. This is one of the primary reasons that Maritech's DD&A grew more rapidly than did its operational pretax profits in 2007." (ACC P 139.) Then, in 2007Q4, TETRA allegedly reported an "impairment" charge for the abandonment of the 2005 package of more than $ 70 million. (ACC P 141.)

Acknowledging a diminishing return potential is not the same as acknowledging that the field is largely exhausted. Acknowledging a diminishing return potential is also not inconsistent with a belief that new reserves would allow Maritech to increase total profits. Likewise, acknowledging that there are fewer operations to develop is not an admission that the fields are largely exhausted. Likewise, in *Barrie v. Intervoice-Brite, Inc*., even though the plaintiffs pled that the defendant contended that the company was focusing on its sales momentum while, in fact, sales were slowing, this was insufficient to plead a misrepresentation (much less a post-class admission of scienter) because a diminishing sales force is not inconsistent with a focus on sales momentum. 397 F.3d at 260. Consequently, these statements do not appear to allow an inference of scienter as to Hertel or TETRA. In addition, [*72] Hertel's other post-class statements do not add much to the analysis of scienter. Hertel stated that he would like to address the ARO issues to the extent that "we can get things cleaned up" even though he recognized "it's not like the old days…. You can't just set up reserves against something you have an issue with." (ACC P 156.) The phrases describing cleaning up the AROs or addressing issues do not suggest that Hertel knew that officers within his company were committing intentional or severely reckless fraud sufficient to create a strong inference of scienter. Drawing that inference is not equally plausible as Defendants' theory that Hertel was accurately describing the business or even that he was providing hindsight analysis of problems that had occurred.

Lastly, Defendants contend that Hertel's stock sales do not permit a strong inference of scienter. They argue that his sales in May occurred well before the alleged partial disclosure of the "fraud" in August and October 2007 and, therefore, the sales were not suspiciously timed. In addition, Hertel allegedly sold his options before they were set to expire in September and October 2007 and while they were well in the money. [*73] Defendants aver that the May 7, 2007 Form 8-K disclosed several pieces of bad news, including a $ 30 million reduction in Fluids Division's profits and delayed production at two Maritech properties. Moreover, Defendants contend that Hertel owned more stock after the Class Period than he did when the period began. Hertel's stock sales as provided to the SEC suggest that each year, he chose a specific month to exercise his stock sales, although not always the same month. That he conducted a large amount of activity in one month, therefore, appears nonsuspicious. The month he choose, however, does allow some suggestion of scienter. The options Hertel exercised were set to expire in the fall of 2007 not in the summer. The magnitude of his sales in 2007, over $ 12 million, was about $ 3 million more than the year before which was, in turn, more than $ 2 million more than the prior year. This increase does not seem particularly suspicious. Lastly, his stock ownership increased over the Class Period.

Plaintiffs aver that both Hertel and Symens dumped tens of millions of dollars of stock within days of the May 7, 2007 announcement of the 2007Q1 performance, which was the last group of laudatory [*74] comments about TETRA's earnings growth and prospects in general. In addition, Plaintiffs contend that one may infer scienter because Hertel identified June 2007 as the month in which TETRA's fortunes turned--therefore the insiders sold before the market learned of TETRA's reversal. Construing all facts in favor of Plaintiffs, the magnitude of the sales

in May 2007, ahead of the purported disclosures in August and October and the turn around in June 2007, provides facts that may be used as motive and opportunity allegations to create a slight inference of scienter.

Even combined with Hertel's stock sales in May 2007, however, the allegations of scienter as to the accounting methods are insufficient to raise a strong inference of scienter as to the challenged patterns of alleged conduct surrounding the successful efforts accounting and recording of reserves and costs at the WA&D Division. Even if there were problems with the accounting, and it is not clear that the CWs allege that there were, neither the post-class statements nor the CWs allege that any particular Defendant knew of these problems and then fraudulently concealed them. The CWs' allegations, even combined with the post-class [*75] statements and the stock sales do not render Plaintiffs' challenged pattern of alleged conduct as plausible as an innocent inference that Defendants did not knowingly mislead their investors. Defendants' misrepresentations as to this challenged pattern of alleged conduct will not support a § 10b-5 claim.

## B. Write off of the 2005 Maritech Properties

Although closely related to the allegations relating to the successful efforts accounting, Defendants also contend that Plaintiffs have not properly alleged securities violations claims for relief related to the reserves of the 2005 properties and their eventual write off.

Beginning with the 2006Q3 performance and guidance, TETRA issued a press release that explained that "Maritech's performance … reflects production increases derived from the acquired properties, reworking older wells and new drillings. These same factors should bode well for production into 2007." [14] (ACC P 90.) The January 3, 2007 conference call included statements that Maritech's production would increase because of expenditures made in 2005 and 2006 to exploit properties. (ACC P 100.) On February 28, 2007, Hertel explained that Maritech had an excellent 2006 because it [*76] increased its proven reserves to 93 Bcf after producing 16 Bcf equivalents and the new reserves should allow an increase in total profits in 2007. In addition, discussing the earnings report and 2007 guidance, Hertel explained that "the ability to generate incremental reserves out of older, mature properties is the primary reason that we are projecting improving profits for Maritech in 2007…."

Defendants contend that they did not make false statements as to Maritech's oil and gas properties: they claim that Plaintiffs essentially allege that reserves could not have "actually increased" when certain fields were about to be written off. Relying on SEC filings, Defendants respond that TETRA reasonably expected 2007 production to exceed 2006 production because storm-damaged parts of the 2005 package of [*77] properties were scheduled to come back onstream. (Doc. No. 45, Ex. 7, at Ex. 99.1, p.3.) Maritech, however, experienced unexpected delays for two properties that were drilled in late 2006. (Doc. No. 45, Ex. 9, at Ex. 99.1, p.3.) Defendants allege that TETRA channeled its development expenditures into existing properties and then, after the Class Period, into new properties Maritech purchased once it determined that it no longer had sufficient capital to develop the remaining undeveloped properties among the 2005 package of properties. Plaintiffs' ACC does not explain why the statement that Maritech continued to produce more reserves from the 2005 properties is inconsistent with the fact that it was about to write them off. [15]

---

[14] As the Court discussed above, with respect to the purportedly meaningful cautionary language related to Misstatement 2, the language cautions against uncertainties in reserve estimates, but does not warn against the behavior alleged by Plaintiffs: the purported decision to falsely tout the production capacity of properties that the Company allegedly knows it will have to soon write off.

[15] In their ACC, Plaintiffs provide TETRA's statements about its accounting practices. For example, TETRA explains that "the oil and gas industry is cyclical, and our estimates of the period over which futures cash flows will be generated, as well as the predictability of these cash flows, can have significant impact on the carrying value of these assets and, in periods of prolonged down cycles, may result in impairment charges." (ACC P 108.) Consequently, impairments [*78] appear to address cash flow considerations rather than necessarily reflecting adjustments in reserve estimates.

Plaintiffs contend that these were material misstatements because the properties had already been largely depleted, and Maritech exploited the most attractive properties first. Plaintiffs plead that, by the end of 2006, "Defendants … fully knew that" TETRA's production and profitability would drop sharply in 2007. (ACC P 38.) Consequently, Defendants, including Hertel, knew that cash flows for the operation of the 2005 properties would not continue for several years, so these statements and the balance statements in the 2006 10-K were false. (ACC P 119(d).) Likewise, Plaintiffs contend that statements made in a May 7, 2007 press release were false: Maritech noted a potential shortfall to production, but Defendants also explained that "Maritech is now attempting to accelerate forward exploitation activities originally planned for late 2007 or early 2008." (ACC P 120, *see also* ACC P 122.) Plaintiffs contend that Defendants knew, at the time, that there was a permanent volumetric shortfall. (ACC P 123.) Plaintiffs argue that these facts became known to the public, when, on October [*79] 16, 2007, as noted above, TETRA reported an "impairment" charge for the abandonment of the 2005 properties of more than $ 70 million. After the Class Period, Hertel explained that "by 2007, most exploitation projects, generated out of 2005 acquisitions, had diminishing return potential. This is one of the primary reasons that Maritech's DD&A grew more rapidly than did its operational pretax profits in 2007." (ACC P 139.)

Some of the alleged misstatements are similar to those in cases in which the plaintiffs have adequately pled material misrepresentations. As to the profitability and production capacity of the 2005 properties, the Court finds that Plaintiffs have successfully pled a material misrepresentation. It finds this case similar to the facts in *Plotkin v. IP Axess, Inc.*. In *Plotkin*, the defendant company's statements regarding the likely success of agreement with another company that later failed satisfied the material misrepresentation requirement. In that case, the partner company later filed for bankruptcy such that statements about the likely success of the sales contracts supported inferences that the relationship was doomed when the defendant company made the statements. [*80] 407 F.3d 690, 697-98 (5th Cir. 2005). Like the bankruptcy of the partner company in *Plotkin*, TETRA purportedly eventually acknowledged the problems with the fields and wrote off the 2005 acquisitions.

Per *Tellabs I*, the Court must take Plaintiffs' pleadings as true. Plaintiffs plead that Defendants knew by early 2007 that TETRA had largely exhausted the economically exploitable oil and gas properties purchased in 2005, but instead of revealing this information then, continued to tout the productive capacity of these properties, going so far as to explain that their reserves had increased by a particular number. The Court finds that these pleadings satisfy the PSLRA requirement for pleading fraud with particularity. Plaintiffs have alleged several misstatements as to this challenged pattern of alleged conduct.

Defendants contend that Plaintiffs have not sufficiently pled materiality because TETRA had already disclosed that it is difficult to predict costs or profits because of the inherently imprecise nature of oil and gas reserve estimating. Again, however, the $ 70 million impairment, that Plaintiffs allege was related to the misstatements regarding the written off fields, was material [*81] because it was the size of Maritech's revenues for the previous year. Drawing all inferences in favor of Plaintiffs, they do allege a plausible material misstatement related to the 2005 properties.

Defendants also argue that several of the alleged misstatements were forward-looking and protected by the PSLRA's safe harbor. For example, as to Misstatement 6, Defendants contend that cautionary language about future production estimates adequately warned of the potential shortfalls that might affect the process of bringing the new "storm damaged production" online. Plaintiffs' contention is that, like the *U.S. v. Skilling* case, 554 F.3d 529, at the time TETRA made the announcement about bringing storm-damaged properties back online, it already knew that the inventory of exploitable operations from the 2005 properties had dwindled such that these properties would not be able to be profitably drilled and prepared for production.

The incorporated 2005 10-K cautionary statements regarding the inaccuracy of future production estimates warns: "actual future production, cash flows, development expenditures, operating and abandonment expenses and quantities of recoverable natural gas and oil reserves [*82] may vary substantially from those initially estimated by us." (Doc. No. 45, Ex. 3, at 15.) Again, however, while this cautionary language explains possible risks with

production estimates, it does not warn about certain dangers that Plaintiffs claim had already begun to materialize. Likewise, the other statements about the anticipated production gains from the 2005 properties and Maritech's cash flow, while forward-looking, are not protected if Defendants knew that the properties were exhausted of possible exploitable or producible reserves at the time those statements were made (Misstatement 8, 9).

The Court must then address whether the CWs' testimony and other allegations of scienter supports a strong inference of scienter on the part of the individual Defendants or TETRA. CW 3's allegations relate to the challenged patterns of alleged conduct at WA&D including the write-offs of the 2005 properties and the purported successful accounting method flaws. CW 3 is described as lead operator for Maritech from 2005 through January 2008 and in charge of five Maritech platforms. (ACC P 58.) Defendants also argue that the job responsibilities of this CW, including inspections, monitoring well [*83] production, reviewing costs, and overseeing repair work, (ACC P 59) do not suggest that he had involvement with accounting or whether or not fields should be written off. The Court agrees with this argument. While it appears that CW 3 had personal knowledge about the production at these wells, and he concluded that the properties "probably should have been written off sooner than they were," (ACC P 60) the description of this CW is insufficient to allow the court to conclude that he spoke with personal knowledge of when a field should be written off or whether it was profitable for Maritech. His testimony does not appear to be based on personal knowledge such that his statements may be used to establish scienter as to whether the fields were not written off when they should have been. Even if the Court had chosen to credit CW 1 (discussed above in the context of the purported manipulation of successful efforts accounting) and CW 3's testimony, they do not allege that they told Hertel or McCarroll that the fields necessarily should have been written off sooner than they were or provide allegations that would support a strong inference that Hertel or McCarroll knew of these problems [*84] and fraudulently failed to reveal them to investors.

Plaintiffs allege that Hertel's post-class statements support a strong inference of scienter. In November 2007, Hertel stated that "[t]he inventory of exploitable operations in these older properties has dwindled during the last 29 months" and "by 2007, most exploitation projects, generated out of the 2005 acquisitions, had diminishing return potential." Consequently, Plaintiffs allege that these statements make it difficult to credit Hertel's earlier assertions that Maritech production from older properties would drive its growth. Defendants respond that these post-class disclosures only state that, in late 2007, TETRA "canceled plans for the development of some of the previously held, less attractive exploitation properties" in order "to create growth opportunities for 2008 through 2010." (ACC P 139.) As noted above, Defendants argue that these statements do not suggest that the accounting for these properties had ever been inaccurate or that it should have previously taken any impairment charges. Defendants' competing theory to defeat scienter is that Defendants had no idea that the properties would need to be written off at the [*85] time of the alleged misstatements because Maritech suffered unexpected production shortfalls from weather and rig delays, and subsequent events rendered other more-recently purchased fields more profitable, even though the 2005 properties produced profits throughout 2007.

The Court discussed the inference that may be drawn from Hertel's stock sales above. Defendants contend that McCarroll's stock sales, which occurred near the end of the Class Period, occurred five days before the options expired, and that he sold half of the shares resulting from the exercise of the stock options. In addition, McCarroll's stock ownership increased during the Class Period and, shortly thereafter, he left TETRA to start another company. *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 258 F.Supp.2d at 594 (explaining that readily available, plausible explanations for a sale, such as that the insider is leaving the company, might make a sale nonsuspicious). McCarroll's sales do not seem concentrated after any particular announcement, and he made significant sales after the August 2007 announcements when the stock fell precipitously. Even construing all facts in favor of Plaintiffs, McCarroll's [*86] stock sales do not seem to be suspicious in timing or amount such that they would substantiate strong motive and opportunity allegations to create an inference of scienter.

The Court finds that, considering the discounted value of the CWs, the only plausible inference of scienter from Hertel's stock sales, and the limited value of the post-class statements, given the plausible non-culpable inferences

that can be drawn from the word "exploitable" as discussed above, renders Plaintiffs' theory that Hertel or McCarroll knowingly or recklessly touted the production capacity of the 2005 properties while knowing that they were unproductive or largely exhausted less plausible than competing theories. The CWs have not provided testimony that there was necessarily anything wrong with the treatment of the 2005 properties. Even if they had, they do not support an inference that any of the defendants knew about these problems at the time and fraudulently concealed them. When considered together, Plaintiffs' allegations as to the write offs of the 2005 properties do not create a strong inference of scienter.

## C. Fluids Buyback Program

As for the other challenged patterns of alleged conduct, Defendants [*87] *inter alia* contend that the CWs did not possess personal knowledge as to the facts they profess to know, some of the alleged misstatements are protected by the safe harbor provisions of the PSLRA, and the post-class statements, stock sales, and other purported indicia of scienter do not support a claim.

Plaintiffs allege that Defendants altered monthly Fluids division sales estimates to reach arbitrary sales goals by manipulating sales and inventory though a "buyback program." (ACC PP 26-27.) Plaintiffs allege that TETRA's fluids customers typically purchase more CBFs than necessary as a precaution with the understanding that TETRA will repurchase the extra at 40-60 percent of the original sales price. (*Id.* at P 81.) When the CBFs were returned, however, TETRA "revalued" the Fluids division's inventory rather than reduce sales or income to account for the returns. (ACC PP 27, 85.) According to a confidential witness, 80 percent of the Fluids Division's total profits were due to the inventory adjustment. (*Id.* at P 84.) In addition, TETRA allegedly stored the used CBFs it also received from customers rather than reworking and recycling them for reuse. TETRA purportedly falsely attributed [*88] the high fluids inventories to a historically high cost supplier and concealed its inventory write-ups/inflated sales. (*Id.* at PP 28, 88.)

Defendants argue that TETRA properly accounted for the Fluids buyback program as a separate transaction. They further aver that TETRA's treatment of the program was approved by TETRA's independent auditors and that CW 7's statements support Defendants' version of the facts. They complain that his statement that inventory has been "written up" lacks sufficient context. Defendants also argue that the November 2006 spreadsheet produced by CW 6 that purportedly shows a variance or revaluation that reflect improper accounting at the Fluids Division is not necessarily connected to the buyback program, and it is unclear to what the word "revaluation" refers. Finally, Defendants contend that CW 8 was not in a position to know whether re-use of CBFs occurred in the Fluids Division. Defendants explain that TETRA's inventories rose because TETRA switched suppliers in 2006 and accelerated purchases from the old supplier to fulfill its obligations more quickly. (Doc. No. 45, Ex. 8 at Ex. 99.1 p.3; Ex. 19 at Ex. 99.1 p.3; Ex. 7 at Ex. 99.1 p.3.) Defendants contend [*89] that these inventory cost increases were properly disclosed.

Plaintiffs respond that the Fluids Division failed to report customer credits as sales returns and allowances as required by SFAS 48 and that cost of goods sold was understated because of Fluids inventory write-ups. In addition, they contend that Fluids' revenues had been recognized even though their collection was not "reasonably assured," despite the Company's agreement to provide credits pursuant to its buyback program. Specifically, the November 3, 2006 press release announced "third quarter pretax earnings that exceeded third quarter 2005 levels by 152 percent." If the costs of goods were understated because of inventory write-ups, these earnings statements were misrepresentations of the true picture of Fluids Division sales. This statement is not forward-looking, and therefore cannot be protected by the safe harbor.

Defendants also aver that several other of the purported misstatements associated with the Fluids Division are protected by the PSLRA safe harbor. Misstatement 3, as it relates to Fluids Division earnings growth, is a statement

of historical fact and not protected. Likewise, Misstatements 24, 25, and 28 are [*90] not forward looking and reflect purported distortions in past numbers because of the allegedly improper reporting of inventory returns. Misstatement 30 relates to the cost of goods for primary completion fluids: Defendants contend that the cost of goods will go down because of a new plant and a new agreement with Chemtura. In addition, TETRA explained that it purchased large inventories in 2005 and 2006 and that it will terminate its previous supply agreements. These statements are purportedly false because they misstate or omit the reasons that Fluids inventories were high--they are not forward-looking statements. In addition, Plaintiffs contend these statements are false because Defendants do not disclose the impact of the buyback program on inventories.

Defendants contend that Plaintiffs do not adequately plead materiality because they only use rough numbers such as "hundreds of storage tanks" of used brine fluids and do not explain how many customers participated in the buyback program to understand its potential impact on TETRA. Notably, Defendants do not address CW 7's allegations that much of Fluids' total profit was attributable to the inventory adjustment. (ACC P 84.) The Court, [*91] however, finds that, even drawing inferences in favor of Plaintiffs, it is not plausible that CW 7 spoke with personal knowledge of the buyback program as to the facts he alleges.

Even assuming Plaintiffs have pled material misstatements, however, Plaintiffs have not alleged a strong inference of scienter. As to allegations of scienter from the confidential witnesses, CW 6 is described as the regional Fluids sales manager. (ACC P 75.) CW 6 provided a report that showed a reduction in the Fluids Division cost of goods sold for "variance/revaluation." (ACC P 76.) This term is not explained, although CW 6 alleges that a person named Hank Reeves disclosed to him that sometime in mid-2006 the fluids inventory was "revalued." (Id.) Defendants contend that CW 6's information from Hank Reeves is a "rumor." Moreover, they argue that there is no suggestion that CW 6's job duties included accounting work or that he would have knowledge of the accounting for the Fluids Division buyback programs. CW 6 explains his understanding of the buyback program, but he admits that the actual computation of the credits was a "big secret" that was held by other people, including Hank Reeves, and he had heard [*92] that some component of the buyback program was "borderline illegal." (ACC PP 81-82.) These admissions suggest that CW 6 was not in a position to know whether or not Defendants were improperly accounting for or misrepresenting the buyback credits or intentionally misstating inventories at the Division.

CW 7 is described as a general manager at the Fluids Division from August 2006 until August 2007 who met with senior executives, including the vice-president for the Fluids Division. (ACC P 86.) CW 7's allegations relate to the challenged patterns of alleged conduct at the Fluids divisions including the buyback program and the purportedly artificially inflated forecast numbers discussed below. CW 7 describes the buyback program as overstating revenues and inventories and contends that 80 percent of the Fluids Division's profits were attributable to this program. (ACC PP 84-85.) Beyond the generic term "general manager," Plaintiffs do not provide CW 7's job description, however, or his interaction with accounting or upper management such that he would know how the buyback program was run or who knew about it. Plaintiffs also fail to describe CW 7's education or employment history that would [*93] provide a basis for any statement about a buyback program, or how it should be treated for purposes of financial reporting. CW 7 averred that, rather than account for these returns against actual sales, TETRA would record this credit in inventory. As explained more below in the section describing the Fluids' forecasts challenged pattern of alleged conduct, CW 7 allegedly reported demand projection figures to Symens, but CW 7 does not allege that he had interactions with Symens regarding the buyback program. Even if the Court had chosen to credit CW 7's statements as based on personal knowledge, CW 7 alleges that much of the Fluids Division's profit was attributable to inventory adjustment, CW 7 does not contend who knew about this program and does not specifically contend that any of the individual Defendants or any officer or manager who prepared the corporate disclosures knew about the allegedly improper massaging of sales at the Fluids' Division. The testimony of CW 7 is therefore insufficient to make a strong inference of scienter as to any of the individual Defendants or as to TETRA, possible.

CW 8 is described as a TETRA contractor who worked as an engineer in the new brine production [*94] facility. He explained that he knew of the "brine buyback program" whereby TETRA would buy "dirty" brine to resell.

(ACC PP 87-88.) Defendants contend that a contract engineer would not have knowledge of accounting practices at the firm. The Court finds that the description provided for CW 8 is insufficiently detailed to allow his allegations to raise an inference of scienter as to any of the individual Defendants or TETRA. Plaintiffs do not provide argument on this point. The Court does not find that the details pled concerning CW 8's job duties and position at TETRA suggest that he would have personal knowledge of the way accounting was conducted for the buyback program and he does not provide support for a strong inference of scienter as to misrepresentations concerning this program. Consequently, regardless of whether Plaintiffs have pled material misrepresentations with sufficient particularity, the allegations of the CWs do not support a strong inference of scienter.

As to this challenged pattern of alleged conduct, Plaintiffs do allege that Defendants specifically violated GAAP by failing to reduce customer sales by the return credits. However, as noted above, GAAP violations [*95] do not alone support a strong inference of scienter.

Defendants contend that Symens' Class Period sales were not unusual because he could have made much more money by selling them earlier or later. In addition, Symens made his final Class-Period sale in May 2007, several months before the alleged disclosures. His stock options were also set to expire in March and September. Unlike Hertel, Symens does not appear to typically concentrate sales, but to make sales periodically, and not very frequently. Symens sold more than half his shares and exercised options that were not about to expire in May 2007. Construing all facts in favor of Plaintiffs, the magnitude of the sales in May 2007, ahead of the purported disclosures in August and October provides facts that may be used as motive and opportunity allegations to create an inference of scienter. Symens, however, was a non-speaking Defendant and Plaintiffs have not connected him to any particular misstatement or to any particular statements in TETRA's SEC filings. Given the Fifth Circuit's rejection of group pleading, that Symens was a non-speaker is determinative of the issue.

When taken together, the lack of sufficient detail to allow [*96] an inference of personal knowledge on the part of the CWs, the non-suspicious timing of the stock sales, even with the purported GAAP violations and SOX certifications, do not support a strong inference of scienter. The Court holds that Plaintiffs have not pled facts that allow for a strong inference of scienter as to any Defendant as to the challenged pattern of alleged conduct related to the buyback program.

## D. Fluids Forecasts

Defendants contend that Plaintiffs' allegations that the Fluids Division's demand was flat are false because revenues increased from 2005 through 2007. In addition, they contend that CW 6 was not in a position to know about the overall Fluids business to the extent that his statements about forecasting can be credited. Moreover, they aver that the spreadsheet he provides, in which his superiors revise upwards sales projections for his region, only demonstrates that CW 6's superiors expected more of him that he did himself. Moreover, Defendants contend that the forecast data CW 7 allegedly provided to Symens was based on upcoming orders from current customers and did not account for projections from future growth or new customers. Defendants aver that the Fluids [*97] Division's onshore operations suffered unexpected losses in 2007 because of flooding in Texas and Oklahoma during May-July 2007.

Plaintiffs claim that Defendants misrepresented TETRA's Fluids Division financial performance as growing rapidly when the company knew that onshore demand was flat. Assuming that Plaintiffs' allegations that TETRA's upper management revised onshore demand upwards are true, statements that the onshore business was growing rapidly, including those in the November 3, 2006, press release could be misstatements that misled investors as to the prospects of the onshore Fluids Division business. In the January 3, 2007 TETRA further explained that there were "greater opportunities" for "domestic onshore and international growth."

As with the other challenged patterns of alleged conduct, Defendants claim that the safe harbor protects several of the alleged misstatements. For example, they respond that Misstatement 3, related to the growth in the onshore Fluids Division business, was a forward-looking statement protected by cautionary language. The specific statement that the onshore business continues to grow rapidly includes a comment on historical fact-- that onshore [*98] business had grown rapidly in the past--and a statement of historical fact cannot be protected by the safe harbor. As to the continuing growth, the Court agrees that the cautionary language provided does not warn investors about the reasons that Plaintiffs contend demand turned out to be flat--that Defendants had knowingly, unreasonably inflated forecasted demand. This same analysis applies to Misstatement 7 related to the Fluids Division forecasts.

As to whether TETRA might have acted with scienter as to these statements, in *Southland Securities Corp.*, the Fifth Circuit explained that in determining whether a statement was made by a corporation with scienter "we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." 365 F.3d at 366. Likewise, scienter may not rest on the inference that the defendants must have been aware of the alleged fraud [*99] because of their position in the company. *Abrams v. Baker Hughes, Inc.*, 292 F.3d at 432. Although courts have found scenarios in which it is possible to infer corporate scienter because of the position of the defendant, that is not the case here. Demand for CBFs onshore is, as Plaintiffs admit, only a part of the Fluids Division revenues and not significant enough to infer that the speaking Defendants would have known about the alleged manipulations of the revenue forecasts such that their statements were made recklessly or with intent to deceive. *See, e.g, Tellabs II*, 513 F.3d at 710 (describing a hypothetical wherein General Motors claimed that it had sold millions of SUVs when it actually sold none); *Nathenson v. Zonagen, Inc.*, 267 F.3d at 424-25.

Turning to the allegations of scienter from the CWs: CW 6 conceded that he did not know where the 2007 forecast numbers came from but that he believed they were inaccurate from the beginning. (ACC P 79.) Based on the pled facts, CW 6 had personal knowledge of the proper forecasts for his region (which comprised the bulk of "onshore" sales) and the amount by which his supervisors revised them upwards, but Plaintiffs' provided job description [*100] does not indicate that he had personal knowledge of the forecasts for the overall Fluids Division, because sales primarily occurred offshore. (ACC P 75.) CW 6 alleges that he informed several managers that demand was to be flat and they told him to make the numbers "work" within the set budget. The "S&OP 2007 Rev" spreadsheet produced in November 2006 supposedly reflects that his supervisors wanted him to change his forecast upward by $ 4 million for 2007. He does not allege that any of the individual Defendants had knowledge of these purported forecast manipulations. Claims regarding an allegedly fraudulent scheme must fail if the complaint does not adequately identify a particular corporate officer who improperly recorded revenue or performed the challenged acts. *See, e.g., Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005).

Plaintiffs also allege that CW 7 provides statements that support a strong inference of scienter: CW 7 avers that he met with Symens every month and provided him and another manager with the projected Fluids demand--that Symens would then "change." (ACC P 86.) Although it is probable that CW 7 had personal knowledge of parts of the forecasting [*101] process, these allegations do not support a strong inference of scienter. It is unclear why Symens changed these numbers. CW 7 contends that demand for fluids was "not there," but he does not provide facts sufficient for the Court to infer that Symens was manipulating the numbers to make fraudulent demand projections such that the Court can draw a strong inference of fraud. Here, even if managers at TETRA and the Fluids Division knew that the Fluids forecasts were massaged, it is unclear that this information was conveyed to the speakers who made the alleged misstatements; or that Short, Pernik or Reeves (unspecified employees in the

Fluids Division) were involved in drafting or signing the TETRA releases that contain the alleged misstatements such that TETRA may have had scienter of the alleged misstatements. [16]

Evaluating together all sources of scienter as to the misstatements related to the Fluids Division forecasts, including the timing [*102] and size of the individual Defendants' stock sales, the purported GAAP violations and SOX certifications, these allegations do not support a strong inference of scienter as to the Fluids forecasts. Misstatements with respect to this challenged pattern of alleged conduct therefore are insufficient to state a securities violation claim. The Court will not, therefore, address Defendants' arguments about Plaintiffs' failure to allege loss causation as to this challenged pattern of alleged conduct.


### E. Insurance Receivables

Defendants contend that TETRA continually disclosed ongoing negotiations with the insurance companies and that none of the CWs claimed knowledge of a final denial of insurance receivables or even knowledge of the insurance negotiation process. Defendants argue that TETRA never promised its investors that hurricane-related claims would be covered and properly disclosed the negotiation process, including that the insurers questioned whether certain well intervention costs would be covered under the policy. Citing several disclosures, Defendants contend that they continually kept investors informed of developments with the insurance company and eventually sued it in November [*103] 2007 over disputed claims. (Doc. No. 45, Ex. 4, at Ex.99.1, p. 1 (a TETRA press release).) Moreover, Defendants aver that Plaintiffs wrongly emphasize the word "repeated" in the 2007Q2 disclosure about the negotiations to suggest that TETRA had already been denied certain insurance claims. Finally, Defendants take the position that its decision to wait until 2007Q2 to write off the insurance receivables, when it decided to sue its insurer, was a conservative decision, rather than a GAAP violation.

Moreover, they aver that the statements about insurance receivables are protected by the safe harbor provisions. For example, as to statements about WA&D Services' profits related to the collection of insurance reimbursements for Maritech, TETRA warned that "a significant factor in the fourth quarter will be the inclusion or elimination of WA&D Services profits related to work performed for Maritech which is contingent on the timing of insurance reimbursements." (Nov. 3. 2006 press release, Doc. No. 45, Ex. 8, Ex. 99.1, p. 4.) In addition, TETRA warned its investors that the press-release includes forward-looking statements that are subject to risks and uncertainties. It contends that other [*104] cautionary language from the 2005 10-K was allegedly incorporated by reference by the November 3, 2006 press release. The press release specifically incorporates the 2005 10-K language. This 2005 10-K (filed March 16, 2006) explains:

> [W]e could suffer additional losses in the future related to storm repair efforts…. We maintain insurance protection covering substantially all of the property damaged incurred; and repair costs incurred up to the amount of deductibles were charged to earnings as they were incurred during 2005. However, the amount of covered costs is subject to certain maximum amounts, depending on the policy. If actual repair costs are significantly greater than our estimates, we may exceed these maximum coverage amounts. In that event, it is possible that a portion of future repair expenditures will have to be funded with our capital resources and result in charges to our earnings. In addition, for repair expenditures that are covered by insurance, the collection of insurance claims may be delayed, resulting in the temporary use of our working capital to fund such repairs.

(Doc. No. 45, Ex. 3, at 13.) Notably, this warning explains that the protection covers "substantially [*105] all" of the property damage incurred. The warning, therefore, that "the amount of covered costs is subject to certain maximum amounts," when read in tandem with the statement that substantially all property damage is covered

---

[16] In their Response, Plaintiffs aver that CW 6 relayed the information to Fluids' management who reported to Symens. Even if this was the proper chain of command, in the ACC, CW 6 does not specifically allege that the information flowed to Symens.

suggests that the company believes actual repair costs will approximate covered costs. Later, however, in a filing made March 1, 2007, TETRA explained:

> If a significant amount of well intervention costs incurred are not covered pursuant to our insurance policy, or if we incur total well intervention costs in excess of our estimates, our working capital and results of operations could be adversely affected…. In June 2006, the underwriters questioned whether there is additional coverage provided for the cost of the removal of … platforms in excess of the policy limit under an endorsement we obtained in August 2005 …. While we have yet to incur costs for the removal of the destroyed platforms, these costs, as well as other costs covered under the endorsement, could equal or possibly exceed the policy maximum limit under the endorsement. If all or a portion of these costs are not reimbursed, or if the total debris removal and other costs exceed the policy maximum, our [*106] working capital and results of operations could be adversely affected.

(Doc. No. 52, Ex. 1, at 13.) In that filing, TETRA also explained that "[w]hile the Company believes that all well intervention costs being questioned by the underwriters will qualify for reimbursement under its insurance policies and are probable of collection, it is possible that all or a portion of these costs may not be reimbursed." (*Id*. at 15.) TETRA specifically warned that all or a portion of the costs may not be reimbursed because insurers questioned whether a policy obtained in August 2005 provided additional coverage for the cost of removal. TETRA reiterated its position that it believes that the costs qualify for reimbursement under the endorsement. (*Id*. at 16.)

Nowhere in this cautionary language does the company explain that significant portions of the insurance receivables have already been denied. Taking all inferences in favor of Plaintiffs, this warning does not render the alleged Misstatement 1, as it relates to the insurance receivables' effect on WA&D profits, immaterial. Likewise, the other misstatements related to the payment of insurance receivables are not protected under the PSLRA because [*107] Plaintiffs have adequately alleged that Defendants knew that certain insurance payments had already been denied at or before the time that Defendants contended that "substantially all" of the insurance claims would be covered. The Misstatements that relate to the insurance receivables, notably 8, 13, 16-21, 25, 27, 29-31 are not protected by the PSLRA safe harbor.

Plaintiffs provide allegations from several confidential witnesses that, in August or September 2006, Maritech reviewed its insurance contracts and discovered that Lloyd's would only pay for the first $ 1 million in weather-delay expenses for the damaged wells even though WA&D had already accrued millions of costs attributable to weather delays for the East Cameron 195 project. (*Id*. at PP 50, 57.) By late 2006 Maritech received unspecified "printouts" that various claims submissions were not allowed. (*Id*. at PP 49-52; 57-58.) In addition, Defendants allegedly admitted their failure to appropriate write off their receivables in the 2007Q2 Form 10-Q in which they stated that "during [2007Q2] … the underwriters repeated their position that certain wells did not qualify for coverage and that certain well intervention costs for [*108] covered wells do not qualify as covered costs." (*Id*. at P 40.)

Plaintiffs aver that the statements in the press releases and earnings report are misstatements because Defendants expressed a belief that they would be paid on several insurance claims even though the claims had already been denied. Plaintiffs aver that the insurer had already disallowed insurance claims and, therefore, statements of January 3, 2007, in which Hertel explained that WA&D "profits" from insurance receivables were deferred until they were collected was a material omission because this statement implies that claims submitted for reimbursement were covered. Likewise, TETRA's 2006 Form 10-K explained that substantially all of the hurricane damage would be covered, apart from deductibles and a $ 5.2 million charge to earnings already made. Similarly, because of these misstatements as to the insurance receivables, Plaintiffs contend that Defendants misstated WA&D profits and earnings in the May 7, 2007 press release.

Defendants contend that Plaintiffs have not alleged that the purported misstatements related to insurance receivables were material. They note that TETRA disclosed its negotiations with the insurer on [*109] its hurricane repair claim, that the insurer had been slow to pay, and that it was possible that the insurer would not reimburse all TETRA's costs. If the individual Defendants or another corporate officer knew that the insurance receivables had been denied prior to the release of these statements, that fact would provide a strong inference of scienter.

As to the confidential witnesses, CW 4 reported that, beginning in December 2005, she was told to set up all claims as "receivables" whether or not they had been paid. (ACC P 66.) CW 4 prepared a monthly report of insurance receivables that she delivered to McCarroll and Hertel. (*Id*. at P 68.) She avers that invoices for repair work done by outside companies were personally approved by McCarroll. (*Id*. at P 67.) Defendants contend that CW 4 was not in attendance at the meetings when the participants discussed her spreadsheet, and CW 4 does not contend that the information in the spreadsheets was different than that disclosed to investors. Defendants also aver that Plaintiffs do not provide specific dates when Defendants purportedly acquired knowledge of the denials. (*Id*. at P 50.)

Based, however, on CW 4's position as a billing accountant [*110] during most of the Class Period, the Court finds it probable that she was in a position to know who was attending the meetings and that her report of insurance receivables must have at least been viewed by the participants. Defendants do not specifically argue that CW 4 lacked personal knowledge of the facts she provides but, rather, contend that nothing to which she testifies suggests that she had any knowledge the receivables she booked were not probable of collection from the insurer. As explained above, knowledge of general wrongdoing rather than specific knowledge of particular accounting errors may support an inference of scienter. Her statements as to the insurance payments and Maritech's compliance with accounting regulations may be credited and evaluated as a basis for scienter. Although CW 4 does not specifically allege that McCarroll and Hertel knew that the insurance claims were disallowed, she does provide information that allows the inference that McCarroll and Hertel were intimately involved with the insurance process and provides support for other allegations of scienter provided by other CWs.

CW 1 averred that there were a number of days lost to weather downtime in [*111] the spring of 2006 and Maritech "quickly" learned that the insurance company would only cover the first $ 1 million of weather time even though the witness credibly estimated that the weather downtime at the East Cameron 195 project was $ 10-12 million. Defendants contend that Plaintiffs do not plead that CW 1 had personal knowledge of the negotiations with the insurers or with the accounting for the insurance claims. Plaintiffs provide details about damages to certain properties, insurance company statements about what work would be paid for, and specific issues at particular fields such as the cost of weather downtime at East Cameron 195, including the dates that they arose sufficient to support a strong inference of scienter. In contrast to the CWs provided in *Cent. Laborers' Pension Fund*, Plaintiffs do provide employment dates for this witness, aver that CW 1 directly reported to Maritech President McCarroll and provide sufficient detail, including property names; dates that suggest that it is probable that he has personal knowledge of his testimony and that he is in a position to know first hand the facts he conveys as far as the disallowed "weather downtime." *See* 497 F.3d at 552. [*112] CW 1 testifies that he was involved only with accounting at the fringes, but suggestions that challenged patterns of alleged conduct are fraudulent, such as allowing millions of dollars of weather downtime to accrue when "Maritech quickly learned the insurance company would only cover the first $ 1 million of weather time incurred" (ACC P 50) may support an inference of scienter, although this inference would need to be strengthened with other evidence because it is unclear who at TETRA knew this and when. CW 1's further allegations that "there were going to be problems" with the coverage of the East Cameron 195 work are more specific. He contends that, in December 2006 or January 2007, the adjusters "balked" at paying any additional claims. [17]

---

[17] On the other hand, his allegation that Maritech started to receive computer printouts that claims submissions were "not allowed" is too vague to be credited. <17> The existence of unspecified confidential corporate reports that reveal corporate information contrary to reported accounts will not defeat a motion to dismiss. *See, e.g., Abrams v. Baker Hughes, Inc*., 292 F.3d at 432; *Tchuruk*, 291 F.3d at 355-56.

CW 2 is described as an operations [*113] manager at Maritech from November 2002 to November 2006, the beginning of the Class Period. (ACC P 54.) McCarroll purportedly told CW 2 that the TETRA invoices to be submitted to the insurance company, should not include references to weather downtime. Defendants contend that Plaintiffs have provided no information to explain why CW 2 would be involved with the Company's negotiations with its insurers. CW 2, however, was involved with platform repair, and he avers that he was told by McCarroll that, with respect to Ship Shoal 269 where he was working, TETRA invoices should not include references to weather downtime. (ACC P 58.) These allegations suggests that CW 2 had knowledge of the reporting for weather downtime because he was working in the field at issue and had heard the instruction directly from McCarroll. Defendants respond that neither CW 2 nor Plaintiffs provide any idea of the percentage of accrued well-intervention costs that constituted by weather downtime. In addition, they note that CW 2 does not allege that McCaroll knew that weather downtime was disallowed or that he knew that the costs already incurred at East Cameron 195 exceeded the weather time allowance. Plaintiffs [*114] respond that, based on CW 2's allegations "McCarroll and others at TETRA realized that the insurance policies had been misread and that the costs attributable to 'weather time' were not covered by the insurance claims for millions in costs attributable to weather delays." (ACC P 58.) Plaintiffs Complaint does not appear to go this far in alleging McCarroll's knowledge of the disallowed weather down time. Instead, CW 2 describes the realization of "the Company" that "weather time" was capped at $ 1 million and that after August or September 2006, McCarroll told unspecified people to limit weather costs on all projects. (ACC P 58.) Taking all inferences in favor of the Plaintiff, however, it is a plausible inference that McCarroll, by making the instruction that he did, knew that the weather time insurance claims were disallowed sufficient to support a strong inference of scienter. [18]

In addition, Hertel, in the 2007Q3 earnings call, explained that, as to insurance receivables, he was going to "force that issue." He also told analysis that

> a lot of the issues that you've seen this year and that could hurt us on a go-forward basis would be involved with the insurance situation and there we do have some control over that from the perspective of when we address or bright line some of these issues and we are going to bright line them this quarter and bring them to a head.

(ACC P 156.) [*116] Plaintiffs contend that Hertel's choice to reveal his decision to bright line the insurance issue was particularly suspicious in the insurance context because he had already sold his stock. Moreover, Plaintiffs aver that, in the 2007 Form 10-Q, signed by Hertel, Hertel explained that "the underwriters repeated their position that certain wells did not qualify for coverage and that certain well intervention costs for covered wells do not qualify as covered costs." (ACC P 40.) Plaintiffs contend that this is Hertel's admission that the underwriters had already disallowed claims. Defendants respond that "repeated" refers to a prior disclosure that the investors had questioned whether certain well costs would be covered under the policy. Although the Court admits some skepticism, it does seem at least as plausible as any innocent inferences that may be drawn that Hertel managed the insurance situation and knew that claims were already denied prior to the time at which TETRA expensed its unreimbursable costs. The scienter analysis does not require the Court to determine the most plausible of competing inferences. *See, e.g., Tellabs I*, 127 S.Ct. at 2510.

---

[18] Defendants contend that allegations that a defendant "attended meetings" is tantamount to the suggestion that the defendant knew something because he was an executive. *See Ind. Elec.*, 537 F.3d at 535. The Court finds the two suggestions distinguishable. The Court realizes that it is relying, in part on [*115] a *Nathenson-type* inference that the head of a Division would have knowledge of disallowed insurance claims that affect millions of dollars of work in his Division. It also acknowledges that the ACC does not explicitly state that McCarroll knew that the insurance claims were disallowed but uses phrases such as "the Company realized" or "the company figured this out." The *Nathenson-inference*, however, combined with McCarroll's instruction to limit weather costs around the same time that the company made the realization that weather time was not allowed enable the Court find that Plaintiffs have pled a strong inference of scienter as to McCarroll for the purportedly disallowed insurance claims.

Although it is a close call, Plaintiffs [*117] have pled facts that give rise to a strong inference of scienter with respect to McCarroll and Hertel's treatment of the purportedly disallowed insurance receivables. CW 2 places McCarroll at meetings with Lloyd's, the insurance adjusters; CW 4 describes weekly meetings involving McCarroll and Hertel to discuss insurance receivables and explains that she prepared reports for these meetings. Based on these allegations, and the inferences the Court may draw from the post-class statements, the Court finds that Plaintiffs have pled sufficient facts so as to make it plausible that McCarroll and Hertel would have been aware that weather downtime already exceeded that allowed for East Cameron 195 and that weather downtime was managed at Ship Shoal 269. Plaintiffs' explanation of disallowance of the insurance receivables is just as compelling as Defendants' argument that TETRA and Maritech were taking a conservative approach pursuant to GAAP. Plaintiffs have pled facts sufficient to satisfy the standard enunciated in *Tellabs I.*

As explained above, the Court finds Plaintiffs' allegations sufficient to plead loss causation, or a connection between the pled fraud and Plaintiffs' injury as the [*118] truth leaks out. Defendants do not contest that Plaintiffs have suffered economic harm.

### F. Exchange Act 20(a)

Controlling person liability is derivative; it is predicated on the existence of an independent securities violation. *Rubinstein v. Collins*, 20 F.3d 160, 166 n. 15 (5th Cir. 1994). Consequently, Plaintiffs 20(a) claims remain only as to the claims based on misstatements related to the insurance receivables.

### G. Leave to Amend

"We will generally not construe unelaborated, nested requests for amendment as motions to amend." *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d at 556. If the party requests leave in response to a motion to dismiss, without indication of the grounds on which the amendment is sought, is not a motion pursuant to FED. R. CIV. P. 15(a). 497 F.3d at 556 (affirming an implicit denial of leave to amend because amending would have been futile). In *Cent. Laborers Pension Fund*, the Court construed a request for leave as a proper motion because the plaintiffs explained that they would fix infirmities with the pleadings using two deposition transcripts such that the plaintiffs request was not "devoid of any indication of the grounds for [*119] amendment." *Id.*

Here, in a footnote to their Response to Defendants' Motion to Dismiss, Plaintiffs ask for leave to amend to remedy any perceived deficiencies as well as incorporate subsequently uncovered facts. [19] In light of the Fifth Circuit's statements, and without further elaboration of the reasons for amendment, this Court is hesitant to consider this footnote a proper Motion pursuant to FED. R. CIV. P. 15(a). The Court has not dismissed the action in its entirety, and therefore, should Plaintiffs so desire, upon proper Motion, the Court will consider whether leave to amend is warranted in this case.

### V. MOTION FOR SANCTIONS

Defendants filed a Rule 11 [*120] Motion, contending that several of the allegations in the ACC have no evidentiary support or factual basis because Plaintiffs misquoted or misconstrued statements made by confidential

---

[19] During the Motion hearing on Defendants' Motion to Dismiss, Plaintiffs submitted several attachments from recent state court pleadings involving TETRA and its insurer. At the time of the hearing, Defendants did not object to the Court taking judicial notice of the documents but later objected, generally, to Plaintiffs purported attempt to rely on new facts outside those alleged in the Complaint to oppose Defendants' Motion. As the Court did not base any of its holdings on these submitted documents, these objections are **DENIED AS MOOT**.

witnesses. Defendants provide sworn affidavits from some of the confidential witnesses in which the witnesses aver that some of the information attributed to them in the ACC is not based on their personal knowledge. Plaintiffs respond that they investigated the allegations behind the ACC and based the CW allegations on the reports of their investigator.

Under Rule 11, the court must identify some federal filing in which the attorney violated the rule that claims must be well-grounded in fact and in law, and that filings not be submitted for an improper purpose. Fed. R. Civ. P. 11; *Edwards v. General Motors Corp.*, 153 F.3d 242, 245 (5th Cir. 1998). The court must examine "whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990). The court considers three issues: (1) factual questions regarding the attorney's pre-filing inquiry and factual basis of the filing (2) legal issues of whether the filing is warranted [*121] by existing law or a good faith argument, and (3) discretionary issues regarding an appropriate sanction. *See id.* at 399; *St. Amant v. Bernard*, 859 F.2d 379, 381-82 (5th Cir. 1988). Reasonableness is measured on an objective basis. *See Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 263 (5th Cir. 2007) (holding that, in certain cases, an isolated factual misrepresentation may serve as the basis for sanctions, including when the misquoted statement could have had a serious impact on a court's summary judgment decision).

Defendants contend that CW 2 based his allegation that "work done by TETRA was costing much more than the insurance company would ever pay Maritech on the claims" on an erroneous assumption that TETRA's insurance policy had a $ 50 million cap. (ACC P 56.) Defendants also claim that CW 2's statements related to the cost of weather downtime at East Cameron 195 were based on rumor. Plaintiffs aver that, based on the state court litigation documents, the proper insurance limit for the insurance policy of which CW 2 speaks, allegedly based on rumor, does have a $ 50 million limit. Defendants note that TETRA holds many policies, and it is unclear of which policy [*122] CW 2 was speaking. Defendants claim that Plaintiffs learned of the $ 50 million policy after they filed the ACC, but they knew that information was not based on the CW's personal knowledge when they filed the ACC. Defendants reiterate their contention that CW 2's statements about the insurance limits, and whether the incurred expenses exceeded those limits, were based on rumor.

Moreover, Plaintiffs purportedly supplied CW 1 the $ 10-12 million estimate of weather downtime at East Cameron that CW 1 confirmed, although he claims he does not know where the number came from. Plaintiffs argue that CW 1's affidavit shows that statement about the $ 10-12 million downtime in for East Cameron 195 was a response to a leading question about an approximation--a proper investigative technique that does not render the statement inadmissible. In his affidavit, Wes Spinic (CW 1) avers: "I [*123] did not estimate that the weather downtime on the East Cameron 195 project alone was approximately $ 10-12 million. Rather the investigators asked me if the weather downtime was approximately $ 10-12 million and I indicated that the approximation was plausible even though I do not know who supplied them that estimate." (Doc. No. 61, Ex. 1 P 6.) The Court does not find the inclusion of this allegation in the ACC improper or sanctionable because Plaintiffs adequately created a foundation for personal knowledge as to that allegation, and Defendants' affidavit does not specifically defeat that foundation.

In addition, Defendants claim that CW 1 never made allegations that Maritech received computer printouts from adjusters that certain claims were disallowed. CW 1 now avers that he did not tell investigators that Maritech received printouts in 2007 indicating that claims submissions were not allowed, whereas, in the ACC, CW 1 alleged that Maritech received the printouts in December 2006. (ACC P 52.) Defendants respond that CW 1 clarified that the printouts occurred in 2007 rather than 2006, an allegation that Plaintiffs aver is contrary to the statements CW 1 provided Plaintiffs' investigators [*124] and the timeline as revealed in state court pleadings. Defendants respond that, because TETRA did not sue Lloyd's until November 2007, it is plausible that the printouts he described were received in late 2007. CW 1's explanation that he had no personal knowledge of the ACC paragraph containing the allegations about printouts is troubling. Based, however, on these discrepancies and conflicting statements, the

Court does not find sanctionable behavior or that Plaintiffs failed to reasonably investigate the statements included in the Complaint. The Court notes that it did not rely on statements about the printouts in its Motion to Dismiss.

Lastly, Defendants aver that CW 6's statements that the Fluids Division's buyback program was "borderline illegal" was made in the context of how it was marketed to customers, not in the manner for which it was accounted. In the ACC, the allegations attributed to CW 6 include:

> His understanding of the program, and how it was marketed to customers, was that TETRA would contract with customers to buy-back the fluids after they were used. The customers were told that they would receive a 50% "credit" for the returned fluids.

> According to the witness, the [*125] actual computation of the buyback credits was a "big secret" and it was closely held by Hank Reeves and Paul Coombs. Reeves once told the witness (in "early" 2007), that the way TETRA did the buyback credit was "borderline illegal."

(ACC PP 81-82.)

The phrase "the way TETRA did the buyback credit" does not seem to particularly refer to either accounting or marketing, and, as Plaintiffs note, falsely described measurements of a business's accounts, in marketing or in financial reporting, may support a securities violation. Defendants respond that there are no allegations in the ACC that the buyback credit was improperly explained to customers or that these statements impacted the financial statements. The Court finds that the provided affidavit, claiming that the previous statements about the borderline illegality of the buyback credit related to the marketing rather than the accounting of the buyback credit, while perhaps inartfully drafted, does not require the Court to strike these statements from the ACC or other take other measures. Moreover, the Court did not rely on this statement in the Motion to Dismiss.


## VI. CONCLUSION

Defendants' Motion to Dismiss (Doc. No. 44) is hereby **GRANTED** [*126] **AS TO ALL PLAINTIFFS' CLAIMS EXCEPT THOSE RELATED TO INSURANCE RECEIVABLES**. Defendants' Motion for Sanctions (Doc. No. 61) is hereby **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this 9th day of July, 2009.

/s/ Keith P. Ellison

KEITH P. ELLISON

UNITED STATES DISTRICT JUDGE

---

End of Document

# Kurtzman v. Compaq Computer Corp.

United States District Court for the Southern District of Texas, Houston Division

December 12, 2000, Decided

CIVIL ACTION NO. H-99-779 CONSOLIDATED WITH CIVIL ACTION NO. H-99-836, CIVIL ACTION NO. 99-869, CIVIL ACTION NO. 99-889, CIVIL ACTION NO. 99-936, CIVIL ACTION NO. 99-937, CIVIL ACTION NO. 99-952, CIVIL ACTION NO. 99-967, CIVIL ACTION NO. 99-1011, CIVIL ACTION NO. 99-1020, CIVIL ACTION NO. 99-1026, CIVIL ACTION NO. 99-1097, CIVIL ACTION NO. 99-1101, CIVIL ACTION NO. 99-1112, CIVIL ACTION NO. 99-1127, CIVIL ACTION NO. 99-1139, CIVIL ACTION NO. 99-1161, CIVIL ACTION NO. 99-1174, CIVIL ACTION NO. 99-1178, CIVIL ACTION NO. 99-1204, CIVIL ACTION NO. 99-1250, CIVIL ACTION NO. 99-1281, CIVIL ACTION NO. 99-1290, CIVIL ACTION NO. H-99-1295, CIVIL ACTION NO. 99-1298, CIVIL ACTION NO. 99-1356, CIVIL ACTION NO. 99-1359, CIVIL ACTION NO. H-99-1376, CIVIL ACTION NO. 99-1381, CIVIL ACTION NO. 99-1415, CIVIL ACTION NO. H-99-1417, CIVIL ACTION NO. 99-1422, CIVIL ACTION NO. 99-1429

**Reporter**
2000 U.S. Dist. LEXIS 22476 *; 2000 WL 34292632

JEFF KURTZMAN, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; DEBBIE KMOBLUTH, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; DAVID GOLAN, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; EMANUEL CATECHIS, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; SUZANNE P. GOODMAN, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; DAVID W. MAZONE, JUSTIN M. VANDERPOT, AND BEHRAH NAKHAI, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; JOSEPH COTRONEO, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; GARY GILMAN, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; VIRGO FAMILY TRUST, by John and Barbara Virgo, on behalf of itself and all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; STEVEN KAMMERMAN, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; ROBERT HONMYHR, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; NEIL GILLIGAN, RICHARD J. KNEEBONE, AND RUTH L. KNEEBONE, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; LAWRENCE E. BALFUS, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; HERBERT J. HAAS AND JOHN E. CLARK, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; CRAIG HOUSTON AND DEBORAH A. DYCKMAN, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; RUTH GRAIFMAN AND JULIUS GRAIFMAN, Individually and on behalf of all those similarly situated,

Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; HAYMAN SCHWARTZ, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, WILLIAM D. STRECKER, AND MICHAEL J. WINKLER, Defendants; ALAN SMITH, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; ROBERT C. DANIELS, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; JEANNE E. LIBIT, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; WAYNE LEE, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; STEVEN OSTROW, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; ARNOLD SILVERSTEIN AND ROBERT STRUGO, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; WARREN HILLS, Individually and on behalf of those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; MILTON AND ROSLYN APPLEBAUM, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; JULIUS TURNER, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; DAVID L. RICHARDS, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; AARON SOLOMON AND MICHAEL ZELMAN, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; JOSEPH PERRI, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; THERESA MAIJDE AND ANGEL L. ROSAS, on behalf of themselves and all others similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; PERRY DICASPRI, Individually on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, WILLIAM D. STRECKER, RODNEY W. SCEROCK, JOHN T. ROSE, ENRICO PESTATORI, HANS W. GUTSCH, MICHAEL D. HEIL, THOMAS C. SIEKMAN, JOHN J. RANDO, AND MICHAEL J. WINKLER, MASON, Defendants; W. MARK LANIER, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; V. PINNOCK BAILEY, II AND DR. ROBERT W. BAILEY, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants

**Subsequent History:** Motion granted by, Dismissed by Kurtzman v. Compaq Computer Corp., 2002 U.S. Dist. LEXIS 26569 (S.D. Tex., Mar. 30, 2002)

**Disposition:** Plaintiffs' request for leave to amend granted. Defendant Compaq's motion to dismiss granted in part and denied without prejudice in part. Defendant Compaq's motion to dismiss complaint denied without prejudice.

**Counsel:** For Jeff Kurtzman, Individually, and on Behalf of All Those Similarly Situated, PLAINTIFF: Michael A Caddell, Caddell and Chapman, Houston, TX USA. William B Emmons, Emmons & Jackson PC, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Joseph C Kohn, Kohn Swift & Graft, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al,

Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For The City of Philadelphia Through its Board of Pensions & Retirement, Robert C Daniels, Joseph Perri, PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Joseph C Kohn, Kohn Swift & Graft, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Samuel H Rudman, Milberg Weiss Et Al, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Joaquin Demonet, Cheng Lee, PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Samuel H Rudman, Milberg Weiss Et Al, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Debbie Knobluth, Individually, and on Behalf of All Those Similarly Situated, David L Richards, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Thomas E Bilek, Hoeffner Bilek & Eidman, Houston, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For David Golan, Individually, and on Behalf of All Those Similarly Situated, Suzanne P Goodman, Individually, and on Behalf of All Those Similarly Situated, David W Mazone, Individually and on Behalf of All Those Similarly Situated, Justin M Vanderpot, Individually, and on Behalf of All Those Similarly Situated, Behrad Nakhai, Individually, and on Behalf of All Those Similarly Situated, Joseph Cotroneo, Individually, and on Behalf of All Those Similarly Situated, Virgo Family Trust, by John and Barbara Virgo, on Behalf of Itself and All Those Similarly Situated, John Virgo, Barbara Virgo, Robert Honmyhr, Individually, and on Behalf of All Those Similarly Situated, Neil Gilligan, Individually, and on Behalf of All Those Similarly Situated, Richard J Kneebone, Individually, and on Behalf of All Those Similarly Situated, Ruth L Kneebone, Individually, and on Behalf of All Those Similarly Situated, Laurence E Balfus, Individually, and on Behalf of All Those Similarly Situated, Craig Houston, Individually, and on Behalf of All Those Similarly Situated, Deborah A Dyckman, Individually, Ruth Graifman, Individually, and on Behalf of All Those Similarly Situated, Julius Graifman, and on Behalf of All Those Similarly Situated, Hyman Schwartz, Individually, and on Behalf of All Those Similarly Situated, Steven Ostrow, Individually, and on Behalf of All Those Similarly Situated, Arnold Silverstein, Individually, and on Behalf of All Those Similarly Situated, Robert Strougo, Individually, and on Behalf of All Those Similarly Situated, Milton Applebaum, Individually, and on Behalf of All Those Similarly Situated, Roslyn Applebaum, Individually, and on Behalf of All Those Similarly Situated, Melissa McCue, Individually, and on Behalf of All Those Similarly Situated, Julius Turner, Individually, and on Behalf of All Those Similarly Situated, Perry Dicaspri, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. William B Emmons, Emmons & Jackson PC, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Emanuel Catechis, Individually, and on Behalf of All Those Similarly Situated, Herbert J Haas, Individually, and on Behalf of All Those Similarly Situated, John E Clark, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. William B Emmons, Emmons & Jackson PC, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Daniel W Jackson, Emmons & Jackson PC, Houston, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Gary Gilman, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFF: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Steven Kammerman, Individually, and on Behalf of All Those Similarly Situated CONSOLIDATED PLAINTIFF: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Elizabeth Kilbride, Kilbride & Cullen, Houston, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Alan Smith, Individually, and on Behalf of All Those Similarly Situated, Jeanne E Libit, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Christopher A Kelser, Kemp & Kesler LLP, Houston, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Aaron Solomon, Individually, and on Behalf of All Those Similarly Situated, Michael Zelman, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Roger Farrell Claxton, Claxton & Hill PLLC, Dallas, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Warren Hills, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFF: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Daniel James Petroski, Jr, Houston, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Angel L Rosas, Theresa Malde, Wayne Lee, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Thomas M Melsheimer, Fish and Richardson, Dallas, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Betti Lidsky, CONSOLIDATED PLAINTIFF: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Charles Leonard-Christo Vaccaro, Lidsky & Vaccaro, Hialeah, FL USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For V Pinnock Bailey, II, Robert W Bailey, Dr, CONSOLIDATED PLAINTIFFS: William B Emmons, Emmons & Jackson PC, Houston, TX USA.

For Compaq Computer Corporation, DEFENDANT: Richard Caldwell Smith, Shook Hardy & Bacon, Miami, FL USA. Karl S Stern, Vinson & Elkins, Houston, TX USA. John Loyd Carter, Vinson and Elkins, Houston, TX USA. William E Wurtz, Davis Polk & Wardwell, New York, NY USA.

For Eckhard Pfeiffer, Earl L Mason, DEFENDANTS: Karl S Stern, Vinson & Elkins, Houston, TX USA. John Loyd Carter, Vinson and Elkins, Huston TX USA. William E Wurtz, Davis Polk & Wardwell, New York, NY USA.

For W Mark Lanier, MOVANT: David H Berg, Berg & Androphy, Houston, TX , USA.

**Judges:** [*1] MELINDA HARMON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MELINDA HARMON

# Opinion

## MEMORANDUM AND ORDER

Pending before the Court in the above referenced, consolidated, federal securities fraud class action on behalf of a class of persons who purchased the common stock or call options, or sold put options [1] of Compaq Computer Corporation during the "Class Period" from January 7, 1999 through April 9, 1999, [2] are two motions:

(1) A motion to dismiss Plaintiffs' Consolidated and Amended Complaint (the "Kurtzman Action") [3] [*3] (instrument # 52), for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) [4] [*4] and

---

[1] Excluded from the class are the Company and Individual Defendants, members of Individual Defendants' immediate families, or company parent, subsidiary, affiliate, officer, or director of Compaq or its subsidiaries or affiliates, any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

[2] April 9, 1999 is the date Compaq announced a shortfall in its first quarter results.

[3] Because the claims asserted by Julius Turner, originally H-99-1356 prior to consolidation, are based on Section 11 of the Securities Act of 1933, while the other consolidated cases assert claims under Section 10(b)(5) of the Securities Act of 1934, Plaintiffs elected to file two separate amended complaints. The Kurtzman Action's Consolidated and Amended Class Action Complaint is # 50 in the record, while the Turner Amended Class Action Complaint is # 51.

[4] In reviewing the sufficiency of a complaint in response to a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), before any evidence has been submitted, the district court's task is limited. Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support its claims. Id. The district court should consider all allegations in favor of the plaintiff and accept as true all well-pleaded facts in the complaint. Lawal v. British Airways, PLC, 812 F. Supp. 713, 716 (S.D. Tex. 1992). Dismissal is not appropriate "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

for failure to satisfy pleading requirements of Rule 9(b) [5] and of the Private Securities Litigation Reform Act ("PSLRA") of 1995, [6] [*5]  15 U.S.C. §§ 78u-4, [7] et seq., filed by Defendants Compaq Computer Corporation and the present and former officers and directors (Eckhard Pfeiffer ("Pfeiffer"), Earl L. Mason ("Mason"), William D. Strecker ("Strecker"), and Michael J. Winkler ("Winkler")) of Compaq who are being sued individually (collectively, "Compaq"); and

(2) Compaq's motion to dismiss Plaintiffs' Section 11 Complaint [*2]  (the "Turner Action") ( # 55), pursuant to Federal Rule of Civil Procedure 12(b)(6) and the PSLRA, 15 U.S.C. §§ 77z-1 et seq.

 [*6]  Compaq, in operation since 1982, is a global information technology company based in Houston, Texas and currently the second largest computer company in the world, as well as the largest global supplier of computing systems. Its products and services are sold in more than one hundred countries.

**Allegations of The Kurtzman Complaint**

Plaintiffs' Consolidated and Amended Class Action Complaint ("the Kurtzman complaint") ( # 50), grounded in Sections 10(b) [8] [*8]  and 20(a) [9] of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b)

---

Nevertheless, conclusory allegations or legal conclusions masquerading as factual conclusions do not defeat a motion to dismiss. Fernandez-Montes v. Allied Pilots Assoc., 987 F.2d 278, 284 (5th Cir. 1993). Courts need only accept well-pleaded factual allegations as true. Shushany v. Allwaste, Inc., 992 F.2d 517, 520, 523 (5th Cir. 1993); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994) (courts should "not accept as true conclusory allegations or unwarranted deductions of fact.").

In the instant action, as discussed below, Plaintiff must also satisfy the pleading requirements of Rule 9(b) (fraud must be pled with particularity) and for scienter under the PSLRA and Rule 10b-5.

Usually a court limits its review under a Rule 12(b)(6) motion to the facts stated in the complaint and any documents either attached to the complaint or incorporated into it, or it converts the motion to one for summary judgment under Rule 56, with notice to the parties and an opportunity to be heard. Fed. R. Civ. P. 12(c). The Fifth Circuit has held that in reviewing a Rule 12(b)(6) motion to dismiss a claim for securities fraud on the pleadings, the district court may take judicial notice of and consider the contents of relevant public disclosure documents that are required by law to be filed with the Securities Exchange Commission ("the SEC") and are actually filed with the SEC, with the restriction that these documents may be considered only for the purpose of determining what statements they contain and not for proving the truth of their contents. Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017-18 (5th Cir. 1996), citing and adopting rule of Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991).

[5] Rule 9(b) provides,

and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, [10] alleges that between January 7, 1999 and April 9, 1999,

---

**Fraud, Mistake, Condition of Mind** In all averments of fraud, or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

In securities fraud actions, Rule 9(b) requires a plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." Williams v. WMX Techs., Inc., 112 F.3d 175, 177 (5th Cir.) (citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)), cert. denied, 522 U.S. 966 (1997).

The Fifth Circuit treats a dismissal for failure to plead fraud with particularity under Rule 9(b) as a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6). Lovelace v. Software Spectrum, Inc., 78 F.3d at 1017, citing Shushany v. Allwaste, Inc., 992 F.2d at 520.

[6] The PSLRA amends the Securities Exchange Act of 1934 and applies to private class actions brought pursuant to the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(1).

[7] Under the PSLRA, 15 U.S.C. § 78u-4(b)(1) & (2),

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

If the facts are not pled with the requisite particularity, the action is to be dismissed. 15 U.S.C. § 78u-4(b)(3)(A). This provision thus requires a heightened standard of pleading over that set out in Federal Rule of Civil Procedure 9(b), which allows a state of mind, or scienter, to be averred generally.

To establish a claim for securities fraud under § 10 of the Exchange Act of 1934, a plaintiff must prove (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1018 (5th Cir. 1996). Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'" Id., quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976). The plaintiff must establish scienter by showing that defendants acted with knowledge or severe recklessness in making misrepresentations. Id. at 1018 n.2. To survive a Rule 9(b) motion to dismiss, a plaintiff must do more than conclusorily allege fraudulent intent; he must set forth specific facts sufficient to support an inference of fraudulent intent (scienter) by either (1) showing a defendant's motive to commit securities fraud or (2) identifying circumstances reflecting conscious behavior on the part of the defendant. Lovelace, 78 F.3d at 1018-19.

[8] Section 10(b) of the Exchange Act makes it unlawful for any person:

To use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Thus Section 10(b) bars conduct "involving manipulation or deception, manipulation being practices . . . that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation or nondisclosure intended to deceive." Field v. Trump, 850 F.2d 938, 946-47 (2d Cir. 1988).

[9] Section 20(a) of the Exchange Act defines control person liability as follows:

Defendants repeatedly in statements of current or historical fact misrepresented to the investing public the projected and actual demand for and the sales of Compaq's computer products in the first quarter of 1999 to date. It asserts that Defendants "knew or recklessly disregarded" material facts, some of which were known internally as early as April 1998, of weaker demand and declining sales, the severity of problems resulting from the acquisition of Digital Equipment Company [*7] ("Digital"), Compaq's competition with Dell Computer Corporation for direct sales to customers, difficulties caused by Compaq's historic reliance on an extensive network of value added resellers ("VARs"), and lost relationships with suppliers crucial to Compaq's success. The motive of Defendants for falsely portraying Compaq as a booming company was to artificially inflate of the value of Compaq's common stock and then reap massive proceeds from insider trading.

More specifically, Plaintiffs allege that there were a number of serious problems that Compaq experienced immediately before and during the Class Period. First, Plaintiffs claim that there was a weakening demand for personal computers, most of which Compaq usually sold to small and medium-sized businesses, and that these problems were undermining [*9] Compaq's ability to attain growth in line with public expectations that Defendants had caused or encouraged analysts to incorporate into their estimates. Plaintiffs assert that Defendants were aware of the weakening demand and decreasing sales as early as August 1998, when the individual Defendants, all senior executives at Compaq, received an internal memo forecasting declining sales of Compaq PCs across the board.

Compaq also purportedly experienced weakening demand throughout the Class Period from its corporate customers, mainly in North America and Europe, which had accounted for 87% of its total sales in 1998.

Furthermore, at the start of the Class Period, Defendants allegedly knew that Compaq's multi-channel distribution system of direct and indirect sales was in trouble. Before November 1998, Compaq had sold personal computers to the public exclusively through an indirect distribution network of VARs. Because of competition from direct retailers like Dell computer, Compaq initiated a direct distribution program for its "Prosignia" PCs while it continued to sell other PCs through the VARs, a hybrid system of direct and indirect sales that Compaq dubbed "Direct Plus." By the [*10] start of the Class Period, Compaq purportedly knew that it could not compete with those PC makers which used only a direct sales method because the VARs' resistance to direct sales over the Internet necessitated higher overhead. By February 1999, Compaq had acquiesced in the VARs' demands that Compaq's direct prices be kept higher than necessary so the VARs would not lose business. These high prices led to reduced sales over the Internet, since the customers buying directly did not receive lower prices, and by February 1999, Compaq purportedly suspended the Direct Plus program. Compaq also allegedly lost substantial sales to direct channel competitors like Dell.

Another purported problem with the VARs' distribution network was caused by "contra-revenues," i.e., price protections and concessions that Compaq pays to its VARs, according to the complaint. If Compaq cut its prices, it would give the VARs a credit equal to the amount of the price cut multiplied by the number of units in the VARs' inventory. Thus even if the average selling price of new products remained high, Compaq could not collect the full amount from its distributors because of the outstanding credit, margins would [*11] decline, and profits would not increase even if sales volume did. During the Class Period, the complaint asserts, Compaq's contra-revenues were much higher than forecast and its gross margin profit greatly decreased. In addition, after the announcement of Intel's new Pentium III processor in early January 1999, which would be available to the public the following

---

Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person.

15 U.S.C. § 78t.

[10] Rule 10b-5, 17 C.F.R. § 240.10b-5, identifies the following conduct proscribed by the statute:

To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

month, Compaq allegedly knew that it would have to cut its prices on its Pentium II PCs to move that inventory and that this price cut in turn would result in higher contra-revenues and decreasing gross profit margins. Nevertheless Compaq did not disclose the coming losses to the investing public. Instead, Plaintiffs assert, Defendants touted the benefits of Compaq's direct sales efforts and its competitiveness in both direct and indirect channels.

The complaint further alleges that Compaq also had problems in developing a Configure to Order ("CTO") plan to compete with a similar program at Dell. Under this plan it would build PCs to customers' specifications, rather than keep a large inventory of finished product in stock. The complaint alleges that Compaq concealed the fact that it could not keep its chain of component [*12] suppliers and lost agreements with critical component suppliers, e.g.., a key hard disk drive agreement with Western Digital.

In addition, Plaintiffs maintain that Compaq had major difficulties with integrating its acquisition of Digital and with increasing "synergies" from that acquisition, even though Compaq publicly represented that the integration was completed by the beginning of the Class Period and that there would be lower overall expenses, significant revenues from Digital's service business, and increased sales of Digital's high end computers with substantially higher margins than Compaq's PCs had. Nevertheless, after Compaq notified Digital's sales force in 1998 that their compensation schedule would be changed and possibly reduced as of January 1, 1999, Digital's sales force allegedly concentrated on sales that would close by the end of 1998 and ignored potential sales for the first quarter of 1999. Compaq also instructed Digital sales personnel to focus on selling Compaq's PCs rather than Digital's computers and Compaq stopped advertising and promoting Digital's computers.

Plaintiffs accuse Defendants, who were allegedly aware of all these problems and adverse trends [*13] by early January 1999, of seeking to conceal them and portraying the demand for and sales of Compaq's PCs in glowing terms throughout the Class Period. These positive statements were intended to and did cause the price of Compaq's common stock to rise from $ 34 per share at the beginning of December 1998 to between $ 46-50 per share during the first two months of 1999. The complaint alleges that Compaq officer-insiders then took advantage of these artificially inflated prices by selling, beginning in February 1999 and extending over the next twenty-four days, more than one million shares of stock for proceeds of over $ 48 million. Plaintiffs specifically claim that Strecker and Winkler, respectively, sold 99% and 86% of their total holdings for a gain of over $ 5 million each, while Mason sold 94% of his holdings for proceeds over $ 12 million. The complaint alleges that "Mason's sales were unusual in that in the 5 quarters prior to the Class Period, he sold 158,000 shares only, for less than one-half of the proceeds he reaped on February 1, 1999. Subsequent to his sales on February 1, 1999, Mason owned 120,391 shares of common stock, of which 102,091 shares are represented by options [*14] which would not become exercisable until April 27, 1999." Amended Complaint at 42. Similarly, " . . . Strecker, who sold 120,000 shares during the Class Period, as compared to sales of only 66,615 in the two years prior to the Class Period, held only 1,332 shares after his sale, while Winkler, who sold 143,336 shares during the Class Period, as compared to sales of only 100,000 shares in the year prior to the Class period, was left with 22,438." Plaintiffs also provide the details of a number of other nondefendant officers' insider selling in 1999. The amended complaint further states that because Compaq compensates its senior officers mainly through stock options, it had a motive to artificially inflate its common stock to enable its senior officers to cash in on their options. As examples, the complaint points out that Mason and John T. Rose, Pfeiffer's top lieutenants, received only 7% of their $ 16.4 million incomes in cash in 1997.

On April 18, 1999, nine days after the end of the Class Period, Eckhard Pfeiffer, Compaq's President, Chief Executive Officer, and Director, abruptly resigned, along with Senior Vice President and Chief Financial Officer Earl Mason. Both officers are [*15] defendants in this action.

Set against this history of business difficulties are the allegedly false and misleading statements made by Defendants during the Class Period, i.e., in January and February of 1999, which form the bases for Plaintiffs' securities fraud allegations. On January 7, 1999, Eckhard Pfeiffer made the following statements on CNBC

regarding the acquisition of Digital, the success and competitiveness of Compaq's direct sales model, and the demand for Compaq PCs:

> The organizations [of Compaq and Digital] are completely integrated and merged and we expect to see the synergies that we've been expecting from the merger not only happening already during the last part of last year but coming into full bloom in 1999. Complaint P 40.

> Late last year we announced Compaq Direct, which is in a very aggressive selling mode, and we are competing in the direct as well as indirect channel . . . . Complaint P 40.

> We're quite optimistic about the PC market. . . . Compaq has always been growing at a higher rate than the market. So that's why we believe it's going to be continuously a good PC market. Complaint P 40.

Plaintiffs assert that these statements [*16] were false and misleading when made because Pfeiffer did not disclose that Compaq had adopted policies and programs intended to reduce, rather than increase, its revenue from Digital in 1999 and did not disclose Compaq's competitive failures, discussed above.

On January 27, 1999, Compaq issued a press release that allegedly misrepresented Compaq's business and failed to disclose negative facts about it and its prospects. In that release Mason stated, "The synergies from the Digital acquisition are becoming more and more evident in our financial performance. Sequential revenue growth in products was exceptionally strong, and we continue to gain momentum in our service business." Complaint P 42. Pfeiffer was quoted as stating at the release, "We continue to see strong demand for Compaq products and services and the opportunity for continued market share gains and revenue growths." Complaint P 43. Plaintiffs claim these statements were false and misleading in light of Compaq's problems, discussed above.

Mason stated on CNBC's "Squawk Box" program after issuance of the January 27, 1999 press release that "our gross margins continue to go up. We view the process to continue in 1999. Some [*17] of the reason [sic] why they're going up is further integration of Digital Equipment companies and of course we've made good progress on that. . . ." Complaint P 45. He further stated that he was "comfortable with earnings statements of our analyst community." Id. Confirming reports of Compaq's optimism about 1999. Mason also allegedly told the <u>Bloomberg New Service</u> on January 17, 1999 that "I don't believe that halfway through the year everything is going to stop" and that "Digital's high-end revenues are starting to pick up." Complaint P 46. Gary McWilliams reported in the <u>Wall Street Journal</u> on January 28, 1999 that Mason stated that Compaq expects to match Wall Street's earnings estimate of 35 cents per share in the first quarter ending on March 31, 1999. Complaint P 47.

Also on January 27, 1999, Compaq's Senior Vice President and General Manager for Europe, the Middle East, and Africa, Andreas Barth (Barth"), gave an interview in which he stated that Europe was Compaq's fastest growing region and that in 1999 the European market would be strong for Compaq and for the industry. Complaint P 48.

On January 28, 1999 the <u>Houston Chronicle</u> wrote, "Mason said the [*18] company began benefitting [in the fourth quarter of 1998] from the presence of Digital [due to] increased sales of Digital's high end, big box computers, which carry greater profits than Compaq's traditional, PC-based lineup." Complaint P 53.

At Compaq's International Press Briefing in London on February 16, 1999, Pfeiffer and Barth represented that Compaq would report $ 43.5 billion in revenue in 1999, described its gains in the PC market worldwide, predicted that Dell would lose market share, and represented that Compaq controls 15.4% of the PC market worldwide, outperforming competitors like IBM, Dell and Hewlitt Packard, and that although "we don't make projections," Compaq wanted to "grow faster than the market in order to increase market share." Complaint P 54.

In an interview Pfeiffer gave to <u>Bloomberg New Service</u> on February 16, 1999, he stated that in 1998 Compaq grew faster than the European market because it had good products, good customer relations, and good niche and that these same factors would allow it to grow at a faster rate than the European market in 1999. Complaint P 55. Plaintiffs maintain that these statements were false and misleading at the time [*19] because Defendants knew that

the demand for and sales of Compaq products, particularly in North America and Europe, which represented more than 40% of Compaq's total revenues, had declined throughout January and February 1999.

On February 24, 1999, Compaq filed its 1998 Form 10-K, signed by Pfeiffer and Mason, with the SEC, which contained positive statements about the demand for Compaq's products and indicated that "Compaq expects the personal computer market to expand in 1999 in line with third-party research organizations' forecasts of unit growth of 15%." Complaint P 57. Plaintiffs maintain this statement was false and misleading for the same reasons as the previous ones.

Furthermore, as briefly noted above, Plaintiffs complain that in the twenty-four days prior to Compaq's first partial disclosure on February 25-26, 1999 of a sales slow-down that precipitated a drop in common stock prices and a corresponding drop in the value of the Fund, a number of Compaq officers sold in the aggregate at the artificially inflated prices over one million shares of Compaq common stock that they personally held for proceeds of over $ 48 million, while these officers were in possession of material, [*20] adverse, undisclosed information about the company. [11] [*21] The amended complaint also claims that Compaq made its first partial disclosure of declining sales one day after this "insider trading frenzy," [12] and that its common stock price fell over twenty-one per cent in five days. Plaintiffs allege that Compaq continued to withhold critical information from the market regarding its decreasing margins, especially regarding Digital's sluggish sales and the ongoing weakness in demand for its personal computers.

At the end of the Class Period, asserts the complaint, additional adverse information was revealed to the market. The price of Compaq's common stock, which had been as high as $ 51 per share during the Class Period, fell to $ 24 1/16 after Compaq disclosed on April 9, 1999 that it would earn less than half of what it had been expected to report for the first quarter, i.e., only 15 cents a share instead of 31 cents. On April 12, 1999, the price of Compaq stock plummeted. On April 18, 1999, Pfeiffer and Mason resigned, soon followed by other executives. On April 21, 1999 Compaq finally admitted that both corporate demand for its PCs and sales of its higher-priced Digital and Tandem computer systems had slowed substantially [*22] through the first quarter. The complaint states that the stock continues in the range of $ 20 per share, about 60% less than the price the insiders received when they sold their stock prior to any disclosure.

The amended Kurtzman Complaint has limited the named Defendants to Compaq, Eckhard Pfeiffer, Earl L. Mason, William D. Strecker, and Michael Winkler. The Kurtzman Complaint charges that these individual Defendants were "controlling persons" of Compaq within the meaning of Section 20(a) of the Exchange Act and caused Compaq to engage in the unlawful conduct and misleading public statements of which Plaintiffs complain. Because of their high level positions as executives and managers at Compaq, the individual Defendants allegedly had access (through internal corporate documents, conversations and communications with other corporate officers and employees, management and Board meetings and committees, reports, etc.) to the adverse, undisclosed information about Compaq's operations, business practices, finances, and business prospects.

## COMPAQ'S MOTION TO DISMISS CONSOLIDATED AND AMENDED COMPLAINT

---

[11] Specifically the amended complaint stated that between February 1 and 24, 1999, Mason, Strecker, and Winkler and other non-defendant officers of Compaq sold over one million shares of Compaq common stock for insider proceeds totaling over $ 48 million.

On February 25, 1999 a partial disclosure of Compaq's slowed sales was made at a meeting of Compaq, Pfeiffer, Mason, and a Credit Suisse First Boston analyst named Michael Kwatinetz, and a group of his firm's clients. Kwatinetz then lowered his forecast from 36 cents per share to 31 cents for the first quarter, well below Compaq's projected 35 cents per share. As the news of these selected disclosures got out, Compaq continued to represent that its high-end and larger accounts were doing well. The price of the common stock began to tumble.

[12] The "disclose or abstain rule," relating to liability under Rule 10b-5 & § 10(b), prohibits a corporate insider who possesses material non-public information from trading on that information unless he makes a public disclosure of it. See, e.g., In re Compaq Securities Litigation, 848 F. Supp. 1307, 1310 n.7 (S.D. Tex. 1993) (and cases cited therein).

With regard to Compaq's motion to dismiss the Kurtzman complaint (instrument [*23] # 55), pursuant to Federal Rules of Civil Procedure 12(b)(6), Compaq argues that the Kurtzman complaint fails to state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)(5) [13] [*25] because it fails to identify any actionable statements. [14] Rather, insists Compaq, those statements it alleges to be fraudulent are either puffery (i.e., vague, amorphous statements of corporate optimism), non-actionable statements about overall industry trends, or accurate historical statements. Compaq further claims that the statements are not actionable in light of Compaq's numerous risk disclosures and warnings regarding the alleged risks. Furthermore, other "forward-looking" statements by Compaq are also protected by the safe harbor provisions of the PSLRA, 15 U.S.C. § 78u-5(c)(1), [15] [*26] insists Compaq, as well as by its common law counterpart, the bespeaks caution doctrine. [16] [*27] In addition, Compaq challenges Plaintiffs' failure to plead facts that show each of the four allegedly fraudulent statements was false when it was made and thus Plaintiffs fail to satisfy PSLRA and Rule 9(b) pleading requirements. Finally, Compaq charges that the complaint [*24] does not plead facts giving rise to a strong inference of scienter (or actual knowledge of the statements' falsity) to defeat its safe harbor defense, as required under the PSLRA, 15 U.S.C. §

---

[13] As noted earlier, Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange" to "use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b) (West Supp. 1999).

Rule 10b-5 makes it unlawful

for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

78u-4(b)(2). [17] <u>See generally In re Advanta Corp. Sec. Litig.</u>, 180 F.3d 525, 538 (3d Cir. 1999) (overwhelming authority requires dismissal of securities fraud claims based on statements that "merely report previous successes and express confidence in [issuers'] prospects for future growth."). Compaq addresses each of these arguments in detail.

[*28]  Regarding puffery, Compaq observes that courts have consistently rejected as a matter of law efforts to base securities fraud claims 'on such vague, amorphous, optimistic statements of opinion because reasonable investors do not rely on these statements in making investment decisions. <u>Advanta,</u> 180 F.3d at 538-39; <u>Searls v. Glasser,</u> 64 F.3d 1061 (7th Cir. 1995); <u>San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.,</u> 75 F.3d 801, 811 (2d Cir. 1996) (statements that defendant "should deliver income growth consistent with its historically superior performance" and that it was "optimistic about 1993" were not actionable); <u>Raab v. General Physics Corp.,</u> 4 F.3d 286, 289 (4th Cir. 1993) (rejecting claim based on statement that "regulatory changes . . . have created a marketplace for [its services] with an expected annual growth rate of 10% to 30% over the next several years . . . because the market price of a share is not inflated by vague statements predicting growth"); <u>Leventhal v. Tow,</u> 48 F.

---

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1998). Under the statute and Rule 10b-5, a plaintiff is given a private right of action "that reaches beyond the statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." <u>In re Burlington Coat Factory</u>, 114 F.3d 1410, 1417 (3d Cir. 1997)

To state a claim under § 10(b) of the Exchange Act, a plaintiff must plead "1) a misstatement or omission; 2) of material fact; 3) made with the intent to defraud; 4) on which the plaintiff relied; and 5) which proximately caused the plaintiff's injury." <u>Williams v. WMX Techs., Inc.,</u> 112 F.3d 175, 177 (5th Cir.), <u>cert. denied,</u> 522 U.S. 966, 139 L. Ed. 2d 315, 118 S. Ct. 412 (5th Cir.), <u>cert. denied,</u> 522 U.S. 966, 139 L. Ed. 2d 315, 118 S. Ct. 412 (1997).

To satisfy the second prong of materiality, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>TSC Industries, Inc. v. Northway, Inc.,</u> 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976); <u>Basic, Inc. v. Levinson,</u> 485 U.S. 224, 231, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988). The Fifth Circuit has stated,

"Materiality is not judged in the abstract, but in light of the surrounding circumstances." [<u>Krim v. BancTexas Group</u>, 989 F.2d 1435, 1448-49 (5th Cir. 1993).] The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." [id. at 1445] Inclusion of cautionary language--along with disclosure of any firm-specific adverse facts or assumptions--is, of course, relevant to the materiality inquiry, for such inclusion or disclosure is part of the "total mix of information." Nevertheless, cautionary language as such is not per se dispositive of this inquiry.

<u>Rubinstein v. Collins,</u> 20 F.3d 160, 167-68 (5th Cir. 1994).

[14] Plaintiffs base their claims on statements made in or paraphrased from a January 7, 1999 Compaq press release and the Company's February 23, 1999 SEC-filed Annual Report on Form 10-K for the year 1998, as well as recitations or paraphrases of statements by Defendants and others culled from selected newspaper articles, media interviews, and industry analyst materials, which Plaintiffs allege were false and misleading because of problems at Compaq, including weakening demand in the first weeks of the first quarter, loss of certain component part supply contracts, concealment of anticipated increases in contra-revenues, and difficulties in the acquisition and merging of Digital. See footnote 9 of this memorandum and order.

[15] The PSLRA establishes a "safe harbor" shielding a "forward looking" statement from Rule 10b-5 liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge . . . that the statement was false and misleading." 15 U.S.C. § 78u-5 and § 78u-5(c)(1)(B)(i). A statement is "forward-looking" if, <u>inter alia,</u> it is

Supp. 2d 104, 113-14 (D. Conn. 1999) (statements that company "believes it can growth [ [*29] sic] at a 14% rate" and that "the stock is worth $ 15-16 per share" were puffing statements "designed to elicit flattering publicity . . but they were not misleading . . . McNamara v. Bre-X Minerals, Ltd., 57 F. Supp. 2d 396, 414 (E.D. Tex. 1999). As examples of statements made by Compaq that Compaq maintains are merely puffery, it inter alia points to the following: "The market in Europe in 1999 is strong for industry and for Compaq."; "Pfeiffer stated that . . . good products, good customer relations and good niche . . . would enable Compaq to grow at a faster rate than the European market in 1999"; "We continue to see strong demand for Compaq products"; "We are quite optimistic about the PC market . . . we believe it's going to be continuously a good PC market"; and "we want to grow faster than the market in order to increase market share." Vague statements of corporate optimism are not actionable. In re Browning-Ferris Indus. Inc. Sec. Litig., 876 F. Supp. 870, 885, 896 (S.D. Tex. 1995) ("The future prospects of our . . . business are extremely attractive," "the future of the Company looks bright," and "we are poised for the next round [*30] of growth"); Ressler v. Liz Claiborne, Inc., 75 F. Supp. 2d 43, 48 (E.D.N.Y. 1999) (rejecting statement as basis for securities fraud' claim that defendant "expects profits to show an increase for all of 1993")

Plaintiffs have challenged 'Defendant Earl Mason's statement that he was "comfortable with earnings estimates of our analyst community." Compaq characterizes it, too, as a general statement of opinion about the future containing no guarantee and too indefinite to give 'rise to liability. Malone v. Microdyne Corp., 26 F.3d 471, 479-80 (4th Cir. 1994) (holding that statement of "comfort" not actionable because it did not "constitute a guarantee and was certainly not specific enough to perpetrate a fraud on the market"); In re Newbridge Networks Sec. Litig., 962 F. Supp. 166, 173 (D.D.C. 1997) (same); Jakobe v. Rawlings Sporting Goods Co., 943 F. Supp. 1143, 1160 (E. Mo. 1996) (same); Pitten v. Jacobs, 903 F. Supp. 937, 944 (D.S.C. 1995) (same). Compaq further notes that Mason's statement in context [18] was intended to dampen, not inflate, some analysts' optimistic forecasts about Compaq's earnings. [*31] [19]

---

A. a statement containing a projection of revenues, income (including income loss). earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer . . . .

15 U.S.C. § 78u-5(i)(1)(A).

The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). If a statement is "accompanied by meaningful cautionary statements," the defendants' state of mind is not relevant. Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999), citing H.R. Conf. Rep. 104-369, at 44 (1995), reprinted in 1995 U.S.C.A.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.") Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u-5(c)(1)(B).

The PSLRA restricts review of forward-looking statements to those specified in the complaint. 15 U.S.C. § 78u-4(b)(1). Thus the Court must examine piecemeal the statements made by the company as expressed in the pleadings.

[16] The Eleventh Circuit in <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1276 n.7 (11th Cir. 1999), presents the following clear explanation of these two defenses to securities fraud, i.e., the PSLRA's "safe harbor" provision, 15 U.S.C. § 78u-5, and its judicially created equivalent, the "bespeaks caution" doctrine:

> The [PSLRA's] safe harbor protects "forward-looking statements" from serving as a basis of liability in private securities fraud suits if the statements qualify as "forward-looking" under 15 U.S.C. § 78u-5(i)(1)(A)-(F), and meet any one of the statutory conditions set forth in 15 U.S.C. § 78u-5(c)(1)(A)-(B). 15 U.S.C. § 78u-5(i)(1) defines "forward-looking statements" as encompassing, <u>inter alia</u>, projections of revenues, such as EPS estimates, <u>see</u> 15 U.S.C. § 78u-5(i)(1)(A), statements regarding management's future plans and objectives, <u>see</u> 15 U.S.C. § 78u5(i)(1)(B), and statements regarding economic performance. <u>See</u> 15 U.S.C. § 78u-5(i)(1)(C). Thus statements in the nature of economic forecasts, such as those listed above, are considered "forward-looking" and may garner the protection of the statutory safe harbor, 15 U.S.C. § 78u-5(c): (1) if they are identified as forward-looking statements and are accompanied by the appropriate cautionary language, <u>see</u> 15 U.S.C. § 78u-5(c)(1)(A)(i); (2) if such statements are immaterial, <u>see</u> 15 U.S.C. § 78u-5(c)(1)(A)(ii); or (3) if the plaintiff fails to prove that the statements were made with actual knowledge of their falsity. <u>See</u> 15 U.S.C. § 78u-5(c)(1)(B). The "bespeaks caution" doctrine, the safe harbor's judicially created counterpart, operates similarly, protecting statements in the nature of projections that are accompanied by meaningful cautionary statements and specific warnings of the risks involved, so as to "bespeak caution" to investors that actual results may differ, thereby shielding the statements from § 10(b) and Rule 10b-5 liability. <u>See Saltzberg v. TM Sterling/Austin Assocs.</u>, 45 F.3d 399 (11th Cir. 1995) <u>(per curiam)</u> (holding that explicit cautionary language in private placement memorandum rendered alleged misstatements immaterial and made them not actionable under "bespeaks caution" doctrine).

The Fifth Circuit rejects the application of the "bespeaks caution" doctrine as a <u>per se</u> bar to liability. <u>Rubinstein v. Collins</u>, 20 F.3d 160, 162 (5th Cir. 1994). Observing that the use of the doctrine by district courts "reflects a relatively recent, ongoing, and somewhat uncertain evolution in securities law," the Fifth Circuit skeptically comments,

> In essence, predictive statements are just what the name implies: predictions. As such, any optimistic projections contained in such statements are necessarily contingent. Thus the "bespeaks caution" doctrine has developed to address situations in which optimistic projections are coupled with cautionary language--in particular, relevant specific facts or assumptions--affecting the reasonableness of the reliance on and the materiality of those projections. To put it another way, the "bespeaks caution" doctrine merely reflects the unremarkable proposition that statements must be analyzed in context.

<u>Id.</u> at 167 [footnotes and citations omitted]. Under Fifth Circuit precedent, "Cautionary language is not necessarily sufficient in and of itself, to render predictive statements immaterial as a matter of law. Rather, . . . materiality is not judged in the abstract, but in light of the surrounding circumstances." <u>Id.</u> at 167-68, <u>citing Krim v. BancTexas Group</u>, 989 F.2d 1435, 1448-49 (5th Cir. 1993). The Fifth Circuit has defined the test: "The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis 'is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment.'" <u>id.</u> at 168, <u>citing Krim</u>, 989 F.2d at 1445.

[17] Section 78u-4b(1-2) of the PSLRA provides,

> (1) In any private action arising under this chapter in which the plaintiff alleges that the defendant-
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> (2) In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Furthermore, § 21(D)(b)(3)(A) of the PSLRA requires the court to dismiss a complaint that fails to meet the pleading requirements of (b)(1) and (b)(2), <u>supra.</u>

As indicated previously, Federal Rule of Civil Procedure 9(b) provides,

Compaq further argues that a paraphrased statement in the <u>Wall Street Journal</u> about earnings projections, i.e., that Compaq expects to match Wall Street earning estimates of 35 cents a share in the first quarter of 1999, also attributed to Mason, is unactionable. Statements that a company "expects" a particular level or range of results are unactionable as a matter of law because "on its fact, the word 'expects' limits the statement's potential to mislead." <u>Pache v. Wallace,</u> 1995 U.S. Dist. LEXIS 3511, 1995 WL 118457, *4 (E.D. Pa. Mar. 20, 1995), <u>aff'd,</u> 72 F.3d 123 (3d Cir. 1995). The word, "expects," conveys opinion and hope, and thus a potential of nonrealization. <u>Genna v. Potts,</u> 1995 U.S. Dist. LEXIS 4866, 1995 WL 222043, *24 (D. Md. Apr. 13, 1995) (holding unactionable statement made by corporate president that "we expect that the current dividend level of $ .26 per share per month will be maintained through the end of 1994 . . . ."); <u>Greenberg v. Howtek, Inc.,</u> 790 F. Supp. 1181, 1185-86 (D.N.H. 1992) (holding unactionable as a matter of law the statement that company "expected" to earn $ .75 per share in 1990 on revenues of $ 30 million and "expected" to [*32] earn $ 2.00 per share in 1991 on revenues of $ 48 million); <u>Rintel v. Wathen,</u> 806 F. Supp. 1467, 1471-72 (C.C. Al. 1992) (dismissing as unactionable a statement that "we expect earnings to increase at least 25% during 1992"). Compaq notes that Plaintiffs fail to plead facts that show there was no basis for alleged statements of expectation or that they were willfully false.

Compaq's optimistic statements about its merger with Digital lack the potential to mislead because they merely convey hope and optimism for success, insists Compaq. Such vague statements [*33] about merger synergies are standardly rejected by courts as a basis for a fraud claim. <u>Grossman v. Novell,</u> 120 F.3d 1112, 1121 (10th Cir. 1997) (following statements immaterial as a matter of law: defendant "had experienced 'substantial success' in integrating the sales forces of the two [merged] companies"; "that the merger was moving 'faster than we thought'"; "that the merger presented a 'compelling set of opportunities'"; and that "by moving rapidly to a fully integrated sales force, we are leveraging our combined knowledge . . . ."; <u>In re Peritus Software Servs., Inc. Sec. Litig.,</u> 52 F. Supp. 2d 211, 227, 229 (D. Mass. 1999) (statement that "the acquisition and integration [of the target] had been a success" was not actionable because the "'success' comment seems exactly the type of 'rosy affirmation' frequently held nonactionable under the corporate puffery doctrine"); <u>In re Oak Tech. Sec. Litig.,</u> 1997 U.S. Dist. LEXIS 18503, 1997 WL 448168, *7 (N.D. Cal. Aug. 1, 1997) ("statements regarding 'synergies' and product integration are general, amorphous comments about Oak's efforts to integrate its various products and do not refer to any particular products [*34] or even particular business units. No reasonable investor would rely on such vague statements.").

Compaq also contends that statements of prediction regarding the overall industry, here trends of the computer industry and general economic conditions for 1999, are also not actionable. <u>Wenger v. Lumisys, Inc.,</u> 2 F. Supp. 2d 1231, 1246 (N.D. Cal. Mar. 31, 1998) (rejecting statement that defendant's sales would "mirror the growth of the [relevant] market" because 'a company cannot be held liable for failing, to educate the public about publically known facts."). The market does not rely on defendants for such information outside of their exclusive 'knowledge; instead investors rely on companies for firm-specific information, which is combined by analysts and market 'professionals with "knowledge and macroeconomic facts" to set the appropriate price for a company's shares. <u>Krim v. BancTexas Group, Inc.,</u> 989 F.2d 1435, 1446 (5th Cir. 1993); <u>Wielgos v. Commonwealth Edison Co.,</u> 892 F.2d 509, 515 (7th Cir. 1989) ("Securities laws require issuers to disclose firm-specific information investors and

---

**(b) Fraud, Mistake, Condition of the Mind.** In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and any other condition of mind of a person may be averred generally.

For purposes of a private action for civil damages for securities fraud under the Exchange Act and Rule 10b-5, "scienter" is defined as "'a mental state embracing intent to deceive, manipulate or defraud.'" <u>Lovelace,</u> 78 F.3d at 1018, <u>quoting Ernst & Ernst v. Hochfelder,</u> 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976).

[18] Mason made the statement in response to the following interview question: "The Paine Webber analysts back in December [were] saying we believe the consensus estimate of $ 1.75 a share next year is dramatically underestimating the earning power of Compaq. Your response to that?" Memorandum of Law ( # 53) at p. 10 n. 6.

[19] In addition, notes Compaq, Mason's statement was about the full year of 1999, not merely the Class Period.

analysts combine that information with knowledge [*35] about the competition, regulatory conditions and the economy as a whole to 'produce a value for stock.").

Plaintiffs also attack several statements offering historical information or characterizations of historical performance. Where there is no challenge to the accuracy of historical statements, such disclosure is not actionable as a matter of law. Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co., 940 F. Supp. 1101, 1117 (W.D. Mich. 1996) (rejecting fraud claim based on accurate historical statement). Such is also true where accurate historical information is juxtaposed to optimistic, forward-looking statements. Rintel, 806 F. Supp. at 1470 (dismissing claim based on statement that was "an example of nonactionable historical data combined with general statements of optimism"); In re Verifone Sec. Litig., 784 F. Supp. 1471, 1481 (N.D. Cal. 1992) (accurately reported historical information, "even if the disclosure is accompanied by generally optimistic statements about the future," is not actionable); Wenger, 2 F. Supp. 2d at 1245 (same, "even if less favorable results might be predictable by the company in the [*36] future"); In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997) (same).

Next Compaq argues that its numerous warnings and disclosures about the very factors that Plaintiffs claim led to Compaq's first quarter earnings shortfall, i.e., lower 'than anticipated demand and increased competitive pricing, make evident Plaintiffs' failure to plead any actionable misstatements or omissions. In basing their suit on selected statements in isolation and outside' of the context of Compaq's repeated disclosures and warnings, Plaintiffs "have disregarded the 'total mix' [20] of available information. The alleged misrepresentations and omissions relied upon by [Plaintiffs] must be considered in the full context in which they were made." Gasner v. Board of Supervisors, 103 F.3d 351, 358 (4th Cir. 1996). In context of the disclosures and warnings, such statements would not have misled a reasonable investor, and therefore the statements are not actionable as a matter of law, argues Compaq. I. Meyer Pincus & Assoc., P.C. v. Oppenheimer Co., 936 F.2d 759, 761, 763 (2d Cir. 1991) (dismissing complaint under Rules 12(b)(6) and 9(b) because [*37] defendants' "'representations, taken together and in context, would [not] have [misled] a reasonable investor'"); Klein v. General Nutrition Cos., 186 F.3d 338, 342-43 (3d Cir. 1999) (dismissing complaint under Rule 12(b)(6) because overall context and defendants' warnings made alleged misstatements unactionable); Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 9 (2d Cir.) (dismissal under Rules 12(b)(6) and 9(b) is appropriate where "plaintiffs' claims are contradicted by the disclosure of risk").

Compaq points to and quotes numerous detailed warnings made in a variety of reports and statements [*38] that relate directly to Plaintiffs' fraud charges:

> Warnings in Compaq's Third Quarter Report on Form 10-Q, filed on November 11, 1998 (Defs.' Appendix, Ex. 5), which were repeated a number of times during the Class period in Compaq's statements and in analyst materials: [21] [*46]
>> - Compaq participates in a highly volatile industry that is characterized by fierce industry-wide competition for market share. Industry participants confront aggressive pricing practices, continually changing customer demand patterns, growing competition from well capitalized high technology and

---

[20] A false statement or omission will be considered "material" if its disclosure would alter the total mix of facts available to an investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision. Basic, Inc. v. Levinson, 485 U.S. 224, 246-47, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988).

[21] Plaintiffs point out that the January 27, 1999 Paine Webber report, cited in their complaint at P 49 to show how "Defendants' statements about strong demand in 1999 were relied upon by the market", in fact plainly disclosed that "Compaq investments contain a high level of risk from fast changes in technology, industry conditions and competitive pressure." Def. App., Ex. 9.

Plaintiffs also quote from a February 2, 1999 BancBoston report, cited in their Complaint at P 49, from a section entitled "Investment Risks": "Among the risks is the ever-present fear of a decline in PC demand. Historically this has resulted in price wars aimed at holding market share and alleviating rising inventories. In turn, these pricing moves have led to significant industry losses." Def. App., Ex. 13.

consumer electronics companies, and rapid technological development carried out in the midst of legal battles over intellectual property rights and the application of intellectual property laws. (p. 23)

- Competition remains fierce in the information technology industry with a large number of competitors vying for market share. Competition creates an aggressive pricing environment, which continues to put pressure on gross margins. (id.)

- [Compaq] sells directly to end users in its high-end business and its service business . . . [and] the success of its programs to increase its business [*39] efficiencies depends upon Compaq's ability to continue its successful working relationship with its resellers. (Id.; also 1998 Report on Form 10-K, filed Feb. 23, 1999, Def. App. 6 at 23)

- In managing production, Compaq must forecast customer demand for its products. . . . Should it overestimate the supplies needed to meet customer demand, cash and profitability could be adversely affected. (id. at 25)

- In the event of . . . lower-than-anticipated demand for one or more of Compaq's products, difficulties in managing product transitions, or component pricing movements, there could be an adverse impact on . . . cash and related profitability. (id. at 24)

- Compaq works with third parties in strategic alliances to facilitate product offerings, product development and compatibility, in various manufacturing, configuring and shipping capacities and as suppliers of components and services in non-core competencies. . . . These relationships lead to a number of risks. First, these companies may suffer financial or operational difficulties that affect their performance, which could lead to delays in product announcements or gaps in component supplies. (id.)

- [*40] Should Compaq be unable to sell the inventory of older products at anticipated prices, should it not anticipate pricing actions that are necessary, or if dealers hold higher than expected amounts of inventory subject to price protection at the time of planned price reductions, there could be resulting adverse impact on sales, gross margins and profitability. (id. at 25)

- In planning product transitions, [Compaq] evaluates the speed at which customers are likely to switch to newer products. . . . Because of the lead times associated with its volume production, should Compaq be unable to gauge the rate of product transitions accurately, there could be an adverse impact on inventory levels, cash, and profitability. (id.)

Warnings from Compaq's 1998 Report on Form 10-K. Defs.' App.. Ex. 6), filed on February 23, 1999 and repeating the above warnings also:

- From time to time, Compaq has experienced significant price increases and limited availability of certain components that are available from multiple sources. At times, Compaq has been constrained by parts availability in meeting product orders and future constraints could have an adverse effect on [*41] Compaq's operating results. (p. 8)

- Compaq's hardware products are sold to large and medium business and government customers primarily through dealers, value-added resellers and systems integrator and to small business and home customers principally through dealers and customer channels. In response to changing industry practices and customer preferences, Compaq is continuing its expansion of distributions establishments. Compaq also sells hardware products directly through its sales force and to small businesses and home customers through Compaq's internet web page at www.compaq.com as well as through its mail order business. (Id.)

- The computer industry 'is 'intensely competitive with many U.S., Japanese and other international companies vying for market share. (Id. at 10)

- The principal elements of competition are product performance, product quality and reliability, service and support, price, marketing and distribution capability and corporate reputation. While Compaq believes that its products and services compete favorably based on each of these elements, Compaq would be adversely affected if its competitors introduce innovative or technologically [*42] superior products, offer a more attractive combination of products and services, or offer their products at significantly lower prices than Compaq.

- Competition creates an aggressive pricing environment, which continues to put pressure on gross margins. (Id. at 23)

- In the event of a drop in worldwide demand for computer products, lower-than-anticipated demand for one or more of Compaq's products, difficulties in managing product transitions or component pricing movements, there could be an adverse impact on inventory levels, cash and related profitability. (Id. at 23).

- While Compaq has increased its service revenue through [the Digital] acquisition, there are risks associated with the service business, which include jeopardizing Compaq's long-term relationships with third-party resellers while it provides services directly to end-user customers. (Id.)

Compaq believes that the Digital acquisition will enhance its operating results, but as with any significant acquisition or merger, it confronts challenges in . . . synchronizing product roadmaps and . . . marketing . . . to achieve greater efficiencies. (Id.)

- Compaq continues to focus [*43] on making business and information management processes more efficient in order to increase customer satisfaction, improve productivity and lower costs. . . . Integrating the systems at Digital and Tandem complicates this process. Should the transition to new systems not occur in a smooth and orderly manner, Compaq could experience disruptions in operations, which could have an adverse financial impact. (Id.)

- To ease product transitions, Compaq carries out pricing actions and marketing programs to increase sales by resellers. It provides currently for . . . price protection that may occur under reseller programs and under floor planning arrangements. . . . Should [Compaq] . . . not anticipate pricing actions that are necessary, or if dealers hold higher than expected amounts of inventory subject to price protection at the time of planned price reductions, there could be a resulting adverse impact on sales, gross margins, and profitability. (Id. at 23-24; see also Third Quarter 1998 Report on Form 10-Q, filed Nov. 11, 1998, Ex. 5 at 25)

- Compaq's operating results could be adversely affected should Compaq be unable to . . . anticipate customer demand accurately.  [*44]  (Id. at 57)

- In the event that a supply of key single-sourced material process or component parts were delayed or curtailed, Compaq's ability to ship the related product in desired quantities and in a timely manner could be adversely affected. (Id.)

Compaq's operating results could be adversely affected should Compaq be unable to successfully integrate acquired entities.

CNBC Interview of Earl Mason

- Well, our gross margins continue to go up. We view that process to continue in 1999. Some of the reasons they're going up is further integration of [Digital] and of course we've made good progress on that. But we have more work to do yet, before we're finished. (Defs.' App. Ex. 8) [22]

Feb. 16, 1999 International Press Briefing by Andreas Barth

- We've achieved most of the integration. [But] there are some things, like the profit alignment, that we still need to do. And then the cultural integration, which will only take long-term . . . . Defs.' App., Ex. 14.

- We've made huge progress as I said on the Digital integration, but obviously we need to complete that fully for the things that are still open there, do them, complete them, [*45] get that behind us, because then we can fully, fully reap the benefit of all of the advantages, products, solutions, services" (Id.)

See Memorandum of Law (# 53) at pp. 18-25. These warnings, Compaq maintains, demonstrate that Compaq did not conceal risks from competition, erroneous forecasting of end-user demand, impact of supply constraints and reliance on third-parties for supply of component parts, Compaq's multi-channel distribution system of both direct and indirect sales, contra-revenues paid to resellers when competition or introductions of new products forced them to lower their prices, and the ongoing integration of Digital that posed continued risks to anticipated sales, growth, and profitability.

Compaq also notes that risks that are matters within the general knowledge of investors do not require explicit warnings. In re Donald Trump Casino Sec. Litig., 793 F. Supp. 543, 562 (D.N.J. 1992) ("there is, no obligation under the securities laws . . . to set forth information which is public and which a reasonable investor ought to be held accountable for knowing"), aff'd, 7 F.3d 357 (3d Cir. 1993), cert. denied sub nom. Gollomp v. Trump, 510 U.S. 1178, 127 L. Ed. 2d 565, 114 S. Ct. 1219 (1994); Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir. 1989) (Issuer "need not disclose the hazards of its business, hazards apparent to all serious observers and most casual ones").

The PSLRA's safe harbor provisions and the [*47] common law bespeaks caution doctrine provide another, independent basis for dismissal of the Kurtzman complaint, Compaq asserts. The safe harbor provisions, offer three independent prongs that shield statements about future performance or activities of a public company. Specifically such "forward-looking" statements cannot as a matter of law form the basis of a securities fraud claim when (1) they are identified as forward-looking and are accompanied by meaningful cautionary language, or (2) they are immaterial, or (3) the person making or approving the statements did not have "actual knowledge" of their falsity. 15 U.S.C. § 78u-5(c)(1). Compaq maintains that each of Defendants' allegedly misleading statements is protected by the safe harbor.

The PSLRA's definition of "forward-looking statement" is broad and includes the following:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure; or other financial items; . . .

(C) a statement of future economic performance, including any such statement contained in a discussion [*48] and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; . . .

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B) or (C) . . .

---

[22] See also January 27, 1999 Bloomberg article, cited at P 46 of Complaint, following Compaq's announcement of fourth quarter 1998 results: "They're starting to see some synergies in terms of expenses, but growing the [Digital] part of the business hasn't happened yet." Def.'s App., Ex. 7.

15 U.S.C. § 78u-5(i)(1)(A)-(D). Where a statement is "mixed," i.e., contains both forward-looking and non-forward-looking elements, and where a plaintiff alleges the entire statement is misleading because it omitted material information, the court should determine whether statement as a whole, not a particular part, is misleading. Harris v. IVAX Corp., 182 F.3d 799, 806 (11th Cir. 1999) ("If the allegation is that the [whole] statement is misleading, then it makes no sense to slice the [statement] into separate sentences.") "Forward-looking conclusions often rest both on historical observations and assumptions about future events." Id. See also Hockey v. Medhekhar, 1997 U.S. Dist. LEXIS 8558, 1997 WL 203704, *5 (N.D. Cal. Apr. 15, 1997) (where "forward-looking statements . . . are based on . . . statements dealing with past or present facts, . . . these non-predictive [*49] statements are 'assumptions underlying or relating to' statements of future economic performance [and] fall under the [PSLRA's] definition of forward-looking statements"). Compaq contends that treating such mixed statements as "forward-looking" better fulfills Congress' purpose in creating the safe harbor to "loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company." IVAX, 182 F.3d at 806. Excluding statements containing both factual and predictive elements from the safe harbor, argues Compaq, "would inhibit corporate officers from fully explaining their outlooks" and thus "hamper the communication that Congress sought to foster." Id. at 806-07.

In this suit Plaintiffs complain about statements that are almost entirely future-based, optimistic, and purportedly willfully false. Thus, contends Compaq, the rules governing statements regarding future events should bind them. Therefore under the first prong of the safe harbor, a statement that is identified as 'forward-looking and is accompanied by meaningful cautionary warnings is totally [*50] immune from liability. 15 U.S.C. § 78u-5(c)(1)(A)(i). Under the second prong, forward-looking statements do not trigger liability to the extent that they are immaterial. 15 U.S.C. § 78u-5(c)(1)(A)(ii). Compaq has argued earlier that statements in the complaint are too vague and amorphous to be material as a matter of law or are made so by Compaq's numerous warnings and disclosures. The third prong of the safe harbor bars liability, even where there are no warnings, where a plaintiff fails to plead facts demonstrating that the forward-looking statements were made with defendants' actual knowledge of their falsity. 15 U.S.C. § 78u-5(c)(1)(A)(iii); Hockey, 1997 U.S. Dist. LEXIS 8558, 1997 WL 203704 at *9-10; Clark v. TRO Learning, Inc., 1998 U.S. Dist. LEXIS 7989, 1998 WL 292382, *5 (N.D. Ill. May 20, 1998). Compaq insists that Plaintiffs have not asserted any facts establishing knowledge by Defendants of the falsity of their statements. Instead Plaintiffs improperly rely on legally invalid presumptions and speculation based on individual Defendants' positions at Compaq, their compensation packages, and their career movements inside [*51] and outside Compaq. Advanta, 180 F.3d at 536 (dismissing claim because complaint failed to "plead any specific facts to support an inference" that the maker of forward-looking' statement had actual knowledge of statement's falsity at the time that it was made); Hockey, 1997 U.S. Dist. LEXIS 8558, 1997 WL 203704 at *10 (rejecting plaintiffs' reliance on 'unidentified internal documents'to demonstrate actual knowledge of forward-looking statement's falsity and dismissing complaint); Clark; 1998 U.S. Dist. LEXIS 7989, 1998 WL 292382 at *5 (dismissing complaint because plaintiffs' allegations of actual knowledge of forward-looking statement's falsity were "conclusory and unsupported by facts"). Compaq maintains that this third prong precludes liability for all forward-looking statements in the Kurtzman complaint.

The bespeaks caution doctrine, which constitutes an independent ground for dismissal, also protects forward-looking statements where the defendant provides cautionary warnings that are "substantive and tailored to specific future projections, estimates or opinions . . . which the plaintiffs challenge." In re Donald Trump Casino Sec. Litig., 7 F.3d at 371-72. See [*52] also In re Royal Appliance Sec. Litig, 1995 WL 490131, *3 (6th Cir. Aug. 15, 1995) (same); Mercury Air Group, Inc. v. Jet USA Airlines, Inc., 1998 U.S. Dist. LEXIS 13159, 1998 WL 542291, *4 (S.D.N.Y. Aug. 26, 1998), aff'd, 189 F.3d 461 (2d Cir. 1999) (same). Compaq maintains that its warnings related to competition and forecasting of demand, i.e., problems that Plaintiffs allege Defendants attempted to conceal, such as risks inherent in Compaq's multi-channel distribution system, risks relating to dealing with suppliers for component parts, risks affiliated with contra-revenues, and risks associated with the integration of Digital. Royal Appliance, 1995 WL 490131 at *3; Stavroff v. Meyo,1997 U.S. App. LEXIS 32774, 1997 WL 720475, *5 (6th Cir.

Nov. 12, 1997) (rejecting claims based on defendants' revenue projections because cautionary statements from the company itself, combined with cautionary statements by independent analysts, bespoke caution and thus were not actionable); Grossman, 120 F.3d at 1122 (dismissing claim based on statements concerning rate of integration following merger and effect of merger on future earnings under bespeaks [*53] caution doctrine).

Finally, Compaq insists that Plaintiffs have failed to plead with factual particularity as required by 15 U.S.C. § 78u-4(b)(1) of the PSLRA [23] [*55] and Rule 9(b) [24] to demonstrate that each challenged vague, forward-looking statement was false when made. Plaintiffs alleging fraud must plead detailed, specific facts that support each of the following elements of their claim: (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) upon which Plaintiffs relied, and (5) which proximately caused their injury. Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994). Conclusory pleadings are not sufficient. Coates v. Heartland Wireless Communications, Inc., 26 F. Supp. 2d 910, 915 (N.D. Tex. 1998). The PSLRA heightens Rule 9(b)'s pleading-with-particularity requirement. 15 U.S.C. § 78u-4(b)(1); Williams v. WMX Techs., Inc., 112 F.3d 175, 177 (5th Cir. 1997), cert. denied, 522 U.S. 966, 139 L. Ed. 2d 315, 118 S. Ct. 412 (1997). The pleaded facts must show why each alleged statement was false, i.e., that there was [*54] no reasonable basis for it, at the time when it was made, not merely that it turned out not to be true. Rubinstein v. Collins, 20 F.3d 160, 166 (5th Cir. 1994); In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 280 (7th Cir. 1996); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1427 (3d Cir. 1997); Glassman v. Computervision Corp., 90 F.3d 617, 626 (1st Cir. 1996). In the absence of such pleaded facts, the complaint should be dismissed. Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 979 (9th Cir. 1999) (affirming dismissal of securities fraud claim where plaintiff failed to "identify any documents, 'including their contents, who prepared them, which officers reviewed them and from whom [the plaintiff] obtained the information' that suggests Ford possessed information in January 1993 regarding the diminishing net benefits of its tax strategy or the likelihood that [the subsidiary] wold be merged back into Ford as early as 1995"); McNamara v. Bre-X Minerals, Ltd., 57 F. Supp. 2d 396,404.

Compaq emphasizes that the Kurtzman complaint fails to reach the required standard. Noting that an important distinction between a fact and a conclusion is that "facts are susceptible to objective verification [while] conclusions . . . are empirically unverifiable in the usual case" because they "represent the pleader's reactions to, sometimes 'inferences from,' the underlying facts," Compaq observes that facts present details and indicia of reliability upon which the court can evaluate Plaintiffs' claims, while conclusions reveal only Plaintiff's characterizations. [25]

---

[23] The PSLRA, 15 U.S.C. § 78u-4(b)(1), which governs a private action for recovery of damages for securities fraud, requires pleading with particularity:

> The complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

Dismissals for failure to plead fraud with particularity under either the PSLRA are treated as dismissals for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017 (5th Cir. 1996).

[24] Rule 9(b) also mandates that a securities fraud action complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."

[25] Compaq points out that under the PSLRA Plaintiffs may set forth facts either based on personal knowledge or on information and belief. 15 U.S.C. § 78u-4(b)(1). Here Plaintiffs do not allege personal knowledge of any facts so their allegations must be based on the latter. Under § 78u-4(b)(1), Plaintiffs must "state with particularity all facts on which [their] belief is formed." Thus they must set forth in detail facts regarding the sources of their information and belief, including the names and descriptions of persons or detailed descriptions of documents, how they were discovered, who drafted them, and who received them. Heliotrope Gen., 189 F.3d at 979 (affirming dismissal of securities fraud claim where plaintiff failed to "identify any documents, 'including their contents, who prepared them, which officers reviewed them and from whom [plaintiff] obtained the information'"); In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 983-84 (9th Cir. 1999) (same).

[*56] As an example, Compaq first points to the allegation that Compaq knew immediately before the Class period that demand for PCs was weakening. Characterizing this statement as a conclusion masquerading as a fact, Compaq highlights the absence of any facts to support the point. Plaintiffs do not state the alleged level of demand during the Class Period or provide a benchmark level against which to compare it, or for that matter, any point of comparison. Nor do they identify the time period or define "weakening." Such "conclusory allegations of 'weak demand' are insufficient to support a claim of fraud." Howard Gunty Profit Sharing v. Quantum Corp., 1997 U.S. Dist. LEXIS 23532, 1997 WL 514993, *6 (N.D. Cal. Aug. 14, 1997); Hockey v. Medhekar, 30 F. Supp. 2d 1209, 1220(same); Zeid v. Kimberley, 973 F. Supp. 910, 920 (N.D. Cal. 1997) (characterizing allegation that "demand . . . was weak" as "conclusory in the extreme" and inadequate to demonstrate that particular statements were false when made"), vacated on other grounds, 1999 WL 993649 (9th Cir. 1999).

Regarding the Kurtzman complaint's allegation that an August 1998 internal sales forecast showed that "sales [*57] of Compaq PC's were expected to decline across the board," Compaq points out that Plaintiffs provide no information as to who prepared the forecast, to whom it was provided, the contents of the forecast, or how certain were its predictions six months before the Class Period started. The absence of these essential details warrants dismissal of the claim as a matter of law. Heliotrope Gen., 189 F.3d at 979 (affirming dismissal of securities fraud claim where plaintiff failed to "identify any documents, including their contents, who prepared them, which officers reviewed them and from whom [plaintiff] obtained the information); In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 983 (9th Cir. 1999) (same); In re Oak Tech. Sec. Litig., 1997 U.S. Dist. LEXIS 18503, 1997 WL 448168, *6 (N.D. Cal. Aug. 1, 1997) (dismissing claim based on inadequately described internal report); Kriendler v. Chemical Waste Management, Inc., 877 F. Supp. 1140, 1150 (N.D. Ill. 1995) (plaintiffs are required to provide details regarding internal projections, such as who prepared them, when they were prepared, how firm the numbers were, and who reviewed them).

Another [*58] conclusory allegation in the Kurtzman complaint is that one of Compaq's direct sales programs ("Direct Plus"), by which Compaq markets and sells computers directly to end-users rather than through a distribution chain, was a failure [26] and was suspended by February 1999. This allegation, although unsupported by facts, according to Plaintiffs demonstrated that Defendants' hopeful statements of optimism about the PC market were false. Compaq highlights the lack of supporting facts and argues that Plaintiffs' own documents contradict their claims. It notes that there are no facts concerning the alleged VARs' demands, no identification of any VAR, no indication when, where, or to whom such demands were given, what keeping prices higher than necessary means, what the alleged prices for Compaq's PCs and its competitors' were, no historical or contemporaneous data on price points or product lines, how PCs offered through Direct Plus were priced, how those prices compared with competitors', or how VARs could participate in the Direct Plus program. Compaq points to a Paine Webber report dated February 1, 1999, cited by Plaintiffs, that contradicts Plaintiffs' representation that Compaq suspended [*59] the Direct Plus program by February 1999. That report also states that Compaq's "direct initiative has proven to be far more effective than past actions because of the aggressive pricing Compaq is maintaining." Compaq charges that this statement undermines Plaintiffs' allegation that Compaq could not match other direct sellers' price. Compaq also demonstrates with a printout from a web page identified in its 1998 Report on Form 10-K, filed February 23, 1999, that the Direct Plus program continues to this day.

Plaintiffs allege that Compaq lost direct sales to competitors with respect to its Configure to Order ("CTO") program because it was unable to maintain a chain of suppliers and because certain unidentified executives that came from Germany with Pfeiffer when he became Compaq's CEO had lost agreements with critical component [*60] suppliers for Compaq PCs. Compaq asserts that Plaintiffs provide no factual support for their conclusions of failure nor show that any particular statement was false when made. They provide no facts about the

---

[26] Specifically the Kurtzman complaint alleged the failure was due to Compaq's giving in to its VARs' demands that direct prices be kept higher so as not to take sales away from the VARs.

CTO program. They do not identify the executives who allegedly lost agreements with suppliers, the type of component parts involved, the agreements that were lost and their terms and conditions, or why and how the agreements were lost.

Another object of the Kurtzman fraud complaint is the contra-revenues, but Compaq maintains that Plaintiffs fail to provide either actual or forecast levels for contra-revenues during the Class Period. The apparent theory that Compaq knew and concealed the contra-revenues in the first quarter of 1999 because the new Pentium III chip would force Compaq to cut prices on Pentium II computers in inventories, with a resulting increase in contra-revenues to compensate resellers, ignores Compaq's public SEC filings in which Compaq explicitly warned of such risks from new product introductions and new technologies. Plaintiffs also provide no factual details about the transition and resulting problems, the amount of inventory affected by the new chips, [*61] the resulting price drop, and the increase in contra-revenues, nor do they discuss whether the contra-revenues increased during the Class Period over the previous quarter.

Plaintiffs claim that after acquiring Digital, Compaq informed Digital's employees that the compensation program would be potentially lower and therefore the Digital employees tried to work on sales that would close by December 31, 1999 and ignore those for the next quarter. Compaq points to deficient factual support here, too. Plaintiffs do not identify the form of communication, who was responsible for the notification, who at Digital received it, the communication's contents, any comparative details about the compensation scheme for any period, any potential sale that was allegedly ignored, what "ignored" means, or any facts demonstrating that any particular sale would have been successfully closed if it had not been ignored.

Compaq challenges Plaintiffs' illogical allegation that after spending $ 9.6 billion to acquire Digital, Compaq immediately undercut its own plan by instructing Digital sales personnel to focus on selling Compaq PCs rather than Digital's higher margin Unix-based computers. Plaintiffs provide [*62] no facts about who gave the alleged instruction, to whom it was given, when it was given, who created this policy, why Compaq would consider such a self-destructive plan, why it would bother to acquire Digital, why it would maintain a compensation structure in 1998 that would ignore the policy, or why Compaq management permitted the sales force to ignore the instruction with impunity during 1998.

Compaq points to a similar lack of facts and details supporting the Kurtzman's complaint that on February 25, 1999 Earl Mason characterized' January 1999 as a "slow" month or any explanation of what that meant.

Finally, Compaq insists that Plaintiffs have failed to plead "with particularity facts raising a strong inference that the defendant acted with the required state of mind," or scienter, under 15 U.S.C. § 78u-4(b)(2), for each purportedly misleading statement. Pleaded facts must show that each statement was made with either knowledge of its falsity or with recklessness as to its truth. Coates v. Heartland Wireless Communications, Inc., 55 F. Supp. 2d 628, 634 (N.D. Tex. 1999); Tuchman, 14 F.3d at 1068. Plaintiffs here rely [*63] on speculative allegations that individuals' positions at Compaq means they had access to adverse undisclosed information about Compaq's operations, business practice, finances, and present and future business prospects. Such pleading is insufficient. Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998); Maldonado v. Dominguez, 137 F.3d 1, 9 (1st Cir. 1998) So are such speculative allegations as because Compaq's European and North American operations were so essential to Compaq, Defendants are charged with knowledge of performance of these operations. Noting that Plaintiffs try to circumvent the requirement by pleading allegations of motive and opportunity, Compaq emphasizes that under the PSLRA such allegations cannot substitute for facts establishing that Defendants acted with the required state of mind. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1285 (11th Cir. 1999) ("We reject the notion that allegations of motive and opportunity to commit fraud, standing alone are sufficient to establish scienter in this Circuit"); Silicon Graphics, 183 F.3d at 974 (though "a motive to commit fraud and opportunity [*64] to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness . . . . Plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and

opportunity"); Hoffman v. Comshare, Inc. (In re Comshare Inc. Secs. Litig.), 183 F.3d 542, 551 (6th Cir. 1999) ("we cannot agree that under the PSLRA, plaintiffs may establish a 'strong inference' of scienter merely by alleging facts demonstrating motive and opportunity . . . . the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter"); McNamara, 57 F. Supp. 2d at 411 ("Satisfaction of the pre-Reform Act motive test does not automatically give rise to a strong inference that the defendant acted with the requisite state of mind.").

As for Plaintiffs' motive allegations, Compaq questions their contention that top management conspired to maintain an artificially inflated stock price so that insiders could reap massive proceeds from insider trading. Two of the alleged ringleaders, CEO and President Eckhard Pfeiffer and Senior Vice President Andreas Barth, though allegedly [*65] makers of misleading statements set out in the complaint, are not charged with selling a single share during the Class Period. These two men headed the operations in North American and Europe, purportedly the regions involved in the fraud. Yet neither of them sold any shares and therefore did not reap any proceeds from insider sales. Compaq underlines the lack of logic in claiming that Pfeiffer and Barth masterminded an elaborate fraud scheme to drive up the price of Compaq stock and then elected not to profit from it. Courts have dismissed such implausible claims. In re Glenavre Techs., Inc. Sec. Litig., 1998 WL 915907, *4 (S.D.N.Y. Dec. 30, 1998) ("absence of sales from [high ranking corporate officers] . . . suggests that the trading by the seven defendants does not give rise to a strong inference of scienter"); In re Zapata Inc. Sec. Litig., Civ. Action No. H-98-3498, sl. op. at 39-40 (S.D. Tex. Sept. 15 1999) (Lake, J.) ("Plaintiffs' allegations that [the CEO would knowingly choose to participate in fraud merely to allow [others] to profit from the sale of stock are not plausible."); Burlington, 114 F.3d at 1423 (same); Herzog v. GT Interactive Software Corp., 1999 U.S. Dist. LEXIS 18380, 1999 WL 1072500, [*66] *8 (S.D.N.Y. Nov. 29, 1999) (scienter absent where, inter alia, CFO did not sell shares); Allison v. Brooktree Corp., 999 F. Supp. 1342, 1352 (S.D. Cal. 1998) (dismissing action where, inter alia, [Plaintiffs allege no stock sales by the alleged primary wrongdoer . . . .").

Compaq further emphasizes that two of the four individual Defendants, William Strecker and Michael Winkler, are not alleged to have made a single false statement, nor have Plaintiffs offered a single fact in support of their conclusory pleadings that "the individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein." Complaint P 20. Nor do they explain how Strecker, the Senior Vice President in charge of Technology, or Winkler, the Group Manager in charge of Products, could have controlled statements made by CEO Pfeiffer, CFO Mason, or head of European operations Barth. Plaintiffs' only allegations against these individuals are based on their positions at Compaq and the fact that they traded shares during the three-month Class Period, which Compaq contends is an [*67] insufficient basis for a fraud claim. Chan v. Orthologic Corp., 1998 WL 1018624, *12 n.9 (D. Ariz. Feb. 5, 1998) ("Plaintiffs cannot use allegations of insider trading to attribute misstatements to insiders who are not otherwise identified as [responsible] for such misstatements."); [27] Oak Tech., 1997 U.S. Dist. LEXIS 18503, 1997 WL 448168, *12 (N.D. Cal. Aug. 1, 1997) (same); [28] Zapata, sl. op. at 52 (same); [29] [*69] Head v. NetManage, Inc., 1998 U.S. Dist. LEXIS 20433, 1998 WL 917794, *5 (N.D. Cal. Dec. 30, 1998) (defendant's trades not suspicious, "particularly in light of the fact that he is not alleged to have personally made any of the false

---

[27] Plaintiffs argue that Chan is factually distinguishable from the instant suit. In Chan, the court found that scienter did not exist since the quantities of the individual defendants' stock sales were not unusual because they retained more shares than they sold and therefore suffered greater financial losses than gains.

[28] Plaintiffs distinguish In re Oak Tech., where the plaintiffs failed to allege that the defendants participated in the preparation or communication of the allegedly misleading information, from the pleadings in the instant action.

[29] Plaintiffs here point out that the complaint in Zapata, unlike theirs, did not allege that the individual defendants were involved in the day-to-day activities of the company or were responsible for the communication of the group.

statements"). [30] Compaq further contends that Plaintiffs' allegations that insider stock sales during the one quarter of the Class Period approximated one million shares and $ 48 million, without a context of the volume of insiders' historically normal trading during financial quarters, are meaningless and demonstrate nothing. Compaq asserts that in twelve separate quarters over the last fifteen years, insiders have traded from three to ten million shares, far more than the amount alleged to have been traded in the Class Period. Also the alleged [*68] dollar value of $ 48 million is a mere fraction (.06 of one percent) of the market value of Compaq at the time, which was approximately $ 80 billion. Thus the trades during the Class Period were neither unusual nor suspicious and do not raise a strong inference of scienter, Compaq insists.

## LEAD PLAINTIFFS' RESPONSE

Plaintiffs contend that the motion to dismiss should be denied. They reiterate the allegations of the amended complaint, on which they stand, insisting that the adverse information they detail regarding Compaq's business at the time directly contradicted Defendants' contemporaneous, positive statements and rendered them false and misleading. They delineate in chronological order the increasing problems at Compaq, information reported to Compaq about its financial condition, and delayed disclosures by Compaq.

They reply to several of Compaq's specific criticisms. For instance, in answer to Compaq's challenge to the alleged suspension of the Direct Plus program in February 1998, Plaintiffs note that in reviewing a motion to dismiss, the Court must presume that the allegations of the complaint are true. Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974). Moreover, the ordinary meaning of "suspend" [*70] is to "stop temporarily." Plaintiffs have not claimed that the direct sales program was permanently abandoned. They highlight, however, Compaq's statements at the time, that the Direct Plus program was successful, with no disclosure of Compaq's substantial problems with direct sales and VARs. Plaintiffs also disagree that their focus on selling Compaq PC's as opposed to Digital's Unix-based computers was an implausible argument; instead their strategy was to focus on the one product in an attempt to capture market share, even at the expense of reduced sales of Digital computers. They furthermore contend that the complaint does not contain allegations based on "information and belief," but on investigation of counsel. Cherednichenko v. Quarterdeck, [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 90,198, at 90,143 (C.D. Cal. 1997) (where "Plaintiffs' allegations are based on investigation of their counsel, and not on information and belief . . . the heightened standard [of 15 U.S.C. § 78u-4 (b)(1) ] does not apply here."); in accord New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc., 1999 U.S. Dist. LEXIS 12999 at 19 n.5 ("the [*71] fact that the complaint is based upon an investigation of counsel, after review of public filings, discussions with analysts, etc. indicates that the complaint is based upon much more that mere 'information and belief'").

More substantively, Plaintiffs first maintain that they have satisfied pleading requirements under Rule 9(b) and the PSLRA. Rule 9(b) does not require pleading of evidence, no less conclusive proof of fraudulent conduct. Chartwell Healthcare, Inc. v. People's Home Health of Texas, Inc., 1997 U.S. Dist. LEXIS 4659, No. 3:96-CV-1938-G, at *6 (N.D. Tex. Feb. 19, 1997); in accord, Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1225 (1st Cir. 1996); Ross v. A.H. Robins Co., 607 F.2d 545, 557 n.20 (2d Cir. 1979). Instead, Plaintiffs need only "put the defendants on notice of the claims and [] allow them to frame responsive pleadings" by "addressing the 'who, what, when, where, and how' of defendants alleged securities fraud." Chartwell, 1997 U.S. Dist. LEXIS at *6; Rubinstein v. Collins, 20 F.3d 160, 163 (5th Cir. 1994); Berger v. Compaq 1999 U.S. Dist. LEXIS 23159, No. H-98-1148, sl. op. at 16 (S.D. Tex. Dec. 21, 1999) (Gilmore, [*72] J.).

---

[30] Plaintiffs respond that in Head the defendants' stock sales were held not to be suspicious in timing or amount.

The PSLRA requires only that a plaintiff asserting an Exchange Act claim "shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs assert that the PSLRA pleading requirements do not materially vary from those under Rule 9(b). Williams v. WMX Techs., Inc., 112 F.3d 175, 177-78 (5th Cir.), cert. denied, 522 U.S. 966, 139 L. Ed. 2d 315, 118 S. Ct. 412 (1997), which, Plaintiff highlights, is controlling precedent in this Circuit. [31] Thus the PSLRA does not require pleading of all evidence and proof supporting a claim. In re Cephalon Sec. Litig., [1997 Transfer Binder] Fed. Sec. L. Rep. (CCH) P99,562, at 97,799 (E.D. Pa. Aug. 29, 1997).

 [*73]  Plaintiffs have identified a number of statements made by Defendants during the Class Period that they maintain are false and misleading because they fail to disclose material adverse facts about (1) the effect of Compaq's acquisition of Digital, along with reduced sales of high-end Digital products resulting from sales policies put in effect by Compaq in 1998; (2) weakening demand for Compaq's PCs, along with decreased sales and margins resulting from high price protections and concessions paid to the VARs and high contra-revenues required by reduced prices on Pentium II PCs; and (3) the failure of Compaq's direct distribution and manufacturing model, including loss of critical component suppliers as Western Digital. They claim they have shown that Defendants were aware of worsening business prospects as early as August 1998, when an internal sales forecast predicted decline across the board. They have shown massive insider selling prior to disclosure of the true financial state of Compaq.

Plaintiffs may "'draw on contemporaneous statements or conditions' to demonstrate why statements were false when made." Fecht v. Price Co., 70 F.3d 1078, 1083 (9th Cir. 1995), [*74]  quoting Decker v. Glenfed, Inc. (In re Glenfed, Inc. Sec. Litig.), 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc). Under the PSLRA, at the pleading stage, "allegations of specific problems undermining a defendant's optimistic claims suffice to explain how the claims are false." Cooper v. Pickett, 137 F.3d 616, 626 (9th Cir. i998), quoting Fecht, 70 F.3d at 1083. See also Bercier v. Compaq, sl. op. at 20-21. By identifying Compaq's positive statements about current sales, products, and distribution channels and then demonstrating how these statements are directly contradicted by adverse information known to Defendants and by evidentiary facts, Plaintiffs have submitted circumstantial evidence that the statements were false. Fecht, 70 F.3d at 1082-84; Cooper, 137 F.3d at 626; Shaw, 82 F.3d at 1224. Moreover, the fact that the adverse information regarding the first quarter of 1999 emerged in so short a time after optimistic statements were made, here in less than a month, is also circumstantial evidence that the statements were false when made. Fecht, 70 F.3d at 1083-84; In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1112. [*75]

Furthermore, insist Plaintiffs, where plaintiffs allege as the motive the inflation of the price of the defendant corporations' shares with defendants' insider selling and there is a short period between optimistic statements and negative disclosure, "the underlying facts on which plaintiffs rely create a strong inference that defendants knew there were significant problems when the statements were made." In re Grand Casinos, Secs. Litig., 988 F. Supp. 1273, 1283 and nn. 14, 15 (D. Minn. 1997); in accord In re Spyglass Sec. Litig., No. 99 C 513, slip op. (N.D. Ill. July 20, 1999). The complaint must be read as a whole and not as selected, isolated passages.

Plaintiffs first accuse Defendants of relying on cases that have "glaringly dissimilar facts," such as Zapata, while ignoring cases on point, such as Berger v. Compaq,1999 U.S. Dist. LECXIS 23159, sl. op. at 18-19 (plaintiffs

---

[31] Nevertheless, Williams dealt with a cause of action that arose before the PSLRA became effective and therefore the Reform Act did not govern the claims in the suit and any comments relating to it are dicta. 112 F.3d at 178. Moreover, the Fifth Circuit panel in Williams was focusing on the Second Circuit's application of Rule 9(b)'s pleading fraud with particularity (identification of fraudulent statements, speaker, time and place the statements were made, and why they were fraudulent), when the panel remarked, "We agree with the Second Circuit's approach." This suit was filed prior to the effective date of the Private Securities Litigation Reform Act, and while its provisions do not apply, the Act adopted the same standard we apply today." Id. at 178. In Williams the panel did not directly address the disputed standards of the pleading of scienter under the PSLRA, to be discussed later, nor has the Fifth Circuit directly reviewed a case under the PSLRA since it became effective in 1995. See In re Paracelsus Corp., 61 F. Supp.2d 591, 598 & n.2 (S.D. Tex. 1998) (Werlein, J.).

satisfied Rule 9(b) and PSLRA pleading requirements when they (1) "stated-- by time, place, content, and speaker-- the statements they allege were false and misleading"; (2) "explained factually why they believe the statements were false"; and (3) identified the particular defendant who made the allegedly false [*76] statement or . . . identified the statement as one that appeared in a document disseminated by Compaq"), and In re Compaq Sec. Litig., 848 F. Supp. 1307, 1310 (S.D. Tex. 1993) (Lake, J.) (Rule 9(b) satisfied by information about time, place and nature of fraudulent behavior and where complaint listed names, dates, specific events, and objective references to evidence that could support allegations of false and misleading public statements by defendants).

Second, Plaintiffs contend that Defendants' argument that Plaintiffs must allege in their pleadings particular documents or identify a percipient witness to show that Defendants knew their statements were false is contrary to the terms of the statute; § 78u-4(b)(1)'s provision on information and belief allegations does not apply to scienter allegations, but only to the pleading of false and misleading statements or omissions. Compare 15 U.S.C. § 78u-4(b)(1) with § 78u-4(b)(2) . Even if it did, there is nothing in the requirement to plead all facts that indicates plaintiffs must disclose the identity of percipient witnesses or identify specific internal documents proving those facts. [*77] Plaintiffs maintain that the Fifth Circuit requires only that plaintiffs allege facts, not evidence or confidential sources--to explain how the challenged statements are false and misleading. They cite a number of cases standing for the proposition that plaintiffs need not plead the details of specific transactions, internal reports, or the precise role of a particular defendant in the alleged fraud prior to discovery. Defendants' efforts to characterize this case as "fraud by hindsight" ignore the fact that Plaintiffs have not quoted predictions that later proved wrong, but have alleged that Defendants' statements about the Digital acquisition, Digital products, Compaq's PC sales and distribution process, and demand for Compaq products were false at the time they were made. Moreover, when viewed in the context of substantial insider sales, the close proximity of the false statements to the adverse disclosures, and Defendants' late denials of the problems, Plaintiffs' allegations are sufficient for purposes of Rule 9(b) and the PSLRA.

Plaintiffs contend that Defendants are liable under Section 10(b) of the Exchange Act for failing to make full and accurate disclosure of all material [*78] facts. Courts have recognized that a duty to disclose material facts arises when one of the following three tests is met: (1) when a corporate insider trades securities; (2) when a statute or regulation requires such disclosure; or (2) when a corporation has made "inaccurate, incomplete or misleading" prior or contemporaneous disclosures. Berger, 1999 U.S. Dist. LEXIS 23159, sl. op. at 18; Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26-27 (1st Cir. 1987). See also Backman v. Polaroid Corp., 910 F.2d 10, 12-13 (1st Cir. 1990) (en banc); Evanowski v. Bank Worcester Corp., 788 F. Supp. 611, 614 (D. Mass. 1991).

Plaintiffs claim they have satisfied all three tests. They have alleged that Defendants chose to sell their stock; therefore Defendants were obligated to inform the public of all material matters (problems with Digital acquisition and sales, with Compaq's direct distribution and manufacturing model, and increased concessions to VARs). [32] Second, SEC securities regulations require that Defendants disclose known material facts that would tend to contradict or qualify their reported financial results. Third, numerous times during the Class Period Defendants [*79] voluntarily chose to speak publicly and therefore had a duty to tell the whole truth about Compaq's financial condition. Rubinstein, 20 F.3d at 170. Their failure to disclose problems impacting Digital's sales, the excessive price protections Compaq was paying to the VARs, and the loss of agreements with critical component suppliers such as Western Digital precluded investors from seeing Compaq "through the eyes of management." In re Caterpillar, 1992 WL 71907, at *7. Thus, insist Plaintiffs, Defendants had a duty to disclose

---

[32] A corporate insider with material inside information is required to disclose it to the investing public or, if he cannot because he must protect a corporate confidence or he chooses not to disclose, he must abstain from trading in or recommending securities concerned while that inside information remains undisclosed. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976 (1969). See also In re Browning-Ferris Indus., 876 F. Supp. 870 (corporate insiders desiring to trade when in possession of material non-public information must either disclose information or wait until it has been disclosed in natural course of events before trading); SEC v. Hoover, 903 F. Supp. 1135 (S.D. Tex. 1995) (same).

this material information. <u>Simon v. American Power Conversion Corp.</u>, 945 F. Supp. 416, 431 (D.R.I. 1996) (10-Q filing imposed affirmative duty on company to disclose related material information). During the Class Period, Defendants allegedly made positive statements about Compaq's business and business prospects relating to those troubles at Compaq that Plaintiffs assert were misrepresented and not fully disclosed and that were of the kind to which a reasonable shareholder would attach significance and therefore were material. Materiality is "not judged in the abstract, but in light of the surrounding circumstances. [*80] " <u>Krim</u>, 989 F.2d at 1448-49 (5th Cir. 1993). "Cautionary language as such is not per se dispositive" of the materiality inquiry. <u>Berger v. Compaq</u>, 1999 U.S. Dist. LEXIS 23159, sl. op. at 27. To be material, a fact need only be considered "important" to an investor in making investment decisions--it need not actually have changed an investor's mind. <u>TSC Indus., Inc. v., Northway, Inc.</u>, 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976); <u>see also Rubinstein</u>, 20 F.3d at 169.

 [*81]  It is well settled that once a company makes a disclosure, even if it is literally true, the company is under "a duty to speak the full truth." <u>Rubinstein</u>, 20 F.3d at 170.; <u>First Virginia Bankshares v. Benson</u>, 559 F.2d 1307, 1314 (5th Cir. 1977), <u>cert. denied sub nom. Walter E. Heller & Co. v. First Virginia Bankshares</u>, 435 U.S. 952, 55 L. Ed. 2d 802, 98 S. Ct. 1580 (1978). <u>See also In re Convergent Tech. Sec. Litig.</u>, 948 F.2d 507, 512 (9th Cir. 1991) (disclosure under Section 10(b) "is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."); <u>Simon</u>, 945 F. Supp. at 433 (court held that allegedly misleading explanations offered for the company's increasing inventory levels were actionable, reasoning as follows: "Either the explanation offered was an outright falsehood, or it was a half-truth, wherein . . . [the company] disclosed one cause for increasing inventories, but failed to add a substantive contributing cause. In either case, such deception would be sufficient to support a securities fraud claim."); <u>In re Genetech, Inc. Sec. Litig. [1998 Transfer Binder]</u>, Fed. Sec. L. Rep. (CCH) P94,544 at 93,476( [*82]  (N.D. Ca. July 7, 1989) "When evaluating plaintiffs' claims, Genetech's public statements must be viewed as part of a 'mosaic' to see if the statements in aggregate, created a misleading impression. Contrary to defendants' contention, the proper test is not the literal truth or the materiality of each positive statement, but the overall misleading impression that it combines to create.").

Plaintiffs do not agree that the statements in dispute are vague expressions of optimism, hope, and opinion that could not mislead investors. As examples of a misstatement of hard current facts, Plaintiffs point to the following: "Compaq Direct is in a very aggressive selling mode, and [is] competing in the direct as well as in the indirect channel . . . ."; "The synergies from the [Digital] acquisition are becoming more and more evident in our financial performance"; "we continue to gain momentum in our service buildings"; "we continue to see strong demand for Compaq products and services"; "our gross margins continue to go up"; "Digital's high-end revenues are starting to pick up"; "Compaq expects the personal computer market to expand in 1999 in line with third party research organizations' [*83]  forecasts of unit growth of 15%"; and "We continue to see strong demand products and services and the opportunity for continued market share gains and revenue growth"; and "sales will be back-end loaded in the quarter." Defendants have failed to show that these statements are not material.

Characterizing a statement as puffing encompasses a conclusion that, as a matter of law, the statement is immaterial either because it is too vague or so exaggerated that a reasonable investor would not rely on it considering the 'total mix' of available information. <u>Basic, Inc.</u>, 485 U.S. at 231; <u>TSC Industries</u>, 426 U.S. at 449; <u>Raab v. General Physics Corp.</u>, 4 F.3d 286, 289-91 (4th Cir. 1993). Here the facts compel the conclusion that Defendants' statements were material.

The complaint alleges non-disclosures, not optimistic statements. <u>Spyglass</u>, sl. op. at 5-6. Furthermore, optimistic statements are actionable: predictive statements about a company's products or business made without a reasonable basis at the time they are made can be material and actionable. <u>Rubinstein</u>, 20 F.3d at 166; Robertson v. Strassner, 32 F. Supp. 2d 443, 449, [*84]  <u>citing In re Browning-Ferris</u>, 876 F. Supp. at 878; <u>Schaffer v. Timberland Co.</u>, 924 F. Supp, 1298, 1314 (D.N.H. 1996) (optimistic statements that a shoe brand "remains very strong" can be material and actionable when viewed in context). <u>See also Stransky v. Cummins Engine Co., Inc.</u>, 51 F.3d 1329, 1333-35 (7th Cir. 1995) ("[A] blanket rule that forward-looking statements are not material does not allow for the contextual,

fact-specific nature of the inquiry and would potentially allow companies to engage in conjecture with impunity."); Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1218-19 (1st Cir. 1996) (no per se rule that optimistic statements are not actionable); Kaplan v. Rose, 49 F.3d 1363, 1375-76 (9th Cir. 1994) (holding optimistic statements actionable wherein investors were told that "our competitive position remains strong" and "our outlook is bright" and "progress is excellent."); In re Computer Associates Class Action Secs. Litig., 75 F. Supp. 2d 68 (E.D.N.Y. 1999); Fecht, 70 F.3d at 1081.

Plaintiffs further argue that in the Fifth Circuit and elsewhere courts [*85] have regularly found that when a company has elected to make optimistic public statements about its business and products, its failure to correct those statements in light of expected reduced sales, orders and other adverse conditions can state a claim for relief under Rule 10b-5. Rubinstein, 20 F.3d at 170 n.41. Moreover, because shareholders understandably pay close attention to the comments of an insider because he usually has knowledge and expertise beyond that of the investor, even conclusory statements by insiders "are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." Virginia Bankshares v. Sandberg, 501 U.S, 1083, 1091, 1093, 115 L. Ed. 2d 929, 111 S. Ct. 2749 (1991).

Plaintiffs contend that the "historical facts" cited by Defendants in no way negate their omissions of material fact. Plaintiffs insist Defendants are liable for presenting a misleading, one-sided, rosy picture of Compaq's growth, trends and prospects, while failing to disclose facts that directly contradict or undermine their optimistic statements.

Plaintiffs maintain that the PSLRA's safe harbor [*86] provision and the "bespeaks caution" doctrine do not protect Defendants' statements and omissions. The defenses apply only to affirmative statements about the future, not to Defendants' omissions, which are the core of Plaintiffs' complaint. Rubinstein, 20 F.3d at 166; Robertson, 32 F. Supp. 2d at 450. Defendants attempt to make their statements of historical or present fact "forward looking" by truncating them and quoting pieces out of context. Grossman, 120 F.3d at 1123 ("Because several of the allegedly misleading statements referred to then-present factual conditions, or implied background factual assumptions a reasonable investor would regard the speaker as believing to be true, the 'bespeaks caution' doctrine would be of no assistance to defendants in those statements."); Robertson, 32 F. Supp. 2d at 449-50 (statements implying present' facts not protected by safe harbor provision). They argue that statements about increasing gross margins (P45), an increase in Digital's revenue (P46), Compaq's ability to meet earnings estimates for the first quarter of 1999 (P47), as well as statements with respect to the current [*87] strength of the market in Europe (P55) are not forward-looking for the same reasons, i.e., they misrepresented and omitted past and present facts.

Even if any of the contested statements were both forward-looking and non-forward-looking, the safe harbor provision does not apply because Defendants knew at the time that they were issuing statements containing false and misleading information and thus they lacked any reasonable basis for making them. Shaw, 82 F.3d at 1213; Gross v. Medaphis Corp., 977 F. Supp. 1463, 1473 (N.D. Ga., 1997); In re Mobile Media Sec. Litig., 28 F. Supp. 2d 901, 930 (D.N.J. 1998).

Defendants' cautionary language is insufficient to constitute the kind of "meaningful" warnings necessary to invoke the safe harbor provision or the bespeaks caution doctrine, Plaintiffs contend. The majority are in documents that cannot be accorded judicial notice by the Court because they were not relied on by Plaintiffs in their complaint and because they occurred outside of the Class Period. See. e.g., Third Quarter 1998 Report on Form 10-Q, filed November 11, 1998. [33] Moreover, the cautionary statements are general in [*88] nature and did not provide meaningful warnings to shareholders. Finally the safe harbor provision does not protect them against statements that were made with actual knowledge of their falsity.

---

[33] Plaintiffs further state that any cautionary warnings made by Defendants in their 1998 10-K or any later press release do not expressly refer back to the Third Quarter 1998 10-Q and were stale at the time of the misrepresentations made by Defendants during the Class Period because they were superseded by Defendants' contrary misrepresentations.

Even if the Court should accord judicial notice to Compaq's Third Quarter 10-Q, the language in them as well as in the 1998 Form 10-K and its press releases issued during the Class Period is not protected by the bespeaks caution doctrine because these documents did not contain meaningful cautionary language directly related to the subject matter of the forward-looking statements to provided a reasonable investor with an adequate warning. Under the bespeaks caution doctrine, [*89] the language relied upon by the defendants must "relate directly to that by which plaintiffs claim to have been misled." <u>Kline v. First W. Gov't Sec.</u>, 24 F.3d 480, 489 (3d Cir. 1994). Even then, including general cautionary language about a prediction does not excuse an alleged failure to reveal known material and adverse facts. <u>Rubinstein</u>, 20 F.3d at 171. There must be sufficient cautionary language or disclosure of risk that "reasonable minds" could not disagree that the challenged statements were not misleading. <u>Fecht</u>, 70 F.3d at 1082.

Plaintiffs charge that Defendants' warnings [34] are "pure boilerplate and fall far short of the specific disclosures necessary to invoke the protections of the bespeaks caution doctrine. <u>In re Compaq Sec. Litig.</u>, 848 F. Supp. 1307, 1318 (S.D. Tex. 1993) (need more than vague, cautionary warnings concerning broad factors like competition, economic recession and foreign exchange rates to "bespeak caution").

[*90] The safe harbor provision of the PSLRA applies only where the statements are forward-looking (not historical or current facts), identified as such if they are oral, accompanied by meaningful cautionary language, and made without knowledge that the statement is false or baseless. 15 U.S.C. § 78u-5(c)(1). None of the challenged statements satisfies all these elements, Plaintiffs maintain.

In a critical area of disagreement among the Circuits, Plaintiffs maintain that the PSLRA, 15 U.S.C. § 78u-4(b)(2), requiring that a complaint asserting claims under § 10(b) must "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind," codified the Second Circuit's scienter standard, which requires only that the plaintiffs' pleadings factually (1) identify circumstances indicating the defendant's conscious or reckless behavior or (2) allege a defendant's motive and opportunity to commit securities fraud. <u>Press v. Chemical Inv. Servs., Corp.</u>, 166 F.3d 529, 538 (2d Cir. 1999); <u>Stevelman v. Alias Research, Inc.</u>, 174 F.3d 79, 84 (2d Cir. 1999); [*91] <u>Advanta</u>, 180 F.3d 525. Plaintiffs assert that courts within the Fifth Circuit have also concluded that the PSLRA codified the two-pronged Second Circuit test. <u>See, e.g.</u>, <u>Williams v. WMX Techs.</u>, 112 F.3d 175; <u>Berger v. Compaq</u>, 1999 U.S. Dist. LEXIS 23159, sl. op. at 28; <u>Robertson v. Strassner</u>, 32 F. Supp. 2d at 447; Zuckerman v. Foxmeyer Health Corp., 4 F. Supp. 2d 618, 623.

To adequately plead "conscious misbehavior or recklessness," "a complaint must allege circumstances supporting a strong inference that defendants had actual knowledge, or recklessly disregarded, that the allegedly fraudulent statements were untrue when made or made without a reasonable basis." <u>Lovelace v. Software Spectrum, Inc.</u>, 78 F.3d 1015, 1018-19 (5th Cir. 1996); <u>Zuckerman</u>, 4 F. Supp. 2d at 624. Plaintiffs insist that their complaint has adequately alleged that Defendants carried out the alleged fraud in a knowing and reckless manner. Specifically, they contend that Defendants' knowledge of falsity may be inferred from their positions as senior executives of Compaq involved in the day to day management, with access to internal information about the most critical [*92] aspects of Compaq's business. Plaintiffs have also highlighted Defendants' suspicious stock sales, which not only provide the motive for Defendants' conduct, but also constitute evidence of conscious misconduct. The complaint alleges that while Defendants made very positive statements to the market about the projected and actual demand for and sales of Compaq products in the first quarter of 1999, they knew or recklessly disregarded that Compaq's expectations were for weaker demand and declining sales. In addition they knew about negative synergies from the 1998 acquisition of Digital and of Compaq's inability to compete in the marketplace with Dell, but made material

---

[34] <u>See, e.g.</u>, "the computer business was volatile and demand could shift unexpectedly"; possibility of a "drop in worldwide demand [or] lower-than-anticipated demand for one or more of Compaq's products"; warnings of possible competition. Plaintiffs assert that by the beginning of the Class Period Defendants knew of their severe problems, yet Defendants' statements indicate just the opposite.

misrepresentations on these very subjects. Furthermore, Plaintiffs allege facts showing that as early as August 1998, Defendants were aware of internal sales forecasts of weakening demand and decreasing sales of Compaq PCs across the board. Plaintiffs insist they have satisfied the pleading requirement for Defendants' actual knowledge of fraud.

The complaint also alleges a pattern of concealment and denial of problems at Compaq from early in the Class Period right up until the disclosure of the 50% earnings shortfall [*93] on April 9, 1999. The limited time between Defendants' optimistic statements and the adverse disclosures constitutes "circumstantial evidence that the optimistic statements were false when made." Fecht, 70 F.3d at 1083 (ten-week proximity). See also Cooper v. Pickett, 122 F.3d 1186, 1196 (three-week proximity suggests "fraud, rather than a business mistake viewed with the benefit of hindsight"), amended and superseded, 137 F.3d 616 (9th Cir. 1997); Shaw, 82 F.3d at 1224. Finally, the sudden resignation of nearly all the top management, including Pfeiffer and Mason, within a few days or weeks of the adverse disclosure, also supports an inference of conscious misbehavior or recklessness. Individually or taken as a whole, these facts establishing conscious behavior or recklessness are sufficient to plead scienter under the PSLRA, Plaintiffs contend.

In addition, Plaintiffs insist, they have satisfied the scienter pleading requirement by alleging motive and opportunity to commit fraud. Berger v. Compaq, 1999 U.S. Dist. LEXIS 23159, sl. op. at 28. The complaint asserts that Defendants as controlling persons of Compaq, involved in the day-to-day [*94] operations at the highest levels, with access to confidential proprietary information about its operations, finances, and future prospects, had the opportunity to commit fraud and did so in participating in the preparation of misleading information. Their motive was to inflate the price of Compaq stock to enable them and others to sell their own stock at artificially inflated prices for insider proceeds of over $ 48 million in the aggregate. "Insider trading in suspicious amounts or at suspicious times is, of course, presumptively probative of bad faith and scienter." Rubinstein, 20 F.3d at 169. [35] They cited several cases where the courts have determined that considerably less insider trading was sufficient to allege scienter. Id., (sale of only $ 760,599 sufficient); Marksman Partners L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (and cases cited therein) ("Twenty percent of a corporate insider's shares, especially where the dollar amounts are high, may constitute a 'suspicious amount' sufficient to support a scienter allegation").

 [*95] The suspicious timing here also supports adequate pleading of scienter, with insider sales of over one million shares at proceeds of more than $ 48 million, ending one day before partial disclosure of slowed sales to the market and just over one month before announcement that Compaq's earnings would be less than half of the already reduced projections of analysts. Berger v. Compaq, 1999 U.S. Dist. LEXIS 23159, sl. op. at 28.

Plaintiffs disagree with Defendants' contention that the fact that some officers, while in possession of material, adverse, non-public information, did not sell stocks negates the inference of scienter for those who did. See In re APAC Teleservices, Inc. Sec. Litig., 1999 U.S. Dist. LEXIS 17908, No. 97 Civ. 9145 (BSJ), at *23 (S.D.N.Y. Nov.

---

[35] According to Plaintiffs, during the Class Period Mason sold 265,236 shares of Compaq stock, which constituted 94% of his Compaq holdings, reaping over $ 12.2 million in proceeds. William Strecker sold 99% of his Compaq holdings or 120,000 shares, for total proceeds of over $ 5.1 million. Michael Winkler sold 86% of his Compaq holdings, or 143,336 shares, for insider proceeds of over $ 6.8 million. Other senior officers collectively sold over 425,000 shares of Compaq stock.

Furthermore, Plaintiffs allege, all of the individual Defendants who sold stock liquidated between 86-99% of their holdings. In the five quarters before Mason's sale of 265,236 shares, he had sold only 158,000 shares for proceeds of less than one-half of the proceeds he received on 2/1/99. After the 2/1/99 sale, he was left with only 13,300 shares apart from options that were yet unexercisable. In the two years prior to Strecker's 2/1/99 sale of $ 120,000 shares, he had only sold a total of 66,164 shares. He was left with only 1,332 shares after the Class Period. Winkler had sold only 100,000 shares in the year prior to the Class Period, but sold 143,336 shares during the Class Period, with only 22,438 shares remaining in his possession afterwards. Plaintiffs assert the clear inference is that the individual Defendants were trying to liquidate the bulk of their Compaq stock, reflecting the requisite scienter for securities fraud under the PSLRA.

12, 1999) (two of three defendants sold stock); Voit v. Wonderware Corp., 977 F. Supp. 363, 369 (E.D. Pa. 1997) (three of four defendants sold stock); Freedman v. Value Health, Inc., 958 F. Supp. 745, 749 (D. Conn. 1997) (three of nine defendants sold stock); Stevelman, 174 F.3d at 86 (failure of complaint to allege sales by all insiders did not defeat inference of scienter as to [*96] selling defendant).

Although Defendants' assertion that some individual Defendants who made no misstatements cannot be held liable is erroneous in light of the "group pleading presumption," i.e., that a complaint need not allege a specific connection between the fraudulent misrepresentation or omission' and each defendant separately when the statements are exclusively within the defendants' knowledge and especially when the defendants are insiders or affiliates participating in the statements at issue. Berger v. Compaq, 1999 U.S. Dist. LEXIS 23159, sl. op. at 29-30, citing McNamara v. Bre-X Minerals Ltd., 57 F. Supp. 2d at 427-28, and Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir. 1985). See also Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.), 60 F.3d 591 (9th Cir. 1995) (holding that the "group publishing" doctrine creates a presumption that statements in "prospectuses, registration statements, annual reports, press releases, or other 'group published information'" are the collective work of those individuals with direct involvement in the day to day affairs of the company); Powers v. Eichen, 977 F. Supp. 1031, 1040 (S.D. Cal. 1997) (same). "Although the Plaintiffs [*97] only plead with particularity that two of the individual defendants actually uttered misleading statements, it can be inferred that these individuals did not operate in a vacuum." Berger v. Compaq, 1999 U.S. Dist. LEXIS 23159, sl. op. at 30. Plaintiffs here contend that the other defendants in the instant case who did not make misleading statements were controlling persons involved at the highest levels in the day-to-day business operations at Compaq and were privy to confidential proprietary information about its operations, finances and future business prospects. They also allege that these individual Defendants participated in the drafting, preparation and/or approval of the various public and shareholder and investor reports and other communications complained of here and had control over the content of the various SEC filings, press releases, and other public statements issued by Compaq during the Class Period. As controlling persons of Compaq within the meaning of Section 20(a) of the Exchange Act, they can be liable for statements made by authorized Compaq representatives during the Class Period.

Plaintiffs have alleged motive, i.e., that Defendants sought to inflate artificially the price of Compaq [*98] stock to allow them to cash in on all exercisable stock options. Courts have found that similar allegations establish motive and are sufficient to raise the inference of scienter. In re Wells Fargo Sec. Litig., 12 F.3d 922, 931 (9th Cir. 1993); In re Digital Int'l, Inc. Sec. Litig., 6 F. Supp. 2d 1089, 1098 (D. Minn. 1998); Press, 166 F.3d at 538.

In sum, Plaintiffs urge the Court to find that they have satisfied all applicable pleading standards or, alternatively, allow them to replead pursuant to Fed. R. Civ. P. 15.

## COMPAQ'S REPLY

In reply, Compaq first insists again that the loose, optimistic statements on which the complaint is based are too vague and insubstantial to support a claim of securities fraud. Compaq identifies similar to virtually identical statements that courts have found unactionable as a matter of law in cases cited earlier. Although Plaintiffs argue (1) that the statements were made without a reasonable basis and (2) that a handful of courts have declined to dismiss seemingly vague expressions of corporate optimism, Compaq claims both arguments fail. Because the statements are not actionable, the issue [*99] of a reasonable basis does not arise. Courts have dismissed such statements as a matter of law because they are not the kind of statements that a reasonable investor would rely on in making investment decisions. Grossman, 120 F.3d at 1119; Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997) ("Soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth. No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market.")

Second Plaintiffs fail to show they satisfy the factual particularity requirements of the PSLRA and Rule 9 (b), as defined in numerous cases in this Circuit and around the country, indeed by the "massive authority" according to Compaq. Moreover, Compaq provides the reason for such rules:

> The law should not encourage investors to makeuninformed investment decisions based on such vague statements of optimism by setting up a judicially administered insurance plan to protect against company business reverses. Nor should the law penalize corporate executives for expressing [*100] their perfectly natural optimism and hope for the business plans and strategies they are responsible for developing and implementing. Indeed, it would be surprising if executives did not routinely express such optimism, and it would inhibit public disclosures if such statements were actionable. If these types of vague statements can be the basis of a claim for fraud, companies and executives would be reticent to disclose their thoughts, hopes and aspirations for the future, disclosures that the securities laws are intended to encourage.

Reply (# 63) at 8. Compaq argues that the PSLRA not only reaffirmed but strengthened pleading requirements, emphasizing plaintiffs' obligation to provide detailed facts, including not only facts demonstrating the falsity of particular statements, but also identifying the sources of their information and belief about the alleged facts. See. e.g., Coates, 26 F. Supp. at 914; Greebel v. FTP Software, Inc., 194 F.3d 185, 193-94 (1st Cir. 1999); In re Zapata, sl. op.; Heliotrope Gen., 189 F.3d at 979; Silicon Graphics, 183 F.3d at 984; In re Comshare, 183 F.3d at 553; [*101] In re Paracelsus Corp. Sec. Litig., 61 F. Supp. 2d 591, 599-600 (S.D. Tex. 1998) (Werlein, J.); McNamara v. Bre-X, 57 F. Supp. 2d at 404; In re PETsMART, Inc. Secs. Litig., 61 F. Supp. 2d 982, 993 (D. Ariz. 1999).

Third, Plaintiffs fail to provide any basis for an exception to the common law doctrine's and the PSLRA's safe harbor that protect Compaq's numerous detailed warnings and disclosures before and during the Class Period. Plaintiffs continue with empty accusations, such as their claim that Defendants lied in predictions about Compaq's and the industry's future unit growth, which Defendants allegedly knew could not be achieved, and which in fact their own documents show not only was achieved, but surpassed. Regarding the "insider trading frenzy," which Plaintiffs identify as Defendants' motive for committing fraud, Compaq claims that the accusation is based on inaccurate calculations and distortions of huge portions of executives' stock holdings because Plaintiffs failed to count vested and fully excisable options. (Compaq provides a chart demonstrating "an extreme overstatement of percentage of personal holdings sold by Strecker [*102] and Winkler," which, when properly calculated, reveals that their trading is consistent with their prior practices and thus does not raise an inference of fraud.)

Instead, urges Compaq, publicly filed SEC documents demonstrate that insider sales represented only 4% of the shares Compaq senior executives and directors had available for sale during the Class Period. Compaq also claims Plaintiffs distort the statements made to analysts. When Compaq said that the first financial quarter of 1999 was "back-end loaded," the term was not a guarantee that Compaq would achieve these expectations, but an explicit statement that achievement of the first quarter would depend on uncertain future events, i.e., sales in its final, third month. Paine Webber report of March 10, 1999, Reply Appendix, Ex. 17 ("Compaq indicated that February appears to have ended with improving results, but Compaq still needs a strong March to deliver expected results. Management is not confident that March will be able to offset January and February."). In April, after it saw how the third quarter turned out contrary to its expectations, it reported that it would have a shortfall because of increased competitive pricing, [*103] lower-than-anticipated demand, and inability to achieve anticipated revenues in higher-end enterprise systems. Ex. 20. Plaintiffs seize on this hindsight and call it fraud, but set out no facts converting the events into a basis for this suit. None of Plaintiffs' allegations can be accepted as true under the standards articulated in Shushany, 992 F.2d at 523 (courts need only "accept complaint's well-pleaded factual allegations as true") and reinforced under the PSLRA.

Another example of inadequate pleading deals with the alleged purported August 1998 forecast that Compaq PC sales were "expected to decline across the board." Plaintiffs fail to identify who prepared the forecast, to whom it was provided, or what was actually said. Nor do they allege that it was approved by Compaq management or anyone who made allegedly misleading statements, nor explain what problem led to this alleged decline, how severe that decline was supposed to be and precisely what declined (unit sales, revenues, demand trends, overall market growth), why Compaq would not be able to address the difficulty during, the six months between the date of the forecast and the beginning of the Class [*104] Period, nor indicate why the forecast would even be relevant in January 1999 when the allegedly misleading statements were made. Shushany and the PSLRA required this basic information about an internal document before such an allegation can be accepted as true.

Similarly, Plaintiffs' allegations about Compaq's direct sales program lack such basic details and indicia of reliability. Plaintiffs fail to identify a single VAR opposing the Direct Plus Program nor identify when, where or to whom such "demands" were given. Nor do they provide information about pricing of PC's offered through the Direct Plus program or what competitors were charging. Compaq notes that while Plaintiffs assert that the prices charged on Direct Plus were higher than those of the competition, an analyst report, which was even cited by Plaintiffs, states, "Since the early November launch of the Prosignia, Compaq has remained in line or better pricing than the Direct channel leaders." Paine Webber Report dated Feb. 1, 1999, Def. Reply App. Ex. 13. Plaintiffs are just as vague in their allegations that Compaq could not build computers for its CTO program because it lost agreements with critical component suppliers. [*105] The only supplier and component identified is Western Digital and hard disk drives. No details are provided about any terms or conditions of the agreement lost, who was involved, when it was lost, or how the loss affected products distributed under the CTO program, or the size of the CTO program in relation to Compaq's $ 40 billion in sales. They also fail to explain how Compaq was able to manufacture over three million computers in the first quarter of 1999, a significant increase over the same quarter of the previous year, if "critical" Western Digital was lost. Plaintiffs do not explain how the loss of the supply contract makes it fraudulent to be "optimistic about 1999" or to believe that Compaq "will continue to grow at a faster rate than the European market in 1999." Defs.' opening brief at 43-46. The same failure to meet detailed, particular pleading standards and to suggest fraud is apparent in Plaintiffs' allegations about contra-revenue and Digital sales.

Furthermore, insists Compaq, Defendants' numerous warning and risks disclosures, discussed supra, render the allegedly misleading statements immaterial as a matter of law. Under Lovelace, 78 F.3d at 1018, [*106] the Court may take judicial notice of the warnings in Compaq's Third Quarter 1998 Report on Form 10-Q. [36]

Compaq additionally insists that all of the statements in question are "forward-looking" and are protected by safe harbor and the bespeaks caution doctrine. Although Plaintiffs focus on grammatical construction, courts have repeatedly recognized that whether a statement is technically characterized grammatically as present or future according to tense employed by the speaker is not the criterion; instead, as the PSLRA expressly states, it depends on whether it is "a statement containing a projection of revenues, income . . . or other financial items," or even more generally, "a statement of future economic performance." 15 U.S.C. § 78u5(i)(1)(A), (C). See Harris v. IVAX, 182 F.3d at 799(mixed statements are treated as forward [*107] looking statements and are entitled to protection); In re Alcatel Alsthom Sec. Litig., MDL No. 1263, sl. op. at 13-14 (E.D. Tex. Nov. 18, 1999) ("all prognostication is based on an extrapolation of 'current information.'"); Ehlert v. Singer, 85 F. Supp 2d 1269, 1999 WL 142735, *4 (1999) (holding that it is irrelevant whether defendant's prospectus contained both factual and forward-looking factors" and applying safe harbor). Compaq contends that because Plaintiffs' claims are based on the future (Compaq's failure to disclose would cause its future performance to fall short of expectations), Plaintiffs are bound by the rules governing claims concerning the future.

[36] Found in Def. Appendix (Section 10(b) Complaint), Vol. I, Ex. 5, filed on November 11, 1998, seven weeks before the beginning of the Class Period.

Compaq argues that its warnings were not boilerplate, but detailed statement directly addressing the risks Plaintiffs claim were concealed. For example, Plaintiffs assert that Compaq failed to meet its earnings estimates in part because it lost its contract with Western Digital, a supplier of hard drives. In its 1998 Report on Form 10-K, [37] Compaq warned, "At times Compaq has been constrained by parts availability in meeting product orders and future constraints could have an adverse effect on Compaq's [*108] operating results," and, "In the event that a supply of a key single-sourced . . . component were delayed or curtailed, Compaq's ability to ship the related product in desired quantities and in timely manner could be adversely affected."

Urging the Court to deny application of the safe harbor and bespeaks caution doctrine, Plaintiffs have also claimed that because Defendants knew at the times that their "boilerplate" warnings were issued that the matters being warned of were not risks but actual realities, having already occurred. Compaq answers that Plaintiffs' allegations are defective under the requirements of Rule 9(b) and PSLRA pleading standards and independently based on protective policies underlying safe harbor and the bespeaks caution doctrine because investors benefit from information about what management foresees for its company. Ivax, 182 F.3d at 806. Only where Plaintiffs show that a warning was not [*109] in good faith, but an act of deceit, is the presumption of protection lost under common law. Compaq contends they have not done so here. They have alleged no facts to support their claim that the "reality" in January 1999 was that the projections or expectations could not be achieved. It further presents documentary evidence showing that Compaq and the industry grew by more than 15%, the amount correctly forecast by Defendants, in the three quarters of 1999 prior to the filing of the complaint in this action.

Challenging mischaracterization of Compaq statements by Plaintiffs, Compaq notes that its statement in February 1999 that the company "feels sales will be back-end loaded in the quarter" was not an effort by Defendants "to assure the market that Compaq could make up for the slow sales in the first two months of the year with strong sales on the high-end" by sale of Digital products nor a guarantee that Compaq would achieve certain results, but rather "an explicit statement to investors that whether those results would be achieved depended on future events whose outcome was not certain." Reply (# 63) at 29. It presents the transcript of the statement on February 26, 1999 (Def. [*110] Reply App., Ex. 14) to demonstrate the context, i.e., that Compaq had had "slower-than-expected sales . . in January and the few weeks of February" and therefore would have to have increased sales at the end of the quarter to reach its earnings target for that quarter. Compaq also submits a statement by Paine Webber two weeks later showing that the analyst community understood the statement in this way. Def. Reply App., Ex. 17 ("Compaq indicated that February appears to have ended with improving results, but Compaq still needs a strong March to deliver expected results. Management is not confident that they can make it up in March."); see also Salomon Smith Barney report of March 1, 1999 ("While the company has seen a pick-up in orders during the latter part of February, management comments that the quarter will have to be more back-end loaded than it would like") (Def. Reply App., Ex. 15). Both statements are cited in Plaintiffs' complaint, PP 33, 49, 69, 78. No facts have been alleged to show that Compaq knew at the time that this statement was false at the time it was made.

Compaq also insists that Plaintiffs have failed to plead particularized facts giving rise to a strong [*111] inference of scienter, that the defendants committed fraud, or made a showing that the Defendants knew the statements were false at the time they were made. For the latter Plaintiffs have pointed to the executive positions held by Defendants, the resignations of certain Defendants after the Class Period expired, and the timing of some optimistic statements in proximity to the negative earning announcements at the end of the first quarter of 1999. Each, maintains Compaq, is insufficient as a matter of law and fails to raise a strong inference of scienter. Numerous courts have ruled that holding an executive position is not adequate to plead scienter under the PSLRA. Stratosphere, 1 F. Supp. 2d at 1116 (rejecting allegations that would lead the court to "infer an intent to defraud based on the position an individual held with a company" because "this would greatly weaken the [PSLRA's] pleading requirements and is not in accordance with the legislative intent." See also Lirette, 27 F. Supp. 2d at 283;

[37] Defendants' Appendix (Sec. 10(b) Complaint), Vol 1, Ex. 6 at pp. 8, 57.

Maldonado, 137 F.3d at 9; Zeid, 973 F. Supp. at 924-25 (holding general allegations of access to internal documents [*112] by executives do not amount to contemporaneous facts showing that defendants knew their statements were false at the time they made them and are insufficient under the Reform Act). Nor do the resignations of certain executives raise a strong inference of scienter. Branca v. Paymentech, Inc., 2000 U.S. Dist. LEXIS 1704, 2000 WL 145083 at *11. Executives often resign when they have not met business objectives or for other business, professional or personal reasons, and their resignations do not mean they have committed fraud. Steiner v. Tektronix, Inc., 817 F. Supp. 867, 885 (D. Or. 1992).

As for the limited time between the optimistic statements and the adverse disclosures as circumstantial evidence that the statements were false when made, Compaq complains that Plaintiffs juxtapose statements about the entire year (1999 as a whole) against the announcement of an earning shortfall for the first quarter and conclude fraud. Compaq notes that Plaintiffs ignore the fact that six weeks before the earnings announcement, Compaq informed investors that the quarter was "back-end loaded" and that achieving quarterly sales projections would depend on having an unusually strong final month of the first quarter. [*113] Such an advisory statement was not a guarantee. In addition, the court cannot infer falsity of fraudulent intent, from such a juxtaposition as a matter of law. Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir. 1993) ("Temporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance does not create an inference that earlier statements were fraudulent."); Yourish v. California Amplifier, 191 F.3d 983, 997 (9th Cir. 1999) ("The temporal proximity of the August disclosure to the June and July statements, without more, is insufficient to satisfy Rule 9(b)"); San Leandro, 75 F.3d at 812 (negative disclosure occurring three weeks after positive representations did not show falsity of positive representations); Ressler v. Liz Claiborne, 75 F. Supp. 2d 43, 52 (E.D.N.Y. 1999) (temporal proximity does not create an inference of fraud); In re Marion Merrell Dow, Inc., Sec. Litig. II,1994 U.S. Dist. LEXIS 10062, 1994 WL 396187 (W.D. Mo. July 18, 1994) (same) Compaq charges Plaintiffs with pleading fraud by hindsight; Plaintiffs are required to show that Defendants knew at the time of [*114] the statements that they were false.

As for Defendants' alleged motive of inflating the price of Compaq stock to sell personally held stock at artificially high prices, Compaq emphasizes that the Eleventh, Ninth, and Sixth Circuits have now held that under the PSLRA, allegations of motive and opportunity are no longer sufficient to plead scienter. Bryant, 187 F.3d at 1285; Silicon Graphics, 183 F.3d at 974; and In re Comshare, 183 F.3d at 551. The Fifth Circuit has not yet ruled on the question. Thus if this Court agrees that motive and opportunity do not adequately plead scienter under the PSLRA, there is no need to examine the allegations. If it does not agree, the Court should find that the allegations are a distorted review of insider sales and filled with wholly conclusory allegations of opportunity that failed to raise the required strong inference of scienter.

Plaintiffs have challenged statements made only by three individuals, Pfeiffer, Mason and Barth. Barth is not even a named Defendant in the amended Kurtzman complaint. Pfeiffer and Barth did not sell any shares of stock during the Class Period. Compaq has already demonstrated [*115] that numerous courts have determined that such improbable and speculative allegations that some individuals would make a number of statements they knew to be false to drive up the stock price, only not to profit from that inflated price, should be rejected as a matter of law. Zapata, sl. op. at 39 ("Plaintiffs' allegations that [the CEO] would knowingly choose to participate in fraud merely to allow two of the [company's] former officers to profit from the sale of stock are not plausible"); San Leandro, 75 F.3d at 814 (cannot rely on the insider sales of one defendant where other allegedly key defendants, including CEO of the company, did not trade); Burlington Coat Factory, 114 F.3d at 1423-24 (in the absence of trades by CEO, insider trading allegations as to others were insufficient to raise the required inference of scienter). They cite numerous district court cases in accord. Reply (# 63) at 38 n.17. Compaq emphasizes that Plaintiffs have not identified a single case in which a claim was allowed to proceed based on allegations of insider trading where the speaker and CEO did not sell any shares. Although Mason did trade shares, Plaintiffs [*116] do not dispute that his statements were consistent with Pfeiffer's and that Pfeiffer as CEO, oversaw all aspects of Compaq's activities,

dominated to the exclusion of all others the public dissemination of information concerning Compaq, spoke for Compaq, and that no statement would or could have been issued by anyone else that was inconsistent with a position adopted by Pfeiffer. [38] Thus it would have been impossible to carry out fraud without Pfeiffer's participation, and Plaintiffs have failed to allege any facts raising any inference of fraud as to Pfeiffer.

[*117] Moreover, urges Compaq, to demonstrate scienter, insider sales of stock must be "in amounts dramatically out of line with prior trading practices." Rehm v. Eagle Fin. Corp., 954 F. Supp. 1246, 1254 (N.D. Ill. 1997); see also Rubinstein, 20 F.3d at 169. Mason sold 86% of his holdings during the Class Period, [39] which was comparable to his sale of over 90% of his holdings in July 1997 and 50% in July 1998. Case law recognizes that even the sale of a large percentage of an insider's holdings does not raise an inference of scienter where the sale is consistent with the insider's prior trading practices. See, e.g., In re CBT Group PLC Sec. Litig., 1999 U.S. Dist. LEXIS 20685, 1999 WL 1249287, *2 (M.D. Cal. July 21, 1999) (sale by insiders of 96% of holdings, worth $75 million, did not raise strong inference of scienter where five of seven defendants had sold same amount the year before); In re Boeing Sec. Litig., 40 F. Supp. 2d 1160, 1174 (W.D. Wash. 1998) (sales by two defendants of significant percentages of stock holdings insufficient to make out motive when sales consistent with prior trading history). Compaq emphasizes that Mason sold his [*118] shares early (February 1, 1999), as he had done in his two prior sales, showing additional consistency. See Defendants' Reply Appendix, Ex., 2, for Mason's full trading history. Finally, Compaq points out that Mason purchased over 4000 shares during the Class Period by exercising options and not selling the resulting shares, thus undermining Plaintiffs' allegation that he was liquidating his Compaq holdings. Thus trading allegations fail to raise an inference of scienter with respect to Mason.

Strecker and Winkler traded shares, but are not alleged to have made any misleading statements, thus negating any inference of scienter as to them, argues Compaq. In re Scholastic Corp. Sec. Litig., 2000 U.S. Dist. LEXIS 791, 2000 WL 91939, *13 (S.D.N.Y. Jan. 27, 2000) (stock sales of 80% of personal holdings by an executive who did not make any alleged misstatements did not establish scienter); Head v. NetManage, 1998 U.S. Dist. LEXIS 20433, 1998 WL 917794 at *5 (insiders' sales of 94% [*119] and 76% of their holdings found to be "insufficient to create the requisite strong inference of scienter in light of the lack of any specific allegations as to their fraudulent conduct, including the lack of allegation that they personally made any of the fraudulent statements"). Since Pfeiffer dominated the public dissemination of information about Compaq and neither Strecker nor Winkler spoke at all or are alleged to have tricked the speakers into making false statements on their behalf, they did not have the requisite opportunity to commit fraud. Nor have Plaintiffs set out any facts distinguishing Strecker and Winkler from other insiders not named Defendants. To counter Plaintiffs' miscalculations of percentage of total holdings of individual Compaq management sold, Compaq presents a chart of other executives who traded during the Class Period who sold only a small percentage of their shares or who sold a significant portion but did so in a manner consistent with their historical trading patterns.

Compaq also contends that the aggregate amount of insider trading during the Class Period was very small. Def. Reply App., Exs. 1, 12.

Finally, Compaq argues that Plaintiffs should [*120] not be granted leave to replead. In light not only of the extensive amount of time this litigation has been pending and the briefing that has already occurred, Plaintiffs have not alleged actionable statements, they will not become actionable by repetition in another pleading. Strassman v.

---

[38] In response to Plaintiffs' reliance on the group pleading doctrine, Compaq points to several district court cases in the Fifth Circuit that have held that the group pleading doctrine is inconsistent with the PSLRA. See, e.g., Branca, 2000 U.S. Dist. LEXIS 1704, 2000 WL 145083 at *11; Coates, 26 F. Supp. 2d at 915-16. Even if the Court does not accept these holdings, Compaq argues that to the extent the doctrine survives, it requires that the person who made the statements also had to commit the fraud, i.e., sell shares of stock, and thus does not apply here.

[39] Compaq disagrees with Plaintiff's figure of 94%.

Fresh Choice, Inc., 1995 U.S.Dist. LEXIS 19343, 1995 WL 743728, *9 (N.D. Cal. Dec. 7, 1995) (dismissing unactionable claims with prejudice); Wenger, 2 F. Supp. 2d at 1252 (refusing leave to replead claims based on unactionable statements). Plaintiffs have failed to show that they will be able, if granted leave to amend, to cure the fatal effect on their claims of Compaq's numerous, detailed warnings before and during the Class Period. IVAX Corp., 182 F.3d at 807-08 (denying leave to replead because no proposed amendment would alter the effect of the Safe Harbor on plaintiffs' claims); Grossman, 120 F.3d at 1116 (denying leave to replead because bespeaks caution doctrine would still be fatal to plaintiffs' claims) . Plaintiffs have provided no reason why a second complaint would contain facts demonstrating that particular statements were false when made and [*121] raising a strong inference that they were made with intent to defraud. Schoenhaut v. American Sensors, Inc., 986 F. Supp. 785, 796 (S.D.N.Y. 1997) (refusing leave to replead unless plaintiffs indicate what amendments they would make in order to satisfy required factual specificity); In re Burlington Coat, 114 F.3d at 1435 (denying leave to replead and noting that "plaintiffs had approximately four months between the initially filed complaints and the revised, consolidated complaint"). The PSLRA was structured to allow "dismissal of frivolous cases at the earliest feasible stage of litigation, thereby reducing cost to the company, and by derivation, to its shareholders, in defending a baseless action." Bryant, 187 F.3d at 1278.


## COURT'S RULING

Plaintiffs have alleged that the following statements or omissions, made by Pfeiffer, Mason or Barth, were material and were false and misleading when made and that they were made to artificially inflate the price of Compaq stock so that Defendants could sell their own holdings by insider trading to reap the benefits of the inflated price before they disclosed Compaq's troubled financial [*122] situation. To make the analysis easier, the Court has numbered each inside parentheses for quick identification.

On January 7, 1999 Eckhard Pfeiffer stated on CNBC regarding the acquisition of Digital, the success and competitiveness of Compaq's direct sales model, and the demand for Compaq PCs:

(# 1) The organizations [of Compaq and Digital] are completely integrated and merged and we expect to see the synergies that we've been expecting from the merger not only happening already during the last part of last year but coming into full bloom in 1999. Complaint P 40.

(# 2) Late last year we announced Compaq Direct, which is in a very aggressive selling mode, and we are competing in the direct as well as indirect channel . . . . Complaint P 40.

(# 3) We're quite optimistic about the PC market. . . . Compaq has always been growing at a higher rate than the market. So that's why we believe it's going to be continuously a good PC market. Complaint P 40.

Plaintiffs assert that these statements were false and misleading when made because Pfeiffer did not disclose that Compaq had adopted policies and programs intended to reduce, rather than increase, its revenue [*123] from Digital in 1999 and did not disclose Compaq's competitive failures, discussed above.

During the January 27, 1999 press release that allegedly misrepresented Compaq's business and failed to disclose negative facts about it and its prospects, Mason stated, "(# 4) The synergies from the Digital acquisition are becoming more and more evident in our financial performance. Sequential revenue growth in products was exceptionally strong, and we continue to gain momentum in our service business." Complaint P42. Pfeiffer was quoted as stating at the same press release, "(# 5) We continue to see strong demand for Compaq products and services and the opportunity for continued market share gains and revenue growths." Complaint P 43. Plaintiffs claim these statements were false and misleading in light of Compaq's problems, discussed above.

Mason stated on CNBC's "Squawk Box" program after issuance of the January 27, 1999 press release that "( # 6) our gross margins continue to go up. We view the process to continue in 1999. Some of the reason [sic] why they're going up is further integration of Digital Equipment companies and of course we've made good progress on that. . .

." Complaint [*124] P 45. He further stated that he was "(# 7) comfortable with earnings statements of our analyst community." Id. Confirming reports of Compaq's optimism about 1999. Mason also allegedly told the Bloomberg News Service on January 17, 1999 that "(# 8) I don't believe that halfway through the year everything is going to stop" and that "Digital's high-end revenues are starting to pick up." Complaint P 46. Gary McWilliams reported in the Wall Street Journal on January 28, 1999 that Mason stated that (# 9) Compaq expects to match Wall Street's earnings estimate of 35 cents per share in the first quarter ending on March 31, 1999. Complaint P 47.

Compaq's Senior Vice President and General Manager for Europe, the Middle East, and Africa, Barth, stated during a January 27, 1999 interview that (# 10) Europe was Compaq's fastest growing region and that in 1999 the European market would be strong for Compaq and for the industry. Complaint P 48.

On January 28, 1999 the Houston Chronicle wrote, "(# 11) Mason said the company began benefitting [in the fourth quarter of 1998] from the presence of Digital [due to] increased sales of Digital's high end, big box computers, which carry [*125] greater profits than Compaq's traditional, PC-based lineup" Complaint P 53.

At Compaq's International Press Briefing in London on February 16, 1999, Pfeiffer and Barth represented that (# 12) Compaq would report $ 43.5 billion in revenue in 1999, described its gains in the PC market worldwide, predicted that Dell would lose market share, and represented that Compaq controls 15.4% of the PC market worldwide, outperforming competitors like IBM, Dell and Hewlitt Packard, and that (# 13) although "we don't make projections," Compaq wanted to "grow faster than the market in order to increase market share." Complaint P 54.

Pfeiffer stated to Bloomberg New Service during a February 16, 1999 interview that (# 14) in 1998 Compaq grew faster than the European market because it had good products, good customer relations, and good niche and that these same factors would allow it to grow at a faster rate than the European market in 1999. Complaint P 55.

Plaintiffs maintain that these statements were false and misleading at the time because Defendants knew that the demand for and sales of Compaq products, particularly in North America and Europe, which represented more than 40% of Compaq's [*126] total revenues, had declined throughout January and February 1999.

On February 24, 1999, Compaq filed its 1996 Form 10-K, signed by Pfeiffer and Mason, with the SEC, which contained the statement, "(# 16) Compaq expects the personal computer market to expand in 1999 in line with third-party research organizations' forecasts of unit growth of 15%." Complaint P 57. Plaintiffs maintain this statement was false and misleading for the same reasons as the previous ones.

While the parties have randomly cited cases covering a broad spectrum of views on all four grounds asserted here for the dismissal of the Kurtzman complaint, a review of the case law reveals significant distinctions among the Circuits. The Court has tried to identify and apply the Fifth Circuit approach for each.

A. Non-actionable statements: Puffing, overall industry trends and accurate historical statements

Under the judicially created puffery doctrine, general, forward-looking, optimistic corporate statements that are so vague and indefinite that they do not affect the price of a security because a reasonable investor would not rely on them in deciding whether to purchase or sell stock, are immaterial [40] as a [*127] matter of law and should be

---

[40] The Supreme Court, in a suit alleging securities fraud based on a corporate statement denying preliminary merger negotiations, has held that a corporate statement is "material" when "a reasonable investor would view the statement 'as significantly altering the "total mix of information available." Basic v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988). In TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976), in the context of a proxy solicitation, the high court defined the standard as whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."

dismissed. Raab, 4 F.3d at 289-90 ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen. The market gives the most credence to those predictions supported by specific statements of fact, and those statements are, of course, actionable if false and misleading. However, 'projections of future performance not worded as guarantees are generally not actionable under the federal securities laws.'"); Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993); Parnes v. Gateway 2000, 122 F.3d 539, 547 (8th Cir. 1997); Greebel v. FTP Software, Inc., 194 F.3d 185, 207 (1st Cir. 1999); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1427 (3d Cir. 1997); Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996). "Predictions of future growth . . . will almost always prove to be wrong in hindsight. . . . Imposing liability would put companies in a whipsaw, with a lawsuit [*128] almost a certainty. Such liability would deter companies from discussing their prospects, and the securities market would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws . . . ." Raab, 4 F.3d at 290. At the same time, Defendants may be liable for more specific, definite statements, beyond merely general rosy predictions, especially where those predictions go to the heart of the plaintiffs' complaint, such as that the inventory was "in good shape" or "under control," when the existing facts alleged by Plaintiffs show that they are misrepresentations. Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000), petition for cert. filed September 19, 2000, No. 00-432. See also Shapiro v. UJB Fin. Corp., 964 F.2d 272, 283 (3d Cir. 1992) (statements (1) that loan loss reserves were "adequate," "adequately maintained," "strong," and "solid," (that loan portfolio was "well secured," "well collateralized," and of a high "quality," (3) that the loan-to-value ration was "good," (4) that the loan management and underwriting practices were, "conservative, [*129] " "basic," "careful," "good," "prudent," and "cautious," and (5) that quality was "high," while level of bad loans was "low," held to be actionable because they went to the heart of plaintiffs' complaint); Cooke v. Manufactured Homes, Inc., 998 F.2d 1256, 1259-62 (4th Cir. 1993) (where company supported its projections of future growth with specific statements of fact, such as its repurchase of 400,000 shares of its own stock and negotiations with an insurance company to act as a guarantor on its loans, an issue was created as to whether the generalized forward-looking statements were material).

 [*130] Although some courts find facially vague statements to be immaterial per se as a matter of law, [41] the Fifth Circuit does not have a per se rule for dismissing puffery. The Fifth Circuit expands the concept of puffery to protect predictive or forward-looking statements and has held that such statements are generally not actionable as a matter of law when they neither rise to the level of a guarantee nor include a specific statement of fact. Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993). [42] Moreover, the Fifth Circuit's approach is to examine each corporate statement in the context in which it was made. Id. at 1447-50. "Materiality is not judged in the abstract but in light of the surrounding circumstances." Id. at 1448.

 [*131] Here, of the statements alleged to be materially false or misleading when made, or omitting material facts necessary to render them not false and misleading, the Court finds that even in the context of Defendants' allegations, taken as true, statements # 3, 7, 13, and 14, are merely general, vague, amorphous statements of simple,

---

The Fifth Circuit has held that a' misrepresentation of a "material" fact is one which a reasonable investor would consider, significant in the decision whether to invest, such that it alters the "total mix" of information available about the proposed investment. Isquith v. Middle South Utilities, 847 F.2d 186, 207-08 (5th Cir.), cert. denied, 488 U.S. 926, 102 L. Ed. 2d 329, 109 S. Ct. 310 (1988); Krim, 989 F.2d at 1445; Krim, 989 F.2d at 1448 ("the definition of materiality developed under the federal securities laws 'contemplates a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [investor]. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

[41] See, e.g., Raab, Parnes.

[42] Although Krim dealt with a claim under § 11 of the Securities Act of 1933, it made clear that the same definition of materiality applies to the Exchange Act of 1934. 989 F.2d at 1448 n. 16.

rosy economic projections of corporate optimism that are not specific, not guarantees, and not material because they would not affect a reasonable investor's investment decision. It finds that these four statements are clearly nonactionable. The rest, viewed in light of all the circumstances, raise issues of fact that preclude a Rule 12(b)(6) dismissal.

B. Forward-looking statements, risk disclosures and warnings, safe harbor and bespeaks caution doctrine

The judicial bespeaks caution doctrine will protect optimistic projections that are accompanied by relevant cautionary statements and specific risk disclosure that render the alleged misleading statement immaterial since it would not affect a reasonable investor's investment decisions. "The cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions [*132] . . . which the plaintiffs challenge." In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371; Grossman v. Novell, Inc., 120 F.3d 1112, 1120 (10th Cir. 1997). As with the puffery defense, in the Fifth Circuit the "'bespeaks caution' doctrine merely reflects the unremarkable proposition that statements must be analyzed in context." Rubinstein, 20 F.3d at 167. The Fifth Circuit makes clear that "cautionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law." The materiality must be judged in light of the surrounding circumstances, i.e., "whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the 'total mix of information available about the proposed investment." Id. at 168. Any cautionary language is part of the "total mix of information," but not per se dispositive of the issue. Id.

Because the Fifth Circuit applies the same approach to statements that bespeak caution as to puffing [*133] statements, i.e., the statements must be viewed in context in light of all the circumstances, the Court concludes that in light of the specific problems of Compaq pled by Defendants here, those statements that have not already been dismissed by the Court for vague generality and immateriality, i.e., # 3, 7, 13, and 14, may not be dismissed under Rule 12(b)(6) and Defendants' defense under the bespeaks caution doctrine. The disclosures identified by Defendants contain broad cautionary warnings about factors such as competition, industry risks, etc. Even where they address particular problems, the disclosures would "not excuse the alleged failure to reveal known, material adverse facts" that Plaintiffs allege in detail exist in Compaq's current financial condition and business prospects. Rubinstein, 20 F.3d at 171 ("the inclusion of general cautionary language regarding a prediction would not excuse alleged failure to reveal known material, adverse facts."); see also Gasner v. Board of Sup'rs of the County of Dinwiddie, Va., 103 F.3d 351, 363 (4th Cir. 1996); Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1213 (1st Cir. 1996) (the bespeaks [*134] caution doctrine does not render a false statement of present fact immaterial as a matter of law); Jardem v. Raffensperger, Hughes & Co., 65 F.3d 1392, 1404 (7th Cir. 1995) (bespeaks caution doctrine cannot, as a matter of law, render misrepresentations of current fact immaterial). This Court, in a 12(b)(6) motion, cannot conclude that the adverse facts alleged here by Plaintiffs would not have led a reasonable investor to believe that the mix of information had been significantly altered. There are issues as to the specificity and materiality of the general warnings pointed out by Plaintiffs as applied to the particular difficulties experienced by Compaq during 1998 and early 1999 and delineated in the Kurtzman complaint that preclude dismissal under 12(b)(6). Materiality is a mixed question of fact and law, and a complaint may not be dismissed under Rule 12(b)(6) unless the alleged misstatements and omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)

Providing a safe harbor for corporations and individual [*135] defendants that make forward-looking statements that prove false, the statutory counterpart of the bespeaks caution doctrine in the PSLRA requires that where a securities fraud claim is based on an alleged material, forward-looking misrepresentation, [43] under 15 U.S.C. § 78u-5(c)(1), the speaker 'is not liable if and to the extent that

_____

[43] See footnote 17 for statutory definition. Under this broad definition, the Court finds that all of the statements identified as forward-looking in the complaint satisfy the definition of "forward-looking," though not necessarily of "material."

(A) the forward-looking statement is-

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false and misleading; or

(ii) if made by a business entity; was

(I) made by or with the approval of an executive officer of that entity; and

(II) made approved by such officer with actual knowledge by that officer that the statement was false or misleading.

The safe harbor is available only for purported false statements specified in the plaintiffs' [*136] complaint. 15 U.S.C. § 78u-4(b)(1); Harris v. IVAX, 182 F.3d at 804. The Court observes that Plaintiffs have alleged, and must prove, that the cautionary statements were sufficiently specific, in the face of the alleged problems Compaq faced prior to and during the Class Period, to adequately warn investors in making their investment decisions. It must also prove, as to Compaq, that its officers had actual knowledge that their statements were false or misleading.

As with the application of the bespeaks caution doctrine to the targeted statements, there are issues here as to the specificity and materiality of Defendants' warnings in the context of the alleged adverse facts regarding Compaq's current situation. Furthermore, [*137] there are questions whether Plaintiffs have satisfied the pleading of the scienter requirement of "actual knowledge" on the part of Defendants to avoid a safe harbor defense, which the Court will address in its discussion of scienter for fraud under the PSLRA.

C. Rule 9 (b) particularity, pleading requirements

The Fifth Circuit requires that securities fraud claims be pled with particularity, i.e., time, place, and contents of the alleged false representations, as well as the identity of the person making the misrepresentation and what that person obtained by the misrepresentation. Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994). "This heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and good will, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." Id. at 1067. As will be noted, many of the same purposes were behind the enactment of the PSLRA.

It appears to the Court that with regard to the numbered, challenged statements, Plaintiffs have met [*138] the Rule 9(b) pleading requirements of time, place, and contents of the alleged false representations, and the identity of the person making the misrepresentation and to whom it was made. They have also placed the statements in the context of Compaq's specific business and financial troubles to show why the statements are allegedly fraudulent or misleading.

Regarding the issue of intent, Rule 9(b) provides that "malice, intent, knowledge, and other condition of mind of a person may be averred generally." Although some courts so rigorously apply Rule 9(b) to securities fraud that the standard is virtually the same as that under the PSLRA, on its face, the PSLRA is more specific, demanding that a "securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Because the standard under the statute is at least as, if not more, specific, the Court will address the issue of scienter under the PSLRA.

D. PSLRA

Defendants' motion for dismissal of the challenged statements must be viewed in the context of the purpose of the PSLRA, which Congress [*139] passed to address the need to deter abusive strike suits [44] of questionable merit by private plaintiffs to obtain large settlement recoveries. H.R. Conf. Rep. No. 104-369, at 31 (1995) (noting "significant evidence of abuse in private securities lawsuits," including "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issue," and "the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle"), reprinted in 1995 U.S.C.C.A.N. 730, 730. To reduce such suits, the PSLRA imposed significant procedural requirements, including heightened pleading standards, on plaintiffs filing private securities fraud actions. Id. at 41.

 [*140] As noted, to establish a claim for federal securities fraud under § 10(b) and Rule 10b-5, plaintiffs must demonstrate (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiffs relied and (5) that proximately caused them injury. Tuchman, 14 F.3d at 1067. The requisite intent, or "scienter," for liability in a section 10(b) and Rule 10b-5 action is "an intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976). "The words 'manipulative and deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional conduct." Id. Because not every misstatement or omission in a corporation's disclosures is actionable under the securities law, scienter is the key to determining what is. Id.

The Fifth Circuit held prior to enactment of the PSLRA in 1995 that "the scienter element of a federal securities fraud claim may be satisfied by proof that the defendant acted with severe recklessness, which is 'limited to those highly unreasonable omissions or misrepresentations [*141] that involve not merely simple or even inexcusable negligence, but an extreme 'departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Id., citing Shushany v. Allwaste, Inc., 992 F.2d 517, 521 (5th Cir. 1993), quoting Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961-62 (5th Cir.) (en banc), cert. denied, 454 U.S. 965, 70 L. Ed. 2d 380, 102 S. Ct. 506 (1991). See also McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989) (same); Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir. 1977); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978). Although Rule 9(b) allows scienter to be "averred generally," case law requires that "the plaintiff must set forth specific facts that support an inference of fraud." Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068 (5th Cir. 1994). These specific facts must "make it reasonable to believe that defendant knew that a statement was materially [*142] false or misleading." Id., The plaintiff can be satisfied by pleading facts showing a defendant's motive to commit securities fraud or, where the motive is not evident, by the more difficult method of "identifying circumstances that 'indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Id.

The PSLRA, 15 U.S.C. § 78u-4(b)(2), provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Moreover, if plaintiffs fail to meet this heightened pleading requirement, a court may, on any defendant's motion, dismiss the complaint. 15 U.S.C. § 78u-4(b)(3). The PSLRA does not define what is meant by "the required state of

---

[44] A 'strike suit' is a "shareholder derivative action begun with hope of winning large attorney fees or private settlements, and with no intention of benefiting [the] corporation on behalf of which [the] suit is theoretically brought." Black's Law Dictionary at 1423 (6th ed. 1990), quoted in Greebel v. FTP Software, Inc., 194 F.3d 185, 191 n.5 (1st Cir. 1999).

mind." The Circuit Courts of Appeals addressing the question have split into three different [*143] positions on the issue.

Like the Fifth Circuit, before the passage of the PSLRA, which eliminated any general pleading of scienter, all the Circuits addressing the issue of scienter held that some form of recklessness is a sufficient state of mind to state a claim for securities fraud under § 10(b) and Rule 10b-5, but were split as to what facts must be pled to avoid a 12(b)(6) dismissal. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1281 (11th Cir. 1999).

The Second Circuit, prior to the PSLRA required,

> [Plaintiffs must allege facts that give rise to a strong inference of fraudulent intent. "The requisite 'strong inference' of fraud may be established either by (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."

Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995), quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). The Second Circuit defined motive and opportunity as follows:

> Motive would entail concrete benefits that could [*144] be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the' means and likely prospect of achieving concrete benefits by the means alleged.

Shields, 25 F.3d at 1130. The appellate court made clear that motives possessed by nearly all corporate insiders, e.g., wish to uphold a high corporate credit rating, to sustain an image of profitability or successful investment, to insure a high stock price to increase executive compensation, or to prolong the benefits of being a corporate officer, were not sufficient; plaintiffs must plead that the defendants benefited in a concrete and personal way from the alleged fraud, such as misrepresenting corporate performance or prospects to artificially inflate the price of stock while the corporate insider sold his own shares at a profit. Novak v. Kasaks, 216 F.3d at 307-08. If plaintiffs chose to plead facts that constituted strong circumstantial evidence of conscious misbehavior or recklessness by defendants, "intentional misconduct" is conduct that "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed [*145] and material information . . . or knowing sale of a company's stock at an unwarranted discount." Id. at 308.

After passage of the PSLRA, the Second and Third Circuits [45] concluded that the PSLRA, in essence, adopts the first portion and expressly tracks the second part of the Second Circuit's test, thus codifying the Second Circuit's pre-PSLRA case law permitting plaintiffs to allege facts showing either (1) that defendants had both motive and opportunity to commit fraud or (2) that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Ganino v. Citizens Utils. Co., 228 F.3d 154, 2000 WL 126550 (2d Cir. 2000); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999); Oran v. Stafford, 226 F.3d 275, No. 99-5184, 2000 WL 1268154, *11 (3d Cir. 2000). The Second Circuit, aware of Congress' failure to include language about motive and opportunity in the PSLRA, minimally modified its test by stating that the court "need not be wedded to these concepts in articulating the prevailing standard" for pleading scienter. Novak, 216 F.3d at 310. [*146] A bare

---

[45] These courts concluded that because Congress specifically incorporated the Second Circuit's "strong inference" language into § 78u-4(b)(2), the PSLRA sets out a pleading standard equal to that of the Second Circuit and reflects an intent to import the judicial interpretations of that language. Novak v. Kasaks, 216 F. at 310. Citing the legislative history, the Second Circuit concluded that Congress chose its pre-PSLRA standard because it was "the most stringent in the nation." Id., citing H.R. Conf. Rep. No. 104-369. at 41. Although conceding that the legislative history of the PSLRA contains "conflicting expressions of legislative intent" regarding the pleading standard, the Ninth Circuit points out that the Senate Committee reporting the bill state that it was proposing not " a new and untested pleading standard that would generate additional litigation," but rather "a uniform standard modeled upon the pleading standard of the Second Circuit." Id. at 311, citing S. Rep. No. 104-98, at 15 (1995), reprinted in 1995 U.S.C.A.A.N. 679, 694 (noting that courts interpreting proposed "strong inference" standard might find Second Circuit case law "instructive.").

invocation of these "magic words" is insufficient; facts regarding the particular circumstances will make "motive and opportunity probative of a strong inference of scienter." Id. at 311. Thus, according to the Second Circuit, a strong inference of fraudulent intent "may arise where the complaint sufficiently alleges that the defendant's: (1) benefitted in a concrete and personal way from the purported fraud . . .; (2) engaged in deliberately illegal behavior . . .; (3) knew facts or had access to information suggesting that their public statements were not accurate . . .; or (4) failed to check information that they had a duty to monitor . . . ." Id., Furthermore, the Second Circuit has at times permitted allegations of simple or non-deliberate recklessness to satisfy the scienter standard where the defendant had a duty to monitor certain information and failed to do so. Novak, 216 F.3d at 308-09.

 [*147]  At the other end of the spectrum, the Ninth Circuit has concluded that the PSLRA substantively changed the level of scienter and required a higher, or more demanding, pleading standard than the Second Circuit's. The Ninth Circuit has rejected the motive and opportunity test in favor of pleading "facts that come closer to demonstrating intent," and has refused to adopt the strong inference standard for simple recklessness, insisting that the PSLRA has substantively enhanced the scienter requirement to, at minimum, "deliberate recklessness." [46] In re Silicon Graphics, Inc., 183 F.3d 970, 974 (9th Cir. 1999). The Ninth Circuit views the PSLRA as expressly adopting only the Second Circuit's "strong inference standard" and as expressly refusing to codify the Second Circuit's case law and motive and opportunity test. Id. Moreover, it reads the statute's factual particularity requirement as mandating that the plaintiffs "provide a list of all relevant circumstances in great detail." Id. at 984. For instance, if a report is the alleged source of the defendants' actual or constructive acknowledge, plaintiffs must provide at least some specific "adequate [*148]  corroborating details," e.g., the sources of plaintiffs' information about the report, how plaintiffs learned of it, who drafted it, which officers received it, and a description of its contents. Id. at 985. Regarding insider stock trading and pleading sufficient facts to give rise to a strong inference of scienter (deliberate recklessness), the Ninth Circuit states that insider trading "is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" Id. at 986, quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir. 1989). A district court needs to consider (1) the amount and percentage of shares sold by insiders, (2) the timing of the sales, and (3) whether the sales were consistent with the insider's prior trading history. Id. In determining whether the sale was unusual or suspicious, it should examine the proportion of shares actually sold by the insider to the volume of shares he could have sold. Id. Furthermore, the Ninth Circuit does not accept as sufficient for establishing scienter the pleading, [*149]  by itself, of the temporal proximity of an allegedly false optimistic statement and a subsequent disclosure. Yourish v. California Amplifier, 191 F.3d 983, 997 (9th Cir. 1999).

In view of the fact that at the 12(b)(6) motion stage of litigation there has been no discovery, this Court finds that the Ninth Circuit's requirement of nearly complete details regarding every material aspect of the litigation [*150]  to be excessive, harsh, and unfair.

In the middle, between the Second and Ninth Circuits' pleading standards under the PSLRA, the Eleventh, Sixth and First Circuits also reject the Second Circuit's relatively easily met motive and opportunity pleading standard, standing alone, which they also maintain that the PSLRA did not codify, as sufficient to plead scienter unless the facts pled regarding motive and opportunity demonstrate that the defendants acted recklessly or knowingly. Bryant, 187 F.3d at 1283; In re Comshare Sec. Litig., 183 F.3d 542, 551 (6th Cir. 1999); Greebel v. FTP Software, Inc., 194 F.3d 185, 197 (1st Cir. 1999). They hold that the operative language of the PSLRA, i.e., that a plaintiff must "state

---

[46] Adopting the Seventh Circuit's definition, the Ninth Circuit defines "deliberate recklessness" as a "form of intentional or knowing misconduct" in much the same way as the courts of appeal discussed above: "Reckless conduct [is defined as] . . . a highly unreasonable omission, involving not merely simple, or even unexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Silicon, 183 F.3d at 976.

with particularity facts giving rise to a strong inference that the defendant acted with <u>the required state of mind</u> [emphasis added]," upholds the established judicial rule of which Congress was well aware that the pleading of specific facts denoting severe recklessness is sufficient to state a claim. <u>Bryant,</u> 187 F.3d at 1283. For these Circuits, scienter "encompass[es] at least a showing of severe [*151] recklessness"; thus the PSLRA did not substantively change the actionable level of scienter. <u>Id.</u> at 1286; <u>Greebel,</u> 194 F.3d at 199-200, 201. [47] The First Circuit has held that "inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." <u>Greebel,</u> 194 F.3d at 195. In support of their conclusions, the Sixth and First Circuits emphasize, in contrast, the express requirement for a scienter of "actual knowledge" that a forward-looking statement was false or misleading a standard necessary to defeat the safe harbor defense of a defendant under 15 U.S.C. § 78u-5(c)(1)(B), instead of a the inferred scienter of recklessness with respect to securities fraud claims under § 10(b) and Rule 10b-5 . <u>Bryant,</u> 187 F.3d at 1286; <u>Greebel,</u> 194 F.3d at 201. The Sixth Circuit stated, "To the extent that the effort in <u>Silicon Graphics</u> is an attempt to import into the law a new and uncertain super-recklessness, see 183 F.3d at 550 ("deliberate or conscious recklessness"; "degree of recklessness that strongly suggests actual intent"), [*152] we believe 'that the intent is inconsistent with the plan statutory language." <u>Bryant,</u> 187 F.3d at 1286.

 [*153]  The First Circuit, moreover, has indicated that because a strong inference of scienter, rather than merely a reasonable inference is now required to survive a motion to dismiss, evidence of mere motive and opportunity to commit fraud would not be sufficient unless it rose to the level of creating a inference of reckless or knowing conduct. <u>Greebel,</u> 194 F.3d at 196-97. Thus standing alone, a single characteristic fact pattern, such as one of the following examples, would not constitute pleading sufficient to raise a strong inference of scienter: insider trading, divergence between internal reports and external statements on the same subject proximity of an allegedly fraudulent statement or omission and a later disclosure of inconsistent information, evidence of bribery by a top official, existence of an ancillary lawsuit charging fraud by a company and that company's quick settlement of the suit, disregard of the most current factual information before making statements, the personal interest of certain directors in not informing disinterested directors of an impending sale of stock, and the self-interested motivation of defendants in saving their salaries or jobs.  [*154]  <u>Greebel,</u> 194 F.3d at 196. Instead, under the PSLRA, a court must examine the particular facts of each individual case to see whether they support a strong inference of scienter or reckless and knowing conduct, not merely a reasonable inference, to survive a motion to dismiss. Id. at 196-97. In a statement relevant to the instant case, the First Circuit notes that "unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." <u>Id.</u> at 197, <u>citing inter alia Rubinstein,</u> 20 F.3d at 169-70. Nevertheless, it cautions that "mere pleading of insider trading, without regard to context or strength of inferences to be drawn, is not enough. . . . At a minimum, the trading must be in a

---

[47] Portions of the legislative history support their rejection of the motive and opportunity test, as discussed in detail by the First Circuit in <u>Greebel,</u> 194 F.3d at 194-96 and summarized as follows. Congress stated, "The Conference Committee language is based in part on the pleading standard of the Second Circuit" and that "because the Conference Committee intends to strengthen the existing pleading standards, it does not intend to codify the Second Circuit's case law interpreting this pleading standard." H.R. Conf. Rep. 104-369, at 41 (1995), reprinted in 1995 U.S.C.A.A.N. 730, 740. An added footnote states, "For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity or recklessness." <u>Id.</u> at 41, n.23, reprinted in 1995 U.S.C.A.A.N. at 747. Furthermore, although the Senate bill (S. 240) contained an amendment that would have codified the Second Circuit law, the Conference Committee deleted it. Amend. 1485, S. 240, 104th Cong., 1st Sess. (1995). In addition, President Clinton, who vetoed the bill but was later overridden by Congress, stated that through the PSLRA Congress "intended to 'strengthen' the existing pleading requirements of the Second Circuit . . . [and] to erect a higher barrier to bringing suit than any now existing[.]" H.R. Doc. No. 104-150 (104th Cong., 1st Sess., (1995), 141 Cong. Rec. H15214 (Dec. 20, 1995).

The First Circuit has conceded that "the legislative history is inconclusive on whether the Act was meant to either embody or to reject the Second Circuit's pleading standards. <u>Greebel,</u> 194 F.3d at 195, <u>citing</u> the Third Circuit's <u>In re Advanta Corp. Sec. Litig.,</u> 180 F.3d 525, 531-33 (3d Cir. 1999) (ignoring legislative history because of contradictions and lack of clarity). The First Circuit concludes, "At best, there appears to have been an agreement to disagree on the issue of Second Circuit standards (other than the strong inference standard), and perhaps, as is common, to leave such matters for the Courts to resolve." <u>Greebel,</u> 194 F.3d at 195.

context where defendants have incentives to withhold material, nonpublic information, and it must be unusual, well beyond the normal patterns of trading by those defendants." Id. at 198.

After reviewing the appellate law, the legislative history of the PSLRA available in U.S.C.A.A.N., and the Kurtzman complaint, the Court concludes that the appropriate [*155] standard of scienter is that persuasively set forth by the Sixth, First and Eleventh Circuits. It best suits the purpose of the PSLRA amendments to stem abusive securities fraud litigation and tracks the plain language of the statute. Thus the Court pursues a fact-intensive review of this particular case to see whether Plaintiffs have pleaded sufficient facts to raise a strong inference of scienter.

First, Plaintiffs place much emphasis on the internal sales forecast that they conclusorily allege alerted Defendants to Compaq's problems as early as August 1998. Yet, as pointed out by Defendants, Plaintiffs fail to provide any significant details regarding this memorandum that are critical to proving actual knowledge. Specifically, they have emphasized the absence of any indication of who prepared the forecast, to whom it was provided, and, more significantly, its specific contents and the accuracy or certainty of its predictions. Without at least some of this information, the memo by itself is merely vague, unspecified insider information that is insufficient to raise even a reasonable, no less strong inference of scienter for securities fraud.

Plaintiffs also rely on knowledge acquired [*156] by reason of the high level positions held by Defendants at Compaq. This global allegation, too, lacks any factual specifics as to what information they were exposed, how, and when. In view of, the purpose of the PSLRA amendments, this Court finds that Plaintiffs rely on too minimal and conclusory an allegation of incomplete motive and opportunity, by reason of Defendants' positions at Compaq to attempt to satisfy the scienter standard under the PSLRA.

Plaintiffs here have alleged that Defendants' motive in making purported misrepresentations was to artificially inflate the value of Compaq stock and take advantage of that price through insider trading by selling their own before disclosing Compaq's situation to the public. Even if this Court accepted a bare bones motive and opportunity test for scienter, Compaq has pointed out a significant weakness in the pleadings. Two of the three officers allegedly making the claimed false statements or misrepresentations were the most powerful Compaq officers and yet neither sold any stock or are alleged to have profited in any way from the purported insider trading: (1) Pfeiffer, Compaq's CEO; and (2) Andreas Barth, who was General Manager for [*157] Europe, the Middle East, and Africa, an area where the concealed substantial drop in business was a critical factor in this suit. Yet Plaintiffs, without explanation, have eliminated Barth as a named defendant in the amended complaint; Moreover, since Pfeiffer obtained no proceeds from any insider sales, Pfeiffer's prompt resignation could reasonably appear to be motivated by a sense of inadequacy for the job in the face of Compaq's troubles.

Moreover, Plaintiffs have not alleged that Defendants Strecker or Winkler made or were personally involved in any way in any false or misleading statements nor how they could have controlled such promulgations by the other named Defendants who were their superiors at Compaq. Thus Winkler and Strecker do not appear to be liable as controlling persons under Section 20A of the Exchange Act with respect to Pfeiffer or Barth.

Plaintiffs have also 'asserted the "group pleading presumption" to impose liability on those who made no misrepresentations. Under that doctrine, a company's statements "in prospectuses, registration statements, annual reports, press releases, or other group-published information" may be presumed to be the collective work of [*158] those individuals with direct involvement in the everyday business of the company. In re Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 142 (S.D.N.Y. 1999) No Circuit court has addressed the question of whether it survived the enactment of the PSLRA with its particularity in pleading requirements.

The district courts that have considered the question are of divergent views. Courts concluding that the group pleading presumption is no longer viable after the passage of the PSLRA include Coates v. Heartland Wireless Communications, Inc., 26 F. Supp. 2d 910, 916 (N.D. Tex. 1998) (since PSLRA requires plaintiffs to set forth facts raising a strong inference that each defendant acted with the required state of mind, group pleading is inconsistent

with 15 U.S.C. § 78u-4(b)(2), as well as contrary to its underlying policy of protecting defendants from unwarranted claims and strike suits); <u>Allison v. Brooktree Corp.</u>, 999 F. Supp. 1342, 1350 (S.D. Cal. 1998) (the "judicial presumption" of group pleading could not "be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each [*159] act or omission by the defendant"); <u>Marra v. Tel-Say Holdings, Inc.</u>, 1999 U.S. Dist. LEXIS 7303, 1999 WL 317103, *5 (E.D. Pa. 1999) ("the presumption inherent in group pleading is inconsistent with the PSLRA's purpose . . . since the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be plead with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind'"; also PSLRA now "allows plaintiffs to plead upon "information and belief" that a statement is misleading provided that the complaint states with particularity all facts on which this belief is formed"). Holding that the group pleading doctrine survived the PSLRA are inter alia <u>In re Oxford Health Plans, Inc.</u>, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) ("the PSLRA has not altered the group pleading doctrine"); <u>In re Miller Industries, Inc. Sec. Litig.</u>, 12 F. Supp. 2d 1323, 1329 (N.D. Ga. 1998); <u>In re Stratosphere Corp., Sec. Litig.</u>, 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998); <u>In re BankAmerica Corp. Secs. Litig.</u>, 78 F. Supp. 2d 976, 988 (E.D. Mo. 1999) [*160] (group pleading doctrine "has nothing to do with scienter," is "a rebuttable presumption applicable only to a limited group of persons within the company [officers and directors with inside knowledge of and involvement in the day-to-day affairs of the company]," and "is not inconsistent with the PSLRA"); <u>Baan Co. Sec. Litig.</u>, 103 F. Supp. 2d 1, 17 (D.D.C. 2000). Somewhere in between in <u>McNamara v. Bre-X Minerals Ltd.</u>, 57 F. Supp. 2d 396, 427 (E.D. Pa. 1999) ("Plaintiffs have relied too heavily on the group pleading presumption. More particularization is required . . . . Plaintiffs should, when possible, avoid attributing actions to Defendants collectively. When not possible the Plaintiffs should offer an explanation as to why this is the case."). Because this Court believes a more stringent pleading is required by the PSLRA, it agrees with those district courts that find the group pleading doctrine has not survived the amendments.

Similarly, Plaintiffs have insisted that they are pleading based not on "information and belief," which would require pleading with particularity under 15 U.S.C. § 78u-4(b)(1) ("allegations regarding [*161] false statements or omissions that are made on information and belief must "state with particularity all facts on which that belief is formed"), but on investigation of counsel, so that the higher pleading requirements do not apply. Once again there is no appellate court ruling on this issue and the district courts are split. Plaintiffs have cited cases <u>supra</u> holding that investigation of counsel does not trigger a more particularized pleading. Holding to the contrary view, that there are only two types of allegations, those based on personal knowledge that do not trigger more detailed pleading and those not based on personal knowledge, including investigation of counsel, that do, are <u>inter alia</u> the following: <u>In re Theragenics Corp. Sec. Litig.</u>, 105 F. Supp. 2d 1342, 1350-51 (D. Ga. 2000) (holding "that allegations based on the investigation of counsel are equivalent of allegations based on information and belief" and that "to rule otherwise would elevate form over substance and allow plaintiffs to avoid the Reform Act's mandate merely by cloaking with a license to practice law the information and belief on which the complaint is based"; concluding [*162] that Congress determined in enacting the PSLRA that Federal Rule of Civil Procedure 11, providing that by presenting a pleading to the court an attorney is certifying that he conducted "an inquiry reasonable under the circumstances," was not enough to plead securities fraud) (and cases cited therein); <u>In re Equimed, Inc.</u>, 2000 U.S. Dist. LEXIS 6209, No. 98-CV-5374 NS, 2000 WL 562909, *3-4 (E.D. Pa., May 9, 2000) ("To distinguish between 'information and belief' and 'investigation of counsel' is meaningless; it would permit the clear intent of a statutory mandate."); <u>In re Green Tree Financial Corp. Stock Litigation,</u> 61 F. Supp. 2d 860, 872 (D. Minn. 1999) ("because an attorney is required under Rule 11 of the Federal Rules of Civil Procedure, to investigate claims before filing a complaint, plaintiffs should not be allowed to avoid the heightened pleading standard by claiming 'investigation of counsel'"); <u>Lirette v. Shiva Corp.</u>, 999 F. Supp. 164, 165 (D. Mass., 1998) ("enhanced pleading requirement" applies to pleadings based on "investigation by plaintiffs' counsel"). Because, as noted, this Court views the purpose of the PSLRA to tighten requirements for pleading a viable [*163] securities fraud action to protect companies from unfounded suits, it agrees with these courts that the particularized pleading requirement applies to allegations based on investigation of counsel. It does not, unlike the Ninth Circuit, require that every single fact upon which plaintiffs

beliefs based on allegedly false or misleading statements are based, but it does conclude that Plaintiffs must plead sufficient facts to support such beliefs.

In view of the deficiencies noted above in light of the particular facts of this case, moreover, the temporal proximity of less than a month between the alleged positive misstatements and the two negative disclosures of Compaq's problems, by itself, is not sufficient to raise a strong inference of recklessness or fraudulent intent.

Thus in view of the record and the applicable law as discussed above, the Court grants Compaq's motion to dismiss statements # 3, 7, 13, and 14, as puffery, denies the motion as to the other grounds asserted, but orders Plaintiffs to replead, within twenty days of receipt of this order, sufficient relevant facts in the Kurtzman action in detail to raise a strong inference of scienter with respect to each named Defendant [*164] so as to cure the deficiencies pointed out by the Court.

Amendment will also be necessary to support Plaintiffs' burden of showing actual knowledge to ultimately defeat Compaq's safe harbor defense, if it if found to apply, for the disputed forward-looking statements. Many if not all of the same facts would support both kinds of scienter.

## Allegations of The Turner Complaint

At issue in this action, based on sections 11 and 15 of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. §§ 77k [48] [*165] and 77o [49] respectively, and arising out of the <u>Turner</u> action (H-99-1356 before consolidation), are

---

[48] Title 15 U.S.C. § 77k imposes civil liability for false registration statements and provides,

(a) Persons possessing cause of action; persons liable

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, in any court of competent jurisdiction, sue-

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner . . . .

Under § 77k(f), such individuals are jointly and severally liable.

[49] Section 77o, Section 15 of the 1933 Securities Act, entitled "Liability of controlling persons," provides,

Every person, who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o (West 1997)

To survive a motion to dismiss a claim for controlling person liability under Section 15, a plaintiff must allege (1) an underlying primary violation by the controlled person, (2) control by the defendant over the controlled person, and (3) particularized facts as to the controlling person's culpable participation in (exercising control over) the fraud perpetrated by the controlled person." <u>Ellison v. American Imacie Motor Co.</u>, 36 F. Supp. 2d 628, 637-38 (S.D.N.Y. 1999) (applying same test to 1933 Securities Act Section 15 claims and 1934 Exchange Act Section 20(a) claims, 15 U.S.C. § 78t(a) ("Every person who, directly or indirectly, controls any person liable under any provision of this chapter or rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable")); <u>Sanders Confectionery Products. Inc. v. Heller Financial Inc.</u>, 973 F.2d 474, 486 (6th Cir.

two S-8 Registration Statements, the first filed on September 30, 1998, and the second, on March 17, 1999, both issued in connection with the offering of Compaq common stock to Compaq employees from January 17, 1999 through April 9, 1999.

[*166]  The Amended Class Action Complaint ("the Turner Complaint") (# 51) alleges that Plaintiff Julius Turner ("Plaintiff" or "Turner"), a former Compaq employee, on February 1, 1999 purchased 415.142 shares of Compaq Stock Fund ("the Fund"), which is offered only to Compaq employees, invests primarily in Compaq common stock, and holds assets in cash for liquidity for purchases and sales. The price Turner paid was $ l6.712 per Fund share, for a total of $ 6,938.03. Then on March 29, 1999, Turner purchased .0416 shares of the Fund at a price of $ 11.317 per share, for a total purchase price of $ 4.71, thereby obtaining beneficial ownership of Compaq common stock. The Turner Section 11 Complaint sues only Pfeiffer and Mason individually.

As the basis for his Section 11 claim, Turner asserts that Compaq filed a September Registration Statement with the SEC on September 30, 1998. Under SEC rules, including Item 3 of Form S-8, the September Registration Statement incorporated by reference all documents subsequently filed by Compaq with the SEC. Moreover, Defendants, to comply with Item 9 of Form S-8, had to provide information required by Item 512(a) of Regulation S-K, which includes the obligation [*167]  "to reflect in any prospectus any facts or events arising after the effective date of the registration statement . . . which individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement."

The Turner complaint alleges that on January 27, 1999 Compaq filed a Form 8-K with the SEC, which, as explained above, was incorporated by reference into the September Registration. In it was a press release (Ex. 99 to Form 8-K) announcing Compaq's results for the fourth quarter and full year of 1998 ("January 27 Press Release") that Turner alleges was materially false or misleading when issued because it misrepresented or omitted adverse facts then existing in touting the contribution of synergies from the Digital acquisition in Compaq's financial performance and indicating strong revenue growth and increased service business.

On February 24, 1999, Compaq filed its 1998 Form 10-K with the SEC. Again by the terms of its Form S-8, the 1998 10-K became incorporated by reference into the September Registration Statement. Item 7, Management's Discussions and Analysis of Financial Condition and Results of Operations ("MDA"), stated, "Compaq [*168]  expects the personal computer market to expand in 1999 in line with third-party research organizations' forecasts of unit growth of 15%." Turner charges that this statement was false and misleading based on the same difficulties. So, too, he maintains, was the additional statement in the MDA that "Compaq believes that the Digital acquisition will enhance its operating results when Compaq had earlier implemented policies and programs to reduce rather than expand Digital's sales in 1999.

The complaint further complains that Compaq again failed to disclose all material, facts relating to its business and operations in the March Registration Statement that it filed with the SEC on March 17, 1999.

Finally, according to Turner, on Friday, April 9, 1999, after the market closed, Compaq announced that it expected its first quarter earnings to be fifteen cents a share, less than half the consensus estimate of thirty-one cents a share. On the following Monday the price of Compaq's stock fell $ 6.875 a share, while the analysts highlighted reasons

---

1992), cert. denied, 506 U.S. 1079, 122 L. Ed. 2d 355, 113 S. Ct. 1046 (1993); Metge v. Baehler, 762 F.2d 621. 631 (8th Cir. 1985), cert. denied, 474 U.S. 1057 (1986). Although whether a defendant is a control person is usually a question of fact, dismissal is appropriate where the plaintiff fails to plead any facts from which it can reasonably be inferred that the particular defendant was a control person. Maher v. Durango Metals, Inc., 144 F.3d 1302, 1306 (10th Cir. 1998); Sanders, 973 F.2d at 485-86. Control can be established by demonstrating that the defendant possessed the power to direct or cause the direction of the management and policies of a person through ownership of voting securities, by contract, business relationships, interlocking directors, family relationships, and the power to influence and control the activities of another. Ellison, 36 F. Supp. 2d at 638.

for Compaq's massive shortfall. On April 21, 1999, Compaq announced that its actual first quarter earnings were sixteen cents per share.

Turner [*169] charges Defendants with violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, in the Registration Statements' untrue statements and omission of material facts as well as inadequate disclosures. He further alleges that the individual Defendants are jointly and severally liable because they were control persons of Compaq and culpable participants in violation of Section 15 of the Securities Act, 15 U.S.C. § 77o.

## COMPAQ'S MOTION TO DISMISS TURNER'S AMENDED COMPLAINT

Plaintiff's Section 11 Complaint is brought on behalf of all persons or entities that purchased Compaq stock pursuant or traceable to two S-8 registration statements filed with the SEC on September 30, 1998 (the "September Registration Statement") and March 17, 1999 (the "March Registration Statement"), issued in connection with the offering of Compaq common stock to Compaq's employees during the period from January 27, 1999 through April 9, 1999 (the "Class Period").

With identical arguments to those it made against the Kurtzman Action's consolidated amended complaint, also under Rule 12(b)6) and for failure to satisfy relevant pleading requirements Compaq [*170] moves to dismiss Plaintiff Turner's Amended Class Action

Complaint, # 51, based on Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, against Defendant Compaq and individual Defendants Eckhard Pfeiffer and Earl L. Mason.

Compaq notes that Section II, which inter alia imposes liability on an issuer of securities and persons who sign a registration statement if part of the registration statement, at the time when the registration statement "became effective," [50] "contained an untrue statement of material fact or omitted a material fact required to be stated therein or necessary to make the statements therein not misleading," 15 U.S.C. § 77k(a), is narrower than Section 10(b). Section 11 regulates only the contents of statements contained in the registration statements used by companies to offer stock or other securities, [51] and it does not impose liability based on any other public statements, such as statements to analysts or to the media regarding a company or its securities. An essential element of a Section 11 claim is "that the information allegedly omitted from the prospectus was known to the issuer at the time the [*171] prospectus was distributed." Krim, 989 F.2d at 1445. Like Section 10(b) claims, Section 11 claims are required to be false when made and reliance on hindsight pleading is prohibited. Schoenhaut v. American Sensors, Inc., 986 F. Supp. 785, 790 (S.D.N.Y. 1997).

As with Section 10(b) claims, to be [*172] actionable the registration statement must contain a material misstatement or omission. Cooperman v. Individual Inc., 171 F.3d 43, 46-47 (1st Cir. 1999). The test for materiality is the same as that for Section 10(b). In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1424 (9th Cir. 1994); Halkin v. VeriFone Inc. (In re VeriFone Sec. Litig.), 11 F.3d 865, 868-69; I. Meyer Pincus & Assocs., 936 F.2d at 761.

A key distinction between the two types of claims is that historically Section 11 claims have no required proof of scienter; innocent or negligent misstatements could result in liability. Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983). With the enactment of the PSLRA, however, argues Compaq,

---

[50] Compaq argues that many requirements under the two statutes are the same. Because Section 11 liability attaches only when the registration statement "became effective," the court must examine the statement for truth or falsity at the time it was made, and not with the benefit of hindsight. Glassman v. Computervision Corp., 90 F.3d 617, 628 (1st Cir. 1996); Kaplan v. Rose, 49 F.3d 1363, 1373 (9th Cir. 1994).

[51] The Turner Action complaint asserts that it is brought on behalf of persons who purchased Compaq stock between January 21, 1999 and April 9, 1999 based on the Registration Statements filed on September 30, 1998 and March 17, 1999.

the safe harbor protections, with the three prongs described <u>supra</u>, have been strengthened and have altered liability for forward-looking statements under Section 11. The third prong, 15 U.S.C. § 77z-2(c)(1)(B), that plaintiff must plead facts demonstrating that a forward-looking statement was made with "actual knowledge" that the statement was false when made, adds a scienter requirement [*173] to Section 11 for forward-looking statements. <u>Greebel v. FTP Software, Inc.,</u> 194 F.3d 185, 200 (1st Cir. 1999); <u>In re Advanta Corp. Sec. Litig.,</u> 180 F.3d 525, 535 (3d Cir. 1999). Thus actual knowledge of falsity is now an essential element and Section 11 claims concerning forward-looking statements are scienter-based claims. <u>In re Stratosphere Corp., Sec. Litig.,</u> 1 F. Supp. 2d 1096, 1109 (D. Nev. 1998). Therefore an innocently, negligently, or recklessly false forward-looking statement can no longer be the basis for Section 11 liability. 3 H. Blumenthal, <u>Securities and Federal Corporation Law</u> § 15.22.5 (1999) ("One of the dramatic changes of the [PSLRA] as applied to Section 11 is that defendants are liable as to forward-looking statements only if plaintiffs can prove that they made the statement and had actual knowledge of its falsity. Neither proof of negligence nor recklessness is sufficient for this purpose."). <u>Id.</u> at § 16.26. As the bases of the Turner Action's Section 11 claims, Compaq points to the following three statements, also cited in the Kurtzman complaint, that are in the Registration Statements filed on [*174] September 30, 1998 and on March 17, 1999, and to a fourth statement from the Registration Statements that was not included in the Kurtzman complaint, but is similar to statements in both complaints: [52]

1. Mason's statement in Compaq's January 27, 1999 press release, Def. App., Ex. 1: "The synergies from the Digital acquisition are becoming more and more evident in our financial performance. Sequential revenue growth in products was exceptionally strong and we continue to gain momentum in our service business." Complaint P 19.

2. Pfeiffer's statement, quoted in the same press release: "We continue to see strong demand for Compaq products and services and the opportunity for continued market share gain and revenue growth." Complaint P 21.

3. A statement in Compaq's 1998 Report on Form 10-K: "Compaq expects the personal computer market to expand in 1999 in line with third-party research organization's forecasts of unit growth of 15%." Complaint P 23.

4. A statement in the 1998 Report on Form 10K: "Compaq believes that the Digital acquisition will enhance its operating results." Complaint P 25.

Compaq claims that these statements were false and misleading [*175] for the same reasons given in the Kurtzman Action motion to dismiss: alleged weakening demand in January and February 1999, alleged problems with Compaq's sales distribution model, alleged inability to compete with direct sellers such as Dell, alleged loss of component part supply contracts, alleged undisclosed anticipation of increases in contra-revenues, and alleged problems relating to the acquisition of Digital.

As the first of several independent grounds for dismissal, Compaq first asserts that the Section 11 complaint does not identify any actionable statements because the four [*176] statements it does attack are either puffery (vague statements of optimism and opinion, routinely found to be non-actionable by courts because they are too general and nonspecific) or relate to overall industry trends or are accurate historical representations. Because the Court has rejected this argument as to three of the four statements, based on the Fifth Circuit's standard, in dealing with the Kurtzman amended complaint, it does the same, but summarily, here. The last statement in dispute, which was not included in the Kurtzman complaint, i.e. "Compaq believes that the Digital acquisition will enhance its operating result" (Complaint par. 25), when viewed in context of the total mix of information available, should also not be dismissed pursuant to Rule 12(b)(6).

---

[52] Plaintiffs allege that the statements in both complaints were false and misleading for the same reasons, while Compaq moves to dismiss both complaints for similar reasons. Compaq accordingly incorporates by reference the legal arguments and relevant analysis contained in its motion to dismiss the Kurtzman Action into the Turner action, which merely draws on a small subset of the statements relied on by the Kurtzman complaint.

As a second and independent ground for dismissal of the Turner complaint, Compaq argues that the statements are also not actionable because of Compaq's numerous risk disclosures and warnings about the very problems that Plaintiffs claim were concealed by Compaq from the market. The disclosures were made in Compaq's public SEC Reports on Forms 10-Q and 10-K, documents that were incorporated by reference in the Registration [*177] Statements and which constitute the substance of the Registration Statements, as noted in the motion to dismiss the Kurtzman complaint. For example, Plaintiff Turner alleges that the Registration Statement did not disclose the effect of possible component part supply constraints on Compaq's results (Complaint par. 22(c)), the 1998 Report on Form 10-K disclosed exactly such a possibility ("At times, Compaq has been constrained by parts availability in meeting product orders and future constraints could have an adverse effect on Compaq's operating results."). Def. App., Ex. 4 at 8; see also Third Quarter 1998 Report on Form 10-Q, Def. App., Ex. 3 at 24. Plaintiff charges that Compaq concealed the incomplete integration of Digital into Compaq in two statements in the complaint at paragraphs 19-20. Compaq points to its 1998 Report on Form 10-K, which "was full of specific warnings that the post-merger integration process was not yet complete and about Digital. Def. App., Ex 4. at 18, 24, and 57. Finally, Compaq challenges the fourth statement, "Compaq believes that the Digital acquisition will enhance its operating results" (Complaint at par. 25) as incomplete in that [*178] the sentence concluded, "but as with any significant merger or acquisition, it confronts challenges in . . . synchronizing product road maps and business processes and integrating logistics, marketing, product development, services and manufacturing operations to achieve greater efficiencies." Def. App., Ex. 4 at 23. Moreover, the Report specifically warned that if these challenges were not met, "actual results" could "differ materially from projected results." Id. at 22. In sum, Compaq urges that because the Registration Statements fully disclosed the precise risks underlying Plaintiff's claim, Plaintiff has failed to identify a single material misrepresentation and thus have no viable Section 11 claim.

Moreover, as the third independent ground asserted by Compaq for dismissal of the Turner complaint, the four statements are all forward-looking within the meaning of, and barred by, the "safe harbor" provisions of the PSLRA, 15 U.S.C. § 77z-2 et seq.; they are protected under one or more of the independent prongs of safe harbor, discussed earlier. Compaq further maintains that because of Defendants' detailed cautionary warnings, these forward-looking [*179] statements are additionally protected by the corresponding common law bespeaks caution doctrine. Contrary to Plaintiff's contention that the statements are not subject to the safe harbor because they are in "historical or present tense" (Complaint P 23). Compaq insists the statements are not about the past, but the future. Compaq accuses Plaintiff of arguing both sides; if he structures his claims based on the future, he should be bound by the rules set out for the future. Harris v. IVAX Corp., 998 F. Supp. 1449, 1453 (S.D. Fla. 1998), aff'd, 182 F.3d 799 (11th Cir. 1999) (holding that whether statements are forward-looking for safe harbor purposes should be judged by substance, not by grammatical perspective). Recently the Eleventh Circuit has held that "mixed" statements combining past and future are "forward-looking" and thus protected by the safe harbor. Id. at 799.

Compaq insists that all four statements are protected by one or more prongs of safe harbor. The first 'prong protects a forward-looking statement when it is identified as such and is accompanied by "meaningful cautions." 15 U.S.C. § 77z2(c)(1)(A)(i). The [*180] statements from Compaq's February 23, 1999 Report on Form 10-K that Compaq expected market expansion to be in line with third-party projections of 15% growth in 1999 and the general statement that Compaq "believed" that the Digital acquisitions would enhance operating results fall into this category because the Report stated that it contained forward-looking statements, Def. App., Ex. 4 at 22, and contained meaningful cautions that identified "important factors which could cause actual results to differ materially" from those statements. Such warnings included the possibility of "a drop in worldwide demand for computer products [or] lower than anticipated demand for one or more of Compaq's products," as well as the extensive warning about risks relating to integration and synergies following the Digital acquisition. Id., at 23; IVAX, 182 F.3d 799.

The second prong of the safe harbor states that a forward-looking statement cannot give rise to liability to the extent that it is "immaterial." § 77z-2(c)(1)(A)(ii). Compaq argues that the statements' vague and amorphous and

cautionary warnings accompany them so that as a matter of law they are immaterial, as discussed [*181] supra regarding the Section 10(b) claims in the Kurtzman complaint.

The third prong under § 77z-2(c)(1)(B) of "actual knowledge" by Defendants of the statement's falsity is also not satisfied here, urges Compaq. Compaq challenges Plaintiff for failing to plead any facts demonstrating that any one of the four statements upon which the claims are based was false when made. Indeed, asserts Compaq, Plaintiff fails to plead even conclusorily without support that Defendants had actual knowledge that any particular statement was false when made.

As an independent basis for dismissal because of failure to satisfy pleading requirements under the PSLRA and Rule 9(b), Compaq observes that because all of the challenged statements are forward-looking, they are now scienter-based claims and are actionable under the PSLRA's safe harbor provision only if Plaintiff can show that Defendants made the statements with actual knowledge. In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1109 (D. Nevada 1998) ("for forward-looking statements forming the basis of Plaintiffs' section 11 . . . claims, as well as their Exchange Act claims, Plaintiff must plead facts creating a [*182] strong inference that the Defendants knew that the statements were false or misleading when made."). Compaq insists that the Turner complaint fails to plead facts that give rise to a strong inference of scienter, as required by 15 U.S.C. § 78u-4(b) (2). Instead it makes only conclusory allegations without factual support.


## PLAINTIFF'S RESPONSE

Plaintiff emphasizes that he has not alleged, nor must he allege, any fraudulent conduct by Defendants, but instead relies on the strict liability and negligence standards of Sections 11 and 15 of the Securities Act. Thus pleading requirements are very different and less stringent than for the 10b-5 complaint, and Plaintiff maintains that he has satisfied them.

Specifically, Section 11 permits suit for material misrepresentations and omissions in a Registration Statement. 15 U.S.C. sec. 77k(a) (An action may be brought under Section 11 of the Securities Act if a registration statement filed with the SEC "(1) contained an untrue statement of a material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statements [*183] therein not misleading . . . ."; Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983) (plaintiffs need only show that they purchased securities pursuant to a registered offering and that the registration statement, including the Prospectus and any documents incorporated therein, for that offering contained a material misstatement or omitted a material fact). A Section 11 claim may be brought against the issuer and any officer or director who signed the registration statement. 3B Blumenthal, Securities and Federal Corporate Law sec. 8.10. The purpose of Section 11 was "to assure compliance with the disclosure of provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." Huddleston, 459 U.S. at 381-82. Under Section 11, the issuer of the stock, here Compaq, is strictly liable for any material misrepresentation or omission, and there are no defenses available to Compaq other than that there was no material misrepresentation or omission. 3B Blumenthal, Securities and Federal Corporate Law sec. 8.13. Liability under Section 11 "is virtually [*184] absolute even for innocent mistakes." Huddleston, 459 U.S. at 382. Pleading and proving knowledge or intent are not required. Id.; Alcatel, sl. op. at 27 ("neither scienter, as required under sec. lob, nor any other culpable mental state is necessary for claims made under the Securities Act.") [53] With respect to the individual Defendants, i.e., Pfeiffer and Mason, the Securities Act establishes a negligence standard, not fraud, for liability. Moreover, Defendants have the burden of proving their diligence as an affirmative defense.

---

[53] Compaq objects on the grounds that Alcatel did not consider the effect of the enactment of the safe harbor provision on Section 11 claims based on forward-looking statements.

Plaintiff insists that because he has alleged that Defendants misrepresented and omitted facts regarding conditions at Compaq at the relevant time and has set forth materially false and misleading facts and omissions and the reasons why they are materially false and misleading, [*185] he has stated a prima facie claim under Section 11.

Plaintiff further contends that neither safe harbor nor the bespeaks caution doctrine applies here because the disputed statements misrepresented or omitted then-present adverse facts and were not forward-looking. He further maintains that the vague general disclosures set forth by Defendants were mere boilerplate risks, not tailored to address the challenged statements. He also asserts that under Section 11 he does not have to plead detailed facts to demonstrate "actual knowledge" by Defendants.

As noted, Turner charges that the January 27, 1999 press release and the 1998 10-K (filed on February 24, 1999) were materially false and misleading about Compaq's business as it existed at the time and that Compaq failed to disclose material adverse facts about the company's business and business prospects.

Plaintiff's Section 11 complaint provides the following material adverse facts concerning the impact of Compaq's acquisition of Digital on its financial performance and its existing prospects and opportunities for revenue growth and market share gains to contradict and to demonstrate that the above statements were materially [*186] misleading:

> Soon after its acquisition of [Digital] in 1998, Compaq notified [Digital's] sales force that their compensation program would be changed starting January 1, 1999 and potentially reflect lower compensation terms. As a result, [Digital's] sales force focused the majority of their energy on the sale that would close by December 31, 1998 and ignored potential sales for the first quarter of 1999. (par. 20(a))
> In 1998, Compaq instructed [Digital's] sales personnel to focus on selling Compaq PC's, as opposed to DEC's higher margin Unix-based computers. (par. 20(b))
> Compaq stopped promoting [Digital's] Unix-based computers in its advertising and promotional material. (par. 20(b))
> Compaq was experiencing weakening demand from its corporate customers, primarily in North America and Europe, which accounted for 87% of Compaq's total sales in 1998. (par. 22(a))

> In November 1998, Compaq launched a direct distribution initiative for its "Prosignia" PCs via the Internet. At the same time, Compaq continued to sell PCs through its Valued Added Resellers ("VARs"). Compaq's initiative, named "Direct Plus," did not work against competitors that used only [*187] a direct sales method, because Compaq had higher overhead due to its continued maintenance of its VAR distribution channel. In February 1999, after giving into VARs' demands that Compaq keep direct prices higher than necessary so as not to take sales away from VARs, Compaq suspended the Direct Plus program. (par. 22(b))
> Compaq's multi-channel distribution system of both direct and indirect sales did not work. (par. 22(b))
> Compaq was losing a substantial amount of sales to competitors such as Dell, who were selling directly to customer and implementing innovative sales methods, such as "configured to order " PCs. Compaq tried to develop its own configure to order ("CTO") plan but failed due to Compaq's inability to manage the chain of suppliers for PCs. Compaq lost an agreement with critical component suppliers, such as Western Digital, a supplier of hard disk drives. (par. 22(c))
> Compaq was experiencing decreasing margins as a result of more price protections and concessions that Compaq was paying to its VARs (known as "contra-revenues"). (par. 22(d))

> Due to the announcement of the introduction of the Pentium III processor in early January 1999, Compaq would have [*188] to cut its prices, and incur substantial contra revenues on its inventory of PC's with Pentium II processors when Pentium III PCs became available to the public at the end of February. (par. 22(d))
> Demand for and sales of Compaq's PC's in small and medium-sized businesses, particularly in North America and Europe, which represents more than 40% of Compaq's revenues, had slowed throughout January and February 1999 causing revenues for January and February to decline. (par. 24)

Defendants, moreover, on March 17, 1999, issued the March Registration Statement on March 17, 1999 without any mention of any adverse facts. All these statements were misleading at the time they were made in light of the severe adverse problems it was experiencing. Only when Compaq disclosed on April 9, 1999 that it expected first quarter earnings of fifteen cents, less than half the consensus estimate of thirty-one cents, already reduced in response to partial disclosures at the end of February 1999, was the truth revealed, Turner contends.

Turner notes that the standard for misrepresentation is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor. [*189] Alcatel, sl. op. at 10-11, quoting Trust Co. of La. v. N.N.P., Inc., 104 F.3d 1478, 1490 (5th Cir. 1997), and Laird v. Integrated Resources, Inc., 897 F.2d 826, 832 (5th Cir. 1990). The same considerations apply to the duty to disclose. Id., quoting Laird, 897 F.2d at 832. The duty to disclose information exists when such disclosure is necessary to make defendants' statements, whether mandatory or volunteered, not misleading. First Virginia Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977) (duty to disclose the whole truth arises when a defendant undertakes to speak on a particular subject), cert. denied sub nom. Walter E. Heller & Co. v. First Virginia Bancshares, 435 U.S. 952, 55 L. Ed. 2d 802, 98 S. Ct. 1580 (1978). Moreover, the affirmative duty to disclose is heightened in the context of an offering, as here. Huddleston, 459 U.S. at 381-82; Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976).

A plaintiff's complaint must demonstrate (1) facts describing undisclosed facts in detail and (2) facts showing the problems [*190] arose before the allegedly misleading statements were made. Alcatel, sl. op. at 11, quoting Wenger, 2 F. Supp. at 1240. "Materiality" must be determined by "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976). Turner maintains that Defendants challenged statements which positively refer to Compaq's business and business prospects, but do not reference the specific problems it was experiencing are of the kind to which a reasonable shareholder would attach significance and are therefore material.

Characterizing a statement as mere puffing is a conclusion that, as a matter of law, the statement is immaterial either because it is so vague or so exaggerated that a reasonable investor would not rely on it considering the "total mix" of [available] information. Basic Inc., 485 U.S. at 231. The challenged statements, which Plaintiff argues were made by Defendants without any [*191] reasonable basis in light of existing adverse facts, are not merely vague expressions of general optimism insists Turner, but misstatements of hard current facts.

As for alleged cautionary statements in Defendants' Registration Statements and the documents incorporated into them, Plaintiff insists that Defendants have failed in their burden to show that the cautionary statements are sufficiently tailored to render the misstatements immaterial as a matter of law. Rubinstein, 20 F.3d at 167 ("Cautionary language as such is not per se dispositive of this inquiry"). Berber, sl. op. at 21 ("inclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading"). To be adequate, cautionary statements must directly address the specific subject matter at hand. Trump Casino Sec. Litig., 7 F.3d at 371-72 ("To suffice [to prevent misinformation], the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which plaintiffs challenge."). Pointing to one, "at times, Compaq has been constrained by parts availability [*192] in meeting product orders and future constraints could' have an adverse effect on Compaq's operating results," Plaintiff emphasizes that nowhere does Compaq disclose that Compaq had lost its hard disk drive agreement' with Western Digital and had not replaced the supplier, essential for the "configure to order" program. Generic warnings of theoretical risks, such as that future constraints could have an adverse effect, when an actual problem already existed, are inadequate. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." Huddleston, 640 F.2d 534, 544 (5th Cir. 1981), aff'd in pertinent part, 459 U.S. 375, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983). See also Eckstein v. Balcor Film Investors, 8 F.3d 1121, 1127 (7th Cir. 1993) ("A prospectus stating a risk that such a thing could happen is a far cry from one stating that this had happened. The former does not put an investor on

notice of the latter. [emphasis in original]"); <u>Pommer v. Medtest Corp.</u>, 961 F.2d 620, 624 (7th Cir.1992) ("It is not enough [*193] that the other party must have recognized a risk. Risks are ubiquitous. Disclosures assist investors in determining the magnitude of risks. Even savvy investors may recover when a bald lie understates the gravity of known risk."). Thus general cautionary language fails to excuse a failure to reveal known, material, adverse facts. <u>Rubinstein,</u> 20 F.3d at 171.

Although Defendants warned that the integration of Digital was not yet complete, Plaintiff emphasizes that Defendants failed to warn of the negative effect that the acquisition of Digital was already having on Compaq's financial performance. Turner contends that Compaq's warnings did not address the specific misrepresentations and omissions at issue here and thus were not meaningful and did not render Compaq's misstatements immaterial as a matter of law.

Turner argues that Compaq's challenged statements were not forward-looking, but statements of existing facts and/or beliefs of then expected results, that the cautions Defendants assert are unrelated to Compaq's existing, undisclosed problems, and that Turner does not have to plead that Defendants had actual knowledge of the falsity of their remarks. He maintains [*194] that when an alleged false statement "has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." <u>Shaw,</u> 82 F.3d at 1213; In re APAC Teleservices, Inc. Sec. Litig. , 1999 U.S. Dist. LEXIS 17908, at *22 ("Linking future success to present and past performance does not render statements immune from liability"). As examples of such unprotected statements of existing facts, he quotes the following: "the synergies from the Digital acquisition are becoming more and more evident"; "We continue to see strong demand"; and "Compaq believes that the Digital acquisition will expand operating results . . . ."

Even if the Court finds that these are forward-looking statements protected by safe harbor and/or the bespeaks caution doctrine, Turner contends Defendants have not met their burden to show the cautionary statements were sufficiently tailored to render the misstatements immaterial as a matter of law. <u>Rubinstein,</u> 20 F.3d at 167. Defendants' disclosure in the 1998 Form 10-K that there is a "possibility of a drop in worldwide demand for computer products [or] lower than anticipated demand [*195] for one or more of Compaq's products" does not address misrepresented and omitted facts that have been discussed at length above. <u>In re Prudential Sec., Ltd., Partnership Litig.,</u> 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("the doctrine of bespeaks caution provides no protection to someone who warns his hiking companions to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"); <u>In re Mobile Media Sec. Litig.,</u> 28 F. Supp. 2d 901, 930 (D.N.J. 1998) (bespeaks caution doctrine inapplicable where complaint alleged defendants warned of possible integration difficulties when they were already experiencing such difficulties); <u>In re Apple Computer Sec. Litig.,</u> 886 F.2d 1109, 1115 (9th Cir. 1989) ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems . . ."). The other alleged risks do not address the particular misrepresentations and omissions put into issue by the Turner complaint.

Finally, Turner argues that the PSLRA, while heightening the pleading requirements of the [*196] Exchange Act through Sections 21D(b) (2) and (3), 15 U.S.C. §§ 78u-4(b(2)and (3), did not do so for the Securities Act, 15 U.S.C. § 77z-1. <u>Bates v. United States,</u> 522 U.S. 23, 139 L. Ed. 2d 215, 118 S. Ct. 285 (1997) (Congress did not intend to apply heightened pleading standard to Security Act claims.). [54] Thus Defendants' insistence that Section 27A of the

---

[54] The Court does not agree that <u>Bates</u> applies here. <u>Bates</u> dealt with a criminal statute, the Higher Education Act of 1965, § 490(a), as amended, 20 U.S.C. § 1097(a), which made it a felony to "knowingly and willfully" misapply student loan funds insured under Title IV of the Act. At issue was whether § 1097(a) required an allegation and proof that the defendant specifically intended to injure or defraud someone, i.e., the United States as loan guarantor or another. Because the statute was silent and because the statute in previous forms had never required fraudulent intent, the Court concluded that the specific intent to injure or defraud someone was not an element of the misapplication of funds proscribed by § 109(a). In the instance of the PSLRA, a civil statute, the statutory language is not silent. It is ambiguous as to the

Securities Act, which requires a defendant to have "actual knowledge" of a forward-looking statement's falsity to impose liability, cannot be equated with scienter, which would erroneously import Rule 9(b) pleading requirements into the Securities Act. Because Rule 9(b) applies only to fraud and mistake, notice pleading under Rule 8 ("a short and plain statement of the claim showing the pleader is entitled to relief") is all that is required here. <u>Leatherman v. Tarrant Co. Narcotics Intelligence and Coordination Unit,</u> 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993); <u>Conley,</u> 355 U.S. at 47. For this reason, Turner insists that Defendants' authority, <u>In re Stratosphere,</u> 1 F. Supp. at 1109 (adopting heightened [*197] pleading standard--i.e., facts creating a strong inference that defendants knew the statements were false and misleading when made--for forward-looking statements in Securities Act cases), is wrongly decided.

 [*198]  In sum, argues Turner, his complaint cannot be dismissed under Rule 12(b)(6). Strict liability is the standard applicable to a material misrepresentation in or omission from a Registration Statement; individual Defendants are liable under a negligence standard, subject to an affirmative defense of due diligence at trial.


## COMPAQ'S REPLY

In reply, Compaq contends that many of the core elements of a Section 11 claim, specifically falsity, false-when-made, and materiality, are identical to the essential elements of a Section 10(b) claim. Common grounds for dismissal of both complaints, reiterated here with references to the same cases cited by Compaq in its motion to dismiss, accompanied by brief, are (1) each disputed statement is unactionable puffery; (2) Compaq's numerous, detailed warnings independently render the statements unactionable as a matter of law; and (3) each of the statements is protected under one or more prongs of the statutory safe harbor provision. Moreover, the four statements at issue are forward-looking statements subject to the safe harbor's requirement of actual knowledge; they are not subject to the traditional, pre-PSLRA strict liability and negligence [*199] standards for Section 11 claims. Instead, the addition of the safe harbor's actual knowledge requirement has made Section 11 claims like those asserted here scienter-based and subject to Rule 9(b) pleading requirements.

Defendants insist that the clear warnings and risk disclosures, outlined earlier by Compaq, addressed the precise issues that Plaintiffs argue were concealed from them, i.e., supply shortages, demand shifts and competition, forecasting risk, and product and company integration risks accompanying the Digital merger. They maintain that these warnings remove all basis for Turner's claims for the reasons they discussed. <u>Olkey v. Hyrperion,</u> 98 F.3d at 9 (dismissal under Rule 12(b)(6) is appropriate where "plaintiffs' claims are contradicted by the disclosure of risk" made by defendants).

Compaq characterizes as conclusory and unsupported Turner's claims that the warnings were not of risks, but were realities. Instead Compaq emphasizes that the caution rule (that misstatements or omissions are not actionable if a company has issued substantive cautions about the very factors that were allegedly concealed from the market) is an important safeguard against [*200] groundless and speculative securities litigation. <u>See e.g., In re Worlds of Wonder Sec. Litig.,</u> 35 F.3d 1407, 1415 (9th Cir. 1994) (bespeaks caution doctrine "helps to minimize" chance that plaintiff with largely groundless claim would use threat of burdensome litigation to coerce settlement); <u>In re Stac Elec. Sec. Litig.,</u> 89 F.3d 1399, 1408 (9th Cir. 1996) (same), <u>cert. denied sub nom. Anderson v. Clow,</u> 520 U.S. 1103, 137 L. Ed. 2d 308, 117 S. Ct. 1105 (1997). Compaq suggests that Turner is artificially constructing a securities claim by relying on isolated statements when, if viewed in context, these statements would show that the market was informed of relevant risks. <u>Gasner,</u> 103 F.3d at 358-59; <u>Rapoport v. Asia Elecs. Holding Co.,</u> 88 F. Supp 2d 179, 2000 WL 257147, *79 (S.D.N.Y. 2000) (dismissing Section 11 claim); <u>In re N2K Sec. Litig.,</u> 82 F. Supp. 2d 204 (S.D.N.Y.)(dismissing Section 11 claim), <u>aff'd,</u> 202 F.3d 81 (2d Cir. 2000).

---

scienter required 15 U.S.C. § 78u-4. and the scienter of "actual knowledge" for forward-looking statements is express under 15 U.S.C. § 77z-2.

Compaq argues that Turner must meet a high burden to show that the "risks" warned of were actually existing "realities" to nullify cautions. In [*201] Plaintiff's primary authority, Huddleston v. Herman & MacLean, 640 F.2d 534 (5th Cir. 1981), aff'd in part, rev'd in part, 459 U.S. 375, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983), which characterized a warning that an event might occur when it had already taken place as "deceit." Since deceit by definition is fraud, such a claim must meet Rule 9(b) pleading standards, which Turner's conclusory claims do not come close to satisfying, as discussed previously. Plevy v. Haggerty, 38 F. Supp. 2d 816, 832-33 (C.D. Cal. 1998) (giving effect to detailed cautions despite plaintiffs' conclusory claims that adverse facts were already affecting defendant's business). Compaq observes, "Indeed, if this type of conclusory allegation were sufficient to nullify substantive warnings, no company would be able to protect itself from protracted and costly litigation should it experience a business reverse." Reply (# 64) at 7.

Compaq responds to Plaintiff's attack on specific warnings. First, regarding its statement about continued share gain and revenue growth, Turner asserts that Compaq allegedly misled investors by not disclosing the loss of the disk drive contract with Western Digital. [*202] Compaq points out that there is no dispute that it warned investors about possible and potential impact of the loss of component parts contracts in the 1998 10-K (Def. App. to Section 10(b) complaint, Ex. 6, at 8): "At times, Compaq has been constrained by parts availability in meeting product orders and future constraints could have an effect on Compaq's operating results"; "in the event that a supply of a single-sourced . . . component were delayed or curtailed, Compaq's ability to ship the related product in desired quantities and in a timely manner could be adversely affected." This warning, insists Compaq, would alert any reasonable investor to understand the nature of this specific risk. Although Turner argues that the warning should be ignored because Compaq already lost the contract with Western Digital for disk drives, leaving Compaq unable to build computers for the CTO program, Compaq highlights the fact that Turner has provided only conclusions supported by no facts or details. Plaintiff fails to identify the types of drives, how many drives, the percentage of drives for the CTO program covered by the contract with Western Digital, or indicate when the contract was lost, [*203] who was responsible, whether Compaq could locate an alternative supplier and when, and what would be the effect of the loss of a small program such as CTO on a $ 40 billion company. Turner does not explain how Compaq was able to manufacture three million computers during the first quarter of 1999, a large increase over the comparable period the year before, if the Western Digital contract was so critical to Compaq's overall performance. Thus Turner's lack of facts precludes establishing an inference of materiality or the risk of an adverse impact, "a reality." Compaq insists this deficiency does not warrant setting aside of the detailed warning and the policies behind such warnings.

Safe harbor, by protecting forward-looking statements, provides access of investors to management's predictions about a company's futures by protecting companies and executives from liability if events do not turn out as predicted. The arguments in Compaq's reply to the 10(b) complaint apply here to the Section 11 complaint, Compaq maintains. Only where plaintiffs demonstrate that a warning was intended not as a caution, but as an actual act of deceit, is the presumption of protection lost. Huddleston, 640 F.2d at 534; [*204] H.R. Conf. Rep. No. 104-369 at 44 (1995) (plaintiff must plead facts giving rise to strong inference that cautionary statements were misleading in order to survive motion to dismiss).

Moreover, the application of safe harbor here has two consequences that are independently fatal to the Section 11 claims. First, by its express terms, it requires dismissal unless the person making the forward-looking statements had "actual knowledge" of the falsity of the statements. Ehlert v. Singer, 85 F. Supp 2d 1269, 1999 WL 1427735, *6 (M.D. Fla. Dec. 16, 1999) (dismissing Section 11 because plaintiffs failed to plead adequately actual knowledge of the falsity). Here Turner concedes he has not pled actual knowledge. Pl.'s memorandum in opposition (# 59) at 21 & n.l0 (arguing that the allegations have "sufficient breadth to establish that defendants had no reasonable basis for their statements" and that the complaint "need not plead knowledge or intent."). Compaq has already noted that the Section 11 complaint systematically removes allegations of knowledge from parallel paragraphs of the Section 10(b) complaint. Second, safe harbor also altered the nature of section 11 claims based on forward-looking [*205]

statements like the ones here; because "actual knowledge" of falsity is required, the Section 11 claims require that the speaker have a certain state of mind at the time the statements are made, so they are no longer based on strict liability or negligence, but require a showing of scienter. Thus Rule 9(b) pleading standards must be applied.

To dispute Turner's contention that certain heightened pleading standards which the PSLRA applied to Exchange Act claims were not included in its amendments to the Securities Act, Compaq points out that Turner failed to address all the authority (e.g., Stratosphere and Ehlert) cited by Compaq concluding that the safe harbor's actual knowledge requirement transformed Section 11 actions based on forward-looking statements into scienter-based claims subject to Rule 9(b) standards. Plaintiff even cites H. Blumenthal, Securities and Federal Corporation Law, for the proposition that Section 11 imposes an absolute liability standard, but he ignores the treatise's explicit discussion of the effect of safe harbor on Section 11 claims based on forward-looking statements in transforming them into scienter-based claims. Moreover, contrary to Turner's [*206] conclusory assertion that actual knowledge is not equivalent to scienter, two courts of appeal have stated that the safe harbor's "actual knowledge of falsity" standard is a more stringent scienter standard than that governing Section 10(b) claims. Greebel, 194 F.3d at 201; Bryant, 187 F.3d at 1284. Compaq has previously shown how each of the contested statements is insufficient under Fifth Circuit law applying Rule 9(b). Thus this inadequacy is an independent ground for dismissal.

Even if the Court should find that the four statements are not forward-looking and therefore not protected by safe harbor and also do not sound in fraud, nevertheless Plaintiff's allegations fail as a matter of law because Section 11 liability attaches only if the statement was false or misleading at the time the registration statement "became effective." Thus an essential element of a Section 11 claim is "that the information allegedly omitted from the prospectus was known to the issuer at the time the prospectus was distributed." Krim, 989 F.2d at 1445. Compaq insists that Turner, with his merely conclusory allegations, does not even come close to refuting [*207] Compaq's showing that even under Rule 8(a) standards traditionally applied in Section 11 actions, Turner is required to plead contemporaneous facts showing that each statement was false at the time it was made. For instance, although Turner attacks Mason's statement in the January 27, 1999 press release that Compaq continued to "gain momentum in [its] service business," his complaint does not mention Compaq's service business, no less any facts that even suggest declining performance in that service business, and no facts indicating the statement was false when made. Turner also challenges the statement made the next month that Compaq believed that industry growth would be in line with third-party research organizations' projections of 15% unit growth. Yet Turner provides no foundation for asserting that the statement was false at the time it was made, and, according to Compaq, the statement turned out to be correct. Def. App. (Sec. 10(b) complaint, Vol I, Exs. 22-27. Thus conclusory allegations are another independent ground for dismissal of the Turner complaint.


## COURT'S RULING

Although Turner has argued otherwise, the Fifth Circuit, in dealing with a claim under [*208] section 11 of the Securities Act of 1933 that was grounded in fraud rather than negligence, like that in the Turner complaint, has held that Rule 9(b) pleading-with-particularity requirements apply. Melder v. Morris, 27 F.3d 1097, 1100. & n.6 (5th Cir. 1994), citing Shushany, 992 F.2d at 520 and 521 . In accord Shapiro v. UJB Fin. Corp., 964 F.2d 272, 287-89 (3d Cir.), cert. denied, 506 U.S. 934, 121 L. Ed. 2d 278, 113 S. Ct. 365 (1992); Sears v. Likens, 912 F.2d 889, 892-93 (7th Cir. 1990). Thus for a section 11 claim, Plaintiffs must at least plead specific time, place and contents of the false representation and the identity of the person making the misrepresentation, as well as what the person obtained thereby. Melder, 27 F.3d at 1100. Regarding pleading of scienter, a plaintiff must allege that defendants acted with at least severe recklessness. Id. at 1102. The Fifth Circuit has concluded that although Rule 9(b) allows scienter to be "averred generally," conclusory or boilerplate allegations of fraudulent intent or conspiracy to commit securities fraud to inflate the price [*209] of the company's common stock to increase executives' compensation are not sufficient because such an allegation would effectively encompass nearly all corporate officials; rather plaintiff must set out facts sufficient to give rise to a proper inference of scienter, of conscious behavior. Id., citing

Tuchman, 14 F.3d at 1068-69. With a possible exception of asserting that corporate defendants personally profited from inflated stock values, "the lone allegation of motive is insufficient." Id. at 1102. While pleading of an apparent motive that withstands scrutiny, such as reaping profits from insider trading, other less obvious fraudulent intent requires the plaintiff to pleading scienter by identifying circumstances implying fraudulent intent. Id. at 1104. Thus while the Court finds that Turner has met the standard as to most of the Defendants, he has not with respect to Pfeiffer. To satisfy Rule 9(b), Turner needs to amend at least regarding Pfeiffer, to allege more specific facts giving rise to an inference of severe recklessness.

After reviewing the law, this Court further agrees with Compaq that although the Securities Act of [*210] 1933 does not contain a scienter requirement, Huddleston, 459 U.S. at 382, to defeat a safe harbor under the PSLRA, 15 U.S.C. § 77z-2(c)(1)(B) and § 78u5(c)(1)(B)(i), for section 11 claims requires Turner to plead and prove an even higher standard, i.e., that the defendant's forward-looking statements were made with "actual knowledge" that they were false and misleading. Greebel, 194 F.3d at 200; Advanta, 180 F.3d at 535; In re Stratosphere, 1 F. Supp. at 1109; Yates v. Newell Rubbermaid Inc. (In re Newell Rubbermaid Sec. Litig.),2000 U.S. Dist. LEXIS 15190, No. 99 C 6853, 2000 WL 1474412, *9 (N.D. Ill. Oct. 4, 2000); In re Prison Realty Securities Litigation, 117 F. Supp. 2d 681, 2000 WL 1202063 (2000); Ehlert v. Singer, 85 F. Supp. 2d 1269, 1274 (M.D. Fla. 1999). The Court has already found that three of the statements at issue here are forward looking under the broad statutory definition and finds that additional fourth to be also. As the Court indicated with regard to the section 10(b) and Rule 10b-5 claims, sufficient additional information needs to be pled by Plaintiff to support the [*211] more demanding standard of actual knowledge to defeat Compaq's safe harbor defense, if it is established.

Otherwise, a person who purchased a security issued pursuant to a registration statement to assert a violation of section 11 "need only demonstrate a material misstatement or omission to establish [a] prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983). Turner has alleged misstatements that would have been material to any investor.

As for Compaq's arguments regarding purpotedly unactionable statements, the same conclusions that the Court applied to the Kurtzman complaint are applicable here for puffery and forward-looking statements of predictive "soft information" [55] under the Securities Act of 1933 or the bespeaks caution doctrine

[*212] **PLAINTIFFS' REQUEST FOR LEAVE TO AMENDED**

Plaintiffs have asked the Court to allow them to amend if it concludes that dismissal of the complaints is appropriate.

"Leave to amend shall be freely given when justice so requires." Fed. R. of Civ. P. 15(a). Such leave, nevertheless, is not automatic. Wimm v. Jack Eckerd Corp., 3 F.3d 137, 139 (5th Cir. 1993). The trial court has discretion in deciding whether to grant such leave and can consider factors "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment." Id., citing Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962).

Because there is such disparity among courts as to the pleading requirements and until now, Plaintiffs could not have known this Court's standard, because it appears from the information that Plaintiffs have allegedly gleaned that they should be able to satisfy the pleading standard laid out in this memorandum and order, because they have not

---

[55] "Soft information" refers to "statements of subjective analysis or extrapolations, such as opinions, motives, intentions or forward-looking statements such as projections, estimates, and forecasts." Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 642 (3d Cir. 1989).

demonstrated lack [*213] of diligence, and because they have not been given the opportunity to replead, the Court grants their request for leave to amend.

**ORDER**

As indicated above, the Court

ORDERS that Compaq's motion to dismiss statements # 3, 7, 13, and 14 in the Kurtzman complaint as puffery is GRANTED but the motion as to the other statements and grounds asserted is DENIED without prejudice to subsequent reurging, if appropriate. The Court further

ORDERS that the Kurtzman Plaintiffs shall replead, within twenty days of receipt of this order, sufficient relevant facts in the Kurtzman action in detail to show how, by what and when Defendants became conscious of Compaq's alleged deteriorating business status so as to support a strong inference of scienter with respect to each named Defendant to cure the deficiencies pointed out by the Court.

Furthermore, the Court

ORDERS that Compaq's motion to dismiss the Turner complaint is currently denied without prejudice to reurging subseqently, Meanwhile, Turner shall replead within twenty days of this order sufficient facts to support a claim that Compaq's statements were made with actual knowledge of their falsity.

**SIGNED** at Houston, Texas, this [*214] 12th day of December, 2000.

MELINDA HARMON

UNITED STATES DISTRICT JUDGE

# McCasland v. FormFactor Inc.

United States District Court for the Northern District of California

July 25, 2008, Decided; July 25, 2008, Filed

No. C 07-5545 SI

**Reporter**

2008 U.S. Dist. LEXIS 60544 *; Fed. Sec. L. Rep. (CCH) P94,789

DANNY McCASLAND, individually and on behalf of all others similarly situated, Plaintiff, v. FORMFACTOR INC., et al., Defendants.

**Subsequent History:** Motion granted by, Complaint dismissed at, Motion to strike denied by, Request granted, in part, Request denied by, in part McCasland v. FormFactor Inc., 2009 U.S. Dist. LEXIS 59996 (N.D. Cal., July 14, 2009)

**Counsel:** [*1] For Danny McCasland, Individually and On Behalf of All Others Similarly Situated, Plaintiff: Shawn A. Williams, LEAD ATTORNEY, Jeffrey W. Lawrence, Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA; Alan R Plutzik, Bramson, Plutzik, Mahler & Birkhaeuser, LLP, Walnut Creek, CA; Catherine J Kowalewski, Lerach Coughlin et al LLP, San Diego , CA; Darren Jay Robbins, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA; David C. Walton, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA.

For Yuk Ling Lui, Plaintiff: Arthur L. Shingler, III, Scott + Scott, LLC, San Diego, CA.

For City of Monroe Employees' Retirement System, LEAD PLAINTIFF, Plaintiff: Darren Jay Robbins, Ramzi Abadou, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA; Shirley H. Huang, Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA.

For Formfactor, Inc., Igor Y. Khandros, Ronald C. Foster, Richard M. Freeman, Defendants: Robert P. Varian, LEAD ATTORNEY, Orrick Herrington & Sutcliffe LLP, San Francisco, CA.

For Joseph P. Bronson, Defendant: Robert P. Varian, Orrick Herrington & Sutcliffe LLP, San Francisco, CA.

**Judges:** SUSAN ILLSTON, United States District Judge.

**Opinion by:** SUSAN ILLSTON

# Opinion

**ORDER GRANTING** [*2] **DEFENDANTS' MOTIONS TO DISMISS WITH LEAVE TO AMEND**

On July 25, 2008, the Court heard argument on defendants' motions to dismiss plaintiffs' fist amended complaint. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS defendants' motions, with leave to amend, for the reasons set out below.

**BACKGROUND**

This is a securities class action against FormFactor, Inc. and certain of its officers [1] under Rule 10b-5 and §§ 10(b) and 20(a) of the Securities Exchange Act of 1935 ("Exchange Act"). Lead plaintiff, the City of Monroe Employees' Retirement System, brings suit on behalf of all those who purchased or otherwise acquired the common stock of FormFactor between February 1, 2006 and February 5, 2008 ("class period").

FormFactor is a publicly traded company headquartered in Livermore, California that designs, manufactures and sells advanced wafer probe cards, which its [*3] customers -- dynamic random access memory (DRAM), flash and microprocessor manufacturers -- use to electrically test integrated circuits for semiconductor chips in the front end of the manufacturing process.

In April 2005, FormFactor introduced its new "Harmony" architecture for wafer probe cards, designed to reduce to one the "touchdowns," or numbers of times the card touched the chip while testing its functionality, thereby minimizing the risk of the card damaging the chip at contact. FormFactor intended Harmony to differentiate it from its competition. Thus, it was not only critical that FormFactor be able to actually deliver and execute Harmony's single-touchdown technology, but also that it be the first in the industry to market with such technology. The market reacted well to FormFactor's representations about Harmony's single-touchdown technology and its potential both for FormFactor's future revenue and for reshaping the integrated circuit test industry. Accordingly, during the period of April 19, 2005 to February 1, 2006, FormFactor's stock price rose 68%, climbing from $ 20.83 per share to $ 30.46.

On February 1, 2006, the first day of the class period, Bronson, Khandros and [*4] Foster held a conference call with securities analysts in which Foster stated:

> We have completed our first Harmony architecture probe card field trial, which began with an early adopter in the second half of '05. Product performance exceeded expectations. We expect to see significant revenues for our probe card based on Harmony platform in the second half of '06, with everything centered around 300 millimeter. Harmony will be the cornerstone of flash and then DRAM for the next several years.

Complaint P 6, 85. Foster further represented, "All production processes are now fully functioning in our new facility, [2] with output and yields improving steadily" and "[FormFactor is] planning to have [Harmony NAND Flash] in place for volume production in the second half of '06." *Id.* P 7, 86, 88. Upon this news, FormFactor's stock rose 21% in one day, from $ 30.46 per share to $ 36.95.

Plaintiffs' complaint alleges that defendants' February 1, 2006 representations were materially false and misleading, and [*5] that defendants knew the representations to be materially false and misleading at the time. Further, according to the complaint, defendants continued throughout the class period to issue similarly materially false and misleading statements in press releases and conference calls with security analysts -- known by defendants to be materially false and misleading when issued -- regarding FormFactor's business, operating and financial results, including representing that Harmony remained on track to be the industry's leading, single-touchdown wafer probe card. Plaintiffs contend that FormFactor struggled throughout the class period to effectively or efficiently manufacture its Harmony products, but issued these statements and engaged in an assortment of fraudulent schemes to represent otherwise to the market. [3] According to the complaint, defendants' materially false and misleading

---

[1] The FormFactor officers named in the complaint include Igor Y. Khandros, CEO; Richard M. Freeman, Senior Vice President, Operations; Ronald C. Foster, CFO until his February 25, 2008 resignation; and Joseph Bronson, President until his January 5, 2007 resignation (collectively, "defendants").

[2] By early 2006, FormFactor moved into a new manufacturing facility in Livermore, California, which was aimed to increase factory productivity, yields and on-time deliveries. *See* complaint P 5.

[3] Plaintiffs base many of the allegations in the complaint on the personal knowledge and statements of nine confidential witnesses (CWs) who worked at FormFactor during parts or all of the class period in various capacities related to production, operations, manufacturing,

statements and information that FormFactor made publicly available about its financial and business prospects caused its stock to trade at artificially inflated prices during the class period, including a high of $ 49.45 per share on August 31, 2006. [4] Lead plaintiff and others similarly situated who purchased [*6] common stock at these prices relied on defendants' statements and were damaged thereby.

Plaintiffs' complaint alleges that, despite defendants' representations to the contrary, defendants knew but concealed from the investing public that they had "no reasonable basis for representing that [FormFactor's] production processes were fully functioning, with output and yields improving steadily," or that FormFactor would be able to produce Harmony probe cards "as promised." *Id.* P 89(a). Plaintiffs further contend that defendants knew but failed to disclose publicly that, throughout the class period, FormFactor faced production constraints, namely [*7] chronic poor yields, [5] that impeded the actual production of Harmony products, including "FormFactor's ability to bring new products into volume production efficiently and in a timely manner," *Id.*; increased FormFactor's costs and expenses; caused delay in customer shipments; [6] and created a risk that customers would seek alternative sources from competitors or endeavor to renegotiate existing contracts with FormFactor.

FormFactor's pervasive poor yields led to the build-up of "scrap," or obsolete parts for wafer probe cards, which plaintiffs allege that defendants covered up through the "practice of overstating inventory and improperly classifying" the scrap as a research and development (R&D) cost rather than as a cost of revenues, [7] "thereby not disclosing FormFactor's actual financial performance and true operating margins." [8] *Id.* P 89(b). Defendants' accounting manipulations and violations of generally accepted accounting principles ("GAAP") both helped to conceal FormFactor's undisclosed production constraints and improperly manage FormFactor's earnings and reported financials so as to meet security analysts' expectations and create the image of FormFactor as engaging in extensive R&D to maintain its technical competitive edge in the industry. [9] As a result, FormFactor falsely reported its results for 2006 and the first half of 2007, including misstating reporting inventory, gross margin, operating margin and net income. FormFactor has since "restated its previously issued financial results due to these accounting [*9] violations" and is presently "in the process of completing its remediation plan to address the design of controls over inventory valuation." *Id.* 1112.

As FormFactor experienced protracted but publicly undisclosed problems with ramping its Harmony products, plaintiffs allege that "defendants took advantage of the inflated stock price to unload their stock." *Id.* P 13. The complaint contends that defendants' "illicit insider trading" consisted of Bronson selling 25,000 shares, or 36.83% of his holdings, for more than $ 1 million in proceeds; Foster selling 19,800 shares, or 87.29% of his holdings, of $

---

engineering, project management, accounting and financial analysis, and information technology. The information provided by the CWs is discussed in further detail below.

[4] On August 31, 2006, FormFactor introduced the Harmony OneTouch probe card for the 300- mm Flash memory product.

[5] Plaintiffs allege that although, throughout the class period, defendants attributed FormFactor's manufacturing constraints to capacity, customer integration or personnel issues, defendants knew but never disclosed to the public that the principal problem was systematic and chronic poor yields in the manufacturing process.

[6] Plaintiffs allege that though defendants assured the market of accelerated Harmony production, FormFactor shipped out merely 20% of Harmony orders on time during the class period. In December 2007, as a result the delays, Elpida Memory, Inc. ("Elpida"), FormFactor's main client in Japan, began considering alternative wafer probe cards from competitor Advantest Corp., which at that juncture, introduced a new DRAM probe card that was technologically [*8] competitive with Harmony, according to analysts reports. *See* complaint PP 19, 53-58.

[7] As the R&D group performed limited, if any testing on the scrap inventory, it did not qualify as an R&D cost and should not have been written off as such, plaintiffs contend.

[8] Specifically, defendants' fraudulent accounting practices caused the understatement of the cost of revenues and the overstatement of gross margin, plaintiffs' complaint alleges.

[9] In part, FormFactor's inadequate internal controls over inventory systems permitted defendants to engage in this practice, according to the complaint.

864,144 in proceeds; and Khandros selling 723,079 shares, or 23.91% of his holdings, for $ [*10] 27.86 million in proceeds. [10]

On October 24, 2007, FormFactor announced possible adjustments to inventory valuations for periods prior to the third quarter of 2007. In a conference call with security analysts on the same day, defendants disclosed for the first time that Harmony production was behind schedule, but attributed the delay to "capacity constraints," *Id.* P 15, and represented that demand remained strong, without referencing FormFactor' s underlying poor yields, plaintiffs contend. FormFactor' s stock declined $ 7.70 per share in one day of trading, dropping nearly 20% from $ 43.24 per share to close at $ 35.54. On November 11, 2007, FormFactor filed amended Forms 10-K and 10-Q and restated its financials for the fiscal year of 2006 and the first two quarters of 2007. [11] Its restated Form 10-K represented that FormFactor "did not maintain effective controls over the valuation of inventory and the related cost of revenues accounts . . . [and] did not maintain effective controls to ensure that the estimation [*11] process to value inventory complied with [FormFactor's] accounting policies." *Id.* P 18.

On February 5, 2008, in announcing its fiscal year of 2007 and fourth quarter of 2007 financial results, FormFactor disclosed what plaintiffs' complaint alleges defendants had known throughout the class period, namely that FormFactor had "severe operations issues in ramping up the production of Harmony, and was therefore unable to ship Harmony to customers, causing a decline in revenue and bookings." *Id.* P 20. In a conference call held by Khandros, Bronson and Foster with security analysts, Khandros stated,

> [O]ur new product ramp challenges with Harmony resulted in missed opportunities with a few customers causing the majority of the overall revenue shortfall in the [fourth] quarter [of 2007]. . . . Due to the protracted Harmony ramp issues we experienced in 2007, FormFactor was [*12] not the first full wafer contractor probe card company qualified at some DRAM suppliers. This resulted in the loss of business in the fourth quarter . .

*Id.* P 20, 161. As a result of lost DRAM market share "driven by DRAM industry weakness and Harmony DRAM production issues," FormFactor also announced a "bleak outlook for 2008." *Id.* P 20. FormFactor's stock dropped 11% on February 5, 2008 and another 9% on the following day, closing at $ 21.06 per share. The stock has traded in the vicinity of $ 20.00 per share since then.

Plaintiffs filed a complaint against defendants in this Court for violations of federal securities laws on October 31, 2007, subsequently amending the complaint on April 3, 2008. Now before the Court are defendants' motions ' a motion filed by defendants collectively and a separate motion filed by Freeman ' to dismiss plaintiffs' first amended complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA") on the grounds that the complaint fails to state a claim and fails to comply with Rule 9(b) and the PSLRA.

## LEGAL STANDARDS

### I. Rule 12(b)(6)

---

[10] Defendants were also rewarded with stock options during the class period: Khandros, 231,540 shares of stock options; Bronson, 94,220; Foster, 115,580; and Freeman, 85,000.

[11] In its restatement, FormFactor represented that it "did not consistently follow its accounting policies for valuing inventory resulting in material misstatement of inventory and cost of revenue," causing a material overstatement of inventory, cost of revenues, gross margin, net income and earnings per share. Complaint P 17.

Under Federal Rule of Civil Procedure 12(b)(6), [*13] a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir. 1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *See United States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir. 1981). Dismissing a complaint for failure to state a claim is proper only "if it appears beyond doubt" that the plaintiff "can prove no set of facts which would entitle him to relief." *Vazquez v. Los Angeles County,* 487 F.3d 1246, 1249 (9th Cir. 2007) (internal quotation marks omitted).

If the Court dismisses the complaint, [*14] it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## II. Section 10(b) and Rule 10b -5

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b- 5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course [*15] of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim under § 10(b) and Rule 10b-5, the plaintiff must allege (1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff justifiably relied (5) that proximately caused the alleged loss. *See Binder v. Gillespie,* 184 F.3d 1059, 1063 (9th Cir. 1999). Generally, plaintiffs in federal court are required to give a short, plain statement of the claim sufficient to put the defendants on notice. Federal Rules of Civil Procedure also require that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

## %III. Private Securities Litigation Reform Act (PSLRA)

The PSLRA was enacted as an amendment to the Exchange Act. *See In re Silicon Graphics Inc. Sec. Litig.* , 183 F.3d 970, 973 n.2 (9th Cir. 1999). Under the PSLRA:

In any private action arising under his chapter under which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each [*16] act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2).

The required state of mind is "at a minimum, deliberate recklessness." *In re Silicon Graphics,* 183 F.3 at 983. Scienter may be pled and proven by reference to circumstantial evidence. *See In re Peoplesoft Sec. Litig.,* No. C 99-0472, 2000 U.S. Dist. LEXIS 10953 at *9 (May 26, 2000). However, when pleading on information and belief, a plaintiff must plead with "particularity" by "provid[ing] all facts forming the basis for [plaintiff's] belief in great detail." *In re Silicon Graphics,* 183 F.3d at 983; *see also* 15 U.S.C. § 78u-4(b)(1). This inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L. Ed. 2d 179 (2007). "More than merely reasonable or permissible," the inference of scienter "must be cogent and compelling, thus strong in light of other explanations," *Id.* (internal quotation marks omitted). Therefore, the PSLRA has strengthened the pleading requirements [*17] of Federal Rule of Civil Procedure 9(b).

## IV. Rule 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[l]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Federal securities fraud claims, like common law fraud claims, are subject to the special pleading requirements of Rule 9(b). *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985).

Rule 9(b) requires particularity in pleading the circumstances constituting fraud. This circuit has interpreted this requirement to mean that allegations of fraud must be specific enough to give defendants notice of "the particular misconduct which is alleged to constitute the fraud." *See id.* In the securities context, a plaintiff may aver scienter generally, but must state the "time, place, and content" of the alleged misrepresentations, and "an explanation as to why the statement or omission complained of was false or misleading." *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541,1547-48 (9th Cir. 1994)(en banc) (remanded to *In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591 (9th Cir. 1995).

## V. [*18] Controlling person liability

Under Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

## VI. Request for judicial notice

Generally, when considering a motion to dismiss, a district court must consider only the facts stated in the plaintiffs' complaint, or in documents attached to the complaint as exhibits or incorporated into the complaint by reference. *See Branch v. Tunnell,* 14 F.3d 449, 453-54 (9th. Cir. 1994). Under certain circumstances, the court may also consider matters that are appropriate subjects of judicial notice under Fed. R. Evid. 201. *See Kramer v. Time Warner,* 937 F.2d 767, 773 (2d Cir. 1991). While the general rule is that "[m] atters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss," in a securities action a court may [*19] also consider documents that the defendant has attached to its motion to dismiss either as exhibits or accompanied by a request for judicial notice. *Weiner v. Klais and Co., Inc.,* 108 F.3d 86, 88-89 (6th Cir. 1997). "In a securities fraud action, the court may take judicial notice of public records outside the pleadings, including SEC filings." *In re Nuko Information Sys., Inc. Sec. Litig.,* 199 F.R.D. 338, 341 (N.D. Cal. 2000) (citing *In re Silicon Graphics,* 183 F.3d at 986 and *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986)).

# DISCUSSION

12

## I. Motion to dismiss section 10(b) and Rule 10b -5 claims

### A. Fraud by hindsight

Defendants contend that the complaint should be dismissed outright because it amounts to an impermissible attempt to plead fraud by hindsight and seeks to contravene the PSLRA by "seiz[ing] [*20] upon a stock decline, and us[ing] the 20/20 vision of hindsight to reverse-engineer an unsupported attempt to exploit this decline." Def.'s Motion at 6. "Congress enacted the PSLRA to put an end to the practice of pleading fraud by hindsight." *Silicon Graphics,* 183 F.3d at 988 (internal quotations marks omitted); *see also In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1549 (9th Cir. 1994) ("The fact that an allegedly fraudulent statement and a later statement are different does not necessarily amount to an explanation as to why the earlier statement was false. . . . [P]laintiff must set forth facts explaining why the difference between the earlier and the later statements is . . . the result of a falsehood."). Here, the complaint does not merit outright dismissal for pleading fraud by hindsight because it does not merely point out the differences between defendants' earlier, purportedly fraudulent statements and later statements. Instead, in an effort to explain why the earlier statements were false at the time they were made, the complaint uses the statements of nine CWs regarding the conditions at FormFactor at the time of defendants' alleged misstatements. Whether those [*21] descriptions, and the complaint generally, contain sufficient particularity and corroborating details under applicable pleading standards is addressed below.

### B. Pleading for mat

Defendants correctly argue that, rather than pleading particular facts showing how and why individual statements were false and fraudulent at the time they were made, the complaint employs an impenetrable "puzzle-pleading" structure that lists an "undifferentiated mass of public statements" from throughout the class period, follows each set of statements with the "same blanket paragraph" to assert falsity and fraudulence and seldom refers with specificity to the individual defendants. Def's Motion at 7-8. Indeed, the complaint is overly long (107 pages), challenging to follow because of its hodgepodge style and "often rambles through long stretches of material quoted from defendants' public statements (many of which seem innocuous enough even by plaintiffs' recounting) unpunctuated by any specific reasons for falsity - which, indeed, prove difficult to locate in the surrounding area." *GlenFed,* 42 F.3d at 1553-54 (internal quotation marks omitted). As the *GlenFed* court noted,

> This is, at the very least, poor draftsmanship. [*22] It is impossible to overlook the fact that the organization of the complaint often makes the nature of the fraud difficult to divine, and certainly makes the complaint difficult to respond to. . . . To say that the drafting is infelicitous puts matters too kindly. The complaint is cumbersome almost to the point of abusiveness. . . .

*Id.* In remanding the case, the *GlenFed* court suggested that the district court should require, "as a matter of prudent case management, that plaintiffs streamline and reorganize the complaint before allowing it to serve as the

---

12 As defendants do not contest plaintiffs' allegations regarding the reliance and causation elements of plaintiffs' Rule 10b-5 & § 10(b) claims, this order will not address them. This order addresses the other requisite elements of plaintiffs' claims, namely whether the complaint adequately pleads misrepresentations or omissions of material fact(s) made with scienter.

2008 U.S. Dist. LEXIS 60544, *22

document controlling discovery, or, indeed, before requiring defendants to file an answer." *Id.* As in *GlenFed,* the complaint here contravenes applicable pleading standards by juxtaposing the same series of generic conclusions against each set of block quotes, without differentiation or specificity. [13] To conform with Rule 9(b) and the PSLRA, this circuit has found that plaintiffs must state "with particularity" facts giving rise to "a strong inference of, at a minimum, deliberate or conscious recklessness," *Silicon Graphics,* 183 F.3d at 979, and in pleading falsity, plaintiffs must "aver with particularity the circumstances constituting [*23] the fraud," *GlenFed, Inc.,* 42 F.3d at 1545 (9th Cir.1993). *See also In Apple Computer, Inc.,* 127 Fed. Appx. 296, 303 (9th Cir. 2005) (rejecting the concept of "collective scienter" and holding that a corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time of the statement); *In re Syncor Intern. Corp. Secur. Litig.,* 327 F.Supp.2d 1149, 1171-1172 (C.D. Cal. 2004) ("An assumption of scienter because of a defendant's position does not plead facts in great detail, nor create a strong inference of deliberate recklessness. As such, the individual defendants cannot be liable for the false statements found in the complaint on a group- pleading theory."). Accordingly, for each allegedly false or misleading statement, plaintiffs must specify the statement, describe the circumstances under which it occurred, identify the person making the statement, state why the statement was false when made, and plead facts that give rise to a strong inference of recklessness and strongly suggest scienter. [14]

### C. Confidential witnesses (CWs)

The parties dispute whether plaintiffs have met the Ninth Circuit's standard for the sufficiency and reliability of the CWs, whose observations form the core of plaintiffs' complaint. Defendants contend that none of the CWs is alleged to have been in a position to provide reliable [*25] information, and the information attributed to them is of no consequence because none of them interacted with the individual defendants. [15] The *Silicon Graphics* court held that plaintiffs may rely on anonymous sources for information, so long as they plead substantial, material specific facts and corroborating details when, as here, allegations are based on non-public information. *Silicon Graphics,* 183 F.3d at 985; *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1233 (9th Cir. 2004) (holding it unnecessary to name sources provided that the sources are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" and the complaint contains "adequate corroborating details.") (citations and internal quotation marks omitted); *In re Secure Computing Corp. Sec. Litig.,* 120 F. Supp. 2d 810, 817 (N.D. Cal. 2000) (holding that plaintiffs must reveal all facts about confidential witnesses material to the formation of the belief that the witnesses' statements are accurate).

Here, plaintiffs provide a large degree of detail in describing the CWs on which they rely. For each of the nine CWs, the complaint endeavors to document the years of employment, the job title, the person to whom the individual CW reported, a description of duties, and the specific, personal knowledge of the CW that is pertinent to

---

[13] For example, the complaint's block-quote conclusions include, "The statements . . [*24] . were false and misleading, and defendants knew that they were false and misleading at the time they were made …,"complaint PP 89; and "[D]efendants knew there was no reasonable basis for representing that [FormFactor's] production processes were fully functioning, with output and yields improving steadily, and that [FormFactor] would be able to have the ability and the capacity to volume produce Harmony probe cards as promised," *id.* P 89(a).

[14] Thus, plaintiffs cannot satisfy the applicable pleading requirements by alleging, for example, that the individual defendants "possessed the power and authority to control the contents of FormFactor's quarterly reports, press releases and presentations to the market," or that they "were provided with copies" of such documents and "had the ability and opportunity to prevent their issuance or cause them to be corrected." Complaint P 30.

[15] Defendants contend that none of the CWs is alleged to have attended any meetings or communicated [*26] with any of the defendants, or heard any statement made by any of the defendants.

the allegations of the complaint, including how the CW learned of the information. *See* complaint 1111 32-40. [16] However, the complaint does not supply adequate corroborating details to provide sufficient indicia of reliability. As defendants correctly argue, the basic problem is that the complaint does not allege the sort of detail or corroboration from other sources -- meetings, conversations, and internal memoranda and reports [17] -- to support the inference that any of the individual defendants actually believed FormFactor's public statements might be false or misleading at the time they were made. Importantly, none of the CWs is alleged to have had any interaction or communication with any of the defendants, or to have provided any defendant with information, or to have heard [*27] or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period. *See In re Northpoint Commc'ns Group, Inc. Secur. Litig.,* 184 F.Supp.2d 991, 997 (N.D.Ca1.2001). [18] The observations of the CWs do not provide an adequate basis for believing that the defendants made false statements, and knowingly so. *See Nursing Home,* 380 F.3d at 1015. Nor do the CWs provide an adequate basis for believing plaintiffs' conclusory assertion that, on "unspecified dates unspecified defendants ' directed' unspecified employees to hide manufacturing issues and manipulate FormFactor's accounting, [19] Def.'s Reply at 4. *Cf. In re LDK Solar Sec. Litig.,* 2008 U.S. Dist. LEXIS 42425, 2008 WL 2242185 *7-15 (N.D. Cal. May 29, 2008). [20]

## D. Accounting fraud

Defendants correctly contend that plaintiffs' allegations of accounting fraud are "impermissibly imprecise," because the complaint lacks the requisite details that the PSLRA requires and does not include sufficient facts to support a strong inference of scienter on the part of any individual defendant. *In re Juniper Networks, Inc.,* 2004 U.S. Dist. LEXIS 4025, 2004 WL 540910 *3 (N.D. Cal. March 11, 2004) (internal quotation marks omitted); *see also In re Pac. Gateway Exch., Inc. Sec. Litig.,* 169 F. Supp 2d 1160. 1167 (N.D. Cal 2001) (holding that plaintiffs must identify transactions and dollar amounts, and specific facts to support their belief that defendants were aware of the alleged fraud, including how or when each defendant became aware and the extent of each defendant's involvement). "' [*30] [T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.'" *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.,* 50 F.3d 615, 627 (9th Cir. 1994)); *see also Hockey v.*

---

[16] The CWs include a (1) former FAB coordinator and administrative assistant to FormFactor's production manager until November 2006; (2) a former production supervisor until December 2006; (3) a former senior process engineer until early 2007; (4) a former customer project manager from mid-2007 until February 2008; (5) a senior cost accountant until November 2007; (6) a senior financial analyst until April 2007; (7) a senior engineering technician until [*28] February 2008; (8) a former operator in the fabrication process of probe-head products until September 2007; and (9) a former senior information technology director from mid-2006 until December 2007. *See* complaint 1132-40.

[17] The complaint makes several, generic references to meetings, documents or reports, see, e.g., complaint P 65-67, 70, but these references do not contain the requisite detail or corroboration, nor do they overcome the absence of any interaction with any of the individual defendants.

[18] "Such evidence might include contemporaneous receipt of a report with information directly at odds with an alleged misrepresentation, the inference being that the conflicting data was timely read and remembered; and statements by witnesses that they told the actor the true facts before the false statement was made, the inference being that the actor heard and remembered the information, saw the discrepancy, and made the statement anyway." *Northpoint,* 184 F. Supp 2d at 997 (internal quotation marks omitted).

[19] *See, e.g.,* complaint 1111, 70.

[20] In LDK, Judge Alsup held that the "whistleblower" central to the revelations of the complaint possessed sufficient context and access to critical [*29] information to make him reasonably reliable and his conclusions about the inner workings of the company non-speculative where the complaint specified numerous, detailed communications that the whistleblower had with senior management, including specific emails, phone calls and conferences, including specific dates, and names of recipients/attendees and individuals involved. *See LDK,* 2008 U.S. Dist. LEXIS 42425, 2008 WL 2242185 *7-15.

*Medhekar,* 30 F. Supp. 2d 1209, 1224 (N.D. Cal. 1998) ("Merely alleging that fraudulent accounting practices have occurred, without more, does not create a strong inference of scienter."). "Rather, to plead fraudulent intent based on GAAP violations, plaintiffs must allege facts showing that: (1) specific accounting decisions were improper; and (2) the defendants knew specific facts at the time that rendered their accounting determinations fraudulent." *Morgan v. AXT, Inc.,* 2005 U.S. Dist. LEXIS 42346, 2005 WL 2347125 *14 (N.D. Cal. Sept. 23, 2005) (citing *DSAM Global Value Fund,* 288 F.3d at 390-391). Similarly, the signing of quarterly certifications of financial statements mandated by the Sarbanes-Oxley Act (SOX) does not, without more, support an inference of scienter. *See In re Hypercom Corp. Sec. Litig.,* 2006 U.S. Dist. LEXIS 45482, 2006 WL 1836181 *11 (D. Ariz. July 5, 2006) ("However, an incorrect [SOX] certification does not, by itself, [*31] create a strong inference of scienter."); *In re Invision Techs., Inc. Sec. Litig.,* 2006 U.S. Dist. LEXIS 12166, 2006 WL 538752 *7 n.3 (N.D. Cal. Jan. 24, 2006); *In re Watchguard Sec. Litig.,* 2006 U.S. Dist. LEXIS 27217, 2006 WL 2038656 *11 (W.D. Wash. April 21, 2006); *Morgan v. AXT, Inc.,* 2005 U.S. Dist. LEXIS 42346, 2005 WL 2347125 * 15 (N.D. Cal. Sept. 23, 2005). Further, personnel changes happening in the aftermath of business setbacks or stock losses, without more specific allegations, do not give rise to an inference of scienter. *See, e.g., In re US Aggregates,* 235 F. Supp. 2d 1063, 1074 (N.D. Cal 2002) (holding that, absent more particularized facts, a CFO's termination subsequent to a restatement of earning and a loan default could have been reasonably related to corporation's poor financial performance); *In re Cornerstone Propane Partners L.P.,* 355 F. Supp. 2d 1069, 1092-93 ("[N]otable departures are not in and of themselves evidence of scienter. Most major stock losses are often accompanied by management departures . . .").

Here, the complaint bases its pleading of accounting fraud on various grounds, including alleged GAAP violations, FormFactor's restatements of financial results, defendants' SOX certifications of FormFactor's financial reports, Foster's resignation [*32] as CFO on February 25, 2008, defendants' alleged improper accounting for scrap as R&D and FormFactor's purportedly weak internal controls. However, as shown in the cases cited above, these factual allegations are not of themselves cogent or compelling, *see, e.g., DSAM Global Value Fund,* 288 F.3d at 390-391, and fail to provide the requisite "foundation and specificity" to meet PSLRA pleading standards for accounting fraud, *Juniper Networks,* 2004 U.S. Dist. LEXIS 4025, 2004 WL 540910 *3. This is because plaintiffs' allegations, considered individually or collectively, lack sufficient particularized facts to create the inference of scienter, namely that defendants knew or must have known of the facts relevant to the purported accounting violations at the time they took place. [21] *See, e.g., Cornerstone Propane Partners,* 355 F. Supp. 2d at 1091 (internal quotation marks omitted) ("In order [*33] to distinguish deliberate recklessness from ordinary carelessness, allegations of GAAP violations must be augmented by facts that shed light on the mental state of defendants, rather than conclusory allegations that defendant must have known of the accounting failures due to the degree of departure from established accounting principles."). The complaint's assertions are too vague and conclusory, fail to "shed light on the mental state of defendants," *id.,* and, as discussed above, too often refers to defendants (or even FormFactor senior management) collectively, without further differentiation or individuation (including the roles played by the individual defendants), or specification of the facts that individual defendants knew (or must have known) at the time of their accounting determinations that indicate the deliberate recklessness involved such determinations. *See Pac. Gateway Exch.,* 169 F. Supp. 2d at 1167 (holding that plaintiffs must allege detailed "how [and] when each defendant became aware of the allegedly improper accounting practices, [and] the extent of each defendant's contribution or involvement . . .").

---

[21] For example, CW6, a former senior financial analyst, states [*34] conclusorily that the unspecified numbers he/she originally reported for an "inventory valuation report" on an unspecified date were adjusted, "I know it happened. I know they were adjusted." Complaint P 74. CW6 further states conclusively that he/she was "aware" that "management did something" with the reported quarterly numbers because those numbers differed from what CW6 "knew" to be the actual results. *Id.* P 75 (internal quotation marks omitted). In another example, the complaint states, "Because of the pervasiveness and chronic occurrence of scrap accumulation from poor yields in the manufacturing process, FormFactor management *knew* about scrap accumulation but *directed* lower-ranked personnel to cover it up," *Id.* P 70 (emphases added), but fails to provide specifics as to where, when and how often, or quantifying to what degree the allegedly improper practice took place, as well as which FormFactor product(s) were involved.

**F. Defendants' stock sales**

The parties dispute whether the patterns of defendants' stock trades during the class period provide circumstantial evidence of scienter. *The Silicon Graphics* court held that this is only the case where the sales are "dramatically out [*35] of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." 183 F. 3d at 986. [22] The correct measure of an insider's ownership is both the shares and vested options to purchase shares held the insider. *Id.* at 986-987. Under this measure, defendants' stock trades during the class period do not provide circumstantial evidence of scienter because, as a group, they maintained 88.5% of their holdings, or 3,110,971 shares. [23] *See In re Apple Computer,* 886 F. 2d at 1117 (defendants' trades not probative of scienter where, as a group, they sold nearly 80% of their holdings). For example, Foster made a single sale of 25,000 shares on May 1, 2006, which was early in the class period and comprised merely 17% of the 145,779 shares he held at the time. [24] Further, Khondros' sales of 723,079 during the class period were in line with his sales in two prior, comparable periods -- 848,371 from February 1, 2004 to January 31, 2006 and 900,000 from August 1, 2003 to January 31, 2004 -- and all of Khandros' sales were made pursuant to previously planned trades that were memorialized in 10b5-1 trading plans. *See* RJN, Ex. 29. [25] Accordingly, [*36] the Court finds defendants' stock trades do not provide circumstantial evidence supporting the inference of fraud.

In conclusion, the § 10(b) and Rule 10b-5 claims in plaintiffs' complaint, taken as a whole, fail to state the requisite particular facts to give rise a strong enough inference of securities fraud to meet the heightened pleading requirements of the PSLRA. The Court GRANTS defendants' motion to dismiss these claims. [*37] [26]

**II. Motion to dismiss section 20(a) claim**

As plaintiffs have not adequately alleged a primary violation of federal securities laws, the Court also GRANTS defendants' motion to dismiss plaintiffs' claim for control person liability under § 20(a). *See Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("[T]o prevail on their claims for violations of § 20(a) . . . plaintiffs must first allege a violation of § 10(b) or Rule 10b-5."). [27]

---

[22] "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Silicon Graphics,* 183 F. 3d at 986.

[23] The Court takes judicial notice of FormFactor's proxy statements and Forms 4 filed with the SEC, see RJN, Exs. 27, 28, which form the basis for these figures, as submitted by defendants. *See Silicon Graphics,* 183 F. 3d at 986 (holding that a court may consider SEC filings on which the complaint relies).

[24] Figures based on the 2006 proxy statement filed with the SEC. *See* RJN, Ex. 28.

[25] The Court takes judicial notice of this document as it is the type of document for which its accuracy cannot be reasonably questioned.

[26] As the Court grants defendants' motion to dismiss for the reasons set forth above, the Court does not reach the disputed questions of (1) whether plaintiffs' theory is "cogent and compelling," *Tellabs,* 127 S. Ct. at 2510, before consideration of competing inferences and (2) whether under the *Tellabs* weighing analysis, nonculpable explanations for defendants' conduct outweigh competing inferences of scienter. Nor does the Court reach the disputed question of whether defendants' non- accounting statements at issue are forward looking and, if so, whether they are protected under more rigorous procedural barriers of the PSLRA's safe-harbor provision.

[27] In the alternative, plaintiffs fail to present much beyond the theory that the individual [*38] defendants violated federal securities laws because they had the power and authority to control information released to the public by virtue of their position. Therefore, plaintiffs fail to plead specific facts upon which a fact finder could reasonably conclude that the individual defendants violated federal securities laws. *See Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir. 1987).

### III. Freeman's separate motion for dismissal

Separately, Freeman moves to dismiss plaintiffs' claims against him on the additional ground that plaintiffs do not allege that Freeman made a purported misstatement or signed any of Formfactor's SEC filings, nor do plaintiffs allege any particularized facts that Freeman participated in preparing any purportedly false statement to which the complaint refers. [28] Plaintiffs do not dispute Freeman's separate grounds for moving to dismiss plaintiffs' claims against him. Though plaintiffs suggest that the non-oral statements in question can be attributed to Freeman through the so-called "group-pleading doctrine," which is a means of linking an individual to corporate statements, courts in this circuit [29] indicate that the have held that this doctrine is [*39] no longer viable in light of the PSLRA's heightened pleading standards requiring plaintiffs to allege particularized facts regarding individual defendants. *See, e.g., In re NextCard, Inc. Sec. Litig.,* 2006 U.S. Dist. LEXIS 16156, 2006 WL 708663 *3 (N.D. Cal. Mar. 20, 2006); *In re Silicon Storage,* 2006 U.S. Dist. LEXIS 14790, 2006 WL 648683 *22 (N.D. Cal Mar. 10, 2006). Irrespective of whether the "group-pleading doctrine" is still viable, as noted above, the PSLRA requires, with regard to each false or misleading statement or material omission, that the complaint "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind." *In re Silicon Storage,* 2006 U.S. Dist. LEXIS 14790, 2006 WL 648683 *22 (quoting 15 U.S.C. § 78u-4(b)(2)) (internal quotation marks omitted) (emphasis in original). Though the complaint provides general, conclusory statements regarding Freeman's role at FormFactor, it does not plead particularized facts describing Freeman's direct involvement in the daily affairs of FormFactor or suggesting why he should be considered part of the group responsible for preparing of any of the non- oral statements in question. Lastly, even if Freeman did participate in preparing any of the non-oral statements [*40] in question (and the complaint were to properly make this allegation), the complaint pleads no facts that would demonstrate Freeman's state of mind and give rise to the strong inference that he acted with scienter. For these reasons, the Court GRANTS Freeman's separate motion to dismiss plaintiffs' claims against him.

### VI. Requests for judicial notice

In defendants' original RJN, defendants ask the Court to take notice of 36 documents, which include transcripts of conference calls with security analysts, FormFactor's SEC filings and earnings press releases, security analyst reports and daily stock price summary charts. In defendants' supplemental RJN, defendants ask the Court to take notice of five documents, which include one FormFactor SEC filing, two FormFactor earnings press releases and two financial industry conference transcripts. As all of these documents are either relied on in the complaint (whether or not they are expressly incorporated) or they are the types of documents for [*41] which the authenticity cannot be reasonably questioned, the Court GRANTS defendants' requests. The Court acknowledges that the parties dispute the truth of some of the facts and statements contained within some of these documents and does not take judicial notice of the truth of the contents that are in dispute.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motions to dismiss plaintiffs' complaint [Docket Nos. 26, 30]. Should plaintiffs wish to do so, they may file an amended complaint no later than August 22, 2008.

---

[28] Additionally, defendants point out that Freeman sold no FormFactor stock during the class period, maintaining all of his 157,615 shares of common stock.

[29] The Ninth Circuit has yet to take up this issue.

**IT IS SO ORDERED.**

Dated: July 25, 2008

/s/ Susan Illston

SUSAN ILLSTON

United States District Judge

---

# N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.

United States District Court for the Southern District of New York

September 30, 2016, Decided; September 30, 2016, Filed

No. 15 Civ. 6034 (RJS)

**Reporter**

2016 U.S. Dist. LEXIS 136929 *; Fed. Sec. L. Rep. (CCH) P99,421; 2016 WL 5794774

NORTH COLLIER FIRE CONTROL AND RESCUE DISTRICT FIREFIGHTER PENSION PLAN AND PLYMOUTH COUNTY RETIREMENT ASSOCIATION, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiffs, VERSUS MDC PARTNERS, INC., MILES S. NADAL, DAVID B. DOFT, MICHAEL C. SABATINO, MITCHELL GENDEL, AND MICHAEL J. L. KIRBY, Defendants.

**Subsequent History:** Dismissed by N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners Inc., 2017 U.S. App. LEXIS 28020 (2d Cir., Feb. 22, 2017)

**Prior History:** KJ Roberts & Co. Inc. v. MDC Partners Inc., 2014 U.S. Dist. LEXIS 34740 (S.D.N.Y., Mar. 14, 2014)

**Counsel:** [*1] For North Collier Fire Control and Rescue District Firefighter Pension Plan, Individually and on behalf of all others similary situated, Plymouth County Retirement Association, Lead Plaintiffs: Kathleen M. Donovan-Maher, LEAD ATTORNEY, Berman, DeValerio & Pease, L.L.P., Boston, MA; Steven J. Buttacavoli, LEAD ATTORNEY, Steven Lev Groopman, Berman De Valerio, Boston, MA; Avital Orly Malina, Robbins Geller Rudman & Dowd LLP, Melville, NY; Samuel Howard Rudman, Robbins Geller Rudman & Dowd LLP(LI), Melville, NY.

For MDC Partners Inc., Defendant: Paul C. Curnin, LEAD ATTORNEY, Craig Scott Waldman, Daniel Joseph Stujenske, Simpson Thacher & Bartlett LLP (NY), New York, NY.

For Miles S. Nadal, Defendant: Lewis J. Liman, LEAD ATTORNEY, Roger Allen Cooper, Cleary Gottlieb, New York, NY.

For David B. Doft, Defendant: Jonathan David Cogan, Steven Gary Kobre, Kobre & Kim LLP, New York, NY.

For Michael C. Sabatino, Defendant: Daniel Jonathan Kramer, James L. Brochin, LEAD ATTORNEYS, Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY), New York, NY; Matthew Jason Weiser, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY.

For Mitchell Gendel, Michael J. L. Kirby, Defendants: Paul C. Curnin, LEAD ATTORNEY, [*2] Daniel Joseph Stujenske, Simpson Thacher & Bartlett LLP (NY), New York, NY.

**Judges:** RICHARD J. SULLIVAN, United States District Judge.

**Opinion by:** RICHARD J. SULLIVAN

# Opinion

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

Lead Plaintiffs North Collier Fire Control and Rescue District Firefighter Pension Plan ("North Collier Fire") and Plymouth County Retirement Association ("Plymouth County" and, collectively with North Collier Fire, "Plaintiffs") bring this putative class action lawsuit against MDC Partners, Inc. ("MDC") and four of MDC's current and former officers and directors. Plaintiffs allege that, throughout the period from October 28, 2013 through April 27, 2015 (the "Class Period"), MDC overstated goodwill associated with certain poorly performing or defunct subsidiaries; reported earnings using a misleading version of EBITDA (earnings before interest, taxes, depreciation, and amortization); failed to disclose all of the compensation paid to MDC's then-CEO, president, and chairman; and falsely reported that its internal controls over financial reporting were adequate. Plaintiffs assert that their reliance on these four categories of false or misleading statements caused injury to them and to all [*3] other persons who acquired MDC's Class A subordinate voting shares during the Class Period, in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5; and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Now before the Court is Defendants' motion to dismiss Plaintiffs' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 54.) For the reasons set forth below, Defendants' motion is granted.

I. BACKGROUND[1]

A. The Parties

Plaintiffs North Collier Fire and Plymouth County are a public sector pension plan and a retirement association, respectively, [*4] that allege they purchased MDC stock during the Class Period and suffered damages as a result of false or misleading statements made by Defendants during the Class Period. (Compl. ¶¶ 23-24.)

Defendant MDC is a holding company incorporated under the laws of Canada and headquartered in New York, New York, that provides a range of marketing, activation, communications, and consulting services via its subsidiaries. (Id. ¶ 25.) After dropping out of college, Defendant Miles Nadal founded MDC in 1980 when he was twenty-two years old, using a $500 credit card advance. (Id. ¶ 3.) Though MDC began as a photography and marketing services business, it quickly became through a series of acquisitions in its first few years one of Canada's largest printing companies, specializing in secure documents such as checks, airline and event tickets, and postage stamps. (Id.) In October 1987, MDC became a NASDAQ-traded public company, and by the late 1990s, Nadal had divested MDC's printing businesses and pivoted the company toward marketing, advertising, and public relations, while increasing MDC's presence in the United States. (Id.) After acquiring several advertising and public relations firms, MDC's breakthrough [*5] came in 2001, when it acquired a 49% stake in a prominent, Miami-based advertising firm. (Id.) The acquisition gave MDC a firm foothold in the advertising industry and launched MDC's "partnership" model, through which it typically purchases a lessthan-100% interest in the agencies it acquires. (Id.) MDC continued to expand through acquisitions, growing from a collection of nineteen small-to-midsize marketing firms in 2004 to a network of fifty-one "agency partners" in 2015. (Id.) By 2015, MDC was one of the ten largest advertising agency holding companies in the world. (Id. ¶ 4.)

The remaining defendants (the "Individual Defendants") include current and former MDC senior officers and directors. Nadal was MDC's chairman, CEO, and president during the Class Period. (Id. ¶ 26.) Nadal led MDC until July 20, 2015, when he resigned amid an ongoing SEC investigation into MDC's reimbursement of certain of his expenses and into MDC's accounting practices. (Id.) Defendant Michael Sabatino was MDC's chief accounting

---

[1] The Court takes the facts below from Plaintiffs' amended complaint (Doc. No. 46 ("Compl.")), statements or documents incorporated into the amended complaint by reference, legally required public disclosure documents filed with the SEC, and documents upon which Plaintiffs relied in bringing the suit. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In ruling on the instant motion, the Court has also considered Defendants' memorandum of law in support of their motion to dismiss (Doc. No. 55 ("Def. Mem.")), Plaintiffs' opposition (Doc. No. 57 ("Pl. Opp'n")), Defendants' reply (Doc. No. 59 ("Def. Reply")), and the declarations and exhibits submitted with those briefs.

officer from April 2005 through April 22, 2015. (*Id.* ¶ 28.) Effective April 23, 2015, Sabatino was reassigned to work on "special projects" at MDC. (*Id.*) On July 20, 2015, Sabatino [*6] resigned from MDC amid the aforementioned SEC investigation. (*Id.*) Defendant David Doft is MDC's current chief financial officer and has held that position since August 2007. (*Id.* ¶ 27.) On April 23, 2015, following Sabatino's reassignment, Doft assumed the additional role of MDC's principal accounting officer. (*Id.*) Defendant Mitchell Gendel has served as MDC's general counsel and corporate secretary since November 2004. (*Id.* ¶ 29.) Defendant Michael Kirby joined MDC's board of directors on April 22, 2004 and, at all relevant times, served as chairman of the board's audit committee and as a member of the board's human resources and compensation committee and the board's nominating and corporate governance committee. (*Id.* ¶ 30.) On June 9, 2015, MDC announced that Kirby would retire from the MDC board on or before the expiration of his then-current term in June 2016. (*Id.*)

B. The Alleged Fraud

Plaintiffs allege that, beginning on October 28, 2013 with the release of MDC's third quarter 2013 earnings and continuing throughout the Class Period, MDC (1) overstated goodwill associated with certain poorly performing or now-defunct subsidiaries, (2) reported earnings using a misleading version [*7] of EBITDA, (3) failed to report all compensation paid to Nadal, and (4) falsely reported that it maintained adequate internal controls over financial reporting. (*Id.* ¶¶ 2, 10-14.)

1. Confidential Witness's SEC Whistleblower Complaint Against MDC

Plaintiffs largely base their amended complaint on assertions from a confidential Dodd-Frank whistleblower submission made to the SEC by a "confidential witness" ("CW 1") not named in Plaintiffs' pleading. (*See id.* ¶¶ 32-36 (describing CW 1); *id.* ¶¶ 40-56 (describing the whistleblower submission).) Plaintiffs allege that MDC retained CW 1, a "former business associate[]" of Nadal's, in mid-2009 to perform consulting services in connection with certain underperforming MDC subsidiaries. (*Id.* ¶¶ 32-33.) In the summer of 2009, CW 1 reviewed nonpublic financial information from eight MDC subsidiaries, six of which had, between June 2008 and June 2009, accounted for combined losses of over $7 million on revenues of less than $30 million. (*Id.* ¶¶ 33-34.) Because these past losses were to serve as a baseline for determining CW 1's compensation, CW 1 discussed the losses with MDC management, including Nadal, Doft, Sabatino, and Gendel. (*Id.* ¶ 34.)

In July [*8] 2012, after his business relationship with MDC had ended, CW 1 filed a lawsuit against MDC regarding a dispute as to CW 1's compensation. *See KJ Roberts & Co. Inc. v. MDC Partners Inc.*, No. 12-cv-5779 (LGS), 2014 U.S. Dist. LEXIS 34740, 2014 WL 1013828 (S.D.N.Y. Mar. 14, 2014), *aff'd*, 605 F. App'x 6 (2d Cir. 2015). The lawsuit was dismissed on summary judgment. *Id.* Nevertheless, on or about February 26, 2014, shortly before the summary judgment decision was issued, CW 1 made his whistleblower submission to the SEC, attaching certain discovery from the litigation such as excerpts of deposition testimony from Nadal, Kirby, and the chief financial officer of one of MDC's subsidiaries. (Compl. ¶¶ 35, 51.) After the SEC contacted CW 1 for more information, CW 1 provided supplemental submissions on April 9, May 30, and July 1, 2014, and on June 3 and August 24, 2015. (*Id.* ¶ 35.) In general, CW 1's whistleblower submissions described MDC's alleged failure to properly account for goodwill (*id.* ¶¶ 47-53) and its alleged use of nonstandard metrics to report earnings to investors (*id.* ¶¶ 42-46).

2. MDC's Growing Goodwill

The primary focus of Plaintiffs' amended complaint is MDC's accounting for "goodwill," which is an intangible asset generated by the acquisition of a business for a price greater [*9] than the value of the business's net identifiable assets (e.g., cash, investments, buildings, equipment, inventory, accounts receivable, and certain identifiable intangible assets). (*Id.* ¶ 5.) As it grew through acquisitions, MDC recorded an increasingly large amount of goodwill, which rose steadily in the years leading up to the Class Period. For the years relevant here- 2010, 2011, 2012, and 2013 — MDC reported goodwill of $514.5 million, $605.2 million, $720.1 million, and

$744.3 million, respectively. (*Id.*) During the Class Period, goodwill was MDC's single largest asset, constituting more than half of MDC's total assets. (*Id.*) In its annual report for 2014, MDC reported goodwill of nearly $851.4 million — approximately 52% of MDC's total assets of $1.649 billion (*id.*) — and for the first quarter of 2015, the last reporting period within the Class Period, MDC reported goodwill of $838.9 million (*id.* ¶ 63).

MDC's growing goodwill was the subject of comment letters from the SEC to MDC's chief financial officer, Doft, dated December 11, 2008, January 30, 2009, December 15, 2010, and November 27, 2012. (*Id.* ¶¶ 6-8.) Generally speaking, the SEC's letters sought, and Doft's responses provided, [*10] explanations of MDC's reasoning for its goodwill accounting in light of falling stock prices, worsening economic conditions, and (at least in the SEC's view) MDC's declining financial performance. (*Id.*) Plaintiffs assert that, because of this publicly filed correspondence between the SEC and MDC, "investors understood that proper accounting for goodwill was an especially significant and sensitive issue that had material significance to [MDC's] financial condition and periodic financial results." (*Id.* ¶ 9.) Plaintiffs also assert that "Doft's responses and the apparent acceptance of MDC's representations by . . . the SEC led investors to believe that MDC was properly accounting for goodwill and related items and making proper and complete disclosures regarding the value of goodwill and any necessary impairment charges." (*Id.*)

Plaintiffs allege that, despite increased scrutiny from the SEC, MDC failed to record required goodwill impairments for "certain subsidiaries" reviewed by CW 1 that had performed poorly or ceased operations after MDC acquired them. (*Id.* ¶¶ 11, 33-34.) While the amended complaint refers broadly to accounting problems with "MDC's poor-performing subsidiaries" (*id.* [*11] ¶ 97), the only subsidiary it discusses with specificity is Zyman Group, a marketing and strategy consulting firm that MDC acquired in 2005 (*id.* ¶¶ 33, 68-76).[2] MDC acquired 61.6% of Zyman Group on April 1, 2005, for a total acquisition cost of $64.6 million, and agreed to pay an additional $12 million if Zyman Group achieved specific financial targets in 2006 and 2007. (*Id.* ¶ 68.) In connection with the transaction, for the second quarter of 2005, MDC recorded $45.4 million in goodwill related to Zyman Group. (*Id.*) Furthermore, MDC agreed to provide the sellers of Zyman Group with certain "earn-out" payments based on Zyman Group's financial performance over the first five years after the transaction. (*Id.* ¶ 69.) From these facts, Plaintiffs infer that, "for at least five years," MDC needed to "create stand-alone financials for Zyman [Group] to calculate the amount of earn-out payments," which in turn required MDC, under Generally Accepted Accounting Principles ("GAAP"), to conduct goodwill impairment testing at the Zyman Group level. (*Id.* ¶¶ 69-71.)

Plaintiffs allege that a number of factors arising [*12] in the years following MDC's acquisition of Zyman Group should have triggered a write-down of goodwill. First and foremost, Plaintiffs assert that, based on internal MDC documents reviewed by CW 1, Zyman Group's revenues dropped continuously following its acquisition by MDC, from $40 million in 2005 to approximately $300,000 as of 2014. (*Id.* ¶ 49.) Plaintiffs further allege that, as disclosed in MDC's annual reports for the years 2006 through 2009, Zyman Group never reached the revenue levels at which MDC would have made earn-out payments under the acquisition agreement. (*Id.* ¶¶ 72-73; *see also id.* ¶¶ 47-48 (CW 1's whistleblower complaint cited declining revenues as "a major reason for MDC's overstatement of goodwill").) Second, Plaintiffs allege that Zyman Group's founder and namesake, Sergio Zyman, whom Plaintiffs call "a legend in the advertising community," left the firm in 2008. (*Id.* ¶ 49.)[3] Third, Plaintiffs contend that at some point not specified in the amended complaint, a significant client terminated its relationship with Zyman Group. (*Id.* ¶ 51(a).) Fourth and finally, Plaintiffs allege that Zyman Group effectively ceased operations in late 2010. (*Id.* ¶¶ 50-51, 73.) The events [*13] culminating in the end of Zyman Group began in 2008 when, following Sergio Zyman's departure, MDC hired two executives from a company called Core Strategy to become the CEO and vice chairman of Zyman Group. (*Id.* ¶ 50.) Around September 2009, MDC changed Zyman Group's name to "Core

---

[2] Plaintiffs' opposition brief similarly focuses on Zyman Group. (*See* Pl. Opp'n at 24-27.)

[3] Those outside of the advertising community may know Mr. Zyman best as the marketing executive behind New Coke. *See* Keith McArthur, *Man Who Authored New Coke Debacle Has No Regrets*, Globe & Mail, Apr. 18, 2005, http://fw.to/yTTpKgT (last visited Sept. 30, 2016).

Strategy" and merged Core Strategy into another MDC subsidiary called KBS+. (*Id.*; *see also id.* ¶ 73 (noting that MDC's annual reports did not mention Zyman Group after 2009).) In late 2010, MDC terminated the Core Strategy executives, gave them the rights to use the "Core Strategy" name and any of Core Strategy's remaining clients, and wound down Core Strategy's operations, leaving the company formerly known as Zyman Group as "a husk without operations." (*Id.* ¶¶ 49-50.)

Nevertheless, "according to CW 1, Zyman Group's goodwill was 'still on the books in 2015.'" (*Id.* ¶ 73.) And according to Plaintiffs, $48.0 million in goodwill related to Zyman Group (comprising $45.4 million [*14] from the original acquisition and an additional $2.6 million from Zyman Group's acquisition of two other companies) "appears to remain on MDC's books" — an assumption Plaintiffs base on the fact that, although MDC recorded impairment charges in 2012, 2013, and 2014, it did not attribute any of those charges to a write-down of Zyman Group's goodwill. (*See id.* ¶¶ 73-76.)

3. Nadal's Growing Compensation

Plaintiffs also allege that, although MDC's revenue in the years leading up to the Class Period was lower than that of MDC's largest competitors, Nadal's compensation as CEO rivaled or exceeded CEO compensation at those companies. (*Id.* ¶ 4.) For 2011, MDC reported nearly $24 million of compensation for Nadal, as a result of which *Business Insider* ranked Nadal number two on a list of the "33 Richest People in Advertising, Ranked by Income." (*Id.*) In 2012, that total dropped to just over $9 million, but rose again in 2013 to over $20 million. *See* MDC Partners Inc., Definitive Proxy Statement at 25 (Sched. 14A) (Apr. 25, 2014) ("2014 Proxy"). Finally, for 2014, MDC reported $16.8 million in compensation for Nadal, which, according to a *New York Times* article, made Nadal the 109th highest-paid [*15] CEO in America across all industries. (Compl. ¶ 4.)

Notwithstanding the media's coverage of the significant compensation disclosed for Nadal, Plaintiffs assert that MDC failed to disclose "the true amount of compensation paid" to Nadal because its filings "omit[ted] amounts for Nadal's use of MDC's corporate aircraft and corporate apartment in New York City." (*Id.* ¶¶ 10, 120.) As in previous years, Nadal's $20,679,263 in disclosed compensation for 2013 included a category of compensation called "All Other Compensation," in the amount of $500,000. (*Id.* ¶ 118-19.) A footnote to the 2014 Proxy's "Summary Compensation Table" defined "All Other Compensation" to include "a $500,000 perquisite allowance in respect of retirement benefits and employee health benefits" and further provided that,

> [i]n addition to the amounts set forth in the table, on limited occasions, while Mr. Nadal is traveling on business, a member of his family has accompanied him on the corporate aircraft. There is no incremental cost to [MDC] for this use of the aircraft by Mr. Nadal's family member. For business purposes during travel from outside of New York City, Mr. Nadal and certain of [MDC]'s executive officers have the use of [*16] a corporate apartment located near [MDC]'s offices in New York City. Mr. Nadal personally paid for all furnishings in this corporate apartment, and also pays for 50% of the leasehold cost. [MDC] believes that such arrangement is more cost effective than the alternative costs of a hotel in New York City.

(*Id.* ¶ 119 (emphasis altered).) As the italicized language above indicates, Nadal received some compensation or benefit beyond the reported $500,000, but the 2014 Proxy did not specify the amount of that compensation or benefit. MDC's definitive proxy statement the following year would disclose the specific amount: $54,172. (*Id.* ¶ 124.)

Plaintiffs also generally allege that MDC failed to disclose "the fact that Nadal received millions of dollars in inappropriately reimbursed personal expenses, above and beyond" his reported compensation. (*Id.* ¶ 10.) As discussed further below, Plaintiffs base this allegation on MDC's disclosures at the end of the Class Period and in the ensuing months that Nadal had agreed to repay approximately $10.5 million of expense reimbursements that MDC had paid to him improperly over the period from 2009 through 2014. (*Id.* ¶¶ 13, 17, 121(a)—(b), 129, 138.)

C. MDC [*17]  Discloses SEC Investigation and Formation of Special Committee

At the end of the Class Period, after the markets had closed on April 27, 2015, MDC issued its first quarter 2015 earnings release, which disclosed, among other things, that since October 2014, MDC had been cooperating with an SEC investigation into Nadal's expense reimbursements and MDC's accounting practices. (*Id.* ¶ 121.) Plaintiffs allege that the following statements from that earnings release "stunned the market" and "reveal[ed] the truth" about MDC's alleged fraudulent scheme (*id.* ¶ 13):

• "[S]ince October 5, 2014, [MDC] has been actively cooperating with the production of documents for review by the [SEC] pursuant to a [s]ubpoena. In connection with this production of documents, [MDC] formed a [s]pecial [c]ommittee of independent directors to review certain matters relating to the reimbursement of expenses incurred by the CEO [Nadal]."

• "The [s]pecial [c]ommittee completed an extensive review of perquisites and payments made by [MDC] to or on behalf of Miles Nadal and Nadal Management Limited [a company wholly owned by Nadal] during the six-year period from 2009 through 2014. The review included a detailed analysis of the available back-up documentation supporting such payments, as [*18]  well as consideration of [a] [m]anagement [s]ervices [a]greement among Mr. Nadal, Nadal Management Limited and [MDC] and certain historical practices. These payments included, among other things, travel and commutation expenses, charitable donations, medical expenses, and certain expenses for which the information was incomplete."

• "Following the review, Mr. Nadal agreed to reimburse [MDC] for perquisites and payments for which [MDC] sought reimbursement, in the aggregate amount of $8.6 million."

• "In addition to this reimbursement, the [s]pecial [c]ommittee recommended, the [a]udit [c]ommittee has adopted, and [MDC] has adopted and implemented, a series of remedial steps to improve and strengthen [MDC]'s internal controls and procedures regarding travel, entertainment and related expenses."

• "The [s]ubpoena received from the SEC also requested production of documents relating to [MDC]'s goodwill and certain other accounting practices, as well as information relating to trading in [MDC]'s securities by third parties. [MDC] has been fully cooperating with the SEC and believes that the inquiries are at an early stage."

• "Effective as of April 23, 2015, [MDC]'s prior [c]hief [a]ccounting [o]fficer, Michael Sabatino, transitioned to a new role in [MDC], in which he will work on special projects." [*19]

(*Id.* ¶ 121 (emphasis removed).)

The next day, on April 28, 2015, MDC filed its definitive proxy statement for 2015, which disclosed $16,832,355 of compensation for Nadal in 2014. Definitive Proxy Statement at 27 (Sched. 14A) (Apr. 28, 2015) ("2015 Proxy"). In addition, like the 2014 Proxy, the 2015 Proxy included a category of compensation for Nadal called "All Other Compensation," this time in the amount of $926,005. *See id.* at 28. Unlike the 2014 Proxy, however, the 2015 Proxy included a table breaking down "All Other Compensation," which included a subcategory of compensation called "Other Perquisites." *Id.* And while the 2015 Proxy, like the 2014 Proxy, disclosed that MDC had paid for "50% of the lease and 100% of the utilities, local phone charges, cable and internet charges" of the New York City apartment, *id.* at 28; (*cf.* Compl. ¶ 119 ("Mr. Nadal personally paid for . . . 50% of the leasehold cost" of the apartment)), the 2015 Proxy departed from the 2014 Proxy and disclosed the specific amount of these expenses — $71,967,2015 Proxy at 28. The 2015 Proxy further disclosed the specific amounts of the New York City apartment expenses for 2013 and 2012: $54,172 and $50,160, respectively. *Id.* MDC had [*20]  not previously disclosed these amounts (Compl. ¶ 124) — it had only generally disclosed MDC's splitting of the New York City apartment leasehold cost with Nadal. These newly disclosed amounts raised Nadal's "All Other Compensation" from $500,000 to $554,172 for 2013 and from $558,343 to $608,503 for 2012. (*Id.* ¶ 14.)

Following these disclosures at the end of the Class Period, MDC's stock price fell from $27.98 per share on April 27, 2015 to a closing price of $20.20 per share on April 28, 2015 — a drop of $7.78 per share or 27.8%. (*Id.* ¶ 127.)

D. Post—Class Period Resignations and Additional Repayment of Reimbursements

Plaintiffs also rely on certain post—Class Period disclosures as "evidenc[e] [of] Defendants' fraud." (*Id.* at 61 (capitalization removed).) In a press release issued July 9, 2015, MDC announced that two of its management directors, Stephen Pustil and Lori Senecal, had resigned from MDC's board, and that two of MDC's outside, non-management directors — Audit Committee Chairman Michael Kirby (who is a defendant) and Clare Copeland (who is not) — would retire from the MDC board on or before the expiration of their current terms, which ended in June 2016. (*Id.* ¶ 16.)

In a press release issued [*21] two weeks later, on July 20, 2015, MDC announced that Nadal had resigned as CEO and as chairman of the board of directors. (*Id.* ¶ 129.) That press release also disclosed that, in connection with the SEC's ongoing investigation, Nadal had agreed to repay an additional $1.88 million in inappropriately reimbursed expenses (bringing the total to approximately $10.5 million). (*Id.*) Moreover, the press release explained that Nadal was "required under [MDC's] [i]ncentive/[r]etention agreements to repay $10.58 million in retention amounts received between 2012 and 2015." (*Id.*) Finally, the July 20 press release announced that Sabatino, who in April 2015 had transitioned from chief accounting officer to a "new role" at MDC working on "special projects" (*id.* ¶ 121 (emphasis removed)), had resigned and "agreed to repay [MDC] $208,535 in cash bonus payments received between 2012 and 2014" (*id.* ¶ 130).

E. Procedural History

North Collier Fire initiated this action by filing a complaint on July 31, 2015. (Doc. No. 1.) On October 6, 2015, the Court issued an order appointing North Collier Fire and Plymouth County as lead plaintiffs and the law firms Robbins Geller Rudman & Dowd LLP and Berman DeValerio as colead counsel. [*22] (Doc. No. 33.)

Plaintiffs filed the operative, amended complaint on December 15, 2015. (Doc. No. 46.) Like the initial complaint, the amended complaint asserts violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against all Defendants (Count I) and a violation of Section 20(a) of the Exchange Act against the Individual Defendants (Count II). The amended complaint alleges that, in various filings with the SEC during the Class period, Defendants misled investors by (1) overstating MDC's goodwill, particularly by failing to record a goodwill impairment for Zyman Group, (2) claiming to monitor MDC's financial performance using EBITDA, when in fact they used a misleadingly modified version of EBITDA, (3) underreporting Nadal's compensation, and (4) reporting that MDC maintained adequate internal financial controls, despite MDC's inappropriate reimbursement of $10.5 million of Nadal's expenses. Plaintiffs allege that these misrepresentations were "revealed" on April 27 and 28, 2015, when MDC disclosed, among other things, Nadal's repayment of certain expense reimbursements and an ongoing SEC investigation into that subject and MDC's goodwill accounting.

On February 9, 2016, Defendants filed a motion to dismiss Plaintiffs' amended complaint [*23] in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. No. 54), on the grounds that Plaintiffs have failed to plead any material misstatements or omissions, failed to plead scienter, failed to plead loss causation, and relied inappropriately on confidential witnesses and a confidential whistleblower submission to the SEC (Doc. No. 55). The motion was fully briefed as of May 9, 2016. (Doc. No. 59.)

II. Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns*, 493 F.3d at 98. Specifically, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff [*24] "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

Moreover, securities fraud claims are subject to heightened pleading standards under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b). *ATSI Commc'ns*, 493 F.3d at 99. To satisfy Rule 9(b), Plaintiffs must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This standard requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99. And to satisfy the PSLRA, Plaintiffs must "'specify' each misleading statement," "set forth the facts 'on which [a] belief' that a statement is misleading was 'formed,'" and "'state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) (emphasis added) (quoting 15 U.S.C. § 78u-4(b)).

A "strong" inference is one that is "more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). This standard thus requires courts to "consider both the inferences urged by the plaintiff [*25] and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citing *Tellabs*). Accordingly, while courts "'normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving'" a defendant's state of mind. *Id.* at 196 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).

III. DISCUSSION

A. Alleged Violations of Exchange Act Section 10(b) and SEC Rule 10b-5

"Section 10(b) of the Exchange Act makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 304-05 (2d Cir. 2015) (quoting 15 U.S.C. § 78j(b)). "SEC Rule 10b-5 implements this provision of the Exchange Act and explicitly prohibits 'mak[ing] any untrue statement of a material fact'" in connection with the purchase or sale of a security. *Id.* at 305 (quoting 17 C.F.R. § 240.10b-5(b)). "To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, [*26] and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns*, 493 F.3d at 105. Defendants here argue that, in the first instance, Plaintiffs' allegations based on CW 1's whistleblower submissions must be categorically rejected, and that in any event Plaintiffs have failed to plead a material misstatement or omission, scienter, and loss causation.

With respect to CW 1's allegations, the Court rejects Defendants' argument that it cannot consider them. (Def. Mem. at 43.) While it is true that courts generally do not consider averments "taken directly from uncorroborated allegations embedded in a complaint in another action" or "parroted allegations for which counsel has not conducted independent investigation," *see In re UBS AG Sec. Litig.*, No. 07-cv-11225 (RJS), 2012 U.S. Dist.

LEXIS 141449, 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014), here Plaintiffs allege that CW 1 contacted their counsel after the initial complaint was filed, and that CW 1 shared information from his whistleblower submissions and other information based on his knowledge of MDC (Compl. ¶ 36). Plaintiffs' reliance on a confidential witness with whom they personally communicated is distinguishable from a lawyer's cribbing "uncorroborated allegations" that he makes no effort to [*27] verify from a "complaint in another action." *UBS AG*, 2012 U.S. Dist. LEXIS 141449, 2012 WL 4471265, at *17 n.17.

Nevertheless, even accepting the confidential witness allegations contained in the amended complaint, the Court still finds as discussed below, that Plaintiffs have failed to plead a material misstatement or omission and failed to plead scienter. Because dismissal is appropriate on either of these grounds, the Court need not address Defendants' remaining argument that Plaintiffs have failed to plead loss causation.

1. Material Misstatement or Omission

Under the PSLRA, a plaintiff "must, at the pleading stage, 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief,' the plaintiff must plead "'with particularity all facts on which that belief is formed.'" *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235-36 (2d Cir. 2014) (quoting 15 U.S.C. § 78u-4(b)(1)). "Thus, plaintiffs asserting claims under Rule 10b-5 'must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so.'" *Id.* at 236 (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)). Moreover, a misstatement is not actionable unless it was false at the time it was made. *See In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("[A]t the time these statements were made they [*28] were neither false nor misleading."); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs allege no circumstances to support their allegation that the allegedly false statements . . . were false at the time made.").

With respect to omissions, they are only actionable under Section 10(b) if "the defendant [is] . . . subject to an underlying duty to disclose." *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)); *see also Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) ("'[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information.'" (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011))). A duty to disclose "may arise when there is [1] a corporate insider trading on confidential information, [2] a statute or regulation requiring disclosure, or [3] a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (brackets and internal quotation marks omitted). Accordingly, "'[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5,'" *id.* at 100-01 (quoting *Basic*, 485 U.S. at 239 n.17), and "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor," *Kleinman*, 706 F.3d at 152-53.

Finally, any misstatement or omission must be "material," which requires the court to "engage in a fact-specific inquiry." *ECA*, 553 F.3d at 197. "The materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable [*29] shareholder would consider it important in deciding how to [act].'" *Id.* (internal quotation marks omitted) (quoting *Basic*, 485 U.S. at 240, and *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)). "In other words, in order for the misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id.* (internal quotation marks omitted) (quoting *Basic* and *TSC Industries*). "Because materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed" on materiality grounds

unless the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (internal quotation marks omitted).

The Court now turns to the alleged misstatements.

a. MDC's Reporting of Goodwill

Plaintiffs allege that MDC materially overstated the value of its goodwill in the quarterly earnings releases (*id.* ¶¶ 97-98), quarterly reports (*id.* ¶ 108(a)—(c)), and annual reports (*id.* ¶ 117(a)—(c)) it filed with the SEC during the Class Period. As explained above, Plaintiffs [*30] focus on MDC's alleged failure to write down the $48.0 million in goodwill associated with Zyman Group, which MDC acquired in April 2005. (*Id.* ¶¶ 33, 68-76). Plaintiffs allege that, although Zyman Group performed poorly from 2005 through 2009 before ceasing operations in 2010 (*id.* ¶¶ 49-51, 73), MDC never wrote down the $48.0 million in goodwill associated with the Zyman Group acquisition and thereby overstated its goodwill balance and earnings during its Class Period financial disclosures in violation of GAAP (Generally Accepted Accounting Principles) (*id.* ¶¶ 73, 75, 97-98, 108(a)—(c), 117(a)—(c)). Importantly, Plaintiffs challenge the *overall* goodwill balances MDC reported during the Class Period, which ranged from $711.3 million to $928.2 million (*id.* ¶ 97) — not a specific amount reported for Zyman Group.[4]

"It is well-settled that GAAP provisions are subject to interpretation and 'tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.'" *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) (quoting *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544, 99 S. Ct. 773, 58 L. Ed. 2d 785 (1979)), *aff'd*, 649 Fed. Appx. 7 (2d Cir. 2016); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010) ("Because . . . 'GAAP is not a lucid or encyclopedic set of preexisting rules . . . and is far from a singlesource accounting rulebook,' reasonable disagreements and deference to business judgment [are] permissible." (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101, 115 S. Ct. 1232, 131 L. Ed. 2d 106 (1995))). Thus, the law in the Second Circuit is clear that "[a]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim," and "[o]nly where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *ECA*, 553 F.3d at 200; *see also Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) ("accounting irregularities [*32] and overly optimistic disclosures, by themselves, . . . amount to allegations of 'fraud by hindsight,' which th[e] [Second Circuit] has rejected as a basis for a securities fraud complaint" (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978))).

Plaintiffs' assertion that MDC's Class Period goodwill balance reflected $48.0 million from Zyman Group is based on two allegations. The first is CW 1's assertion that "Zyman Group's goodwill was 'still on the books in 2015.'" (Compl. ¶ 73.) But according to Plaintiffs, CW 1 worked with MDC in 2009 (*id.* ¶¶ 32-33), and though CW 1 may know how MDC accounted for Zyman Group or other subsidiaries in 2009, nothing in the amended complaint suggests that CW 1 possessed similar knowledge with respect to MDC's Class Period financials and whether Zyman Group was "still on the books in 2015," years after CW 1's relationship with MDC had terminated and ended in litigation. A securities fraud complaint may rely on information from confidential witnesses only if "'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Blanford*, 794 F.3d at 305 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). CW 1's alleged assertion regarding nonpublic [*33] information that

---

[4] Plaintiffs' opposition brief argues for the first time that MDC misrepresented how it tests its goodwill for potential impairments, since "Nadal admitted in sworn deposition testimony that MDC did not perform its goodwill impairment testing," but rather "[MDC's] outside auditor did." (Pl. Opp'n at 28 (citing Compl. ¶ 51(a)).) The Court questions what inference of fraud could possibly [*31] be drawn from a company's general statement that it tests its goodwill for impairment and its subsequent delegation of such testing to an outside, independent auditor — at least in the absence of an allegation that the company withheld information from the auditor. In any event, the theory appears nowhere in the amended complaint, and the Court accordingly disregards it. *See Kleinman*, 706 F.3d at 153 ("a party may not amend pleadings through a brief" (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998))).

postdates his tenure at MDC by a number of years falls well short of that requirement. *See In re Lululemon Secs. Litig.*, 14 F. Supp. 3d 553, 580-81 (S.D.N.Y. 2014) (confidential witness's allegations regarding product testing in the spring of 2012 rejected because they "sa[id] nothing about" what testing the company was conducting in March 2013), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 142 (D. Conn. 2007) ("substantial" information from confidential witnesses who were never employed at defendant company or employed there before the start of the class period was "inadequate substantively to support an inference of scienter"), *aff'd*, 312 F. App'x 400 (2d Cir. 2009). Thus, CW 1's statement does not establish the misreporting of MDC's goodwill.

The second basis for the allegation that MDC never wrote down its Zyman-related goodwill is Plaintiffs' assertion, independent of CW 1's similar contention, that that goodwill "appears to remain on MDC's books" (Compl. ¶ 73), a conclusion Plaintiffs seemingly base on the fact that MDC never specifically disclosed an impairment related to Zyman Group, and Plaintiffs were unable to deduce whether the impairment charges that MDC *did* take in 2012, 2013, and 2014 were related to Zyman Group. (*See id.* ¶¶ 74-76.) To begin with, Plaintiffs may not simply speculate that wrongdoing occurred based [*34] on their inability to discern whether any of the impairment charges MDC took were associated with Zyman Group. *See Harris*, 135 F. Supp. 3d at 171 ("The fact that [l]ead [p]laintiff c[ould not] tick and tie the loss and loss adjustment expense reported in [defendant's] consolidated financial statement to the losses its individual subsidiaries reported to insurance regulators, without more, d[id] not plausibly allege a misstatement."). Moreover, Plaintiffs' conclusion ignores the fact that MDC merged Zyman Group into another MDC subsidiary in 2009 (*see* Compl. ¶¶ 49-50) and had not referenced Zyman Group in its financial statements for several years before the Class Period even began (*see id.* ¶ 73). And although Plaintiffs conclude that, because MDC owed earn-out payments to the previous owners of Zyman Group for "at least five years" following the 2005 acquisition (*id.* ¶ 69), MDC was therefore required to perform goodwill impairment testing at the Zyman Group level (*id.* ¶ 70-71), Plaintiffs fail to explain how that held true after Zyman Group became Core Strategy and merged with KBS+ in 2009 (*id.* ¶¶ 49-50), let alone held true through the Class Period.

In addition to these two allegations, Plaintiffs assert in a footnote in their opposition [*35] brief that, "in sworn deposition testimony, Defendants Nadal and Kirby confirmed that MDC never took a goodwill impairment on account of Zyman[ Group]'s decline." (Pl. Opp'n at 25 (citing Compl. ¶ 51(a)—(b)).) Plaintiffs' assertion mischaracterizes the amended complaint, which merely alleges that Nadal and Kirby testified that they did not know whether MDC had written down the goodwill associated with Zyman Group. (*See* Compl. ¶ 51(a)—(b).) Accordingly, the amended complaint provides no basis for inferring that MDC's Class Period goodwill balance included $48.0 million from Zyman Group.

Moreover, even if the amended complaint did permit that inference, it is well-settled in the Second Circuit that goodwill estimates are opinion statements because they "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact" and "will vary depending on the particular methodology and assumptions used." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011), *modified on other grounds, Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015); *see also Harris*, 135 F. Supp. 3d at 173 ("[A]ctuarial or accounting assumptions . . . are, by definition, not statements of fact." (citing *Fait*)).[5] For a statement of belief or opinion to be

---

[5] Plaintiffs cite *City of Omaha, Nebraska Civilian Employees' Retirement System v. CBS Corp.*, 679 F.3d 64 (2d Cir. 2012), and *City of Sterling Heights Police & Fire Retirement System v. Vodafone Group Public Ltd. Co.*, 655 F. Supp. 2d 262 (S.D.N.Y. 2009), for the proposition that the goodwill balances MDC reported were not opinion statements, but rather misstatements of fact because "Defendants did nothing at all to determine whether MDC's goodwill was impaired and failed to take any necessary impairment charges." (Pl. Opp'n at 28.) But those cases provide no support for Plaintiffs' assertion. Rather, *CBS* held that, "even if" plaintiffs had pled "that defendants were aware of facts that should have led them to begin" testing goodwill "earlier," plaintiffs would still have to meet the pleading standard for opinion statements. *CBS*, 679 F.3d at 68. And *Vodafone* simply observed that, "if pleaded with particularity and based on allegations that a defendant disregarded clear [*38] and unmistakable loss, the failure to take impairment charges may provide a viable basis for a securities fraud claim."

actionable under Section 10(b), a plaintiff must [*36] allege that (1) "'the speaker did not hold the belief she professed,'" (2) "'the supporting fact[s] she supplied were untrue,'" or (3) the stated opinion, "though sincerely held and otherwise true as a matter of fact," "omit[ted] information whose omission ma[de] the [stated opinion] misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *Omnicare*, 135 S. Ct. at 1327). If a plaintiff alleges falsity on the third ground, he "'must identify particular (and material) facts going to the basis for the issuer's opinion — facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have — whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1332). "[M]eeting the standard under *Omnicare* 'is no small task for an investor,'" since reasonable investors — although they rightly do not expect opinions stated in filings with the SEC "'to reflect baseless, off-the-cuff judgments'" — "'understand that opinions sometimes rest on a weighing of competing facts,'" "'do[] not expect that *every* fact known to an issuer supports its opinion statement,'" "'read[] each statement within [an SEC filing] . . . in light of all its surrounding text, including [*37] hedges, disclaimers, and apparently conflicting information,'" and "'take[] into account the customs and practices of the relevant industry.'" *Id.* at 210 (quoting *Omnicare*, 135 S. Ct. at 1328, 1329, 1330, 1332). Accordingly, "a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329). "The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).

The amended complaint does not satisfy these pleading requirements. Plaintiffs' assertion that MDC failed to record a "necessary" $48.0 million goodwill impairment for Zyman Group (Compl. ¶¶ 97, 108(a), 117(a)) after Zyman Group's revenues declined or fell below targets (*id.* ¶¶ 47, 49, 72-73) and Sergio Zyman and one of the firm's significant clients departed (*id.* ¶¶ 49, 51(a)) alleges nothing more than disagreement with MDC's accounting judgments, which cannot support a fraud claim. *See Harris*, 135 F. Supp. 3d at 172 ("In the absence of a restatement or allegations pointing to objective facts that [d]efendants' accounting methods violated GAAP, carping about [d]efendants' application of GAAP amounts [*39] . . . d[id] not permit the [c]ourt to infer that the [d]efendants committed accounting fraud."); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012) (declining to "intervene in a business and accounting judgment simply because . . . accountants reached different conclusions" about how defendant should have exercised its judgment), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 Fed. Appx. 72 (2d Cir. 2013); *Can. Imperial Bank*, 694 F. Supp. 2d at 303 ("allegations regarding [a company's] write-downs amount[ed] to fundamental disagreements with [d]efendants' business judgments in a tumultuous economic downturn — claims that are not actionable under Section 10(b) and Rule 10b-5").

Plaintiffs also allege that MDC was required to write down goodwill "related to MDC's [other] poor-performing subsidiaries" (Compl. ¶¶ 97, 108(a), 117(a)), but the amended complaint offers nothing but Plaintiffs' own, generalized opinion as to why an impairment was "necessary." (*See, e.g., id.* ¶ 63 (alleging that MDC experienced "persistent net losses[] from the end of 2009 through Q1 2015," yet reported growing goodwill balances over that period); *id.* ¶ 67 (arguing that, "[b]ecause MDC has operated at current and historical net losses, it is not plausible to use an honest DCF [discounted cash flow] analysis or similar method to arrive at a large enough valuation to support [MDC's] growing goodwill balance and failure to record any goodwill [*40] impairments during the Class Period").) To these assertions, Plaintiffs add those of a third confidential witness, whom Plaintiffs describe as an "accounting manager" who worked two reporting levels below Sabatino over a year before the Class Period began, and who "did not personally work on goodwill accounting because it was reserved for 'higher level' personnel," but "is aware" that Sabatino, Nadal, and Doft "worked on," "oversaw," or "confirmed and approved" MDC's goodwill

---

*Vodafone*, 655 F. Supp. 2d at 269. *Vodafone* was decided before the Second Circuit held in *Fait* that goodwill estimates are opinion statements; regardless, the allegations *Vodafone* describes presumably would satisfy both the Second Circuit's standard for recklessness, *see Novak*, 216 F.3d at 308 (recklessness includes "fail[ing] to review or check information that [defendants] had a duty to monitor, or ignor[ing] obvious signs of fraud"), and the standard for false opinion statements set forth below.

calculations. (*Id.* ¶¶ 38-39.) Such allegations do not approach those necessary to plead the falsity of an opinion under *Omnicare* and *Tongue*, much less suggest securities fraud. Accordingly, Plaintiffs have failed to plead that Defendants' made any false or misleading statements in connection with MDC's goodwill reporting.

b. MDC's Use of the Term "EBITDA"

Plaintiffs next allege that MDC's Forms 10-Q filed during the Class Period misleadingly stated that MDC's management monitored MDC's "'financial performance and financial condition'" using "*industry standard* 'EBITDA,' which the Class Period 10-Qs specifically define as 'earnings before interest, income taxes and depreciation and amortization.'" (*Id.* ¶ 107 (emphasis [*41] added).)[6] While Plaintiffs acknowledge that the 10-Qs themselves did not report any earnings results using EBITDA (*id.* ¶ 12), they argue that the 10-Qs nevertheless misled investors because the EBITDA metric reported in MDC's quarterly earnings releases "d[id] not comport with the industry standard definition referenced in the Class Period 10-Qs" (*id.* ¶ 108(e)). (*See also id.* ¶ 12 ("Investors were misled" because the "highly modified" version of EBITDA reported in MDC's earnings releases did not match "the industry standard definition . . . touted in [MDC's] Forms 10-Q.").)

Specifically, relying on CW 1's whistleblower complaint, Plaintiffs allege that the "EBITDA" reported in MDC's earnings releases "actually meant 'operating income (loss) plus depreciation and amortization, stock-based compensation, acquisition deal costs, deferred acquisition consideration adjustments and profit distributions from affiliates.'" (*Id.* ¶ 44.) This was [*42] a problem, CW 1 and Plaintiffs say, because the calculation should have started with "GAAP net income," not "operating income," and because the adjustments MDC applied were "seemingly arbitrary." (*Id.*) Since these adjustments "were so extensive," and the resulting definition of EBITDA so "heavily manipulated," "constantly changing," "nonstandard," and "tortured," Plaintiffs argue that "the common term EBITDA should not have been used in [MDC's] public filings." (*Id.* ¶¶ 12, 45, 81, 82.)

However, Plaintiffs' ambitious claims in this regard ignore what MDC actually disclosed. To begin with, the challenged statements from MDC's 10-Qs read as follows: "MDC manages the business by monitoring several financial and nonfinancial performance indicators. The key indicators that we review focus on the areas of revenues and operating expenses, which results in earnings before interest, income taxes and depreciation and amortization ('EBITDA') and capital expenditures." *See, e.g.*, Quarterly Report at 28 (Form 10-Q) (Nov. 5, 2013). These sentences neither "tout" (nor use) the phrase "industry standard," nor do they contain actual financial disclosures, and Plaintiffs allege no facts suggesting that [*43] MDC management did not actually monitor the company's revenues and operating expenses such that the general statements above would have been untrue.

Plaintiffs nevertheless argue that these sentences in the 10-Qs led investors to believe that MDC's Class-Period earnings releases, which actually did report "EBITDA" results, followed an "industry standard" definition of that term, when in fact the earnings releases employed a "highly modified definition of EBITDA." (Compl. ¶ 12.) But this assertion also ignores MDC's filings, since the earnings releases specifically explained how MDC had calculated the "EBITDA" amounts reported in those releases. *See* Current Report Ex. 99.1, scheds. 2-3 (Form 8-K) (Oct. 28, 2013); Current Report Ex. 99.1, scheds. 2-3 (Form 8-K) (Feb. 20, 2014); Current Report Ex. 99.1, scheds. 2-5 (Form 8-K) (July 24, 2014); Current Report Ex. 99.1, scheds. 2-5 (Form 8-K) (Oct. 29, 2014); Current Report Ex. 99.1, scheds. 2-5 (Form 8-K) (Feb. 23, 2015). In addition, under a section titled "Non-GAAP Financial Measures," MDC explained that it "has included in this earnings release certain financial results that the [SEC] defines as 'non-GAAP financial measures,'" which " [*44] [m]anagement believes . . . can provide useful supplemental information for investors" analyzing MDC's results when the non-GAAP numbers are "read in conjunction with [MDC's] reported results." *See, e.g.*, Current Report Ex. 99.1 (Form 8-K) (Oct. 28, 2013). The releases note that the non-GAAP numbers include "EBITDA and EBITDA margin (*as defined*)." *See, e.g., id.*

---

[6] These include MDC's Forms 10-Q for the third quarter of 2013, filed November 5, 2013; the first quarter of 2014, filed April 29, 2014; the second quarter of 2014, filed August 11, 2014; and the third quarter of 2014, filed November 6, 2014. (Compl. ¶¶ 99-102.)

(emphasis added). No reasonable investor would ignore these definitions, much less assume that the reported EBITDA is governed by a definition set forth in a generic statement in another document, as Plaintiffs suggest.

Plaintiffs separately argue that MDC misled investors by changing its "nonstandard" calculation of EBITDA from quarter to quarter. (Compl. ¶¶ 45, 89.) But this argument also misses the mark. EBITDA is a non-GAAP metric "for which there is no 'right' formula because, unlike GAAP metrics, they have no uniform definition." *Ironworkers Local 580 — Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014). The fact that a plaintiff may "take issue with the way [a company] ch[ooses] to calculate these metrics . . . is of no moment," because "[i]t is not fraudulent for a reporting entity to calculate metrics that," like EBITDA, "are not defined under GAAP," nor is it fraudulent for the company to [*45] "tak[e] (or not tak[e]) into account whatever factors the reporting entity thinks appropriate — as long as the public is told exactly what the company is doing." *Id.* Unless Plaintiffs can show that MDC somehow misled investors about how it actually calculated EBITDA, which they have not, there can be no claim for fraud. *See id.* (dismissing complaint where plaintiffs were "unable to identify a single instance in which [defendant's] disclosures of how it calculated" the challenged non-GAAP metrics "were incorrect"); *In re One Communs. Corp.*, No. 07-cv-3905 (LTS), 2009 U.S. Dist. LEXIS 29012, 2009 WL 857535, at *10 (S.D.N.Y. Mar. 31, 2009) (dismissing complaint where plaintiff merely alleged that defendant's EBITDA was artificially inflated without "explain[ing] how the EBITDA was incorrectly calculated" and "how this representation might be misleading").

Plaintiffs' allegation that MDC "altered the components of its EBITDA metric to further inflate [its] financial performance" (Compl. ¶ 89) is similarly deficient. The allegation is conclusory, and in any event, "[t]here is nothing inherently improper . . . about reporting a positive EBITDA while simultaneously reporting a [GAAP] net loss" because "[t]he two are entirely different measures." *Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007), *aff'd sub nom. Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71 (2d Cir. 2008). Indeed, the fact that MDC included a reconciliation [*46] of adjusted EBITDA to GAAP metrics in each of its earnings releases, *see, e.g.*, Current Report Ex. 99.1, scheds. 2-5 (Form 8-K) (Feb. 23, 2015), belies Plaintiffs' conclusory assertion that MDC used adjusted EBITDA to mask GAAP losses. Accordingly, the Court finds that Plaintiffs have failed to plead that Defendants made any false or misleading statements in connection with MDC's disclosures relating to EBITDA.

c. MDC's Disclosures of Nadal's Compensation

Plaintiffs next contend that MDC failed to disclose "the true amount of compensation paid" to Nadal, both by underreporting Nadal's perquisites and by improperly reimbursing $10.5 million of Nadal's expenses. (Compl. ¶ 10.) The Court will address each in turn.

i. Underreported Perquisites

Plaintiffs allege that although the 2014 Proxy disclosed the fact that MDC split fifty-fifty with Nadal the leasehold for a New York City corporate apartment used by Nadal and other MDC officers (*id.* ¶ 119), it nevertheless concealed the fact that the cost of MDC's share was $54,172, which included "50% of the [New York City apartment] lease and 100% of the utilities, local phone charges, cable and internet charges of the apartment" (*id.* ¶ 124). Because [*47] this amount was not included in the $500,000 disclosed as other compensation for Nadal for 2013, Plaintiffs argue that the 2014 Proxy's disclosure of $20,679,263 in total 2013 compensation for Nadal was false and misleading because the actual total, with the $54,172 included, was $20,733,435. (*Id.* ¶¶ 118-20.) Plaintiffs also allege that the 2014 Proxy "omit[ted] amounts for Nadal's use of MDC's corporate aircraft," which supposedly were also "revealed in MDC's 2015 [d]efinitive [p]roxy [s]tatement." (*Id.* ¶ 120 (citing *id.* ¶¶ 123-24).)

With respect to compensation related to Nadal's use of MDC's aircraft in 2013, the 2015 Proxy does not appear to disclose any such amounts, and Plaintiffs do not identify any such disclosure. Paragraphs 123 and 124 of the amended complaint, which Plaintiffs cite in paragraph 120 for the assertion that aircraft-related compensation was

"revealed" in the 2015 Proxy, merely discuss the revelation of the amounts paid for the New York City apartment. (*See id.* ¶¶ 123, 124.) Accordingly, Plaintiffs' allegation regarding undisclosed aircraft-related compensation does not plead a false or misleading statement.

With respect to the New York City apartment, there can be no dispute that the 2013 compensation [*48] originally disclosed for Nadal was "false" in the sense that the total compensation reported for Nadal ($20,679,263) did not include the $54,172 MDC paid for Nadal's use of the apartment. (*Id.* ¶ 124.) Defendants argue, however, that the undisclosed amount is not material. (Def. Mem. at 27-28.) Materiality is a "fact-specific inquiry," and courts may not dismiss securities fraud claims on materiality grounds unless the facts at issue "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197. However, the Second Circuit has made clear that courts may evaluate materiality at the pleading stage, and if they do so "must consider," in an "integrative matter," "both 'quantitative' and 'qualitative' factors." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011); *ECA*, 553 F.3d at 198; *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162-63 (2d Cir. 2000). In aid of this analysis, the Second Circuit has held that a "five percent numerical threshold" — i.e., at least a five percent difference between an inaccurate versus accurate financial disclosure — is a "good starting place for assessing the materiality of the alleged misstatement," and that useful "qualitative factors" include "(1) concealment of an unlawful transaction, (2) significance of the [*49] misstatement in relation to the company's operations, and (3) management's expectation that the misstatement will result in a significant market reaction." *ECA*, 553 F.3d at 198.

The parties focus here on the five percent threshold and disagree as to which item in MDC's financial statements the $54,172 should be measured against. (*See* Def. Mem. at 27-28; Pl. Opp'n at 15-18.) Perhaps not surprisingly, Plaintiffs argue that it should be measured as a percentage of Nadal's "All Other Compensation" for 2013 ($500,000) (Pl. Opp'n at 16-17), which just happens to be the smallest subcategory of expenses in which the expense could fall in the 2014 Proxy and the only way to even approach the Second Circuit's 5% threshold. But while Plaintiffs correctly note that "the items in issue should be compared to like items on the corporate financial statement," *Ganino*, 228 F.3d at 165, Plaintiffs offer no justification, and the Court can think of none, for comparing the $54,172 in undisclosed benefits to any category lower than Nadal's total compensation for 2013 ($20,679,263), and arguably the more appropriate comparison is MDC's total expenses for 2013, which exceeded $1.1 billion, *see* Current Report Ex. 99.1, sched. 1 (Form 8-K) (Feb. 20, 2014). [*50] And since $54,172 is a mere 0.26% of Nadal's total 2013 compensation, it is well below the Second Circuit's 5% threshold. Moreover, the fact that the 2014 Proxy actually identified the existence of compensation beyond the numbers reported in Nadal's compensation table — by disclosing the New York City apartment perquisite, albeit without including the precise dollar value (*see* Compl. ¶ 119) — further weighs against a conclusion that the disclosure of the dollar amount, in the mind of a reasonable investor, would have "significantly altered the total mix of information made available," *ECA*, 553 F.3d at 197 (internal quotation marks omitted). Accordingly, in light of its minuscule impact on Nadal's overall compensation and given Plaintiffs' failure to identify any qualitative factors that would otherwise support materiality, the Court finds that Nadal's 2013 compensation was not materially misstated.[7]

ii. Undisclosed Improper Reimbursements

Plaintiffs also allege that MDC inappropriately reimbursed $10.5 million of Nadal's expenses over the period 2009 through 2014. (Compl. ¶¶ 13, 17, 121(a)— (b), 129, 138.) However, the amended complaint does not identify specific statements that were false when made in light of these improper expense reimbursements; indeed, its

---

[7] The amended complaint also alleges that the 2015 Proxy revealed, like its disclosure with respect to Nadal's 2013 compensation, the specific amount of Nadal's New York City apartment compensation for *2012*. (Compl. ¶ 124.) While the amended complaint does not specifically allege that the $9,277,422 in compensation [*51] disclosed for Nadal for 2012 was thus understated (*see id.* ¶ 118), if it had made that allegation, it would have failed on the same materiality ground as set forth above.

"Materially False and Misleading Statements" section mentions the $10.5 million only to establish that MDC's internal controls were inadequate. (*See id.* ¶¶ 108(d), 117(d).) Similarly, in explaining why Nadal's compensation was understated in the 2014 Proxy, the amended complaint cites only MDC's failure to specify the amounts paid for Nadal's use of company aircraft and the New York City apartment. (*See id.* ¶ 120.) Moreover, Plaintiffs allege no facts supporting the inference that MDC's financial statements improperly characterized the reimbursements as something other than expenses, so as to "conceal[] MDC's true financial condition by understating the [*52] amount of its executive compensation expenses." (*Id.* ¶ 10.) Nevertheless, Plaintiffs' opposition brief argues, for the first time, that the improper reimbursements were not just an internal controls issue, but also a separate ground for the assertion that MDC underreported Nadal's compensation. (*See* Pl. Opp'n at 15 (arguing that "Defendants misled MDC's investors in two respects," including by underreporting Nadal's perquisites and failing to report improperly reimbursed expenses).) With some guesswork and speculation, the amended complaint's allegations could be read as supporting, however vaguely and inarticulately, a contention that, for each year from 2009 through 2014, MDC should have characterized about $2.10 million (one fifth of the $10.5 million for the total period) as compensation paid to Nadal, rather than some other type of expense — such that MDC underreported Nadal's compensation despite accurately reporting its overall expenses.

This is not a *pro se* action, however, and the Court is not required to construe Plaintiffs' pleading "liberally to raise the strongest arguments it suggests." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014). Rather, the PSLRA imposes — "[a]s a check against abusive litigation by private parties" [*53] — "[e]xacting pleading requirements" with respect to "the facts constituting the alleged violation," *Tellabs*, 551 U.S. at 313, mandating that courts dismiss a complaint that fails to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), (3). The general allegation that "Defendants failed to disclose the true amount of compensation paid to Defendant Nadal, including the fact that Nadal received" $10.5 million "in inappropriately reimbursed personal expenses" over the period from 2009 through 2014 (Compl. ¶¶ 10, 13, 17), does not "specify [a] statement alleged to have been misleading" or "the reason or reasons why th[at] statement is misleading." Accordingly the PSLRA compels the Court to reject the allegation.

However, even if Plaintiffs had pled the theory the Court has identified from the amended complaint's unspecific allegations, that theory would still fail to plead a material misstatement. While MDC obviously would have understated the 2013 compensation reported for Nadal during the Class Period if it had failed to report $2.10 million of additional compensation in the form of reimbursements, the question remains whether the misstatement would have been material. [*54] Arguably, as with Nadal's undisclosed perquisites, the proper comparison for materiality purposes is with MDC's total 2013 expenses ($1,180,873,000), against which another $2.10 million would amount to a paltry 0.18% — well below the Second Circuit's 5% threshold and clearly immaterial. When compared to Nadal's $20,679,263 in 2013 compensation, however, the percentage lands above the threshold at 10.2%.

But even assuming that is the correct comparison, the Court's analysis does not end there, as it must also consider "'qualitative' factors" of materiality. *Litwin*, 634 F.3d at 717. On this point, Plaintiffs argue that "'management's expectation that the misstatement will result in a significant market reaction,'" *ECA*, 553 F.3d at 198, is a factor supporting qualitative materiality, and they cite negative media coverage following MDC's disclosures at the end of the Class Period. (*See* Compl. ¶¶ 172-74.) But this media coverage actually cuts *against* qualitative materiality, since none of the cited news reports express the view that MDC's disclosures revealed Nadal's pay to be materially higher than previously thought, or revealed it to be excessive whereas before it was considered reasonable. To the contrary, the reports suggest [*55] that investors already knew Nadal was paid like a sultan. (*See id.* ¶ 172 (*Globe and Mail* article noting Nadal's history of exorbitant pay and ranking him among the highest-paid executives in Canada despite MDC's uneven financial results and the fact that its competitors perform better and pay their CEOs less)); *see also* Nathalie Tadena, *MDC Partners' Stock Takes a Hit on SEC Investigation*, Wall St. J., Apr. 28, 2015, http://on.wsj.com/1ENtdWe (last visited Sept. 30, 2016) (noting that Nadal's $16.8 million in 2014 compensation

was "down from $20.7 million a year earlier" but still exceeded that of CEOs at "much bigger" and better-performing rivals), *cited in* Compl. ¶ 173. The compensation rankings cited by Plaintiffs in the amended complaint further demonstrate that Nadal's excessive compensation was widely known, ranking Nadal as the second-highest paid advertising executive in 2011. (Compl. ¶ 4.) Similarly, the *New York Times* published an article during the Class Period listing Nadal as the 58th highest-paid CEO of any American company in 2013. Karl Russell, *The Pay at the Top*, N.Y. Times, June 7, 2014, http://nyti.ms/1kI4p6h (last visited Sept. 30, 2016). An additional $2.10 million in either of those years would not have earned [*56] Nadal the number one spot among advertising executives, *see* Jim Edwards, *The 33 Richest People in Advertising, Ranked by Income*, Bus. Insider, May 19, 2012, http://www.businessinsider.com/businessinsiders-advertising-rich-list-2012-2012-5 (last visited Sept. 30, 2016), and it would have bumped him only from 58th to 45th on the list of all executives, *see* Russell, *supra*.

Thus, setting aside for the moment whether the $10.5 million in improper reimbursements shows inadequate controls, when this figure is considered solely as a misstatement of Nadal's compensation, $2.10 million per year hardly registers. In that context, it is simply not "substantial[ly] likel[y] that a reasonable shareholder would," in deciding whether to purchase MDC securities, "consider it important" to know that Nadal was marginally closer to being the highest-paid advertising CEO, instead of the second-highest-paid, or that he was not the 58th highest-paid CEO in American business, but rather the 45th. *ECA*, 553 F.3d at 197; *see also Kleinman*, 706 F.3d at 152-53 ("[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor"). Stated differently, the revelation that Nadal's notoriously excessive compensation was in fact 10.2% higher than previously disclosed would not, as a matter of law, be viewed by a reasonable investor [*57] as "*significantly alter[ing]* the 'total mix' of information made available." *ECA*, 553 F.3d at 197 (emphasis added). Accordingly, the Court concludes that MDC's failure to disclose the $10.5 million in improper expense reimbursements, even if considered as an undisclosed form of compensation and compared against Nadal's 2013 pay, was not a material misstatement.[8]

d. Management's Statement that MDC's Internal Controls Were Adequate

Plaintiffs also allege that MDC, in its quarterly and annual reports filed during the Class Period, misled investors by affirming that it maintained adequate internal controls over its financial reporting (*id.* ¶¶ 105, 106, 115-16), when in fact MDC "had substantial internal control deficiencies" that caused MDC to inappropriately [*58] reimburse $10.5 million of Nadal's expenses (*id.* ¶¶ 108(d), 117(d)). While a closer call than Plaintiffs' undisclosed compensation argument, this argument also fails as a matter of law.

First, the mere fact that MDC's internal controls failed to catch these improper reimbursements does not demonstrate the falsity of MDC's statements that its controls were adequate. *See Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 400 (S.D.N.Y. 2001) ("'The mere disclosure of adverse information shortly after a positive statement does not support a finding that the prior statement was false at the time it was made.'" (quoting *Elliott Assocs., L.P. v. Covance, Inc.*, No. 00-cv-4115 (SAS), 2000 U.S. Dist. LEXIS 17099, 2000 WL 1752848, at *7 (S.D.N.Y. Nov. 28, 2000) (citing *San Leandro*, 75 F.3d at 812))); *see also, e.g., In re Royal Bank of Scot. Grp. PLC Sec. Litig.*, No. 09-cv-300 (DAB), 2012 U.S. Dist. LEXIS 126220, 2012 WL 3826261, at *8 (S.D.N.Y. Sept. 4, 2012) ("Pointing to the subsequent subprime market collapse and alleging that [defendant] must therefore have failed to follow its internal control procedures is not sufficient."), *aff'd sub nom. Freeman Grp. v. Royal Bank of Scot. Grp. PLC*, 540 F. App'x 33 (2d Cir. 2013). Plaintiffs must instead allege "why or how" MDC's internal controls "were materially deficient at the time" of the challenged statements. *See Janbay v. Can. Solar, Inc.*, No. 10-

---

[8] The Court expresses no view on whether the services Nadal provided to MDC, a seemingly underperforming advertising firm holding company, justified paying him more than the CEOs of Verizon Communications, Dow Chemical, Goldman Sachs, General Electric, Coca-Cola, Pfizer, Starbucks, Lockheed Martin, Nike, and IBM. *See* Russell, *supra*. In any event, allegations of excessive compensation (Compl. ¶¶ 4, 172-73) belong in a corporate waste complaint; they do not establish securities fraud. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977).

cv-4430 (RWS), 2012 U.S. Dist. LEXIS 47125, 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012) (dismissing Section 10(b) claim where "[t]he [c]omplaint [did] not allege any facts explaining why or how [the company's] internal controls were materially [*59] deficient at the time [the company] made any of the challenged statements"); *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (dismissing Section 10(b) claim where the complaint "d[id] not claim that [defendant] failed to evaluate its internal controls or disclose any weaknesses to its auditors" or "make any allegation as to how or why [defendant's] internal controls were inadequate"), *aff'd sub nom. Klein v. PetroChina Co.*, 644 F. App'x 13 (2d Cir. 2016); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10-cv-2835 (NRB), 2011 U.S. Dist. LEXIS 106046, 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011) (dismissing Section 10(b) claim because "plaintiffs have not alleged any facts pertaining to the [c]ompany's internal structure for financial reporting, much less that [the company] lacked adequate internal controls").

Here, the only specific allegations in the amended complaint regarding the controls and processes in place at MDC come from a second confidential witness ("CW 2"), who offers no information regarding the adequacy of MDC's controls. Specifically, Plaintiffs allege that CW 2, who was a vice president in MDC's treasury from 2011 through 2013 and processed Nadal's expenses as part of that job, would receive a "cover sheet" containing a total amount (but not any of the details) of Nadal's travel and entertainment expenses. (*Id.* ¶ 37.) Before CW 2 received the cover sheet, [*60] however, all of Nadal's expenses were first approved by MDC's board of directors or the board's compensation committee. (*Id.*) Moreover, CW 2 would only process Nadal's expenses after obtaining an approval signature from Sabatino or, if Sabatino was unavailable, Doft. (*Id.*) After receiving that approval, CW 2 would then arrange payment to Nadal by wire transfer, and MDC's accounting department would book the reimbursements in MDC's financial records. (*Id.*) These allegations do not identify a failure to evaluate controls, to follow procedures, to report a weakness to auditors, or any other basis from which the Court could infer that MDC's controls were inadequate during the Class Period.

Nor can Plaintiffs simply rely on the fact that, upon disclosing in 2015 that Nadal had received $10.5 million in inappropriate reimbursements, MDC announced that it would be implementing "remedial steps to improve and strengthen its internal controls and procedures regarding travel, entertainment and related expenses." (*Id.* ¶ 121(c).) In fact, the law is clear that remedial efforts are "a prudent course of action that weakens rather than strengthens an inference of scienter." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010); *see also Stevelman*, 174 F.3d at 84 (rejecting argument [*61] that a company's "subsequent revelation of its accounting policy change and retroactive announcement of lowered earnings should be probative of conscious misbehavior or recklessness"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014) ("The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made."), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

* * *

For the foregoing reasons, the Court concludes that Plaintiffs have not pled a material misstatement or omission, which alone warrants dismissal of the amended complaint. The Court nevertheless turns to scienter, which provides an alternate basis for dismissal.

2. Scienter

Under the PSLRA, a securities fraud complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). "The requisite state of mind . . . is an intent 'to deceive, manipulate, or defraud.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 313). To be "strong," an inference of scienter "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at

314. [*62] In making this determination, the question is not whether "any individual allegation, scrutinized in isolation, meets th[e] standard"; rather, courts must "collectively" evaluate "all of the facts alleged." *Id.* at 323.

In the Second Circuit, the requisite strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198; *accord ATSI Commc'ns*, 493 F.3d at 99. It is "indisputable that key directors and officers have [the] ability to manipulate their company's stock price," *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996), and so securities fraud allegations typically focus, as they do here, on officer defendants' motives, rather than their opportunity, to commit fraud.

a. Motive to Commit Fraud

To raise a strong inference of scienter by pleading motive to defraud, a plaintiff must allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. However, "it is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability [*63] or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 308); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("If scienter could be pleaded" solely on the basis that "defendants were motivated to defraud the public because an inflated stock price would increase their compensation," then "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."). Here, Plaintiffs allege that the Individual Defendants' insider stock sales and compensation structure during the Class Period demonstrate that they had a motive to commit fraud. The Court will address each of these allegations in turn.

i. Insider Trading

A plaintiff may plead motive by alleging facts showing that "corporate insiders misrepresent[ed] material facts to keep the price of stock high while selling their own shares at a profit." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001); *see also ECA*, 553 F.3d at 198 ("[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."). Here, the amended complaint alleges that the Individual Defendants collectively sold 6,475,305 shares of MDC stock during the eighteen-month Class [*64] Period, for combined gross proceeds of $163,600,046, while selling only 52,050 shares for $570,049 over the same length of time immediately prior to the Class Period. (*Id.* ¶ 135; *see also id.* ¶¶ 136-37, 147, 154, 159, 162 (discussing each of the Individual Defendants' sales).)

"'However, the mere fact that insider stock sales occurred does not suffice.'" *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (quoting *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009)). Instead, to demonstrate motive, "'plaintiffs must establish that the sales were 'unusual' or 'suspicious'" at the time they were made. *Id.* (brackets omitted) (quoting *Gildan Activewear*, 636 F. Supp. 2d at 270). "Whether trading was unusual or suspicious turns on factors including (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Glaser*, 772 F. Supp. 2d at 587 (collecting cases).

To start, the allegation that the Individual Defendants collectively sold far more shares [*65] for far greater proceeds during the Class Period than they did over the eighteen-month period preceding the Class Period (Compl. ¶ 135) fails to support a strong inference of scienter because the totals are based on a time period with no apparent connection to the alleged fraud. While Plaintiffs' reason for selecting April 27, 2015 — the date MDC disclosed the

SEC investigation — as the conclusion of the Class Period is clear, Plaintiffs have not explained why October 28, 2013 — a date on which MDC simply announced its third quarter 2013 earnings — holds any significance as the opening date of the Class Period. To be sure, Plaintiffs allege that earnings release contained fraudulent statements (*see id.* ¶¶ 90, 96-98), but the bases for that allegation are that MDC had continuously failed to write down goodwill associated with Zyman Group since 2006 (*see id.* ¶¶ 72-73), that MDC had reported non-"industry standard" EBITDA since 2012 (*id.* ¶¶ 46, 82), and that Nadal had received improper expense reimbursements since 2009 (*id.* ¶ 138).

A more logical beginning date for assessing the Individual Defendants' trades is October 5, 2014, the date MDC received a subpoena from the SEC. (*Id.* ¶¶ [*66] 13, 56, 170.) After this date, based on Plaintiffs' allegations, the Individual Defendants presumably would have realized that the unraveling of the alleged fraud was imminent and would have had motive to dump their shares before the stock price inevitably dropped. But when the alleged stock sales are reviewed from this date through the end of the Class Period, instead of the illogical eighteen-month period alleged by Plaintiffs, a much different picture emerges. Plaintiffs allege that Nadal, Doft, Sabatino, Gendel, and Kirby each executed a trade on November 5, 2013, that Doft, Sabatino, and Gendel also executed trades on December 30, 2013, February 20, 2014, and February 23, 2015, and that Nadal alone executed an additional trade on May 16, 2014 for a combined total of 6,475,305 shares and $163,600,046 in gross proceeds. (*See id.* ¶¶ 135, 136, 147, 154, 159, 162.) However, when only the February 23, 2015 trades are considered (the only trades that were made after MDC received the SEC subpoena), two of the Individual Defendants, Nadal and Kirby, sold no shares (*see id.* ¶¶ 137, 162), and the remaining three individuals collectively sold only 8,630 shares for proceeds of $219,375 (*see* [*67] *id.* ¶¶ 147, 154, 159). Given these facts, the Court simply cannot infer scienter from far greater sale totals occurring over Plaintiffs' far less logical time period.

Plaintiffs offer no convincing arguments for why their eighteen-month period, or even some period other than the one described above, should be considered when analyzing the Individual Defendants' trades. To get around the October 2014 subpoena date, Plaintiffs argue that the SEC began "questioning" MDC "about the way it presented earnings and accounted for its profitability" "[n]ot long after" CW 1 submitted his whistleblower complaint and that Defendants thus "likely knew of the SEC investigation" shortly thereafter. (Pl. Opp'n at 53-54 (quoting Compl. ¶ 41 (emphasis removed)).) But this is mere conjecture; Plaintiffs allege no facts suggesting that the Individual Defendants were aware of the investigation before they received the subpoena in October 2014. Moreover, the assertion that the SEC began "questioning" MDC about its financial reporting appears to be based on a comment letter the SEC sent to MDC on May 9, 2014 (*id.* ¶ 136), which was publicly filed and included certain instructions for MDC's reporting of non-GAAP [*68] metrics in "future filings." (*See* MDC Partners Inc., SEC Comment Letter (May 9, 2014).) As Plaintiffs acknowledge, however, MDC had previously received and responded to several comment letters of this nature (*id.* ¶¶ 6-8), and the May 9, 2014 letter says nothing about GAAP violations or an ongoing or potential investigation.

The only other argument Plaintiffs offer in defense of the trading period alleged in the amended complaint is that, "when the Defendants disposed of their shares, they were aware of relevant issues that had been raised in the context of CW 1's lawsuit against [MDC], which was filed in July 2012" and touched on subjects relating to goodwill and Zyman Group. (Pl. Opp'n at 54.) But CW 1's lawsuit was filed nearly a year and a half before the alleged insider trading began, and CW 1's mere allegations — in a dispute over CW 1's own compensation — would hardly have put Defendants on notice that their alleged scheme would soon unravel. Nor, for that matter, does the filing of CW 1's lawsuit establish that Defendants knew or foresaw that issues raised in the litigation would later be submitted in a whistleblower complaint to the SEC and become the subject of an investigation. [*69] Thus, the amended complaint fails to support an inference of scienter based on the Individual Defendants' trading during the eighteen-month Class Period.

Even accepting the Class Period as a logical period of review for the Individual Defendants' trades, however, all of the trades except for the February 23, 2015 trades occurred nearly a year or more before the end of the Class Period.

Courts in this District have consistently held that stock sales occurring even a few months before the alleged revelation of the fraud do not raise a strong inference of scienter. *See, e.g., In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) (lapse of "approximately four months" between defendant's "substantial sales and the revelation of the alleged falsity" "inescapably attenuate[d] any inference of scienter"); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595-96 (S.D.N.Y. 2006) (stock sales "six months in advance of" an attorney general's complaint "d[id] not suggest a motive to commit fraud"); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444-45 (S.D.N.Y. 2005) (stock sales that were "not clustered at [the] end" of the Class Period, "when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted," did not suggest scienter). Accordingly, because the vast majority of the Individual Defendants' trades occurred a year or more before the alleged revelation [*70] of the fraud, they do not support an inference of fraudulent motive even if the Class Period were a logical measurement period.[9]

The Court also notes that information contained in the Forms 4 that reported the Individual Defendants' trades to the SEC suggests that the trades were executed for legitimate rather than fraudulent purposes.[10] The filings disclose that the Individual Defendants' November 5, 2013 trades all involved the exercise of stock appreciation rights that were set to expire in February 2014, and that the trades by Doft, Sabatino, and Gendel on December 30, 2013, February 20, 2014, and February 23, 2015 all involved the [*71] withholding of shares to satisfy tax requirements on vesting restricted stock.[11] Courts in this District have held that the exercise of expiring stock appreciation rights and the disposition of shares to pay taxes do not demonstrate a defendant's motive to defraud. *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) (where "the timing of [defendant's] transactions was tied to the predetermined expiration of his employee stock options," "[t]he fact that [defendant] exercised the expiring options and sold his newly-purchased shares does not, in and of itself, demonstrate a motive to defraud"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (rejecting motive allegations where defendants' trading "show[ed] a consistent pattern of trading undertaken primarily to make payments required for the exercise of stock options or to pay taxes"); *see also Lululemon*, 14 F. Supp. 3d at 586 (executive's "established practice of exercising stock options as they vested and selling a matching number of shares on a quarterly basis" was not "suspicious[]"). Thus, the disclosed nature of the Individual Defendants' trades also suggests the absence of fraudulent motive.

ii. Compensation Tied to Earnings Results

Plaintiffs also allege that Nadal, Doft, Sabatino, and Gendel were motivated to artificially inflate MDC's financial performance using a "highly misleading EBITDA calculation" because their compensation was "[d]irectly [t]ied" to this figure. (Compl. ¶¶ 142-43, 150-51, 157, 160 (capitalization removed).) Plaintiffs also denounce Kirby for his alleged role in the decision by MDC's compensation committee to approve this EBITDA metric "as a critical [*73]

---

[9] Plaintiffs further allege that Nadal "continued to dump his MDC shares" *after* the Class Period, selling 1.842 million shares (approximately 48% of his MDC holdings) on October 29, 2015. (Compl. ¶ 137.) It is not clear what relevance this sale could have to Nadal's alleged motive to make fraudulent statements during the Class Period. If anything, the fact that Nadal waited to sell millions of shares until MDC's stock price had dropped following the revelation of the alleged fraud cuts against an inference that he sold stock illegally during the Class Period.

[10] Courts may consider "legally required public disclosure documents filed with the SEC," *ATSI Commc'ns*, 493 F.3d at 98, and they routinely look to "information from SEC filings regarding a defendant's stock sales [*72] to determine whether such sales were 'unusual' or 'suspicious,'" *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 582 (S.D.N.Y. 2011) (collecting cases); *see also Glaser*, 772 F. Supp. 2d at 587 ("When a complaint alleges only 'incomplete information' concerning insider sales, the court is 'free to consider' defendants' SEC filings to fill gaps on [a] motion to dismiss." (citing *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 n.182 (S.D.N.Y. 2006)).

[11] See the Forms 4 filed on behalf of Nadal, Doft, Sabatino, Gendel, and Kirby on November 7, 2013, and the Forms 4 filed on behalf of Doft, Sabatino, and Gendel on January 2, 2014, February 24, 2014, and February 25, 2015, available on the SEC's EDGAR website, samples of which are attached as Exhibits 14-17 to the Declaration of Craig S. Waldman in Support of Defendants' Motion to Dismiss the Amended Complaint. (Doc. No. 56.)

component of MDC's executive compensation." (*Id.* ¶ 168.) However, the law is clear in the Second Circuit that a plaintiff cannot plead motive to defraud simply by "alleg[ing] goals that are 'possessed by virtually all corporate insiders,' such as the desire to . . . sustain the appearance of corporate profitability." *S. Cherry*, 573 F.3d at 109; *see also Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Insufficient motives . . . can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation."). These allegations accordingly do not support motive.

b. Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

Although Plaintiffs have failed to plead that Defendants had a motive to defraud, that failure "is not fatal" to a securities fraud claim, *Tellabs*, 551 U.S. at 325, since a plaintiff may also plead scienter by alleging "strong circumstantial evidence of defendants' conscious misbehavior or recklessness," *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted). However, in the absence of motive, "the strength of th[ose] circumstantial allegations must be correspondingly greater." *Id.* Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material [*74] information, or knowing sale of a company's stock at an unwarranted discount," *Novak*, 216 F.3d at 308 (citations omitted), while recklessness is defined as "a state of mind approximating actual intent, and not merely a heightened form of negligence," and "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," *S. Cherry*, 573 F.3d at 109 (emphasis removed). A plaintiff may plead recklessness by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements," or by "alleg[ing] facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Dynex*, 531 F.3d at 196.

i. Approval of Nadal's Expense Reimbursements

Plaintiffs argue that Nadal's receipt of expense reimbursements that were later deemed improper, coupled with the fact that Doft, Sabatino, and Kirby signed off on those reimbursements, demonstrates that these defendants knew MDC was underreporting Nadal's compensation. [*75] (Compl. ¶¶ 138, 149, 155, 168.) But these allegations, without more, do not suggest that Nadal, Doft, Sabatino, or Kirby knew the expenses were not appropriate for reimbursement at the time of MDC's filings. The mere fact that a defendant held a supervisory position or a position of authority — including, here, Nadal's role as chairman of the board and CEO, which entitled him to "influence appointments" to MDC's compensation committee (*id.* ¶ 144), and Doft's and Sabatino's roles in the expense reimbursement approval process (*id.* ¶¶ 149, 155) — has been repeatedly rejected by courts in this District as supportive of an inference of scienter. *See, e.g., Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011) ("[C]ourts in this District have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." (internal quotation marks omitted) (collecting cases)), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). Plaintiffs' allegation that MDC announced "remedial steps to improve and strengthen its internal controls and procedures regarding travel, entertainment and related expenses" (Compl. ¶ 170; *see also id.* ¶ 13) is likewise insufficient. *See Slayton*, 604 F.3d at 777; *Stevelman*, 174 F.3d at 84; *Magnum Hunter*, 26 F. Supp. 3d at 295.

Plaintiffs' only specific allegations regarding MDC's expense reimbursement process [*76] come from CW 2, whose assertions add little to Plaintiffs' claims. As noted above, Plaintiffs do not allege that CW 2 had any role in the actual approval of Nadal's expenses; rather, CW 2's job was to process reimbursements after they had already been approved. (Compl. ¶ 37.) And although CW 2 purports to have received a "cover sheet" containing the total amount (but not any of the details) of Nadal's travel and entertainment expenses, CW 2 does not assert that this was the only information that anyone reviewed in connection with approving expenses. (*Id.*) To the contrary, it is clear that CW 2 lacks personal knowledge of the review and approval of Nadal's expenses, given Plaintiffs' allegation that, "[a]s far as CW 2 understood, all of Nadal's expenses were approved by MDC's [b]oard of [d]irectors or the

[c]ompensation [c]ommittee before CW 2 received the cover sheet." (*Id.*) Thus, the Court can infer no fraud from CW 2's allegations. *See In re BioScrip, Inc. Secs. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) ("Allegations premised on the testimony of confidential sources 'must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements . . . .'"); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 691 (S.D.N.Y. 2008) (rejecting confidential witness allegation that "lack[ed] detail that might suggest that th[e] [witness] had personal [*77] knowledge").

Nothing in the amended complaint, moreover, comes close to explaining why Doft, Sabatino, and Kirby would have knowingly approved the payment of reimbursements to Nadal that he was not entitled to or why these defendants would have sat idly by while MDC failed to report these payments as compensation for Nadal. Indeed, with respect to Kirby, who sat on the board's compensation committee and "ma[de] recommendations for the [b]oard" on "the compensation of senior executives" (Compl. ¶ 168), Plaintiffs cannot logically explain why a board member who had no problem approving tens of millions of dollars of *disclosed* compensation to Nadal would feel the need to secretly approve, and fraudulently omit from MDC's disclosures, an additional one or two million dollars per year. Plaintiffs simply allege that because these individuals were involved in the approval process and because MDC ultimately disclosed that Nadal had received improper reimbursements, the individuals who approved the reimbursements must have known that they were improper and that MDC was misrepresenting its expenses — a plainly insufficient "fraud by hindsight" theory.

### ii. Resignations of Nadal and Sabatino

Plaintiffs also ask [*78] the Court to draw an inference of fraud from the facts that (1) Sabatino moved from chief accounting officer to "work on special projects" toward the end of the Class Period, during MDC's internal investigation, and that (2) both Sabatino and Nadal resigned "abruptly" several months after the Class Period ended, during the SEC's investigation, and returned certain bonus payments or forwent certain severance packages. (*Id.* ¶¶ 139, 156.) However, courts "have consistently held that an officer's resignation, without more, is insufficient to support a strong inference of scienter." *See Gillis v. QRX Pharma Ltd.*, No. 15-cv-4868 (PAE), 197 F. Supp. 3d 557 , 2016 U.S. Dist. LEXIS 87489, 2016 WL 3685095, at *35 (S.D.N.Y. July 6, 2016) (collecting cases); *see also Glaser*, 772 F. Supp. 2d at 598 (resignations support an inference of fraud only if they are "highly unusual and suspicious"). The fact that, as part of these resignations, Nadal and Sabatino forfeited or agreed to repay certain bonuses or severance packages does not connect a resignation to fraud any more than does the resignation itself. The amended complaint simply contains no allegations supporting an inference of fraud that is at least as compelling as an inference of mismanagement or one of the myriad other reasons an executive might resign.

### iii. Involvement [*79] in Financial Reporting

Plaintiffs also attempt to plead scienter based on allegations that Nadal, Doft, Sabatino, Gendel, and Kirby were involved in MDC's financial accounting and reporting by reason of their positions at the company or their signing of SEC filings. (Compl. ¶¶ 145-46, 148, 152-53, 158, 161, 164-65.) But, as explained above, the argument that defendants must have known that alleged misstatements were false because they were high-ranking officers or board committee members has been repeatedly rejected by courts in this District. *See Mechel OAO*, 811 F. Supp. 2d at 873. Similarly insufficient are Plaintiffs' bare allegations that certain defendants signed SEC filings. *See Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp.*, No. 15-cv-2492 (WHP), _ F. Supp. 3d _, 2016 U.S. Dist. LEXIS 120641, 2016 WL 4688862, at *7 (S.D.N.Y. Sept. 7, 2016) ("'required certifications under Sarbanes-Oxley . . . add nothing substantial to the scienter calculus' because 'allowing Sarbanes-Oxley certifications to create an inference of scienter in every case where there was an accounting error or auditing mistake made by a publicly traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA'" (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1003-04 (9th Cir. 2009))); *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 590 (S.D.N.Y. 2010) (dismissing defendants who merely "signed [the company's] SEC disclosures"). The Court thus accords [*80] these arguments no weight in its comparison of fraudulent and nonfraudulent inferences.

#### iv. Kirby's Performance and Qualifications as Chairman of the Audit Committee

Finally, Plaintiffs assert that, at least with respect to Kirby, scienter can be inferred from his "reckless[] abdicat[ion] [of] his duties as chairman of MDC's audit committee" and his "lack[] [of] the requisite expertise to execute those duties." (Compl. at 77 (capitalization removed).) Plaintiffs base this contention on the fact that, in a deposition taken in connection with CW 1's dismissed lawsuit against MDC, Kirby testified that he (1) was not aware whether MDC's outside auditors "reviewed and tested" Zyman Group's goodwill or "propose[d] any adjustment" based on an impairment, and (2) "would rely totally on the outside auditors . . . on the audit questions," under "the assumption that [they were] treated appropriately because the accounting firm is a good accounting firm." (*Id.* ¶ 166.) In the first instance, Plaintiffs offer no authority for the striking proposition that it is improper or a "reckless[] abdicat[ion]" of duty for the chairman of a public company's audit committee to rely on the work of an outside auditor. Even if that were true, it [*81] would describe mismanagement and poor governance, not securities fraud. *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 228 (2d Cir. 2000) ("[A] section 10(b) plaintiff cannot transform a fiduciary-duty claim or a mismanagement claim into a claim of non-disclosure."); *Magnum Hunter*, 26 F. Supp. 3d at 295 ("inference . . . of an oversight failure of management" did not support securities fraud claim). As for Plaintiffs' assertion that Kirby lacked "the requisite financial expertise to serve on MDC's [a]udit [c]ommittee, much less serve as its Chairman" (Compl. ¶ 167), this too alleges at most mismanagement, not securities fraud. The securities laws are not concerned with an individual's "reckless[] lack[] [of] the requisite . . . expertise" (*id.*) — only his "reckless disregard for the truth" of his public statements. *S. Cherry*, 573 F.3d at 109. This Plaintiffs have failed to plead.

#### c. Holistic Assessment of Scienter Allegations

Even though the Court has rejected all of Plaintiffs' scienter arguments individually, it must also consider whether the allegations and other proper sources of facts "give rise to a strong inference of scienter" when "taken collectively." *Tellabs*, 551 U.S. at 322-23. In sum, the amended complaint alleges that MDC's senior-most executives and the chair of MDC's audit committee orchestrated a scheme to defraud investors by (1) marginally inflating [*82] MDC's total assets by maintaining goodwill for a small, defunct subsidiary, (2) boosting MDC's earnings by reporting a "nonstandard" version of "Adjusted EBITDA" that Defendants also defined in every earnings release, (3) concealing immaterial amounts of Nadal's widely reported eight-figure compensation, and (4) generally attesting to the adequacy of MDC's controls despite approving $10.5 million in expense reimbursements to Nadal that ultimately had to be repaid, with no alleged benefit to MDC or the other defendants. The Court finds that the implausibility of this theory of fraud speaks for itself and is far less compelling than an inference of, at most, non-actionable mismanagement and negligence.

#### B. Alleged Violations of Exchange Act Section 20(a)

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act." *Blanford*, 794 F.3d at 305 (quoting 15 U.S.C. § 78t(a)). Because Plaintiffs' Section 20(a) claim "is necessarily predicated on a primary violation of securities law," and the Court has determined that Plaintiffs have failed to plead a primary violation, Plaintiffs' Section 20(a) claim "must also be dismissed." *Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004).

#### C. Required Findings as to the Parties' Compliance [*83] with Rule 11

The PSLRA mandates that, at the end of any private securities action, the district court must "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of" Federal Rule of Civil Procedure 11(b). 15 U.S.C. § 78u—4(c)(1); *see also Rombach*, 355 F.3d at 178 (remanding for findings under Rule 11 because the PSLRA "mandates" such findings and "the imposition of sanctions" if "the court finds that any party or lawyer violated Rule 11(b)"). Having carefully considered the

amended complaint and the briefing on Defendants' motion to dismiss, the Court concludes that no party has violated Rule 11(b).

D. Leave to Amend

In their brief opposing Defendants' motion to dismiss, Plaintiffs request leave to amend the complaint a second time in the event that the Court grants Defendants' motion. (Pl. Opp'n at 66.) Plaintiffs' brief identifies a number of "newly discovered facts" that they propose to incorporate into a new complaint to "cure any deficiencies" identified by the Court's dismissal of their first amended complaint. (*Id.* at 10-11, 66.) These facts include MDC's disclosures in its most recent annual report and its fiscal year 2015 earnings call that (1) Nadal has agreed to repay additional reimbursements, (2) MDC incurred expenses for [*84] "business use of an airplane and helicopter that are owned by entities controlled by Nadal," (3) the SEC's investigation is ongoing and MDC cannot predict how much the company will need to spend before it concludes, (4) MDC has "engaged an outside accounting firm to review and assess the company's historical goodwill accounting," (5) MDC's cooperation with the SEC's investigation has been expensive, (6) following the resignation of Kirby and another audit committee member, MDC has been "actively looking to revamp [its] [b]oard of [d]irectors with expanded strategic vision, financial and operational expertise[,] and stronger independence," (7) two new board members will include a former executive vice president of Scotiabank and a "longtime partner" at Ernst & Young, (8) the Scotiabank executive will bring "over 30 years of experience in financial services, governance[,] and risk management" to MDC's audit committee, and (9) MDC had been looking for a new director with the Scotiabank executive's qualifications and expects that she will "step into the audit committee in a very pronounced way." (*Id.* at 10-11.)

The Court finds that these proposed new allegations would add nothing to cure the deficiencies identified [*85] in this Opinion. Rather, they are more of the same: irrelevant facts or mischaracterizations of remedial efforts as evidence of prior misleading disclosures that amount, at best, to a claim of corporate mismanagement and breach of fiduciary duty, which are not actionable under the federal securities laws. *See Santa Fe Indus.*, 430 U.S. at 476 (rejecting the proposition that "a breach of fiduciary duty ... , without any deception, misrepresentation, or nondisclosure, violates" Section 10(b) or Rule 10b-5). Since Plaintiffs have offered no facts to suggest that another amendment would be fruitful at this time, Plaintiffs' request for leave to amend is denied as futile. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (courts may deny leave to amend where amendment would be futile).

IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss the amended complaint is GRANTED, and this case is dismissed with prejudice. The Clerk of the Court is respectfully directed to terminate the motion pending at docket number 54, enter judgment in favor of Defendants, and close this case.

SO ORDERED.

/s/ Richard J. Sullivan

RICHARD J. SULLIVAN

United States District Judge

Dated: September 30, 2016

New York, New York

# Plaisance v. Schiller

United States District Court for the Southern District of Texas, Houston Division

March 14, 2019, Decided; March 14, 2019, Filed

CIVIL ACTION NO. H-17-3741

**Reporter**

2019 U.S. Dist. LEXIS 42073 *; 2019 WL 1205628

KRISTEN PLAISANCE, ROBBIE PLAISANCE, RICHIE CORLEY, CHARLES F. LEEKLEY, BRETT MORRIS, HENRY NEGRETTE, JIM NESBITT, CINDY SPARACINO, RICHARD SPARACINO, CHRISTIAN SCHICK, JACK GOSTL, SANTIAGO CORDOVEZ, FLOYD BONE, TOM HOWLAND, MICHAEL MERNAH, BEN A. SEALE, JOE SHUPAK, MARSHALL WHITMER, BILL WALTERS, ROBERT ROIG, JOSEPH C. ROSSO, and ARTHUR D. SECOR, Plaintiffs, v. JOHN D. SCHILLER, JR., D. WEST GRIFFIN, HILL A FEINBERG, NORMAN M.K. LOUIE, WILLIAM COLVIN, DAVID M. DUNWOODY, CORNELIUS DUPRÉ II, KEVIN FLANNERY, SCOTT A. GRIFFITHS, JAMES LaCHANCE, and UHY LLP, Defendants.

**Counsel:** [*1] For Kristen Plaisance, Robbie Plaisance, Richie Corley, Charles F. Leekley, Brett Morris, Henry Negrette, Jim Nesbitt, Cindy Sparacino, Richard Sparacino, Christian Schick, Jack Gostl, Santiago Cordovez, Floyd Bone, Tom Howland, Michael Mernah, Ben A. Seale, Joe Shupak, Marshall Whitmer, Bill Walters, Robert Roig, Plaintiffs: Randall Scott Newman, LEAD ATTORNEY, Mark C Rifkin, Wolf Haldenstein et al, New York, NY; Deirdre Carey Brown, Hoover Slovacek LLP, Galleria Tower II, Houston, Tx.

For Joseph C Rosso, Arthur D Secor, Plaintiffs: Deirdre Carey Brown, Hoover Slovacek LLP, Galleria Tower II, Houston, Tx.

For John D. Schiller, Jr., Defendant: Barrett H Reasoner, LEAD ATTORNEY, Ashley McKeand Kleber, Gibbs Bruns LLP, Houston, TX; David Michael Sheeren, Gibbs and Bruns LLP, Houston, TX; Kenneth E. Warner, Warner Partners, P.C., New York, NY.

For D. West Griffin, Defendant: Jill Rickershauser Carvalho, King and Spalding, Austin, TX; Paul R Bessette, King & Spalding LLP, Austin, TX; Tyler Wayne Highful, King and Spalding LLP, Austin, TX.

For Hill A. Feinberg, William Colvin, David M. Dunwoody, Cornelius Dupre, II, Kevin Flannery, Scott A Griffiths, James LaChance, Defendants: Clifford Thau, Vinson [*2] Elkins, New York, NY; Jeffrey S Johnston, Vinson Elkins LLP, Houston, TX; Richard Kent Piacenti, Vinson and Elkins LLP, Dallas, TX.

For Norman M.K. Louie, Defendant: David Giller, LEAD ATTORNEY, Paul Weiss Rifkind Wharton Garrison LLP, New York, NY; Walter Ricciardi, LEAD ATTORNEY, Paul Weiss et al, New York, NY; Anand Sithian, PRO HAC VICE, Paul Weiss et al, New York, NY; Kenneth P. Held, Megan Healy Schmid, Thompson & Knight LLP, Houston, TX.

For UHY LLP, Defendant: Lawrence Anthony Wojcik, LEAD ATTORNEY, McDermott Will et al, Chicago, IL; Timothy E Hoeffner, LEAD ATTORNEY, McDermott Will & Emery, New York, NY; Xenia Nicole Figueroa, LEAD ATTORNEY, McDermott Will & Emery LLP, Dallas, TX.

For BDO USA LLP, Defendant: Timothy E Hoeffner, LEAD ATTORNEY, McDermott Will & Emery, New York, NY; Allyson Elena Riemma, McDermott Will et al, Chicago, IL; Lawrence Anthony Wojcik, McDermott Will et al, Chicago, IL.

**Judges:** SIM LAKE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** SIM LAKE

# Opinion

## MEMORANDUM OPINION AND ORDER

This action is brought by plaintiffs, Kristen Plaisance, Robbie Plaisance, Rickie Corley, Charles F. Leekley, Brett Morris, Henry Negrette, Jim Nesbitt, Cindy Sparacino, Richard Sparacino, Christian Schick, Jock [*3] Gostl, Santiago Cordovez, Floyd Bone, Tom Howland, Michael Mernah, Ben A. Seale, Joe Shupak, Marshall Whitmer, Bill Walters, Robert Roig, Joseph C. Rosso, and Arthur D. Secor (collectively, "Plaintiffs"), against defendants, UHY LLP ("UHY"), and ten individual defendants (collectively, "Individual Defendants"): John D. Schiller ("Schiller"), D. West Griffin ("Griffin"), Hill A Feinberg ("Feinberg"), Norman M.K. Louie ("Louie"), William Colvin ("Colvin"), David M. Dunwoody ("Dunwoody"), Cornelius Dupré II ("Dupré"), Kevin Flannery ("Flannery"), Scott A. Griffiths ("Griffiths"), and James LaChance ("LaChance"), for common law fraud and alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, during the period beginning on September 28, 2007, and ending on December 30, 2016, arising from statements and representations regarding Energy XXI Ltd. ("EXXI" or the "Company"). Plaintiffs also assert claims for violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and for breach of fiduciary duty against the Individual Defendants all of whom served as members of EXXI's Board of Directors. Pending before the court are UHY LLP's Motion to Dismiss ("UHY's [*4] MD") (Docket Entry No. 101), Defendant D. West Griffin's Motion to Dismiss the Amended Complaint ("Griffin's MD") (Docket Entry No. 102), Defendant Norman M.K. Louie's Motion to Dismiss the Amended Complaint ("Louie's MD") (Docket Entry No. 103), Defendant John D. Schiller, Jr.'s Motion to Dismiss the Amended Complaint ("Schiller's MD") (Docket Entry No. 104), and The Director Defendants' Motion to Dismiss the Amended Complaint ("Director Defendants' MD") (Docket Entry No. 105). For the reasons stated below, the defendants' motions to dismiss will be granted.

## I. Procedural History and Alleged Facts

Plaintiffs initiated this action on September 6, 2017, by filing in the Southern District of New York a Complaint for Violation of the Federal Securities Law, Common Law Fraud, and Breach of Fiduciary Duty (Docket Entry No. 1), asserting claims for fraud and violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all defendants, and claims for violation of § 20(a) of the Exchange Act and breach of fiduciary duty against the Individual Defendants. On December 1, 2017, the Southern District of New York entered an Order pursuant to 28 U.S.C. § 1404(a) transferring the action to this court (Docket Entry No. [*5] 52). On February 12, 2018, defendants moved for dismissal (Docket Entry Nos. 85, 86, 89, 93, and 94). On March 29, 2018, Plaintiffs filed an Amended Complaint for Violation of the Federal Securities Law, Common Law Fraud, and Breach of Fiduciary Duty ("Plaintiffs' Amended Complaint") (Docket Entry No. 97), in which they reassert the same claims asserted in their initial complaint. On May 18, 2018, defendants filed the pending motions to dismiss Plaintiffs' Amended Complaint (Docket Entry Nos. 101-105). On July 16, 2018, plaintiffs filed responses to each of the pending motions to dismiss (Docket Entry Nos. 111-115), and on August 29, 2018, defendants filed replies in support of their motions to dismiss (Docket Entry Nos. 118-122).

Plaintiffs' Amended Complaint alleges that EXXI was founded by Schiller and Griffin in 2005 to acquire, explore, develop, and operate oil and natural gas properties onshore in Louisiana and Texas and offshore in the Gulf of Mexico Shelf, funded by a $300 million initial public offering of common stock traded on the London Stock

Exchange Alternative Investment Market ("AIM").[1] Plaintiffs allege that Schiller served as EXXI's President, Chief Executive Officer [*6] ("CEO"), and member of the Board of Directors ("Board") from the company's inception through and including February 2, 2017, when EXXI announced the termination of Schiller's employment as President, CEO, and member of the Board in a Current Report filed with the SEC on Form 8-K.[2] From EXXI's founding in 2005 through and including October 15, 2015, Schiller also served as Chairman of the Board. He was stripped of that title by the Board on October 9, 2015, following an internal investigation that found he borrowed funds from personal acquaintances or their affiliates, some of whom provided services to EXXI or its subsidiaries, and that in 2014 he personally borrowed $3 million from defendant Louie before Louie was appointed to the Board effective December 15, 2014.[3] Plaintiffs allege that as EXXI's Board Chairman and CEO, Schiller signed the Company's annual reports filed with the SEC on Forms 10-K and 10-K/A.[4]

Plaintiffs allege that defendant Griffin served as EXXI's Chief Financial Officer ("CFO") and Board member from the Company's inception through and including October 20, 2014, when EXXI announced Griffin's resignation in a press release and a Current Report filed with the [*7] SEC on Form 8-K/A on December 1, 2014, following BDO USA, LLP's ("BDO") acquisition of the Texas practice of UHY, which provided independent public accounting services to EXXI.[5] Plaintiffs allege that as CFO, Griffin signed EXXI's quarterly and annual reports filed with the SEC on Forms 10-Q, 10-K, and 10-K/A, and that Griffin is responsible for the content of the reports that he signed.[6]

Plaintiffs allege that UHY was engaged to audit EXXI's financial statements and to express an opinion on whether those financial statements fairly presented the financial condition of the Company.[7] Specifically, UHY was engaged to audit EXXI's financial statements for the years ended June 30, 2011, 2012, 2013, and 2014.[8] Plaintiffs allege that each audit opinion contained UHY's opinion that it audited EXXI's financial statements "in accordance with the standards of the Public Company Accounting Oversight Board (United States)" (the "PCAOB"),[9] that it "plan[ned] and perform[ed] the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects,"[10] and that each audit stated: "'In our opinion Energy XXI (Bermuda) Limited and [*8] subsidiaries maintained, in all material respects, effective internal control over financial reporting' for the year in question."[11]

---

[1] Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 15 ¶¶ 64-65. All page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

[2] Id. at 6 ¶ 20.

[3] Id. ¶ 22.

[4] Id. ¶¶ 20-21.

[5] Id. at 9 ¶ 39.

[6] Id. ¶¶ 37-38.

[7] Id. at 19 ¶ 85.

[8] Id.

[9] Id. at 20 ¶ 92.

[10] Id. ¶ 93.

[11] Id. at 20-21 ¶ 94.

Plaintiffs allege that in addition to serving on EXXI's Board, defendant Colvin was Chairman of the Audit Committee and a member of the Nomination and Governance Committee;[12] defendant Flannery was a member of the Audit Committee and the Nomination and Governance Committee;[13] defendant Dunwoody was Chairman of the Remuneration Committee and a member of the Audit Committee;[14] defendant Griffiths served on the Audit Committee and the Compensation Committee;[15] defendant Feinberg was Lead Independent Director, Chairman of the Nomination and Governance Committee, a member of the Compensation Committee, and an *ex officio* member of the Audit Committee;[16] and defendant Dupre was Chairman of the Compensation Committee and a member of the Nomination and Governance Committee.[17]

Plaintiffs allege that between 2006 and 2010, EXXI completed five major acquisitions for aggregate cash consideration of approximately $2.5 billion of borrowed funds: (1) Marlin Energy, L.L.C. ("Marlin") in February 2006 for approximately $448.4 million; (2) certain Louisiana Gulf Coast producing [*9] properties from affiliates of Castex Energy, Inc. ("Castex Properties") in June 2006 for approximately $312.5 million; (3) certain Gulf of Mexico shelf properties from Pogo Producing Company ("Pogo Properties") in June 2007 for approximately $415.1 million; (4) certain Gulf of Mexico shelf oil and natural gas interests from MitEnergy Upstream LLC, a subsidiary of Mitsui & Co., Ltd. ("MitEnergy Interests") in November 2009 for $276.2 million; and (5) certain shallow water Gulf of Mexico shelf oil and natural gas interests from affiliates of Exxon Mobil Corporation ("ExxonMobil Acquisition") in December 2010 for $1.01 billion.[18]

Plaintiffs allege that on July 31, 2007, following EXXI's acquisition of the Pogo Properties in June of 2007, EXXI announced that in addition to trading on the AIM in London, its common stock was approved for trading in the United States on the NASDAQ national exchange.[19] Plaintiffs allege that on August 12, 2011, EXXI's common stock was listed for trading on the NASDAQ Global Select Market under the symbol "EXXI."[20] Plaintiffs allege that because many institutional investors are prohibited from investing in companies that do not meet certain minimum requirements such [*10] as the requirements needed to be listed on the NASDAQ Global Select Market exchange, listing thereon gave EXXI greater access to capital and increased market liquidity.[21] Plaintiffs assert their belief that after a reasonable opportunity for discovery, evidence will show that but for EXXI's use of cash flow hedge accounting, EXXI would not have met the minimum requirements for listing on the NASDAQ Global Select Market.[22]

---

[12] Id. at 11 ¶ 48.

[13] Id. ¶ 49.

[14] Id. at 11-12 ¶ 50.

[15] Id. at 12 ¶ 51.

[16] Id. ¶ 52.

[17] Id. at 12 ¶ 53.

[18] Id. at 16 ¶¶ 69-71.

[19] Id. at 16-17 ¶ 72.

[20] Id. at 17 ¶ 73.

[21] Id. ¶ 74.

[22] Id. ¶ 76.

Plaintiffs allege that from 2010 to 2013 EXXI made optimistic and positive statements about its ultimately unsuccessful ultra-deep exploration program, particularly the Davy Jones No. 1 and No. 2 wells, that were false and misleading when made.[23]

Plaintiffs allege that in early 2014 defendants caused EXXI to acquire EPL, an independent oil and natural gas exploration and production company, and assert their belief that after a reasonable opportunity for discovery evidence will show that Schiller pursued the acquisition without customary and reasonable due diligence, and consequently that EXXI overpaid for EPL,[24] that following the acquisition one of EPL's Board of Directors, defendant Griffiths, joined EXXI's Board and changed EPL's method of accounting from successful [*11] efforts to full cost accounting to match EXXI's accounting method,[25] EXXI's reported goodwill rose from zero reported in EXXI's financial statements from the period ended March 31, 2014, shortly before the acquisition, to $329 million reported by EXXI in its June 30, 2014, financial statements filed immediately after the acquisition.[26]

Plaintiffs allege that following EXXI's acquisition of EPL, EXXI issued financial statements that were false and misleading because EXXI failed to perform a quantitative goodwill impairment test and therefore failed to recognize goodwill impairments for EPL or for its other oil and gas properties[27] and failed to disclose the existence of a personal loan from defendant Louie to defendant Schiller.[28]

Plaintiffs allege that on or about December 14, 2014, EXXI common stock was cancelled for trading on the AIM in London by action of the Board taken pursuant to a shareholder vote at the annual meeting held on November 4, 2014.[29]

Plaintiffs allege that in September of 2015, following a change in independent auditors, EXXI was required to restate more than four years of financial statements to eliminate the use of hedge accounting.[30] Plaintiffs allege that EXXI's financial [*12] statements for the years ended June 30, 2011, 2012, 2013, 2014, and 2015, filed with the SEC on August 26, 2011, August 9, 2012, August 21, 2013, August 28 and December 23, 2014, and September 29, 2015, were materially false and misleading because they stated that EXXI did not use hedging for speculative or trading purposes.[31] Plaintiffs allege that "[u]ntil EXXI's financial statements were corrected on September 29, 2015, the Company's publicly filed financial statements for at least the years ended June 30, 2011, 2012, 2013, and 2014, and for all the intervening quarters materially misstated and did not fairly and accurately present the Company's financial condition and its results of operations."[32] Plaintiffs also allege that

> EXXI's disclosure that it was required to restate its financial statements to eliminate cash flow hedge
> accounting was materially false and misleading because it made it appear that the reason for the restatement

---

[23] Id. at 25-32 ¶¶ 108-43.

[24] Id. at 33-34 ¶¶ 147-155.

[25] Id. at 35-36 ¶¶ 159-68.

[26] Id. at 37 ¶ 173.

[27] Id. at 38-49 ¶¶ 176-230.

[28] Id. at 56 ¶¶ 269-70.

[29] Id. at 18 ¶ 78.

[30] Id. at 17-18 ¶ 77.

[31] Id. at 52 ¶ 249.

[32] Id. at 54 ¶ 257.

was a mere technical deficiency in documentation, when the true reason for the restatement was that the Company was hedging for improper purposes, including speculating on future oil and natural gas prices or manipulating reported revenue and earnings.[33]

[*13] Plaintiffs allege that on April 16, 2016, EXXI sought protection from its creditors by filing a voluntary Chapter 11 bankruptcy petition in the Southern District of Texas.[34]

Plaintiffs allege that on April 20, 2016, EXXI was informed by the Listing Qualifications Department of NASDAQ that its stock would be delisted from the NASDAQ for failure to meet the minimum listing qualifications.[35]

Plaintiffs allege that on December 13, 2016, the Bankruptcy Court for the Southern District of Texas approved EXXI's amended plan of reorganization.[36]


## II. <u>Standards of Review</u>

Defendants argue that Plaintiffs' Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted. A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." <u>Ramming v. United States</u>, 281 F.3d 158, 161 (5th Cir. 2001), <u>cert. denied sub nom. Cloud v. United States</u>, 536 U.S. 960, 122 S. Ct. 2665, 153 L. Ed. 2d 839 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the Plaintiffs, and draw all reasonable inferences in the Plaintiffs' favor. <u>Id.</u> To defeat a motion to dismiss pursuant to Rule 12(b) (6) a plaintiff must plead "enough facts to state a claim to relief [*14] that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (citing <u>Twombly</u>, 127 S. Ct. at 1965). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> (quoting <u>Twombly</u>, 127 S. Ct. at 1965). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" <u>Id.</u> (quoting <u>Twombly</u>, 127 S. Ct. at 1966).

When considering a motion to dismiss courts generally are limited to the complaint and its proper attachments. <u>Dorsey v. Portfolio Equities, Inc.</u>, 540 F.3d 333, 338 (5th Cir. 2008). Courts may also rely on "'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" <u>Id.</u> See also <u>Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC</u>, 594 F.3d 383, 387 (5th Cir. 2010) (When considering a motion to dismiss, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.") (citing <u>Collins v. Morgan Stanley Dean Witter</u>, 224 F.3d 496, 498-99 (5th Cir. 2000)). In securities cases courts may take judicial notice of the contents of [*15] public disclosure documents that are required by law to be filed and are filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain; not for proving the truth of their contents. <u>Lovelace v. Software Spectrum Inc.</u>, 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996) (citing and adopting rule of <u>Kramer v. Time Warner Inc.</u>,

---

[33] <u>Id.</u> at 54-55 ¶ 259.

[34] <u>Id.</u> at 68-69 ¶ 328.

[35] <u>Id.</u> at 18 ¶ 79.

[36] <u>Id.</u> ¶ 81.

937 F.2d 767, 774 (2d Cir. 1991), and explaining that rule does not apply to other forms of disclosure such as press releases and announcements at shareholder meetings).

## III. Analysis

Defendants argue that all of the claims asserted against them should be dismissed because Plaintiffs have failed to state a claim for which relief may be granted.

### A. Federal Securities Law Claims

Defendants argue that the securities claims asserted against them should be dismissed because Plaintiffs have failed to satisfy the pleading requirements for stating either a primary claim under § 10(b) or Rule 10b-5, or a claim for control person liability under § 20(a), and because the factual allegations do not satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b) or the Private Securities Litigation Reform Act ("PSLRA") set forth at 15 U.S.C. § 78u-4(b).

1. Applicable Law

(a) Federal Securities Law

Section 10(b) of the Exchange Act makes it unlawful for any person:

> To use or employ, in connection with the purchase or sale of any security [*16] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To recover damages for violations of § 10(b) and Rule 10b-5, plaintiffs must prove

> "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 134 S. Ct. 2398, 2407, 189 L. Ed. 2d 339 (2014). See also Owens v. Jastrow, 789 F.3d 529, 535 (5th Cir. 2015) (same). To satisfy the materiality requirement, "there must be a substantial likelihood that the disclosure of the [*17] omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, [449] , 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976) (citing Basic Inc. v. Levinson, 485 U.S. 224, [231], 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)). The Fifth Circuit has stated that "Materiality is not judged in the abstract, but in light of the surrounding circumstances." Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1448 (5th Cir. 1993). Inclusion of cautionary language along with disclosure of any firm-specific adverse facts or assumptions is relevant to the materiality inquiry, but "cautionary language as such is not per se dispositive of this inquiry." Rubinstein v. Collins, 20 F.3d 160, 168 (5th Cir. 1994).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2507, 168 L. Ed. 2d 179 (2007) (quoting Ernst & Ernst v. Hochfelder,

425 U.S. 185, 96 S. Ct. 1375, 1381, n.12, 47 L. Ed. 2d 668 (1976)). Scienter does not require a specific intent to deceive; instead,

> the scienter element of a federal securities fraud claim may be satisfied by proof that the defendant acted with severe recklessness, which is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994) (quoting Shushany v. Allwaste, Inc., 992 F.2d 517, 521 (5th Cir. 1993)). Plaintiffs "must allege facts [*18] sufficient to raise a strong inference of scienter with respect to each individual defendant." R2 Investments LDC v. Phillips, 401 F.3d 638, 643 (5th Cir. 2005) (citing Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 365 (5th Cir. 2004) (holding that plaintiffs claiming securities fraud against multiple defendants must "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud")). Group allegations that "the defendants" or "the company" knew something do not meet that standard. Southland, 365 F.3d at 366. The factual allegations contained in the entire complaint must be considered in determining whether plaintiffs' allegations raise a strong inference of scienter. Id. To withstand a motion to dismiss, the facts alleged must permit an inference of intentional deception that is at least equally as compelling as any alternative inference. Lormand v. US Unwired, Inc., 565 F.3d 228, 254 (5th Cir. 2009) (quoting Tellabs, 127 S. Ct. at 2499, 2510).

Plaintiffs must show a causal connection between the company's revealing of the truth regarding an earlier misrepresentation and a subsequent decline in the company's stock price. See Alaska Electrical Pension Fund v. Flowserve Corp., 572 F.3d 221, 229 (5th Cir. 2009). This corrective disclosure must be "related to" or "relevant to" the alleged fraud, meaning the disclosed information must make the existence of the alleged fraud "more probable than it would be without that alleged fact." Public Employees' Retirement System of Mississippi, Puerto Rico Teachers' Retirement System v. Amedisys, Inc., 769 F.3d 313, 321 (5th Cir. 2014), cert. denied, 135 S. Ct. 2892, 192 L. Ed. 2d 926 (2015). The corrective [*19] disclosure "can be gradually perceived in the marketplace through a series of partial disclosures." Id. at 322. Partial disclosures are viewed collectively and considered as a whole to determine when cumulative facts support a corrective disclosure that meets the loss causation pleading standard. Id. at 325.

The parties agree that the applicable statute of limitations and repose is 28 U.S.C. § 1658(b).[37] Under 28 U.S.C. § 1658(b) an action for securities fraud must be brought no later than two years after the discovery of the facts constituting the violation or five years after the occurrence of the violation, whichever is earlier. The period of repose begins to run from the date of the misrepresentation or omission that forms the basis of the securities law violation. Hall v. Variable Annuity Life Insurance Co., Civil Action No. H-11-3639, 2012 WL 12877431, at *4 (S.D. Tex. May 31, 2012), aff'd, 727 F.3d 372 (5th Cir. 2013) (citing In re Exxon Mobil Corp. Securities Litigation, 500 F.3d 189, 199-200 (3d Cir. 2007) ("[W]e hold that the repose period applicable to § 10(b) claims as set out in §§ 9(e) and 1658(b)(2) begins to run on the date of the alleged misrepresentation."). Because Plaintiffs filed this action on September 6, 2017,[38] the date of repose is September 6, 2012. Plaintiffs state that they "do not assert any claims for any false, misleading, or incomplete statements made prior to that date."[39] Nevertheless, citing [*20] Rubinstein, 20 F.3d at 170 n.41, Plaintiffs argue that "to the extent that untrue statements were made prior to September 6, 2012, about which Defendants had a duty to correct — such as EXXI's 2011 annual report, which

---

[37] See, e.g., Director Defendants' MD, Docket Entry No. 105, pp. 29-30, and Plaintiffs' Memorandum of Law in Opposition to the Director Defendants' Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to Director Defendants' MD"), Docket Entry No. 115, p. 26.

[38] See Complaint for Violation of the Federal Securities Law, Common Law Fraud, and Breach of Fiduciary Duty, Docket Entry No. 1.

[39] Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 26.

improperly utilized hedge accounting — the omission of a corrective disclosure in subsequent statements made *after* that date are actionable."[40]

In Rubinstein, 20 F.3d at 170 n.41, the Fifth Circuit acknowledged that defendants have a duty under Rule 10b-5 to correct statements if those statements have become materially misleading in light of subsequent events, but the Rubinstein court neither held nor stated that material omissions made before the date of repose remain actionable because defendants have an ongoing duty to correct such omissions. Plaintiffs' argument that material omissions made before the date of repose are nevertheless actionable because defendants had an ongoing duty to correct those omissions would negate the five-year statute of repose by allowing plaintiffs to revive time-barred claims simply by asserting that defendants had an ongoing duty to correct their material omissions. Any claims based on misrepresentations or omissions allegedly made before September 6, 2012, are therefore barred by the statute [*21] of repose. See Hall, 2012 WL 12877431, at *4 (citing Malhotra v. The Equitable Life Assurance Society of the United States, 364 F. Supp. 2d 299, 305-06 (E.D.N.Y. 2005) (granting defendants' 12(b)(6) motion on the ground that the statute of repose began to run on the day of the initial omission).

(b) Federal Rule of Civil Procedure 9(b)

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Plaintiffs must plead the elements of their Rule 10b-5 claims with particularity. See Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003) (citing Williams v. WMX Technologies, Inc., 112 F.3d 175, 177 (5th Cir.), cert. denied, 522 U.S. 966, 118 S. Ct. 412, 139 L. Ed. 2d 315 (1997)). Particularity is required so that the complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. See Tuchman, 14 F.3d at 1067.

Pleading fraud with particularity in this circuit requires "the particulars of 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" Id. at 1068 (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992)). See also Carroll v. Fort James Corp., 470 F.3d 1171, 1174 (5th Cir. 2006) (quoting United States ex rel. Riley v. St. Luke's Episcopal Hospital, 355 F.3d 370, 381 (5th Cir. 2004) ("In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead [*22] the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.")). "A dismissal for failure to plead fraud with particularity as required by rule 9(b) is a dismissal on the pleadings for failure to state a claim." Southland, 365 F.3d at 361 (citing Shushany, 992 F.2d at 520-520).

(c) Private Securities Litigation Reform Act

In 1995 Congress amended the Exchange Act through the passage of the PSLRA, 15 U.S.C. § 78u-4(b)(1). In relevant part the PSLRA provides:

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

**(A)** made an untrue statement of a material fact; or

---

[40] Id.

**(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

**(A)** *In general*

Except as provided in subparagraph [*23] (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
. . .

**(3) Motion to dismiss; stay of discovery**

**(A) Dismissal for failure to meet pleading requirements**

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

15 U.S.C. § 78u-4(b).

In ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002), the court coalesced the pleading requirements in the PSLRA and Rule 9(b) into a succinct directive for litigants:

[A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b) (1) & 78u-4(b) (3)(A):

(1) specify each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person [*24] making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.

This is the "who, what, when, where, and how" required under Rule 9 (b) in our securities fraud jurisprudence and under the PSLRA. Additionally, under 15 U.S.C. § 78u-4(b)(1), for allegations made on information and belief, the plaintiff must:

(7) state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief.

In Indiana Electric Workers' Pension Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 533 (5th Cir. 2008), the Court reiterated that the PSLRA heightened the pleading standards for private claims of securities fraud by requiring

plaintiffs to allege with particularity why each one of defendants' representations or omissions was misleading under 15 U.S.C. § 78u-4(b)(1), and by requiring plaintiffs to plead with particularity those facts giving rise to a strong inference that the defendant acted with the required state of mind under 15 U.S.C. § 78u-4(b)(2). In Tellabs, 127 S. Ct. at 2510, the Supreme Court held that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." However, in Lormand, 565 F.3d at 267, the Fifth Circuit held that the PSLRA did not [*25] heighten pleading standards for all six elements of securities fraud. The Fifth Circuit explained that the plain text of 15 U.S.C. § 78u-4(b)(4) provides only that "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." Id. at 255 n.18. Nothing in this language expressly or impliedly heightens the standard of pleading to loss causation. Thus, when considering a motion to dismiss, courts are "not authorized or required to determine whether the plaintiff's plausible inference of loss causation [under 15 U.S.C. § 78u-4(b)(4)] is equally or more plausible than other competing inferences, as [they] must in assessing allegations of scienter under the PSLRA." Id. at 267.

The PSLRA contains a safe harbor provision that protects individuals and corporations from liability for certain forward-looking statements that later prove false. To qualify for this protection the statement at issue must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or be "immaterial." 15 U.S.C. § 78u-5(c)(1)(A)(i, ii). "To avoid the safe harbor, plaintiffs must plead facts demonstrating [*26] that the statement was made with actual knowledge of its falsity." Southland, 365 F.3d at 371 (citing 15 U.S.C. § 78u-5(c)(1)(B); Nathenson v. Zonagen Inc., 267 F.3d 400, 409 (5th Cir. 2001)).

2. Application of the Law to the Alleged Facts

(a) Defendant UHY

UHY argues that the federal securities law claims asserted against it should be dismissed because Plaintiffs' Amended Complaint fails to allege facts capable of establishing an actionable misstatement or omission of fact arising from its audit opinions or a strong inference of scienter.[41] UHY also joins in the arguments presented in the Director Defendants' MD with respect to the securities fraud claims regarding group pleading, loss causation, and the statute of repose.[42]

**(1) Alleged Misstatements and Omissions**

Citing Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, 135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015), UHY asserts that its audit reports are statements of opinion, not fact, and argues that the securities law claims asserted against it should be dismissed because plaintiffs fail to allege an actionable misstatement or omission of fact arising from its audit reports.[43] At least one court in this district has held that audit reports are statements of opinion, not fact, and plaintiffs do not argue otherwise. See Johnson v. CBD Energy Ltd., Civil Action H-15-1668, 2016 U.S. Dist. LEXIS 87174, 2016 WL 3654657, at *10 (S.D. Tex. July 6, 2016) ("an auditor's 'statement regarding . . . compliance inherently [is] [*27] one of opinion'"). Nevertheless, without addressing the applicability of the Supreme Court's Omnicare opinion, plaintiffs respond that UHY's

---

[41] UHY's MD, Docket Entry No. 101, p. 12. See also UHY LLP's Reply in Support of the Motion to Dismiss the Amended Complaint (UHY's Reply"), Docket Entry No. 119, pp. 6-15.

[42] UHY's MD, Docket Entry No. 101, p. 7 n.2.

[43] Id. at 20.

argument ignores the fact that Plaintiffs have alleged materially false and misleading statement[s] *in UHY's own audit reports*. As alleged in the Amended Complaint, each of the Company's annual financial statements included an affirmative statement prepared by UHY that it audited the financial statements "in accordance with the standards of the [PCAOB] (United States)." ¶ 92. Plaintiffs also allege UHY represented that it planned and performed the audits to obtain reasonable assurance about whether the Company maintained effective internal control over its financial reporting. ¶ 93. And UHY also affirmatively represented in each audit report that EXXI maintained effective internal control over its financial reporting. ¶ 94.

As alleged in the Amended Complaint, and as explained above, those statement [s] were materially false and misleading, and UHY had no basis for making them.[44]

Asserting that UHY audited EXXI's annual financial statements included in EXXI's 2011, 2012, 2013, and 2014 annual reports filed with the SEC on Form 10-K, plaintiffs allege [*28] that "[t]hose financial statements were erroneous,"[45] because

[a]s EXXI announced in a press release and a Current Report on Form 8-K filed with the SEC on September 8, 2015, the Company's previously issued consolidated financial statements for the years ended June 30, 2011, 2012, 2013 and 2014, along with its consolidated financial statements for the quarters ended September 30, 2013 and 2014, December 31, 2013 and 2014, March 31, 2014 and 2015, and June 30, 2014, should no longer be relied upon and would be reinstated. ¶ 83.[46]

In Omnicare the Court clarified how trial courts should evaluate whether a plaintiff has alleged an actionably misleading statement of opinion. Omnicare provides "two potential avenues for plaintiffs to establish the falsity of an opinion." In re BP P.L.C. Securities Litigation, 2016 U.S. Dist. LEXIS 73721, 2016 WL 3090779, at *9. First, "every . . . statement [of opinion] explicitly affirms one fact: that the speaker holds the stated belief." Omnicare, 135 S. Ct. at 1327. A speaker can be liable for an opinion statement if the speaker did not in fact hold that opinion. Second, "depending on the circumstances," a reasonable investor could

understand an opinion statement to convey facts about the speaker's basis for holding that view. Specifically, [a speaker's] statement [*29] of opinion may fairly imply facts about the inquiry the issuer conducted or the knowledge it had. And if the real facts are otherwise, but not provided, the opinion statement will mislead by omission.

Id. at 1322. Thus, even if a speaker's opinion is sincerely held,

the statement may nonetheless be actionable under 10b-5's omissions provision if: (i) the speaker "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and (ii) "those facts conflict with what a reasonable investor would take from the statement itself."

In re BP P.L.C. Secs. Litig., MDL No. 4:10-MD-2185, 2016 U.S. Dist. LEXIS 73721, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016) (quoting Omnicare, 135 S. Ct. at 1329) . The Omnicare Court emphasized that the latter avenue to liability does not allow a plaintiff to circumvent the particularity and materiality requirements of a fraud claim by alleging in general terms that the defendant improperly failed to reveal the basis for his opinion, or failed to disclose "some fact cutting the other way." 135 S. Ct. at 1329 (explaining that "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why [a speaker] may frame a statement as an opinion, thus conveying uncertainty"). [*30]  Id. But the Supreme Court

---

[44] Plaintiffs' Memorandum of Law in Opposition to Defendant UHY LLP's Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to UHY's MD"), Docket Entry No. 111, p. 17.

[45] Id. at 5.

[46] Id. at 5-6.

also recognized that reasonable investors expect a speaker's statement of opinion to fairly align with the information in his or her possession at the time. Id.

> In their Amended Complaint Plaintiffs allege that
>
> UHY's unqualified audit reports were materially false and misleading because, among other things: (a) the audits were not conducted in accordance with PCAOB standards; and (b) EXXI's financial statements did not fairly present the Company's true financial position and results of operations and did not comply with GAAP [Generally Accepted Accounting Principles].[47]

In support of their allegations that UHY's audit reports were materially false and misleading, Plaintiffs allege

> 102. The Company's financial statements did not comport with GAAP as they failed to disclose the millions of dollars in loans to Defendant Schiller from EXXI's vendors and from a confederate on the Board who was also an affiliate of one of the Company's largest shareholders.
>
> 103. Contrary to the Audit Report, the audit was not conducted in accordance with PCAOB standards. In particular, PCAOB Standard AU § 316 sets forth certain fraud risks or red flags, including: (a) unsupported balances or transactions; (b) [*31] inconsistent, vague or implausible responses from management arising from inquiries or analytical procedures; (c) lack of timely and appropriate documents; (d) missing documents; and (e) evasive or unreasonable responses of management to audit reports.
>
> 104. In conducting its audits of the financial statements in EXXI's annual reports, Defendant UHY ignored the most obvious of red flags, the missing documentation necessary to permit the Company to use cash flow hedge accounting.[48]

Missing from the Plaintiffs' Amended Complaint are allegations of fact capable of proving that UHY did not subjectively believe its audit opinions when they were issued. Therefore, to state a claim against UHY for its audit reports, Plaintiffs must allege, with particularity, facts capable of establishing that UHY knew, but omitted to include in its audit reports, material facts that contradict its opinion statements. See In re Plains All American Pipeline, L.P. Securities Litigation, 245 F. Supp. 3d 870, 905 (S.D. Tex. 2017).[49] The facts that Plaintiffs allege contradict UHY's audit opinions concern loans that defendant Schiller received from defendant Louie and EXXI vendors and lack of documentation needed to support EXXI's use of hedge accounting.[50] But missing from Plaintiffs' Amended Complaint are allegations of [*32] facts capable of establishing that when UHY issued its audit reports, UHY knew or should have known about Schiller's loans. Moreover, since Plaintiffs' Amended Complaint expressly alleges that Schiller's loans were undisclosed until October of 2015, long after UHY issued the audit opinions about which Plaintiffs complain,[51] the facts alleged in Plaintiffs' Amended Complaint contradict their

---

[47] Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 22 ¶ 100.

[48] Id. at 24 §§ 102-04.

[49] In Plains All American Judge Rosenthal explained that

> [s]howing that a statement was false or misleading using this Omnicare prong blurs the lines between the falsity and scienter elements of an Exchange Act claim. Determining whether a statement is false or misleading turns on what the speaker knew, making it similar to the scienter inquiry. But even though this Omnicare inquiry overlaps with the scienter inquiry, the two are not identical. Here, the issue is whether the plaintiffs have adequately pleaded that the defendants were aware of material facts that: (1) contradicted or undermined their compliance opinion statements; and (2) that an investor would reasonably believe were not true based on that statement. The [*33] scienter issue is the individual's state of mind in stating the opinion.

245 F. Supp. 3d at 905.

[50] Plaintiffs' Opposition to UHY's MD, Docket Entry No. 111, p. 17.

[51] Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 3 ¶ 22, p. 4 ¶ 24, p. 10 ¶ 44.

contention that UHY's audit reports were false and misleading because they omitted information about Schiller's loans.[52]

Also missing from Plaintiffs' Amended Complaint are any allegations of fact capable of establishing that when UHY issued its audit reports, UHY knew or should have known that EXXI lacked documentation needed to support its use of cash flow hedge accounting. Asserting that "EXXI lacked the specific required documentation to utilize cash flow hedge accounting,"[53] Plaintiffs argue that

> [i]n any adequate audit, UHY would have requested or looked for the required documentation as part of its audit procedures. Had UHY done so, it immediately would have learned that EXXI lacked the required documentation for hedge accounting. Had UHY performed any adequate audit, the lack of specific required documentation would have been obvious to it.[54]

A careful review of Plaintiffs' Amended Complaint, however, only reveals allegations that UHY's audit reports were false when made because EXXI later restated some of its financial statements.[55]

Plaintiffs allege that in December of 2014, following UHY's acquisition by BDO, EXXI engaged BDO as its successor auditor, and that in September of 2015 EXXI filed a Current Report on Form 8-K [*34] with the SEC announcing that the Company's previously issued consolidated financial statements for the years ended June 30, 2011, 2012, 2013, and 2014, and for the quarters ended September 30, 2013 and 2014, December 31, 2013 and 2014, March 31, 2014 and 2015, and June 30, 2014, should no longer be relied upon and would be restated.[56] Plaintiffs allege that

> 252. During the preparation of its annual report on Form 10-K for the year ended June 30, 2015, EXXI and its new auditor, BDO, determined that certain of the Company's oil and gas hedges did not qualify for cash flow hedge accounting treatment. EXXI and BDO determined that the Company's hedge documentation did not specify the hedged items and, therefore, the designations failed to meet the documentation requirements for cash flow hedge accounting treatment.
>
> 253. As a result of that determination, EXXI was required to restate its previously issued consolidated financial statements to reflect the unrealized recognition of gains and losses on derivative financial instruments . . .[57]

But missing from Plaintiffs' Amended Complaint are allegations of fact capable of establishing that when UHY issued its audit reports, UHY knew or should have known [*35] that EXXI lacked documentation required to use cash flow hedge accounting. Instead, asserting that "[t]he lack of documentation regarding the hedged items could not be a result of a difference of opinion between the Company's auditors BDO and UHY as the Company disclosed that it had no documentation regarding what was being hedged,"[58] Plaintiffs allege that UHY's audit reports were false and misleading because absent the missing documentation the audit reports could not have been conducted in accordance with PCAOB Auditing Standards or Generally Accepted Auditing Standards ("GAAS").[59]

---

[52] See Plaintiffs' Opposition to UHY's MD, Docket Entry No. Ill, p. 16 n.7 (apparently contradicting the allegations in ¶ 102 of Plaintiffs' Amended Complaint by stating: "Plaintiffs do not allege that UHY's audits were deficient because they failed to uncover the loans.").

[53] Id. at 15.

[54] Id.

[55] See Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 50-51 ¶¶ 239-243.

[56] Id. at 51 UH 244-245.

[57] Id. at 53 fH 252-53.

[58] Id. at 50 H 235 (emphasis in original) .

[59] Id. at 50-51 Kf 237-43.

Despite Plaintiffs' assertion to the contrary, the Current Report on Form 8-K filed with the SEC in September of 2015 announcing the restatement did not state that EXXI had no documentation regarding what was being hedged. Instead, EXXI's September 2015 Form 8-K states:

> [I]n connection with preparing its annual report on Form 10-K for the year ended June 30, 2015 (the "2015 Form 10-K") management of Energy XXI Ltd. (the "Company") and the Audit Committee of its Board of Directors (the "Audit Committee") determined that the contemporaneous formal documentation it had historically prepared to support [*36] its initial designations of derivative financial instruments as cash flow hedges in connection with the Company's crude oil and natural gas hedging program did not meet the technical requirements to qualify for cash flow hedge accounting treatment in accordance with ASC Topic 815, Derivatives and Hedging. The primary reason for this determination was that the formal hedge documentation lacked specificity of the hedged items and, therefore, the designations failed to meet hedge documentation requirements for cash flow hedge accounting treatment.[60]

EXXI's disclosures in the September 2015 Form 8-K show that EXXI's management reached a judgment different from that previously reached regarding the level of specificity required for the documentation of hedged transactions; the disclosures do not show that EXXI had no documentation regarding what was being hedged. Nor do EXXI's disclosures mention UHY or its auditing services as a reason for the restatements.

Because Plaintiffs fail to allege facts capable of establishing either that UHY did not sincerely believe the opinions stated in its audit reports, or that when UHY issued its audit reports UHY knew or should have known — but failed to [*37] disclose — material facts about its inquiry into or knowledge concerning the opinions stated in its audit reports, and that those facts conflict with what a reasonable investor would take from the reports themselves, i.e., information about Schiller's loans and about deficiencies in documentation required to support EXXI's use of cash flow hedge accounting, Plaintiffs have failed to allege facts capable of establishing an actionable misstatement or omission of fact arising from the opinions expressed in UHY's audit reports. See Omnicare, 135 S. Ct. at 1329. Moreover, for the reasons stated below, the court concludes that even if the facts alleged in Plaintiffs' Amended Complaint were capable of establishing an actionable misstatement or omission of fact in UHY's audit reports, Plaintiffs have failed to allege facts capable of raising a strong inference that the misstatements or omissions were made with scienter.

### (2) Scienter

UHY argues that the Exchange Act claims asserted against it should be dismissed because Plaintiffs fail to allege facts capable of establishing a strong inference of scienter. Asserting that EXXI restated its financial statements for fiscal years 2011 through 2014, Plaintiffs argue that the [*38] restatements are compelling evidence of UHY's scienter because "UHY knew, or was severely-reckless in not knowing, that EXXI's consolidated annual financial statements were not prepared in accordance with GAAP and did not fairly and accurately present the Company's financial results."[61] Plaintiffs argue that "UHY has provided no alternative or opposing explanation for certifying financial statements in which EXXI utilized cash flow hedge accounting without the requisite documentation of specific hedged risks."[62]

To adequately plead scienter Plaintiffs must allege circumstances supporting a strong inference that UHY had actual knowledge, or recklessly disregarded, that its audit reports were false or misleading when made or were made without a reasonable basis. See Lovelace, 78 F.3d at 1018-19. Circuit courts of appeal have found that the

---

[60] September 2, 2015, Form 8-K, Exhibit A to UHY's MD, Docket Entry No. 101-1, p. 2.

[61] Plaintiffs' Opposition to UHY's MD, Docket Entry No. Ill, p. 8.

[62] Id.

requirement of "recklessness" in securities fraud cases is especially stringent when a claim is made against an outside auditor like UHY. See PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 693, 91 Fed. Appx. 418 (6th Cir. 2004) (collecting cases) . "Recklessness on the part of an independent auditor entails a mental state so culpable that it 'approximate [s] an actual intent to aid in the fraud being perpetrated by the audited company.'" Id. (quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 121 (2d Cir. 1982)) . Thus, Plaintiffs [*39] must allege facts capable of establishing not merely that there was a deviation from accounting principles, but

> that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

Id. at 693-94 (quoting In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1426 (9th Cir. 1994)). See also In re Franklin Bank Corp. Securities Litigation, 782 F. Supp. 2d 364, 402 (S.D. Tex. 2011); In re Dell Inc., Securities Litigation, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008) .

A careful review of the Plaintiffs' allegations of scienter reveal little more than assertions that UHY's audit reports were false because EXXI later restated certain financial information. Courts in this circuit inferring scienter based in part on improper accounting do so only when other factors strongly support the inference. See In re ArthroCare Corp. Securities Litigation, 726 F. Supp. 2d 696 (W.D. Tex. 2010) (improper accounting practices and denials of media reports); In re Seitel, Inc. Securities Litigation, 447 F. Supp. 2d 693 (S.D. Tex. 2006) (improper accounting practices and overstated revenues, memoranda and meeting minutes revealing that the defendants explicitly discussed the improper accounting methods, affirmatively chose to ignore potential problems, and dismissed an auditor who confronted them about the improper practices).

Plaintiffs' Amended Complaint does not allege [*40] media reports or internal company documents that would permit an inference that UHY knew of or recklessly disregarded evidence that EXXI's accounting misrepresented EXXI's financial condition. Instead, as reasons to infer UHY's scienter, Plaintiffs point to the magnitude of the restatements, and to the reason for the restatements — i.e., lack of specificity in the documentation used to support EXXI's use of cash flow hedge accounting.[63] But the magnitude of misstated financials cannot support a strong inference of scienter absent allegations of facts capable of establishing either that UHY knew or was severely reckless in not knowing of the improper accounting, or that UHY ignored warning signs or red flags indicating that such an inference is merited. See ArthroCare, 726 F. Supp. 2d at 724; Seitel, 447 F. Supp. 2d at 693.

Asserting that "the lack of supporting documentation of EXXI's hedging activities [needed] to permit the Company to utilize hedge accounting was a glaring red flag, giving UHY every reason to know that the financial statements contained material misstatements or omissions,"[64] Plaintiffs argue that " [h]ad UHY performed any-adequate audit, the lack of specific required documentation would have been obvious to it."[65] But Plaintiffs do [*41] not plead any specific facts capable of showing what UHY's audits entailed, how or why they were deficient, or why there is any reason to believe that the alleged deficiencies were purposeful or reckless as opposed to negligent mistakes. Arthrocare, 726 F. Supp. 2d at 735 (citing Dell, 591 F. Supp. 2d at 903) . Instead, Plaintiffs rely on the circular reasoning that UHY must have acted with scienter simply because it did not catch the lack of specific documentation for cash flow hedge accounting later identified as the reason for EXXI's restatements. These allegations may support an inference of negligent mismanagement, but they are not sufficient to make intentional or reckless fraud at least as compelling as plausible nonculpable explanations. See Lormand, 565 F.3d at 254 (quoting Tellabs, 127 S. Ct. at 2510).

---

[63] Id. at 11-14.

[64] Id. at 14-15.

[65] Id. at 15.

Plaintiffs' pleading on this issue consists of long explanations of the GAAP and GAAS accounting principles allegedly violated, followed by the conclusory statement that UHY clearly violated that principle based solely on the fact that the restatement was issued.[66] But the GAAS standards acknowledge that "even a properly planned . . . audit may not detect a material misstatement," AU § 23 0.12; thus, the mere fact that the audits did not catch a later-revised accounting error in the financial [*42] statements is not conclusive. <u>Arthrocare</u>, 726 F. Supp. 2d at 735 (citing <u>In re Dell</u>, 591 F. Supp. 2d at 903) . Absent facts specifying fraudulent intent or UHY's state of mind, accounting errors "merely suggest that either management or the accountant missed something, and may have failed to prepare or review the financial statements in accordance with an accepted standard of reasonable care." <u>In re Baker Hughes Securities Litigation</u>, 136 F. Supp. 2d 630, 649 (S.D. Tex. 2001) . The parties dispute the simplicity and obviousness of the misapplied accounting rules.[67] But reading the Plaintiffs' Amended Complaint and the record in the Plaintiffs' favor, the Amended Complaint does not sufficiently allege that EXXI violated rules that were so clear and obvious as to make its outside auditor either knowingly deceptive or severely reckless in certifying EXXI's figures on the SEC filings. Plaintiffs' factual allegations make it more plausible, or at least as plausible, to infer that UHY acted negligently than to infer that UHY knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements.

Because Plaintiffs have failed to allege facts capable of establishing that when UHY issued its audit reports, UHY knew — or was severely [*43] reckless in not knowing — that its audit opinions contained statements that were false or misleading or that the audit opinions were so deficient that they amounted to "no audit at all," Plaintiffs' allegations against UHY are not capable of raising a strong inference of scienter. <u>See In re Dell Inc., Securities Litigation</u>, 591 F. Supp. 2d at 900. That UHY failed to discover in 2011 and 2014 accounting deficiencies that were not found until 2 015 might arguably and at most support an allegation of negligence, but not of fraud.[68] Accordingly, UHY's motion to dismiss the federal securities law claims asserted against it will be granted and those claims will be dismissed with prejudice.

(b) Defendant Griffin

Griffin argues that the Exchange Act claims asserted against him should be dismissed because he did not make many of the alleged misstatements, because he left EXXI on October 20, 2014 — more than two years before the last alleged misstatement, and because Plaintiffs fail to plead facts capable of raising a strong inference of scienter with respect to statements that he did make.[69] Griffin also joins in all of the arguments presented in the Director Defendants' MD and in the arguments presented in Louie's MD with respect to alleged "related party [*44] transactions."[70] Plaintiffs respond that Griffin's MD should be denied because he is liable for EXXI's false, misleading, and incomplete financial statements, and because they have adequately alleged scienter with respect to him.[71]

## (1) Alleged Misstatements and Omissions

---

[66] Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 20-24 ¶¶ 92-104, pp. 49-51 ¶¶ 231-43.

[67] <u>See</u> Plaintiff's Opposition to UHY's MD, Docket Entry No. 111, pp. 9-11.

[68] For the reasons stated in § III.A.2(e)(3), below, the court concludes that Plaintiffs have failed to plead facts capable of establishing loss causation.

[69] Griffin's MD, Docket Entry No. 102, p. 5.

[70] <u>Id.</u> at 5 & n.1.

[71] Plaintiffs' Memorandum of Law in Opposition to Defendant D. West Griffin's Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to Griffin's MD"), Docket Entry No. 112, pp. 7-16.

Plaintiffs allege that Griffin served as EXXI's CFO and Board member from the Company's inception in 2005 through and including October 20, 2014, when EIXXI announced Griffin's resignation in a Press Release and a Current Report filed with the SEC on Form 8-K/A on December 1, 2014, following BDO's acquisition of UHY's Texas practice, which had provided independent public accounting services to EXXI.[72] Plaintiffs allege that as CFO, Griffin signed EXXI's quarterly and annual reports filed with the SEC on Forms 10-Q, 10-K, and 10-K/A, and that Griffin is responsible for the content of the reports that he signed and the financial information contained in the Company's press releases.[73] Plaintiffs allege that Griffin was responsible for preparing nearly all of the financial statements that were restated after BDO became EXXI's auditor and determined that EXXI's financial statements for 2011 through 2014 should no longer be relied [*45] upon.[74] Asserting that

> [t]he financial statements issued during Griffin's tenure as CEO that had to be restated after his resignation were the annual financial statements for the four years ended June 30, 2011, 2012, 2013, and 2014, and the quarterly-financial statements for the quarters ended September 30, and December 31, 2013, March 31, 2014, and June 30, 2014,[75]

Plaintiffs argue that these financial statements were false and misleading because they

> were not prepared according to generally accepted accounting principles ("GAAP"), including ASC Topic 815, which requires the reporting entity to document exactly what was being hedged, specifying the exact items (i.e., the particular monthly well production) to utilize hedge accounting. . . . While Griffin was responsible for EXXI's financial reporting, the Company lacked the necessary documentation for its hedging program to utilize cash flow hedge [accounting] but did so anyhow.[76]

Griffin does not plausibly argue that the financial statements he signed that were ultimately restated did not contain statements that were false and misleading.[77] The court concludes, therefore, that Plaintiffs have pled specific facts sufficient to hold Griffin liable [*46] for the financial statements that he signed. See Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 131 S. Ct. 2296, 2302, 180 L. Ed. 2d 166 (2011) ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

The court concludes, however, that as to statements made in press releases, Plaintiffs are relying on the group pleading doctrine — a doctrine abolished by the Fifth Circuit in Southland, 365 F.3d at 365. In Southland the Fifth Circuit held that the PSLRA requires plaintiffs to "enlighten *each defendant* as to his or her particular part in the alleged fraud," so that "corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles." Id. Specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of the entire document or specific portion of the document containing the statement. Id. Plaintiffs have not pled with particularity facts capable of showing that statements made in any of the press releases about which they complain are attributable to Griffin. Instead, Plaintiffs attempt to hold Griffin responsible [*47] for unattributed corporate

---

[72] Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 9 ¶ 39.

[73] Id. at 9 ¶¶ 37-38.

[74] Plaintiffs' Opposition to Griffin's MD, Docket Entry No. 112, p. 8 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 51 ¶ 245).

[75] Id. at 8.

[76] Id. (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 17-18 ¶ 77).

[77] Griffin's MD, Docket Entry No. 102, p. 10 (arguing that "[f]or the reasons explained in the Director Defendants' Motion to Dismiss and Defendant Norman M.K. Louie's Motion to Dismiss the Amended Complaint, Plaintiffs have not alleged that any statement in those financial statements was false or misleading when made.").

statements in the press releases based solely on his title as CFO.[78] Accordingly, the court concludes that Plaintiffs have not sufficiently pled specific factual allegations linking Griffin to allegedly false and misleading statements in EXXI's press releases.

## (2) Scienter

Griffin argues that "[a]s explained in the Director Defendants' Motion to Dismiss, Plaintiffs' impermissible attempt to plead scienter based solely on Defendants' positions within EXXI and alleged GAAP violations mandates dismissal of their Complaint."[79] Griffin argues that the only allegations as to his scienter are that

> (1) his "net worth was dependent upon his investment in EXXI stock and options," Am. Compl. ¶ 42; *se also id.* ¶¶ 40-41; (2) he had an incentive to "protect his job," *id.* ¶ 42; and (3) he had access to unspecified "material non-public information," *e.g., id.* ¶¶ 57, 59.[80]

Griffin argues that Plaintiffs fail to allege that he sold any stock during the Class Period, and that Plaintiffs' factual allegations are internally inconsistent about his alleged motivations because they allege not only that his incentive was to protect his job, but also that he "'resigned over a disagreement [*48] regarding the Company's financial disclosures, including those related to its ultra-deep [water] investments and accounting for its acquisition of EPL.'"[81] Asserting that Plaintiffs' theory of his scienter "rests on nothing more than baseless speculation, and is not 'at least as compelling as any opposing inference one could draw from the facts alleged,'"[82] Griffin argues that "[t]he far more compelling inference is that, to the extent there was any wrongdoing occurring within EXXI, [his] resignation is evidence that he was not a participant."[83]

Asserting that EXXI restated its financial statements for four years, Plaintiffs argue that the restatements are compelling evidence of Griffin's scienter because

> as EXXI's [CFO] — the senior officer directly responsible for assuring the accuracy of EXXI's financial reporting — Griffin undoubtedly knew the Company lacked the necessary documentation — *i.e.*, it had no specific documents regarding the hedged items — to utilize hedge accounting under ASC Topic 815. At the very least, Griffin was severely reckless in not knowing so.[84]

Plaintiffs also argue that the following allegations support a strong inference of Griffin's scienter: (1) the amount [*49] of EXXI's restatements was significant; (2) EXXI's hedging activities were unusually high; (3) Griffin knew or recklessly disregarded the fact that EXXI delayed recognizing impairment of assets that it acquired

---

[78] Id. at 9 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 29 ¶ 128, p. 34 ¶ 157, and p. 36 ¶ 166). See also id. at 10 n.2 (asserting that "[s]ince Griffin was the Company's CFO, it is far more likely that he provided the 'numbers' to [the employee who prepared the press releases] so that they could be incorporated in the Company's press releases").

[79] Id. at 10.

[80] Id. at 11.

[81] Id. at 12 (quoting Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 10 ¶ 43).

[82] Id.

[83] Id.

[84] Plaintiffs' Opposition to Griffin's MD, Docket Entry No. 112, p. 11 (emphasis in original).

from EPL despite steadily declining oil and gas prices that caused EPL to write down those same assets ahead of EXXI; and (4) EXXI lost its entire investment in EPL in a year.[85]

A complaint for violation of federal securities laws "will survive [a motion to dismiss] . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S. Ct. at 2510. A defendant's signature on an SEC filing with false or misleading statements or omissions cannot by itself support a strong inference of scienter. See Central Laborers' Pension Fund v. Integrated Electrical Services Inc., 497 F.3d 546, 555 (5th Cir. 2007) ("If we were to accept [this] proffered interpretation of Sarbanes—Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.") (quoting Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006)). In Central Laborers' the Fifth Circuit adopted the Eleventh Circuit's test for when Sarbanes-Oxley [*50] certifications, i.e., signatures on SEC filings, could support an inference of scienter.[86] The "person signing the certification [must have] had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." Id.

In ArthroCare, 726 F. Supp. 2d at 716, an individual defendant confronted with media reports providing "blatant evidence" of the specific accounting fraud at issue nonetheless "continued to defend [the accounting] stridently and deny the allegations." Although the plaintiffs in ArthroCare alleged accounting errors in eight quarterly SEC filings, and the defendant signed each filing, the court held that only the two quarterly filings immediately following [*51] the detailed media reports could support an inference of scienter. Id. at 724. In Seitel, 447 F. Supp. 2d at 693, the court held that the defendant's signature on SEC filings supported a strong inference of scienter because the plaintiffs alleged not only improper accounting practices but also: (1) overstated revenues of 15 percent for the year 2000 and 30 percent for the first 9 months of 2001; (2) memoranda and meeting minutes revealing that the defendants explicitly discussed the improper accounting methods and affirmatively chose to ignore potential problems; and (3) the dismissal of an auditor who confronted the defendants over the improper practices. Id.

Plaintiffs allege that Griffin signed SEC filings that contained false and misleading statements of EXXI's financial condition because EXXI misapplied the accounting standard for documenting use of cash flow hedge accounting. But "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." Lovelace, 78 F.3d at 1020. To infer scienter from accounting errors, courts typically examine the [*52] magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules. See, e.g., ArthroCare, 726 F. Supp. 2d at 721 ("'[W]hen the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter.").

Plaintiffs argue that the facts they have alleged raise a strong inference of scienter as to Griffin because EXXI misapplied two accounting standards, i.e., the standards for documenting the use of hedge accounting and for reporting asset impairment, the resulting restatements covered four years, and the magnitude of the restatements

---

[85] Id. at 14-15 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 17 ¶¶ 75-76, pp. 42-43 ¶¶ 197-201, p. 46 ¶ 220.

[86] In Central Laborers', 497 F.3d at 554, the Fifth Circuit explained that,

[t]he Sarbanes-Oxley Act states that signing officers must certify that they are "responsible for establishing and maintaining internal controls [and] have designed such internal controls to insure that material information relating to the [company] and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the period reports are being prepared." 15 U.S.C. § 7241(a)(4).

was significant. Plaintiffs also allege that Griffin was motivated to inflate EXXI's profitability to help EXXI qualify for listing on the NASDAQ Global Markets. While the parties dispute the simplicity and obviousness of the misapplied accounting standards, Plaintiffs' Amended Complaint does not allege facts capable of establishing either that the standards being violated were so clear and obvious as to [*53] make Griffin either knowingly deceptive or severely reckless in certifying EXXI's SEC filings, or severely reckless by not knowing that EXXI's accounting was improper. Plaintiffs' allegations regarding the magnitude of EXXI's misstated financials do not support a strong inference of scienter because "the magnitude of the error does not show that the existence of the error was clear when it was made," Schott v. Nobilis Health Corp., 211 F. Supp. 3d 936, 955 (S.D. Tex. 2016), and because EXXI's improper accounting did not uniformly benefit EXXI or consistently line up with a motive to skew the accounting results to favor EXXI's financial position.[87] See ArthroCare, 726 F. Supp. 2d at 724; Seitel, 447 F. Supp. 2d at 693. Moreover, missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting Griffin to the accounting violations that led to the restatement of EXXI's financial statements. Nor are there any allegations that Griffin engaged in insider trading or stood to benefit personally from any of the alleged accounting errors. Plaintiffs offer no facts in support of their contention that Griffin signed the financial statements at issue with scienter other than the fact that, like the senior financial managers of every company, he had control over EXXI's accounting policies and procedures. [*54] See Izadjoo v. Helix Energy Solutions Group, Inc., 237 F. Supp. 3d 492, 516 (S.D. Tex. 2017) (find no scienter for officers where there were no "glaring irregularities or red flags" to put them on notice of material misstatements and omissions in Sarbanes-Oxley certifications or earnings calls).

Plaintiffs cannot demonstrate scienter by relying either on Griffin's position on the Board, Abrams, 292 F.3d at 432, or on the fact that certain financial statements were restated. See Central Laborers', 497 F.3d at 546 (restatement of financial data, by itself, does not create a strong inference of scienter). Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the SEC filings at issue Griffin negligently relied on EXXI's accountants and auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers', 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that lead to a restatement of a company's financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court therefore concludes that Plaintiffs' factual allegations are not sufficient to raise a strong [*55] inference of scienter as to Griffin. Accordingly, Griffin's motion to dismiss the Exchange Act claims asserted against him will be granted and those claims will be dismissed with prejudice.

(c) Defendant Louie

Asserting that he joined EXXI's Board on December 15, 2014, and that his term expired on December 1, 2015,[88] Louie argues that the Exchange Act claims asserted against him should be dismissed because he did not make many of the alleged misstatements, because Plaintiffs allege no facts requiring disclosure of his personal loan to Schiller, and because Plaintiffs rely on group pleading and fail to plead facts capable of raising a strong inference of scienter or loss causation.[89] Plaintiffs respond that Louie's MD should be denied because he knew — but failed to disclose — that he had loaned $3 million to Schiller, because he signed EXXI's 2014 amended Annual Report which had to be restated, and because scienter and loss causation are adequately pled.[90]

---

[87] See UHY's MD, Docket Entry No. 101, p. 16 (asserting without objection from Plaintiffs: "For fiscal years 2012 and 2013 the restated net income was higher than the originally reported net income."). See also UHY's Reply, Docket Entry No. 119, pp. 9-12.

[88] Louie's MD, Docket Entry No. 103, p. 6. See also Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 10 ¶¶ 44-45.

[89] Louie's MD, Docket Entry No. 103, p. 9.

[90] Plaintiffs' Memorandum of Law in Opposition to Defendant Norman M.K. Louie's Motion to Dismiss ("Plaintiffs' Opposition to Louie's MD"), Docket Entry No. 113, pp. 7-12.

**(1) Alleged Misstatements and Omissions**

Regarding Louie plaintiffs allege:

22. From EXXI's founding in 2005 through and including October 15, 2015, Defendant Schiller . . . served as Chairman of the Board. He was stripped of that title [*56] by the Board on October 9, 2015, following an internal investigation that found he borrowed funds in 2007, 2009, and 2014 from personal acquaintances or their affiliates, certain of whom provided the Company and certain of its subsidiaries with services, and in 2014 he personally borrowed $3 million from Defendant Norman Louie ("Louie"), before Louie was appointed to the Board effective December 15, 2014. At the time of the loan from Louie, Louie was a managing director at Mount Kellet Capital Management, LP, one of the Company's largest shareholders. The internal investigation was prompted by an SEC inquiry.

. . .

44. Defendant Louie was appointed to the Board, effective December 15, 2014, by Defendant Schiller and the rest of the Board without election by shareholders, to stand for election by shareholders at the 2015 annual meeting. When Defendant Schiller's secret loan from Defendant Louie was discovered, the Board determined not to nominate Defendant Louie for election as a director at the 2015 annual meeting.

45. During his short tenure on the Board, Defendant Louie signed the Company's Amended 2014 annual report filed on Form 10-K/A with the SEC on December 23, 2014. As a signatory [*57] of the annual report issued in the name of the Company and not attributed to an individual author, Louie is responsible for the content of the annual report he signed.

. . .

269. In the Current Report on Form 8-K, filed with the SEC on December 15, 2014, announcing Defendant Louie's appointment to the Board, Defendants caused EXXI to state that there were no related party transactions between Louie and the Company or any of its subsidiaries that would require disclosure pursuant to Item 404(a) of Regulation S-K, 17 C.F.R. ¶ 229.404(a).

270. That statement in the Current Report on Form 8-K was materially incomplete and misleading because it failed to disclose that (a) Louie had loaned Defendant Schiller $3 million and the loan was outstanding at the time the Form 8-K was filed, (b) Louie was at least indirectly interested in the hedge fund MK's ownership of EXXI common stock, (c) Louie was at least indirectly interested in the M21K partnership between the Company and MK, and (d) Louie was at least indirectly interested in M21K's $123 million asset purchase from EXXI in 2014. All of those transactions were related party transactions requiring disclosure pursuant to Item 404(a) of Regulation [*58] S-K.[91]

Louie does not argue the Form 10-K/A he signed that was ultimately restated did not contain statements that were false and misleading.[92] The court concludes, therefore, that the plaintiffs have plead specific facts sufficient to hold Louie liable for the financial statement that he signed. See Janus, 131 S. Ct. at 2302 ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

Louie argues, however, that Plaintiffs' allegations fail to state an Exchange Act claim against him for statements made in the December 15, 2014, Form 8-K because he did not sign that form and cannot be held liable for the statements contained therein, and because the statements in the Form 8-K are all true as the transactions at issue

---

[91] Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 6 ¶ 22, p. 10 ¶¶ 44-45, and p. 56 ¶¶ 269-70.

[92] Id. at 10 ¶ 45.

were not related-party transactions that Regulation S-K, 17 C.F.R. ¶ 229.404(a) require to be disclosed.[93] Plaintiffs do not dispute that Louie did not sign the Form 8-K filed on December 15, 2014, and therefore cannot be held liable as a maker of the statements contained therein. See Kerr v. Exobox Technologies Corp., Civil Action No. 1-1-10-4221, 2012 U.S. Dist. LEXIS 7523, 2012 WL 201872, at *11 (S.D. Tex. 2012) (defendant not liable under Rule 10b-5 for allegedly [*59] false statements in company's SEC filings, even if he supplied the statements at issue, because he did not sign the filings). See also Janus, 131 S. Ct. at 2302 ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). Nor do Plaintiffs dispute that the transactions at issue are not "related party" transactions that Regulation S-K, 17 C.F.R. ¶ 229.404(a) require to be disclosed.[94]

Citing In re Bristol Myers Squibb Co. Securities Litigation, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008), and City of Monroe Employees Retirement System v. Bridgestone Corp., 399 F.3d 651, 670 (6th Cir. 2005), plaintiffs argue, however, that their Exchange Act claims against Louie should not be dismissed because the Form 8-K "statements regarding no related party transactions, which may have been literally true under the narrow definition of 'related party,' were, if not literally false, highly misleading,"[95] and because the Form 10-K/A that Louie signed was one of EXXI's annual reports that had to be restated.[96] Plaintiffs argue that Louie's loan to Schiller and involvement with entities that owned EXXI stock

> should have been disclosed to investors because they adversely impacted Schiller's and Louie's ability to manage the Company prudently and to ensure that the Company's public disclosures were truthful. Schiller's [*60] dire financial circumstances were a strong motive for him to mislead investors — precisely as he did. Likewise, Louie was highly motivated to inflate the value of EXXI stock, which secured his secret loan to Schiller, if only to reduce his risk of loss if Schiller defaulted on the loan.[97]

It is undisputed that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." Chiarella v. United States, 445 U.S. 222, 100 S. Ct. 1108, 1118, 63 L. Ed. 2d 348 (1980) (discussing disclosure requirements in the context of insider trading and finding that silence is only fraudulent if there exists a duty to disclose). The Bristol Myers and Bridgestone cases on which Plaintiffs rely stand for the well established principle that once a party makes a disclosure, even if it is literally true, the party is under a duty to speak the full truth. See Bristol Myers, 586 F. Supp. 2d at 160 ("even an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it — or other statements made — materially misleading"); Bridgestone, 399 F.3d at 670 ("If a company 'chooses to volunteer such information,' though, 'its disclosure must be full and fair, and courts may conclude that the company was obliged to disclose additional material facts . . . to the [*61] extent that the volunteered disclosure was misleading'"). See also Rubinstein, 20 F.3d at 170 ("'a duty to speak the full truth arises when a defendant undertakes a duty to say anything'"). But the statements Plaintiffs allege were misleading due to Louie's failure to disclose his loan to Schiller and his relationship to entities that owned EXXI stock are statements made by EXXI on the Form 8-K signed by Griffin; not statements made by Louie.

Plaintiffs fail either to cite any authority or to allege any facts capable of establishing that Louie had a duty to disclose information needed to correct the allegedly misleading statements made by EXXI and Griffin. See In re

---

[93] Louie's MD, Docket Entry No. 103, pp. 7-8.

[94] Id. at 7-9 (arguing that the transactions at issue were either not "related party" transactions, or that Louie did not have a material interest in them).

[95] Plaintiffs' Opposition to Louie's MD, Docket Entry No. 113, p. 7.

[96] Id. at 9-10.

[97] Id. at 8.

Franklin Bank Corp. Securities Litigation, 782 F. Supp. 2d 364, 398 (S.D. Tex. 2011), aff'd, 464 F. App'x 334 (5th Cir. 2012) (plaintiffs failed to allege facts capable of establishing that defendant was under a duty to correct a misleading statement made by a third-party analyst). Plaintiffs also fail to allege facts capable of establishing that Louie was the source of the information for the related-party statements in the Form 8-K about which Plaintiffs complain, that Louie knew those statements had been made in the Form 8-K, that those statements were material to the Plaintiffs' decision to purchase or to hold (i.e., not to sell) EXXI stock, or that those statements [*62] imposed upon Louie a duty to disclose the existence of his loan to Schiller or his relationship to entities that owned EXXI stock. See In re Securities Litigation BMC Software, Inc., 183 F. Supp. 2d 860, 871 & n.21 (S.D. Tex. 2001) (recognizing that a party generally has no liability for misleading claims made about it by a third party and no obligation to correct such statements, but that a party may be liable for allegedly misleading statements made by a third-party if sufficiently involved in preparation of those statements). Absent such allegations Plaintiffs may not maintain an Exchange Act claim against Louie arising from either the related-party statements contained in EXXI's December 15, 2014, Form 8-K, or from Louie's failure to disclose his loan to Schiller or his position with respect to entities that owned EXXI stock. See Basic Inc. v. Levinson, 485 U.S. 224, 108 S. Ct. 978, 987 n.17, 99 L. Ed. 2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").


### (2) Scienter

Plaintiffs' failure to allege facts capable of establishing that Louie had a duty to disclose his loan to Schiller or his position with respect to entities that owned EXXI stock precludes Plaintiffs from raising a strong inference of scienter with respect to allegedly misleading statements and/or omissions arising from the Form 8-K that EXXI filed on December 15, 2014. [*63] See In re Centerline Holdings Co. Securities Litigation, 678 F. Supp. 2d 150, 161-62 (S.D.N.Y. 2009) (defendants did not act with scienter regarding omissions "when there was no duty to disclose in the first place"). Nor have Plaintiffs alleged facts capable of raising a strong inference of scienter with respect to the Form 10-K/A that Louie signed in December of 2014 shortly after being named to the Board because missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting Louie to the accounting violations that led to the restatement of EXXI's financials. Plaintiffs offer no facts in support of their contention that Louie signed the Form 10-K/A at issue with scienter other than the fact that he was allegedly motivated to inflate the market value of EXXI because his personal loan to Schiller was purportedly secured by Schiller's EXXI shares. However, the law in this circuit has long been well established that scienter in a particular case may not be based solely on motives universal to all corporate executives such as the desire to maintain a high stock price. See Indiana Electrical, 537 F.3d at 544. Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the Form 10-K/A at issue Louie negligently relied on EXXI's accountants and [*64] auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers', 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that lead to a restatement of a company's financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court concludes therefore that Plaintiffs' factual allegations are not sufficient to raise a strong inference of scienter as to Louie.


### (3) Loss Causation

Louie argues that even if Plaintiffs had alleged facts capable of establishing all the elements of their Exchange Act claims, they "have not alleged, nor can they, that there was any loss associated with this loan or its disclosure.[98]

---

[98] Louie's MD, Docket Entry No. 103, p. 9.

Louie argues that under <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 125 S. Ct. 1627, 1633-34, 161 L. Ed. 2d 577 (2005),

> Plaintiffs must allege "that the market reacted negatively to a corrective disclosure, which revealed the falsity of [the Company's] previous representations. . . ." . . . The personal loan from Mr. Louie to Mr. Schiller was disclosed on September 29, 2015. *See Ex. C* Energy XXI Ltd, Annual Report (Form 10-K) (Sept. 29, 2015) at 43. Immediately thereafter, EXXI's price increased. [*65] *See Ex. D* Energy XXI Stock Prices (showing seven consecutive trading days of increases, reaching a high of $2.28 on October 8, 2015). Even assuming there was a prior misstatement regarding the personal loan — which there was not — without any alleged loss caused by the disclosure of Mr. Louie's personal loan, all of Plaintiffs' claims relating to the personal loan must fail.[99]

Plaintiffs respond only that they "have sufficiently alleged loss causation to withstand his motion to dismiss."[100]

Under the PSLRA Plaintiffs must prove that a defendant's act or omission alleged to have violated federal securities laws "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). In <u>Dura Pharmaceuticals</u>, 125 S. Ct. at 1633-34, the Supreme Court held that loss causation incorporates traditional elements of proximate causation and economic loss. <u>See Amgen Inc. v. Connecticut Retirement Plans and Trust Funds</u>, 568 U.S. 455, 133 S. Ct. 1184, 1192, 185 L. Ed. 2d 308 (2013) (confirming that loss causation continues to be an element of a claim under § 10(b)). Loss causation refers to a direct link between the misstatement and a plaintiff's loss, and generally requires a corrective disclosure relating to the challenged representations, followed by a decline in the stock's price. <u>See Catogas v. Cyberonics, Inc.</u>, 292 F. App'x 311, 314 (5th Cir. 2008) ("Plaintiffs must allege . . . that the market reacted negatively to a corrective [*66] disclosure, which revealed the falsity of [defendant's] previous representations regarding the accounting for its stock options."). Because Plaintiffs fail to allege in their Amended Complaint or to argue in their brief in opposition to Louie's motion to dismiss that a corrective disclosure about Louie's loan to Schiller caused EXXI's stock price to fall, Plaintiffs have failed to plead loss causation.

Because Plaintiffs have failed to allege facts capable of establishing that Louie made an actionable misstatement or omission, with scienter, that caused the loss of which the Plaintiffs complain, Louie's motion to dismiss the Plaintiffs' Exchange Act claims will be granted, and those claims will be dismissed with prejudice.

(d) Defendant Schiller

Schiller argues that the Exchange Act claims asserted against him should be dismissed because Plaintiffs' Amended Complaint fails to allege facts capable of establishing that the statements attributed to him were false or misleading, or that he acted with scienter. Schiller also joins the arguments made by Louie and by the Director Defendants that Plaintiffs' Amended Complaint fails to allege facts capable of establishing loss causation, or that [*67] his loans from Louie were "related party transactions."[101]

## (1) Alleged Misstatements and Omissions

Plaintiffs argue that

> [a]s Chairman and CEO, Schiller signed all of EXXI's Annual Reports including its 2011, 2012, 2013, and 2014 Annual Reports. ¶ 21. On September 8, 2015, the Company announced that all four annual reports should not be relied upon and had to be restated to eliminate hedge accounting from them. ¶¶ 83 & 89. The Company's Annual Reports for 2012, 2013, and 2014 also included materially false or misleading information about the

---

[99] Id.

[100] Plaintiffs' Opposition to Louie's MD, Docket Entry No. 113, p. 12.

[101] Schiller's MD, Docket Entry No. 104, p. 6.

Company's ultra-deep drilling activities (¶¶ 124-26, 132, & 242), and the 2014 Annual Report included materially false or misleading information about EXXI's acquisition of EPL (¶¶ 172 & 174).

And *third*, Schiller is tied directly to the Company's misstatements regarding its oil and gas reserves in EXXI's annual and quarterly financial statements. As Plaintiffs allege, Schiller repeatedly pressured Company employees to include unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program in the reserves reported in the quarterly and annual financial statements. ¶ 141. That pressure undermined [*68] the integrity of the Company's financial statements. ¶ 142.[102]

Plaintiffs argue that Schiller made false and misleading statements on three matters: EXXI's ultra-deep oil drilling activities, EXXI's accounting for the EPL acquisition, and EXXI's financial condition resulting from its use of cash flow hedge accounting.[103] Schiller argues that the statements Plaintiffs attribute to him are not actionable because Plaintiffs have failed to allege facts capable of proving that the statements were, in fact, false or misleading.[104] Schiller also argues that the statements for which Plaintiffs seek to hold him liable are not actionable because they were generally forward looking statements of opinion or belief, and because Plaintiffs have failed to plead facts capable of establishing that he did not genuinely hold the stated opinion Or belief, that the opinion or belief contained embedded misstatements of fact, or that he omitted material facts about his inquiry into or knowledge of information that would conflict with what a reasonable investor would have understood from his comments.[105] See Omnicare, 135 S. Ct. at 1327-29.

(i) Statements About EXXI's Ultra-Deep Drilling Activities Are Not Actionable

Plaintiffs argue that they have plausibly [*69] alleged that Schiller either made or caused EXXI to make false and misleading statements regarding EXXI's ultra-deep drilling activities on five separate occasions: (1) a November 7, 2012, Press Release regarding the Davy Jones well production; (2) EXXI's 2013 Annual Report filed with the SEC on August 21, 2013; (3) comments made at an Oil & Gas conference on October 17, 2013; (4) EXXI's quarterly report for the second quarter of fiscal year 2014 filed with the SEC on Form 10-Q on February 7, 2014; and (5) EXXI's quarterly report for the third quarter of fiscal year 2014 filed with the SEC on Form 10-Q on May 1, 2014.[106] Plaintiffs argue that

as Schiller knew, the Company's ultra-deep drilling activities were largely unsuccessful — only one of 15 target wells identified by the joint venture ever produced any oil (¶ 139) — and he lacked any basis for the upbeat statements he repeatedly made. Plaintiffs substantiate their allegations that Defendants knowingly grossly overstated the status of the ultra-deep drilling activities with information provided by a former EXXI employee who was directly responsible for managing EXXI's reserves and the Company's reserve accounting at the time of the [*70] Davy Jones discovery. ¶ 140. In that capacity, the former employee was well positioned to know whether the Company possessed information to substantiate the stated reserves. That former employee said that when the Davy Jones 2 well was tested, it only produced *water*, not natural gas. . .[107]

---

[102] Id. at 24-25 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 6 ¶ 21, pp. 18-20 ¶¶ 83 & 89, pp. 27-29 ¶¶ 124-26 & 132, pp. 31-32 ¶¶ 141-42, p. 37 ¶¶ 172 & 174, and p. 51 ¶ 242).

[103] Plaintiffs' Memorandum of Law in Opposition to Defendant John D. Schiller's Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to Schiller's MD"), Docket Entry No. 114, pp. 9-16.

[104] Director Defendants' MD, Docket Entry No. 105, p. 11.

[105] Id. at 12-13.

[106] Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, pp. 10-11, 18-19 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 6 ¶ 21, pp. 28-31 ¶¶ 127-29, 132-34, 136-37).

[107] Id. at 19 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 31 ¶¶ 238-40).

(A) November 7, 2012, Press Release

Regarding the November 7, 2012, Press Release Plaintiffs allege:

> On November 7, 2012, EXXI issued a press release in which Defendants caused the Company to state as follows:
>
>> Within the shallow-water ultra-deep exploration program with McMoRan, the Davy Jones discovery well is proceeding toward first production and the company is participating in the Blackbeard West #2, Lomand North and Lineham Creek wells.
>>
>> The Davy Jones discovery well, the first shallow-water, ultra-deep sub-salt completion on the Gulf of Mexico shelf, is being completed. The wellbore was cleaned out to enable testing of all 165 feet of perforated sands in the Wilcox and the final steps of installing the wellhead are underway. Once these steps are complete, flow testing is expected to commence. . .
>>
>> Completion and testing of the Davy Jones offset appraisal well (Davy Jones #2) is expected to commence following [*71] review of results from the Davy Jones discovery well.[108]

Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing that any of the statements in the November 7, 2012, Press Release were false or misleading when made, or that they were attributed to, formulated, signed, or adopted by Schiller. Instead, Plaintiffs merely allege that "[o]nly one of 15 target wells identified by the joint venture ever produced oil."[109] But the fact that EXXI's ultra-deep drilling activities were ultimately not successful is not probative of falsity. See Carlton v. Cannon, 184 F. Supp. 3d 428, 469 (S.D. Tex. 2016) ("[T]he plaintiffs have at most alleged fraud by hindsight. Courts treat this as insufficient because it is based on 'the fact that something turned out badly must mean [the] defendant[s] knew earlier that it would turn out badly.'"). Plaintiffs fail to allege contemporaneous facts capable of showing that Schiller knew earlier material information that he chose not to disclose until later. Id. (citing Abrams, 292 F.3d at 433 ("company officials should not be held responsible for failure to foresee future events")). Because Plaintiffs fail to allege facts capable of establishing either that statements contained in the November [*72] 7, 2012, Press Release were false or that any false statements are attributable to Schiller, and because Plaintiffs neither allege nor argue that statements contained in the November 7, 2012, Press Release misled the market, the statements made in that press release are not actionable under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d 862, 882 (S.D. Tex. 2002) (holding that statements were "not actionable because plaintiffs have not pleaded any facts indicating that the statements were untrue"), aff'd sub nom. Rosenzweig v. Azurix Corp., 332 F.3d 854 (5th Cir. 2003); Southland Securities Corp. v. INSpire Insurance Solutions, Inc., 365 F.3d 353, 365 (5th Cir. 2004) (holding that facts tying an officer or director to a statement "would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document" containing the false or misleading statement).

(B) EXXI's 2013 Annual Report

Regarding EXXI's 2013 Annual Report, Plaintiffs allege:

> In its 2013 Annual Report filed with the SEC on August 21, 2013, Defendants caused the company to state that "work is ongoing to establish commercial production" from Davy Jones No. 1. However, when the statement was made, Defendants knew that Davy Jones No. 1 was not commercially viable.[110]

Plaintiffs also allege that

---

[108] Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 28-29, ¶ 127.

[109] Id. at 31 ¶ 139.

[110] Id. at 29-30 ¶ 132.

[a]s Chairman [*73] of the Board and Chief Executive Officer of EXXI, Defendant Schiller signed the Company's annual reports filed with the SEC on Form 10-K and 10-K/A. As a signatory of the annual reports issued in the name of the Company and not attributed to an individual author, Schiller is responsible for the content of the annual reports he signed.[111]

Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing that on August 21, 2013, when EXXI's 2013 Annual Report was filed, work was not ongoing to establish commercial production from Davy Jones No. 1, that Schiller knew or did not genuinely believe that work was ongoing to establish commercial production from Davy Jones No. 1, or that Schiller had contradictory information, i.e., information that Davy Jones No. 1 was not commercially viable. Absent allegations of such facts, the statements about ultra-deep drilling activities in EXXI's 2013 Annual Report are not actionable against Schiller. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

(C) Statements at Oil & Gas Conference

Regarding Schiller's October 17, 2013, statements at an Oil & Gas Conference, Plaintiffs allege that

[a]t an Oil & Gas conference on October 17, 2013, Schiller said that Davy Jones No. 1 [*74] was "too deep and too narrow to flow gas" but Schiller falsely stated that Davy Jones No. 2 had a "high probability" of producing and that completion of Davy Jones 2 was expected to start in December, 2013.[112]

Plaintiffs allege that

Defendant Schiller's "high probability" statement was false and misleading when it was made. As Schiller knew on October 17, 2013, there was no objective or empirical evidence, such as test results or preliminary production data, to support Schiller's "high probability" statement at that time (or ever). Thus, on that date, Schiller lacked any reasonable basis for his "high probability" statement.[113]

Plaintiffs also allege that

[a]ccording to a former EXXI employee directly responsible for managing EXXI's reserves and the Company's reserve accounting at the time of the Davy Jones discovery, when the Davy Jones No. 2 well was tested, it only produced water, not natural gas. This material adverse fact, though known by EXXI and the Individual Defendants, was not timely disclosed to investors, including Plaintiffs in particular.[114]

Missing from Plaintiffs' Amended Complaint are allegations of fact capable of establishing that Schiller's statements that Davy Jones No. 2 [*75] had a "high probability" of producing or that completion of Davy Jones No. 2 was expected to start in December of 2013, were false, or that when Schiller made these statements he either knew that they were false or did not genuinely believe them. Plaintiffs' assertion that Schiller lacked any reasonable basis for his "high probability" statement because he had no objective or empirical evidence to support that statement is unavailing because Plaintiffs fail to allege particularized facts capable of establishing that objective or empirical evidence existed that contradicted that statement. In Rosenzweig, 332 F.3d at 870, the Fifth Circuit reaffirmed its prior recognition in Rubinstein, 20 F.3d at 169, that "[s]imply alleging that the predictive statements . . . did not have a reasonable basis — that is, that they were negligently made — would hardly suffice to state a claim under Rule 10b-5."

---

[111] Id. at 6 ¶ 21.

[112] Id. at 30 ¶ 133.

[113] Id. ¶ 134.

[114] Id. at 31 ¶ 140.

Plaintiffs' reference to an unidentified former EXXI employee in support of their allegations that when Davy Jones No. 2 was tested, it produced water, not gas, is unavailing because Plaintiffs have not alleged either when the test occurred or that it occurred before Schiller made the statements alleged to be false and misleading at the Oil & Gas Conference [*76] on October 17, 2013. Nor have plaintiffs alleged any facts capable of establishing that Schiller knew about the test, knew the test demonstrated that Davy Jones No. 2 was incapable of producing gas, or knew that the test necessarily meant that completion of Davy Jones No. 2 was not expected to start in December of 2013. Because Plaintiffs do not allege facts capable of establishing that Schiller's statements at the Oil & Gas Conference on October 17, 2013, were false, or that Schiller either knew those statements were false or did not genuinely believe them, and because Plaintiffs neither allege nor argue that any of those statements misled the market, Schiller's statements at the Oil & Gas Conference on October 17, 2013, are not actionable under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

(D) Form 10-Qs Filed in Early 2014 Regarding statements on EXXI's Form 10-Q filings for the second and third quarters of fiscal year 2014, Plaintiffs allege:

> 136. In EXXI's quarterly report for the period ended December 31, 2013, filed on Form 10-Q with the SEC on February 7, 2014, Defendants caused the Company to state that "work is ongoing to establish commercial production" from Davy Jones 1 and that "[o]perations [*77] to commence completion of the Davy Jones No. 2 well are expected during calendar year 2014."
> 137. In EXXI's quarterly report for the period ended March 31, 2014, filed on Form 10-Q with the SEC on May 1, 2014, Defendants failed to mention Davy Jones No. 1, but maintained that Davy Jones No. 2 was "in the process of being completed."[115]

Plaintiffs argue that the statement in the Form 10-Q filed on February 7, 2014, that "work is ongoing to establish commercial production" from Davy Jones No. 1 was false because Schiller had stated at an October 17, 2013, Oil & Gas Conference that Davy Jones No. 1 was "too deep and too narrow to flow gas."[116] Schiller replies that Plaintiffs have not alleged any facts capable of establishing that statements in the Form 10-Q filed on February 7, 2014, were false or misleading.[117] Asserting that Plaintiffs have selectively cited only a portion of the Form 10-Q filed on February 7, 2014, Schiller argues that when read in context together with the surrounding statements, the statement that work was "ongoing to establish commercial production from Davy Jones 1," which plaintiffs allege is false and misleading because it conflicts with the statement he made on October [*78] 17, 2013, that Davy Jones No. 1 is too deep and too narrow to flow gas is, in fact, consistent with his October 17, 2013, statement. Schiller explains that Plaintiffs

> omit an important sentence in the February 7, 2014 Form 10Q filing in which the company truthfully disclosed that "work is ongoing to establish commercial production" from Davy Jones 1. Immediately following that sentence, the company stated in the 10Q: "The operator [Freeport McMoRan] is developing a fit for purpose fracture stimulation process" for Davy Jones 1."[118]

In pertinent part the Form 10-Q filed on February 7, 2014, states:

> *Davy Jones.* As previously reported, our operating partner, Freeport McMoRan, has drilled two wells in the Davy Jones field. The Davy Jones No. 1 well is located on South Marsh Island Block 230 in 19 feet of water

---

[115] Id. at 30-31 ¶¶ 136-37.

[116] Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, pp. 10-11.

[117] Defendant John D. Schiller, Jr.'s Reply in Support of His Motion to Dismiss the Amended Complaint ("Schiller's Reply"), Docket Entry No. 122, pp. 12-13.

[118] Id. at 13 (citing Energy XXI (Bermuda) Limited, Form 10-Q for the quarterly period ended December 31, 2013, Exhibit 2 to Declaration of David M. Sheeren, Docket Entry No. 122-3).

and work is ongoing to establish commercial production from the well. The operator currently is developing a fit for purpose fracture stimulation process. The Davy Jones No. 2 offset appraisal well, located two and a half miles southwest of Davy Jones No. 1, confirmed 120 net feet of potential pay in multiple Wilcox sands, indicating continuity across the major structural features of the [*79] Davy Jones prospect, and also encountered 192 net feet of potential hydrocarbons in the Tuscaloosa and Lower Cretaceous carbonate sections. Operations to commence completion of the Davy Jones No. 2 well are expected during calendar year 2014.[119]

Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing that when the Form 10-Q was filed on February 7, 2014, the work to complete Davy Jones No. 1 was not still ongoing, that the operator was not attempting to develop a "fit for purpose fracture stimulation process" to that well, or that objective or empirical evidence existed that contradicted the statement that Plaintiffs allege was false. Because Plaintiffs do not allege facts capable of establishing that the statement that "work is ongoing to establish commercial production" from Davy Jones No. 1 made in the Form 10-Q filed on February 7, 2014, was false, because Plaintiffs neither allege nor argue that Schiller did not genuinely believe that statement or had information that contradicted it, and because Plaintiffs neither allege nor argue that the statement about the Davy Jones No. 1 well misled the market, that statement will not support [*80] a claim against Schiller under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

Plaintiffs argue that the statements that "[o]perations to commence completion of the Davy Jones No. 2 well are expected during calendar year 2014" made in the Form 10-Q filed on February 7, 2014, and that Davy Jones No. 2 was "in the process of being completed" made in the Form 10-Q filed on May 1, 2014, were false because by 2014 specialized production equipment used for ultra-deep well production had been removed from Davy Jones No. 2 and relocated to a different site, and because an unidentified former EXXI employee has allegedly provided information that when Davy Jones No. 2 was tested, it produced water, not gas.[120] These allegations are not sufficient to state a claim for violation of the Exchange Act against Schiller because Plaintiffs have failed to allege facts capable of establishing when the specialized equipment was removed from the Davy Jones No. 2 site or even that it was removed from the site before EXXI filed the Form 10-Qs at issue on February 7, 2014, and May 1, 2014. Nor have Plaintiffs alleged facts capable of establishing the type of specialized equipment that was removed, that removal of the equipment necessarily [*81] meant the Davy Jones No. 2 well could not be completed, or that when the statements were made Schiller did not genuinely believe them or had information that contradicted them. Plaintiffs have similarly failed to allege facts capable of establishing when the test that allegedly produced water instead of gas occurred or even that it occurred before EXXI filed the Form 10-Qs at issue on February 7, 2014, and May 1, 2014. Nor have Plaintiffs alleged any facts capable of establishing that Schiller knew about the test, knew the test demonstrated that Davy Jones No. 2 was incapable of producing gas, or knew that the test would necessarily lead to the cessation of ongoing efforts to complete Davy Jones No. 2. Absent factual allegations capable of establishing that when EXXI filed the Form 10-Qs at issue on February 7, 2014, and May 1, 2014, operations to commence completion of the Davy Jones No. 2 well were not expected during calendar year 2014, and that when EXXI filed the Form 10-Q filed on May 1, 2014, Davy Jones No. 2 was not "in the process of being completed," or that Schiller knew either that work was not ongoing on that well or that the well was not capable of producing gas,

---

[119] Energy XXI (Bermuda) Limited, Form 10-Q for the quarterly period ended December 31, 2013, p. 35, Exhibit 2 to Declaration of David M. Sheeren, Docket Entry No. 122-3, p. 42. The court may properly consider the full section of this Form 10-Q at this stage of the case because in securities cases courts may take judicial notice of the contents of public disclosure documents that are required by law to be filed and are actually filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain. See Lovelace, 78 F.3d at 1018 & n.l. See also Lone Star Fund V (U.S.), 594 F.3d at 387 (holding that when considering a motion to dismiss courts may consider documents that are "central to the claim and referenced by the complaint").

[120] Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, p. 11 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 31 ¶¶ 139-40).

Schiller [*82] cannot be held liable under the Exchange Act for the allegedly false statements regarding Davy Jones No. 2 contained in EXXI's Form 10-Qs filed on February 7, 2014, or May 1, 2014. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

(ii) Statements About EXXI's Accounting For The EPL Acquisition Are Not Actionable

Asserting that Schiller caused EXXI to buy EPL in 2014 to turn around the Company's stagnant growth and sagging stock price,[121] Plaintiffs argue that

> [a] year earlier, the Company decided that EPL was overpriced. $¶¶ 149 & 160. However, Schiller was so desperate to deliver any purportedly good news to the market that he rushed the Company to complete the $2 billion purchase — its largest by far — without conducting any due diligence. ¶ 153. The haste in which Schiller forced EXXI to buy EPL was matched by the haste in which the purchase soured: less than a year after buying EPL, the assets EXXI acquired had become worthless. ¶¶ 220-21.

> After EXXI acquired EPL, the Company and its subsidiary reported financial results side-by-side. Quarter after quarter, EPL wrote down assets as impaired, only to have EXXI delay doing so by one quarter. Each time, EXXI wrote down the exact same impairment charge one quarter after EPL did so. [*83] EXXI has never explained the reason for its delayed recognition of the impairment charge.[122]

Plaintiffs' allegations that Schiller rushed the EPL acquisition, caused EXXI to overpay for EPL, and was so desperate to bring good news to the market that he failed to do any due diligence, are not supported by allegations of particularized facts capable of establishing that any statements about the EPL acquisition attributable to Schiller were false or misleading, or that Schiller failed to disclose information needed to make his EPL statements not misleading. Even assuming that such facts were pled with specificity, the "failure to engage in due diligence before closing an acquisition does not automatically support an inference of fraud." Schiller v. Physicians Resource Group, Inc., 2002 U.S. Dist. LEXIS 3240, 2002 WL 318441, *11 (N.D. Tex. February 26, 2002) (citing Brogen v. Pohlad, 933 F. Supp. 793, 799 (D. Minn. 1995) (failing "to adequately investigate the merits of a potential acquisition and subsequent steps to remedy that omission may give rise to a claim for negligence; but it cannot support a claim for securities fraud")).

Plaintiffs' allegations that Schiller can be held liable under the Exchange Act for false or misleading statements because EXXI recognized impairment charges for EPL one quarter after EPL did so without explaining the [*84] reason for its delayed recognition, are not supported by allegations of particularized fact. Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing the relevant accounting standards, how those standards were violated, or that Schiller knew or ignored glaring red flags that statements about EPL attributable to him were false or misleading when made. Also missing from Plaintiffs' Opposition to Schiller's MD is any argument or authority for Plaintiffs' contention that a corporate parent has a duty to explain why its accounting for impairment of a subsidiary's assets differs from the subsidiary's own accounting for the same assets. See North Collier Fire Control and Rescue District Firefighter Pension Plan and Plymouth County Retirement Association v. MDC Partners, Inc., No. 15 Civ. 6034 (RJS), 2016 U.S. Dist. LEXIS 136929, 2016 WL 5794774, *3, 9-11, 24 (S.D.N.Y. 2016) (dismissing § 10(b) claim that rested on allegations of how management of parent company should have treated and impaired goodwill related to subsidiary). See also Harris v. Amtrust Financial Services, Inc., 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) ("The fact that Lead Plaintiff cannot tick and tie the loss and loss adjustment expense reported in AmTrust's consolidated financial statement to the losses its individual subsidiaries reported to insurance regulators, without more, does not plausibly allege a misstatement."). Because Plaintiffs do not allege facts capable of establishing that any of EXXI's statements [*85] about EPL were false, or that EXXI had a duty to

---

[121] Id. at 19-20 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 33 ¶ 147). See also id. at 11-15.

[122] Id. See also Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 32-49 ¶¶ 144-230.

explain the differences between its accounting for EPL's goodwill impairment and EPL's own accounting for impairment of its assets; because Plaintiffs fail to allege facts capable of establishing that Schiller either knew that any statements about EPL attributable to him were false, or did not genuinely believe any such statements; and because Plaintiffs' neither allege nor argue that any statements about EPL misled the market, the EPL statements about which Plaintiffs complain are not actionable against Schiller under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

(iii) EXXI's Financial Statements Are Actionable

Asserting that "EXXI lacked the necessary documentation for its hedging activities to utilize hedge accounting,"[123] Plaintiffs argue that

> [a]s a result, in September 2015, shortly after EXXI's auditor was acquired, the new auditor required the Company to restate more than four years of financial statements and to make an adjustment to its accumulated deficit to eliminate the effects of cash flow hedge accounting. ¶¶ 244-45. On September 8, 2015, EXXI announced that its previously issued consolidated financial statements for the four years ended June 30, [*86] 2011, 2012, 2013, and 2014, and for the seven quarters ended September 30, 2013 and 2014, December 31, 2013 and 2014, March 31, 2014 and 2015, and June 30, 2014 - *eleven* financial statements in all - should no longer be relied upon, and would be restated. ¶ 245. The announcement stunned Plaintiffs and other EXXI investors. ¶ 247.[124]

Plaintiffs argue that

> [a]s Chairman and CEO, Schiller signed all of EXXI's Annual Reports including its 2011, 2012, 2013, and 2014 Annual Reports. ¶ 21. On September 8, 2015, the Company announced that all four annual reports should not be relied upon and had to be restated to eliminate hedge accounting from them. ¶¶ 83 & 89. The Company's Annual Reports for 2012, 2013, and 2014 also included materially false or misleading information about the Company's ultra-deep drilling activities (¶¶ 124-26, 132, & 242), and the 2014 Annual Report included materially false or misleading information about EXXI's acquisition of EPL (¶¶ 172 & 174).

> And *third*, Schiller is tied directly to the Company's misstatements regarding its oil and gas reserves in EXXI's annual and quarterly financial statements. As Plaintiffs allege, Schiller repeatedly pressured Company employees to include [*87] unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program in the reserves reported in the quarterly and annual financial statements. ¶ 141. That pressure undermined the integrity of the Company's financial statements. ¶ 142.[125]

Regarding Schiller's alleged misstatements on EXXI's oil and gas reserves Plaintiffs allege:

> 141. According to the former EXXI employee, Defendant Schiller pressured Company employees to include unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program in the amount of reserves reported in the Company's quarterly and annual financial statements. This led to internal confrontations over accounting policies and practices.

> 142. Although the unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program were not included in any of the Company's financial statements, the

---

[123] Id. at 15-16 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 49-50 ¶¶ 234-35).

[124] Id. at 16 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 244-45, and 247).

[125] Id. at 24-25 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 6 ¶ 21, pp. 18-20 ¶¶ 83 & 89, pp. 27-30 ¶¶ 124-26 & 132, pp. 31-32 ¶¶ 141-42, p. 37 ¶¶ 172 & 174, and p. 51 ¶ 242).

pressure from Defendant Schiller and the confrontations it led to created mistrust between the Company's internal accountants and senior management.[126]

Because Plaintiffs expressly allege that "the unsubstantiated estimates [*88] of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program were not included in any of the Company's financial statements,"[127] they are not statements for which Schiller can be held liable under the Exchange Act. Schiller does not plausibly argue, however, that the financial statements he signed that were ultimately restated due to EXXI's lack of specific documentation needed to support its use of cash flow hedge accounting did not contain statements that were false and misleading. The court therefore concludes that the Plaintiffs have pled specific facts sufficient to hold Schiller liable for the financial statements that he signed and that were restated because EXXI improperly utilized cash flow hedge accounting. See Janus, 131 S. Ct. at 2302.

(iv) Conclusions

For the reasons stated above, the court concludes that the purportedly false and misleading statements that Plaintiffs allege Schiller made about EXXI's ultra-deep oil drilling activities, and EXXI's accounting for the unsuccessful EPL acquisition will not support Exchange Act claims against Schiller either because Plaintiffs have failed to allege facts capable of establishing that the statements were false when [*89] made, or that to the extent they were statements of opinion or belief, Schiller did not genuinely hold the opinions expressed, the opinions contained embedded untrue statements of fact, or Schiller omitted material facts about his inquiry or knowledge that would conflict with what a reasonable investor would have understood from his statements. See Omnicare, 135 S. Ct. at 1327-29. The court concludes, however, that the Plaintiffs have pled particularized facts capable of establishing Schiller's liability for false and misleading statements contained in EXXI's financial statements that Schiller signed, that were filed with the SEC, and that were restated because EXXI improperly utilized cash flow hedge accounting. See Janus, 131 S. Ct. at 2302.


**(2) Scienter**

Schiller argues that "the Amended Complaint should be dismissed for failure to allege any inference of scienter, much less a strong one. "[128] He argues that Plaintiffs' references to his desire to maintain a lavish lifestyle, his executive position within EXXI, his signature on SEC filings that were restated, and his loans from Louie and EXXI vendors are all inadequate — individually or collectively — to raise a strong inference of scienter.[129]

Citing Nathenson v. Zonagen Inc., 267 F.3d 400 (5th Cir. 2001), Plaintiffs respond that they have [*90] alleged

> several "special circumstances" that strongly support an inference of Schiller's scienter. Those circumstances include: (i) Schiller's prominence as EXXI's founder, Chairman, and CEO; (ii) the importance of the Company's ultra-deep drilling activities, its oil and gas reserves, and the EPL acquisition to EXXI's net worth and future prospects; (iii) the fact that Schiller himself made several statements regarding the Company's ultra-deep drilling, its reserves, and the EPL acquisition; (iv) Schiller's attempt to influence the Company's reserve estimates; and (v) Schiller's dependence on the market price for EXXI stock to meet his need for cash to fund his lavish lifestyle. Those circumstances — particularly Schillers' need to control the Company's disclosures to

---

[126] Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 31-32 ¶¶ 141-42.

[127] Id. ¶ 142.

[128] Schiller's MD, Docket Entry No. 104, p. 13.

[129] Id. at 13-22. See also Schiller's Reply, Docket Entry No. 122, pp. 16-21.

satisfy his urgent need for cash — make his scienter "at the very least, equally as compelling as any alternative inference, and **a tie favors the plaintiff**." *Lormand*, 565 F.3d at 254 (emphasis added).[130]

Plaintiffs also point to the loans that Schiller took from Louie and from EXXI's vendors but failed to disclose to the Board or to the market as strong inferences of scienter.[131]

In <u>Nathenson</u> the Fifth Circuit held that the individual defendants' positions [*91] within the defendant pharmaceutical company enhanced the scienter allegations. Recognizing "that normally an officer's position with a company does not suffice to create an inference of scienter," <u>id.</u> at 424, the court found a number of special circumstances that taken together, sufficed to support a different result in that case: (1) the company was small and had only three-dozen full-time employees; (2) it was essentially a one-product company; and (3) the alleged misrepresentations were about the patent protection for that single product, the company's most crucial issue. <u>Id.</u> at 425.

The Fifth Circuit and other courts have been reluctant, however, to apply the limited exception recognized in <u>Nathenson. See Rosenzweig</u>, 332 F.3d at 867-68 (rejecting the plaintiffs' argument that "the failure of Azurix's core business — water-privatization projects — supports the inference that defendants knew, or recklessly disregarded, Azurix's prospects for success" and holding that the plaintiffs must identify exactly who supplied the information or when they knew the information"); <u>Abrams</u>, 292 F.3d at 432 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."). Instead, [*92] the Fifth Circuit has stated that only in the "rare case" will a strong inference of scienter be drawn from an officer's position in a company, and only when this factor combines with other, "special circumstances." <u>Local 731 I.B of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.</u>, 810 F.3d 951, 959 (5th Cir. 2016). The Fifth Circuit reiterated that such circumstances may include: (1) a small company in which corporate executives are more likely to be familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent. <u>Id.</u>

Plaintiffs neither allege nor argue that facts capable of establishing any of the special circumstances recognized in <u>Nathenson</u> or <u>Diodes</u> are present in this case. Plaintiffs' allegations that between 2006 and 2010 EXXI completed five major acquisitions for aggregate cash consideration of approximately $2.5 billion demonstrates that EXXI differed substantially from the small, single product companies at issue in <u>Nathenson</u> and <u>Diodes</u>.[132] Instead, as special circumstances capable of allowing a strong inference of scienter to be drawn from Schiller's position with the Company, Plaintiffs point to [*93] Schiller's prominence as EXXI's founder, Chairman, and CEO known for his lavish lifestyle, the importance of EXXI's ultra-deep drilling activities, the EPL acquisition, and oil and gas reserves to EXXI's net worth and future prospects, and the allegedly false and misleading statements that Schiller made about these subjects, <u>i.e.</u>, EXXI's ultra-deep drilling activities, EPL acquisition, and gas reserves.[133] Since, however, for the reasons stated in § III.A.2(d)(1)(i)-(iii), above, the court has already concluded that Plaintiffs have failed to plead facts capable of establishing that Schiller's statements about EXXI's ultra-deep drilling activities, EPL

---

[130] Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, p. 27 (emphasis in original).

[131] <u>Id.</u> at 27-31.

[132] Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 16 ¶¶ 69-71. Moreover, Schiller argues without objection that EXXI had approximately 257 employees at the time of its bankruptcy, more than the companies falling under the <u>Nathenson</u> exception. See Schiller's Reply, Docket Entry No. 122, p. 19 & n.9 ("In connection with its bankruptcy petition, the company sought emergency relief to pay these employees during the course of the bankruptcy. See Ex. 3 to the Declaration of David M. Sheeren at p. 5 (disclosing 257 employees). The Court can properly take judicial notice of that adjudicative fact. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011)." <u>See also Carlton</u>, 184 F. Supp. 3d at 479 (183 employees voids the <u>Nathenson</u> exception).

[133] Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, p. 27.

acquisition, or reserves were false or misleading, Plaintiffs' attempt to infer a strong inference of scienter for and/or from making those statements misses the mark. The only allegedly false and misleading statements that the court has found are actionable against Schiller are the financial statements included in the EXXI SEC filings that he signed and were later restated.

A defendant's signature on an SEC filing with false or misleading statements or omissions cannot by itself support a strong inference of [*94] scienter. See Central Laborers', 497 F.3d at 555. "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." Lovelace, 78 F.3d at 1020. See also ArthroCare, 726 F. Supp. 2d at 716; Seitel, 447 F. Supp. 2d at 693. To infer scienter from accounting errors, courts typically examine the magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules. See ArthroCare, 726 F. Supp. 2d at 721 ("[W]hen the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter."). Although Plaintiffs have argued that the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] and the restatement raise a strong inference of scienter as to Griffin, EXXI's CFO, Plaintiffs have made no such argument as to Schiller. Instead, Plaintiffs merely point to the loans that Schiller borrowed from fellow board member [*95] Louie and from EXXI vendors but did not disclose. But for the reasons stated in § III.A.2(o) (1), above, the court has already concluded that Plaintiffs have failed to allege any facts capable of establishing that Louie — or now Schiller — had a duty to disclose those loans. Absent a duty to disclose, failure to disclose is not capable of raising a strong inference of scienter. See Chiarella v. United States, 100 S. Ct. at 1118 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

Moreover, missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting Schiller to the accounting violations that led to the restatement of EXXI's financial statements. Nor are there any allegations that Schiller engaged in insider trading or stood to benefit personally from any of the alleged accounting errors. Plaintiffs offer no facts in support of their contention that Schiller signed the financial statements at issue with scienter other than the fact that, like the senior managers of every company, he had control over the Company. See Izadjoo, 237 F. Supp. 3d at 516 (find no scienter for officers where there were no "glaring irregularities or red flags" to put them on notice of material misstatements [*96] and omissions in Sarbanes-Oxley certifications or earnings calls). Plaintiffs cannot demonstrate scienter by relying either on Schiller's position on the board, Abrams, 292 F.3d at 432, or on the fact that certain financial statements were restated. See Central Laborers, 497 F.3d at 549 (restatement of financial data, by itself, does not create a strong inference of scienter). Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the SEC filings at issue Schiller negligently relied on EXXI's accountants and auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers, 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that lead to a restatement of a company's financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court concludes therefore that Plaintiffs' factual allegations are not sufficient to raise a strong inference of scienter as to Schiller.

**(3) Loss Causation**

Schiller joins in and incorporates by reference arguments made by the Director Defendants and by Louie [*97]

that Plaintiffs failed to show that any of the alleged misstatements were followed by corrective disclosures that caused the price of the stock to drop. Plaintiffs fail to plead loss causation because they do not allege any causal connection between the supposed fraudulent conduct and their purported losses.[134]

Although they have not responded directly to Schiller's loss causation argument, Plaintiffs argue that they "have sufficiently alleged loss causation. to withstand [Schiller's] motion to dismiss."[135] Citing Lormand, 565 F.3d at 256-58, and asserting that "Moss causation 'is subject to the pleading standard of Federal Rule of [Civil] Procedure 8(a)(2), rather than the heightened pleading requirement of Rule 9(b),"[136] Plaintiffs argue that "[u]nder that relaxed pleading standard, [they] need only allege 'a facially "plausible"' connection between the misstatements or omissions and their loss."[137] Citing North Port Firefighters' Pension — Local Option Plan v. Temple-Inland, Inc., 936 F. Supp. 2d 722, 761 (N.D. Tex. 2013), Plaintiffs argue that they "need not plead a fact-for-fact disclosure to establish loss causation,"[138] and if the court disagrees, Plaintiffs "respectfully request the opportunity to amend their complaint to add such factual allegations in further support of loss causation."[139]

For [*98] the reasons stated in § III.A.2(c) (3), above, with respect to Louie, and in § III.A.2(e)(3), below, with respect to the Director Defendants, Plaintiffs have failed to plead loss causation with respect to Schiller.

### (4) Conclusions as to Schiller

Because Plaintiffs have failed to allege facts capable of establishing that Schiller made an actionable misstatement or omission, with scienter, that caused the loss of which the Plaintiffs' complain, Schiller's motion to dismiss the Plaintiffs' Exchange Act claims will be granted, and those claims will be dismissed with prejudice.

(e) Director Defendants

The Director Defendants argue that the federal securities law and fraud claims asserted against them should be dismissed because Plaintiffs' Amended Complaint fails to plead an actionable misstatement or omission, scienter, or loss causation. The Director Defendants also argue that Plaintiffs' Amended Complaint

fails to the extent it asserts (1) claims against the Director Defendants based on statements attributed to unspecified "Defendants" or the Company when those Director Defendants were not on the EXXI board and (2) claims barred by the five-year statute of repose or the prohibition on holder [*99] claims.[140]

### (1) Alleged Misstatements and Omissions

---

[134] Schiller's Reply, Docket Entry No. 122, p. 21. See also Schiller's MD, Docket Entry No. 104, p. 6 ("Mr. Schiller joins in all of the arguments in The Director Defendants' Motion to Dismiss and incorporates those arguments herein by reference.").

[135] Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 24.

[136] Id.

[137] Id.

[138] Id.

[139] Id. at 25.

[140] Director Defendants' MD, Docket Entry No. 105, p. 11. See also Reply Brief in Support of the Director Defendants' Motion to Dismiss the Amended Complaint ("Director Defendants' Reply"), Docket Entry No. 121, pp. 6-12.

Asserting that the Director Defendants are Feinberg, Colvin, Dunwoody, Dupre, Flannery, Griffiths, and LaChance, Plaintiffs argue that

> [a]t relevant times, each of the Director Defendants served as a director of EXXI. In addition to serving on the Board, Defendant Colvin was Chairman of the Audit Committee and a member of the Nomination and Governance Committee. ¶ 48. Defendant Flannery was a member of the Audit Committee and the Nomination and Governance Committee of the Board. ¶ 49. Defendant Dunwoody was Chairman of the Remuneration Committee and a member of the Audit Committee. ¶ 50. Defendant Griffiths served on the Audit Committee and the Compensation Committee. ¶ 51. Defendant Feinberg was Lead Independent Director, Chairman of the Nomination and Governance Committee, a member of the Compensation Committee, and an *ex officio* member of the Audit Committee. ¶ 52. Defendant Dupré was Chairman of the Compensation Committee and a member of the Nomination and Governance Committee. ¶ 53.

> By virtue of their Board positions and responsibilities, the Director Defendants were privy to and participated in the creation, development, and [*100] reporting of the Company's financial condition; they had significant personal contact and familiarity with the Company and its senior officers and their fellow directors; and they were advised of and had access to internal reports and other non-public data and information about the Company's finances, operations, and sales. ¶ 290. The Director Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false, misleading, and incomplete. *Id.*
> . . . [T]he Amended Complaint more than sufficiently pleads claims under the [PSLRA], for common law fraud, and for breach of fiduciary duty against the Director Defendants. Their motion to dismiss the Amended Complaint should be denied in its entirety.[141]

Plaintiffs argue that they have plausibly alleged that the Director Defendants caused EXXI to make a series of materially misleading statements about three different matters: EXXI's ultra-deep oil drilling activities, EXXI's accounting for the unsuccessful EPL acquisition, EXXI's improper use of cash hedge accounting, and Schiller's secret loan from defendant Louie.[142] Unlike the specific statements on these issues [*101] made by or attributed to Schiller, Plaintiffs argue that the statements regarding EXXI's ultra-deep drilling activities for which they seek to hold the Director Defendants liable were not attributed to any person.[143] Citing Southland, 365 F.3d at 365, Plaintiffs argue that "directors may be held liable for false, misleading, or incomplete statements in corporate documents that have no stated author or are not attributed to any individual if they are sufficiently linked to the document or statement in question."[144]

(i) Statements About EXXI's Ultra-Deep Drilling Activities Are Not Actionable

Plaintiffs argue that they have plausibly alleged that the Director Defendants caused EXXI to make false and misleading statements regarding EXXI's ultra-deep oil drilling activities in a November 7, 2012, Press Release regarding the McMoRan and Davy Jones well production, and in EXXI's Form 10-Q filed on February 7, 2014, for the period ended December 31, 2013.[145] Plaintiffs' allegations regarding the November 7, 2012, Press Release are quoted in § III.A.2(d)(1)(i)(A), above, and their allegations regarding the Form 10-Q filed on February 7, 2014, are

---

[141] Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, pp. 8-10 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 11-13 ¶¶ 48-53 and p. 62 ¶ 290).

[142] Id. at 12-22.

[143] Id. at 12-13, & n.5.

[144] Id. at 12.

[145] Id. 12-13 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 28-29 ¶ 127, and 30 ¶ 136.

quoted in § III.A.2(d) (1) (i) (D), above. For the reasons stated in those previous [*102] sections of this Memorandum Opinion and Order, the court has already concluded that Plaintiffs' Amended Complaint fails to allege facts capable of establishing that any of the statements in either the November 7, 2012, Press Release, or the February 7, 2014, Form 10-Q about which Plaintiffs complain were false or misleading when made. Plaintiffs' Amended Complaint similarly fails to allege facts capable of establishing that any of the statements about EXXI's ultra-deep drilling activities contained in either of these documents was attributed to, formulated, signed, adopted, or used by any of the Director Defendants as conduits to the market. Absent such allegations, the Director Defendants cannot be held liable for statements in either the November 7, 2012, Press Release, or the February 7, 2014, Form 10-Q. See Azurix, 198 F. Supp. 2d at 882 (holding that statements were "not actionable because plaintiffs have not pleaded any facts indicating that the statements were untrue"); Southland, 365 F.3d at 365 (holding that facts tying an officer or director to a statement "would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that [*103] specific portion of the document"). Also missing from Plaintiffs' Amended Complaint are allegations of fact capable of establishing that any of the statements contained in either the November 7, 2012, Press Release, or the February 7, 2014, Form 10-Q mislead the market. Accordingly, the court concludes that the Director Defendants cannot be held liable under the Exchange Act for allegedly false and misleading statements about EXXI's ultra-deep drilling activities made in either the November 7, 2012, Press Release or the February 7, 2014, Form 10-Q.

(ii) Statements About EXXI's Accounting For The EPL Acquisition Are Not Actionable

Asserting that after EXXI acquired EPL, EPL wrote down assets as impaired, only to have EXXI delay doing so by one quarter,[146] that in Plaintiffs' Amended Complaint they "allege in detail the sequence of accounting for the impairment charges,"[147] and that "EXXI restated financial statements that were prepared after the Company acquired EPL in June [of 2014,"[148] Plaintiffs argue that

> [t]he side-by-side comparison of EXXI's recognition of impairments in the Company's consolidated annual and quarterly financial statements with EPL's more timely recognition of them in its [*104] stand-along financial statements amply explains how and why EXXI's accounting for the assets acquired from EPL in the Company's consolidated financial statements was false, misleading, and incomplete. The adequately inform the Director Defendants of the particular misrepresentations.[149]

Citing Southland, 365 F.3d at 365, Plaintiffs argue that

> the Director Defendants are liable for the false, misleading, or incomplete statements in EXXI's financial statements because they are linked to them by virtue of their ability to control EXXI's financial disclosures. . . . In particular, the Director Defendants who were members of the Audit Committee — Colvin (Chair), Flannery, Dunwoody, Griffiths, and Feinberg (ex *officio*) — are closely linked to the Company's financial statements. As members of the Audit Committee, those five Director Defendants recommended the annual appointment of the Company's auditor, reviewed the scope of the audits, reviewed the Company's accounting principles, and

---

[146] Id. at 13.

[147] Id.

[148] Id. at 14.

[149] Id.

reviewed the Company's financial statements included in the annual and quarterly reports filed with the SEC. ¶ 54. They are undoubtedly liable for the false and misleading financial statements.[150]

Plaintiffs' argument that the Director [*105] Defendants can be held liable under the Exchange Act for false or misleading statements in EXXI's financial statements because EXXI recognized impairment charges for EPL one quarter after EPL did without explaining the reason for its delayed recognition is not supported by allegations of particularized fact. Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing the relevant accounting standards, how those standards were violated, or that any of the Director Defendants knew — or ignored glaring red flags — that EXXI's financial statements were false and misleading due to improper accounting for impairment of EPL's assets. Also missing from Plaintiffs' Amended Complaint is an allegation that any of EXXI's financial statements were restated to correct misstatements arising from a failure to properly account for the impairment of EPL's assets. Missing from Plaintiffs' Opposition to Director Defendants' MD is any argument or authority supporting their contention that a corporate parent has a duty to explain why its accounting for impairment of a subsidiary's assets differs from the subsidiary's own accounting for impairment of the same assets. See MDC Partners, 2016 U.S. Dist. LEXIS 136929, 2016 WL 5794774, at *3, 9-11, 24 [*106] (dismissing § 10(b) claim that rested on allegations of how management of parent company should have tested and impaired goodwill related to subsidiary). See also Harris, 135 F. Supp. 3d at 171 ("The fact that Lead Plaintiff cannot tick and tie the loss and loss adjustment expense reported in AmTrust's consolidated financial statement to the losses its individual subsidiaries reported to insurance regulators, without more, does not plausibly allege a misstatement."). Because Plaintiffs do not allege facts capable of establishing that the Director Defendants made or caused EXXI to make any false or misleading statements about EPL and/or the impairment of its assets, or that EXXI had a duty to explain the differences between its accounting for impairment of EPL's assets and EPL's own accounting for impairment of its assets, and because Plaintiffs neither allege nor argue that any statements about EPL misled the market, the court concludes that the Director Defendants cannot be held liable under the Exchange Act for allegedly false and misleading statements about EPL and/or EXXI's accounting for impairment of EPL's assets. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

(iii) EXXI's Financial Statements Are Actionable

Plaintiffs allege that because EXXI used hedge accounting without required documentation, "EXXI was required to restate its financial statements for the fiscal years ended June 30, 2011, 2012, 2013, and 2014, and for the intermediate quarters from September 30, 2013 through March 31, 2015. "[151] Plaintiffs argue that "[t]he Director Defendants cannot dispute that those erroneous financial statements were materially false and misleading when issued."[152] Because Plaintiffs' Amended Complaint alleges that each of the Director Defendants signed the Company's annual reports filed with the SEC on Forms 10-K and 10-K/A,[153] each of them can be held liable for false and misleading statements made in those annual reports. The Director Defendants do not dispute that they signed EXXI's annual reports filed with the SEC on Forms 10-K and 10-K/A and that the annual reports for fiscal years ending June 30, 2011, 2012, 2013, and 2014 that they signed and that were ultimately restated did not contain statements that were false and misleading.[154] The court concludes, therefore, that the Plaintiffs have pled specific facts sufficient to hold [*107] the Director Defendants liable for the financial statements that they signed

---

[150] Id. at 14-15.

[151] Id. at 16 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 19-20 ¶ 89).

[152] Id.

[153] Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 11-13 ¶ 46 (LaChance), ¶ 48 (Colvin), ¶ 4 9 (Flannery), ¶ 50 (Dunwoody), ¶ 51 (Griffiths), ¶ 52 (Feinberg), and ¶ 53 (Dupre).

[154] Id. at 11 ¶ 46.

containing false and misleading statements resulting from EXXI's use of hedge accounting. See Janus, 131 S. Ct. at 2302 ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

(iv) Statements About Schiller's Loans Are Not Actionable

Plaintiffs allege that EXXI's Form 8-K filed with the SEC on December 15, 2014, was false and misleading because it "state[d] that there were no related party transactions between Louie and the Company or any of its subsidiaries that would require disclosure pursuant to Item 404(a) of Regulation S-K," but failed to disclose that Schiller had taken a personal loan from Louie.[155] But for the reasons stated in § III.A.2(c)(1), above, the court has already concluded that the statement in the Form 8-K about which the Plaintiffs complain was neither false nor misleading and therefore not actionable under the Exchange Act.

(v) Conclusions

For the reasons stated above, the court concludes that the purportedly false and misleading statements that Plaintiffs allege the Director Defendants caused [*108] EXXI to make about ultra-deep drilling activities, accounting for the impairment of EPL's assets, and Schiller's secret loan from defendant Louie will not support Exchange Act claims, but that Plaintiffs have alleged an actionable claim against the Direct Defendants for false and misleading statements contained in EXXI's financial statements that they signed, that were filed with the SEC, and that were restated because EXXI improperly utilized cash flow hedge accounting. See Janus, 131 S. Ct. at 2302.


**(2) Scienter**

Asserting that "[t]he facts of the restatements give rise to a strong inference of scienter [, . . . as] do the facts of the related party transaction between Louie and Schiller,"[156] Plaintiffs argue that

> the Director Defendants, particularly the four directors on the Nomination and Governance Committee, were severely reckless in not discovering Louie's loan to Schiller before he joined the Board. And so, too, do the facts relating to the accounting for the EPL acquisition and EXXI's ultra-deep drilling activities. The differences in accounting for impairment in EXXI's consolidated financial statements [for] EXXI when compared to the stand-alone financial statements of its subsidiary, EPL, cannot be attributed [*109] to any "overhaul" in accounting systems. Taken together, the sum of all these misstatements and omissions of material fact easily gives rise to the requisite strong inference of scienter.[157]

Plaintiffs allege that the Director Defendants signed SEC filings that contained false and misleading statements of EXXI's financial condition because EXXI misapplied the accounting standard for documenting use of cash flow hedge accounting. But "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." Lovelace, 78 F.3d at 1020. See also Central Laborers, 497 F.3d at 555 (recognizing that a defendant's signature on an SEC filing with false or misleading statements or omissions cannot by itself support a strong inference of scienter). To infer scienter from accounting errors, courts typically examine the magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules. See ArthroCare, 726 F. Supp. 2d at 721. Although Plaintiffs have argued that the number, size, timing, [*110] nature, frequency, and context of

---

[155] Id. at 56 ¶¶ 269-70.

[156] Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 23.

[157] Id.

the misapplication of accounting principles and the restatement raise a strong inference of scienter as to Griffin, EXXI's CFO, plaintiffs have made no such argument as to the Director Defendants. Instead, Plaintiffs merely point to the loans that Schiller borrowed from fellow Board member Louie that the Director Defendants neither discovered nor disclosed. But for the reasons stated in §§ III.A.2(c)(1) and III.A.2(d)(1)(iv), above, the court has already concluded that Plaintiffs have failed to allege any facts capable of establishing that Louie or Schiller had a duty to disclose those loans. Absent a duty to disclose, failure to disclose is not capable of raising a strong inference of scienter. See Chiarella v. United States, 100 S. Ct. at 1118 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

Moreover, missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting the Director Defendants to the accounting violations that led to the restatement of EXXI's financial statements. Nor are there allegations that any of the Director Defendants engaged in insider trading or stood to benefit personally from any of the [*111] alleged accounting errors. Plaintiffs offer no facts in support of their contention that the Director Defendants signed the financial statements at issue with scienter other than the fact that, like the directors of every company, they had control over the Company. See Izadjoo, 237 F. Supp. 3d at 516 (find no scienter for officers where there were no "glaring irregularities or red flags" to put them on notice of material misstatements and omission in Sarbanes-Oxley certifications or earnings calls). Plaintiffs cannot demonstrate scienter by relying either on the Director Defendants' position on the Board or on certain board committees, Abrams, 292 F.3d at 432, or on the fact that certain financial statements were restated. See Central Laborers, 497 F.3d at 549 (restatement of financial data, by itself, does not create a strong inference of scienter). Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the SEC filings at issue Schiller negligently relied on EXXI's accountants and auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers, 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that [*112] lead to a restatement of a company's financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court concludes therefore that Plaintiffs' factual allegations are not sufficient to raise a strong inference of scienter as to the Director Defendants.

### (3) Loss Causation

The Director Defendants argue that even if Plaintiffs could satisfy the falsity and scienter elements of their Exchange Act claims that "[a] third, independent basis compelling dismissal is Plaintiffs' failure to plead facts demonstrating loss causation — that is, 'a causal connection between the [alleged] material misrepresentation and the loss.'"[158] The Director Defendants argue that the Plaintiffs have not alleged that there was any loss associated with any of the statements or categories of statements that Plaintiffs allege were false and misleading, i.e., statements about EXXI's ultra-deep drilling activities, EPL, Schiller's loans, or EXXI's improper use of hedge accounting.[159]

---

[158] Director Defendants' MD, Docket Entry No. 105, p. 27. Defendants UHY and Schiller join the Director Defendants' argument on loss causation. See UHY's MD, Docket Entry No. 101, p. 7 & n.2 ("The arguments in the motion to dismiss of the Director Defendants are adopted for purposes of this motion to dismiss,-" and n.2, "[w]ith respect to the securities fraud claim, UHY incorporates the arguments regarding group pleading, loss causation, and the statute of repose."); Schiller's MD, Docket Entry No. 104, p. 6 ("Mr. Schiller joins in all of the arguments in The Director Defendants' Motion to Dismiss and incorporates those arguments herein by reference.").

[159] Id. at 27-29.

Plaintiffs respond that they "have sufficiently alleged loss causation to withstand [the defendants'] motion [s] to dismiss."[160] Citing  [*113] inter alia Lormand, 565 F.3d at 256-58, and asserting that "[l]oss causation is subject to the pleading standard of Federal Rule of [Civil] Procedure 8(a)(2), rather than the heightened pleading requirement of Rule 9(b),"[161] Plaintiffs argue that "[u]nder that relaxed pleading standard, [they] need only allege a facially plausible connection between the misstatements or omissions and their loss."[162] Citing North Port Firefighters' Pension — Local Option Plan v. Temple-Inland, Inc., 936 F. Supp. 2d 722, 761 (N.D. Tex. 2013), Plaintiffs argue that they "need not plead a fact-for-fact disclosure to establish loss causation,"[163] and if the court disagrees, Plaintiffs "respectfully request the opportunity to amend their complaint to add such factual allegations in further support of loss causation."[164]

Under the PSLRA Plaintiffs must prove that a defendant's act or omission alleged to have violated federal securities laws "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Loss causation refers to a direct link between the misstatement and a plaintiff's loss, and generally requires a corrective disclosure relating to the challenged representations, followed by a decline in stock price after the truth is revealed. See Spitzberg v. Houston American Energy Corp., 758 F.3d 676, & n.18 (5th Cir. 2014) (citing In re Williams Securities Litigation, 558 F.3d 1130, 1137 (10th Cir. 2009)). In Dura Pharmaceuticals, 125 S. Ct. at 1633-34, the Court held that loss causation incorporates traditional [*114] elements of proximate causation and economic loss. See Amgen, 133 S. Ct. at 1192 (confirming that loss causation continues to be an element of a claim under § 10(b)). The Fifth Circuit has held that the Rule 8(a) and 12(b)(6) plausibility pleading standard, not heightened pleading, is sufficient to plead loss causation. Lormand, 565 F.3d at 258 ("[W]e conclude that Rule 8(a) (2) requires the plaintiff to allege, in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss . . . or, as Twombly indicates, the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation." (internal citations omitted)). A court is "not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as [it] must in assessing allegations of scienter under the PSLRA." Id. at 267.

In pertinent [*115] part Plaintiffs allege:

LOSS CAUSATION/ECONOMIC LOSS

278. As alleged herein, Defendants engaged in a scheme to deceive the investing market generally, and Plaintiffs in particular, and a course of conduct that artificially inflated EXXI's stock price and operated as a fraud or deceit on purchasers of EXXI stock by misrepresenting the Company's financial and operating condition and prospects as well as known trends in its industry.

279. Once Defendants' misrepresentations and fraudulent conduct were disclosed to the market, EXXI's stock price reacted negatively as the artificial inflation was removed from it. As a result of their purchases of EXXI stock alleged herein, and their decision to refrain from selling EXXI stock alleged herein, Plaintiffs suffered significant economic losses.

280. Defendants' false and misleading statements had the intended effect and caused EXXI stock to trade at artificially inflated levels at all relevant times and caused Plaintiffs to refrain from selling EXXI stock.

---

[160] Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 24.

[161] Id.

[162] Id.

[163] Id.

[164] Id. at 25.

281. As investors and the market became aware of EXXI's prior misstatements and omissions and that EXXI's actual financial condition and business prospects were, in fact, not as represented, EXXI's [*116] stock price reacted negatively, substantially damaging Plaintiffs.[165]

Missing from Plaintiffs' Amended Complaint are allegations that identify any corrective disclosure followed by a drop in the price of EXXI stock. Argument as to the existence of any such disclosures is also missing from the briefs that Plaintiffs have filed in opposition to the defendants' motions to dismiss.

Plaintiffs allege that in September of 2015 EXXI was required to restate more than four years of financial statements to eliminate the use of hedge accounting.[166] Plaintiffs allege that EXXI's financial statements for the years ending June 30, 2011, 2012, 2013, 2014, and 2015, filed with the SEC on August 26, 2011, August 9, 2012, August 21, 2013, August 28 and December 23, 2014, and September 29, 2015, were materially false and misleading because they stated that EXXI did not use hedging for speculative or trading purposes.[167] Plaintiffs allege that "[u]ntil EXXI's financial statements were corrected on September 29, 2015, the Company's publicly filed financial statements for at least the years ended[] June 30, 2011, 2012, 2013, and 2014, and for all the intervening quarters materially misstated and did not fairly and [*117] accurately present the Company's financial condition and its results of operations."[168] Plaintiffs do not allege that EXXI stock price declined as a result of the disclosure that four years of financial statements would be restated. The Director Defendants argue that Plaintiffs are unable to satisfy the requirement for pleading loss causation because EXXI's stock price actually increased following disclosure in September of 2015 that certain of EXXI's financial statements would be restated and that Schiller had taken personal loans from Louie and from EXXI vendors.[169]

While the Fifth Circuit has recognized that courts can take judicial notice of historical stock prices, see Catogas, 292 F. App'x at 316, the court need not do so here because it is sufficient in considering the motions to dismiss that Plaintiffs have alleged no losses following the relevant disclosures in September of 2015. See Schott, 211 F. Supp. 3d at 946. Since Plaintiffs have not alleged that the restatements caused their losses, the court does not factor the restatements into its analysis of loss causation. Instead, Plaintiffs allege that

> EXXI's disclosure that it was required to restate its financial statements to eliminate cash flow hedge accounting was materially false and [*118] misleading because it made it appear that the reason for the restatement was a mere technical deficiency in documentation, when the true reason for the restatement was that the Company was hedging for improper purposes, including speculating on future oil and natural gas prices or manipulating reported revenue and earnings.[170]

But also missing from Plaintiffs' Amended Complaint are facts capable of establishing that EXXI's stated reason for the restatements was false, or that the stated reason for the restatements was ever the subject of a corrective disclosure that was followed by a decline in stock price. Accordingly, Plaintiffs have failed to plead loss causation.

At the end of their responsive briefing on the issue of loss causation, Plaintiffs request leave to amend Mt]o the extent the Court requires . . . specificity notwithstanding the general pleading requirements of Rule 8(a)(2), Plaintiffs respectfully request the opportunity to amend their complaint to add such factual allegations in further

---

[165] Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 59 ¶¶ 278-81.

[166] Id. at 17-18 ¶ 77.

[167] Id. at 52 ¶ 249.

[168] Id. at 54 ¶ 257.

[169] Director Defendants' MD, Docket Entry No. 105, pp. 28-29 (citing Exhibit 10, EXXI stock price table, Docket Entry No. 106-10).

[170] Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 54-55 ¶ 259.

support of loss causation."[171] Federal Rule of Civil Procedure 15(a)(2) states that "[t]he court should freely give leave [to amend] when justice so requires." "Although Rule 15[a] 'evinces a bias in favor of granting leave to amend,' it is not automatic." [*119] Southmark Corp., 88 F.3d 311, 314 (5th Cir. 1996), cert denied, 519 U.S. 1057, 117 S. Ct. 686, 136 L. Ed. 2d 611 (1997) (quoting Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594, 597 (5th Cir. 1981)). "A decision to grant leave is within the discretion of the trial court. Its discretion, however, is not broad enough to permit denial if the court lacks a substantial reason to do so." Id. (citing State of Louisiana v. Litton Mortgage Co., 50 F.3d 1298, 1302-1303 (5th Cir. 1995) (per curiam)). Generally, a district court errs in dismissing a complaint for failure to state a claim under Rule 12(b)(6) without giving the plaintiff an opportunity to amend. Bazrowx v. Scott, 136 F.3d 1053, 1054 (5th Cir.) (per curiam), cert. denied, 525 U.S. 865, 119 S. Ct. 156, 142 L. Ed. 2d 128 (1998). If, however, a complaint alleges the plaintiff's best case, there is no need for further amendment. Id. See also Jones v. Greninger, 188 F.3d 322, 327 (5th Cir. 1999) (per curiam) (dismissing plaintiff's pro se action because court could perceive of no viable claim plaintiff could include in an amended complaint based on the underlying facts). The Fifth Circuit has also held that in exercising its discretion, a court may consider various criteria including, inter alia, the failure to cure deficiencies by amendments previously allowed and futility of the proposed amendment. See Whitaker v. City of Houston, Texas, 963 F.2d 831, 836 (5th Cir. 1992) (citing Foman v. Davis, 371 U.S. 178, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962)). Because Plaintiffs have already had an opportunity to file an amended complaint and because the court is persuaded that Plaintiffs have pleaded their best case, the Plaintiffs' request for leave to amend will be denied.

## B. Control Person Liability [*120] Claims

Plaintiffs allege that the Individual Defendants are all liable as "controlling persons" of EXXI under § 20(a) of the Exchange Act. Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud. 15 U.S.C. § 78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation." Southland, 365 F.3d at 383. Because the court has concluded that the Plaintiffs' primary claims under § 10(b) should be dismissed, the § 20(a) claims will also be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. See Izadjoo, 23 7 F. Supp. 3d at 520.

## C. Common Law Fraud Claims

Plaintiffs assert claims for common law fraud against all of the defendants.[172] Under Texas law a claimant alleging fraud must prove the following:

> (1) that a material representation was made; (1) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on [*121] the representation; and (6) the party thereby suffered injury.

Aquaplex, Inc. v. Rancho La Valencia, Inc., 297 S.W.3d 768, 774 (Tex. 2009) (per curiam) (quoting In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001)). See also Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp., 565 F.3d 200, 212-13 (5th Cir. 2009) (same). Although Plaintiffs' common law fraud claim is

---

[171] Plaintiffs' Opposition to the Director Defendants' MD, Docket Entry No. 115, p. 25.

[172] Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 66-67 ff 313-320. Although Plaintiffs' Amended Complaint does not specify that this claim is being asserted under Texas law, both defendants and Plaintiffs have cited and relied upon Texas law. See Director Defendants' MD, Docket Entry No. 105, pp. 31-33 and Plaintiffs' Opposition to the Director Defendants' MD, Docket Entry No. 115, p. 27.

not subject to the heightened "strong inference" standard for pleading scienter under the PSLRA, Plaintiffs are nevertheless required to satisfy Rule 9(b), which requires them to state with particularity facts supporting each element of fraud. See Benchmark Electronics, Inc. v. J.M. Huber Corp., 343 F.3d 719, 724 (5th Cir. 2003). "'At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" Id. (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992)). In other words, the claimant must plead the who, what, when, where, and how of the fraud. Id.

Plaintiffs' common law fraud claims rest on the same alleged misstatements underlying their Exchange Act claims and fail for the same reasons, i.e.. Plaintiffs have not alleged facts with particularity showing that any of the defendants made false statements with scienter that caused injury. Accordingly, defendants' motions to dismiss Plaintiffs' common law fraud claims will be granted, and these claims will be dismissed.

## D. Breach of Fiduciary Duty Claims

Plaintiffs assert claims [*122] for breach of fiduciary duty against the Individual Defendants.[173] In pertinent part Plaintiffs allege that the Individual Defendants breached their fiduciary duties of care and loyalty to the Company and its shareholders, including the Plaintiffs, inter alia "by making or causing the Company to make the materially false and misleading statements about the Company's financial and operating condition and prospects alleged herein."[174] Plaintiffs also allege that "[t]he Individual Defendants' breaches of fiduciary duty were intertwined with the materially false and misleading statements they made or caused the Company to make about the Company's financial and operating condition and prospects alleged herein."[175] Plaintiffs' breach of fiduciary duty claims rest on the same alleged misstatements underlying their Exchange Act claims and fail for the same reasons, i.e., Plaintiffs have not alleged facts with particularity showing that any of the defendants made false statements that caused injury. Accordingly, defendants' motions to dismiss Plaintiffs' breach of fiduciary duty claims will be granted, and these claims will be dismissed.

## IV. Conclusions and Order

For the reasons explained above, the court [*123] concludes that Plaintiffs have failed to state claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, for common law fraud, or for breach of fiduciary duty.[176] Accordingly, UHY LLP's Motion to Dismiss (Docket Entry No. 101) is **GRANTED**. Defendant D. West Griffin's Motion to Dismiss the Amended Complaint (Docket Entry No. 102) is **GRANTED**. Defendant Norman M.K. Louie's Motion to Dismiss the Amended Complaint (Docket Entry No. 103) is **GRANTED**. Defendant John D. Schiller, Jr.'s Motion to Dismiss the Amended Complaint (Docket Entry No. 104) is **GRANTED**. The Director

---

[173] Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 67-69 ¶¶ 321-32.

[174] Id. at 68 ¶ 324.

[175] Id. at 69 ¶ 329.

[176] The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

Defendants' Motion to Dismiss the Amended Complaint (Docket Entry No. 105) is **GRANTED**. Plaintiffs' request for leave to amend is **DENIED**.

**SIGNED** at Houston, Texas, on this the 14th day of March, 2019.

/s/ Sim Lake

SIM LAKE

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# Stephens v. Uranium Energy Corp.

United States District Court for the Southern District of Texas, Houston Division

July 15, 2016, Decided; July 15, 2016, Filed

CIVIL ACTION NO. H-15-1862

**Reporter**
2016 U.S. Dist. LEXIS 91897 *; Fed. Sec. L. Rep. (CCH) P99,232; 2016 WL 3855860

HEATHER M. STEPHENS, Individually and On Behalf of All Others Similarly Situated, Plaintiff, VS. URANIUM ENERGY CORP., et al., Defendants.

**Subsequent History:** Related proceeding at McMahon v. Adnani, 2019 Nev. Unpub. LEXIS 210 (Feb. 22, 2019)

**Counsel:** [*1] For Heather M. Stephens, Individually and on Behalf of All Others Similarly Situated, Plaintiff: Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX.

For Chris Jones, Plaintiff: Sammy Ford, IV, LEAD ATTORNEY, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX.

For Uranium Energy Corp., Amir Adnani, Mark A. Katsumata, Defendants: Gerard G Pecht, LEAD ATTORNEY, Fulbright and Jaworski, Houston, TX; Peter Andrew Stokes, Fulbright & Jaworski, Austin, TX.

For Robert Cramer, Movant: Ronald Dean Gresham, LEAD ATTORNEY, Payne Mitchell Law Group, Dallas, TX.

For Mark Besendorfer, Movant: Thomas E Bilek, LEAD ATTORNEY, The Bilek Law Firm LLP, Houston, TX.

**Judges:** Lee H. Rosenthal, United States District Judge.

**Opinion by:** Lee H. Rosenthal

## Opinion

### MEMORANDUM AND OPINION

Uranium Energy Corporation advertised its stock by paying third-party promoters to circulate positive articles, newsletters, and email alerts touting its financial strength and prospects for future growth. In this putative class action, investors allege that the advertising campaign, and the failure adequately to disclose it in SEC filings, violated the federal securities laws. The lead plaintiff, Heather Stephens, sued Uranium Energy; [*2] its cofounder, president, and CEO, Amir Adnani; its CFO, Mark Katsumata; and the third-party promoters, Raven Consulting Corp., LuckyStockPicks.com, Brazil Resources, Inc., Red Rock Media Group, Inc., Action Holdings, Inc., and Stock Gumshoe, Inc. Stephens asserted claims under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78pp, and sought to represent purchasers of Uranium Energy's stock between June 7, 2013 and June 17, 2015.

Stephens filed an amended complaint alleging that all of the defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and that Uranium Energy, Adnani, and Katsumata violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Docket Entry No. 28). She alleged that Uranium Energy's SEC disclosures misled investors by failing to disclose that the promotional campaign increased the company's stock-price volatility and that the company had engaged in a "scheme" and "course of business" to conceal the extent of its involvement in the promotional campaign, including paying for the promotions, directly or otherwise.

The defendants moved to dismiss the amended complaint. (Docket Entry No. 31). They argued that the amended complaint failed to allege: (1) materially misleading omissions that the defendants had a duty [*3] to make; (2) facts giving rise to a strong inference of scienter; and (3) loss causation. They also argued that the amended complaint failed to allege a fraudulent "scheme." Uranium Energy, Adnani, and Katsumata argued that they lacked the ability to control the omissions and violations alleged, defeating § 20(a) liability. Stephens responded, the defendants replied, and the court heard oral argument. (Docket Entry Nos. 38, 41, 45, 46).

Based on the pleadings, the motions and responses, the applicable law, and counsels' arguments, the court grants the defendants' motion to dismiss. This action is dismissed with prejudice because the pleading has already been amended and the governing law makes further amendment futile.

The reasons for this ruling are set out below.

## I. Background

### A. The Alleged Fraud: An Alleged "Pump" Scheme Without any "Dump"

Uranium Energy is a Vancouver-based uranium exploration-and-production company. It owns the mineral rights to uranium-mining projects in Arizona, Colorado, New Mexico, Texas, Wyoming, and Paraguay. (Docket Entry No. 28 at ¶ 30). The company also owns and operates a Texas-based uranium mine that extracts and processes uranium oxide for sale to nuclear power [*4] plants. (*Id.* at ¶¶ 30-33).

Uranium companies faced record-low prices in the wake of the 2011 Fukushima, Japan nuclear disaster, which drastically reduced interest in nuclear power. Uranium Energy turned to third-party advertisers to try to increase investor confidence and the stock price. (*Id.* at ¶¶ 3-5, 40). The company's CEO, Amir Adnani, cofounded two of the third-party promotional companies Uranium Energy used. In 2004, Adnani and Alan Lindsay, his father-in-law, cofounded Blender Media. Lindsay also served as Uranium Energy's board chair and as a director. (*Id.* at ¶ 37). Adnani's brother, Arash, is Blender Media's president, and his brothers-in-law, Oliver-Barret Lindsay and John Lindsay, are co-owners. (*Id.*). Adnani also founded Brazil Resources, which retained Red Rock Media, an advertising company that "provide[d] advertising and promotional services for the benefit of Uranium Energy." (*Id.* at ¶ 39). In addition to Adnani's companies, Uranium Energy worked with an unaffiliated financial public-relations firm, Raven Consulting, to create and distribute the promotional pieces. (*Id.* at ¶ 47).

The amended complaint alleged that Uranium Energy paid, "directly or indirectly, approximately 30 [*5] different entities to publicize its stock" with a "massive promotional campaign" involving at least 40 online advertisements. (*Id.* at ¶¶ 46-48). The third-party promoters released these advertisements in "waves" in four different months: June 2013, May 2014, November 2014, and April 2015. (*Id.* at ¶¶ 47, 50-74). Each advertisement was styled using the "guise of widely circulated 'newsletters' and 'alerts' authored by seemingly objective analysts and observers" when, in fact, "the information came, directly or indirectly, from Uranium Energy." (*Id.* at ¶ 46). Each advertisement relayed positive information about Uranium Energy's stock, encouraging readers to invest. In short, the amended complaint alleged a scheme to "pump" the stock price without any corresponding sale, or "dump," at the inflated prices.[1]

The amended complaint acknowledged that all (but one, addressed below) of the advertisements included a disclaimer stating that the third-party promoter had been paid to promote Uranium Energy stock and disclosing how

---

[1] There is a suggestion of a limited amount of insider selling, but the record provides no support, as discussed in footnote 5.

much. The amended complaint alleged that the [*6] disclaimers were, however, incomplete and set out in small print, "buried," and intended to be overlooked.

The advertisements are in the record.[2] The disclaimers included variations on the theme that these were paid advertisements, not objective investment advice. The disclaimers warned that the advertisements were "intended for commercial advertising, business media marketing, and . . . informational purposes only"; were "neither [offers] nor recommendation[s] to buy or sell any security"; were produced under "an investor relations agreement with the [promoted] company which includes marketing coverage, video production, travel, speaking at conferences, and . . . analysis"; or were "commercial advertisement[s] . . . not intended to be investment advice." (Docket Entry No. 28 at ¶¶ 50, 52, 56-59, 62-63, 64-65).

Some of the advertisements included disclaimers stating that Uranium Energy itself [*7] had paid for the advertisement. Other advertisements had disclaimers identifying a different company as the compensation source, without disclosing the relationship of that company to Uranium Energy. (*Id.* at ¶ 46). The amended complaint alleged that Uranium Energy "engaged in a concerted effort . . . to conceal the true source of these promotional materials and to persuade the investing public that information being presented was coming from parties not affiliated with Uranium Energy." (*Id.*). The amended complaint alleged that after each "wave," Uranium Energy's stock-price increase outpaced the price of similarly situated uranium stocks and of the broader market. (*Id.* at ¶ 41). It was only "[i]n the absence of paid promotional activities [that] Uranium Energy's stock plummeted, resetting itself to track more closely to the fortunes of its industry and broader markets." (*Id.* at ¶ 5). According to the amended complaint, the advertisements increased Uranium Energy's stockprice volatility and concealed the fact that the company's fundamentals were unsound.


### 1. The June 2013 Promotions

In June 2013, TooNiceStocks.com published three articles about Uranium Energy. These articles stated that Uranium [*8] Energy was an "impressive emerging growth company" that should be "on top of your radar from here on out!"; continued "to look strong" and "just last year raised a massive financing at a much higher price to an institutional investor!"; and was "well positioned to capitalize on the world's overwhelming demand for more uranium." (*Id.* at ¶¶ 50-52).

A disclaimer accompanying each article provided the following information:

> Please remember that this newsletter is intended for commercial advertising, business media marketing and is for informational purposes only. . . . From time to time [TooNiceStocks.com is] compensated for commercial advertising and business media marketing or providing [its] own independent research coverage and opinions. . . . TooNiceStocks.com expects to be compensated up to sixty thousand dollars to provide one month of commercial/digital advertising and business brand media marketing by a third party[,] Fin Media Networks. TooNiceStocks.com has been previously been [sic] compensated sixty thousand dollars to provide one week of commercial/digital advertising and business brand media marketing by a third party[,] VentureCap Group."

(Docket Entry No. 28, Exs. 5-7).

TooNiceStocks.com [*9] stated in each article that it had been paid for the articles and the amount. But the amended complaint alleged that the location, appearance, and content of the disclaimers effectively concealed them and negated their presence. The disclaimers were allegedly "buried" because they were excessively long, were placed at the end of the articles, and were in small font. The amended complaint alleged that although Uranium

---

[2] Four of the 17 advertisements are reproduced below in the Appendix. Stephens attached the advertisements to her amended complaint. Neither side disputes that the advertisements may be properly considered on a motion to dismiss. And as explained below in Part II, the case law permits reliance on these documents at the pleading stage.

Energy indirectly paid for these advertisements through Fin Media, a Uranium Energy "promotional agent," the disclaimers did not state that Uranium Energy paid for the advertising or identify any affiliation of Fin Media Networks or VentureCap Group with Uranium Energy. (*Id.* at ¶¶ 47, 53).

The amended complaint alleged that the June 2013 promotions caused Uranium Energy's stock price to increase by 25 percent. (*Id.* at ¶ 54). During that same period, other uranium producers allegedly saw stock-price increases of between 0.3 to 8 percent. (*Id.* at ¶ 55). The amended complaint alleged that "[n]othing but undisclosed paid promotions explains the vast difference between the rise in [Uranium Energy's] per share price and the performance of industry competitors or the broader market," and [*10] that once the advertisements stopped, the stock price fell. (*Id.* at ¶¶ 41, 55).


## 2. The May 2014 Promotions

In May 2014, Raven Consulting published an "alert" about Uranium Energy on different websites, including LuckyStockPicks.com, StockProfessors.com, USAMarketNews.com, and PennyStockShark.com. (*Id.* at ¶ 56). The alert stated that Uranium Energy was a "HOT stock" that was "flying up the charts," and it urged investors to "put it on [their] RADAR" because Uranium Energy "looks poised to be a contender as the uranium market rebounds!" (*Id.*).

A disclaimer appeared after each alert. It included a statement identifying it as a "commercial advertisement" and warning that "[t]he information contained in [the] report . . . is not intended to be investment advice." (Docket Entry No. 28, Exs. 8-13). Unlike the June 2013 advertisements, the disclaimers told investors that Uranium Energy had paid directly for the promotion. The disclaimers stated that the websites were "wholly owned subsidiar[ies] of Raven Consulting Corp.," which "expect[ed] to be compensated $5,000.00 cash for [the Uranium Energy] advertising and promotion by [Uranium Energy] directly." (*Id.*).

The amended complaint alleged that the May 2014 alerts caused [*11] Uranium Energy's stock price to increase by 68 percent, while other uranium producers saw stock-price increases of between 0.3 to 8 percent. (*Id.* at ¶¶ 58-59). The amended complaint again alleged that "[n]othing but undisclosed paid promotions explains the vast difference between the rise in [Uranium Energy's] per share price and the performance of industry competitors or the broader market," and that once the advertisements stopped, the stock price fell. (*Id.* at ¶¶ 41, 58-59).


## 3. The November 2014 Promotions

In November 2014, third-party promoters Uranium Energy had retained published one alert and two newsletters. Red Rock Media, the advertising arm of Adnani's company, Brazil Resources, published an alert on LuckyStockPicks.com. (*Id.* at ¶ 60). The alert stated that Uranium Energy was "posed to be a major contender as the uranium market rebounds," had "caught fire," and was "absolutely flying up the charts the past week." (*Id.*). The alert had a disclaimer identifying it as an advertisement rather than objective investment information or advice. The disclaimer stated that Brazil Resources had paid Red Rock "up to $5,000 cash" to advertise Uranium Energy stock. (*Id.* at ¶ 61). The amended complaint [*12] alleged that Uranium Energy indirectly paid for the alert, but the disclaimer did not include this statement. (*Id.*). Nor did the disclaimer reveal that Uranium Energy's CEO was also Brazil Resources's founder.

Action Media also published a newsletter advertising Uranium Energy stock on five websites, InvestorSoup.com, TheHotPennyStocks.com, StockPreacher.com, MicroStockProfit.com, and TheLightningPicks.com. (*Id.* at ¶ 62). The newsletter stated that Uranium Energy was poised for "a big vertical takeoff" and was "clearly in play." (*Id.*). The newsletter's disclaimer stated that Raven Consulting paid Action Media $22,500 to advertise Uranium Energy. (*Id.* at ¶ 63). The amended complaint alleged that Uranium Energy indirectly paid for the newsletter, but the

disclaimer did not include this statement. (*Id.*). Nor did the disclaimer reveal that Raven Consulting was Uranium Energy's public-relations firm.

FutureMoneyTrends.com published a newsletter advertising Uranium Energy as a "low-cost producer" that would benefit from "rising . . . demand." (*Id.* at ¶ 64). The newsletter advised investors "looking to own shares of an advanced-stage business in the junior resources market . . . to put [Uranium [*13] Energy] at the top of their list." (*Id.*). Unlike some of the others, the disclaimer included with the FutureMoneyTrends.com newsletter stated that the company had a public-relations agreement with Uranium Energy and had "been directly compensated by Uranium Energy a total of up to eighty seven thousand dollars and twenty thousand shares." (*Id.* at ¶ 65). The disclaimers appeared after the advertisements. Stephens alleges that they were in small, gray-colored text, making them difficult to read. (Docket Entry No. 28, Exs. 14-20).

The amended complaint alleged that the November 2014 promotions caused Uranium Energy's stock price to increase by 57 percent. (*Id.* at ¶ 66). During that same period, other uranium producers saw stock-price increases of between 6.3 to 35 percent. (*Id.* at ¶ 67). The amended complaint repeated the allegation that "[n]othing but undisclosed paid promotions explains the vast difference between the rise in [Uranium Energy's] per share price and the performance of industry competitors or the broader market," and that once the advertisements stopped, the stock price fell. (*Id.* at ¶¶ 41, 67).


## 4. The April 2015 Article

In April 2015, StockGumshoe.com published an article that "discuss[ed], summarize[d], and quote[d] extensively" from [*14] a "teaser pitch" written by Dr. Kent Moors, "who styles himself as an internationally recognized expert in oil and natural gas policy, risk management, emerging markets, economic development, and market risk assessment." (*Id.* at ¶ 68). The article stated that Moors would sell information to investors about his top-four uranium-related stock "picks" for $1,995. (*Id.* at ¶ 69). The article then revealed that Uranium Energy was one of Moors's "secret" stock picks. (*Id.*). The article had a link to Moors's website, which solicited investors to pay to subscribe to receive his investment advice. (*Id.*). The article also quoted Moors's report to explain why Uranium Energy was a good investment. According to the article, Moors's report stated that Uranium Energy had attracted "prominent industry figures" and had a strong "corporate infrastructure." (*Id.*).

The article's disclaimer stated that "Stock Gumshoe may receive compensation based on reader behavior in relation to advertisements, including payment for leads, purchases, or clicks/site visits made by Stock Gumshoe visitors, in addition to or instead of direct payment for the placement of the ad." (*Id.* at ¶ 71). Unlike earlier promotions, the [*15] article did not state that Stock Gumshoe had been paid to publish it.

The amended complaint alleged that the article's reliance on Moors's $1,955 report "suggests that there exists some undisclosed agreement for the promotion of Uranium Energy stock." (*Id.* at ¶ 70). The amended complaint alleged that "[t]his inference is strengthened by the fact that the Stock Gumshoe article contains a link to the subscription site from which Moors's work may be purchased, and that Stock Gumshoe, according to its own disclaimer, receives compensation from the publisher of Moors's work for each visit the site receives . . . ." (*Id.*). Like the Stock Gumshoe article, Moors's article did not have a disclaimer stating that he had been paid to write and publish his report. (*Id.* at ¶ 72).

The amended complaint alleged that the April 2015 promotions caused Uranium Energy's stock price to increase by 76 percent, while other uranium producers saw stock-price increases of less than 3 percent or decreases of between 1.8 and 5.5 percent. (*Id.* at ¶¶ 74-75). The amended complaint again alleged that "[n]othing but undisclosed paid promotions explains the vast difference between the rise in [Uranium Energy's] per share price and the [*16] performance of industry competitors or the broader market." (*Id.*).

**B. The Allegedly Fraudulent Omissions**

**1. Omissions About Risks**

The amended complaint alleged that Uranium Energy's SEC filings omitted material information about risks relating to Uranium Energy's common stock that misled investors. The amended complaint alleged that the following SEC filings were materially misleading: the June 2013, December 2013, March 2014, June 2014, December 2014, March 2015, and June 2015 Forms 10-Q, (*id.* at ¶¶ 75, 87, 91, 95, 111, 119, 123); the 2013 and 2014 Forms 10-K, (*id.* at ¶¶ 79, 107); the November 2013 and September 2014 Forms S-3, (*id.* at ¶¶ 83, 99); the September 2014 Form 424B3, (*id.* at ¶ 103); and the January 2015 Form S-8, (*id.* at ¶ 115).

In each of these public filings, Uranium Energy disclosed risks associated with investing in its common stock. The risks included "volatility in the uranium market," an "occurrence of a major nuclear incident," and "failure to meet market expectations on our exploration, pre-extraction, or extraction activities." (*E.g., id.* at ¶ 87). None of the filings disclosed Uranium Energy's use of third-party promoters, its alleged "scheme" to flood the market [*17] with positive advertisements, or the potential effect on its stock-price volatility. Stephens alleged that these disclosures were materially misleading because the "[d]efendants knew or recklessly disregarded that they set in motion and fueled with [Uranium Energy's] funds a scheme to boost Uranium Energy's stock price artificially through paid promotions." (*Id.* at ¶¶ 76, 80, 84, 88, 92, 96, 100, 104, 108, 112, 116, 120, 124). She alleged that "[h]aving disclosed [some] risks concerning [Uranium Energy's] common stock, [the] [d]efendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme." (*Id.*).

**2. Omissions About Related-Party Transactions**

In 1982, the SEC "adopted an integrated disclosure system [known as] Regulation S-K." THOMAS LEE HAZEN, 2 TREATISE ON THE LAW OF SECURITIES REGULATION § 9.38 (2016). The agency "sought to define (1) what information is material in securities transactions, and (2) when and how such information should be disclosed to investors and the market." *Id.* (quotation marks omitted). Among other information, Regulation S-K requires disclosure of any "related party transactions," known as "Item 404." Item 404 requires an issuer to "[d]escribe any [*18] transaction . . . in which the registrant was or is to be a participant and the amount exceeds $120,000, and in which any related person had or will have a direct or indirect material interest." 17 C.F.R. § 229.404(a).

The regulations define a "related person" as:

    a. Any person who was in any of the following categories at any time during the specified period for which disclosure under paragraph (a) of this Item is required:

        i. Any director or executive officer of the registrant;

        ii. Any nominee for director, when the information called for by paragraph (a) of this Item is being presented in a proxy or information statement relating to the election of that nominee for director; or

        iii. Any immediate family member of a director or executive officer of the registrant, or of any nominee for director when the information called for by paragraph (a) of this Item is being presented in a proxy or information statement relating to the election of that nominee for director, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of such director, executive officer or nominee for director, and any person (other than a tenant or employee) sharing the household [*19] of such director, executive officer or nominee for director; and

b. Any person who was in any of the following categories when a transaction in which such person had a direct or indirect material interest occurred or existed:

    i. A security holder covered by Item 403(a) (§ 229.403(a)); or

    ii. Any immediate family member of any such security holder, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of such security holder, and any person (other than a tenant or employee) sharing the household of such security holder.

*Id.* § 229.404(a), Instruction 1.

The amended complaint alleged that Uranium Energy's Item 404 disclosures omitted material information the SEC regulations required, including "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount involved in the transaction." *Id.* § 229.404(a)(1)-(3); (Docket Entry No. 28 at ¶¶ 78, 82, 86, 90, 94, 98, 102, 106, 110, 114, 118, 122, 126). The amended complaint alleged that these omissions materially misled investors by obscuring [*20] "the depth of the paid-promotions scheme" and the extent to which Uranium Energy funneled money to companies owned by Adnani and his family members to advertise Uranium Energy stock. (Docket Entry No. 28 at ¶¶ 6, 29). The amended complaint alleged that the following SEC filings were materially misleading: the April 2013, March 2014, June 2014, December 2014, March 2015, and June 2015 Forms 10-Q, (*id.* at ¶¶ 77, 87, 93, 97, 113, 121, 125); the 2013 and 2014 Forms 10-K, (*id.* at ¶¶ 81, 109); the November 2013 and September 2014 Forms S-3, (*id.* at ¶¶ 85, 101); the September 2014 Form 424B3, (*id.* at ¶ 105); and the January 2015 Form S-8, (*id.* at ¶ 117).

Although the specific value of the related-party transactions changed, the Item 404 disclosures were similar over the class period. For example, the April 2013 Form 10-Q Item 404 disclosure stated:

    During the three and nine months ended April 30, 2013, the Company had transactions with certain officers and directors of the Company as follows:

    Incurred $42,409 and $126,323 (three and nine months ended April 30, 2012: $39,455 and $90,315) in general and administrative costs paid to a company controlled by a direct family member of a current officer; [*21] and

    Incurred $9,000 and $27,000 (three and nine months ended April 30, 2012: $Nil) in consulting fees paid to a company controlled by a current director of the Company.

(*Id.* at ¶ 77). The amended complaint did not allege that the stock price changed as a result of these disclosures. Although the amended complaint alleged that the disclosures contained material omissions, it did not allege that these omissions were revealed to the market or identify specific communications correcting and disclosing the omissions.

## C. The Alleged Corrective Disclosures

The amended complaint alleged that on June 18, 2015, TheStreetSweeper.org published an article stating that "Uranium Energy was using undisclosed, paid stock promotions to increase the value of Uranium Energy shares." (*Id.* at ¶ 127). The article, which Stephens attached to her amended complaint, discussed Uranium Energy's low stock price, attributing it to low uranium prices, low production, and bad earnings. The article also stated that "[Uranium Energy] has been running up on promotions coming from Twitter, Seeking Alpha authors and reportedly hype by the company itself." (Docket Entry No. 28, Ex. 26 at p. 5).

The amended complaint alleged [*22] that the article caused Uranium Energy's stock price to fall approximately 6.9 percent "on unusually heavy volume" that same day. (Docket Entry No. 28 at ¶ 130). On June 19, 2015,

Uranium Energy issued a press release responding to the article's allegations. The press release denied the truth or validity of TheStreetSweeper.org article as "unfounded allegations of a third party" with "questionable" motives. (*Id.* at ¶ 131). According to the press release, the report had "no merit." (*Id.*). The amended complaint alleged that the press release caused Uranium Energy's stock price to fall approximately 25.6 percent "on unusually heavy volume" that same day. (*Id.* at ¶ 132).

The amended complaint alleged that a similar, more detailed, critical report about Uranium Energy had appeared in 2013. On February 1, 2013, hotStocked.com cited a "Shazam Stocks" article claiming that Uranium Energy had run "a paid advertising campaign" and that the company had "practically initiated promotional coverage of its own stock." (*Id.* at ¶ 44). According to the article, the goal was to "ramp up" the Uranium Energy stock price. (*Id.*). The article alleged that the stock-price increase would be only "temporary." [\*23] (*Id.*).

The allegations in the amended complaint are analyzed under the applicable legal standards and the documents and information properly considered at this stage of the case.

## II. The Legal Standards

### A. Rule 12(b)(6) Motions to Dismiss

A pleading is deficient and may be dismissed under Rule 12(b)(6) if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,'" and "'a formulaic recitation of the elements of a cause of action will not do.'" *Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. at 555). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and [\*24] the court.'" *Id.* (quoting *Twombly*, 550 U.S. at 558).

When a plaintiff's complaint fails to state a claim, the court should generally allow the plaintiff to amend the complaint under Rule 15(a) before dismissing the action with prejudice, unless it is clear that doing so would be futile. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). However, a plaintiff should be denied leave to amend a complaint if the court determines that the "proposed amendment clearly is frivolous, advancing a claim or defense that is legally insufficient on its face." 6 WRIGHT & MILLER § 1487; *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999))).

In considering a Rule 12(b)(6) motion to dismiss, a court limits itself to the contents of the pleadings, with an exception. In *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000), the Fifth Circuit approved the district court's consideration of documents the defendant attached to a motion to dismiss. The Fifth

Circuit made it clear that "such consideration [*25] is limited to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing *Collins*, 224 F.3d at 498-99). Other courts approve the same practice. *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." (citations omitted)); *see also Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1988) (citation omitted); *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

Stephens attached to the amended complaint articles about the uranium industry, blog posts about Uranium Energy, and the advertisements it used to promote its stock. (Docket Entry No. 28, Exs. 1-26). She also submitted copies of Uranium Energy's SEC filings. (Docket Entry No. 38, Exs. A—J). The defendants attached to their briefs several additional Uranium Energy SEC filings, a chart showing Uranium Energy's historic stock-price information, and a chart matching each advertisement with its disclosure. (Docket Entry No. 31, Exs. 2, 5-6). The case law permits, and the plaintiffs do not object to, the court considering these documents in deciding the motion to dismiss. *Collins*, 224 F.3d at 498-99; *In re Sec. Litig. BMC Software*, 183 F. Supp. 2d 860, 884 (S.D. Tex. 2001) (chart "included only for the court's convenience as a summary of information included [*26] in SEC filings" can be considered on a motion to dismiss (citing FED. R. EVID. 1006)).


## B. The Pleading Requirements


### 1. Rule 8

Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555. Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).


### 2. Rule 9(b)

Rule 9(b) requires a complaint to "state with particularity the circumstances constituting the fraud." FED. R. CIV. P. 9(b). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Elecs., Inc. v. J.M Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) ("In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have [*27] appeared, and the way in which the omitted facts made the representations misleading." (quotation marks omitted)). The Fifth Circuit applies "Rule 9(b) to fraud complaints with 'bite' and 'without apology,'" while recognizing "that Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185-86 (5th Cir. 2009) (footnote omitted).

"Rule 9(b) does not reflect a subscription to fact pleading and requires only simple, concise, and direct allegations of the circumstances constituting fraud, which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *Id.* at 186 (footnote omitted) (quotation marks omitted). "Securities fraud claims brought by

private litigants are also subject to the pleading requirements imposed by the [PSLRA]." *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015).

## III. Analysis

### A. The Elements Required Under Section 10(b) and the PSLRA

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407, 189 L. Ed. 2d 339 (2014). "Although section 10(b) does not create an express private cause of action, [the Supreme Court has] long recognized an implied private cause of action to enforce the provision and its implementing regulation." *Id.* The implementing regulation reads:

> It shall [*28] be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Stephens sues all the defendants under all three subdivisions. "The elements of a private securities fraud claim based on Section 10(b) and Rule 10b-5 are (1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as transaction causation, (5) economic loss, and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Owens*, 789 F.3d at 535 (quotation marks [*29] omitted).

The defendants moved to dismiss for three reasons: they had no duty to make the alleged omissions and the omissions were not materially misleading; the amended complaint does not give rise to a strong inference of scienter; and the amended complaint does not plausibly allege loss causation. Each is considered below.

### 1. Fraud by Omission

A complaint alleging a material misstatement or omission must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). "At a minimum, the PSLRA pleading standard incorporates the . . . requirements of Rule 9(b)." *Owens*, 789 F.3d at 535; *see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007) ("The PSLRA appears to comport with [the Fifth Circuit's] relatively strict interpretation of Rule 9(b), which requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." (quotation marks omitted)); *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012)

("[A] plaintiff must . . . (1) specify each statement alleged to have been misleading; [*30] (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent." (citing *ABC Arbitrage Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

Fraud based on an omission must sufficiently allege "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011) (quotation marks omitted). But "[s]ome information is of such dubious significance that insistence on its disclosure may accomplish more harm than good." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 448, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976). "[I]f the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information a result that is hardly conducive to informed decisionmaking." *Id.* at 448-49. To balance these concerns, "the plaintiff must plead [*31] not only why the statement at issue is incomplete but why that incompleteness makes the statement misleading or untrue." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005). "[I]t bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5).

While these cases make clear that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5," *Basic v. Levinson*, 485 U.S. 224, 239 n.17, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988), "[t]he omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action," *Lormand*, 565 F3d. at 248. The Fifth Circuit has

> long held under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything. Although such a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction.

*Id.*


## 2. Scienter

Under the PSLRA, plaintiffs must state with particularity facts giving rise to a "strong inference" that the defendant [*32] acted with scienter. 15 U.S.C. § 78u-4(b)(2)(A). For "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter requires "an intent to deceive, manipulate or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Phillips*, 401 F.3d at 643 (quotation marks omitted). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id.* (quotation marks omitted).

In *Tellabs, Inc. v. Makor Issues & Rights Ltd.* ("*Tellabs I*"), 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007), the Supreme Court described how to analyze the sufficiency of scienter allegations on a motion to dismiss a

federal securities-fraud case under the PSLRA.[3] *Id.* at 322-23. First, the district court must determine the factually sufficient complaint allegations and take them as true. *Id.* at 322. Second, the court considers documents incorporated in the complaint by reference and matters subject to judicial notice. *Id.* at 322-23. Third, [*33] the court must take into account plausible inferences opposing as well as supporting an inference of scienter. *Id.* at 323. The factual allegations must be evaluated collectively, not in isolation, to determine whether they plead a strong inference of scienter. *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) ("While [the Fifth Circuit] will view a complaint *in toto* when considering whether a complaint has adequately pled scienter, each allegation of fraud must individually meet the particularity requirements of the PSLRA." (citation omitted)). "A district court may best make sense of scienter allegations by first looking to the contribution of each individual allegation to a strong inference of scienter, especially in a complicated case . . . ." *Owens*, 789 F.3d at 537. "As a matter of efficiency, if any single allegation, standing alone, create[s] a strong inference of scienter, the court [does] not need to consider additional allegations of scienter." *Id.* If analyzing each allegation alone does not support a strong inference of scienter, "the court must follow this initial step with a holistic look at all the scienter allegations," or may assess the allegations holistically, without first engaging in an allegation-by-allegation analysis. *Id.*

The scienter inference need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs I*, 551 U.S. at 324 (quotation marks omitted). But it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* "The strength of an inference cannot be decided in a vacuum." *Id.* at 323. "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C. § 78u-4(b)(2)). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least [*35] as compelling as any opposing inference one could draw from the facts allege." *Id.* at 324. "[A] tie favors the plaintiff." *Lormand*, 565 F.3d at 254.

Courts in this circuit look to the state of mind of the individual corporate official who allegedly made, approved, or issued the statement at issue, or who furnished information or language to include in the statement. It is insufficient to impute to each defendant a kind of collective knowledge that all the corporation's officers and employees acquired in their employment. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009). The allegations claimed to show scienter on each defendant's part must be analyzed individually to determine whether the complaint sufficiently pleads scienter as to that defendant. *Id.*; *see also Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 532-33 (5th Cir. 2008) ("[T]his court has rejected the group pleading approach to scienter. . . . Consequently, it is only necessary for us to address the allegations claimed to adequately show scienter on the part of the named officers to determine whether the complaint sufficiently pleads scienter." (quotation marks omitted)).

The rejection of group pleading requires plaintiffs pleading fraud claims against individuals under § 10(b) and Rule 10b-5 to distinguish among the defendants and allege each one's role, intent, and knowledge. *Southland*, 365 F.3d at 365 (courts may not [*36] "construe allegations contained in the Complaint against the defendants as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded."). "A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or

_____

[3] The Supreme Court did not decide [*34] whether recklessness suffices for civil liability under §10(b) and Rule 10b-5 because the question was not presented in that case. The Court noted that the courts of appeals all permit §10(b) claims based on reckless behavior but define "recklessness" differently. *Tellabs I*, 551 U.S. at 319 n.1.

she makes the statement." *Id.* at 366. Courts must "look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the court of their employment." *Id.* Under the securities laws, as under the common law, "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual [*37] . . . ." *Id.*

In *Local 731 I.B. v. Diodes, Inc.*, 810 F.3d 951 (5th Cir. 2016), the Fifth Circuit affirmed the dismissal of a § 10(b) putative class action, stressing the importance of pleading a strong inference of scienter. "[A]llegations of motive and opportunity standing alone will not suffice, though such circumstantial evidence can enhance the strength of the inference of scienter." *Id.* at 957 (quotation marks omitted). Without more, "an officer's position with a company does not suffice to create an inference of scienter." *Id.* at 958 (quotation marks omitted). An officer's company position can support a scienter inference only when viewed with other, "special circumstances," including: (1) a small company in which corporate executives are likely to be familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) omitted information readily apparent to the speaker; and (4) internally inconsistent statements by the officer. *Id.* at 959.

### 3. Loss Causation

Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." [*38] *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810, 131 S. Ct. 2179, 180 L. Ed. 2d 24 (2011) (quotation marks omitted). The PSLRA "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005). "To establish proximate causation, the plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm." *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014).

The complaint must plausibly allege that the defendant's share price fell "after the truth became known"; alleging "purchase price inflation alone [is not] sufficient." *Dura*, 544 U.S. at 347. "Loss causation in fraud-on-the-market cases can be demonstrated circumstantially by (1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective [*39] disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of price drop." *Amedisys*, 769 F.3d at 320-21 (quotation marks omitted).

A corrective disclosure must "relate to" or "be relevant to" "the defendants' fraud and earlier misstatements." *Id.* at 321. But a corrective disclosure need not "precisely mirror" the alleged misrepresentations. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (quotation marks omitted). "If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements." *Id.*

"The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Amedisys*, 769 F.3d at 321. A corrective disclosure can come from any source and "can be gradually perceived in the marketplace through a series of partial disclosures." *Id.* at 322. Sources may include "whistleblowers, analysts' questioning financial results, resignations of

CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc." *Id.* (quotation marks omitted). When a complaint alleges a series of partial disclosures, the [*40] court may analyze each in isolation but must "consider them collectively in determining whether a corrective disclosure has occurred." *Id.*

## B. The Claims Under Rule 10b-5(b): Omissions in the SEC Disclosures

Stephens alleged that Uranium Energy's SEC filings contained materially misleading omissions about the company's stock-price volatility and related-party transactions, violating 17 C.F.R. § 240.10b-5(b).

### 1. The Claims Based on Omitting the Risks of the Stock-Price Volatility

#### a. The Arguments About Materiality and the Duty to Disclose

Although the defendants argue that they had no duty to disclose the advertising campaign and that the omissions in the SEC filings cannot be material as a result, the amended complaint does not allege that the failure to disclose the advertising campaign was materially misleading under Rule 10b-5(b). Rather, Stephens argues that the defendants misled investors by disclosing some Uranium Energy stock risks without disclosing the stock-price-volatility risks caused by the advertising campaign. Stephens alleges "a substantial likelihood that the disclosure of the [promotional campaign as an investment risk] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of [*41] information made available." *See Matrixx*, 563 U.S. at 38 (quotation marks omitted). These alleged omissions generally consist of information showing the effect of the advertising campaign on the stock price. (Docket Entry No. 28 at ¶ 41).

The defendants respond that the market knew the material information about the promotional campaign because each newsletter, alert, or article stated that it was a paid advertisement and that a reasonable investor could use publicly available information to see the relationship between the advertisements and the stock price. Stephens contends that although each advertisement included disclaimers, none revealed to the market the promotional campaign's size, scale, ties to Uranium Energy, or effect on the company's stock price. Stephens argues that the defendants' "truth-on-the-market" defense cannot appropriately be considered at the motion-to-dismiss stage.

Even assuming, without deciding, that the omissions were material, the claims still fail because the amended complaint neither pleads facts giving rise to a strong inference of scienter nor plausibly alleges loss causation.

#### b. Scienter

For "each act or omission alleged" to be false or misleading, plaintiffs must "state with [*42] particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "[T]he PSLRA requires the plaintiffs to distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland*, 365 F.3d at 365 (quotation marks omitted). The Fifth Circuit repeatedly has "rejected the group pleading doctrine." *Owens*, 789 F.3d at 537 (collecting cases). "Consistent with [that] rejection," a court cannot "construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Southland*, 365 F.3d at 365. The scienter allegations are analyzed separately for each defendant.

### i. No Individual Liability of Adnani and Katsumata

Stephens alleges that Adnani and Katsumata signed SEC filings containing materially misleading omissions. (Docket Entry No. 38, Ex. 1). Corporate statements can be tied to directors and officers by allegations that the officer or director signed the document with the statement. *Southland*, 365 F.3d at 365. But a signature without more does not establish scienter. Rather, "[t]here must be . . . facts establishing [*43]  that the officer who signed the certification had a reason to know, or should have suspected, due to the presence of . . . 'red flags,' that the [disclosure] statements contained material misstatements or omissions." *Shaw*, 537 F.3d at 545.

Stephens argues that the amended complaint's allegations raise a strong inference that the defendants "were aware of the paid promotional campaign" based on the cost, the company's small size, and the fact that the advertisements concerned a "core" aspect of the company's business—the value of its common stock. (Docket Entry No. 38 at p. 23). But the question is not whether Adnani and Katsumata knew about the promotional campaign. Rather, "[t]he resulting question is whether any inference of scienter should be drawn from defendants' knowledge." *Owens*, 789 F.3d at 539.

A company may advertise or promote its stock without violating the securities laws. *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D. Mass. 2005). Under § 17(b) of the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, however, it is unlawful "to publish, give publicity to, or circulate any . . . communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer . . . without fully disclosing the receipt . . [*44]  . of such consideration and the amount thereof." 15 U.S.C. § 77q(b). Section 17(b) places "the burden to disclose . . . on the person who publishes the analyst's report; by contrast, there is no duty imposed by the statute on the issuer who has paid for the puffery." *Id.; see also United States v. Wenger*, 427 F.3d 840, 850 (10th Cir. 2005) ("[T]he *promoter* must provide a disclaimer as to each security he touts at the time he promotes the security." (emphasis added)); HAZEN, 5 TREATISE ON THE LAW OF SECURITIES REGULATION § 14.148 (Section 17(b) "focuses on the person making the recommendation and thus does not expressly extend to the company or other person paying for the recommendation"; only "substantial involvement by the company or other person paying for the recommendation could result in their being accountable as primary violators . . . [under] Rule 10b-5."). Absent an affirmative duty to disclose the advertisements, Adnani's and Katsumata's general knowledge of the advertising campaign does not support an inference that they acted with scienter.

Nor does the defendants' knowledge of the promotions give rise to—much less strongly support—an inference that they knew about the specific omission alleged: the risk that the promotional campaign would increase Uranium Energy's stock-price volatility. And even [*45]  if it did, that knowledge does not support an inference that either Adnani or Katsumata acted purposefully or severely recklessly to defraud investors by failing to disclose this risk of the advertising campaign in the SEC filings. The court must consider plausible, nonculpable explanations for the defendants' conduct, as well as inferences favoring the plaintiffs. *Tellabs I*, 551 U.S. at 323. A plausible, nonculpable explanation for the nondisclosure is that the defendants should have known—but did not in fact know—about the promotional scheme's boom-and-bust effect on the stock-price volatility. Another plausible, nonculpable explanation for the nondisclosure is that the defendants failed to perceive that risk as material. Negligence cannot support a scienter inference. *Owens*, 789 F.3d at 536. The answer to whether the scienter inference the plaintiffs seek to draw is "at least as compelling" as these opposing inferences is "no." *Id.* (quoting *Tellabs I*, 551 U.S. at 324).

Stephens relies heavily on Adnani's and Katsumata's positions in the company for support. She contends that as the company's cofounder and CFO, Adnani and Katsumata must have known about the promotions and their effect on Uranium Energy's stock price, citing *Nathenson v. Zonagen*, 267 F.3d 400 (5th Cir. 2001).

*Nathenson* held that the individual [*46] defendants' positions within the defendant pharmaceutical company enhanced the scienter allegations. The court also "recognize[d] that normally an officer's position with a company does not suffice to create an inference of scienter." *Id.* at 424; *see also Shaw*, 537 F.3d at 535 ("[Fifth Circuit] caselaw makes clear that pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." (quotation marks omitted)). The court noted "a number of special circumstances . . . taken together, [that] suffice[d] to support a different result in the present case." *Nathenson*, 267 F.3d at 425. The defendant company was small and had only three-dozen full-time employees; it was essentially a one-product company; and the alleged misrepresentations were about the patent protection for that single product, the company's most crucial issue.

The Fifth Circuit and other courts have been reluctant to apply the limited exception recognized in *Nathenson. See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867-68 (5th Cir. 2003) (rejecting the plaintiffs' argument that "the failure of Azurix's core business—water-privatization projects—supports the inference that defendants knew, or recklessly disregarded, Azurix's prospects for success" and holding that the plaintiffs must "identify [*47] exactly who supplied the information or when they knew the information"); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company.").[4] Instead, only in the "rare" case will a strong inference of scienter be drawn from an officer's position in a company, and only when this factor combines with other, "special circumstances." *Diodes*, 810 F.3d at 959. These circumstances may include: (1) a small company in which corporate executives are more likely to be familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent. *Id.*

None of those circumstances are present here. Uranium Energy had 61 full-time employees, more than the companies falling under the *Nathenson* exception. Stephens does not allege that Adnani's or Katsumata's statements were internally inconsistent. There are no allegations that Katsumata, in his role as CFO, developed, oversaw, or managed the promotional campaign; his corporate position provides a weaker basis for inferring scienter as a result. Nor does the amended complaint allege facts supporting an inference that the information Katsumata failed to disclose was "readily apparent" to him.

As for Adnani, the amended complaint alleges that other companies he founded, including Brazil Resources, were used to advertise Uranium Energy's stock. That Adnani held a leadership role in both Uranium Energy and in the third-party-promoter companies Uranium Energy used to advertise its stock strengthens [*49] the inference that he knew about the promotional campaign. But the amended complaint does not allege facts linking Adnani's knowledge about the promotional campaign with the specific effect it allegedly had on the stock-price volatility. There are no allegations supporting an inference that this effect was "readily apparent" to him or that he was so involved in the advertising campaign that he must have known about its demonstrated, consistent effect on the stock price. Although Adnani was the CEO, and although the amended complaint supports an inference that he was aware of the promotional campaign, the plaintiffs have not alleged facts giving rise to a cogent and compelling inference that he was at least severely reckless in failing to disclose the stock-price-volatility information.

Stephens argues that this case is "on all fours" with *In re CytRx Corp. Securities Litigation*, No. 14-1956-GHK, 2015 U.S. Dist. LEXIS 91447, 2015 WL 5031232 (C.D. Cal. July 13, 2015). That case appears different in

---

[4] *See also Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 754 (S.D. Tex. 2003) ("Plaintiffs have relied on the judicially created presumption that facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers. . . . [T]he purpose of the PSLRA's particularized pleading requirements leads this Court to find that such an imputation, without some additional facts such as exposure to content-identified [*48] internal corporate documents (and who drafted them, who received them or how plaintiffs learned of them) or specific conversations or attendance at specified management or board meetings dealing with such problems, is inadequate to plead scienter." (citations omitted) (quotation marks omitted)).

important ways. CytRx hired a marketing team and paid it to publish positive, allegedly misleading advertisements in the form of articles about the company. The corporate-officer defendants "edited and approved the articles before publication." 2015 U.S. Dist. LEXIS 91447, [WL] at *2. The articles did [*50] not disclose that they were paid advertisements, and they were written under aliases to conceal "the involvement of CytRx's management." *Id.* The *CytRx* plaintiffs supported the complaint allegations with a whistleblower report written by an advertiser who had worked with CytRx management. After the advertisements "artificially inflated shares of CytRx's common stock," the defendants "awarded themselves and members of CytRx's Board of Directors . . . with massive amounts of *perfectly*-timed stock option grants." *Id.* (quotation marks omitted).

Here, by contrast, Stephens does not allege—with one exception, addressed below—that the promotions failed to reveal that they were paid advertisements or otherwise contained misleading information about Uranium Energy. Unlike the *CytRx* promotions, the articles, alerts, and newsletters at issue disclosed that they were paid advertisements. Stephens's focus in alleging misleading omissions is on Uranium Energy's SEC filings, not the promotions. Nor does Stephens allege that the individual defendants reviewed, edited, or approved the promotions, or claim that they awarded themselves "perfectly timed" or other stock-option grants designed to reap the [*51] profits from the advertising campaign. Indeed, the amended complaint does not rely on insider-trading allegations.[5] In other words, this amended complaint alleges a "pump" scheme without any "dump." The *CytRx* court relied on those types of allegations to find a strong scienter inference as to the individual defendants. *See* 2015 U.S. Dist. LEXIS 91447, [WL] at *10-11 (complaint allegations raised strong scienter inference as to CEO who sold his shares in another company that was "allegedly involved in the exact same type of [promotional] scheme" and did so "soon before" the scheme became public); *id.* (CEO received 925,000 "spring-loaded stock options" one day before the company issued a press release touting the "statistically significant positive results" of a clinical trial that was "the most important news in [company] history," even though the company also stated that it had not "timed the release of material nonpublic information for the purpose of affecting the value of stock options"); 2015 U.S. Dist. LEXIS 91447, [WL] at *11 (complaint allegations raised strong scienter inference as to CFO who received 150,000 stock options the day before announcing the clinical-trial results and who, in his role as CFO, "surely must [have] been aware" of the stock-option grants, [*52] which were "the largest director grants ever made to CytRx insiders and nearly doubled the amount of compensation that each of the directors had received in 2012"). The amended complaint, by contrast, alleges that the articles truthfully disclosed that they were paid advertisements, did not themselves contain false or misleading statements, were written without the defendants' personal involvement or approval, and were circulated without the defendants profiting from suspicious stock sales or "perfectly timed" stock-option grants.

Stephens also cites *In re BP P.L.C. Securities Litigation*, 843 F. Supp. 2d 712 (S.D. Tex. 2012). That case is different as well. In *BP*, the CEO had promised to focus on the security of oil rigs "like a laser." *Id.* at 782. The court concluded that the CEO's "own actions as the spokesperson and champion for BP's reform efforts weigh[ed] strongly in favor of the inference that [the CEO] paid special attention to BP's process safety efforts or, at the least, was reckless in not doing so while continuing to publicly tout improvements." *Id.* at 783. Stephens does not allege

---

[5] Stephens does invoke the amended complaint allegation that a February 2013 online article reported that "Adnani had recently been busy selling shares and exercising corporate options and warrants" to benefit personally from the promotional campaign. (Docket Entry No. 28 at ¶ 44). The article also "suggested" that "the ultimate aim of [the] promotional campaign was to 'ramp up' the price of Uranium Energy shares and, thus, 'potentially pave the way for further insider trading.'" (*Id.*). These allegations do not support a strong scienter inference because they antedate the class-period start of June 2013. And even if pre-class-period allegations could support [*53] scienter during the class period, the amended complaint does not allege insider trading during the class period. The amended complaint does not allege "sales [that] are out of line with prior trading practices" or that were made "in suspicious amounts or at suspicious times . . . calculated to maximize personal profit." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 435 (5th Cir. 2002). A single, pre-class-period insider-trading allegation, without more, cannot give rise to a compelling and cogent inference of scienter during the class period. *Cf. id.* ("[E]ven unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the [c]lass [p]eriod.").

that Adnani or Katsumata publicly or privately pledged to "champion" the advertising [*54] campaign. The complaint allegations support an inference that Adnani and Katsumata knew about that campaign but not that they were personally involved in writing, editing, or approving the advertisements. The primary similarity between the BP CEO and the two Uranium Energy executives here is their status as "chief" company officers. But a defendant's position in a company is not enough on its own to support a cogent and compelling scienter inference.

Stephens's group pleading further undermines her scienter arguments as to Adnani and Katsumata. Besides their different corporate roles and Adnani's involvement with Brazil Resources and Blender Media, the amended complaint fails to distinguish between their intent and knowledge, how or when each came to know about "red flags" that allegedly showed the effects of the promotional campaign on stock-price volatility, and how and when each decided to withhold that information from investors to defraud them. Instead, the amended complaint effectively imputes scienter to Adnani and Katsumata based on actions Uranium Energy took. That has it backwards. The complaint must cogently and compellingly support an inference that Adnani and Katsumata— not [*55] the company—acted with at least severe recklessness. *See Southland*, 365 F.3d at 366 (the court must "look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II)*, 513 F.3d 702, 707 (7th Cir. 2008) ("The problem with inferring a collective intent to deceive behind the act of a corporation is that the hierarchical and differentiated corporate structure makes it quite plausible that a fraud, though ordinarily not a deliberate act, could be the result of a series of acts none of which was done with scienter and imputable to the company by the doctrine of respondeat superior.").

Stephens's final argument is that a press release issued after the alleged corrective disclosure on TheStreetSweeper.org website shows that the defendants "were keenly focused on publicity about [Uranium Energy] that appeared on the internet" and that "the only reasonable inference is that [the defendants] tracked the existence of such a massive, paid [*56] promotional scheme campaign" and were "reckless in disregarding internet traffic regarding [Uranium Energy] while at the same time failing to disclose the stock price volatility risks associated with such a campaign." (Docket Entry No. 38 at p. 22). The press release does not support this chain of inferences. The press release stated that Uranium Energy had reviewed the article on TheStreetSweeper.org and its statement that Uranium Energy used paid promoters. (Docket Entry No. 38, Ex. 11). The press release stated that the article's allegations had "absolutely no merit" and were "unfounded." The press release does not generate or support an inference that Adnani or Katsumata "tracked" or "followed" internet traffic before the press release or that internet traffic put them on notice of stock-price-volatility risks. This argument is too conclusory and speculative to provide the necessary support for a scienter inference.

Taking "collectively" the facts alleged, accounting for "plausible opposing inferences," and weighing the strength of the scienter inferences against the nonculpable inferences the factual allegations support, together lead to the conclusion that Stephens has not alleged [*57] the strong scienter inference the PSLRA requires. *Tellabs I*, 551 U.S. at 323-24. At most, the amended complaint supports an inference that Adnani and Katsumata acted negligently in failing to disclose the risk that the advertising campaign would make Uranium Energy's stock price more volatile. The allegations provide inadequate support for a plausible—much less strong—inference that Adnani and Katsumata were severely reckless in disregarding known or obvious facts about the advertising campaign when they made the statements challenged for what they omitted. There is instead a strong, plausible, nonculpable inference that in this alleged "pump-without-a-dump" scheme, Adnani and Katsumata knew about the advertisements but not about their full effects on stock-price volatility and without a severely reckless or deliberate intent to conceal that risk.

To survive dismissal under the PSLRA, the scienter inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling." *Id.* at 325. The amended complaint, taken as a whole, does not

give rise to a cogent and compelling inference that Adnani and Katsumata acted with intent to, or with severely reckless disregard for the likelihood of, misleading investors [*58] when they made the allegedly incomplete statements.

### ii. No Corporate Liability of Uranium Energy

"While . . . a corporation may be charged with the collective knowledge of its employees, it does not follow that the corporation may be deemed to have a culpable state of mind when that state of mind is possessed by no single employee. A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual." *Southland*, 365 F.3d at 367 (quoting *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988)). As discussed, the amended complaint does not give rise to a strong scienter inference as to Adnani or Katsumata. Nor does the amended complaint assert that "any particular individual [Uranium Energy] director, officer or employee, *other than* the named individual defendants, acted with scienter in or respecting the making or issue of the complained of statements." *See id.* The amended complaint fails to give rise to a strong scienter inference as to Uranium Energy. *Id.* at 366 ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to [*59] its falsity, at the time he or she makes the statement . . . ." (quotation marks omitted)).

In *Tellabs II*, the Seventh Circuit noted that a plaintiff may be able "to draw a strong inference of corporate scienter without being able to name the individuals who concocted the fraud." 513 F.3d at 710. The court offered the hypothetical example of General Motors announcing that it had sold one million SUVs in a year when it had not sold any. In a lawsuit based on this announcement, even if the plaintiff could not name an individual officer responsible for the statement, "[t]here would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.*

Although the Fifth Circuit has not issued an opinion discussing the Seventh Circuit's approach, at least two district courts in this circuit have found the circumstances for inferring corporate scienter to be limited. In *In re Dell Securities Litigation*, 591 F. Supp. 2d 877 (W.D. Tex. 2008), the court concluded that the facts alleged could not support an inference of corporate scienter to replace a showing of individual scienter. The court explained that the alleged misrepresentations [*60] were not "dramatic enough to assume corporate officials who were knowledgeable about the company generally would have known of their falsity at the time they were made." *Id.* at 899. In *In re B.P. P.L.C. Securities Litigation*, 843 F. Supp. 2d 712 (S.D. Tex. 2012), by contrast, the court found that the complaint gave rise to an inference of corporate scienter. After the Deepwater Horizon oil spill, BP had estimated that it could recover about 500,000 barrels of oil per day. Just over a month after the spill, BP and its contractors were recovering about 15,000 barrels per day. The court found that "the erroneous estimates climb very close to—if not exceed—the extraordinary nature of the facts envisioned by the Seventh Circuit." *Id.* at 790.

In this case, Stephens has not alleged misleading statements by omissions made so clearly and obviously as to support an inference that the individual officers knowledgeable about the company generally also knew that the omissions were materially misleading. There is no basis to find that the alleged omissions meet the "extraordinary nature" of those envisioned in *Tellabs II*. To the extent Stephens relies on a corporate-scienter theory, the complaint allegations provide no support.

### c. The Third-Party Promoters Did not "Make" Statements with Materially [*61] Misleading Omissions

To the extent the amended complaint asserts claims against the third-party promoters under Rule 10b-5(b), those claims fail as a matter of law. In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011), the Supreme Court considered what it means to "make" a statement under Rule 10b-5(b). "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. The misrepresentations Stephens alleged were in SEC reports Uranium Energy wrote and issued. The amended complaint does not allege that the third-party promoters played a role in authoring, editing, or approving Uranium Energy's SEC filings, much less that they had "the ultimate authority" over the content or method of communication. Adnani and Katsumata were the only defendants who allegedly signed the SEC filings. "And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* at 142-43.

*Janus* clearly precludes the relief sought against the third-party promoters under Rule 10b-5(b).

### d. No Loss Causation

Stephens alleged that the "relevant truth" obscured by the fraudulent omissions [*62] came to light on June 18, 2015 when TheStreetSweeper.org published an article claiming that Uranium Energy used undisclosed, paid stock promotions to increase the value of its shares. (Docket Entry No. 28 at ¶ 7). The article reported that "[Uranium Energy] has been running up on promotions coming from Twitter, Seeking Alpha authors and reportedly hype paid by the company itself." (Docket Entry No. 28, Ex. 26). Stephens argues that once this information became known, Uranium Energy's stock price fell as a result. The question is whether the online article revealed information to the market that made "the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Amedisys*, 769 F.3d at 321. The alleged fraud is omitting the advertisements' effect on Uranium Energy's stock-price volatility.

The amended complaint does not allege, nor does the article show, that TheStreetSweeper.org revealed information to the market that made the advertising campaign's role in increasing Uranium Energy's stock-price volatility more likely. The article merely stated that Uranium Energy paid third parties to advertise its stock. The market already knew that. All of the advertisements, [*63] save one, had a disclosure that the authors and issuers were paid in exchange for positive publicity about the company.

The amended complaint alleged that Uranium Energy's use of third-party promoters was first revealed to the market in February 2013, several months before the class period began. The amended complaint alleged that on February 1, 2013, hotStocked.com cited a "Shazam Stocks" article claiming that Uranium Energy had run "a paid advertising campaign" and that the company had "practically initiated promotional coverage of its own stock." (*Id.* at ¶ 44). According to the article, the goal was to "ramp up" the Uranium Energy stock price. (*Id.*). The article alleged that the stock-price increase would be only "temporary." (*Id.*).

A complaint does not plausibly allege loss causation when the disclosed information has already been revealed to the market. Confirmatory information cannot cause a change in stock price, as a matter of law. *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665-66 (5th Cir. 2004) ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price. Because the presumption of reliance is based upon actual movement of the stock price, confirmatory information cannot be the basis for a fraud-on-the-market [*64] claim.").

Stephens responds that the TheStreetSweeper.org article alerted investors "for the first time . . . to the size and scope of the promotional campaign" and "claimed that [Uranium Energy] had failed to disclose its paid promotional scheme." (Docket Entry No. 38 at p. 28-29). The article, however, stated that Uranium Energy had "been running

up on promotions coming from Twitter, Seeking Alpha authors and reportedly hype paid by the company itself"; it did not provide the sweeping picture or the more specific details Stephens describes in her argument. And, as discussed, Uranium Energy had no independent duty to disclose its use of third-party promoters in the first place. The relevant fraudulent omissions for purposes of the Rule 10b-5(b) claims focus on the effect the advertisements had on the stock-price volatility. The TheStreetSweeper.org article was not the first "alert" to investors that the advertising campaign made Uranium Energy's stock price more volatile.

The amended complaint does not plausibly allege loss causation.[6] This is an independent ground supporting dismissal of the Rule 10b-5(b) claims against all defendants.

## 2. The Claims Based on Omitting Related-Party-Transaction Information

### a. No Materiality

Stephens argues that the defendants materially misled investors [*66] by omitting in the Item 404 disclosures "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount involved in the transaction." The defendants respond that these omissions were immaterial. The amended complaint alleges that the Item 404 disclosures stated the value of each related-party transaction and identified which payments were made "to a company controlled by a direct family member of a current officer." (Docket Entry No. 28 at ¶¶ 77, 81, 85, 89, 93, 97, 101, 105, 109, 113, 117, 121, 125). These allegations show that although the defendants did not disclose "the name of the related person and the basis on which the person is a related person," the defendants did disclose the interest in and the dollar value of each transaction.

Item 404 does not create an implied cause of action. "The case law is clear as to the absence of an express private right of action under Regulation S-K, and courts may not imply a private right of action under Regulation S-K where Congress has not established one." *Golan v. Puleo*, 480 F. Supp. 2d 1325, 1328 (S.D. Fla. 2007); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 37 (S.D.N.Y. 2004). But "if a plaintiff can establish all [*67] of the elements of a Rule 10b-5 claim such as scienter and reliance, a Regulation S-K violation may be relevant in establishing such a claim." HAZEN, 2 TREATISE ON THE LAW OF SECURITIES REGULATION § 9.56 n.13.

Stephens has not shown or explained how disclosing the name and relationship of family members involved in related-party transactions would have given rise to "a substantial likelihood that the disclosure . . . would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38 (quotation marks omitted).[7] She argues that had the defendants disclosed the family

---

[6] The defendants argue that the amended complaint does not plausibly allege [*65] loss causation for an additional reason: relying on historical stock-price data that they submitted with their motion to dismiss, the defendants reason that "the paid promotions had no material immediate impact on the stock price, which actually declined in the days immediately after" some of the advertisements. (Docket Entry No. 31 at p. 29). The court's brief review of the data provides an inadequate basis to conclude that Stephens has mischaracterized it. No greater examination is appropriate at this stage. The case law makes clear that this type of argument is not properly considered at the motion-to-dismiss stage, because "[t]he market could plausibly have had a delayed reaction; a delayed reaction can still satisfy the pleading requirements for 'loss causation' though proof of causation would be more difficult when significant time elapses before the market allegedly reacts." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 266 n.33 (5th Cir. 2009). "The actual timing issue is a factual question, and is not enough to dismiss a complaint that alleges a specific causal link, as is the case here, under Rule 12(b)(6)." *Id.*

[7] The SEC has made clear that Item 404 requires disclosure only when it would be "material," as the [*68] Supreme Court has articulated that standard since *Basic v. Levinson*, 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988). *See* Executive Compensation and Related Person Disclosure, 71 Fed. Reg. 53,158, 53,198 & n.413 (Sept. 8, 2006) (codified at 17 C.F.R. §§ 228, 229, 232, 239, 240, 245, 249, and 274).

member names, this "would have called into question the value of [the plaintiffs'] investments in [Uranium Energy's] stock" and that by failing to comply with Item 404, the defendants "prevented investors from learning that [Uranium Energy's] related-party transactions supported a longstanding stock promotion campaign that artificially inflated [the] stock price." (Docket Entry No. 38 at p. 18). This argument is too conclusory and speculative to support an inference of materiality.

The alleged omissions from the Item 404 disclosures were not material and cannot support a Rule 10b-5(b) claims against any of the defendants.


**b. No Loss Causation**

Even if the Item 404 omissions were material, there is no accompanying corrective-disclosure allegation. The amended complaint does not allege that the truth about the names of the individuals engaged in the related-party transactions was revealed or that this corrective disclosure preceded the stock-price drop. Because the amended complaint failed to identify the "release of information that reveal[ed] to the market the pertinent truth that was previously concealed or obscured by the . . . fraud" and that caused a price drop, no Rule 10b-5(b) claim is stated. *See Amedisys*, 769 F.3d at 320-21; *see also Dura*, 544 U.S. at 347 ("The complaint's failure to claim that [the defendant's] share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient," even though "the 'artificially inflated purchase price' is not itself a relevant economic loss."). This is an independent ground supporting dismissal of the Rule 10b-5(b) claims against the defendants [*69] based on the Item 404 omissions.


**C. The Claims Under Rule 10b-5(a) and Rule 10b-5(c): Omissions in or About the Third-Party Promotions**

Stephens alleged that Uranium Energy's advertising campaign was a "scheme to defraud" and a "course of business" that "operated as a fraud," violating 17 C.F.R. § 240.10b-5(a) and (c).


**1. The Legal Standard**

Claims under Rules 10b-5(a) and (c) invoke what some courts call "scheme liability." *E.g., Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008). While Rule 10b-5(b) imposes liability for deceptive statements, Rules 10b-5(a) and (c) impose liability for deceptive conduct. *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 n.29 (3d Cir. 2011), *abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013). Although the Fifth Circuit has not addressed the issue, at least three courts of appeals have held that the "scheme" must "encompass[] conduct beyond those misrepresentations or omissions" allegedly giving rise to Rule 10b-5(b) liability. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011); *see also Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) ("[S]cheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)."); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).

The scope of scheme liability is unclear. The Supreme Court has held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994). To hold otherwise would "impose . . . liability when at least one element critical for recovery under 10b-5 is absent: reliance." *Id.* at 180. But that "does not mean that secondary actors in the securities markets are always [*70] free from liability under the securities Acts." *Id.* at 191. The Court explained that:

[a]ny person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met.

*Id.; see also Stoneridge*, 552 U.S. at 166 ("[T]he implied right of action in § 10(b) continues to cover secondary actors who commit primary violations."). The Fifth Circuit has held that "any defendant who does not make or affirmatively cause to be made a fraudulent statement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5." *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 388 (5th Cir. 2007) (quoting *In re Charter Commc'ns, Inc., Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006)).

The question is whether the amended complaint alleges a "scheme" or "course of business" actionable under Rules 10b-5(a) and (c).

## 2. Analysis

Stephens alleged that the defendants engaged in a scheme to conceal Uranium Energy's involvement in paying for the third-party promotions. The defendants allegedly "engaged in a concerted effort . . . to conceal the true source of the[] promotional materials [*71] and to persuade the investing public that information being presented was coming from parties not affiliated with Uranium Energy." (Docket Entry No. 28 at ¶ 46). "Although these materials purported to provide investors with detailed 'disclaimers' alongside the investing guidance and updates, in fact they gave readers little or no notice that the information came, directly or indirectly, from Uranium Energy." (*Id.*). By paying "for promotions through third parties," the defendants, the amended complaint alleges, intentionally "preclud[ed] even those investors who actually read the lengthy, fine-print disclosures" from "understanding the source of the payment the promoter received." (*Id.* at ¶ 26).

Stephens concedes that none of the articles, newsletters, or alerts themselves contained false or misleading statements and that all, except one, came with disclaimers that the materials were paid advertisements and not objective investment advice. Some disclaimers disclosed that Uranium Energy had paid for the advertising materials directly. This category included the May 2014 alerts and the November 2014 FutureMoneyTrends.com newsletter. (*Id.* at ¶¶ 57, 65). Others disclosed that the materials were paid [*72] advertisements but did not identify Uranium Energy as the source. Instead, these disclaimers identified a third party who Uranium Energy allegedly paid, without disclosing Uranium Energy as the source. The June 2013 and the remaining November 2014 promotions are in this category. (*Id.* at ¶¶ 53, 61, 63). Because the amended complaint did not allege that the content of the advertisements was fraudulent, and because the disclaimers revealed that the promoters had been paid and how much, Stephens's scheme-liability allegations turn on the allegation that some, but not all, of the advertisement disclaimers revealed that Uranium Energy had directly or indirectly paid for the advertisements.

Stephens relies on four district court cases for support, but in each of those cases, the advertisements themselves were allegedly false or misleading. *In re CytRx*, 2015 U.S. Dist. LEXIS 91447, 2015 WL 5031232, at *2; *SEC v. Farmer*, No. 14-cv-2345, 2015 U.S. Dist. LEXIS 136702, 2015 WL 5838867, at *15 (S.D. Tex. Oct. 7, 2015) (defendant "coordinated and funded" advertising campaign that "disseminated false information"); *SEC v. Strebinger*, 114 F. Supp. 3d 1321, 1325, 1331 (N.D. Ga. 2015) (defendant was "part of a scheme involving the contents of" reports containing "several materially false and otherwise misleading statements"); *JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 735 (E.D. Mich. 2014). Here, by contrast, Stephens does not contend that the advertisements misled investors. [*73] She concedes that the advertisements conveyed truthful information to the market. (Docket Entry No. 46 at p. 21). That makes the scheme here materially different from those involved in the cited cases. Instead of showing how the advertisements misled investors, Stephens must allege facts showing that the failure to disclose the "true" or "ultimate" identity of the party paying

for the advertisements and the connection to Uranium Energy states a claim under § 10(b). *See Bank of Denver*, 511 U.S. at 191 (scheme-liability allegations must meet "all of the requirements for primary liability under Rule 10b-5.").

The amended complaint fails to allege that the defendants' "scheme" or "course of business" withheld material information from investors. The court's reasoning in *Garvey v. Arkoosh*, 354 F. Supp. 2d 73 (D. Mass. 2005), is persuasive. The *Garvey* plaintiffs, like Stephens, based Rule 10b-5(a) and (c) claims on a campaign to advertise a company's stock. *Id.* at 76. The plaintiffs argued that even though newsletters with positive information about the company disclosed that they were paid advertisements, the promotions were a fraudulent scheme because they failed to disclose that the individual corporate-officer defendants were the ones ultimately "using company funds to carry out a 'pump and dump' scheme." *Id.* at 84. [*74] The court held that the identity of the party paying for the advertisement was not material, provided that investors knew that the information in the "newsletter" or "article" was written by a party receiving financial compensation. *Id.* The court relied on the observation that "[a]ny reasonable investor told that the publisher of an investment report had received $700,000, $100,000, or even $50,000 to tout a particular stock would give the analyst's recommendation the proverbial grain [of] salt regardless of the source of the funds." *Id.*

So too here. Stephens has failed to show or explain how knowing that Uranium Energy paid for some of the advertisements—as opposed to, for example, Raven Consulting or Fin Media—would have "been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38. And to the extent that she argues that failing to disclose Uranium Energy's involvement prevented investors from learning about the advertisements' effect on the stock's volatility, that omission is the same omission that forms the basis of the Rule 10b-5(b) claims and cannot, without more, give rise to liability under Rules 10b-5(a) and (c). *See, e.g., KV Pharm. Co.*, 679 F.3d at 987.

Stephens emphasizes that [*75] the April 2015 Stock Gumshoe article did not disclose the alleged payment by Uranium Energy. (*Id.* at ¶ 70). Even if this omission was material, and even if a single nondisclosure could constitute a "scheme" under Rules 10b-5(a) and (c), the amended complaint does not allege facts giving rise to a strong inference that any of the defendants knowingly or severely recklessly conspired to hide that information from investors. Because there are no scienter allegations relating to the Stock Gumshoe article, the absence of this disclosure is not actionable.

The amended complaint does not state a claim for scheme liability against any of the defendants under Rules 10b-5(a) or (c).

### D. The Claims Under Section 20

Section 20(a) of the Exchange Act imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud. 15 U.S.C. § 78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland*, 365 F.3d at 383. Because the amended complaint does not allege a primary violation, the Section 20 claims fail.

### IV. Leave to Amend

Stephens filed her original complaint on June 29, 2015 and amended on November 16, 2015. (Docket Entry [*76] Nos. 1, 28). In a footnote on the last page of her response to the motion to dismiss, she sought leave to amend the complaint and argued that it "should be granted unless there is a 'substantial reason' to deny the request." (Docket Entry No. 38 at p. 31 n.38). She has not "either tendered a further amended Complaint or advised the [] court of

how or in what manner [she] would amend the Complaint or what allegations would be added or deleted if allowed to do so." *See Southland*, 365 F.3d at 384 (district court did not abuse its discretion in denying leave to amend). Nor has she suggested that she has "relevant information [she was] unaware of when the Complaint was filed (or that the defendants' motion to dismiss did not adequately inform [her] of the asserted deficiencies in the Complaint)." *See id.* The pleading already has been amended once without curing the deficiencies. The governing law makes further amendment futile.

The request for leave to amend is denied.


## V. Conclusion

The defendants' motion to dismiss is granted. (Docket Entry No. 31). This action is dismissed with prejudice. A final judgment is separately entered.

SIGNED on July 15, 2016, at Houston, Texas.

/s/ Lee H. Rosenthal

Lee H. Rosenthal

United States [*77]  District Judge


## Appendix: Sample Advertisements


### A. June 2013 (Docket Entry No. 28, Ex. 6)



UEC was featured in yet another research report and you can receive your on-line copy by <clicking here>. A fascinating excerpt from the report stated that, "The uranium market has always had compelling fundamentals. In fact, the supply/demand argument for higher prices has been irrefutable for years — it's just the timing that has been in question.

_

But it's not like these powerful fundamentals haven't impacted the price before. In 2007, for example, the price briefly hit $140/pound, or more than triple today's levels. But then came the global financial crisis to toss the prices of all commodities into the dumpster...

Once we get past that train wreck and the global monetary inflation kicked in, the fundamentals for uranium began to kick in once more. The price of uranium was steadily climbing back up...when the Fukushima accident sent the price reeling once again." Make sure you head over to read the full report report now!

Remember we continue to initiate our coverage on UEC for weeks to come. You also have to remember UEC is a NYSE-AMEX listed company and just last year raised a massive financing at a much higher price to a institutional investor!

Keep UEC on top of your radar from here on out!

If you missed reading our original report on this impressive emerging growth company, please read full details by clicking here or read parts below. Click here to view research report

**Uranium Mining Projects in the US**
The Company has focused its property acquisition program primarily in the southwestern US states of Texas, Wyoming, New Mexico, Arizona, Colorado and Utah. This region has historically been the most concentrated area for uranium mining in the U.S. With the use of historical exploration databases, Uranium Energy Corp has been able to target properties for acquisition that have already been the subject of significant exploration and development by senior

energy companies in the past. Uranium Energy Corp's strategy of acquiring exploration databases and leveraging these databases to generate acquisition targets has been effective thus far. The Company will continue to aggressively pursue this formula on an ongoing basis. Uranium Energy Corp is well positioned to capitalize on the world's overwhelming demand for more uranium, for more energy, for cheaper energy and for a cleaner environment. Continue your research at www.uraniumenergy.com

Thanks,
www.TooNiceStocks.com
"Finding Value in the Undervalued"
We work hard to research promising companies in all exchanges. Read our independent research here!
Please join us for DAILY CHATTER! QUESTIONS!!? ASK US ON REAL RESEARCH FOR REAL TRADERS

Never invest in any stock featured on our site or newsletter unless you can afford to lose your entire investment. Please remember that this newsletter is intended for commercial advertising, business media marketing and is for informational purposes only. None of the profiles issued by TooNiceStocks.com constitutes a recommendation for any investor to purchase or sell any particular security or that any security is suitable for any investor as these are our opinions. Any investor should determine whether a particular security is suitable based on the investor's objectives, other securities holdings, financial situation needs, and tax status. The disclaimer is to be read and fully understood as a double opt-in subscriber as we do not tolerate spam. Please note well that TooNiceStocks.com employees are not Registered as an Investment Advisor in any jurisdiction whatsoever. Full disclaimer can be read
at www.toonicestocks.com  Release of Liability: Through use of this website viewing or using you agree to hold TooNiceStocks.com, its operators owners and employees harmless and to completely release them from any and all liability due to any and all loss (monetary or otherwise), damage (monetary or otherwise), or injury (monetary or otherwise) that you may incur. The information contained herein is based on sources which we believe to be reliable but is not guaranteed by us as being accurate and does not purport to be a complete statement or summary of the available data. This third party, may turn shares and may liquidate it, which may negatively affect the stock price. TooNiceStocks.com encourages readers

and investors to supplement the information in these reports with independent research and other professional advice. All information on featured companies is provided by the companies profiled, or is available from public sources and TooNiceStocks.com makes no representations, warranties or guarantees as to the accuracy or completeness of the disclosure by the profiled companies. TooNiceStocks.com, nor any of its affiliates are not registered investment advisors or a broker dealers. None of the materials or advertisements herein constitute offers or solicitations to purchase or sell securities of the companies profiled herein and any decision to invest in any such company or other financial decisions should not be made based upon the information provided herein. Instead TooNiceStocks.com strongly urges you conduct a complete and independent investigation of the respective companies and consideration of all pertinent risks. TooNiceStocks.com does not offer such advice or analysis, and TooNiceStocks.com further urges you to consult your own independent tax, business, financial and investment advisors. Investing in micro-cap and growth securities is highly speculative and carries and extremely high degree of risk. It is possible that an investor's investment may be lost or impaired due to the speculative nature of the companies profiled. From time to time we are compensated for commercial advertising and business media marketing or providing our own independent research coverage and opinions, full disclosure can be found in accordance with section 17(b) of the Securities Act of 1933 at every publication. TooNiceStocks.com expects to be compensated up to sixty thousand dollars to provide one month of commercial digital advertising and business brand media marketing by a third party Fin Media Networks. TooNiceStocks.com has been previously been compensated sixty thousand dollars to provide one week of commercial digital advertising and business brand media marketing by a third party VentureCap Group. We own no shares. If we are ever compensated, this compensation constitutes a conflict of interest as to our ability to remain objective in our communication regarding the profiled company. Any statements that express or involve discussions with respect to predictions, expectations, beliefs, plans, projections, objectives, goals, assumptions or future events or performance are not statements of historical fact may be "forward looking statements". Forward looking statements are based on

expectations, estimates, and projections at the time the statements are made that involve a number of risks an uncertainties which could cause actual results or events to differ materially from those presently anticipated. Forward looking statements in this action may be identified through use of words such as "projects", "foresee", "expects", "will", "anticipates", "estimates", "believes", "understands", or that by statements indicating certain actions "may", "could", or "might" occur. Understand there is no guarantee past performance will be indicative of future results. TooNiceStocks.com may from time to time, trade securities mentioned in our profiles covered by our own independent research where we are not compensated for any coverage or compensated. Public disclosure, by any means, of future coverage, estimate changes, and/or chances in earnings estimates prior to publication is prohibited as we will always disclose fully. In preparing this publication, TooNiceStocks.com has relied upon information supplied by its customers, and press releases which it believes to be reliable; however, such reliability cannot be guaranteed. Investors should not rely on the information contained in this website. Rather, investors should use the information contained in this website as a starting point for doing additional independent research on the featured companies. The advertisements in this website are believed to be reliable, however, TooNiceStocks.com and its owners, affiliates, subsidiaries, officers, directors, representatives and agents disclaim any liability as to the completeness or accuracy of the information contained in any advertisement and for any omissions of materials facts from such advertisement. TooNiceStocks.com is not responsible for any claims made by the companies advertised here and are our own opinions.

**B. May 2014 (Docket Entry No. 28, Ex. 9)**



**New Pick: UEC !**

**New Alert: (UEC) Is a HOT Stock !**

NYSE: Uranium Energy Corp. (UEC)
is flying up the charts, put it on your RADAR!

May 7th (UEC) reached a
bottom at .94 and from there
UEC has soared to $1.61 on Break-Out
Volume.

Multiple factors are driving UEC higher,
and tells me UEC is back in the drivers seat,
and so I'm putting it on immediate alert.

I have no crystal ball, nor can I guarantee that
there won't be further price and volume volatility,
but I DO KNOW that UEC is absolutely flying
up the charts. The shorts may be in major trouble
here!

**About Uranium Energy Corp.**

*UEC is engaged in the exploration, extraction and processing
of uranium concentrates on projects in the United States
and Paraguay.* Learn More

Recent Interview On Bloomberg News: Watch Here

**Bottom Line:** The Uranium Markets recent dip
have not affected UEC of late.

Don't Miss Out!



**More About UEC:**

**UEC** went from exploration to production
in less than 5 years. Navigating his own company
through Fukushima and attracting investors like
Rick Rule and Li Ka-shing (the Richest man in all of Asia).

**UEC** looks poised to be a contender as the Uranium
market rebounds!

**As always use our findings & conduct your own research.*



**Trade Well,**

**Stock Professors**

DO NOT BASE ANY DECISION UPON ANY MATERIALS FOUND ON THIS REPORT OR WEBSITE unless you can afford to lose your entire investment. We are not registered as a securities broker-dealer or an investment advisor either with the U.S. Securities and Exchange Commission (the "SEC") or with any state securities regulatory authority. We are neither licensed nor qualified to provide investment advice. This is not an offer or solicitation to buy UEC. Barron referenced news releases and publicly available information and was persuaded that the facts that Rimon be construed as an accurate assessment. StockProfessors.com is a wholly owned subsidiary of Raven Consulting Corp. Raven Consulting Corp. expects to be compensated $5,000 in cash for this UEC advertising and promotion by Uranium Energy Corp (UEC) directly. All direct third party compensation received will be fully disclosed in any communication regarding a profiled company. This website is a service of Raven Consulting, Corp, a financial public relations firm that has been compensated by the companies profiled. All direct and third party compensation received has been clearly set out in each individual profile in accordance with section 17(b) of the Securities Act of 1933. This compensation constitutes a conflict of interest as to our ability to remain objective in our communication regarding the profiled companies. Raven Consulting Corp, and/or its affiliated withhold, buy, and sell securities in the companies profiled. When compensated in shares, all readers should be aware that as our policy to liquidate all shares immediately. We reserve the right to buy or sell the shares of any the companies mentioned in any market as we produce at any time. This compensation constitutes a conflict of interest as to our ability to remain objective in our communication regarding the profiled companies. The information contained in our report should be viewed as commercial advertisement and is not intended to be investment advice. The report is not provided to any particular individual with a view toward their individual circumstances. The information contained in our report is not an offer to buy or sell securities. We distribute opinions, comments and information free of charge exclusively to individuals who wish to receive them. Our newsletter and website have been prepared for informational purposes only and are not intended to be used as a complete source of information on any particular company. An individual should never invest in the securities of any of the companies' profiled based solely on information contained in our report. Individuals should assume that all information contained in the report about profiled companies is not trustworthy unless verified by their own independent research. Full disclaimer can be read at stockprofessors.com

C. November 2014 (Docket Entry No. 28, Ex. 16)

![investorsoup logo] **investorsoup**
intelligent commentary, solid analysis

This email contains sponsored content. Please read the entire disclaimer before making any investment decisions.

## High-Energy Trade To Start The Week

Greetings Trader!

If you wrote off the uranium stocks after the Japan disaster you might want to take a look at how **Uranium Energy Corp. (UEC)** is trading now.

Load that **UEC** chart and the power lighting up this play speaks for itself:



That big "vertical takeoff" arrow represents a **59.2% rally** since **UEC** hit what now looks like a near-term bottom of $1.08 on Tuesday.

I'm not seeing any public catalyst for that kind of big bull run so my guess is

that somebody saw a lot of value here or is simply riding the technicals.

Either way, a massive move like this twists all the indicators like the RSI and MACD, creating rally signals that alert traders to the fun **UEC** is having!

**More traders, more buzz, more rally? The team has seen similar "virtuous cycles" before, so let's unwrap what's making UEC tick.**

- Obviously **UEC** makes its money digging and selling uranium from its 7,000-acre mine in Texas when market conditions go its way. More recently they've been hoarding their ore and $8 million in cash.

- A quick scan of **UEC's** property portfolio reveals at least 30 MILLION pounds of uranium concentrate lurking in its dirt. Even here at a depressed $36 per pound, that's a cool $1 billion in future sales.

- Fun fact, uranium prices have already come back 30% since bottoming out last summer and as **UEC** points out, nuclear power still needs to burn 13 MILLION pounds a year beyond current supply! (Read more)

- Sooner or later, the stockpiles will be gone, Japan will OK new plants and uranium prices can spike back toward pre-Fukushima highs about double where they are now! Then **UEC** starts mining again!

**BOTTOM LINE:** Maybe that Japanese nuclear power plant starting up was the signal traders needed that the uranium play has come back to life.

The timing is a pretty close match to the huge upswing in both **UEC** share volume (10 times normal over the last 3 days) and obviously the PPS.

**Maybe somebody read between the lines and is now expecting UEC to put the mothballs away and start crunching ore again?**

All I really know is that this chart is rocking and so many short sellers were clinging to this ticker that those who haven't covered must be getting antsy!

This kind of breakout move usually goes one of two ways: either **UEC** keeps rallying, in which case the party hasn't shown any sign of stopping yet.

Or else **UEC** actually needs a rest, in which case that 60% gap on the chart should give you day traders plenty of "spread" to play around with!

One way or another, **UEC** is clearly in play -- so keep it in your sights today and see if you can dig a little of its glow for yourself!

Sincerely,

Michael Reef
yourstockguy@gmail.com

Disclaimer

This newsletter is a paid advertisement and is neither an offer nor recommendation to buy or sell any security. We hold no investment licenses and are thus neither licensed nor qualified to provide investment advice. The content in this report, email is not provided to any individual with a view toward their individual circumstances. InvestorSoup.com is wholly owned by Action Media Holdings Corp. This newsletter is a paid advertisement. Twenty Two Thousand Five Hundred Dollars by Maven Consulting Ltd (a non contracting third party) for UEC advertising and promotional services. This compensation constitutes a conflict of interest as to our ability to remain objective in our communication regarding the profiled company. Because of this conflict, individuals are strongly encouraged to not use this newsletter as the basis for any investment decision.

While information is believed to be reliable, it is not guaranteed as to be accurate. Individuals should assume that all information contained in our newsletter is not trustworthy unless verified by their own independent research. Also, because events and circumstances frequently do not occur as expected, there will likely be differences between the any predictions and actual results. Always consult a licensed investment professional before making any investment decision. Be extremely careful, investing in securities carries a high degree of risk; you may lose some or all of the investment.

**End of Document**

# Stockman v. Flotek Indus.

United States District Court for the Southern District of Texas, Houston Division

September 29, 2010, Decided; September 29, 2010, Filed

CIVIL ACTION NO. H-09-2526

**Reporter**
2010 U.S. Dist. LEXIS 103196 *; 2010 WL 3785586

DAVID EARL STOCKMAN and CAROL BURKE, on behalf of themselves and others similarly situated, Plaintiffs, v. FLOTEK INDUSTRIES, INC., JERRY D. DUMAS, SR., and LISA G. MEIER, Defendants.

**Counsel:** [*1] For David Earl Stockman, Individually and on Behalf of All Others Similarly Situated, Plaintiff: Jennifer L Gmitro, LEAD ATTORNEY, Jonah H Goldstein, Anne L Box, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Michael I Fistel, LEAD ATTORNEY, Holzer, Holzer & Fistel, LLC, Atlanta, GA; Roger B Greenberg, LEAD ATTORNEY, Schwartz Junell et al, Houston, TX; Jeffrey A Berens, Dyer & Berens LLP, Denver, CO; Robert J Dyer, III, Dyet & Berens LLP, Denver, CO.

For Flotek Industries Inc, Jerry D. Dumas, Sr., Lisa G. Meier, Defendants: Gerard G Pecht, LEAD ATTORNEY, Fulbright and Jaworski, Houston, TX; Peter Andrew Stokes, Fulbright & Jaworski, Austin, TX.

For Mr. Sean M Feeley, Movant: Michael A Lee, Susman Godfrey, Houston, TX.

For Carole Burke, Movant: Anne L Box, LEAD ATTORNEY, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Jennifer L Gmitro, LEAD ATTORNEY, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Roger B Greenberg, LEAD ATTORNEY, Schwartz Junell et al, Houston, TX; Jonah H Goldstein, Robbins Geller Rudman & Dowd, LLP, San Diego, CA.

**Judges:** SIM LAKE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** SIM LAKE

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiffs, David Earl Stockman and Carol Burke, bring this federal securities [*2] class action on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Flotek Industries, Inc. ("Flotek" or "the Company") between May 8, 2007, and January 23, 2008, inclusive ("the Class Period"). The defendants named in this action are Flotek, Jerry D. Dumas, Sr., who served as Chief Executive Officer of Flotek from September 1998 until his retirement in 2009 and as Chairman from 1998 until Flotek's 2010 annual stockholder's meeting, and Lisa G. Meier, who served as Chief Financial Officer of Flotek from April 2004 until August 2008 and Vice-President from January 2005 until August 2008. Plaintiffs' First Amended Class Action Complaint for Violations of Federal Securities Laws (Docket Entry No. 32) asserts claims for violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the Securities Exchange Commission (SEC). Pending before the court are Defendants' Motion to Dismiss and Brief in Support (Docket Entry No. 36) and plaintiffs' request for leave to amend if the court grants the defendants' motion to dismiss (Docket [*3] Entry No. 40). For the reasons explained

below, the defendant's motion to dismiss will be granted, and the plaintiffs' request for leave to amend will be denied.

## I. Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief may be granted tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001), cert. denied sub nom Cloud v. United States, 536 U.S. 960, 122 S. Ct. 2665, 153 L. Ed. 2d 839 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. Id.

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S. Ct. 992, 997, 152 L. Ed. 2d 1 (2002) (quoting Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974)). [*4] To avoid dismissal a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). This "plausibility standard" requires "more than an unadorned, the-defendantunlawfully-harmed-me accusation." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 127 S. Ct. at 1966). [1]

The claims for fraud asserted in plaintiff's complaint are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b), which states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Pleading fraud with particularity in this circuit requires "[a]t a minimum . . . the particulars of time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." Benchmark Electronics, Inc. v. J.M. Huber Corp., 343 F.3d 719, 724 (5th Cir.), modified on denial of rehearing on other grounds, 355 F.3d 356 (5th Cir. 2003) (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992)). "A dismissal for failure to plead fraud [*6] with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim." Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 361 (5th Cir. 2004) (citing Shushany v. Allwaste, Inc., 992 F.2d 517, 520 (5th Cir. 1993)).

In considering a Rule 12(b)(6) motion to dismiss a court must limit itself to the contents of the pleadings, with two exceptions. In Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000), the Fifth Circuit approved the district court's consideration of certain documents the defendant attached to a motion to dismiss. The Fifth Circuit has "restricted such consideration to documents that are referred to in the plaintiff's complaint and are

---

[1] Before Twombly a dismissal under Rule 12(b)(6) would not be appropriate unless it appeared beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957). In Twombly, 127 S. Ct. at 1966, the Supreme Court disavowed the "no set of facts" language from Conley. The Supreme Court explained that "[t]his phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 1969. [*5] Courts have applied this change generally, and not limited its application to cases like Twombly that involve antitrust law. Although this court's decision to grant the Defendants' Motion to Dismiss rests on the standard expressed in Twombly and Iqbal, the court would have reached the same decision had it applied the Conley standard.

central to the plaintiff's claim." <u>Scanlan v. Tex. A & M Univ.</u>, 343 F.3d 533, 536 (5th Cir. 2003) (citing <u>Collins</u>, 224 F.3d at 498-99).

In securities cases courts may also take judicial notice of the contents of public disclosure documents that are required by law to be filed with the SEC and are actually filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain; not for proving the [*7] truth of their contents. <u>See Lovelace v. Software Spectrum, Inc.</u>, 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996) (citing and adopting rule of <u>Kramer v. Time Warner, Inc.</u>, 937 F.2d 767, 774 (2d Cir. 1991), and explaining that this rule does not apply to other forms of disclosure such as press releases or announcements at shareholder meetings). <u>See also In re Azurix Corp. Sec. Litig.</u>, 198 F.Supp.2d 862, 877 (S.D. Tex. 2002), <u>aff'd sub nom. Rosenzweig v. Azurix Corp.</u>, 332 F.3d 854 (5th Cir. 2003), and <u>Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.</u>, 565 F.3d 200, 209 (5th Cir. 2009).

Although defendants bear the burden of pleading and proving affirmative defenses, where facts alleged in plaintiff's pleadings make clear that a claim is barred, dismissal under Rule 12(b)(6) may be granted. <u>See Jones v. Alcoa, Inc.</u>, 339 F.3d 359, 366 (5th Cir. 2003), <u>cert. denied</u>, 540 U.S. 1161, 124 S. Ct. 1173, 157 L. Ed. 2d 1206 (Jan. 26, 2004) (citing <u>Kansa Reinsurance Co., Ltd. v. Congressional Mortgage Corp. of Texas</u>, 20 F.3d 1362, 1366-70 (5th Cir. 1994) (dismissing claim as time barred under Rule 12(b)(6)).


## II. **Factual Allegations**

Flotek is an oil field industry service provider that has three primary divisions: Chemicals and Logistics, [*8] Drilling Products, and Artificial Lift.

> Chemicals and Logistics consists of . . . specialty chemical and automated bulk material handling divisions; Drilling Products consists of downhole drilling tool sales, rentals and inspection services; and Artificial Lift consists of . . . Petrovalve and . . . downhole submersible pump divisions. [2]

In 2006, "[i]n the face of increased industry competition from other niche players in the oil field service industry, Dumas and Meier sought to convert Flotek from a niche oil field industry service provider to a specialized solutions outfit." (FACAC ¶ 4) [3] That year Flotek achieved a revenue milestone, reporting more than $100 million in sales, nearly double its Fiscal Year 2005 sales.

On March 13, 2007, Flotek issued a press release announcing its financial results for the fourth quarter of 2006, which ended on December 31, 2006. Flotek reported revenues of $33.3 million and net income of $3.9 million, [*9] or $0.21 per diluted share—a 14% increase over the prior quarter. (FACAC ¶ 41) [4] The press release explained that "[t]he revenue growth was driven primarily by organic growth in our Chemicals and Logistics and Drilling Tools segments, coupled with three acquisitions made in the Drilling Tools and Artificial Lift segments." [5] The press release quoted Dumas as stating "[d]espite a hefty increase in professional fees and effective tax rate, we met the expectations of our shareholders. We have brought together a first-rate collection of companies and will

---

[2] News Release, May 8, 2007, Exhibit C attached to Defendants' Motion to Dismiss and Brief in Support ("Motion to Dismiss"), Docket Entry No. 36, p. 1.

[3] First Amended Class Action Complaint for Violations of Federal Securities Laws (FACAC), Docket Entry No. 32.

[4] <u>See</u> March 13, 2007, News Release, Exhibit A attached to Motion to Dismiss, Docket Entry No. 36. This press release actually reported net income of $0.42 per share, but since on June 19, 2007, Flotek announced approval of a 2-for-1 split of its common stock, plaintiffs have adjusted the per share amounts alleged in the FACAC to reflect the stock split.

[5] <u>Id.</u>

continue to focus on integrating them in 2007 to maximize profit." (FACAC ¶ 41) [6] Following the press release the defendants conducted a conference call with investors and analysts, at which Dumas explained,

> [f]or the full year the Company exceeded $100 million in revenue, nearly doubling sales levels from 2005. The growth was driven and the sales were driven by 72 acquisitions, two artificial lift acquisitions as well as strong organic growth within both our chemicals division and our established downhole drilling and mining tool group.

(FACAC ¶ 42) [7] Dumas stated "based on our performance projections, we're providing earnings guidance [*10] of [$1] of diluted earnings per share for '07 without the addition of any acquisitions." [8] Meier similarly projected "company revenues of $160 million with diluted earnings per share of $[1.00]." [9] Plaintiffs do not allege that these statements were false when made but, instead, that these statements "remained alive and uncorrected throughout the Class Period." (FACAC ¶ 43)

On May 8, 2007, Flotek issued a press release announcing its financial results for the First quarter of 2007, which ended on March 31, 2007. Flotek reported revenues of $35.1 million and net income of $3.7 million, or $0.19 per diluted share. (FACAC P 45) [10] The press release quoted Dumas as stating, "[w]e are actively integrating Triumph Drilling Tools into our existing drilling tool segment and have begun the process of rolling out Rental Tool Management Software (RTMS) to better utilize our extensive inventory of rental tools." [11] (FACAC ¶ 45) Following the press release the defendants conducted a conference call with investors and analysts, at which Meier stated that in January 2007 Flotek completed the acquisition of Triumph Drilling Tools, a regional provider of downhole rental equipment in the oil and gas industry, and that later in January Flotek [*12] acquired a 50% partnership interest in CAVO Drilling Motors, an entity specializing in the rental servicing and sales of high performance mud motors for drilling applications. [12] Meier also stated that "we project the company will generate revenues of $160 million and diluted earnings per share of $[1.00]. These projections include the purchase of Triumph and CAVO." [13] Dumas similarly stated that "[b]ased on our performance, we hold to our earnings guidance of $[1] diluted earnings per share for 2007 without the addition of any more acquisitions which obviously would have a positive [e]ffect." [14] (FACAC ¶ 46)

Plaintiffs allege that in response to statements made in the press release and conference call held on May 8, 2007, the price of Flotek stock rose $1.88 per share, or 9%, to close to $21.90 per share on May 9, 2007, and that from

---

[6] Id.

[7] 03/13/07 Flotek Earnings Call, Exhibit B attached to Motion to Dismiss, Docket Entry No. 36, p. 1. But see Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 1 n.2 (acknowledging that Flotek did not complete 72 acquisitions between 2005 and early 2007 but, instead, completed only nine acquisitions and citing in support of this acknowledgment Flotek's Form 10-K for the fiscal year ended December 31, 2007, Exhibit K attached to Motion [*11] to Dismiss, Docket Entry No. 36, p. 5.

[8] Id. at 3. The earnings guidance provided in this conference call was actually $2 per diluted share, but on June 19, 2007, Flotek approved a 2-for-1 stock split. The earlier statements of projected earnings per share alleged in the FACAC have been adjusted to reflect this stock split.

[9] Id. at 4.

[10] See May 8, 2007, News Release, Exhibit C attached to Motion to Dismiss, Docket Entry No. 36.

[11] Id.

[12] 05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36, p. 3.

[13] Id. at 4.

[14] Id. at 3.

May 11, 2007, through May 18, 2007, Dumas and Meier sold over 55,000 shares of their Flotek stock for gross proceeds of over $1.27 [*13] million at prices exceeding $22.00 per share. (FACAC ¶ 47-48)

On June 19, 2007, Flotek announced approval of a 2-for-1 split of its common stock. The additional shares were distributed on July 11, 2007, and Flotek began trading at the split-adjusted price the following day. Accordingly, Flotek's previous guidance of $2.00 in diluted earnings per share was adjusted to $1.00 per share to reflect the stock split. (FACAC ¶ 50)

On August 2, 2007, Flotek issued a press release announcing its financial results for the second quarter of 2007, the period ended June 30, 2007. Flotek reported revenues of $37.8 million and net income of $4.9 million, or $0.25 per fully diluted share despite inclement weather. (FACAC P 51) [15] The press release quoted Dumas as stating that "[n]et income more than doubled in the second quarter of 2007 compared to 2006, and increased 31% above first quarter 2007, despite severe weather in many of our operating areas. We estimate inclement weather deferred approximately $2 million in sales." [16] Following the press release the defendants conducted a conference call with investors and analysts at which Dumas stated that "[b]ased on our performance projections we hold our [*14] earnings guidance of $1 a diluted share, diluted earnings per share for '07 without the addition of any more acquisitions." [17] (FACAC ¶ 52) Plaintiffs allege that Meier similarly stated, "[w]e hold to our original guidance" (FACAC P 52), [18] and that she allegedly touted Flotek's integration efforts, stating:

> [i]n January, we completed the acquisition of Triumph Drilling Tools. Triumph is a leading regional provider of downhole rental equipment to the oil and gas industry. The integration of Triumph into Flotek has been very successful. We have leveraged off their expertise to help roll out our RTMS shore-drilling location this year which we feel will further increase the utilization of our expansive tool inventory.

(FACAC ¶ 52) [19] Plaintiffs allege that in response to these statements, "the price of Flotek stock rose $1.45 per share, or 5%, to close at $31.94 per share on August 2, 2007." (FACAC ¶ 53)

Plaintiffs [*15] allege that between August 6 and August 10, 2007, defendant Dumas sold over 155,000 shares of his Flotek stock (more than 17% of his holdings) at prices between $31.00-$33.00 per share for gross proceeds of over $4.9 million, and that on August 13, 2007, Meier sold 5,000 shares of her Flotek stock at a price of $32.30 per share for gross proceeds of $61,500. (FACAC ¶ 54)

On October 31, 2007, Flotek issued a press release announcing its financial results for the third quarter of 2007, which ended on September 30, 2007. Flotek reported revenues of $41.7 million and net income of $5.0 million, or $0.26 per fully diluted share. (FACAC ¶ 56) [20] The press release quoted Dumas as stating:

> [t]he drop in Rocky Mountain wellhead gas prices and associated drop in gas drilling and production delayed sales in our chemical, drilling and artificial lift divisions. Despite this, we are on track and performing at or above plan and making progress on several strategic initiatives. Based on our performance we reiterate our guidance of $1.00 per share on a fully diluted basis for 2007. [21]

---

[15] August 2, 2007, News Release, Exhibit E attached to Motion to Dismiss, Docket Entry No. 36.

[16] Id.

[17] 08/03/2007 Flotek Earnings Call, Exhibit F attached to Motion to Dismiss, Docket Entry No. 36, p. 3.

[18] Id. at 12 (Meier is quoted as stating: "We hold to our original guidance.").

[19] Id. at 3.

[20] October 31, 2007, News Release, Exhibit G attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

[21] Id.

(FACAC ¶ 56) Following the press release the defendants conducted a conference call with investors and analysts at which [*16] Dumas explained that

> [s]equentially, third quarter revenues were 4% higher than the second quarter revenues with low gas prices in the Rocky Mountains affecting drilling activity. The focus in that area is continued integration, product line expansion and moving from sub-rental of products to owning tools that will increase the profitability on those rentals. . . Operating profit margins were 12.4% in the third quarter '07 verses 11.7% in the second quarter of '07. And they were 20.1% in the third quarter of '06.

> Year-over-year operating profit margins are lower due to a shift in our revenue mix from sales to rentals and services, which are more people intensive, plus $700,000 more in depreciation and amortization expense. Artificial Lift sales decreased from 5.8 million in the third quarter of '06 to 4.3 million in the third quarter of '07. Low gas prices and pipeline capacity constraints significantly reduced coal bed methane production and drilling activity in the Powder River Basin in the third quarter of '07 versus 2006. There were about 25% less drilling rigs operating in the third quarter compared to the quarter in '06.

> As a percentage of revenue, operating margins for the third [*17] quarter were 10.9% verses 14.6% for the same period in '06. Sequentially, Artificial Lift sales increased 1.3 million in the third quarter compared to second quarter of this year. Operating margins also increased from 5.4% in the second quarter of '07 to 10.9% in the third quarter. In our corporate cost, we were $2.6 million in the third quarter of '07 versus 1.6 million in the third quarter of '06.

> The primary increase in this cost relates to the expansion of our accounting and support personnel plus equity compensation expenses associated with the retention plan by the Board to put into place for me and Lisa. . . .

> Our business operations and prospects for future revenue remain strong. We have not seen a reduction in demand for our products and services due to the quality of the service of our products but as I mentioned we have had some reduction because of the gas price that affected the drilling operation and because we had pipeline problems and we also have other issues that reduced the activity in the Powder River in our coal bed methane operations that reduced the rig count by 25%.

> Based on all of this activity, based on the performance of projections and the third quarter performance, [*18] we are right on our plan as we have anticipated this year and we have consistently indicated to our share holders that we would have a guidance of $1 per share diluted earnings and without any addition of any acquisitions.

> At this point, I want to point out that we continue to stand firm on that guidance. [22]

(FACAC ¶ 57) During a question and answer period Dumas explained that Flotek had anticipated a sales decline "[b]ecause we were beginning to hear from our customers that . . . some of the operators are taking a pause, a time out, on some of fracing and sure enough, we had about a $1.5 million drop in sales in the chemical division in September over August." [23] (FACAC ¶ 58) When asked "[w]here . . . [does Flotek] stand in terms of the final integration with Triumph, the RTMS and stuff like that to kind of get the last the consolidation benefits out?" [24] Dumas stated "we are going to continue to work on it. I hope that we will see and I think that we will see an improvement in the fourth quarter over the third quarter." [25] (FACAC ¶ 59) Nevertheless, Dumas insisted

---

[22] Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36, pp. 1-3.

[23] Id. at 7.

[24] Id. at 4.

[25] Id.

there is nothing in our planning that doesn't indicate that we are going to continue to grow at the same approximate level [*19] that we have been growing for the last 3-4 years, and that is a 75-80% growth in profits and a, we grew 65% organic in revenues in the third quarter. So we are doing it internally with it's kind of like Wal-Mart same-store sales were up 65%. [26]

(FACAC ¶ 60) In response to these statements, the price of Flotek common stock fell $14.35 per share, or 28%, to close at $36.45 per share on November 29, 2007. (FACAC ¶ 61)

On January 23, 2008, Flotek issued a press release announcing that it was lowering its previously announced guidance for the year ending December 31, 2007. The press release stated:

The Company expects revenues for the 2007 year to be approximately $158 million, generating earnings in the range of approximately $0.88 to $0.92 per diluted share, as compared to prior guidance of $1.00 per diluted share, and actual earnings of $0.61 per diluted share in 2006. The revised guidance is preliminary and subject to audit. Flotek expects to release [*20] final results for the fourth quarter and year ending December 31, 2007 on March 12, 2008.

During the fourth quarter, which historically has been one of Flotek's strongest quarters, revenues were lower than anticipated due to a general slowdown in North American fracturing activity and drilling activity, accompanied by weather disruptions in the mid-continent region.

(FACAC ¶ 63) [27] The press release quoted Dumas as stating:

"The growth fundamentals of our core businesses remain sound, and the pace of North American oilfield service activity seems to be strengthening in January. We believe the business line additions of the last several years will continue contributing to growth in 2008 and beyond as these businesses are integrated and ramp-up matures. We have made a significant investment in 2007 to strengthen our internal controls and expand our information technology processing capability. We anticipate the costs associated with these initiatives to level off in 2008." [28]

Plaintiffs allege that in response to these announcements, the price of Flotek stock fell 30%, or $7.60 per share to close at $17.86 per share on January 24, 2008. (FACAC ¶ 64)

On March 17, 2008, Flotek held a conference call with investors and analysts to discuss the Company's fourth-quarter and full-year results for the period ending December 31, 2007, stating:

Flotek delivered a strong performance in '07 and we earned net income of $16.7 million, or $0.88 per fully diluted share during 2007, compared to $11,400,000 or $0.61 per fully diluted share in '06. Our net income increased 46% and fully diluted earnings per share increased 45% in '07 versus '06. All amounts reflect the two-for-one split we completed in July of '07. Our focus has been clearly on expanding sales and rentals of our proprietary technology-driven products. Because of this company-wide, we increased our gross profit margins from 41% in 2006 to 43% in 2007.

Operating income margin remained constant at 19% in 2007 and 2006. We generated total revenues of $158 million, compared to 101 million in 2006, despite adverse weather and lower gas prices due to lack of pipeline outlets in the Rocky Mountains. Our organic sales growth made approximately 64% of our year-over-year growth. The acquisition of Triumph Drilling Tools, Sooner Energy Services [*22] and CAVO Drilling Motors made up the balance. The chemicals and logistics segment increased revenue 71% year-over-year as a result of 117% growth in our biodegradable environmentally benign "green" chemicals sales. [29]

---

[26] Id. at 11.

[27] Press Release, Exhibit I attached to [*21] Motion to Dismiss, Docket Entry No. 36, p. 1.

[28] Id.

[29] Q4 2007 Earnings Call, Exhibit J attached to Motion to Dismiss, Docket Entry No. 36.

(FACAC ¶ 65)

On March 16, 2009, Flotek issued a press release announcing that the Company had recorded a goodwill impairment of $67.7 million. (FACAC ¶ 66) [30] The impairment caused Flotek to breach a minimum net worth covenant associated with its credit arrangements with various banks. As a result, the Company was forced to enter into a series of amendments to its credit arrangements that limited Flotek's revolving credit line and imposed capital expenditure limitations. [31]

Each of Flotek's press releases ended with a section titled "Forward-Looking Statements" that stated:

> This Press Release contains forward-looking statements (within the meaning of Section 27A of the Securities Act of 1933 (the "Securities Act") and Section 21E of the Securities Exchange Act of 1934) regarding [*23] Flotek Industries, Inc. business, financial condition, results of operations and prospects. Words such as expects, anticipates, intends, plans, believes, seeks, estimates and similar expressions or variations of such words are intended to identify forward-looking statements, but are not the exclusive means of identifying forward-looking statements in this Press Release.

> Although forward-looking statements in this Press Release reflect the good faith judgment of management, such statements can only be based on facts and factors currently known to management. Consequently, forwardlooking statements are inherently subject to risks and uncertainties, and actual results and outcomes may differ materially from the results and outcomes discussed in the forward-looking statements. Factors that could cause or contribute to such differences in results and outcomes include, but are not limited to, demand for oil and natural gas drilling services in the areas and markets in which the Company operates, competition, obsolescence of products and services, the Company's ability to obtain financing to support its operations, environmental and other casualty risks, and the impact of government regulation. [*24] Further information about the risks and uncertainties that may impact the Company are set forth in the Company's most recent filings on Form 10K (including without limitation in the "Risk Factors" Section) and Form 10-Q, and in the Company's other SEC filings and publicly available documents. Readers are urged not to place undue reliance on these forwardlooking statements, which speak only as of the date of this Press Release. The Company undertakes no obligation to revise or update any forward-looking statements in order to reflect any event or circumstance that may arise after the date of this Press Release.[32]

Plaintiffs allege that in August of 2009 Flotek reported another goodwill impairment of $18.5 million, amended its credit arrangements, [*25] and conducted a non-public offering to repay its debt and fund its working capital needs, and announced the departure of defendant Dumas. (FACAC ¶ 68) Plaintiffs allege that Flotek Director, John Chisholm, interim president, later remarked,

> "[A]s I indicated on the second quarter call, one of the most important goals I have as interim President is to provide no nonsense transparency to all of our stakeholders. We have worked diligently to renew lines of communication with all of our stakeholders, and while we still have work to do, we are generally pleased with our efforts today."

(FACAC ¶ 68)

---

[30] March 16, 2009, Press Release, Exhibit Q attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

[31] Id. at 5.

[32] May 8, 2007, Press Release, Exhibit C attached to Motion to Dismiss, Docket Entry No. 36, p. 4. Identical and/or virtually identical statements are included at the end of every press release at issue in this action. See the following press releases attached to Docket Entry No. 36: March 13, 2007, Exhibit A, p. 4; August 2, 2007, Exhibit E, p. 4; October 31, 2007, Exhibit G, p. 5; January 23, 2008, Exhibit I, p. 2; and March 16, 2009, Exhibit Q, p. 10.

## III. **Analysis**

Plaintiffs bring this securities class action on behalf of all persons and entities who purchased or otherwise acquired the publicly-traded securities of Flotek during the Class Period. Plaintiffs assert violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act) and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission (SEC) against Flotek and its senior officers, Jerry D. Dumas, Sr., and Lisa G. Meier. Plaintiffs allege that the defendants made false statements and omissions in four sets of press releases and analysts calls between March [*26] 13 and October 31, 2007. The alleged misstatements and omissions fall into four broad categories: (1) earnings guidance, (2) integration of acquired companies, (3) inventory accounting, and (4) product demand. Defendants contend that the plaintiff's claims are subject to dismissal under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b)(1), because plaintiffs have failed to allege facts sufficient to state a claim for securities fraud in violation of § 10(b), Rule 10b-5, and/or § 20. For the reasons explained below, the court agrees.

### A. Applicable Law

1. Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person:

> To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person, directly or indirectly,

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement [*27] of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(b).

2. Rule 9(b) and Private Securities Litigation Reform Act

Actions for securities fraud filed pursuant to § 10(b) and Rule 10b-5 are subject to the pleading requirements of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, et seq.

(a) Rule 9(b)

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Plaintiffs must also plead the elements of their Rule 10b-5 claims with particularity. See Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003) (citing Williams v. WMX Technologies, Inc., 112 F.3d 175, 177 (5th Cir.), cert. denied, 522 U.S. 966, 118 S. Ct. 412, 139 L. Ed. 2d 315 (1997)). See also Shushany v. Allwaste, Inc., 992 F.2d 517, 520-521 (5th Cir. 1993). Particularity is required so that the [*28] complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. See Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994).

Pleading fraud with particularity in this circuit requires "the particulars of 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained

thereby.'" Id. at 1068 (quoting Tel-Phonic Services, 975 F.2d at 1139). "A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim." Southland Securities, 365 F.3d at 361.

(b) PSLRA

In 1995 Congress amended the 1934 Act through the passage of the PSLRA. In relevant part, the PSLRA, 15 U.S.C. § 78u-4(b)(1), provides that

In any private action arising under this chapter in which the plaintiff alleges that the defendant—
(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make [*29] the statements made, in the light of the circumstances in which they were made, not misleading, the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

In ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002), the Fifth Circuit coalesced the pleading requirements in the PSLRA and Rule 9(b) into a succinct directive for litigants:

[A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A):

(1) specify the [sic] each statement alleged to have been misleading, i.e., contended to be fraudulent;
(2) identify the speaker;
(3) state when and where the statement was made;
(4) plead with particularity the contents of the false representations;
(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason [*30] or reasons why the statement is misleading, i.e., why the statement is fraudulent. This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA.

Where misrepresentations appear in certain types of documents that plaintiffs believe were written by groups, some courts have allowed plaintiffs to link certain defendants to alleged misrepresentations simply by pleading that the defendants were part of the group that likely put the challenged documents together. In re Solv-Ex Corp. Sec. Litig., 210 F.Supp.2d 276, 283 (S.D.N.Y. 2000); In re Worlds of Wonder Sec. Litig., 721 F.Supp. 1140, 1143 (N.D. Cal. 1989). Under this group-pleading-doctrine, the plaintiff need not allege any facts demonstrating an individual defendant's participation in the particular communication containing the misstatement or omission where the defendants are insiders or affiliates of the company. Solv-Ex, 210 F.Supp.2d at 283. The group-pleading-doctrine allows plaintiffs to plead the first element of a section 10(b) case against an individual defendant without citing particular facts connecting the defendant to the alleged fraud.

In Southland the Fifth [*31] Circuit held that group pleading cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to "the defendant" and that scienter be pleaded with regard to "each act or omission" sufficient to give "rise to a strong inference that the defendant acted with the required state of mind."

365 F.3d at 364. Given the PSLRA's directive that each defendant must be enlightened as to his or her part in the alleged fraud, corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded.

However, corporate documents that have no stated author, or statements within documents not attributed to any individual, may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of [*32] the document, containing the statement. Id. at 365. "[T]he corporation itself may be treated as making press releases and public statements issued by authorized officers on its behalf, and statements made by its authorized officers to further the interests of the corporation." Id.

3. Pleading Standards

Section 10(b) and Rule 10b-5 may be violated by using devices, schemes, or artifices, making misstatements or omissions of material fact, or engaging in any act, practice, or course of business that would operate as a fraud in connection with the purchase or sale of any security. To state a claim under section 10(b) of the 1934 Act and Rule 10b-5 the plaintiffs must allege (1) that the defendant made a material misstatement or an omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. See Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co., 597 F.3d 330, 335 (5th Cir. 2010), pet. for cert. filed May 13, 2010 (No. 09-1403).

(a) Misrepresentations and Manipulations

A misrepresentation is not actionable unless it is material. Tuchman, 14 F.3d at 1067. To meet the materiality requirement "there must [*33] be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 108 S. Ct. 978, 983, 99 L. Ed. 2d 194 (1988). "[M]ateriality is not judged in the abstract, but in light of the surrounding circumstances." Rubinstein v. Collins, 20 F.3d 160, 168 (5th Cir. 1994) (quoting Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1448 (5th Cir. 1993)). The appropriate inquiry is whether, under all the circumstances, the statement or omitted fact "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." Id. (quoting Krim, 989 F.2d at 1445).

(b) Scienter

The term "scienter" as applied to conduct giving rise to an action under the Exchange Act and Rule 10b-5 is defined as "a mental state embracing intent to deceive, manipulate or defraud." Lovelace, 78 F.3d at 1018 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S. Ct. 1375, 1381 n.12, 47 L. Ed. 2d 668 (1976)). In order to survive a motion to dismiss, a plaintiff alleging a section 10(b)/Rule 10b-5 claim must [*34] plead facts rendering a plausible inference of scienter that is cogent and at least as strong as any opposing inference one could draw from the facts alleged. Lormand v. US Unwired, Inc., 565 F.3d 228, 250-51 (5th Cir. 2009) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2510-11, 168 L. Ed. 2d 179 (2007)).

> [S]evere recklessness can supply the scienter required to prove securities fraud. Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

Abrams v. Baker Hughes, Inc., 292 F.3d 424, 430 (5th Cir. 2002) (quoting Nathenson v. Zonagen, Inc., 267 F.3d 400, 408-409 (5th Cir. 2001)). "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Lormand, 565 F.3d at 251 (citing Tellabs, 127 S. Ct. at 2509).

**(1) Circumstantial** [*35] **Evidence**

The Fifth Circuit has "never required a plaintiff to present direct evidence of scienter in order to withstand dismissal of his securities claims." Goldstein, 340 F.3d at 246. "[U]nder the PSLRA circumstantial evidence can support a strong inference of scienter." Nathenson, 267 F.3d at 410. Nevertheless, conclusory allegations will not suffice to plead scienter, and the court may not conduct a piecemeal analysis of the alleged facts and circumstances but must, instead, view the totality of the alleged facts and circumstances as a whole to determine whether they raise the requisite strong inference of scienter. See Abrams, 292 F.3d at 430-431 (citing Nathenson, 267 F.3d at 424-425).

**(2) Motive and Opportunity**

Before enactment of the PSLRA the Fifth Circuit followed the Second Circuit's approach that allowed plaintiffs to raise an inference of scienter either by pleading facts that identify circumstances indicating defendants' conscious or severely reckless behavior, or by pleading facts that demonstrate defendants' motive and opportunity to commit securities fraud. Lovelace, 78 F.3d at 1018-1019. See also Melder v. Morris, 27 F.3d 1097, 1102 (5th Cir. 1994), and Tuchman, 14 F.3d at 1068. [*36] Following the PSLRA, however, the Fifth Circuit has "concluded that '[a]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter,' but that allegations of motive and opportunity, without more, will not fulfill the pleading requirements of the PSLRA." Goldstein, 340 F.3d at 246 (quoting Nathenson, 267 F.3d at 412).

Insider trading can be alleged as a form of motive and opportunity. See Southland, 365 F.3d at 368 (citing In re Comshare Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir. 1999) (allegations "that the individual [d]efendants did profit by selling many of their shares at artificially inflated prices during the class period . . . largely tend to illustrate that [d]efendants had the motive and opportunity to commit securities fraud")). However, insider trading will raise a strong inference of scienter only when "in suspicious amounts or at suspicious times." Id. (quoting Abrams, 292 F.3d at 435). See also Central Laborers' Pension Fund, v. Integrated Electric Services, Inc., 497 F.3d 546, 552-53 (5th Cir. 2007) ("Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious [*37] amounts."); In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 987 (9th Cir. 1999) ("insider trading is suspicious only when dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information"). Courts consider the amount and percentage of shares sold, trading history, and timing, including whether other defendants sold shares at the same time, when assessing whether a stock sale qualifies as extraordinary or unusual. See id. (citing In re Silicon Graphics, 183 F.3d at 986).

**(3) Totality of the Circumstances**

All the facts and circumstances alleged must be considered to determine whether they, in toto, raise a requisite strong inference of scienter. Abrams, 292 F.3d at 430; Nathenson, 267 F.3d at 410. Conclusory assertions that the defendant should have known about internal corporate problems based merely on his position or status within the corporation will not suffice to establish scienter. Abrams, 292 F.3d at 432. The mere publication of inaccurate accounting figures or failure to follow Generally Accepted Accounting Principles ("GAAP"), without more, does not establish scienter. Melder, 27 F.3d at 1103. [*38] Allegations that the defendant was motivated to commit fraud to enhance his incentive compensation or to raise capital are also inadequate to establish scienter because "the executives of virtually every corporation in the United States would be subject to fraud allegations." Abrams, 292 F.3d at 434.

(c) Reliance

Plaintiffs must also allege reliance on defendants' material misrepresentations or omissions. In class actions plaintiffs usually premise the reliance element of their claims on the fraud-on-the-market doctrine, which allows plaintiffs who may not have read the alleged misrepresentations to rely upon market conditions reflecting the fraud. The theory is that an established market assimilates all of the available information regarding a particular stock, sets the stock price accordingly, and that investors make their decisions in reliance on the integrity of an informed market. See Basic, 108 S. Ct. at 983. Where material misrepresentations have been placed into the mix of information or where omissions render the market information misleading, the stock price is skewed and investors may be defrauded. Id. Under this theory plaintiffs are entitled to a rebuttable presumption of reliance [*39] when they show that materially misleading statements were, in fact, disseminated into "an impersonal, well-developed market for securities." Id. at 991. Defendants can rebut the presumption by showing that the market price was not affected by their misrepresentations, that the plaintiffs did not trade in reliance on the integrity of the market, or that plaintiffs would have traded despite knowing the statement was false. Id. at 992.

(d) Loss Causation

Under the PSLRA plaintiffs "have the burden of proving that the act or omission of the defendant alleged to violate [the Exchange Act] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). But the PSLRA does not specifically describe what a plaintiff must allege in a complaint in order to plead the "loss causation" element of such a claim. In Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 1631, 161 L. Ed. 2d 577 (2005), the Supreme Court held that the federal securities statutes and regulations "permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." Id. at 1633.

> In other words, the federal laws require "that [*40] a plaintiff prove that the defendant's misrepresentations (or other fraudulent conduct) proximately caused the plaintiff's economic loss." In order to establish this proximate causation, the plaintiff must prove that when the "relevant truth" about the fraud began to leak out or otherwise make its way into the marketplace it caused the price of the stock to depreciate and thereby proximately cause the plaintiff's economic loss.

Lormand, 565 F.3d at 255 (quoting Dura, 125 S. Ct. at 1631, 1633).

4. Section 20(a)

Section 20(a) of the Exchange Act defines "controlling person liability." It provides, in pertinent part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). To establish controlling person liability plaintiffs must show that a primary violation was committed and that the defendants directly or indirectly controlled the violator. See ABC Arbitrage, 291 F.3d at 348 n.57, 362 n.123. See G.A. Thompson & Co., Inc. v. Partridge, 636 F.2d 945, 958 (5th Cir. 1981) (rejecting need to allege that the controlling [*41] person actually participated in the underlying primary violation). Nevertheless, the plaintiff needs to allege some facts beyond a defendant's position or title to show that the defendant had actual power or control over the controlled person. See Dennis v. General Imaging, Inc., 918 F.2d 496, 509-510 (5th Cir. 1990).


**B. Application of the Law to the Facts**

1. Failure to State a Claim for Primary Liability Under Section 10(b)/Rule 10b-5 Claims

The defendants argue that the Exchange Act claims asserted against them should be dismissed because plaintiffs have failed to allege particularized facts showing a material false statement or actionable omission; plaintiffs' claims are barred by the safe harbor for forward-looking statements; plaintiffs' allegations do not support a plausible inference of scienter; and plaintiffs fail to allege loss causation.

(a) Material False Statements or Actionable Omissions

The statements and omissions about which the plaintiffs complain fall into four categories: (1) earnings guidance, (2) integration of acquired companies, (3) inventory accounting, and (4) product demand.

## (1) Earnings Guidance

Plaintiffs allege that throughout the Class Period "[d]efendants repeatedly [*42] highlighted the company's 100% year-overyear growth and promised the market Flotek was poised to achieve $1.00 in diluted earnings per share in 2007." (FACAC ¶ 9) Plaintiffs allege that during a pre-Class Period conference call with analysts held on March 13, 2007, Dumas projected that the Company would "be able to deliver $[1] per share diluted earnings," (FACAC ¶ 42), and that Meier similarly projected that "the Company will generate revenues of $160 million with diluted earnings per share of $[1]." (FACAC ¶ 42) Plaintiffs do not allege that these projections were false when made but, instead, that they "remained alive and uncorrected throughout the Class Period." (FACAC ¶ 43) Plaintiffs allege that during conference calls with analysts held on May 9, 2007, [33] August 3, 2007, [34] and November 1, 2007, [35] Dumas and Meier both reiterated that based on the Company's performance projections they held to their original earnings guidance for 2007 of $1.00 earnings per diluted share. (FACAC ¶ 46 (Dumas and Meier on May 9th), ¶ 52 (Dumas and Meier on August 3rd), ¶ 57 (Dumas on November 1st)) [36]

Plaintiffs allege that, unbeknownst to investors, defendants' statements about earnings guidance were false because undisclosed "internal projections indicated that the Company could not achieve $1.00 per share." (FACAC ¶ 9) However, plaintiffs do not support their allegations with cites to any promises as opposed to estimates of Flotek's 2007 earnings, or to any specific internal projections that contradict and/or conflict with Dumas's and Meier's earnings guidance. Instead, plaintiffs support their allegations that the defendants' statements about earnings guidance were materially false and misleading with statements attributed to CW1 identified as a "Flotek Human Resources Director from August of 2007 through May of 2009." (FACAC ¶¶ 9 and 49(a)(i)) Plaintiffs allege that CW1 heard from Company executives, including Steve Reeves, President of the Downhole Tool Division, Bruce McGovern, who headed up the Drilling Products segment, and Jesse "Jumpy" Neyman, Chief Accounting Officer, that Dumas "'had a habit' of overstating [*44] financial projections to the market" (FACAC ¶ 49(a)(i)), and "had no factual information or projections from anyone to support his positive statements" (FACAC ¶ 49(a)(iv)); but plaintiffs have not identified any specific financial projections that Dumas overstated. Plaintiffs allege that CW1 witnessed a disconnect between Dumas and Meier evidenced by Dumas's habit of regularly jumping in to add a positive spin on numbers that demonstrated a shortfall against expectations or in comparison to prior periods (FACAC ¶ 49(a)(iii), ¶ 55(a)(i), ¶ 62(a)). But plaintiffs fail to identify any specific numbers showing a shortfall or expected shortfall on which Dumas placed an unreasonably positive spin, and fail to identify any specific time, place, or context at which Dumas added a positive spin to such numbers. Plaintiffs allege that during a meeting with Reeves, Neyman, McGovern, Meier, and possibly others that took place during the third or fourth quarter of 2007, "in the middle of descriptions about specific issues causing the problems, Dumas got up to leave and in typical fashion said, 'just go out and find it,' referring to revenues that would meet performance expectations" (FACAC ¶ 62(a)(v), [*45] but plaintiffs fail to identify which issues were raised, and/or why whatever was said about those issues would prove that Dumas's and/or Meier's statements about earnings guidance were materially false and/or misleading.

---

[33] 05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36.

[34] 08/03/2007 [*43] Flotek Earnings Call, Exhibit F attached to Motion to Dismiss, Docket Entry No. 36.

[35] Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36.

The statements attributed to CW1 are not sufficient to raise an inference that Dumas's and Meier's statements about earnings guidance were materially false and/or misleading because they are hearsay lacking factual particularity and specificity required by Rule 9(b) and the PSLRA. The statements attributed to CW1 fail to specify any financial projections that Dumas and/or Meier overstated, fail to specify any dates on which Dumas and/or Meier received financial projections that they overstated, and fail to specify the amounts by which Dumas and/or Meier overstated any financial projections. "The mere fact that a business did not live up to expectations is insufficient to create an inference of fraud." In re Azurix, 198 F.Supp.2d at 882. The statements attributed to CW1 also lack indicia of reliability required by case law to raise an inference that the defendants' statements were materially false and misleading. See ABC Arbitrage, 291 F.3d at 353 (alleged sources of [*46] information must be described "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded"). Because plaintiffs have not alleged any particularized facts capable of establishing that Flotek could not reasonably estimate annual earnings of $1 per share, the court concludes that plaintiffs have failed to plead facts that if true would show that statements attributed to the defendants about Flotek's earnings guidance contained material misstatements or actionable omissions.

### (2) Integration of Acquired Companies

Plaintiffs allege that commenting on a pre-Class Period press release issued on March 13, 2007, Dumas stated "[w]e have brought together a first-rate collection of [9] companies and will continue to focus on integrating them in 2007 to maximize profit" (FACAC ¶ 41), and that during a conference call with investors and analysts following the press release, Dumas stated that "[t]he drilling tool groups will focus on integration this year." (FACAC ¶ 42) Plaintiffs allege that throughout the Class Period defendants touted the integration efforts that would reduce costs and improve Flotek's [*47] margins. (FACAC ¶ 44) Plaintiffs allege that during a conference call with analysts held on May 9, 2007, [37] Dumas stated, "[w]e are actively integrating Triumph Drilling Tools into our existing drilling tool segment" (FACAC ¶ 45), and that during a conference call with analysts held on August 3, 2007, [38] Meier stated that "[t]he integration of Triumph into Flotek has been very successful. We have leveraged off their expertise to help roll out our RTMS to our drilling locations this year which we will further [use to] increase the utilization of our expansive tool inventory." (FACAC ¶ 52) Plaintiffs allege that during a conference call with analysts held on November 1, 2007, Bo McKenzie of Pritchard Capital Partners asked where the Company stood "in terms of the final integration with Triumph . . . and stuff like that to . . . get the last of the consolidation benefits out" (FACAC ¶ 59), to which Dumas responded, "Bo, we are going to continue to work on it. I hope that we will see and I think we will see an improvement in the fourth quarter over the third quarter." (FACAC ¶ 59)

Plaintiffs allege that unbeknownst to investors, defendants' statements about integration of acquired companies were materially false and misleading because

> defendants failed to integrate any of the acquired companies into Flotek, exacerbating the inevitable complexity that ensues from so many acquisitions in such a short period of time. Instead, according to former employees, the acquired companies continued to operate as independent entities within various, separate frameworks for sales, process, technology, finance, accounting and controls (to the extent any controls existed). Flotek simply had no uniform accounting or forecast system in place to integrate and assimilate the acquisitions and was incapable of providing accurate financial results as a result of this lack of due diligence and integration.

(FACAC ¶ 8) However, plaintiffs do not support their allegations with cites to any evidence that Flotek ever reported inaccurate financial results or that any inaccurate financial reports were attributable to Flotek's failure to

---

[37] 05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36.

[38] 08/03/2007 [*48] Flotek Earnings Call, Exhibit F attached to Motion to Dismiss, Docket Entry No. 36.

integrate new acquisitions. Instead, plaintiffs support their allegations [*49] that the defendants' statements about integration of acquired companies were materially false and misleading with statements attributed to CW1, a "Flotek Human Resources Director from August of 2007 through May of 2009," (FACAC ¶¶ 9 and 49(a)(i)), CW2, "a Fixed Asset Accountant who worked for the company from July 2008 through February 2009, performing inventory counts at most of Flotek's tool yards," (FACAC ¶ 49(b)(iv)), CW3, "Flotek's IT Director and Senior Architect from April 2008 to June 2009 . . . [whose] position was akin to the position of a Chief Information Officer[, and who] visited each facility for each division in performing . . . responsibilities to spearhead Flotek's IT initiatives" (FACAC ¶ 49(b)(vi)) and CW4, a person who "worked for Triumph from April 1, 2004 as a Regional Manager responsible for North Texas and Oklahoma until Flotek acquired Triumph in January 2007 . . . [and who i]n March 2008 . . . was transferred to manage the integration of the CAVO and Spidle Turbeco sales forces." (FACAC ¶ 49(b)(xx))

Plaintiffs allege that CW1 heard from Company executives, including Reeves, McGovern, and Neyman, that Dumas "did not integrate anything" (FACAC ¶ 49(b)(i)), "kept [*50] everyone in place doing business the same way with the same system they had" (FACAC ¶ 49(b)(i)), and "had no uniform accounting or forecasting system for the newly acquired companies." (FACAC ¶ 49(b)(ii)) Plaintiffs allege that CW1's statements are corroborated by CW2 who "saw no indication of an integrated, uniform accounting or other management/computer system utilized by Flotek's facilities during CW2's employment[, i.e., July 2008 through February 2009]" (FACAC ¶ 49(b)(v)), and "heard from the people CW2 worked with that when generating sales projections, 'they used whatever they sold the last year and maybe adjusted that as things changed.'" (FACAC ¶ 49(b)(v)) Plaintiffs have failed to allege any particularized facts showing that statements attributed to CW1 and CW2 contradict or otherwise prove that Dumas's statements that in 2007 Flotek was focused on actively integrating its recent acquisitions to maximize profit or Meier's statement that the integration of Triumph Tools had been very successful were materially false and/or misleading. Because plaintiffs have not alleged that the defendants ever stated that Flotek had a uniform accounting or forecast system for new acquisitions, [*51] or that absent such uniform systems Flotek could not reasonably generate sales projections, the statements attributed to CW1 and CW2 are insufficient to raise an inference that defendants' statements about Flotek's efforts to integrate new acquisitions contain material misstatements or actionable omissions. Moreover, plaintiffs' allegations lack any explanation for why CW1, a human resource manager who worked for Flotek during only part of the Class Period, and/or CW2, an accountant who did not work for Flotek during any of the class period, are reliable sources of information about Flotek's efforts to integrate new acquisitions during the Class Period.

Plaintiffs allege that the statements regarding Flotek's integration of new acquisitions attributed to CW1 and CW2 are corroborated by CW3 who worked as Flotek's IT Director and Senior Architect from April of 2008 to June of 2009. Plaintiffs allege that "CW3 learned right away that although Flotek had acquired numerous companies over the past few years, there had been **virtually** no integration." (FACAC ¶ 49(b)(vii) (emphasis added)) According to CW3, Meier explained

> that Flotek had been experiencing "serious inventory problems," and accounting [*52] problems resulting from the various facilities all operating independently. CW3 was to visit each of the facilities for each division, to prepare a detailed integration plan and execute it so that Flotek could begin operating as one.

(FACAC ¶ 49(b)(vii) Plaintiffs allege that

> [a]ccording to CW3, Flotek had not been able to even devise a plan to perform this system integration, that the Company had paid hundreds of thousands of dollars to consultants and "seemed to have gotten nowhere" when CW3 joined in April 2008. CW3 said they were bogged down figuring out what was needed and how to get all the reporting modules, the statistics and "underlying baseline" they needed.

(FACAC ¶ 49(b)(viii))

Far from showing that the statements attributed to Dumas and Meier about Flotek's efforts to integrate new acquisitions during the Class Period were materially false and misleading, the statements attributed to CW3 show

that before CW3 was hired in April of 2008 Flotek had "paid hundreds of thousands of dollars to consultants" in an effort to integrate its newly acquired companies. The only inference to be drawn from the statements attributed to CW3 is that Flotek made efforts to integrate its new acquisitions [*53] in 2007, but had not completed that effort by April of 2008 when CW3 was hired to continue that effort. Thus, even if true, CW3's allegations would only prove that Flotek's efforts to integrate its new acquisitions had not succeeded by April of 2008; they would not prove that Flotek was not focused on actively attempting to integrate its new acquisitions. Nor would CW3's statements prove that the statements about Flotek's integration efforts attributed to Dumas and Meier contained material misstatements and/or actionable omissions.

Plaintiffs allege that the statements attributed to CW2 and CW3 are corroborated by CW4 who worked for Triumph from April 1, 2004, as a Regional Manager responsible for North Texas and Oklahoma, and in March of 2008 was transferred to manage the integration of the CAVO and Spidle Turbeco sales forces. (FACAC ¶ 49(b)((xx)) Plaintiffs allege that

> [a]ccording to CW4, there was no integration in 2007 . . . Flotek was clearly moving too fast buying companies and expecting "too many cooks in the kitchen" to work together in a cooperative organized manner. CW4 saw there would be no possibility of a "seamless" integration of the acquired companies in 2007 or 2008 [*54] as "nobody knew who was supposed to do what" and each was operating the way it always had.

(FACAC ¶ 49(b)(xx)) CW4's statements about Flotek's efforts to integrate its new acquisitions in 2007 are neither sufficiently particularized nor sufficiently reliable to raise an inference that Dumas's statements that Flotek was actively integrating its recent acquisitions to maximize profit in 2007 were materially false and/or misleading because CW4's statements address only the outcome of Flotek's integration effort. CW4 does not cite any particularized facts that, if true, would show that throughout the Class Period Flotek was not focused on actively integrating its new acquisitions, that the efforts Flotek was making to integrate its new acquisitions were unreasonable, or that those efforts could not be expected to accomplish the task of integrating the new acquisitions within a reasonable period of time. Nor are CW4's statements sufficiently particularized to prove that Meier's statement that Triumph had been successfully integrated was materially false or misleading. Meier qualified the statement about which plaintiffs complain, *i.e.*, "[t]he integration of Triumph into Flotek has been very [*55] successful" (FACAC ¶ 52), with the explanation that Flotek had "leveraged off [Triumph's] expertise to help roll out [Flotek's] RTMS to [its] drilling locations this year which [Flotek] will further [use to] increase the utilization of [its] expansive tool inventory." (FACAC ¶ 52) Meier did not state that every aspect of Triumph's business had been successfully integrated but only that Triumph had successfully been integrated into Flotek's RTMS. [39] None of the statements attributed to CW4 would contradict this statement, or prove that Triumph had not been successfully integrated into Flotek's RTMS.

The statements attributed to CW1, CW2, CW3, and CW4 are insufficient to raise an inference that the defendants' statements about Flotek's 2007 efforts to integrate its newly acquired companies were materially false and/or misleading because they are hearsay lacking [*56] specificity required by Rule 9(b) and the PSLRA and lacking indicia of reliability required by case law. See ABC Arbitrage, 291 F.3d at 353. Missing from plaintiffs' allegations about defendants' statements concerning Flotek's 2007 efforts to integrate its new acquisitions is any factual description by plaintiffs of Flotek's integration efforts, any explanation of why those efforts were unreasonable, and/or why those efforts could not be expected to accomplish the task of integrating Flotek's acquisitions within a reasonable period of time. Moreover, plaintiffs' allegations that defendants' statements about Flotek's efforts to integrate its acquisitions in 2007 contained material misstatements and/or actionable omissions are contradicted by

---

[39] See May 8, 2007, News Release, Exhibit C attached to Motion to Dismiss, Docket Entry No. 36. ("We are actively integrating Triumph Drilling Tools into our existing drilling tool segment and have begun the process of rolling out Rental Tool Management Software (RTMS) to better utilize our extensive inventory of rental tools.")

the statements attributed to CW3 that before Flotek hired CW3 in April of 2008, Flotek paid consultants hundreds of thousands of dollars in an effort to integrate its acquisitions. Accordingly, the court concludes that plaintiffs have failed to allege particularized facts that if true would show that statements attributed to Dumas and Meier about Flotek's efforts to integrate newly acquired companies contained material misstatements and/or actionable [*57] omissions.

### (3) Inventory Accounting

Plaintiffs allege that "[i]n order to inflate the price of Flotek's stock, defendants caused the Company to falsely report its results for the first three quarters of 2007 by improperly accounting for its inventory, including its valuation for excess and obsolete inventory, which misstated the Company's reported inventory, gross margin and net income." (FACAC ¶ 73) Plaintiffs allege that the "results for interim 2007 were included in Form 10-Q's filed with the SEC . . . [and] included in press releases disseminated to the public" (FACAC ¶ 74), and that "[d]ue to Flotek's failure to properly account for excess and obsolete inventory, the Company's financial statements were not a fair presentation of Flotek's results and were presented in violation of . . . [GAAP] and SEC rules." (FACAC ¶ 75)

However, plaintiffs do not support their allegation with cites to any specific misstatements of reported inventory, gross margin, or net income. Instead, plaintiffs support their allegations that Flotek's failure to accurately account for its inventory caused Flotek to misstate its interim financial results for 2007 by alleging that Flotek had "huge volumes of old, [*58] unusable inventory throughout several of the acquired companies, including Triumph" (FACAC ¶ 49(c)), and that "Flotek did not adequately reserve for this obsolete inventory during the Class Period." (FACAC ¶ 55(c)) Plaintiffs' allegations about Flotek's failure to properly account for its inventory are based primarily on observations attributed to CW2, "a Fixed Asset Accountant who worked for the Company from July 2008 through February 2009, performing inventory counts at most of Flotek's tool yards" (FACAC ¶ 49(b)(iv)) and CW3, an accountant who began working for Flotek in April of 2008 and did on-site inspections. (FACAC ¶ 49(b)(vii))

Plaintiffs allege that "[d]uring inventory at the Spidle Turbeco tool yards, CW2 found large volumes of old, rusting and otherwise unusable tools which were scheduled to sit on Flotek's books for as many as seven years as usable assets being depreciated." (FACAC ¶ 49(c)(i)) Plaintiffs allege that while CW2 was employed by Flotek, i.e., July 2008 through February 2009, Flotek's former Controller, Julie Schwendimann, told CW2 that Reeves and McGovern could not understand why the plants in their division were keeping obsolete tools on their books for up [*59] to seven years, that according to McGovern, Flotek executives wanted to maintain the obsolete inventory as assets on Flotek's books under the rationale that the tools could be cut up or changed in a way that would make them usable, but that CW2 never observed that practice. (FACAC ¶ 49(c)(ii) and (viii))

Plaintiffs allege that CW3 learned from Meier "that tool inventory accounting and tracking was intended to be performed on Flotek's RTMS that had begun implementation in 2006 or 2007 . . . [but that] there had been an inventory accounting performed in early 2007 that demonstrated the RTMS was seriously inadequate . . . because too many plant level personnel had direct access to input or change information . . . [and t]his created an array of problems, including failures to show that a tool had been transferred to another facility or a customer site." (FACAC ¶ 49(b)(ix)) Plaintiffs allege that Meier told CW3 "that the 2007 inventory accounting project was the result of concerns that assets may have been overstated and thus they wanted to 'get it cleaned up,' and get integrated" (FACAC ¶ 49(b)(xiv)), and that "when the inventory team went out in early 2007, the RTMS was so inaccurate [*60] they had to perform physical counts by hand[, and that t]he same was true again during the 2008 count." (FACAC ¶ 49(b)(xix)) According to CW3, these inventory accounting concerns "resulted in material variations and inconsistencies that necessitated yet another, and more comprehensive physical inventory count in 2008[, and that t]his count was performed sometime in May or June 2008." (FACAC ¶ 49(b)(ix)) Plaintiffs allege that Schwendimann told CW3 that

the dollar value of old and unusable tools, determined through the inventory counts and efforts to reconcile the RTMS with actual inventories at the various locations, equated to millions of dollars that would eventually come off of Flotek's books. Schwendimann explained that this was one component of an "impairment charge" that Flotek was going to take in 2008. Schwendimann told CW3 that these were assets that should not be on the books, and that there were things on the books that were "very inaccurate" and this was to be "part of the goodwill write-off."

(FACAC ¶ 49(b)(xvii))

According to CW3, Flotek's inventory problems were particularly acute at CAVO. Plaintiffs allege that "CW3 personally saw large volumes of junk inventory strewn [*61] around CAVO yards, clearly unusable and rusting" (FACAC ¶ 49(b)(xi)), and that in the fall to latter part of 2008, RTMS expert contractor, Michelle Hill, discovered what amounted to "two sets of books" at CAVO, and learned that Flotek's Controller, Schwendimann, "was well aware of the two sets of books." (FACAC ¶ 49(b)(xii)) According to CW3, Schwendimann confirmed that accounting entries from prior periods dating back to the time of the CAVO acquisition had been changed to remove certain inventory as assets, but that "reclassifications" were performed to inflate CAVO's value to a level that supported its acquisition price. (FACAC ¶ 49(b)(xiii))

Plaintiffs allege that "[u]ltimately, at year-end 2007, during a quarter in which Flotek's financial statements were audited, the company increased its allowance of excess and obsolete inventory to above 10% of gross inventory, up from less than 8% in each of the prior quarters." (FACAC ¶ 81)

On March 16, 2009, Flotek issued a press release announcing that the Company had recorded a goodwill impairment of $67.7 million, [40] which caused Flotek to breach a minimum net worth covenant associated with its credit arrangements with various banks, and [*62] forced Flotek to amend its credit arrangements in ways that limited its revolving credit line and imposed capital expenditure limitations. [41] (FACAC ¶ 66) In the press release Flotek explained that

> [t]he impairment charge resulted from management's comparison of the current asset carrying values to their fair-value. The economic outlook in 2009 caused management to reach the conclusion that the fair market value of those identified assets had been lowered, or "impaired". [42]

Plaintiffs allege that in August of 2009 Flotek reported another goodwill impairment of $18.5 million, amended its credit arrangements, conducted a non-public offering to repay its debt and fund its working capital needs, and announced the departure of defendant Dumas. (FACAC ¶ 66)

The statements attributed to CW2 and CW3 are insufficient to raise an inference that problems associated with Flotek's inventory accounting caused Flotek's financial reports for the first three quarters of 2007 to be materially false and/or misleading because they lack factual particularity and specificity required by Rule 9(b) [*63] and the PSLRA. None of the statements attributed to either CW2 or CW3 explain (1) why either of these CWs, one a fixed asset accountant and the other an IT director, was competent and/or capable of identifying tools that were old, obsolete, or unusable, (2) why seven years was an unreasonable amount of time for Flotek to keep tools on its books, or (3) why Flotek should not hold old and obsolete tools on its books until they could be sold as scrap. Moreover, although CW3 says that the RTMS inventories were inaccurate because too many plant-level personnel had direct access to input and change information, and that the RTMS inaccuracies prompted hand counts of inventory in 2007 and again in 2008, neither CW2 nor CW3 provides particularized facts showing that the hand counts were inaccurate, or that Flotek did not adjust its allowance for excess and obsolete inventory to above 10%

---

[40] March 16, 2009, Press Release, Exhibit Q attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

[41] Id.

[42] Id. at p. 2.

of gross inventory, up from 8%, as soon as the data on which that adjustment was based became available. Nor does either of these two CWs provide any facts demonstrating the amounts by which Flotek's allegedly improper accounting for its inventory caused the Company to misstate its reported inventory, gross [*64] margin, or net income. Accordingly, the court concludes that plaintiffs have failed to allege particularized facts that if true would show that any problems Flotek had with its inventory accounting during the Class Period caused Flotek's 2007 interim financial statements to contain material misstatements and/or actionable omissions.

### (4) Product Demand

Plaintiffs allege that the defendants made materially false statements regarding continuing demand for Flotek's products by stating that sales had been "deferred" and/or "delayed" when, in fact, the defendants knew that the sales in question had been lost. Plaintiffs allege that during a conference call with analysts held on May 9, 2007, [43] Dumas stated "we have not seen a slow down in any of our three operating segments exclusive of the weather that just delayed some of our activities." (FACAC ¶ 46) Plaintiffs allege that during a conference call with analysts held on November 1, 2007, Dumas explained during a question and answer session that Flotek had actually anticipated a sales decline during the third quarter but, nevertheless, assured investors that the decline was only temporary. In response to a question posed by Joe Hill of Wachovia [*65] Capital about the weekly run rate of sales for an emulsion chemical, Dumas stated:

> . . . I visited with our people, and I said[,] I see that July numbers were moving up. We had the second largest month that we had in and it looked like August is going to be better. And do you see this as a trend? *And their comment is no, I don't think so. Because we were beginning to hear from our customers that we sell . . . the microemulsion to[,] that some of the operators are taking a pause, a time out, on some of fracing and sure enough, we had about a $1.5 million drop in sales in the chemical division in September over August.* Then we had a pickup in October. I am certainly hopeful and right now it appears that we are still moving forward, so we could have about a $2 million increase in sales in the chemical division or more in the fourth quarter. Because it appears that they are beginning to do a little more fracing.
>
> . . .
>
> We saw a pause in the fracing work. But that seems to some how or another, based on what we're seeing right now, that pause seems to have been eliminated . . . But we clearly had a reduction in their proprietary chemicals, which is our — primarily our microemulsion. And that [*66] was the reason we have a small decrease in the gross profit margin in the chemical group. But we do not consider that a trend. It was only a short-term adjustment.

(FACAC ¶ 58 (emphasis in original))

Plaintiffs allege that unbeknownst to investors, Dumas's statements about product demand were materially false and misleading because "defendants knew by early 3Q07 that sales had not been 'delayed,' but that decreasing drilling and fracing activity would further erode sales throughout 2007 and impact the Company's margins by 30%." [44] Plaintiffs support these allegations with statements attributed to CW1, a "Flotek Human Resources Director from August of 2007 through May of 2009." (FACAC ¶¶ 9 and 49(a)(i)) Plaintiffs allege that

> [w]ith respect to the Drilling Products segment, defendants knew that the pricing pressure would continue to negatively impact both sales and margins. According to CW1, McGovern confided in CW1 that he felt Dumas had unfairly committed the Drilling Products segment to positive results for 4Q07 and to meet 2007 expectations. According to CW1, the very problems Dumas admitted [*67] to having in 3Q were not going to

---

[43] 05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36.

[44] Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 9 (citing FACAC ¶¶ 49(d), 55(d), 58-59).

be clearing up, yet the CEO assured the market problems were already "eliminated" by the end of 3Q07. McGovern told CW1 that Dumas could not be reasoned with, that the CEO would not listen to what he and the other operating division thought "was realistic."

(FACAC ¶ 62(d))

CW1's statements about Flotek's product demand are insufficient to raise an inference that the statements about which plaintiffs complain were materially false and/or misleading because those statements are neither sufficiently particularized nor sufficiently reliable to prove that Dumas's statements were materially false and/or misleading. CW1 states that McGovern confided that he felt Dumas had unfairly committed the Drilling Products segment to positive results for 4Q07 and to meet 2007 expectations, but fails to allege facts that show the basis for McGovern's opinion or that he had communicated it to defendants. CW1 states that "the very problems Dumas admitted to having in 3Q were not going to be clearing up," but fails to allege any facts showing why those [*68] problems were not going to clear up, or why CW1's belief that they were not going to clear up was reasonable. Accordingly, the court concludes that plaintiffs have failed to allege particularized facts that if true would show that Dumas's statements about Flotek's product demand made during the Class Period contained material misstatements and/or actionable omissions.

### (5) Conclusions as to False Statements

Because plaintiffs have not alleged any particularized facts capable of establishing that Flotek (1) could not reasonably estimate 2007 annual earning of $1 per share; (2) did not actively attempt to integrate newly acquired companies; (3) did not accurately report Flotek's financial results, including inventory, gross margin, and net income; and (4) did not reasonably expect that demand for its products would remain stable, the court concludes that plaintiffs have failed to plead facts that if true would prove that the statements attributed to the defendants about Flotek's earnings guidance, integration of new acquisitions, inventory accounting, and product demand contained any material misstatements and/or actionable omissions.

### (b) Safe Harbor for Forward-Looking Statements

The PSLRA [*69] creates a safe harbor for forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A). Citing ABC Arbitrage, 291 F.3d at 336, defendants contend that plaintiffs' Exchange Act claims are barred under both the PSLRA and common law prohibitions on liability for forward-looking statements because "Flotek did not 'guarantee' anything and consistently warned that actual results could differ from guidance." [45] Id. at 359 (quoting Krim, 989 F.2d at 1446) ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws.")). Plaintiffs respond that the statutory safe harbor provided for forward-looking statements does not apply to any of the allegedly false statements pleaded in the FACAC because "the alleged misrepresentations and omissions concerned present facts and the 'cautionary language' was insufficient to afford protection to defendants' statements." [46] For the reasons explained below, the court concludes that all but one of the statements regarding [*70] earnings guidance, integration of acquired companies, and product demand about which plaintiffs complain are protected by the safe harbor provision because they are forward-looking statements that were accompanied by specific cautionary disclosures. The single exception is Meier's August 3, 2007, statement that "[t]he integration of Triumph into Flotek has been very successful. We have leveraged off their expertise to help roll out our RTMS to our drilling locations this year which we will further [use to] increase the utilization of our expansive tool inventory." (FACAC ¶ 52)

---

[45] Defendants' Motion to Dismiss, Docket Entry No. 36, p. 19.

[46] Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 11.

However, for the reasons explained in § III.B.1(a)(2) above and in § III.B.1(c) below, the court concludes that the statement Meier made on August 3, 2007, is not actionable.


## (1) Earnings Guidance

Plaintiffs allege that during conference calls with investors and analysts on March 13, 2007, [47] May 9, 2007, [48] August 3, 2007, [49] and November 1, 2007, [50] defendants stated that based on the Company's performance projections their earnings guidance for 2007 was $1.00 earnings [*71] per diluted share. (FACAC ¶¶ 42, 46, 52, 57) These earnings guidance statements were forward-looking and were accompanied by both general statements of caution and by specific cautionary disclosures. The March statements were accompanied by specific cautionary disclosures that Flotek had recently undergone an "exorbitant" audit process in 2006 due to the first year of Sarbanes-Oxley compliance, would not raise per share earnings guidance above $1 per share for fiscal year 2007, and could not give guidance regarding its margins because Flotek had a lot of acquisitions to integrate. [51] The May statements were accompanied by specific cautionary disclosures that weather adversely affected activity levels, that Flotek had experienced a significant increase in administrative costs, and that information provided about Triumph and CAVO were based on only two months of experience. [52] The August statements were accompanied by specific cautionary disclosures that Flotek's major customers had experienced a slowdown, that the weekly run rate in July was "not good," and that revenue was "hopefully delayed rather than lost." [53] The November statements were accompanied by specific cautionary statements [*72] from Dumas that he was "hopeful" that Flotek was still moving forward and could have a $2 million sales increase in October, but that Flotek's costs were increasing due, in part, to expansion of accounting and support personnel, and that Flotek could only "guesstimate" the Sarbanes-Oxley expenses, which Meier predicted to be approximately $1 million in 2007. [54] Moreover, Dumas candidly opined that there had been "some irrational exurberance" in the marketplace about Flotek's stock price, and that the $50-$55 peak price during the third quarter was "pretty rich." [55]


## (2) Integration of Acquired Companies

Plaintiffs allege that defendants made statements in press releases and/or conference calls with investors and analysts on March 13, 2007, [56] May 8, 2007, [57] August 2, 2007, [58] and October 31, 2007, [59] touting Flotek's efforts

---

[47] 03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[48] 05/09/2007 Flotek Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[49] 08/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[50] Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[51] 03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 1 (audit), 6 (EPS estimate), and 7-8 (inability to give guidance on margins).

[52] 05/09/2007 Flotek [*73] Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 1 (weather), 4 (costs), 3 and 6 (Triumph and CAVO).

[53] 08/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 4 (slowdown and weekly run rate), and 13 (revenue "hopefully" delayed).

[54] Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 2 and 6 (costs), 7 ("hopeful" about sales), and 11 (Sarbanes-Oxely "guesstimate").

[55] Id. at 11.

[56] 03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

to integrate its recently acquired companies. (FACAC ¶¶ 41-42, 45, 52, and 59) The integration statements made on each of these dates were forward-looking and accompanied by both general statements of caution and by specific cautionary disclosures. The March statements were accompanied by specific cautionary disclosures that Flotek would need to spend significant efforts integrating recently acquired companies. [*74] [60] The May statements were accompanied by specific cautionary disclosures that statements about Triumph and CAVO were based on only two months of experience. [61] Moreover, when asked about the integration of Flotek's previously acquired companies during the November 1, 2007, conference call, Dumas stated that "we are going to continue to work on it. I hope that we will see and I think we will see an improvement in the fourth quarter over the third quarter." [62]


### (3) Product Demand

Plaintiffs allege that defendants made materially false statements during conference calls with investors and analysts on May 9, 2007, [63] and November 1, 2007, [64] about continuing demand for Flotek's products by stating that sales had been "deferred" and/or "delayed" when, in fact, they knew that the sales in question had been lost. (FACAC ¶¶ 46 and 58) The product demand statements made on each of these dates were forward-looking statements that were accompanied by both general statements of caution and by specific qualifying and/or cautionary disclosures. Specific disclosures in May cautioned that statements about Triumph were based on only two months' experience, [65] and specific cautionary statements made in November disclosed that low gas prices and pipeline capacity constraints significantly reduced activity, that 25% fewer drilling rigs were operating during the third quarter of 2007 than during the same quarter of 2006, that competitors were cutting prices, and that the market was showing some "irrational exuberance" about Flotek's expectations and stock price. [66]

(c) Scienter

The critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to [each of the defendants] such that [a] strong inference of scienter on their part is appropriate." Goldstein, 340 F.3d at 249. In determining whether a plaintiff's allegations support a strong inference of scienter, the court must consider all facts, circumstances, and allegations in toto. Goldstein, 340 F.3d at 246; Abrams, 292 F.3d at 431 ("the allegations should not be read in isolation, but taken together as a whole to see if they raise the necessary strong inference of scienter"). See also Nathenson, 267 F.3d at 425. Under the Supreme Court's decision in Tellabs, 127 S. Ct. at 2510, "a court must take into account plausible inferences opposing as well as supporting a strong [*77] inference of scienter. Id. The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or 'permissible.'" Indiana Electrical Workers Pension Trust Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 533 (5th Cir. 2008) (quoting Tellabs, 127 S. Ct. at 2510).

---

[57] 05/09/2007 Flotek Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[58] 08/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[59] Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[60] 03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 3.

[61] 05/09/2007 Flotek Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 6.

[62] Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry [*75] No. 36, p. 4.

[63] 05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket [*76] Entry No. 36.

[64] Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36.

[65] 05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36, p. 6.

[66] Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36, pp. 2, 4, 10, and 11.

**(1) Dumas**

Dumas argues that the Exchange Act claims asserted against him should be dismissed because plaintiffs have failed to allege with particularity facts showing that he made any misrepresentations about Flotek's earnings guidance, integration efforts, inventory accounting, product demand, or finances; or that he made any misrepresentations with scienter. Plaintiffs respond that the Exchange Act claims asserted against Dumas should not be dismissed because his public admissions, knowledge of Flotek's false financial projections and GAAP violations, and his stock sales all show that he acted with scienter when he knowingly or recklessly certified the following false and misleading financial statements during the Class Period: First Quarter Form 10-Q filed on May 10, 2007, Second Quarter Form 10-Q filed on August 9, 2007, and Third Quarter Form 10-Q filed on September 30, 2007.

(i) <u>Public Admissions</u>

Plaintiffs [*78] contend that

> Dumas' admissions reveal that in August 2007 he was aware of facts that directly contradicted statements he made to the public at that time. During the August 2007 earnings call, Dumas reassured investors that Flotek "had not seen a reduction in demand for [its] products" and that despite "$4 million in total revenue" that was not booked due to inclement weather, "[w]e are very confident that a vivid portion of that was delayed, and [that we] will pick it up" . . . Although Dumas did not admit it until October 2007, he knew at the time he made those statements that customers were advising Flotek that "some of the operators are taking a pause, a time out, on some of [the] fracing" and that Flotek was expecting a further sales decline — not a "pick up" — of deferred sales. . . Indeed, as customers were advising defendants of a slowdown in drilling, defendants were bracing for the imminent price cutting, as evidenced by Dumas' admission that "we made a decision; we were not going to cut prices. No question about it, we knew what we did. And we knew that we were absolutely going to lose some market share, because we've actually seen price discounts up to 28% and we made a decision [*79] to ignore that and it has cost us some revenue." [67]

Plaintiffs contend that Dumas's admissions demonstrate his knowledge that Flotek expected diminished sales in 3Q07 and that he intended to deceive investors to capitalize on Flotek's inflated stock price.

Defendants contend, and the court agrees, that there is no inconsistency between Dumas's statements in August and November. During the August 3, 2007, conference call Dumas stated that inclement weather shut down drilling activity and delayed dramatically the amount of frac activity that was going on in Texas and Oklahoma, that the July run rate was not good, that customers were taking pauses in fracing, that Flotek had experienced a slowdown, and that Flotek had "determined by talking to . . . customers [in the mid-continent region that there was] . . . a ten week backlog of frac jobs." [68] Dumas also disclosed on August 3, 2007, that these delays reduced Flotek's second-quarter earnings by $3-4 million, and that the revenue from these jobs was "hopefully delayed rather than lost." [69]

Although plaintiffs attempt to create an inference that Dumas already knew at the beginning of August that there would be an additional slowdown and price cutting in September, the evidence does not support such an inference. Dumas's August 3, 2007, statement that revenues were "hopefully delayed rather than lost" appears to have had a reasonable basis because Flotek's total revenues and chemical sales undisputedly increased during the third quarter:

---

[67] Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, pp. 15-16.

[68] 8/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' [*80] Motion to Dismiss, Docket Entry No. 36, p. 4.

[69] <u>Id</u>. at 13.

Flotek generated total revenues in the third quarter of $42 million compared to . . . 38 million in the second quarter of '07. . . During the third quarter sales of our green chemical grew 5% over the prior quarter. While total sales for the Chemical and Logistics segment grew 10%. [70]

The fact that Flotek's total revenues and chemical sales actually increased during the third quarter substantiate Dumas's August 3, 2007, statement that "we have not seen a reduction in demand for our products." [71] The court concludes that the discrepancies that plaintiffs contend exist between Dumas's August and November statements neither exist nor create a strong inference of scienter.

(ii) Knowledge of Flotek's Financial Projections and GAAP Violations

Plaintiffs contend that the following allegations contained in the FACAC establish a strong inference that Dumas acted with scienter because they show that Dumas knew or recklessly disregarded that Flotek's financial projections were false and in violation of GAAP:

Defendant Dumas spoke directly with executives in the Divisions to discuss . . . reports and financial projections (¶49(b)(ii)), but intentionally ignored the projections that were stated to him, and touted false projections to the market in May, August and October of 2007, because Dumas "never wanted to hear any bad news" and would tell the divisions to "just go out and find it" if they were not projecting the numbers Dumas wanted. ¶¶49(a)(i), 49(a)(iv), 55(d)(ii)-(iii), 62(a)(i)-(v), 62(d) . . .

At a minimum, Dumas' "egregious refusal to see the obvious, or to investigate the doubtful" demonstrates his severe recklessness with respect to giving guidance to investors . . . [*82] Indeed, Defendant Dumas' severe recklessness is demonstrated by the Division presidents' consensus that he should be "[kept] away from the analysts" because he "had a habit" of overstating financial projections to Wall Street (¶49(a)(i)) and touting guidance that the Division presidents told him was "impossible" to achieve and "not fair" to investors (¶62(a)(i)-(ii)). See also ¶49(a)(iii)-(iv) (management "cringed" at projections Dumas stated to the market that were contrary to actual performance because he would just "make it up as he went"). [72]

These allegations fail to establish a strong inference of scienter that is cogent and at least as compelling as the inference that Dumas's conduct was not fraudulent because they fail to identify any specific communications or reports that directly contradicted Dumas's public statements, fail to identify any individual who provided such communications or reports to Dumas, and fail to establish that such communications or reports had been provided to Dumas before he made any of the public statements about which the plaintiffs complain. Nor do plaintiffs allege any facts showing that any of Flotek's financial projections were false or in violation [*83] of GAAP, or that Dumas knew that Flotek's financial projections were false or in violation of GAAP. See Abrams, 292 F.3d at 432 (dismissing complaint where plaintiffs could "point to no specific internal or external report available [to the Defendants] at the time of the alleged misstatements that would contradict them"); Shaw Group, 537 F.3d at 539 (allegation that executive was "informed, in great detail, by a former . . . project controls manager, of all the problems associated with the use of Shaw-Tac" insufficient); Southland, 365 F.3d at 376 (allegation that individual defendants were told by programmers of alleged problems insufficient). The court concludes that the allegations against Dumas on which plaintiffs rely to establish that Dumas acted with scienter do not create a strong inference of scienter.

(iii) Stock Sales

Plaintiffs allege that in May and August of 2007 while in possession of adverse, material, undisclosed information about the Company, Dumas sold 186,816 shares of his Flotek stock for over $5 million in illegal insider-trading

[70] Q3 2007 Earnings [*81] Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

[71] 8/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 3.

[72] Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, pp. 17-19.

proceeds. (FACAC ¶ 90) Plaintiffs argue that [*84] the size and timing of Dumas's sale is probative of scienter. (FACAC ¶ 91)

Plaintiffs allege that Dumas made sales on two days in May of 2007, shortly after the beginning of the Class Period, at prices that ranged from $22.25 to $22.57, and sales on four days in August of 2007 at prices that ranged from $31.00 to $33.00 — prices that were far below the alleged Class Period high of $53.49. (FACAC ¶ 101) Far from being suspiciously timed or calculated to maximize personal benefit from allegedly undisclosed information, the timing of Dumas's sales is not consistent with fraudulent intent. See Nathenson, 267 F.3d at 420-421 (sales well below the class period high were "so inauspiciously timed" that they "do not meet this test"); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1093-1096 (9th Cir. 2002) (sales made at $20 to $25 were not suspicious — even if in substantial quantities — where stock price peak was several months later at $39). Moreover, although plaintiffs allege that Dumas's sales were made while Dumas possessed undisclosed information about the Company (FACAC ¶ 89), plaintiffs fail to plead particularized facts showing what undisclosed information about the Company Dumas [*85] possessed.

The court concludes that Dumas's stock sales are not sufficient to raise any inference of scienter because plaintiffs fail to allege facts that connect the sales to any alleged fraud or that show that the sales were extraordinary or otherwise suspicious. Although plaintiffs allege that Dumas's 2007 stock sales "well exceeded [his] pre-Class Period sales," plaintiffs fail to allege any facts about Dumas's trading history. Plaintiffs' failure to plead facts showing Dumas's trading history negates any inference of scienter. See Silicon Graphics, 183 F.3d at 986 (defendant's trading history is a critical element in analyzing whether a sale is unusual or suspicious); Abrams, 292 F.3d at 435 (insider selling must be unusual to have meaningful probative value); Nathenson, 267 F.3d at 420-421 (same).

(iv) Conclusions

The Fifth Circuit has stated that the critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to [each of the defendants] such that [a] strong inference of scienter on their part is appropriate." Goldstein, 340 F.3d at 249. When considered [*86] in toto, the allegations asserted against Dumas fail either to state a claim or to raise a strong inference of scienter because they are no more than conclusory assertions of wrongdoing unsupported by particularized facts that connect him to any alleged fraud.


**(2) Meier**

Meir argues that the Exchange Act claims asserted against her should be dismissed because plaintiffs have failed to allege with particularity facts showing that she made any misrepresentations about Flotek's earnings guidance, integration efforts, inventory accounting, product demand, or finances or that she made any misrepresentations with scienter. Plaintiffs respond that the Exchange Act claims asserted against Meier should not be dismissed because her knowledge of Flotek's false financial projections and GAAP violations, and her stock sales all show that she acted with scienter when she knowingly or recklessly certified the following false and misleading financial statements during the Class Period: First Quarter Form 10-Q filed on May 10, 2007, Second Quarter Form 10-Q filed on August 9, 2007, and Third Quarter Form 10-Q filed on September 30, 2007.

(i) Knowledge of Flotek's Financial Projections and GAAP Violations

Plaintiffs [*87] contend that the following allegations in the FACAC establish a strong inference of Meier's scienter because they show that she knew that Flotek's financial projections were false and that Flotek's financial statements for the first three quarters of 2007 were false:

. . . Meier received financial results and projections from the Division presidents through conversations and through monthly profit and loss reports, and participated in meetings to discuss financial results and prospects prior to quarterly closing . . .

. . . Defendant Meier — the CFO — was acutely aware of Dumas' inaccurate forecasting to the market and his recitation of lofty numbers that did not correspond to those prepared by the operating divisions. ¶62(a)(i)-(v). Despite her duty to shareholders and her opportunity to correct Dumas during quarterly earnings calls, Meier not only failed to correct the CEO, but she also knowingly reiterated the same false guidance projections touted by Dumas. ¶¶55(a)(i), 62(a)(i)-(ii). Accordingly, plaintiffs have adequately alleged that [Meier] knew [her] public statements concerning guidance were false and issued with utter disregard for internal reports and management consensus [*88] demonstrating $1.00 EPS was unachievable. [73]

Plaintiffs' allegations fail to establish a strong inference of scienter that is cogent and at least as compelling as the inference that Meier's conduct was not fraudulent because they fail to identify any specific communications or reports that directly contradicted Dumas's and/or Meier's public statements, fail to identify any individual who provided such communications or reports to Meier, and fail to establish that such communications or reports had been provided to Meier before she made any of the public statements about which plaintiffs complain. See Abrams, 292 F.3d at 432; Shaw Group, 537 F.3d at 539; Southland, 365 F.3d at 375-76. Accordingly, the court concludes that the allegations against Meier on which plaintiffs rely to establish that she acted with scienter, do not create a strong inference of scienter.

(ii) Stock Sales

Plaintiffs allege that in May, August, and December of 2007 while in possession of undisclosed information about the Company, Meier sold 40,000 shares of Flotek stock for over $1 million in illegal insider-trading proceeds. [*89] (FACAC ¶ 90) Plaintiffs argue that the amount and timing of Meier's stock sales are probative of scienter. (FACAC ¶ 91)

Plaintiffs allege that Meier made sales on three days in May of 2007, shortly after the beginning of the Class Period, at prices that ranged from $22.31 to $23.80, a sale on one day in August of 2007 at the price of $32.30, and sales on two days in December of 2007 at prices of $35.20 and $36.10; prices that were all far below the alleged Class Period high of $53.49. (FACAC ¶ 101) Far from being suspiciously timed or calculated to maximize personal benefit from allegedly undisclosed information, the timing of Meier's stock sales is not consistent with fraudulent intent. See Nathenson, 267 F.3d at 420-421 (sales well below the class period high were "so inauspiciously timed" that they "do not meet this test"); In re Vantive Corp., 283 F.3d at 1093-1096 (sales made at $20 to $25 were not suspicious — even if in substantial quantities — where stock price peak was several months later at $40). Moreover, although plaintiffs allege that Meier's sales were made while Meier possessed undisclosed information about the Company (FACAC ¶ 89), plaintiffs fail to plead particularized [*90] facts showing what undisclosed information about the Company Meier possessed.

The court concludes that Meier's stock sales are not sufficient either to state a claim or to raise any inference of scienter because plaintiffs fail to allege facts that connect the sales to any alleged fraud or that show that the sales were extraordinary or otherwise suspicious. Although plaintiffs allege that Meier's 2007 stock sales "well exceeded [her] pre-Class Period sales," plaintiffs fail to allege any facts about Meier's trading history. Plaintiffs' failure to plead facts showing Meier's trading history negates any inference of scienter. See Silicon Graphics, 183 F.3d at 986 (defendant's trading history is a critical element in analyzing whether a sale is unusual or suspicious); Abrams, 292 F.3d at 435 (insider selling must be unusual to have meaningful probative value); Nathenson, 267 F.3d at 420-421 (same).

---

[73] Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, pp. 17-18.

(iii) <u>Conclusions</u>

The Fifth Circuit has stated that the critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to [each of the defendants] such that [a] strong inference [*91] of scienter on their part is appropriate." <u>Goldstein</u>, 340 F.3d at 249. When considered in toto, the allegations asserted against Meier fail either to state a claim or to raise a strong inference of scienter because they are no more than conclusory assertions of wrongdoing unsupported by particularized facts that connect her to any alleged fraud.

(d) Loss Causation

Plaintiffs allege that during the Class Period the defendants engaged in a scheme to deceive the market into believing that Flotek could meet guidance for fiscal year 2007, that Flotek was successfully integrating its new acquisitions, and that sales would not decrease. Plaintiffs allege that defendants' scheme artificially inflated the price of Flotek common stock and operated as a fraud or deceit on Class Period purchases of that stock by failing to disclose materially adverse facts. (FACAC ¶¶ 99-105) Asserting that plaintiffs have identified only two sets of "corrective disclosures," neither of which revealed the falsity of any prior alleged misstatements, defendants contend that they are entitled to dismissal because plaintiffs have failed to allege facts that if true would establish that the defendants' acts or omissions [*92] caused the losses for which the plaintiffs seek to recover. [74] For the reasons explained above in section III.B.1(a) pursuant to which the court has already concluded that plaintiffs have failed to allege particularized facts showing that the statements about which they complain contained any material misstatements or actionable omissions, the court agrees that the plaintiffs have failed to properly allege loss causation.

2. <u>Section 20(a) Control Person Claims</u>

Plaintiffs allege that Dumas and Meier

> acted as controlling persons of Flotek within the meaning of §20(a) of the Exchange Act. . . By reason of their positions as officers and/or directors of Flotek, and their ownership of Flotek stock, the Individual Defendants had the power and authority to cause Flotek to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

(FACAC ¶ 113)

Section 20(a) of the 1934 Act imposes liability on anyone "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). [*93] Because the plaintiffs have failed to plead a violation of section 10(b) and Rule 10b-5 against the controlled person, i.e., Flotek, there can be no liability against Dumas or Meier under §20(a). <u>In re Capstead Mortgage Corp. Securities Litigation</u>, 258 F.Supp.2d 533, 566 (N.D. Tex. 2003). Accordingly, the § 20(a) claims alleged against Dumas and Meier will be dismissed.

3. <u>Conclusions</u>

Plaintiffs allege violations of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), against Dumas, Meier, and Flotek. For the reasons explained above, the court concludes that the plaintiffs have failed to allege particularized facts showing that any of the statements about which plaintiffs complain contained a material misstatement or actionable omission, and that instead, plaintiffs' allegations show that all but one of those statements is subject to protections afforded by the safe harbor provision. The court also concludes that plaintiffs have failed to allege particularized facts establishing a strong inference of scienter against Dumas or Meier, or that any of the defendants' acts and/or omissions about which the plaintiffs complain caused the

---

[74] Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 29-30.

losses [*94] for which the plaintiffs seek to recover. Accordingly, the § 10(b) and Rule 10b-5 claims asserted against Dumas, Meier, and Flotek will be dismissed.

Plaintiffs allege violations of § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), against Dumas and Meier. Because the court has concluded that plaintiffs have failed to state a claim against any of the defendants under § 10(b) or Rule 10b-5, there can be no liability against Dumas or Meier under §20(a). Accordingly, the § 20(a) claims alleged against Dumas and Meier will be dismissed.


## IV. **Plaintiffs' Request to Amend**

Plaintiffs end their response to the defendants' motion to dismiss by requesting leave to amend "[i]n the event that the Court grants defendants' motion in whole or in part." [75]

The Fifth Circuit recognizes that leave to amend shall be freely granted when justice so requires, Goldstein, 340 F.3d at 254, and that Rule 15 evinces a bias in favor of granting leave to amend. Id. (citing Southern Constructors Group, Inc. v. Dynalectric Co., 2 F.3d 606, 611 (5th Cir. 1993)). However, the Fifth Circuit has also stated that leave to amend [*95] under Rule 15 is by no means automatic, Southern Constructors, 2 F.3d at 612, and has upheld the denial of leave to amend when the moving party attempted to present theories of recovery serially to the district court. Southern Constructors, 2 F.3d at 612. The Supreme Court has sanctioned bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment as plausible reasons for a district court to deny a party's request for leave to amend. See Foman v. Davis, 371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

Plaintiffs have filed two complaints in this action: a Class Action Complaint for Violation of the Federal Securities Laws filed on August 7, 2009 (Docket Entry No. 1), and the First Amended Class Action Complaint (FACAC) filed on February 4, 2010 (Docket Entry No. 32). The FACAC is 65-pages long. In addition to being repetitive, the FACAC is legally deficient in many respects. Yet, almost as an afterthought, plaintiffs have tacked a general curative amendment request to the end of each of their responses in opposition to the defendants' motion to dismiss. Plaintiffs [*96] are certainly aware of the defendants' objections to the FACAC as written because they appeared in the defendants' motion to dismiss. Despite this awareness, plaintiffs have not demonstrated how they would replead their claims with greater specificity if given the opportunity, have not proffered a proposed second amended class action complaint, and have not suggested in their opposition to defendants' motion to dismiss any additional facts not initially pleaded that could cure the pleading defects raised by the defendants. See Goldstein, 340 F.3d at 254-255. Under these circumstances the court is not persuaded that plaintiffs should receive yet another opportunity to amend their complaint. See McKinney v. Irving Independent School Dist., 309 F.3d 308, 315 (5th Cir. 2002), cert. denied, 537 U.S. 1194, 123 S. Ct. 1332, 154 L. Ed. 2d 1030 (2003) (no abuse of discretion in denying leave to amend where the plaintiffs failed to alert the court to the substance of any proposed amendment). Accordingly, plaintiffs' request for leave to amend will be denied.


## V. **Conclusions and Order**

For the reasons stated above, Defendants' Motion to Dismiss (Docket Entry No. 36) is **GRANTED**, and plaintiffs' request for leave to amend is **DENIED**.

**SIGNED** [*97] at Houston, Texas, this 29th day of September, 2010.

/s/ Sim Lake

---

[75] Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 30.

SIM LAKE

UNITED STATES DISTRICT JUDGE

---