United States District Court
Southern District of Texas
**ENTERED**
June 19, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN HECK, Individually and On Behalf if All Others Similarly Situated, | § § § § | |
| Lead Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-19-1337 |
| ORION GROUP HOLDINGS, INC., MARK R. STAUFFER, CHRISTOPHER J. DEALMEIDA, and ROBERT L. TABB, | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

This action is brought against Orion Group Holdings, Inc. ("Orion"), Orion's Chief Executive Officer ("CEO"), Mark R. Stauffer ("Stauffer"), Orion's former Chief Financial Officer ("CFO"), Christopher J. DeAlmeida ("DeAlmeida"), and Orion's current CFO, Robert L. Tabb ("Tabb"), for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, during a proposed class period beginning on March 13, 2018, and ending on March 26, 2019.[1] Pending before the court are Defendants' Motion to Dismiss

---

[1]Amended Class Action Complaint for Violations of the Federal Securities Laws ("ACAC"), Docket Entry No. 23, pp. 2-4 ¶¶ 1-19. Page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system.

Amended Complaint or in the Alternative, Motion for More Definite Statement ("Defendant's Motion to Dismiss") (Docket Entry No. 24), and Plaintiffs' Opposition to Defendants' Motion to Dismiss Amended Complaint or in the Alternative Motion for More Definite Statement ("Plaintiffs' Opposition" and "Plaintiff's Request to Amend") (Docket Entry No. 26), in which plaintiff argues that "the Court should deny Defendants' Motion. Alternatively, if the Court grants any portion of the Motion, Plaintiff respectfully requests leave to amend."[2]   Also before the court are Defendants' Reply to Plaintiff's Opposition to Their Motion to Dismiss ("Defendants' Reply") (Docket Entry No. 31), and Plaintiff's Sur-Reply in Response to Defendants' Reply in Support of Defendants' Motion to Dismiss Amended Complaint or in the Alternative, Motion for More Definite Statement ("Plaintiff's Sur-Reply") (Docket Entry No. 32). For the reasons stated below, the Defendants' Motion to Dismiss will be granted, and Plaintiff's Request to Amend will be denied.

## I. **Procedural History and Alleged Facts**

John Heck ("Heck") initiated this action on April 11, 2019, by filing a Class Action Complaint for Violations of the Federal Securities Laws (Docket Entry No. 1) asserting claims for violations of §10(b) and §20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. On July 15, 2019, the court signed an

---

[2]Plaintiff's Opposition, Docket Entry No. 26, p. 31.

Order (Docket Entry No. 15) granting the Motion of John Heck for Appointment as Lead Plaintiff and Approval of Counsel (Docket Entry No. 7).  Pursuant to the July 15, 2019, Order Heck was appointed Lead Plaintiff, Glancy Prongay & Murray LLP was appointed as Lead Counsel for the class, and Kendall Law Group, PLLC was appointed as Liaison Counsel for the class.  On November 4, 2019, Lead Plaintiff filed the ACAC (Docket Entry No. 23).

The ACAC alleges that Orion is a speciality construction company with two segments, marine and concrete, operating in the United States, Canada, and the Caribbean Basin, that Orion's "marine segment services include marine transportation facility construction, marine pipeline construction, and dredging of waterways, channels, and ports,"[3] and that "[the Company's concrete segment provides turnkey concrete construction services across the light commercial, structural, and other associated business areas."[4]  The ACAC alleges that Orion is "incorporated under the laws of Delaware with its principal executive offices located in Houston, Texas[, and that its] common stock trades on the New York Stock Exchange ('NYSE')."[5]  The ACAC alleges that Stauffer served as Orion's CEO "at all relevant times,"[6] DeAlmeida served as

---

[3]ACAC, Docket Entry No. 23, p. 2 ¶ 2.

[4]Id.

[5]Id. at 4 ¶ 16.

[6]Id. ¶ 17.

3

Orion's CFO from February 2014 until his resignation on November 2, 2018,[7] and that Tabb "is the CFO of the Company, having previously served as interim CFO since November 2, 2018."[8]  The ACAC alleges that

> [d]efendants Stauffer, DeAlmeida, and Tabb, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC[, *i.e.,* the Securities Exchange Commission], press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.[9]

The ACAC alleges that "[t]he Class Period begins on March 13, 2018.  On that day, the Company filed its annual report on Form 10-K for the period ended December 31, 2017 ('the 2017 10-K')."[10]  The ACAC alleges that the 2017 10-K contained statements about Orion's goodwill, allowance for doubtful accounts, debt service, internal

---

[7]Id. ¶ 18, and 2 ¶ 3.

[8]Id. at 4 ¶ 19.

[9]Id. at 4-5 ¶ 20.

[10]Id. at 5 ¶ 22.

controls over financial reporting ("ICFR"), and certifications signed pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").[11]   The ACAC alleges that

> [t]he above statements identified in ¶¶ 22-27 [of the ACAC] were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, contrary to Defendants' representations, among others, that: (1) Orion's goodwill was not impaired; (2) there existed no doubtful accounts that required the recording of an allowance; (3) the Company was in compliance with all financial covenants and expected to meet its future internal liquidity and working capital needs; (4) its estimates on construction projects and reserves on certain customer disputed accounts receivable[] were reasonable; and (5) Orion disclosed any material changes to the Company's internal control over financial reporting as well as any fraud, the accounts of former Orion employees — as well as the Company's subsequent admissions — demonstrate the false and misleading nature of Defendants' statements, and that Defendants made such statements with scienter.[12]

The ACAC alleges that two confidential witnesses, both former employees who left Orion in March 2018, have provided information supporting the allegations of falsity regarding Orion's 2017 10-K.[13] Based on information provided by the confidential witnesses, the ACAC asserts that

> [d]efendants failed to disclose to investors: (1) that the Company had overstated goodwill in certain periods; (2) that the Company had overstated accounts receivable in certain periods; (3) that the Company lacked effective internal control over financial reporting, including over

---

[11] Id. at 5-11 ¶¶ 22-27.

[12] Id. at 11 ¶ 28.

[13] Id. at 11-14 ¶¶ 29-36.

goodwill impairment testing and allowance for doubtful
accounts; (4) that, as a result, the required adjustments
would materially impact the Company's financial results;
and (5) that, as a result of the foregoing, Defendants'
positive statements about the Company's business,
operations, and prospects were materially misleading
and/or lacked a reasonable basis.[14]

The ACAC alleges that on May 3, 2018, "the Company issued a
press release announcing the Company's financial results for the
first quarter of 2018,"[15] which quoted Stauffer as stating that

[d]uring the first quarter, we had solid execution with
continued strong market drivers. . . While weather
patterns impacted production in our Concrete segment, our
Marine segment experienced solid execution. Overall, we
remain pleased with the end market drivers across our
business, and continue to expect 2018 will see
improvements over 2017.[16]

The ACAC alleges that in a Research Update dated May 3, 2018,
Stonegate Capital Markets ("Stonegate") stated that "Orion reported
good results in Q1F18,"[17] and that "[o]n May 4, 2018, the Company
filed its quarterly report on Form 10-Q with the SEC for the period
ended March 31, 2018,"[18] which in pertinent part stated

[a]t March 31, 2018, goodwill totaled $69.5 million, of
which $33.8 million relates to the marine segment and
$35.7 million relates to the concrete segment.

---

[14]Id. at 14 ¶ 37.

[15]Id. ¶ 38.

[16]Id.

[17]Id. at 15 ¶ 41.

[18]Id. at 14-15 ¶ 39.

> . . . [G]oodwill is reviewed at a reporting unit level
> for impairment annually as of October 31st or whenever
> circumstances arise that indicate a possible impairment
> might exist.  Test of impairment requires a two-step
> process to be performed to analyze whether or not
> goodwill has been impaired.  The first step of this test,
> used to identify potential impairment, compares the
> estimated fair value of a reporting unit with its
> carrying amount.  The second step, if necessary,
> quantifies the impairment.  **No indicators of goodwill
> impairment were identified during the three months ended
> March 31, 2018.**[19]

The ACAC alleges that

> the Company's Form 10-Q filed with the SEC on May 4,
> 2018[,] also contained signed certifications pursuant to
> the SOX by the Individual Defendants stating that the
> financial information contained in the Form 10-Q was
> accurate and disclosed any material changes to the
> Company's internal control over financial reporting as
> well as "[a]ny fraud, whether or not material, that
> involves management or other employees who have a
> significant role in the registrant's internal control
> over financial reporting."[20]

The ACAC alleges that the statements from Orion's May 3, 2018,
press release, Stonegate's May 3, 2018, Research Update, and
Orion's May 4, 2018, Form 10-Q,

> identified in ¶¶ 38-40 were materially false and/or
> misleading, and failed to disclose material adverse facts
> about the Company's business, operations, and prospects.
> Specifically, as stated more fully within ¶¶ 28-37, 60,
> 65-66, contrary to Defendants' representations, the
> accounts of former Orion employees — as well as the
> Company's subsequent admissions — demonstrate the false
> and misleading nature of Defendants' statements, and that
> Defendants made such statements with scienter.[21]

---

[19]Id. (emphasis in original).

[20]Id. at 15 ¶ 40.

[21]Id. at 16 ¶ 42.

7

The ACAC alleges that "[o]n August 2, 2018, Orion issued a press release announcing the Company's financial results for the second quarter of 2018,"[22] and that "Orion held a conference call to discuss the Company's results for the second quarter of 2018."[23] The ACAC alleges that both the press release and the conference call contained statements describing an amendment to Orion's credit facility.[24] The ACAC alleges that "[o]n August 3, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018,"[25] which in pertinent part stated

> [a]t June 30, 2018, goodwill totaled $69.5 million, of which $33.8 million relates to the marine segment and $35.7 million relates to the concrete segment.
>
> . . . [G]oodwill is reviewed at a reporting unit level for impairment annually as of October 31st or whenever circumstances arise that indicate a possible impairment might exist.  Test of impairment requires a two-step process to be performed to analyze whether or not goodwill has been impaired.  The first step of this test, used to identify potential impairment, compares the estimated fair value of a reporting unit with its carrying amount.  The second step, if necessary, quantifies the impairment.  **No indicators of goodwill impairment were identified during the three months ended June 30, 2018.**[26]

The ACAC alleges that

---

[22] Id. ¶ 43.

[23] Id. at 17 ¶ 44.

[24] Id. at 16-17 ¶¶ 43-44.

[25] Id. at 18 ¶ 45.

[26] Id. (emphasis in original).

the Company's Form 10-Q filed with the SEC on August 3, 2018[,] also contained signed certifications pursuant to the SOX by the Individual Defendants stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting as well as "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."[27]

The ACAC alleges that in a Research Updated dated August 3, 2018, Stonegate stated that Orion reported "**[s]olid Q2F18 results,**" "**[a]ggregate trends look positive,**" "**[m]anagement positive on segment performance,**" and "**guidance increased.**"[28]

The ACAC alleges that the statements from Orion's August 2, 2018, press release and conference call, Stonegate's August 3, 2018, Research Update, and Orion's August 3, 2018, Form 10-Q,

identified in ¶¶ 43-46 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, as stated more fully within ¶¶ 28-37, 60, 65-66, contrary to Defendants' representations, the accounts of former Orion employees — as well as the Company's subsequent admissions — demonstrate the false and misleading nature of Defendants' statements, and that Defendants made such statements with scienter.[29]

The ACAC alleges that "[t]he truth began to emerge on October 18, 2018, when the Company announced that it expected a significant revenue shortfall for third quarter 2018 due to production delays

---

[27]Id. at 18 ¶ 46.

[28]Id. at 18-19 ¶ 47 (emphasis in original).

[29]Id. at 19 ¶ 48.

and that it may perform an interim goodwill impairment test."[30]  The ACAC alleges that on October 18, 2018, Orion issued a press release and held a conference call discussing Orion's preliminary financial results for the third quarter of 2018,[31] and "[t]he same day, the Company announced that CFO DeAlmeida had resigned."[32]

The ACAC alleges that in a Research Updated dated October 18, 2018, Stonegate stated that

> [t]his morning, Orion preannounced its 3QF18 with weaker than expected results.  While management remains confident in its long-term strategy, unforeseen customer project delays, new project award delays, and negative weather impacts caused Orion to lower expectations for Q3F18.  Additionally, the Company announced its CFO, Chris DeAleimda, is leaving Orion on November 2 to pursue another opportunity.[33]

Stonegate also stated that "Orion promoted its VP of Finance, Mr. Robert Tabb, as interim CFO."[34]

The ACAC alleges that "[o]n this news, the Company's share price fell $0.68, or over 10%, to close at $6.11 per share on October 18, 2018, on unusually heavy trading volume."[35]

---

[30] Id. at 20 ¶ 49.

[31] Id. at 20-21 ¶¶ 49 (press release) and 51 (conference call).

[32] Id. at 20 ¶ 50.

[33] Id. at 22 ¶ 52.

[34] Id.

[35] Id. at 23 ¶ 53.

The ACAC alleges that "[o]n November 1, 2018, Orion issued a press release announcing the Company's financial results for the third quarter of 2018,"[36] "Orion held a conference call to discuss the Company's financial results for the third quarter of 2018,"[37] and Stonegate issued a Research Update stating, <u>inter alia</u>, that Orion's **"[b]acklog and bids look positive," "[m]anagement continues to look long-term,"** and Orion updated its guidance by dropping "its F18 EBITDA guidance to a range of 'upper 20's to low 30's'. Prior guidance was $45M to $50M, which included 1x gains. We adjusted our model to updated guidance."[38]

The ACAC alleges that "[o]n November 2, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018, in which it reported $125.1 million revenue, $6.36 million net loss, $69.48 million goodwill, and $81.18 million accounts receivable."[39] The ACAC alleges that

> as to goodwill impairment testing, the report stated, in relevant part:
>
> During the three months ended September 30, 2018, the Company identified potential indicators of impairment of goodwill for both its marine and concrete reporting units, including operating losses within each segment and adjusted forecasted earnings for the full fiscal year. As such, the Company performed a qualitative assessment

---

[36] <u>Id.</u> at 23 ¶ 54.

[37] <u>Id.</u> at 26 ¶ 55.

[38] <u>Id.</u> ¶ 56.

[39] <u>Id.</u> at 28 ¶ 57.

11

and certain sensitivity analysis to determine whether it
was more likely than not that goodwill was impaired.
**After evaluating all events, circumstances and factors
which could affect the significant inputs used to
determine fair value, the Company determined it was not
more likely than not that an impairment existed at either
reporting unit.** The Company did not progress to
subsequent steps of impairment testing and plans to
perform its annual impairment testing as of October 31.[40]

The ACAC alleges that Orion's

Form 10-Q filed with the SEC on November 2, 2018 also
contained signed certifications pursuant to the SOX by
the Individual Defendants stating that the financial
information contained in the Form 10-Q was accurate and
disclosed any material changes to the Company's internal
control over financial reporting.[41]

The ACAC alleges that the statements from Orion's October 18,
2018, press release and conference call, November 1, 2018, press
release and conference call, and November 2, 2018, Form 10-Q,

identified in ¶¶ 49, 51, 54-55, and 57-58 were materially
false and/or misleading, and failed to disclose material
adverse facts about the Company's business, operations,
and prospects. Specifically, as stated more fully within
¶¶ 28-37, 60, 65-66, contrary to Defendants'
representations, the accounts of former Orion employees
— as well as the Company's subsequent admissions —
demonstrate the false and misleading nature of
Defendants' statements, and that Defendants made such
statements with scienter.[42]

The ACAC alleges that "[o]n March 18, 2019, the Company
revealed that it would be unable to timely file its annual report
due to 'extended evaluations of goodwill impairment testing and

---

[40]Id. (emphasis in original).

[41]Id. at 28 ¶ 58.

[42]Id. at 19 ¶ 48.

12

income tax adjustments, among other things,' and that it expected

to report a net loss."[43]   The ACAC alleges that

> [i]n a Form 12b-25 Notification of Late Filing filed with
> the SEC, the Company stated, in relevant part:
>
> . . .
>
> The Company expects that a significant change in results
> of operations from the corresponding period for the last
> fiscal year will be reflected in its financial
> statements.  The Company expects to report an operating
> loss and net loss for the year ended December 31, 2018.
> These expected results are significantly lower than the
> operating income and net income reported in the prior
> fiscal year, primarily due to: (1) the impairment of
> goodwill during the year ended December 31, 2018, as a
> result of a decline in market capitalization,
> (2) unfavorable changes in our estimates on construction
> projects in both the marine and concrete segments, and
> (3) taking a reserve on certain customer disputed
> accounts receivable[].[44]

The ACAC alleges that "[o]n this news, the Company's share

price fell $0.52, or over 12%, to close at $3.72 per share on March

18, 2019, on unusually heavy trading volume."[45]

The ACAC alleges that

> [o]n March 26, 2019, the Company reported $94.4 million
> net loss for the fourth quarter 2018 due to certain non-
> cash charges, including a $69.5 million goodwill
> impairment charge.  In a press release announcing the
> fourth quarter and full year 2018 financial results, the
> Company stated in relevant part:

---

[43]Id. at 28 ¶ 60.

[44]Id.

[45]Id. at 29 ¶ 61.

**Fourth Quarter Highlights**

- Contract revenues were $99.2 million for the fourth quarter of 2018 compared to $162.2 million for the fourth quarter of 2017.  Revenues were impacted by continued negative weather patterns in Texas, as well as adjustments of estimates on certain projects.

- Operating loss was $104.8 million compared to operating income of $10.8 million for the fourth quarter of 2017.

- Net loss was $94.4 million ($3.32 diluted loss per share) for the fourth quarter of 2018 compared to net income of $9.5 million ($0.34 diluted earnings per share) for the fourth quarter of 2017.

- The fourth quarter 2018 operating loss and net loss included non-cash charges totaling $96.5 million ($2.65 per diluted share) related to the impairment of goodwill ($69.5 million), customer-driven cost overruns on certain projects ($22.8 million), and reserve on disputed accounts receivable ($4.3 million). . . .

. . .

"We remain focused on the operational transformation underway throughout our Company, which we believe will become increasingly evident as 2019 progresses," stated Mark Stauffer, Orion Group Holding's President and Chief Executive Officer.  "Our reported results for the fourth quarter were impacted by shifts in the timing of the commencement of several Marine projects, as well as weather-related delays for our concrete operations as a result of heavy rains and disruptive weather patterns throughout our key Texas markets.  **These were issues that began in the third quarter of 2018 and, unfortunately, they persisted through the final months of the year, which we indicated were a risk when we reported our third quarter results in November.  Additionally, our fourth quarter results included non-cash charges for the impairment of goodwill, as well as a write-down of revenues as a result of losses in our Marine segment resulting from cost overruns on certain projects created by customer schedules, customer delays, and other customer impacts to production.**  We are seeking recovery through change orders for these cost overruns, however we cannot assure recovery at this time.

14

* * *

- Contract revenues were $99.2 million, a decrease of 38.8%, as compared to $162.2 million. The decrease is primarily attributable to a **$22.8 million charge related to customer-driven cost overruns** on certain projects in the Marine segment, coupled with the impact of continued rainy weather patterns in Texas in the Concrete segment.

- Gross (loss) profit was $(20.9) million, as compared to $27.8 million. Gross (loss) profit margin was (21.0)%, as compared to 17.1%. The decrease reflects the aforementioned decline in contract revenues, along with a $22.8 million charge related to customer-driven cost overruns on certain projects in the Marine segment and a $4.3 million non-cash charge for reserves on **disputed** accounts receivables.

. . .

- Operating loss was $104.8 million as compare to operating income of $10.8 million. The operating loss in the fourth quarter of 2018 reflects the aforementioned contract adjustments of $22.8 million, the goodwill impairment charge of $69.5 million, and the $4.3 million non-cash charge for reserves on disputed accounts receivables.[46]

The ACAC alleges that "[o]n this news, the Company's share price fell $0.22, or nearly 7%, to close at $2.97 per share on March 26, 2019, on unusually heavy trading volume."[47]

The ACAC alleges that on March 26, 2019, Stonegate issued a Research Update stating, <u>inter alia,</u> that Orion's **"Q4F18 results miss expectations,"** and **"[m]anagement continues to look long-term.**"[48]

---

[46]<u>Id.</u> at 29-31 ¶ 62 (emphasis in original).

[47]<u>Id.</u> at 31 ¶ 63.

[48]<u>Id.</u> at 31-32 ¶ 64.

The ACAC alleges that

> [o]n March 27, 2019, the Company filed its Form 10-K for the fiscal year ended December 31, 2018 ("2018 10-K"). Within the 2018 10-K, the Company stated the following:
>
> During the year-ended December 31, 2018, we recognized unfavorable changes in our estimates on two construction projects in our Marine Segment.  These changes were caused by prolonged weather delays, unforeseen access and other **client-imposed restrictions** that impacted our productivity.  The result of these changes in estimates is reflected as a **decrease in revenue** of $22.8 million in the consolidated statement of operations for the year-ended December 31, 2018[,] and included in billings in excess of costs and estimated earnings on uncompleted contracts.[49]

The ACAC also alleges that

> [t]he Company's 2018 10-K also stated the following:
>
> Contract revenue is derived from the original contract price as modified by agreed-upon change orders and estimates of variable consideration related to incentive fees and **change orders or claims for which price has not yet been agreed by the customer.**  The Company estimates variable consideration based on the most likely amount to which it expects to be entitled.  **Variable consideration is included in the estimated transaction price to the extent it is probable** that a significant reversal of cumulative recognized revenue will not occur.  As of December 31, 2018, approximately $1.1 million of claims against customers has been recognized and is reflected on the Company's Consolidated Balance Sheet under "Costs and estimated earnings in excess of billings on uncompleted contracts."  The Company believes collection of these claims is probable, although the full amount of the recorded claims  may not be collected.[50]

---

[49]Id. at 32 ¶ 65.

[50]Id. at 32-33 ¶ 66.

## II. **Defendants' Motion to Dismiss**

Defendants argue that the ACAC should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because Lead Plaintiff has failed to satisfy the pleading requirements for stating either a primary claim under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, or a secondary claim for control person liability under § 20(a) of the Exchange Act.[51]  Defendants argue that Lead Plaintiff has failed to allege facts capable of establishing (1) that they made an actionable misrepresentation either by making a false statement or by failing to state a fact needed to prevent a statement from being misleading; (2) that they made any actionable misrepresentation with scienter; or (3) that any actionable misrepresentation caused the loss for which the plaintiff class seeks relief.[52]  Defendants argue that plaintiffs' control-person claims under § 20(a) asserted against the Individual Defendants, Stauffer, DeAlmeida, and Tabb, fail because plaintiffs have failed to state a primary claim for securities fraud under §10(b) or Rule 10b-5.[53]

---

[51]Defendants' Motion to Dismiss, Docket Entry No. 24.  See also Defendants' Reply, Docket Entry No. 31, p. 6.

[52]Id. at 12-21 ("The [ACAC]'s Allegations do not Support Scienter"), 21-22 ("The [ACAC] Does Not Specify How the Statements are False"), and 25-26 ("The [ACAC] Does Not Plead Loss Causation").  See also Defendants' Reply, Docket Entry No. 31.

[53]Defendants' Motion to Dismiss, Docket Entry No. 24, p. 31 n. 8 ("Because the Amended Complaint fails to allege a primary (continued...)

## A.   Standards of Review

### 1.   Federal Rule of Civil Procedure 12(b)(6)

Defendants' motion to dismiss is governed by Federal Rule of Civil Procedure 12(b)(6).  A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim."  Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001), cert. denied sub nom. Cloud v. United States, 122 S. Ct. 2665 (2002).  The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor.  Id.  To defeat defendants' motion to dismiss Lead Plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 127 S. Ct. at 1965).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  Id.

---

[53](...continued)
violation of Section 10(b), the claim for control-person liability under Section 20(a) necessarily fails.").

When considering a motion to dismiss courts generally are limited to the complaint and its proper attachments. <u>Dorsey v. Portfolio Equities, Inc.</u>, 540 F.3d 333, 338 (5th Cir. 2008). Courts may, however, also "rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" <u>Id.</u> (quoting <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499, 2509 (2007)).  In securities cases courts may take judicial notice of the contents of public disclosure documents that are required by law to be filed with the SEC and are actually filed with the SEC, with the caveat that these documents may be considered only for the purpose of determining the statements they contain; not for proving the truth of their contents. <u>Lovelace v. Software Spectrum Inc.</u>, 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996)(citing and adopting holding and rationale stated in <u>Kramer v. Time Warner, Inc.</u>, 937 F.2d 767, 774 (2d Cir. 1991)).


  2. <u>Federal Securities Law</u>

Section 10(b) of the Exchange Act makes it unlawful

> [t]o use or employ, in connection with the purchase or
> sale of any security . . . any manipulative or deceptive
> device or contrivance in contravention of such rules and
> regulations as the [SEC] may prescribe as necessary or
> appropriate in the public interest or for the protection
> of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 makes it

unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To recover damages for violations of § 10(b) and Rule 10b-5, plaintiffs must prove

(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014) (quoting Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 133 S. Ct. 1184, 1192 (2013) (quoting Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317-18 (2011)). A fact is material if the reasonable investor would have found the fact significant in making the decision to invest. Southland Securities Corp. v. INSpire Insurance Solutions, Inc., 365 F.3d 353, 362 (5th Cir. 2004). Such claims are subject to pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Lormand v. US Unwired, Inc., 565 F.3d 228, 239 (5th Cir. 2009).

20

(a)   Federal Rule of Civil Procedure 9(b)

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed.R.Civ.P. 9(b). Pleading fraud with particularity in this circuit requires "the particulars of 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068 (5th Cir. 1994) (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992)).  See also Carroll v. Fort James Corp., 470 F.3d 1171, 1174 (5th Cir. 2006) (quoting United States ex rel. Riley v. St. Luke's Episcopal Hospital, 355 F.3d 370, 381 (5th Cir. 2004) ("In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.")).  "A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim." Southland, 365 F.3d at 361 (citing Shushany v. Allwaste, Inc., 992 F.2d 517, 520 (5th Cir. 1993)).

(b)   Private Securities Litigation Reform Act

In 1995 Congress amended the Exchange Act by passing the PSLRA, 15 U.S.C. § 78u-4(b)(1), which, in relevant part, states:

(1)   Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A)   made an untrue statement of a material fact; or

(B)   omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2)   Required state of mind

(A) In general

Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

.  .  .

(3)   Motion to dismiss; stay or discovery

(A)   Dismissal for failure to meet pleading requirements

In any private action arising under this chapter, the court shall, on the motion of any defendant,

22

> dismiss the complaint if the requirements of
> paragraphs (1) and (2) are not met.

15 U.S.C. § 78u-4(b).

In <u>ABC Arbitrage Plaintiffs Group v. Tchuruk</u>, 291 F.3d 336,

350 (5th Cir. 2002), the Fifth Circuit combined the Rule 9(b) and

the PSLRA pleading requirements into one succinct directive:

> [A] plaintiff pleading a false or misleading statement or
> omission as the basis for a section 10(b) and Rule 10b-5
> securities fraud claim must, to avoid dismissal pursuant
> to Rule 9(b) and [the PSLRA]:
>
> (1)   specify each statement alleged to have been
>       misleading, <u>i.e.,</u> contended to be fraudulent;
>
> (2)   identify the speaker;
>
> (3)   state when and where the statement was made;
>
> (4)   plead with particularity the contents of the false
>       representations;
>
> (5)   plead with particularity what the person making the
>       misrepresentation obtained thereby; and
>
> (6)   explain the reason or reasons why the statement is
>       misleading, <u>i.e.,</u> why the statement is fraudulent.
>
> This is the "who, what, when, where, and how" required
> under Rule 9(b) in our securities fraud jurisprudence and
> under the PSLRA.  Additionally, under [the PSLRA], for
> allegations made on information and belief, the plaintiff
> must:
>
> (7)   state with particularity all facts on which that
>       belief is formed, <u>i.e.,</u> set forth a factual basis
>       for such belief.

In <u>Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw</u>

<u>Group, Inc.,</u> 537 F.3d 527, 533 (5th Cir. 2008), the Fifth Circuit

held that the PSLRA "enhanced the particularity requirements for

23

pleading private claims of securities fraud by requiring plaintiffs
(1) to "specify each statement alleged to have been misleading,
[and] the reason or reasons why the statement is misleading. . .;"
and (2) to "state with particularity facts giving rise to a strong
inference that the defendant acted with the required state of
mind." Quoting Tellabs, 127 S. Ct. at 2509-10, the Fifth Circuit
acknowledged that "a court must take into account plausible
inferences opposing as well as supporting a strong inference of
scienter," and that "[t]he inference of scienter must ultimately be
'cogent and compelling,' not merely 'reasonable' or 'permissible.'"
Indiana Electrical, 537 F.3d at 533. In Lormand, 565 F.3d at 257-
58, however, the Fifth Circuit held that the PSLRA did not heighten
the pleading requirements for loss causation, which remain subject
to Federal Rule of Civil Procedure 8(a)(2)'s plausibility standard.

The PSLRA contains a safe harbor provision that protects
defendants from liability for certain forward-looking statements
that later prove false. To qualify for this protection, the
statement at issue must be "accompanied by meaningful cautionary
statements identifying important factors that could cause actual
results to differ materially from those in the forward-looking
statement" or be "immaterial." 15 U.S.C. § 78u-5(c)(1)(A)(i, ii).
"To avoid the safe harbor, plaintiffs must plead facts
demonstrating that the statement was made with actual knowledge of
its falsity." Southland, 365 F.3d at 371.

24

**B.   Analysis**

    1.   <u>Claims for Violation of § 10(b) and Rule 10b-5</u>

        (a)   Lead Plaintiff Fails to Allege an Actionable Misrepresentation

Defendants argue that the ACAC should be dismissed because Lead Plaintiff has failed to plead an actionable misrepresentation. Asserting that "Plaintiff's litany of quotations, with no explanation of their significance, does not tell the Court how all these statements were false when made,"[54] defendants argue that "[t]he [ACAC] fails to provide any particulars to demonstrate **why** Orion's treatment of receivables, doubtful accounts, construction project estimates, goodwill and ICFR were fraudulent."[55] Defendants argue that "Courts in this Circuit and elsewhere repeatedly reject these sorts of allegations as violating the PSLRA."[56]

---

[54]<u>Id.</u> at 21.

[55]<u>Id.</u> at 22.

[56]<u>Id.</u> at 21. Defendants also argue that the PSLRA's Safe Harbor Provisions, 15 U.S.C. § 78u-5, apply to statements quoted in the ACAC because "[t]he statements in the [ACAC] were forward-looking and accompanied by general statements of caution and by specific cautionary disclosures." <u>Id.</u> at 31. Since, however, defendants do not identify any specific statement as forward-looking, and the court concludes that the statements that the ACAC alleges were false or misleading when made are all statements of current or historical fact, the court is not persuaded that the PSLRA's Safe Harbor Provisions apply to any of the misrepresentations alleged in this case. <u>See</u> Plaintiff's Opposition, Docket Entry No. 26, p. 19 (arguing that the PSLRA's Safe Harbor provision does not apply to defendants' statements of current or historical fact); and <u>Spitzberg v. Houston American Energy Corp.,</u> 758 F.3d 676, 691 (5th Cir. 2014) ("[W]e join the First Circuit, Third Circuit, and
(continued...)

Asserting that the ACAC adequately alleges that defendants made false and misleading statements regarding Orion's goodwill, doubtful accounts, estimates on construction projects, customer disputed accounts receivable, and ICFR, and that the Individual Defendants all signed false SOX certifications, Lead Plaintiff responds that the falsity of the defendants' public statements is demonstrated by defendants' admissions, and by the accounts of two anonymous sources, both former Orion employees.[57]

### (1) Defendants' Admissions

As admissions capable of establishing that defendants' public statements about Orion's goodwill, doubtful accounts, construction project estimates, disputed customer accounts receivable, ICFR, and SOX certifications were false and misleading, Lead Plaintiff cites Orion's October 18, 2018, press release and conference call, Orion's Form 10-Q filed on November 2, 2018, disclosures made in Orion's Form 12b-25 Notification of Late Filing filed with the SEC on March 18, 2019, and Orion's March 26, 2019, press release.[58]

---

[56](...continued) Seventh Circuit in concluding that a 'mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'") (citations omitted).

[57]Plaintiff's Opposition, Docket Entry No. 26, pp. 13-16.

[58]Id. at 13-14 (citing ACAC, Docket Entry No. 23, ¶¶ 49-51 (October 18, 2018, press release and conference call); ¶ 57 (continued...)

Asserting that "Defendants' admissions demonstrate that their statements were false and misleading,"[59] Lead Plaintiff argues that

> [o]n October 18, 2018, the Company announced that it expected a significant revenue shortfall for third quarter 2018 due to production delays and that it may perform an interim goodwill impairment test. ¶¶ 49-51. Additionally, on November 2, 2018, the Company reported $125.1 million revenue, $6.36 million net loss, $69.48 million goodwill, and $81.18 million accounts receivable. ¶ 57. With respect to goodwill impairment testing, the report stated, in relevant part: [a]fter evaluating all events, circumstances and factors which could affect the significant inputs used to determine fair value, the Company determined it was not more likely than not that an impairment existed at either reporting unit. Id. On March 18, 2019, moreover, the Company revealed that it would be unable to timely file its annual report due to "extended evaluations of goodwill impairment testing and income tax adjustments, among other things" and that it expected to report a net loss. ¶ 60. On March 26, 2019, the Company reported $94.4 million net loss for the fourth quarter 2018 due to certain non-cash charges, including a $69.5 million goodwill impairment charge. ¶ 62.[60]

The public statements that Lead Plaintiff refers to as defendants' admissions are announcements of bad news that the ACAC acknowledges Orion attributed to unexpected events that began during the third quarter and continued through the fourth quarter of 2018.[61]   Neither Orion's announcement on October 18, 2018, that

---

[58](...continued)
(November 2, 2018, Form 10-Q); ¶ 60 (March 18, 2019, Form 12b-25 Notification of Late Filing filed with the SEC); and ¶ 62 (March 26, 2019, press release).

[59]Id. at 13.

[60]Id. at 13-14 (citing ACAC, Docket Entry No. 23, ¶¶ 49-51, 57, 60, and 62).

[61]ACAC, Docket Entry No. 23, p. 30 ¶ 62 (quoting March 26,
(continued...)

it was experiencing production delays caused by unexpected events
that would likely cause revenue shortfalls that could impair the
company's goodwill, nor Orion's report in March of 2019 of revenue
shortfalls, a goodwill write down, and a reserve for doubtful
accounts demonstrate that the Orion's previously reported financial
results, i.e., the financial results for 2017 and the first two
quarters of 2018 reported in March, May, and August of 2018 were
false or misleading when made.  While the Fifth Circuit has
recognized that "evidence of later events can provide useful
circumstantial evidence that a given representation was false when
made," Masel v. Villarreal, 924 F.3d 734, 750 (5th Cir. 2019), Lead
Plaintiff has not cited and the court has not found any authority
that has accepted reports of poor financial results attributed to
unexpected events that postdate the alleged misrepresentations as
evidence that earlier reports of good financial results were false

---

[61](...continued)
2019, press release announcing the fourth quarter and full year
2018 financial results stating that the financial results for the
third and fourth quarter of 2018 were impacted by "shifts in the
timing and commencement of several Marine projects, as well as
weather-related delays for our concrete operations as a result of
heavy rains and disruptive weather patterns throughout our key
Texas markets," that "[t]hese were issues that began in the third
quarter of 2018 and, unfortunately, they persisted through the
final months of the year, which we indicated were a risk when we
reported our third quarter results in November," and that "our
fourth quarter results included non-cash charges for the impairment
of goodwill, as well as a write-down of revenues as a result of
losses in our Marine segment resulting from cost overruns on
certain projects created by customer schedules, customer delays,
and other customer impacts to production").

when made.  See Rosenzweig v. Azurix Corp., 332 F.3d 854, 867-68
(5th Cir. 2003) (characterizing report dated after alleged
misrepresentations as a "plainly a hindsight assessment").

The allegations of false and misleading statements in the ACAC
differ from many — if not most — securities fraud cases, which are
commonly precipitated by a company's announcement of bad news that
previously reported financial results need to be restated due to
accounting mistakes or the discovery and correction of material
errors or misdeeds.  See Central Laborers' Pension Fund v.
Integrated Electrical Services Inc., 497 F.3d 546, 549 (5th Cir.
2007) (after expressing confidence in the company's financial
status following which the company's stock price increased, the
company disclosed that it could not timely release its quarterly
earnings numbers due to an ongoing evaluation of certain projects,
the company subsequently acknowledged that material weaknesses in
its internal controls might require restatement of prior financial
figures, and the company ultimately restated its financial results
for two fiscal years and the first two quarters of a third fiscal
year).  Although the ACAC alleges that Orion overstated assets by
tens of millions of dollars during the Class Period, the ACAC does
not allege that Orion ever acknowledged any wrongdoing, restated
its financial results, reported accounting irregularities, suffered
a liquidity crisis, or received a qualified audit opinion on its
financial reports or any aspect of its business about which the
ACAC alleges the defendants made false and misleading statements.

The ACAC does not contain any allegations of fact capable of establishing that the events to which Orion attributed the bad financial results reported for the third and fourth quarters of 2018, did not occur when Orion said they occurred, were not unexpected, or did not cause the bad financial results reported for the third and fourth quarters of 2018.  Nor does the ACAC allege any events or facts that the Individual Defendants knew but concealed from the public.  Lead Plaintiff's argument that the defendants' admissions demonstrate that the alleged statements were false when made is analogous to allegations of fraud by hindsight where a plaintiff alleges the fact that a company reports negative results means that the company's prior reports of good results must have been false.  The Fifth Circuit has made clear that allegations of negative results alone are generally not sufficient to satisfy the requirements for pleading securities fraud, and that a plaintiff must allege facts capable of raising a plausible inference that earlier statements were false when made.  In Masel, 924 F.3d at 750, the Fifth Circuit explained that such an inference could be raised when "the representation in question concerned an asset or skill possessed by the defendant . . ., [and] the defendant's failure to perform as promised cast doubt on whether the defendant possessed that skill in the first place."

The ACAC's allegations that Orion's reported results for 2017 or for the first two quarters of 2018 were false when made fail to

meet the pleading requirements of the PSLRA and Rule 9(b) because the allegations fail to explain why or in what particulars the statements made about Orion's financial results, or Orion's treatment of receivables, doubtful accounts, construction project estimates, goodwill, ICFR, or SOX certifications were inaccurate. See Southland, 365 F.3d at 370 (holding that plaintiffs failed to satisfy the requirements for pleading securities fraud because they "fail[ed] to explain how or in what particulars the reported earnings and revenues figures were inaccurate").

### (2)   Confidential Witness Accounts

Lead Plaintiff also argues that accounts from two confidential sources "demonstrate the false and misleading nature of Defendants' representations."[62]   Lead Plaintiff argues that a Confidential Witness ("CW1"), who served as a Regional Controller at Orion from April 2017 to March 2018, and reported directly to Vice President ("VP") of Accounting Kristy Norris, stated that Orion was engaged in improper revenue recognition to enable the Company to meet its debt covenants.[63]   Lead Plaintiff argues that according to CW1, Norris and

> Orion were booking revenue accruals and cost accruals for all regions without supporting documentation. . . . CW1 stated that Norris did not understand the requirements

---

[62]Plaintiff's Opposition, Docket Entry No. 26, p. 14.

[63]Id. at 14 (citing ACAC, Docket Entry No. 23, ¶ 30).

31

governing revenue recognition, and that Norris and Orion
were recognizing revenue on projects outside of what was
authorized on the Company's contracts. . . . CW1 stated
that an accrual spreadsheet and month-end workbook were
falsified to support false journal entries to the general
ledger. . . . As a result, according to CW1, Orion was
improperly recognizing revenue on work that had not yet
been completed.  Additionally, CW1 stated that Norris
told CW1 that Norris could recognize any revenue she
needed in order to "make the numbers work."

Additionally, CW1 stated that VP of Accounting
Norris had set up a spreadsheet that contained contracts,
amounts associated with the contracts, and the
adjustments made regarding the contracts. . . .
According to CW1, Assistant Controller Ashley Claypole
used the spreadsheet to make general ledger entries, and
the adjustments were made to book accruals to increase
the Company's Earnings Before Interest Taxes Depreciation
and Amortization ("EBITDA"). . . . CW1 stated that
Orion's motivation in making these improper adjustments
was to be able to show a falsified profit and loss
statement to enable Orion to meet its debt covenants. .
. . CW1 stated that CFO DeAlmeida was involved in the
falsification of the Company's accrual spreadsheet and
the month-end workbook. . . . CW1 also stated that the
Company falsified the Company's records so that
executives could receive their bonuses. . .

CW1 stated further that when CW1 became aware of the
fraud around January 2018, CW1 called an internal
whistleblower hotline. . . . CW1 stated that CW1 spoke
directly with CFO DeAlmeida and told him that the conduct
that CW1 witnessed was improper.  Id.  CW1 also stated that
CW1 reported the improper conduct to Jason Rash, who
served as an external auditor at KPMG. . .

CW1 also stated that CW1 participated in a meeting
with CFO DeAlmeida and Director of Human Resources ("HR")
Jenifer Lake ("Lake") in December 2017 involving a
dredging project in the Company's Gulf Coast Region known
as the Eastwest Jones Project. . . . CW1 stated that at
the time, CFO DeAlmeida and Orion were attempting to make
a $1 million "adjustment" to recognize revenue despite
the fact that CW1 never received the necessary paperwork
to support the claim that the project had been completed.
. . . According to CW1, at the time the project was only
about 40% completed.  Id.  CW1 said that Orion made the

32

adjustments to book accruals to increase the Company's EBITDA. . . . CW1 stated further that dredging projects were low-margin, and that the Company was having a difficult time coming up with enough costs to justify the revenue recognition.[64]

Lead Plaintiff argues that a Confidential Witness ("CW2"), who served as Orion's Division Controller for the Company's Marine Group from October 2017 to March 2018, "also reported that the Company was engaged in fraud with respect to revenue recognition."[65] Lead Plaintiff argues that

> CW2 stated that in October 2017 — during the preparation of information for the fourth quarter of 2017 — CW2 found that the revenue that Orion had been reporting was significantly more than the Company had actually received. . . . CW2 also observed that the Company's improper revenue recognition had been occurring period after period. . . . CW2 stated further that Orion's Regional Controllers were not making their numbers and, as a result, Orion's executives — including VP of Accounting Norris — were engaged in manipulating the Company's revenue results. . . . CW2 stated further that CW2 discussed the overstatements with Erin Fazio, who served as Orion's Financial Planning and Analysis Manager, and Anthony Randazzo, who served as the Company's Senior Internal audit Manager. . . .
>
> CW2 also stated that CW2 reported the fraud regarding Orion's revenue recognition to Norris, Randazzo, and Brian Hayden ("Hayden"), who served as the Company's VP of Internal Audit. . . . CW2 stated that Hayden began a formal investigation that was conducted by the external auditors at KPMG. . . . CW2 stated that Director of HR Lake and Human Resources Manager Iris Elden were heavily involved in the investigation. . . . Because these accounts illustrate the falsity of Defendants' representations, Plaintiff has adequately alleged falsity.[66]

---

[64]Id. at 14-15 (citing ACAC, Docket Entry No. 23, ¶¶ 31-32).

[65]Id. at 16 (citing ACAC, Docket Entry No. 23, ¶ 35).

[66]Id. at 15-16 (citing ACAC, Docket Entry No. 23, ¶ 35).

Lead Plaintiff argues that the CW1 and CW2 accounts alleged in the ACAC demonstrate that the "[d]efendants were falsifying the Company's accrual spreadsheet and month-end workbook, improperly recognizing revenue on projects beyond what was authorized on the Company's contracts, and reporting significantly more revenue than the Company had actually received."[67]

The court concludes the alleged accounts of CW1 and CW2 fail to meet the pleading requirements of the PSLRA and Rule 9(b) because, like the allegations of "defendants' admissions," they fail to explain why or in what particulars (1) defendants improperly recognized revenue beyond what was authorized on the Company's contracts, reported significantly more revenue than the Company actually received, and falsified financial results for 2017 and 2018, or (2) made public statements about Orion's goodwill, doubtful accounts, estimates on construction projects, customer disputed accounts receivable, and ICFR, or filed SOX certifications that were false or misleading.

The confidential witnesses' accounts of false revenue recognition are incapable of establishing that any of Orion's reported results for 2017 and 2018, or public statements about its goodwill, doubtful accounts, estimates on construction projects, customer disputed accounts receivable, or ICFR and SOX certifications were false or misleading when made because neither

---

[67]Id. at 11.

34

CW1 nor CW2 is alleged to have provided any particulars about the amount of revenue that was falsely recognized, how such amount was determined, why such amount was false, or how such amount was reflected in any of Orion's financial reports. The ACAC's allegation that Orion booked revenue without supporting documentation, and that Orion reported "significantly" more revenue than the Company actually received,[68] are too vague to satisfy the requirements for pleading securities fraud with particularity. Absent allegations as to the amount of revenue falsely booked and reported, why that amount was false, or how that amount was calculated in general, or in relation to Orion's overall revenue, there is no basis for determining whether the ACAC's allegations that the alleged misrepresentations about revenue are material. See Shushany, 992 F.2d at 522 (affirming the dismissal of a securities fraud complaint in part because it did not allege how the improper accounting adjustments were material in light of the defendants' overall financial position). See also Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 257-58 (5th Cir. 2005) (holding that plaintiffs successfully pleaded material misstatement by stating with particularity how and why defendant's revenue recognition or reporting practices violated the company's contracts and Generally Accepted Accounting Principles).

---

[68]Id. (citing ACAC, Docket Entry No. 23, ¶¶ 28-37).

Nor does the ACAC allege any facts tying CW1's or CW2's accounts of false revenue recognition to Orion's public statements about goodwill, doubtful accounts, construction project estimates, disputed customer accounts receivable, and ICFR, or to the SOX certifications signed by the Individual Defendants.  The ACAC also fails to plead particulars about the timing of the false revenue recognition.  The ACAC alleges that the false revenue recognition occurred during CW1's and CW2's employment with Orion which began in 2017 and ended in March of 2018, the same time that the Class Period begins.  But absent a tie between the amounts of falsely recognized revenue and Orion's allegedly false and misleading financial reports or statements about goodwill, doubtful accounts, construction project estimates, disputed customer accounts receivable, ICFR, or SOX certifications, the ACAC allegations fail to meet the pleading requirements of either the PSLRA or Rule 9(b).

### (3)  Conclusions

The ACAC is subject to dismissal for failure to allege an actionable misrepresentation because neither the allegations of defendants' admissions nor the allegations of information provided by confidential witnesses contain facts capable of establishing that any of Orion's financial reports for 2017 or 2018, Orion's alleged public statements about its goodwill, doubtful accounts, construction project estimates, disputed customer accounts receivable, ICFR, or Orion's SOX certifications were false or misleading when made.

36

### (b)   Lead Plaintiff Fails to Plead Scienter

Defendants argue that they are entitled to dismissal of the § 10(b) and Rule 10b-5 claims asserted against them because

> [Lead] Plaintiff fails to allege facts adequate to support an inference, let alone a strong inference, that the Individual Defendants had the requisite scienter to state a claim for fraud under Section 10(b) with respect to any of the alleged misrepresentations made during the purported class period.[69]

Asserting that the ACAC adequately alleges scienter,[70] Lead Plaintiff responds that the ACAC's allegations regarding the defendants' admissions, SOX certifications, and desire to comply with Orion's debt covenants, together with the accounts of the two confidential witnesses and the announcement of CFO DeAlmeida's resignation on the same day as the truth began to emerge, all support a strong inference of scienter.[71]  For the reasons stated in § II.B.1(a), above, the court has already concluded that this action is subject to dismissal because the ACAC fails to allege an actionable misrepresentation.  The ACAC's failure to allege an actionable misrepresentation precludes Lead Plaintiff from raising a strong inference of scienter with respect to any of the alleged misrepresentations.  In the alternative, assuming that the alleged misrepresentations are actionable, the court has analyzed Lead

---

[69]Defendants' Motion to Dismiss, Docket Entry No. 24, p. 12.

[70]Plaintiff's Opposition, Docket Entry No. 26, p. 22.

[71]Id. at 22-27.

Plaintiff's allegations of scienter and concludes that this action is also subject to dismissal because Lead Plaintiff has failed to allege facts supporting a strong inference that any of the alleged misrepresentations were made with scienter.

### (1)  Additional Law

The PSLRA, 15 U.S.C. § 78u-4(b)(2), requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." "The required state of mind [for scienter] is an intent to deceive, manipulate, or defraud or severe recklessness." Lormand, 565 F.3d at 251 (quoting Indiana Electrical, 537 F.3d at 533). "Severe recklessness" is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Indiana Electrical, 537 F.3d at 533 (citation omitted).   In Tellabs, 127 S. Ct. at 2510, the Supreme Court held that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."   See also Lormand, 565 F.3d at 251 ("[I]n determining whether the pleaded facts give rise to a 'strong' inference of

38

scienter, the court must take into account plausible opposing inferences."). The critical issue in a motion to dismiss for failure to allege scienter "is whether <u>all</u> of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." <u>Tellabs,</u> 127 S. Ct. at 2509. <u>See also</u> <u>Barrie,</u> 397 F.3d at 259 (acknowledging that courts "consider all the facts and circumstances alleged to determine whether they, <u>in toto,</u> raise a requisite strong inference of scienter").

Lead Plaintiff "must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendant." <u>R2 Investments LDC v. Phillips,</u> 401 F.3d 638, 643 (5th Cir. 2005) <u>See Southland,</u> 365 F.3d at 365 ("[T]he PSLRA requires the plaintiffs to distinguish among those they sue and enlighten <u>each</u> <u>defendant</u> as to his or her particular part in the alleged fraud."). Group allegations that "the defendants" or "the company" knew something do not meet that standard. <u>Indiana Electrical,</u> 537 F.3d at 533 ("[T]his court has rejected the group pleading approach to scienter and instead looks to the state of mind of the individual corporate official or officials 'who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'")(quoting <u>Southland,</u> 365 F.3d at 366)).

39

### (2)   Analysis

#### (i)   Defendants' Admissions, SOX certifications, and Alleged Motivation Do Not Support a Strong Inference of Scienter

##### (A)   Defendants' Admissions

Asserting that "[d]efendants' admissions constitute powerful evidence of [d]efendants' scienter,"[72] Lead Plaintiff argues that disclosures made in Orion's October 18, 2018, press release and conference call, Form 10-Q filed on November 2, 2018, Form 12b-25 Notification of Late Filing filed with the SEC on March 18, 2019, and March 26, 2019, press release,[73] are admissions that

> directly contradict Defendants' representations during the Class Period that "we determined that the estimated fair value of each reporting unit exceeded its respective carrying values as of October 31, 2017, goodwill was not impaired, and no events have occurred since that date that would require an interim impairment test" (¶ 22 [referencing Orion's 2017, Form 10-K]), "no indicators of goodwill impairment were identified" (¶¶ 39, 45 [referencing the Form 10-Q that Orion filed on May 4, 2018, and August 3, 2018, respectively]), and "[a]s of December 31, 2017 and 2016, the Company had not recorded an allowance for doubtful accounts." ¶ 23 [referencing Orion's 2017, Form 10-K]. Thus, "the admissions by the individual defendants, as alleged in the complaint, directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions, i.e., they are evidence that the defendants actually knew earlier that the course of action would turn out badly." Lormand, 565 F.3d at 254.[74]

---

[72]Id. at 23.

[73]Id. (citing ACAC, Docket Entry No. 23, ¶¶ 49-51 (October 18, 2018, press release and conference call); ¶ 57 (November 2, 2018, Form 10-Q); ¶ 60 (March 18, 2019, Form 12b-25 Notification of Late Filing filed with the SEC); and ¶ 62 (March 26, 2019, press release).

[74]Id. at 23-24.

The disclosures that Lead Plaintiff characterizes as admissions do not raise an inference of scienter because they are not admissions that any of the alleged misrepresentations were false or misleading when made but, instead, are reports of bad news attributed to the occurrence of unexpected events that postdate the alleged misrepresentations. Lead Plaintiff's argument that the disclosures made in October and November of 2018, and March of 2019 constitute evidence that statements made in March, May, and August of 2018 were made with scienter is a classic fraud-by-hindsight pleading that is not sufficient to raise a strong inference of scienter. See Southland, 365 F.3d at 383 ("because fraud cannot be proved by hindsight, subsequent [events] are unpersuasive of scienter, as they do not show what any particular individual knew, or was severely reckless in not knowing, at the time [the alleged misrepresentations were made]"); Lormand, 565 F.3d at 254 (describing "the classic fraud by hindsight case" as the "case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly") (citation omitted)).

As stated in § II.B.1(a)(1), above, although the ACAC alleges that Orion overstated assets by tens of millions of dollars during the Class Period, the ACAC does not allege that Orion ever restated its financial results, reported any accounting irregularities, suffered a liquidity crisis, or received a qualified audit opinion

on its financial reports or any aspect of its business about which the ACAC alleges the defendants made false and misleading statements. Nor does the ACAC allege that Orion or any of the Individual Defendants ever acknowledged any wrongdoing, or that the events to which Orion attributed the poor financial results reported for the third and fourth quarters of 2018, did not occur when they were said to have occurred, were not unexpected, or did not cause Orion to suffer the poor financial results reported for the third and fourth quarters of 2018. Nor does the ACAC allege any events or facts that the Individual Defendants knew but concealed from the public.

The court therefore concludes that the disclosures that Lead Plaintiff characterizes as admissions do not raise any inference — much less a strong inference — that when the statements alleged to have been false and misleading were made in March, May, and August of 2018, any defendant knew or was severely reckless in not knowing that the estimated fair value of Orion's reporting units did not exceed their carrying value, that Orion's goodwill was impaired, that indicators of goodwill impairment had been identified, that an event had occurred that required an interim impairment test, that Orion should have recorded an allowance for doubtful accounts, or that the company's course of action would turn out badly.

42

(B)   Defendants' SOX Certifications

Asserting that "[d]efendants' SOX certifications . . . add to the strong inference of scienter,"[75] Lead Plaintiff argues that

> [d]efendants were severely reckless in signing the SOX certifications because, among other things, [d]efendants were falsifying the Company's accrual spreadsheet and month-end workbook, improperly recognizing revenue on projects beyond what was authorized on the Company's contracts, and reporting significantly more revenue than the Company actually received.[76]

Lead Plaintiff argues that the SOX certifications signed by Stauffer and DeAlmeida for Orion's 2017 Form 10-K filed on March 26, 2018, Orion's Form 10-Q filed on May 4, 2018, and Orion's Form 10-Q filed on August 3, 2018, not only contained false statements but also support a strong inference of scienter.[77]

The signing of a SOX certification that is required by law does not, by itself, establish a strong inference of fraudulent intent. See Central Laborers' Pension Fund, 497 F.3d at 555 ("If we were to accept [this] proffered interpretation of Sarbanes—Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA."). In Central

---

[75]Id. at 26.

[76]Id. (citing ACAC, Docket Entry No. 23, ¶¶ 28-37).

[77]The ACAC does not allege and Lead Plaintiff does not argue that any SOX certification signed by Tabb contained any false or misleading statements or support a strong inference of scienter.

43

Laborers' Pension Fund the Fifth Circuit held that SOX
certifications, i.e., signatures on SEC filings, could support an
inference of scienter when the "person signing the certification
had reason to know, or should have suspected, due to the presence
of glaring accounting irregularities or other 'red flags,' that the
financial statements contained material misstatements or
omissions." Id. (citation omitted).[78]   For the SOX certifications
that Lead Plaintiff alleges defendants Stauffer and DeAlmeida
signed to support a strong inference of scienter, Lead Plaintiff
must also allege facts capable of

> establishing that the officer who signed the
> certification had a "reason to know, or should have
> suspected, due to the presence of glaring accounting
> irregularities or other 'red flags,' that the financial
> statements contained material misstatements or
> omissions."

Indiana Electrical, 537 F.3d at 545 (quoting Garfield v. NDC Health
Corp., 466 F.3d 1255, 1266 (11th Cir. 2006)).   But missing from the
ACAC are any allegations of fact capable of establishing that

---

[78]In Central Laborers' Pension Fund, 497 F.3d at 554, the Fifth
Circuit explained that,

> [t]he Sarbanes-Oxley Act states that signing officers
> must certify that they are "responsible for establishing
> and maintaining internal controls [and] have designed
> such internal controls to insure that material
> information relating to the [company] and its
> consolidated subsidiaries is made known to such officers
> by others within those entities, particularly during the
> period in which the period reports are being prepared."
> 15 U.S.C. § 7241(a)4).

Stauffer or DeAlmeida knew or were severely reckless in not knowing that any statement in the SOX certifications was false or misleading.

Lead Plaintiff cites information provided by CW1 and CW2 in support of his argument that the SOX certifications support a strong inference of scienter.  But the ACAC does not allege that either CW1 or CW2 provided any information to or about Stauffer, and does not allege any facts capable of establishing that Stauffer knew or was severely reckless in not knowing that statements in the SOX certifications he signed were false or misleading.

While the ACAC does contain allegations that "CW1 stated that CFO DeAlmeida was involved in the falsification of the Company's accrual spreadsheet and the month-end workbook,"[79] that "CW1 stated that CW1 spoke directly with CFO DeAlmeida and told him that the conduct that CW1 witnessed was improper,"[80] and that

> CW1 participated in a meeting with CFO DeAlmeida . . . in December 2017 . . . [and that] CFO DeAlmeida and Orion were attempting to make a $1 million "adjustment" to recognize revenue despite the fact that CW1 never received the necessary paperwork to support the claim that the project had been completed,[81]

these allegations do not support a strong inference that DeAlmeida knew or was severely reckless in not knowing that statements in the

---

[79]ACAC, Docket Entry No. 23, p. 12 ¶ 31.

[80]Id. ¶ 32.

[81]Id. at 13 ¶ 33.

45

SOX certifications he signed were false or misleading.  Missing from the ACAC are any allegations of fact capable of establishing that CW1 told DeAlmeida or that DeAlmeida knew or was severely reckless in not knowing that Orion's accrual spreadsheet and month-end workbook were being falsified, that Orion was improperly recognizing revenue on projects beyond what was authorized on its contracts, or that Orion was reporting significantly more revenue than the Company actually received.

Instead, the ACAC alleges that the person responsible for falsifying the accrual spreadsheet and month-end workbook, for improperly recognizing revenue, and for reporting more revenue than the Company actually received was not DeAlmeida but, instead, Vice President of Accounting Kristy Norris to whom CW1 reported directly.[82]  The ACAC alleges that CW1 stated that "Norris and Orion were booking revenue accruals and cost accruals for all regions without supporting documentation,"[83] and that "Norris had set up a spreadsheet that contained contracts, amounts associated with the contracts, and the adjustments made regarding the contracts."[84] Although the ACAC alleges that "CW1 stated that CW1 spoke directly with CFO DeAlmeida and told him that the conduct that CW1 witnessed

---

[82]Id. at 12 ¶ 29.

[83]Id. ¶ 30.

[84]Id. ¶ 31.

was improper,"[85] the ACAC does not state any facts capable of establishing what CW1 told DeAlmeida or why whatever CW1 told DeAlmeida is capable of establishing that DeAlmeida knew or was severely reckless in not knowing that any statements in the SOX certifications he signed were false or misleading.

Citing In re ArthroCare Corp. Securities Litigation, 726 F.Supp.2d 696, 724 (W.D. Tex. 2010), and In re OCA, Inc. Securities Litigation, No. 05-2165, 2006 WL 3747560, at *22 (E.D. La. December 14, 2006), Lead Plaintiff argues that "[d]efendants fail to address [his] authorities that demonstrate that such allegations support an inference of scienter."[86]   But the allegations in the ACAC are substantially different from those at issue in the cases that Lead Plaintiff cites in support of his argument that the ACAC's scienter allegations are sufficient to withstand Defendants' Motion to Dismiss.  For example, in ArthroCare, 726 F. Supp. 2d at 715-16, an individual defendant confronted with media reports that detailed "blatant evidence" of the specific accounting fraud at issue nonetheless "continued to defend [the defendant company's accounting] stridently and deny the allegations."  The ArthroCare plaintiffs alleged accounting errors in eight quarterly SEC filings for which the defendant signed SOX certifications, but the court

---

[85]Id. ¶ 32.

[86]Plaintiff's Sur-Reply, Docket Entry No. 32, p. 16.  See also Plaintiff's Opposition, Docket Entry No. 26, p. 26.

held that only the two quarterly filings immediately following the detailed media reports could support a strong inference of scienter. Id. at 724.

In re OCA the court held that the defendants' signatures on SEC filings supported a strong inference of scienter because the plaintiffs alleged not only false statements in the defendants' SOX certifications but also allegations capable of establishing that defendants knew their SOX certifications contained false statements because (1) defendant OCA had, after terminating one independent auditor under questionable circumstances, concealed information from its subsequent auditor and prevented it from conducting an investigation into alterations of accounting records; (2) OCA's new independent auditor had publicly stated OCA had failed to act following the discovery of potentially illegal acts and subsequently resigned; and (3) three confidential witnesses provided direct allegations of insider knowledge of the alleged misstatements. In re OCA, 2006 WL 3747560, at *6-*8, *22. The court concluded that

> OCA's history of dealing with its auditors contributes to the inference that defendants knew that their statements in the certifications that they had disclosed "[a]ll significant deficiencies and material weaknesses" in the company's internal controls to its auditors were false or misleading when made.

Id. The ACAC in this case lacks allegations comparable to those in In re ArthroCare and In re OCA that the courts found sufficient to support a strong inference of scienter.

48

(C)   Defendants' Motivations

Nor has Lead Plaintiff alleged facts capable of raising a strong inference of scienter with respect to the defendants' alleged motivations for making the alleged misrepresentations. Citing <u>Ramirez v. Exxon Mobil Corp.,</u> 334 F.Supp.3d 832, 853 (N.D. Tex. 2018), and <u>Indiana Electrical,</u> 537 F.3d at 544, Lead Plaintiff argues that "[d]efendants' desire to insure compliance with the Company's debt covenants adds to the strong inference of scienter alleged."[87]   In support of this argument Lead Plaintiff cites the ACAC's allegations that

> CW1 stated that Orion's motivation in making . . . improper adjustments was to be able to show a falsified profit and loss statement to enable Orion to meet its debt covenants. . . . CW1 also stated that the Company falsified the Company's records so that executives could receive their bonuses.[88]

Lead Plaintiff offers no facts in support of the contention that DeAlmeida signed the SOX certifications at issue with scienter other than the fact that he was allegedly motivated to enable Orion to meet its debt covenants and to enable executives to receive bonuses.   But the law in this circuit has long been well established that scienter in a particular case may not be based solely on motives universal to all corporate executives such as the desire to maintain a high stock price.   <u>See Indiana Electrical,</u> 537

---

[87]Plaintiff's Opposition, Docket Entry No. 26, p. 27.

[88]ACAC, Docket Entry No. 23, p. 12 ¶ 31.

49

F.3d at 544.  In <u>Indiana Electrical</u> the Fifth Circuit did, however, recognize an exception to this rule when a company is in need of completing a "crucial" transaction or particularly motivated to maintain or improve its credit rating.   <u>Id.</u>   In <u>Ramirez</u> the plaintiff alleged that at the time of a debt offering, the defendant company "was in dire financial need of an infusion of capital and that the Debt Offering was the 'largest single debt offering in [the company's] history.'"   334 F.Supp.3d at 853. Citing the exception recognized in <u>Indiana Electrical,</u> and observing that the plaintiff alleged facts capable of establishing that the defendant company lacked sufficient cash flow to pay the shareholders' dividends, and that both paying dividends and maintaining a AAA credit rating was extremely important to the company, the <u>Ramirez</u> court held that the plaintiff had alleged facts supporting a strong inference of scienter as to all of the defendants.  <u>Id.</u>

The ACAC filed in this case contains no allegations of fact comparable to those alleged in <u>Ramirez.</u>  The ACAC does not allege facts capable of establishing either that Orion had a crucial need for funds or that Orion was particularly motivated to maintain or to improve its credit rating.  Accordingly, the court concludes that Lead Plaintiff's argument that defendants' desire to comply with Orion's debt covenants do not support a strong inference of scienter as to any defendant.

>           (ii) Confidential Witness Accounts Do Not Support a
>                Strong Inference of Scienter

Lead Plaintiff argues that "[t]he accounts of the CWs alleged
in the [ACAC] add to the strong inference of scienter alleged."[89]
But for the same reasons that the court has already rejected Lead
Plaintiff's contention that information allegedly received from CW1
and CW2 fails to support a strong inference of scienter with
respect to either the SOX certifications alleged to be false or
misleading stated in § II.B.1(b)(2)(i)(B), above, or the
defendants' motivations for making false and misleading statements
stated in § II.B.1(b)(2)(i)(C), above, the court concludes that the
confidential witnesses accounts do not support a strong inference
of scienter with respect to any of the statements alleged to be
false or misleading.  Fatal to Lead Plaintiff's arguments regarding
the confidential witness accounts is that the ACAC does not allege
with specificity that either CW1 or CW2 presented information to
any Individual Defendant capable of establishing that any of the
statements alleged to be false or misleading was, in fact,
inaccurate.  See In re Citigroup Inc. Securities Litigation, 753
F.Supp.2d 206, 245 (S.D.N.Y. 2010).  See also id. n. 6 (rejecting
as "unavailing" plaintiffs' allegations that one defendant attended
meetings at which the performance of certain loans was discussed
but plaintiffs failed to tie those discussions to their theory of
scienter, i.e., impairment of defendant's mortgage portfolio).

---

[89]Plaintiff's Opposition, Docket Entry No. 26, p. 24.

> (iii)   DeAlmeida's Resignation Does Not Support a
> Strong Inference of Scienter

Asserting that "CFO DeAlmeida resigned **on the same day** as Orion's announcement of a significant revenue shortfall,"[90] Lead Plaintiff argues that "this fact adds to the strong inference of scienter alleged."[91]   Citing <u>Hall v. Rent-A-Center, Inc.</u>, No. 4:16CV978, 2017 WL 6398742, * 34 (E.D. Tex. October 19, 2017), Lead Plaintiff argues that "[c]ourts have held that coupled with other allegations, suspiciously-timed resignations can add to a strong inference of scienter."[92]   But as urged by the defendants, "'[t]he resignation of officials is, in and of itself, unavailing as proof of the commission of fraud' absent 'specific evidence' indicating that the resigning officials knew of the alleged misconduct."   <u>Id.</u> at *33 (quoting <u>Schott v. Noblis Health Corp.</u>, 211 F.Supp.3d 936, 956 (S.D. Tex. 2016)).   <u>See also In re ArthroCare</u>, 726 F.Supp.2d at 724-25 ("Multiple Fifth Circuit decisions suggest resignations have little implication on the scienter analysis.").   Because the ACAC lacks specific allegations of fact that DeAlmeida knew of alleged misconduct, his resignation does not support a strong inference that any alleged misrepresentation was made with scienter.

---

[90]Plaintiff's Opposition, Docket Entry No. 26, p. 25.

[91]<u>Id.</u>

[92]<u>Id.</u>

### (3)   Conclusions

The PSLRA requires Lead Plaintiff to allege facts sufficient to raise a strong inference of scienter with respect to each defendant. R2 Investments, 401 F.3d at 643; Southland, 365 F.3d at 365; Indiana Electrical, 537 F.3d at 533. A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S. Ct. at 2510. Lead Plaintiff argues that the ACAC's allegations regarding defendants' admissions, SOX certifications, and desire to comply with Orion's debt covenants, together with the accounts of the two confidential witnesses and the announcement of CFO DeAlmeida's resignation on the same day as the truth began to emerge, all support a strong inference of scienter.[93]  The court concludes that taken together, all of the facts alleged in the ACAC fail to support a strong inference of scienter because Lead Plaintiff has failed to allege any facts regarding defendants' admissions, SOX certifications, desire to comply with Orion's debt covenants, confidential witness statements, or DeAlmeida's resignation that are capable of establishing that any of the alleged misrepresentations were made with scienter. Moreover, Lead Plaintiff has failed either to allege or to argue that an inference of scienter is cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

---

[93]Id. at 22-27.

53

(c)   Lead Plaintiff Fails to Plead Loss Causation

Defendants argue that they are entitled to dismissal of the § 10(b) and Rule 10b-5 claims asserted against them because plaintiffs have failed to allege facts capable of establishing loss causation.[94]   Asserting that he "has adequately alleged loss causation,"[95] Lead Plaintiff argues that defendants' alleged

> representations regarding Orion's goodwill, doubtful accounts, compliance with financial covenants, expectations to meet Orion's future internal liquidity and working capital needs, estimates on construction projects and reserves on certain customer disputed accounts receiveables, and the Company's internal control over financial reporting all related to the Company's [corrective] disclosures between October 2018 and March 2019.[96]

### (1)   Additional Law

The PSLRA, 15 U.S.C. § 78u-4(b)(4), requires plaintiffs to bear "the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."   In Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1631 (2005), the Supreme Court held that the PSLRA requires plaintiffs to plead "loss causation, i.e., a causal connection between the material misrepresentation and the loss."   See also Amgen, 133 S. Ct. at 1192, (confirming

---

[94]Defendants' Motion to Dismiss, Docket Entry No. 24, pp. 25-26.   See also Defendants' Reply, Docket Entry No. 31, pp. 19-20.

[95]Plaintiff's Opposition, Docket Entry No. 26, p. 28.

[96]Id. at 29 (citing ACAC, ¶¶ 49-66; 76-84).

that loss causation continues to be an element of a private securities fraud action under § 10(b)).  To plead loss causation Lead Plaintiff

> must allege that when the "relevant truth" about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm.

Public Employees' Retirement System of Mississippi, Puerto Rico Teachers Retirement System v. Amedisys, Inc., 769 F.3d 313, 320 (5th Cir. 2014), cert. denied, 135 S. Ct. 2892 (2015) (citing Lormand, 565 F.3d at 255).

> Loss causation in fraud-on-the-market cases can be demonstrated circumstantially by "(1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure — as opposed to other possible depressive factors — that caused at least a 'substantial' amount of price drop".

Id. at 320-21 (quoting FindWhat Investor Group v. FindWhat.com, 658 F.3d 1282, 1311-12 (11th Cir. 2011), cert. denied, 133 S. Ct. 109 (2012)(emphasis added)).  While the corrective disclosure need not be "complete" and "need not precisely mirror [an] earlier misrepresentation," the corrective disclosure "must reflect part of the 'relevant truth' — the truth obscured by the fraudulent statements." Alaska Electrical Pension Fund v. Flowserve Corp., 572 F.3d 221, 230 (5th Cir. 2009) (per curiam). "Plaintiffs are

required to allege the truth that emerged was 'related to' or
'relevant to' the defendants' fraud and earlier misstatements."
<u>Amedisys,</u> 769 F.3d at 321.  "The test for relevant truth simply
means that the truth disclosed must make the existence of the
actionable fraud more probable than it would be without that
alleged fact, taken as true." <u>Id.</u> (citing <u>Lormand,</u> 565 F.3d at 256
n. 20).  <u>See also Spitzberg,</u> 758 F.3d at 688 (confirming that "the
applicable standard in this circuit under <u>Lormand,</u> 565 F.3d at 256
n. 20, is that a corrective disclosure must 'make the existence of
the actionable fraud more probable than it would be without that
alleged fact (taken as true).'").

> A corrective disclosure can come from any source and "can
> be gradually perceived in the marketplace through a
> series of partial disclosures." . . . When a complaint
> alleges a series of partial disclosures, the court may
> analyze each in isolation but should also "consider them
> collectively in determining whether a corrective
> disclosure has occurred."

<u>Schott,</u> 211 F.Supp.3d at 950-51 (quoting <u>Amedisys,</u> 769 F.3d at
322).  <u>See also Lormand,</u> 565 F.3d at 261 ("[L]oss causation may be
pleaded on the theory that the truth gradually emerged through a
series of partial disclosures and that the entire series of partial
disclosures caused the stock price deflation.").

### (2)  **Analysis**

Lead Plaintiff alleges that in March, May, August, and October
of 2018, defendants made false and misleading statements that
Orion's goodwill was not impaired, there existed no doubtful

accounts that required recording an allowance, the Company was in
compliance with all financial covenants and expected to meet its
future liquidity and working capital needs, its estimates on
construction projects and reserves on disputed accounts receivable
were reasonable, and disclosed any material changes to the
Company's internal control over financial reporting, and that those
statements later proved to be false as shown by corrective
disclosures made in October of 2018 and March of 2019.[97]   Lead
Plaintiff also alleges that in October of 2018, following Orion's
announcement of DeAlmeida's resignation and expectation of a third
quarter revenue shortfall, Orion's announcement on March 18, 2019,
that its Form 10-K would not be filed on time, and the report on
Orion's Form 10-K filed on March 27, 2019, that the company
suffered losses in 2018, Orion's stock price fell.[98]

                (i)   Disclosures Made in October of 2018

     Regarding the disclosures made in October of 2018, Lead
Plaintiff argues that the ACAC

>     alleges that on October 18, 2018, the Company announced
>     that it expected a significant revenue shortfall for
>     third quarter 2018 due to production delays.  ¶¶ 49-53,
>     78-79.   On the same day, Orion also announced the
>     resignation of CFO DeAlmeida.  Id.  On this news, the

---

[97]Id. (citing ACAC, Docket Entry No 23, p. 11 ¶ 28 (March
2018); p. 16 ¶ 42 (May 2018); p. 19 ¶ 48 (August 2018); p. 28 ¶ 59
(October 2018).

[98]Id. at 28-29 (citing ACAC, Docket Entry No. 23, ¶¶ 49-53, 60-
63, 78-79, 80-83).

> Company's share price fell $0.68, or over 10%, to close
> at $6.11 per share on October 18, 2018, on unusually
> heavy trading volume.[99]

But missing from the ACAC are allegations that the alleged
misrepresentations caused inflation of the price of Orion's common
stock.  Simply alleging that plaintiffs purchased Orion's common
stock at inflated prices and that the stock price fell after
negative news of the Company's finances and operations came out is
not sufficient to plead loss causation.  Lormand, 565 F.3d at 256
(citing Dura Pharmaceuticals, 125 S. Ct. at 1633-34).  Lead
Plaintiff must also make a plausible showing of loss causation,
i.e., that when "the 'relevant truth' about the fraud began to leak
out or otherwise make its way into the marketplace it caused the
price of the stock to depreciate and thereby proximately cause the
plaintiff's economic loss."  Id. at 255.  Lead Plaintiff must
allege that the stock price declined in response to a "corrective
disclosure," i.e., "the truth obscured by the fraudulent
statements."  Alaska Electrical Pension Fund, 572 F.3d at 230.
Lead Plaintiff fails to connect the October 18, 2018, announcement
of DeAlmeida's resignation and disclosure that revenue shortfalls
were expected for the third quarter of 2018 to any of the alleged
misrepresentations made in March, May, or August of 2018, i.e.,
that Orion's goodwill was not impaired, there existed no doubtful
accounts that required recording an allowance, the Company was in

---

[99]Id. at 28 (citing ACAC, Docket Entry No. 23, ¶¶ 49-53, 78-
79).

compliance with all financial covenants and expected to meet its future liquidity and working capital needs, its estimates on construction projects and reserves on certain customer disputed accounts receivables were reasonable, and that Orion had disclosed any material changes to the Company's internal control over financial reporting as well as any fraud.  Accordingly, the court concludes that the ACAC fails to allege loss causation with respect to disclosures Orion made in October 2018.

### (ii) Disclosures Made in March of 2019

Regarding the disclosures made in March of 2019, Lead Plaintiff argues that the ACAC alleges that

> on March 18, 2019, Orion revealed that the Company would be unable to timely file its annual report due to "extended evaluations of goodwill impairment testing and income tax adjustments, among other things."  ¶¶ 60-61, 80-81.  The Company also announced that it "expects that a significant change in results of operations from the corresponding period for the last fiscal year will be reflected in its financial statements.  <u>Id.</u>  On this news, the Company's share price fell $0.52, or over 12%, to close at $3.72 per share on March 18, 2019 . . .[100]

Lead Plaintiff also argues that the ACAC alleges that

> on March 26, 2019, the Company reported $94.4 million net loss for the fourth quarter 2018 due to certain non-cash charges, including a $69.5 million goodwill impairment charge.  ¶¶ 62-63, 82-83.  On this news, the Company's share price fell $0.22, or nearly 7% to close at $2.97 per share on March 26, 2019. . .[101]

---

[100]<u>Id.</u> (citing ACAC, Docket Entry No. 23, ¶¶ 60-61, 80-81).

[101]<u>Id.</u> at 28-29 (citing ACAC, Docket Entry No. 23, ¶¶ 62-63,
(continued...)

The only possible connection between the disclosures that Lead Plaintiff alleges defendants made in March of 2019 and the misrepresentations made in March, May, August or October of 2018 concern statements that Orion's goodwill was not impaired. But while Orion reported goodwill impairment in March of 2019, Lead Plaintiff does not allege any facts capable of establishing that report corrected misrepresentations made earlier, i.e., in 2018. Instead, the ACAC alleges that in March of 2019 Orion reported goodwill impairment and attributed that impairment to unexpected events that occurred in the third and fourth quarters of 2018. As stated in § II.B.1(a), above, the ACAC does not allege facts capable of establishing that the events to which defendants attributed the goodwill impairment did not occur when Orion said they occurred, were not unexpected, or did not cause the goodwill impairment reported in March of 2019.  Nor does the ACAC allege facts capable of establishing that defendants knew but failed to disclose earlier that Orion's goodwill was impaired.  The March 2019 disclosures do not qualify as corrective, and Lead Plaintiff has therefore failed to allege loss causation.  See Markman v. Whole Foods Market, Inc., No. 1:15-CV-681-LY, 2016 WL 10567194, *12 (W.D. Tex. Aug. 19, 2016) ("[I]n the absence of a false representation, there can be no revelation of falsity to the market.") (citation omitted).

---

[101](...continued)
82-83).

2.   Claims for Violation of § 20(a) Control Person Liability

Lead Plaintiff alleges that the individual defendants, Stauffer, DeAlmeida, and Tabb are liable as "control persons" of Orion under § 20(a) of the Exchange Act.[102]   Section 20(a) imposes joint and several liability for securities fraud on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a).   "Control person liability is secondary only and cannot exist in the absence of a primary violation." Southland, 365 F.3d at 383.   Defendants' argue that the control person claims asserted in the ACAC are subject to dismissal because the primary claims under § 10(b) are subject to dismissal.   Because the court has concluded that the primary claims asserted in the ACAC are subject to dismissal for failure to allege an actionable misrepresentation, failure to plead facts supporting a strong inference of scienter, and failure to plead loss causation, the § 20(b) claim that plaintiffs have asserted against the Individual Defendants, Stauffer, DeAlmeida, and Tabb are also subject to dismissal.   Id. at 383-84.   See also Alaska Electricians Pension Fund, 915 F.3d at 986 ("Because Plaintiffs have not established a primary violation, their Section 20(a) claims fail.").

---

[102]ACAC, Docket Entry No. 34, pp. 40-42 ¶¶ 134-41.

### III. **Lead Plaintiff's Request to Amend**

At the end of Plaintiff's Opposition to Defendants' Motion to Dismiss, Lead Plaintiff asserts that "[i]f the Court grants any portion of the Motion, Plaintiff respectfully requests leave to amend."[103]   Federal Rule of Civil Procedure 15(a)(2) states that "[t]he court should freely give leave [to amend] when justice so requires."   "Although Rule 15[a] 'evinces a bias in favor of granting leave to amend,' it is not automatic."   Matter of Southmark Corp., 88 F.3d 311, 314 (5th Cir. 1996), cert denied, 117 S. Ct. 686 (1997) (quoting Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594, 597 (5th Cir. 1981)).   "A decision to grant leave is within the discretion of the trial court."   Id. (citing State of Louisiana v. Litton Mortgage Co., 50 F.3d 1298, 1302-1303 (5th Cir. 1995) (per curiam)).   In exercising its discretion, a court may consider various criteria including, inter alia, the failure to cure deficiencies by amendments previously allowed and futility of the proposed amendment.   Id. at 314-15 (citing Foman v. Davis, 83 S. Ct. 227, 230 (1962)).   Because Lead Plaintiff has already filed an amended complaint, and has argued strenuously that his amended complaint states claims for which relief may be granted, and because Lead Plaintiff has failed either to submit a proposed second amended complaint or described any additional facts that could be alleged in a second amended complaint that could not have

_____

[103]Plaintiff's Opposition, Docket Entry No. 26, p. 31.

been alleged in the ACAC, the court is persuaded that Lead Plaintiff has pleaded his best case, and that any additional attempt to amend would be futile. Accordingly, Lead Plaintiff's request for leave to amend will be denied. See Rosenzweig, 332 F.3d at 865 (affirming district court's denial of plaintiff's motion to file a second amended complaint).

## IV. Conclusions and Order

For the reasons stated in § II, above, the court concludes that Lead Plaintiff has failed to state claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Accordingly, Defendants' Motion to Dismiss Amended Complaint, Docket Entry No. 24, is **GRANTED**.

For the reasons stated in § III, above, the court concludes that Lead Plaintiff should not be allowed an additional opportunity to amend. Accordingly, Lead Plaintiff's Request to Amend stated at the end of Plaintiff's Opposition to Defendants' Motion to Dismiss, Docket Entry No. 26, is **DENIED**.

**SIGNED** at Houston, Texas, on this 19th day of June, 2020.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE